# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
:
UNITED STATES OF AMERICA                       :
:
:
v.                                     :
:       No.: 15-CR-765 (PAC)
EFRAIN ANTONIO CAMPO FLORES,                   :
FRANQUI FRANCISCO FLORES DE FREITAS,:
:
Defendants.                    :
:
:
------------------------------------------------------------------ x

## DECLARATION OF EFRAIN ANTONIO CAMPO FLORES IN SUPPORT OF MOTION TO SUPPRESS POST-ARREST STATEMENTS

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. On the morning of November 10, 2015, I traveled from Caracas, Venezuela to Port-au-Prince, Haiti by airplane. I flew on the plane with, among others, my cousin Franqui Francisco Flores de Freitas. When I arrived in Haiti that morning, I travelled to a nearby hotel for a meeting.

2. While at the meeting, numerous armed men stormed into the room. The men were dressed in military uniforms and wore masks. They did not, however, have any insignias on their uniforms. They did not say who they were or what they were doing there. The men forcibly seized myself and my cousin and handcuffed both of us. As they did this, the men did not tell us why we were being seized, where we were being taken, or what they were going to do with us. At this point, I was struck with extreme fear. I believed that these men were kidnapping us and possibly planning to kill us. Given my familial relationship with senior members of the Venezuelan government, I believed that we were potential targets for an extortionate scheme or other violent attempt at retribution against my family and country.

3. Outside the hotel, my cousin and I were put in separate vehicles. We were transported by the men who seized us to what appeared to be a nearby house. We were not told why we were being taken to the house and I did not observe any written signs indicating where we were or the function served by the house. On the way from the hotel to the house, I was placed in the back of a vehicle. One of the men who seized us who was sitting next to me had the butt of his rifle on the

1

    floor and the barrel pointed at my head. I repeatedly asked the man to move the barrel away from me because I felt threatened by it. He refused to do so. My hands were cuffed in front and I used them to push the barrel away from me. The man then grabbed my throat and threatened me. Once inside the house, I was taken away from my cousin and told to remain quiet. I was still handcuffed. The men continued to not identify who they were and I was held for what seemed to be a number of hours in the house. During the time in the house, my fears that we were being kidnapped and were perhaps going to be killed grew.

4. Thereafter, the men who had seized us took me and my cousin to what appeared to be a police station. At the police station, my picture was taken by someone using a camera phone. The police also demanded that I sign a form. I refused to sign it because I did not know what it was for. I was then made to provide fingerprints. However, none of the police officers would tell me what was happening or why we had been seized. I asked the officers a number of questions, but they would not respond to me and instead remained silent. I was not permitted to make a phone call. While I was in the police station, a man in civilian clothes walked up to me and said, in English, "today is a bad day for you." He then started to laugh. I had no idea who the man was when he approached me at the police station, but I later learned that he was a DEA agent. I found all of this to be highly unusual and it further convinced me that this was likely a kidnapping.

5. We were then driven to the airport where there was a plane waiting. In front of the plane six additional men were present and wearing civilian clothes. These six individuals did not indicate who they were and I did not observe any markings indicating where they were from. The men who transported us to the airport did not tell us what was happening and they did not tell us who these six men were. This again added to my fear and disorientation. Someone then stated that we were being taken back to Venezuela. This caused me to further fear that I was being kidnapped.

6. We were then turned over to the six men who were at the airport. The handcuffs we had been restrained with were removed and we were placed in a new set of handcuffs. At this point, our waists were also restrained and our legs put in shackles. We were placed on the plane and the six men also boarded the aircraft.

7. The plane took off. My cousin and I remained shackled and handcuffed and no one was telling us where we were going or what would be done with us. My fear and confusion over what was happening grew and I began to tremble and shake. After we were in the air for what seemed to be a significant period of time, one of the men approached us and told us that they were agents from the DEA and that we had been charged with conspiring against the United States. The man, who I later learned was Special Agent Gonzalez, spoke to us in Spanish. He further told

us that we were facing ten years to life in prison and that we would likely die in prison if we did not cooperate.

8. Special Agent Gonzalez then asked me whether I would speak with them. I was petrified and in fact believed I might die in a United States prison if I did not talk to the agents. I was then taken away from my cousin and moved into a different part of the plane.

9. I was questioned by Special Agent Gonzalez for what seemed to me to be a substantial period of time. At this point, I was not advised of any of the rights set forth in the Miranda waiver that was later given to me. During this examination, I was questioned about, and gave answers to, a number of topics. Among other things, I was asked about various meetings I attended and statements that I made in connection with what the agents described as the conspiracy that I was charged with. I was asked about the roles of various individuals in that conspiracy. I was shown various photographs and asked to identify individuals who appeared in them. I was also asked about specific other individuals who the agents claimed were involved in narcotics trafficking in Venezuela. The agents also questioned me about my family and their involvement in Venezuelan politics. I was also asked various questions about my cousin's involvement in the events leading up to our arrest. After this questioning, I was told that I should cooperate with the agents.

10. In addition, prior to being advised of any Miranda warning, I was also told that if I did not cooperate I would not see my family for many years and that my infant children would not get to know me. The agents made a joke that my children did not need me around anyway. At this point I began to shake and cry out of fear. I did not understand what was happening to me, why I was being taken to the United States, nor how I had done anything wrong against the United States.

11. The agents then presented me with the Miranda form and I signed it. After I signed it, I spoke with them for what seemed again to be a substantial amount of time. During that time period, we discussed many of the same topics that we spoke about prior to me signing the form. I was handcuffed and shackled this entire time.
12. When the plane landed, we were in New York. I had never been to New York before in my life.

DATED: June 30, 2016

_____
Efrain Antonio Campo Flores, Defendant

Sworn and subscribed before me this day June 30, 2016

*[signature]*
JOSEPH M. CAIAZZO
Notary Public, State of New York
NO. 01CA6194440
Qualified in Kings County
Commission Expires September 29, 20_16_

_____
Nancy Adler, Interpreter

4