UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES, and
FRANQUI FRANCISCO FLORES DE FREITAS,

Defendants.

S2 15 Cr. 765 (PAC)

## THE GOVERNMENT'S OPPOSITION TO THE
## DEFENDANTS' PRETRIAL MOTIONS

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Brendan F. Quigley
Michael D. Lockard
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 3

  I. The October 4, 2015 Meeting in Honduras ..................................................... 3

  II. The October 2015 Meetings in Venezuela ..................................................... 5

  III. The November 2015 Meetings in Honduras .................................................. 8

  IV. The Arrests of the Defendants in Haiti ....................................................... 10

  V. The Defendants' Confessions ....................................................................... 11

ARGUMENT ............................................................................................................ 14

  I. The Defendants' Confessions Were Voluntary and Should Not Be Suppressed ................. 14

    A. Relevant Facts ........................................................................................ 14

      1. The Defendants' Detentions by the *BLTS* and Expulsions from Haiti ........................ 14

      2. The Defendants' Written *Miranda* Waivers and Confessions ..................................... 15

      3. The Defendants' Arrival in the Southern District of New York and Presentments ...... 16

    B. Applicable Law ...................................................................................... 17

      1. Admissibility of Confessions ................................................................ 17

      2. "Two-Step" Interrogation .................................................................... 19

      3. Timing of Presentments ...................................................................... 19

    C. Discussion ............................................................................................ 20

      1. The Defendants' Confessions Complied with *Miranda* and Were Otherwise Voluntary ........................................................................ 21

      2. There Was No Presentment Delay Justifying Suppression ............................. 27

        a. Both Defendants Confessed Well Within § 3501(c)'s Six-Hour Safe Harbor ........ 27

        b. Any Purported "Delay" in Presentment Was Reasonable ......................... 31

II. The Defendants' Spoliation Claims Are Meritless ............................................................ 34

    A. Relevant Facts ............................................................................................................ 34

        1. The Defendants' October 4, 2015 Meeting With CW-1 in Honduras ......................... 34

        2. The Cocaine Sample the Defendants Brought to the Confidential Sources ................ 35

        3. The Recordings Produced in Discovery ..................................................................... 35

    B. Applicable Law ........................................................................................................... 36

    C. Discussion ................................................................................................................... 37

        1. There Was No Spoliation With Respect to the October 4, 2015 Meeting................... 37

        2. The Confidential Sources' Recordings Did Not Offend Due Process......................... 41

        3. The Defendants' Cocaine Sample Is Damning Rather Than Exculpatory ................. 43

        4. No Hearing Is Warranted ........................................................................................... 45

III. The Defendants Are Not Entitled to a Bill of Particulars ................................................. 48

    A. Relevant Facts ............................................................................................................ 49

    B. Applicable Law ........................................................................................................... 50

    C. Discussion ................................................................................................................... 50

IV. The Request for *Brady* Material Is Moot and the Request for Early Production of *Giglio* Material Should Be Denied............................................................................................... 57

    A. The Government Is In Compliance With Its *Brady* Obligations.................................... 58

    B. The Defendants Are Not Entitled to Early Disclosures Regarding the Confidential Sources ............................................................................. 59

        1. Applicable Law .......................................................................................................... 59

        2. Discussion .................................................................................................................. 61

    C. Early *Giglio* Disclosures Are Unwarranted.................................................................. 64

V. The Defendants Are Not Entitled to the Early Production of Translated Materials............ 66

CONCLUSION ...................................................................................................................... 68

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Arizona* v. *Youngblood*, 488 U.S. 51 (1988) ............................................................... 37

*Berkemer* v. *McCarty*, 468 U.S. 420 (1984) .............................................................. 22

*Borras* v. *United States*, No. 99 Cr. 689, 2003 WL 21960991 (S.D.N.Y. Aug. 13, 2003) .......... 55

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .................................................................. 58

*Buie* v. *Sullivan*, 923 F.2d 10 (2d Cir. 1990) ............................................................ 36

*Colorado* v. *Connelly*, 479 U.S. 157 (1986) ........................................................ 17, 25

*Corley* v. *United States*, 556 U.S. 303 (2009) ........................................................... 20

*DiBlasio* v. *Keane*, 932 F.2d 1038 (2d Cir. 1991) ................................................... 60, 61

*Dickerson* v. *United States*, 530 U.S. 428 (2000) .................................................... 18, 22

*Franks* v. *Delaware*, 438 U.S. 154 (1978) ............................................................... 45

*Green* v. *Scully*, 850 F.2d 894 (2d Cir. 1988) ........................................................... 18

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008) ........... 42

*Kyles* v. *Whitley*, 514 U.S. 419 (1995) ................................................................. 58

*Lynumn* v. *Illinois*, 372 U.S. 528 (1963) ............................................................... 23

*Miranda* v. *Arizona*, 384 U.S. 436 (1966) .............................................................. 17

*Missouri* v. *Seibert*, 542 U.S. 600 (2004) .......................................................... 19, 22

*Moran* v. *Burbine*, 475 U.S. 412 (1986) ................................................................ 17

*Oregon* v. *Elstad*, 470 U.S. 298 (1985) ............................................................. 19, 22

*Parsad* v. *Greiner*, 337 F.3d 175 (2d Cir. 2003) ....................................................... 18

*Pennsylvania* v. *Muniz*, 496 U.S. 582 (1990) ............................................................ 19

*Steele* v. *Duncan*, No. 03 Civ. 477, 2004 WL 2334074 (S.D.N.Y. Oct. 14, 2004) ...................... 44

*United States ex rel. Castro* v. *LaVallee*, 282 F. Supp. 718 (S.D.N.Y. 1968) ............................ 23

*United States* v. *Abu Ghayth*, 945 F. Supp. 2d 511 (S.D.N.Y. 2013) ........................................ 30

*United States* v. *Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ............................................... 52

*United States* v. *Alvarez-Sanchez*, 511 U.S. 350 (1994) ................................................. 20, 28, 29

*United States* v. *Amery*, No. 02 Cr. 143, 2002 WL 31027514 (S.D.N.Y. Sept. 10, 2002) ........... 27

*United States* v. *Anderson*, 929 F.2d 96 (2d Cir. 1991) .................................................. 18, 22

*United States* v. *Andreas*, No. 96 Cr. 762, 1998 WL 214666 (N.D. Ill. Apr. 22, 1998) ....... 42, 46

*United States* v. *Arteaga*, 807 F.2d 424 (5th Cir. 1986) ................................................. 41

*United States* v. *Baldeo*, 13 Cr. 125 (PAC), 2013 WL 5477373 (S.D.N.Y. Oct. 2, 2013) ........... 58

*United States* v. *Barrios*, 210 F.3d 355, 200 WL 419940 (2d Cir. 2000) .................................... 45

*United States* v. *Belin*, No. 99 Cr. 214, 2000 WL 679138 (S.D.N.Y. May 24, 2000) ................. 62

*United States* v. *Bin Laden*, 132 F. Supp. 2d 198 S.D.N.Y. 2001) ..................................... 30

*United States* v. *Brimage*, 115 F.3d 73 (1st Cir. 1997) ................................................... 40

*United States* v. *Bufalino*, 576 F.2d 446 (2d Cir. 1978) ................................................ 46

*United States* v. *Butler*, 59 F. Supp. 3d 648 (D. Vt. 2014) ............................................. 22

*United States* v. *Carmona*, 873 F.2d 569 (2d Cir. 1989) .............................................. 19

*United States* v. *Carroll*, 510 F.2d 507 (2d Cir. 1975) ................................................. 54

*United States* v. *Carter*, 489 F.3d 528 (2d Cir. 2007) ................................................. 19

*United States* v. *Cashion*, No. 12 Cr. 20, 2013 WL 1791052 (W.D.N.C. Apr. 26, 2013) ........... 66

iv

*United States* v. *Castro*, No. 94 Cr. 809, 1995 WL 6235 (S.D.N.Y. Jan. 6, 1995) ..................... 60

*United States* v. *Chaudhry*, 850 F.2d 851 (1st Cir. 1988) ........................................................ 41

*United States* v. *Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005) ............................................... 53

*United States* v. *Cohen*, 427 F.3d 164 (2d Cir. 2005) .............................................................. 51

*United States* v. *Dalisay*, No. 03 Cr. 1305, 2005 WL 1176115 (S.D.N.Y. May 17, 2005) ......... 46

*United States* v. *Dames*, 380 F. Supp. 2d 270 (S.D.N.Y. 2005) ............................................... 50

*United States* v. *Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ........................................................ 55

*United States* v. *Davis*, 491 F. App'x 219 (2d Cir. 2012) ........................................................ 44

*United States* v. *Davis*, 57 F. Supp. 3d 363 (S.D.N.Y. 2014) .................................................. 64

*United States* v. *Davis*, No. 06 Cr. 911, 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009) ............... 64

*United States* v. *Del Rosario*, No. 12 Cr. 81, 2012 WL 1710923 (S.D.N.Y. May 11, 2012) ....... 45

*United States* v. *DiCesare*, 765 F.2d 890 (9th Cir. 1985) ........................................................ 53

*United States* v. *Eldridge*, No. 09 Cr. 329-A, 2014 WL 4829146 (W.D.N.Y. Sept. 29, 2014) .... 46

*United States* v. *Failla*, No. 93 Cr. 294, 1993 WL 547419 (E.D.N.Y. Dec. 21, 1993) ............... 53

*United States* v. *Feekes*, 879 F.2d 1562 (7th Cir. 1989) ......................................................... 39

*United States* v. *Fields*, 113 F.3d 313 (2d Cir. 1997) .............................................................. 60

*United States* v. *Fishel*, 324 F. Supp. 429 (S.D.N.Y. 1971) ................................................... 46

*United States* v. *Gallo*, No. 98 Cr. 338, 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ................... 53

*United States* v. *Gee*, 695 F.2d 1165 (9th Cir. 1983) .............................................................. 67

*United States* v. *George*, 839 F. Supp. 2d 430 (D. Mass. 2012) ............................................. 43

*United States* v. *Glisson*, No. 03 Cr. 148, 2003 WL 21709502 (S.D.N.Y. July 23, 2003) .......... 53

v

*United States* v. *Gomez*, 758 F. Supp. 145 (S.D.N.Y. 1991) ........................................ 33

*United States* v. *Gorayska*, 482 F. Supp. 576 (S.D.N.Y. 1979) ................................... 25

*United States* v. *Gotchis*, 803 F.2d 74 (2d Cir. 1986) ................................................ 19

*United States* v. *Haouari*, No. 00 Cr. 15, 2000 WL 1593345 (S.D.N.Y. Oct. 25, 2000) ............ 32

*United States* v. *Henderson*, 442 F. Supp. 2d 159 (S.D.N.Y. 2006) ....................................... 37, 43

*United States* v. *Huang You*, 198 F. Supp. 2d 393 (S.D.N.Y 2002) ................................... 23

*United States* v. *Huynh*, 60 F.3d 1386 (9th Cir. 1995) ................................................ 27

*United States* v. *Isom*, 588 F.2d 858 (2d Cir. 1978) ................................................ 32

*United States* v. *Jackson*, No. 13 Cr. 142 (PAC),
   2013 WL 4744828 (S.D.N.Y. Sept. 4, 2013) ........................................................ 56

*United States* v. *Jacques Dessange, Inc.*, No. 99 Cr. 1182,
   2000 WL 280050 (S.D.N.Y. Mar. 14, 2000) ......................................................... 64

*United States* v. *James*, No. 94 Cr. 750, 1995 WL 330651 (S.D.N.Y. June 2, 1995) ................. 26

*United States* v. *Jaswal*, 47 F.3d 539 (2d Cir. 1995) ............................................... 17, 26

*United States* v. *Jimenez*, 824 F. Supp. 351 (S.D.N.Y. 1993) ....................................... 63

*United States* v. *Kendrick*, No. 10 Cr. 6096, 2015 WL 627886 (W.D.N.Y. Feb. 10, 2015) ........ 46

*United States* v. *Mahaffy*, 446 F. Supp. 2d 115 (E.D.N.Y. 2006) .................................. 53

*United States* v. *Major*, 912 F. Supp. 90 (S.D.N.Y. 1996) ......................................... 27

*United States* v. *Male Juvenile*, 121 F.3d 34 (2d Cir. 1997) ........................................ 17

*United States* v. *Manley*, 781 F. Supp. 296 (S.D.N.Y. 1992) ....................................... 63

*United States* v. *Martinez*, 992 F. Supp. 322 (S.D.N.Y. 2014) .................................... 45

*United States* v. *Miller*, No. 12 Cr. 368 (PAC),
   2012 WL 4791992 (S.D.N.Y. Oct. 9, 2012) ................................................................ 64

*United States* v. *Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) .................................... 53, 61

*United States* v. *Myers*, 692 F.2d 823 (2d Cir. 1982) .................................................. 57

*United States* v. *Nixon*, 418 U.S. 683 (1974) ............................................................... 64

*United States* v. *Perez*, 198 F. Supp. 2d 406 (S.D.N.Y. 2002) ..................................... 21

*United States* v. *Philippeaux*, No. 13 Cr. 277, 2015 WL 405240 (S.D.N.Y. Jan. 30, 2015) ........ 61

*United States* v. *Pichardo*, No. 92 Cr. 354, 1992 WL 249964 (S.D.N.Y. Sept. 22, 1992) .... 21, 23

*United* States v. *Prescott*, 125 F.3d 845 (2d Cir. 1997) ............................................. 61

*United States* v. *Rahman*, 189 F.3d 88 (2d Cir. 1999) ................................................. 38

*United States* v. *Ramirez*, 609 F.3d 495 (2d Cir. 2010) ............................................... 55

*United States* v. *Ramirez*, No. 09 Cr. 446,
   2011 WL 6945199 (S.D.N.Y. Dec. 23, 2011) ....................................... 40, 43, 44, 48

*United States* v. *Rastelli*, 870 F.2d 822 (2d Cir. 1989) ........................................ 43, 48

*United States* v. *Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998) ................................... 53

*United States* v. *Rey*, 923 F.2d 1217 (6th Cir. 1991) ................................................. 53

*United States* v. *Rodas*, No. 91 Cr. 1036, 1992 WL 30936 (S.D.N.Y. Feb. 13, 1992) ............... 61

*United States* v. *Rodriguez*, No. 99 Cr. 367, 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ......... 53

*United States* v. *Saa*, 859 F.2d 1067 (2d Cir. 1988) .................................................. 60

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ............................................... 26

*United States* v. *Saleh*, No. 10 Cr. 623,
   2011 WL 1210207 (S.D.N.Y. Mar. 24, 2011) ....................................... 36, 42, 44, 48

*United States* v. *Sanchez*, No. 01 Cr. 277, 2003 WL 1900851 (S.D.N.Y. Apr. 17, 2003) ........... 44

*United States* v. *Santana*, No. 13 Cr. 147, 2015 WL 5781413 (S.D.N.Y. Oct. 1, 2015).............. 54

*United States* v. *Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001) .................................................. 54

*United States* v. *Santoro*, No. 03 Cr. 484, 2004 WL 2346621 (S.D.N.Y. Oct. 19, 2004) ........... 62

*United States* v. *Sattar*, No. 02 Cr. 395, 2003 WL 22510435 (S.D.N.Y. Nov. 5, 2003).............. 37

*United States* v. *Shamsideen*, No. 03 Cr. 1313,
   2004 WL 1179305 (S.D.N.Y. Mar. 31, 2004) .......................................................... 59

*United States* v. *Tang*, 214 F.3d 365 (2d Cir. 2000) ................................................................. 56

*United States* v. *Taylor*, 745 F.3d 15 (2d Cir. 2014) ................................................................ 18

*United States* v. *Tomasetta*, No. 10 Cr. 1205 (PAC),
   2012 WL 896152 (S.D.N.Y. Mar. 16, 2012) ...................................................... 65

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ......................................................... 52, 53

*United States* v. *Viera*, No. 14 Cr. 83, 2015 WL 17848 (S.D.N.Y. Jan. 14, 2015) ..................... 64

*United States* v. *Wedd*, No. 15 Cr. 616, 2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016).............. 50

*United States* v. *Welch*, Nos. 12 Cr. 4402, 12 Cr. 5004,
   2016 WL 536656 (2d Cir. Feb. 11, 2016)............................................................. 44

*United States* v. *Young*, No. 10 Cr. 640 (PAC), 2011 WL 838907 (S.D.N.Y. Mar. 9, 2011) ...... 58

*United States* v. *Yun Lee*, No. 13 Cr. 290 (PAC),
   2013 WL 4889178 (S.D.N.Y. Sept. 9, 2013)......................................................... 50

**Federal Statutes**

18 U.S.C. § 3501(c) .................................................................................................. 20, 33

18 U.S.C. § 3553(f) ....................................................................................................... 56

21 U.S.C. § 960(b)(1) ................................................................................................. 25, 56

**Federal Rules**

Fed. R. Crim. P. 45(a)(6) ............................................................................................... 31

Fed. R. Crim. P. 5(a)(1)(B) ............................................................................................. 19

Fed. R. Crim. P. 5(c)(1) .................................................................................................. 19

Fed. R. Crim. P. 5(c)(2) .................................................................................................. 20

Fed. R. Evid. 403 ........................................................................................................... 44

Fed. R. Evid. 802 ........................................................................................................... 44

**Other Authorities**

Carlos Garcia Rawlins, *Venezuela's First Lady Cilia Flores: U.S. Kidnapped My Nephews*,
   Newsweek (Jan. 12, 2016) ....................................................................................... 1

José de Córdoba and Juan Forero, *U.S. Investigates Venezuelan Oil Giant*, Wall Street Journal
   (Oct. 21, 2015), http://www.wsj.com/articles/u-s-investigates-venezuelan-oil-giant-
   1445478342 ............................................................................................................ 13

Marco Cáceres, *Drugs, Violence and Immigration: Think Twice, America*,
   Huffington Post (July 9, 2014), http://www.huffingtonpost.com/marco-caceres/drugs-
   violence-and-immigr_b_5571077.html .................................................................. 40

Steven Dudley, *How Drug Trafficking Operates, Corrupts in Central America*, InSight Crime
   (July 6, 2016), http://www.insightcrime.org/news-analysis/how-drug-trafficking-operates-
   corrupts-in-central-america ..................................................................................... 55

U.S. Dep't of State, *Honduras 2014 Human Rights Report* at 1 (2014) ....................... 55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       -v.-

EFRAIN ANTONIO CAMPO FLORES, and
FRANQUI FRANCISCO FLORES DE FREITAS,

                    Defendants.

S2 15 Cr. 765 (PAC)

The Government respectfully submits this memorandum of law in opposition to the defendants' Joint Motions:  (i) to Suppress Post-Arrest Statements ("Defs. Suppression Mem." (dkt. no. 45)); (ii) to Suppress Evidence on the Basis of Spoliation ("Defs. Spoliation Mem." (dkt. no. 48)); (iii) for a Bill of Particulars ("Defs. Particulars Mem." (dkt. no. 44)); (iv) to Compel Prompt Production of *Brady* and *Giglio* Material and the Identities of Confidential Informants ("Defs. Disclosures Mem." (dkt. no. 49)); and (v) for Early Production of Translated Materials ("Defs. Transcripts Mem." (dkt. no. 47)).

*First*, parroting inaccurate public claims by a Venezuelan official following the defendants' arrests,[1] the defendants' motion to suppress their confessions starts from the faulty premise that they were "kidnapped" or "abducted" in Haiti, and proceeds to the meritless claim that they were subsequently coerced into making statements to agents of the Drug Enforcement Administration ("DEA").  The Government respectfully requests an evidentiary hearing at which

---

[1] *E.g.*, Carlos Garcia Rawlins, *Venezuela's First Lady Cilia Flores: U.S. Kidnapped My Nephews*, Newsweek (Jan. 12, 2016), http://www.newsweek.com/cilia-flores-venezuela-dea-nicolas-maduro-kidnapping-drugs-haiti-franqui-414948 (last accessed July 21, 2016).

it will refute and disprove these claims. Specifically, the Government will establish that: (i) the defendants were detained in Haiti by foreign law enforcement officials who identified themselves, expelled by the Haitian government and taken into custody by the DEA, and transported promptly to this District where they were presented on the pending charge expeditiously; and (ii) during the flight from Haiti to the United States, the defendants confessed to participating in the charged cocaine-importation conspiracy, without coercion and only after they waived their *Miranda* rights knowingly, voluntarily, intelligently, and in writing.

   *Second*, the defendants' remaining motions are transparent attempts to obtain an improper preview of the Government's case-in-chief at trial through requests for discovery to which they are not entitled, premature identification of Government witnesses and pretrial disclosures, and cross-examination of potential Government trial witnesses at unnecessary hearings. This is a straightforward two-defendant drug-trafficking case based on a charged conspiracy that is alleged to have lasted approximately two months. The Government is mindful of, and in compliance with, its obligations under Rule 16, *Giglio*, and *Brady*. In fact, the Government's disclosures during discovery—including itemized recordings, draft translations, and search warrant affidavits—have gone beyond the requirements of Rule 16 and provided the defendants with sufficient information to prepare for trial and avoid unfair surprise. Therefore, the defendants' additional motions should be denied without a hearing.

## BACKGROUND

In the fall of 2015, defendants Efrain Antonio Campo Flores ("Campo") and Franqui Francisco Flores De Freitas ("Flores"), and others, worked together to try to send hundreds of kilograms of cocaine from Venezuela to Honduras so that the drugs could be imported into the United States by purported Mexican drug traffickers who were in fact confidential sources acting at the direction of the DEA. In late October 2015, Campo told two of the sources during a recorded meeting: "[W]e're at war with the United States." And during recorded meetings in Venezuela, Honduras, and Haiti, the defendants discussed transporting multiple loads of cocaine via private aircraft, with the unambiguous understanding that the narcotics would end up in this country, in connection with transactions that they hoped would generate millions of dollars in proceeds.

## I.  The October 4, 2015 Meeting in Honduras

Contrary to the defendants' motion arguments, but consistent with their confessions, the defendants rather than the DEA initiated the drug-trafficking activities at issue in this case. In early October 2015, a cooperating witness in Honduras ("CW-1")[2] reported to a U.S.-based DEA agent that a Honduran national had introduced CW-1 to two Venezuelans— subsequently identified as the defendants—who were interested in sending cocaine-laden aircraft with legitimate-seeming flight plans from Venezuela to Honduras. CW-1 subsequently reported

---

[2] In or about 2015, CW-1 was charged in this District with a violation of Title 21, United States Code, Section 963. CW-1 appears to be referred to as "CS-4" in the defendants' moving papers. (*See, e.g.*, Defs. Spoliation Mem. at 3). CW-1 was murdered in Honduras in early December 2015. (July 22, 2016 Decl. of DEA Special Agent Sandalio Gonzalez III ¶ 8).

that he had met with the defendants and others in San Pedro Sula, Honduras to discuss sending

hundreds of kilograms of cocaine from Simón Bolívar International Airport ("CCS Airport") in

Maiquetía, Venezuela to Juan Manuel Gálvez International Airport ("RTB Airport") in Roatan,

Honduras.

A flight plan lists the defendants as passengers on a private jet that traveled from

Ramón Villeda Morales International Airport in San Pedro Sula, Honduras to CCS Airport in

Venezuela after the meeting with CW-1 on or about October 4, 2015:



CW-1 was the only participant in the October 4, 2015 meeting authorized to act at

the direction of the DEA. (*See* July 22, 2016 Decl. of DEA Special Agent Sandalio Gonzalez III

(the "Gonzalez Decl.") ¶¶ 5, 9). However, CW-1 later provided a photograph from the meeting,

which depicts the defendants and others and appears to have been taken by a third party:



(*Id.* ¶ 7 & Ex. A).

## II.  The October 2015 Meetings in Venezuela

In late-October 2015, two confidential sources acting at the direction of the DEA ("CS-1" and "CS-2," collectively, the "CSes") traveled to Caracas, Venezuela to meet with the defendants.  CS-1 purported to be the Mexican boss of the drug-trafficking organization with which CW-1 was affiliated, and CS-2 purported to be an associate of CS-1.

On or about October 23, 2015, the defendants participated in a meeting in Caracas with the CSes regarding the cocaine-trafficking venture.  During the meeting, Campo described connections to the Venezuelan government and later stated, "we're at war with the United States . . . with Colombia . . . with the opposition."[3]  One of the CSes explained that the cocaine would ultimately be sent to New York.  Campo stated that he would be "the one in charge" of handling the deal in Venezuela and that he and Flores would be present at the airport for the loading of the cocaine into the plane.  He also assured the CSes that the plane would not be followed by law

---

[3] The descriptions herein of statements during recorded meetings, including attributions, are based on draft translations prepared by a contractor engaged by the Government and are subject to change as the translations are finalized.

5

enforcement upon departure from Venezuela because "it departs from here as if . . . someone from our family were on the plane."

Campo and Flores met with the CSes in Caracas on or about October 26, 2015. Campo explained that he wanted to "get started immediately" and send multiple loads of drugs in November and December 2015, with the hope that they would generate at least approximately $20 million. The defendants—not the CSes—were to provide the cocaine. Specifically, Campo said that his cocaine supplier would be able to provide the first load within a "couple days" and that the supplier would "make sure" that the drugs were "the best you can get." One of the CSes described cocaine prices in New York, and the sources also reiterated that the cocaine was destined for the United States:

> Because the merchandise you're going to send me is mine . . . I keep putting money to you until it gets to Mexico, . . . and I keep putting money into it to get it in to the Americans, to cross it over . . .

Campo also explained that he anticipated paying CW-1 approximately $900,000 to facilitate the receipt of the cocaine in Honduras, and that he also had to "give a cut" to his "contact in Honduras."

The defendants participated in a third meeting with the CSes in Caracas on or about October 27, 2015.[4] During the meeting, the defendants—not the CSes—presented a brick that appears from the video to be a kilogram package of cocaine (the "Kilo"). Campo explained

---

[4] The defendants assert that this meeting took place on October 25, 2015 in some places, but agree in at least one other instance that it took place on October 27, 2015. (*Compare* Defs. Spoliation Mem. at 2, *with id.* at 9-10 n.4).

that his supplier had sent the Kilo to him packed in a bag.  Video of the meeting demonstrates that while Flores observed, Campo put on gloves to avoid leaving fingerprints on the Kilo, helped the CSes open the Kilo to examine the quality of the cocaine, and then used packing tape to help reseal the Kilo:



**Campo**

**Flores**

While examining the cocaine, the CSes explained that they believed the drugs were between 95% and 97% pure based on smell, appearance, and texture.

7

### III.  The November 2015 Meetings in Honduras

On or about November 5, 2015, co-defendant Roberto de Jesus Soto Garcia ("Soto") and others met in San Pedro Sula, Honduras with CW-1 and a third confidential source acting at the direction of the DEA ("CS-3").  CS-3 purported to be a representative of CS-1, and Soto explained during the meeting how he and his associates would receive the load of cocaine at RTB Airport in Roatan.  Specifically, Soto described the schedule at the airport and the need for cocaine-laden aircraft to arrive in the late afternoon before it got too dark.  He also assured CS-3 that the plane could be "unloaded" and refueled in approximately 20 minutes, and that the drug flight would look more legitimate if the pilots also dropped off passengers in Roatan.

The next day, Flores traveled to San Pedro Sula for another meeting relating to the cocaine-trafficking venture.  Photographs sent by Flores on the day of the meeting, which were obtained from a phone seized in connection with the defendants' arrests, suggest that he made the trip to Honduras via private aircraft:



**Flores**

8

In Honduras, Flores met with Soto, CW-1, CS-3, and others:



During the meeting, Soto asked that the cocaine-laden plane arrive at the airport in Honduras on a Sunday between approximately 4:00 p.m. and 5:20 p.m. so that there would be enough time to unload the drugs and then refuel and dispatch the plane before it got dark. Soto assured Flores that someone in the air traffic control tower would be aware of the incoming cocaine shipment and would "control it," that the receipt of the load would be "arranged with all of those inside the airport," and that "only the Americans . . . are not squared away."[5] Soto also described a "Plan B" for receiving the plane at a clandestine airstrip, likely in the La Mosquitia region of Honduras, in the event of problems at RTB Airport. Flores said that he would "meet up with" the pilots to "feel them out" and "make sure that they have a flight plan 30 minutes prior" to departing Venezuela with the cocaine. He also confirmed that Soto and his workers would

---

[5] Soto's reference to "the Americans" is believed to have been a reference to the fact that, although he guaranteed that Honduran law enforcement and RTB Airport personnel would facilitate rather than interfere with the anticipated cocaine load to be sent by the defendants, Soto could make no promises about avoiding interdiction of the narcotics by United States law enforcement such as the DEA.

"receive it [*i.e.*, the cocaine-laden aircraft] for me" and "unload my merchandise immediately." Based on these understandings, Flores agreed with the other participants in the meeting to send the first load of cocaine on Sunday, November 15, 2015.

## IV.  The Arrests of the Defendants in Haiti

On the morning of November 10, 2015, the defendants and four other men (including pilots) flew in the jet depicted below from Venezuela to Port-au-Prince, Haiti, on the understanding that CS-1 was to provide the defendants with millions of dollars to be used for, among other things, the defendants' future purchases of cocaine in Venezuela:



Upon their arrival, the defendants met with CS-1 in the restaurant of a hotel in Port-au-Prince. During the meeting, CS-1 described a drug-importation route through Miami and stated: "[M]y business is right there inside the United States, which is your business as well because you are the owner of the work there."  The defendants explained that they "already [had] all" of the cocaine for the first load to be sent to RTB Airport on November 15, 2015.

While the defendants were meeting with CS-1, Haitian law enforcement personnel from the *Bureau de Lutte contre le Trafic illicite de Stupéfiants* ("*BLTS*") entered the restaurant, identified themselves, and took the defendants into custody.  Some of the *BLTS*

10

personnel present during the detention wore helmets, facemasks (to protect their identities for safety reasons), and fatigues, but their uniforms contained official patches and several of them also wore chest plates bearing the word "POLICE," as depicted in the photograph below that was taken following the detention on November 10, 2015:



After the defendants were taken into custody by the *BLTS*, in response to a request from the DEA, Haiti elected to expel the defendants that afternoon.  (*See* July 22, 2016 Decl. of Emil J. Bove III (the "Bove Decl.") Exs. A, B (DEA request and expulsion order)). The defendants were subsequently taken into custody by the DEA and flown to Westchester County International Airport in White Plains, New York.

## V.  The Defendants' Confessions

As discussed in more detail below, *see infra* Argument Part I.A, during the approximately 3.5-hour flight to the Southern District of New York, both defendants signed

Spanish-language waivers of their *Miranda* rights and confessed to participating in a conspiracy to import cocaine into the United States.  (*See* Bove Decl. Exs. E-H (defendants' waivers and translations)).  Campo made the following admissions, in substance and in part, after signing the waiver:

- Approximately two months prior to his arrest, "Hamudi" put Campo in touch with "El Gocho" in Caracas.[6]  Campo met with El Gocho approximately five times.  El Gocho obtained cocaine from the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC"),[7] had provided the Kilo, and was going to provide approximately 800 kilograms of cocaine on consignment for the anticipated first shipment.

- Hamudi introduced Campo to "El Negrito," a/k/a "Flaco," who was from Honduras. Campo was in contact with El Negrito when he traveled to Honduras in approximately October 2015.

- Campo felt that his reputation in Venezuela was such that he could accomplish the dispatch of 800 kilograms of cocaine from CCS Airport without assistance from government, military, or police officials.

- After being shown a still image from a video of the defendants' meeting with CS-1 and CS-2 in Caracas on or about October 27, 2015, in which Campo was holding the Kilo, Campo stated "you know what that is."

- Campo knew based on statements by "the Mexican"—presumably, CS-1—that the cocaine they had discussed was going to be sent to the United States.

- Campo's motives for participating in the cocaine transaction were financial.  He only earned about $800 per week from a Panama-based taxi company.  And his cousin, Erick Malpica-Flores, had rejected a proposed arrangement in which Campo would

---

[6] Campo told the DEA that he did not know the real names of El Gocho or Hamudi, and that Hamudi had been murdered approximately 15 days prior to Campo's arrest.

[7] In October 1997, the Department of State designated the FARC as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, and it remains so designated.

seek to collect "commissions," *i.e.*, bribes, from debtors of Petróleos de Venezuela S.A. ("PDVSA"), in exchange for working with Malpica-Flores to cause PDVSA to approve and make payments on certain debts.[8]

(Bove Decl. Ex. F (DEA report regarding Campo's post-arrest statements)).

Flores made the following admissions, in substance and in part, after signing the

*Miranda* waiver:

- "Pepero" introduced Flores and Campo to "El Gocho" in Caracas, and Campo had remained in contact with El Gocho following that meeting.

- "Hamudi" introduced Flores to "El Flaco" in Honduras.  El Flaco worked for the wheelchair-bound "El Sentado"—*i.e.*, CW-1.  CW-1, in turn, introduced Campo and Flores to "the Mexican"—presumably, CS-1.

- Flores understood that "the Mexican" was taking the cocaine to Mexico and then to multiple locations in the United States.

- With respect to the 800 kilograms of cocaine to be involved in the anticipated first shipment, 100 kilograms belonged to Flores, 100 kilograms belonged to Campo, 200 kilograms belonged to El Gocho, and the remaining 400 kilograms belonged to "the Mexican."

- Flores' security team was aware of the cocaine shipment, and he expected the members of the team to help the defendants load the cocaine at CCS Airport.

- Flores was involved in the cocaine transaction "to make money."  Specifically, he expected the first load to generate approximately $5 million, and that he would make approximately $560,000.

(Bove Decl. Ex. H (DEA report regarding Flores' post-arrest statements)).

───────────────

[8] PDVSA is a Venezuelan state-owned oil and natural gas company.  *See* José de Córdoba and Juan Forero, *U.S. Investigates Venezuelan Oil Giant*, Wall Street Journal (Oct. 21, 2015), http://www.wsj.com/articles/u-s-investigates-venezuelan-oil-giant-1445478342.

<u>**ARGUMENT**</u>

**I.  The Defendants' Confessions Were Voluntary and Should Not Be Suppressed**

The defendants present a two-pronged attack in support of their motion to suppress their confessions.  First, they argue that their post-arrest statements were involuntary and the result of an impermissible "two-step" interrogation.  Second, they argue that suppression is required by Title 18, United States Code, Section 3501(c), based on the timing of their presentments in this District.

The Court should deny the defendants' first argument following a limited evidentiary hearing on the issue of voluntariness, at which the Government will establish, among other things, that the agents did not conduct an impermissible two-step interrogation.  Indeed, several of the defendants' factual assertions and legal arguments are plainly contradicted by documentary evidence, the defendants' prior statements, and controlling case law.   The defendants' argument based on Section 3501(c) is meritless for the reasons set forth below, and should be denied.

**A.  Relevant Facts**
**1.  The Defendants' Detentions by the *BLTS* and Expulsions from Haiti**

On November 10, 2015, at approximately 11:15 a.m., members of the Haitian *BLTS* identified themselves and detained the defendants inside a hotel restaurant, and then transported the defendants to a *BLTS* office in Port-au-Prince.  (Bove Decl. Ex. C at 1 (agent notes)).  Following the Haitian detentions, the DEA requested that the defendants be expelled from Haiti and transferred to U.S. custody, and, at approximately, 1:45 p.m., Haitian officials

14

approved the request.  (*Id.* Ex. C at 2; *see also* Exs. A, B (DEA request and Haiti's response)).

The defendants were transferred to DEA custody at Toussaint Louverture International Airport in

Port-au-Prince, in the presence of at least one DEA agent wearing a jacket with his employer's

acronym displayed prominently.  (*Id.* Ex. C at 5).  Soon after the defendants were taken into

custody by the DEA, at approximately 4:30 p.m., agents and the defendants departed Haiti on a

DEA plane.  (*Id.*).  Shortly after departing for the approximately 3.5-hour flight, the defendants

were given bottles of water and candy.  (*Id.*).

### 2.  The Defendants' Written *Miranda* Waivers and Confessions

Approximately 45 minutes after departing Haiti, and slightly over an hour after

being taken into custody by the DEA, Campo executed a Spanish-language document advising

him that:

- Before he answered any question, he needed to understand his rights;

- He had the right to remain silent;

- Anything he said could be used against him in a court of law;

- Before being questioned, he had the right to speak to an attorney; and

- He had the right to have an attorney present during any questioning.

(Bove Decl. Ex. E (Campo waiver and translation)).  The waiver form also asked Campo

whether he understood his rights and whether he was willing to answer any questions.  (*See id.*).

On the form, Campo acknowledged that he had "read . . . the rights mentioned above and I

understand what my rights are.  At the present time I am willing to answer freely and voluntarily

any questions without an attorney present." (*Id.*).  Campo then made the confession described above.  (*See id.* Ex F).

At approximately 7:35 p.m., Flores executed an identical *Miranda* wavier and made the confession described above before the DEA plane landed.  (Bove Decl. Ex. G  (Flores waiver and translation), Ex. H).

### 3.  The Defendants' Arrival in the Southern District of New York and Presentments

The defendants landed at Westchester County Airport at approximately 8:10 p.m. on November 10, 2015.  (Bove Decl. Ex. C at 5).  After processing by the DEA and U.S. Customs and Border Protection to permit them to enter the United States, the defendants were lodged at the Metropolitan Correctional Center in Manhattan (the "MCC").  The Court was closed the next day, Wednesday, November 11, 2015, for Veterans' Day.

On the morning of the next business day, November 12, DEA agents removed the defendants from the MCC and brought them to the courthouse so they could be interviewed by the District's Pretrial Services Office and presented before the Honorable James L. Cott, the Magistrate Judge on duty that day.  Initially, attorneys from the law firm Squire Patton Boggs sought to represent both defendants.  However, after the Government objected, citing applicable conflict-of-interest rules, the attorneys conceded that they had not analyzed the potential conflict and elected to appear on behalf of Campo, only.  The Federal Defenders of New York agreed in the late afternoon to appear on behalf of Flores.

As a result of these events, Federal Defenders personnel consulted with Flores for the first time after approximately 4:00 p.m. on November 12.  Judge Cott conducted another two-

defendant presentment, as well as a bail hearing, at approximately 5:15 p.m.[9]  The defendants were presented before Judge Cott at approximately 6:00 p.m.  The Government advised the Court that the defendants had been arrested on November 10 and that "[t]hey arrived in the district Tuesday night."  (Bove Decl. Ex. I at 4).

**B.  Applicable Law**

    **1.  Admissibility of Confessions**

        Generally, a statement made during custodial interrogation is admissible only if the statement was made voluntarily after a knowing waiver of the defendant's Fifth Amendment rights.  *See Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966).  To prove a valid waiver, the Government must establish by a preponderance of the evidence that the defendant was aware of his rights and the consequences of relinquishing those rights, and that the defendant voluntarily relinquished his rights.  *See Colorado* v. *Connelly*, 479 U.S. 157, 168 (1986) ("[T]he State need prove waiver only by a preponderance of the evidence."); *Moran* v. *Burbine*, 475 U.S. 412, 421 (1986) (waiver must be made "'voluntarily, knowingly and intelligently'" (quoting *Miranda*, 384 U.S. at 444)); *United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

        A waiver is voluntary if it is "the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'"  *United States* v. *Male Juvenile*, 121 F.3d 34, 41 (2d Cir. 1997) (quoting *Burbine*, 475 U.S. at 421 (internal quotation marks omitted)).  "While all custodial interrogations inherently involve serious pressures," *Parsad* v. *Greiner*, 337 F.3d 175,

---

[9] *See United States* v. *Betances, et ano.*, No. 15 Cr. 637 (GBD) (S.D.N.Y.) (dkt. nos. 10, 13).

183 (2d Cir. 2003) (internal quotation marks omitted), a defendant may be coerced into making a statement if "the totality of the circumstances" indicates that the government overbore the defendant's will, *Green* v. *Scully*, 850 F.2d 894, 901 (2d Cir. 1988). Where a defendant argues that a statement was involuntary, courts generally focus on the characteristics of the defendant, the conditions of interrogation, and the conduct of law enforcement officials. *See Parsad*, 337 F.3d at 183; *United States* v. *Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *Green*, 850 F.2d at 901-02. "Regardless of whether [an] agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances—considering the three listed factors [*i.e.*, the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials]—the defendant's will was overborne by the agent's conduct." *Anderson*, 929 F.2d at 99.

Even where a defendant validly waives his or her *Miranda* rights, the Court must still determine whether any subsequent statement by the defendant was voluntary. *See United States* v. *Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). However, "[i]n general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *Id.* Thus, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson* v. *United States*, 530 U.S. 428, 444 (2000) (internal quotation marks, citation and alterations omitted).

*Miranda* applies only to statements made during custodial interrogation; it is well settled that routine questions by the police seeking pedigree information from a defendant do not

fall within the protection of *Miranda*.  *See Pennsylvania* v. *Muniz*, 496 U.S. 582, 600-02 (1990);
*United States* v. *Carmona*, 873 F.2d 569, 573 (2d Cir. 1989); *United States* v. *Gotchis*, 803 F.2d
74, 79 (2d Cir. 1986).

### 2.  "Two-Step" Interrogation

Under *Oregon* v. *Elstad*, once a defendant is advised of his *Miranda* rights, his
subsequent statements are generally admissible in court *even if* the defendant was also
questioned before being advised of his *Miranda* rights, as long as the initial statements were
voluntarily made.  *See* 470 U.S. 298, 318 (1985).  In *Missouri* v. *Seibert*, the Supreme Court laid
out an exception to this general rule, holding that the subsequent statements may be inadmissible
if they were the result of a deliberate "two-step interrogation technique . . . used in a calculated
way to undermine the *Miranda* warning."  542 U.S. at 600, 622 (2004) (Kennedy, J., concurring
in judgment); *see also id*. ("The admissibility of postwarning statements should continue to be
governed by the principles of *Elstad* unless the deliberate two-step strategy was employed.");
*United States* v. *Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (explaining that "*Seibert* lays out an
exception to *Elstad*").

### 3.  Timing of Presentments

When a defendant is arrested outside the United States, he must be brought
"without unnecessary delay before a magistrate judge, unless a statute provides otherwise."  Fed.
R. Crim. P. 5(a)(1)(B).  In the case of a foreign arrest, in contrast to arrests made in the United
States, there are no restrictions on where the presentment before a magistrate must occur.  *Cf.*
Fed. R. Crim. P. 5(c)(1) (explaining that, when a defendant is arrested in the district in which he

is charged, he must be presented in that district); Fed. R. Crim. P. 5(c)(2) (explaining that, when the defendant is arrested inside the United States but outside the district in which he is charged, his presentment must occur in either the district of arrest or, if certain requirements are met, in an "adjacent district").

Even if there is a delay in presentment after arrest, however, a confession by a defendant in custody "shall not be inadmissible solely because of delay" if it was made voluntarily and "within six hours immediately following his arrest." 18 U.S.C. § 3501(c). If the confession is made outside this six-hour safe harbor, "the court must decide whether delaying that long was unreasonable or unnecessary . . . and if it was, the confession is to be suppressed." *Corley* v. *United States*, 556 U.S. 303, 322 (2009). Relevant factors in this analysis include "the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer." 18 U.S.C. § 3501(c). A delay does not compel suppression, however, unless "there is some obligation to bring the person before [] a judicial officer in the first place." *United States* v. *Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).

## C.  Discussion

The Government anticipates that the evidence at the requested hearing, supplemented by the documentary evidence discussed above, will establish that both defendants knowingly, intelligently, and voluntarily waived their *Miranda* rights, and that their confessions were otherwise voluntary. Moreover, for the reasons set forth below, Section 3501(c) is not a bar to the admissibility of the defendants' confessions.

1.  **The Defendants' Confessions Complied with *Miranda* and Were Otherwise Voluntary**

As both defendants acknowledge, they executed written *Miranda* waivers.[10] Those waivers clearly advised the defendants of their rights. In signing the forms, each defendant acknowledged that he had "read . . . the rights mentioned above and I understand what my rights are. At the present time I am willing to answer freely and voluntarily any questions without an attorney present." (Bove Decl. Exs. E, G). These warnings sufficiently advised the defendants of their rights. *See, e.g.*, *United States* v. *Perez*, 198 F. Supp. 2d 406, 414 (S.D.N.Y. 2002) (holding that *Miranda* warnings were adequate when they were contained on "a standard DEA form" that "touched all of the bases required by *Miranda*" and was sufficient to "reasonably inform [the defendant] of his *Miranda* rights" (internal quotation marks omitted)), *aff'd* 72 F. App'x 857 (2d Cir. 2003).[11] Further, evidence at the hearing will establish that these waivers were executed before any substantive questioning by the DEA.

"[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after

---

[10] (*See* July 1, 2016 Decl. of Efrain Antonio Campo Flores in Support of Motion to Suppress Post-Arrest Statements (dkt. no. 52-1) (the "Campo Decl.") ¶ 11; July 1, 2016 Decl. of Franqui Francisco Flores De Freitas In Support of Motion to Suppress Evidence (dkt. no. 46-1) (the "Flores Decl.") ¶ 20).

[11] The fact that the defendants both executed written *Miranda* waivers is one factor that distinguishes this case from *United States* v. *Pichardo*, No. 92 Cr. 354, 1992 WL 249964 (S.D.N.Y. Sept. 22, 1992), cited by defendants as the "most factually analogous" case to the situation here. (Defs. Suppression Br. at 21). In *Pichardo*, the defendant was orally advised of his *Miranda* rights but apparently never executed a written waiver and, although he "appeared to understand his rights . . . never affirmatively stated that he understood his rights." *Id.* at *2.

21

warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Missouri* v. *Seibert*, 542 U.S. at 608-09.[12]  And this not is one of the "rare" cases "in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite" having executed a *Miranda* waiver.  *Dickerson* v. *United States*, 530 U.S. at 444.  The cases cited by defendants in which courts have found confessions involuntary, despite the giving of *Miranda* warnings, involved circumstances not present here, such as affirmative actions by law enforcement to undercut the *Miranda* warnings,[13] or defendants who were manifesting severe physical or emotional problems such as loss of consciousness or reactions to having recently been "robbed and sprayed in the face with mace."[14]  Further, defendants' voluntariness arguments rely on several cases in which *no Miranda* or similar warnings were actually given, including multiple

---

[12] *Accord Oregon* v. *Elstad*, 470 U.S. at 318 ("The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."); *Berkemer* v. *McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

[13] *See, e.g.*, *United States* v. *Anderson*, 929 F.2d 96, 100 (2d Cir. 1992) (after giving *Miranda* warnings, agent told defendant "three times" that he could not cooperate with the Government if he asked for an attorney).

[14] *Taylor*, 745 F.3d at 25 (defendant "in and out of consciousness while giving his statement, and in a trance or a stupor most of the time when not actually asleep"); *United States* v. *Butler*, 59 F. Supp. 3d 648, 652 (D. Vt. 2014) (prior to receiving *Miranda* warnings, female defendant had allegedly been "robbed and sprayed in the face with mace" and, during pre-*Miranda* interview, "was hard to understand, her eyes were closed, and she kept trailing off").  Although the defendants cite *Butler* as a Southern District of New York case, it is, in fact, a case from the District of Vermont.  (*Compare* Defs. Suppression Mem. at 16, *with id.* at 10 n.6).

cases where the conduct pre-dated *Miranda*.[15]  All of those cases presented circumstances that are obviously and easily distinguishable from the facts here.

   The Government will establish at the requested evidentiary hearing that many of the defendants' factual claims as to why their confessions were involuntary are inconsistent with their prior statements and not a basis for suppression under controlling case law.  The defendants liken themselves to a single mother on welfare and an 18-year-old recent immigrant living in a small upper Manhattan apartment.  (*See* Defs. Suppression Mem. at 21 (claiming that *United States* v. *Pichardo*, No. 92 Cr. 354, 1992 WL 249964 (S.D.N.Y. Sept. 22, 1992) and *Lynumn* v. *Illinois*, 372 U.S. 528 (1963) are the "cases most factually analogous to this one")).  The defendants' prior statements and the documentary evidence make clear, however, that the defendants are educated adult men in good physical and mental health, who, at the time of their arrests, enjoyed access to significant financial and other resources.

---

[15] *See, e.g.*, *Lynumn* v. *Illinois*, 372 U.S. 528, 530-31 (1963); *United States* v. *Huang You*, 198 F. Supp. 2d 393, 404 (S.D.N.Y 2002) (noting, in case involving voluntariness of consent, not post-arrest statement, that "[n]o *Miranda* warnings were given"); *United States ex rel. Castro* v. *LaVallee*, 282 F. Supp. 718, 725-26 (S.D.N.Y. 1968) ("In resolving the voluntariness issue, it is significant and undisputed that at no time was Castro ever advised by anyone . . . of any of his Constitutional rights . . . .  The State seeks to excuse this lack of advice and warning as to his Constitutional rights on the ground that the interrogation of Castro pre-dated the Supreme Court's decisions in *Escobedo* v. *State of Illinois*, 378 U.S. 478 . . . (1964), and *Miranda*. . . . Although such advice and warnings, prior to *Escobedo* and *Miranda*, were not compulsory, nevertheless the failure to give them is a significant factor in determining the issue of voluntariness.").

23

Specifically, Campo is a 29-year-old attorney.  (*See* Bove Decl. Ex M (*Curcio* hearing tr. at 4-5)).  He suffers from no physical or mental health issues.  (*See id.* at 5).  Flores is 30 years old, and he attended "up to the fourth year of high school."  (*Id.* at 6).  Like Campo, he did not report any physical or mental health issues.  (*Id.* at 6-7).  Both defendants are related to the President and First Lady of Venezuela.  (Flores Decl. ¶ 8; Campo Decl. ¶ 2 (explaining his "familial relationship with senior members of the Venezuelan government")).  Moreover, the defendants' recorded statements to CS-1 and CS-2 are inconsistent with their assertion to the Court that they "were living modestly in Venezuela" prior to their arrests.  (Defs. Spoliation Mem. at 2).  For example, during the charged conspiracy, they flew to Honduras and Haiti in private jets.  In addition, during the October 26, 2015 recorded meeting in Venezuela, Campo referred to his "Ferraris" and stated that he "earn[s] ten thousand million with oil," that "we have been making money for many years," and that "ever since we started making money we've been flashy."  Although the defendants also claim that they were not "engaged in the business of drug trafficking" (*id.*), seized electronic communications and their statements during recorded meetings suggest that claim is false as well.  For example, during the meeting on or about October 26, 2015, they described negotiations with drug customers in France involving a dispute over whether payment should be made in narcotics ("product") or funds:

| Campo | We were negotiating with some French people like that because they wanted . . . |
|---|---|
|  | [*Overlapping voices*] |
| Flores | For us to pay them with [*unintelligible*] . . . |
| Campo | . . . they wanted us to pay them with, with 30 percent of the cost of the product and I told him, "well, that's fine, I pay you thirty percent of the cost . . ." |

24

While the defendants claim that their arrest in Haiti created a great deal of anxiety about whether they were being kidnapped, it bears noting that—by their own admission—before the defendants confessed, DEA agents had dispelled any uncertainty as to why they were in custody.  (Campo Decl. ¶ 7 ("[O]ne of the men approached us and told us that they were agents from the DEA and that we had been charged with conspiring against the United States"); Flores Decl. ¶ 14 ("Special Agent Gonzalez told us in Spanish that he and the others on the plane were DEA agents from the United States.  He showed my cousin and me a piece of paper and told us it was a warrant for our arrest in the United States")).  Indeed, a photo taken at the time of the defendants transfer from Haitian authorities to the DEA clearly shows Haitian *BLTS* officers wearing uniforms that said "Police" and or "BLTS" on the chest, and an agent wearing a DEA jacket.  (Bove Decl. Ex. D).

Moreover, the evidence at the hearing will show that there was no coercive conduct by law enforcement.  As the Supreme Court has held, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." *Colorado* v. *Connelly*, 479 U.S. 157, 167 (1986).  Indeed, stripped of their somewhat sensationalistic tone and viewed in light of the reality of this case, many of the defendants' core allegations fail to establish any coercive conduct by law enforcement.  For example, the defendants claim DEA agents told them they faced life in prison if they failed to cooperate.  But the defendants do, in fact, face a potential life sentence under the applicable statutory maximum.  *See* 21 U.S.C. § 960(b)(1)(B)(ii); *see also United States* v. *Gorayska*, 482 F. Supp. 576, 583 (S.D.N.Y. 1979) (holding confession voluntary and noting that agent's statement "was not a mere threat, but a

statement of fact"). *Miranda* warnings are not "vitiated by agents' statements to the defendant regarding the penalties that he is facing or by assurances that cooperation would improve his circumstances." *United States* v. *James*, No. 94 Cr. 750, 1995 WL 330651, at *4 (S.D.N.Y. June 2, 1995); *see also United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("An indication by the arresting officers to the defendant that his cooperation will help him is only one factor to consider in determining whether the defendant's waiver was given voluntarily. There is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him. Both are true.").

Finally, while defendants also take issue with the actions of Haitian law enforcement officials, the Second Circuit has previously declined to take into account actions by foreign officials in determining whether a confession was involuntary, requiring state action by U.S. officials before finding the necessary degree of coercion. *United States* v. *Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (declining to suppress post-arrest statement and noting "while it is reasonable that [10 days of] Egyptian incarceration and torture, if true, would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion." (citing *Connelly*, 479 U.S. at 166)). For similar reasons, the defendants' claim that their prior experiences with kidnappings and murders made the agents' actions more coercive is dubious, particularly in light of the absence of any claim that the agents were aware of that information at the time of the interviews. *E.g.*, *United States* v. *Amery*, No. 02 Cr. 143, 2002 WL 31027514, at *2 (S.D.N.Y. Sept. 10, 2002) ("The defendant's limited education, coupled

26

with experiences in Afghanistan and his post-September 11th fears and apprehensions, are wholly unrelated to the agents' conduct.  Moreover, defendant does not even claim that the agents were cognizant of . . . his background or used to it their advantage.").[16]

***

For the reasons stated above, the Government respectfully submits that the Court should find, following a limited evidentiary hearing to supplement the existing record, that the defendants knowingly, intelligently, and voluntarily waived their *Miranda* rights and that their confessions were otherwise voluntary.

### 2.  There Was No Presentment Delay Justifying Suppression

There is also no basis to suppress the defendants' confessions based on any purported delay in presenting the defendants to a magistrate judge following their arrests.

### a.  Both Defendants Confessed Well Within § 3501(c)'s Six-Hour Safe Harbor

Both defendants confessed well within Section 3501's six-hour safe harbor.  The defendants were transferred to DEA custody shortly before 4:30 p.m. on November 10, 2015.  Campo signed his *Miranda* waiver at approximately 5:15 p.m., less than an hour after the DEA plane took off from Haiti to New York.  (*See* Bove Decl. Ex. E).  Flores signed his *Miranda*

---

[16] *Accord United States* v. *Major*, 912 F. Supp. 90, 96 (S.D.N.Y. 1996) ("There is no evidence, however, that the Customs agents took advantage of Major's unusual susceptibility, or that they were even aware of any special vulnerability on his part."); *see also United States* v. *Huynh*, 60 F.3d 1386, 1387-88 (9th Cir. 1995) (affirming denial of motion to suppress statements on voluntariness grounds were the defendant testified that "childhood experiences in Indochina impressed upon her a survival instinct to 'do whatever she was instructed to do' by persons in authority, and that her arrest induced such a state of panic that her *Miranda* waiver and confession were 'not a product of her free choice'").

waiver at approximately 7:35 p.m., and both defendants completed their confessions by the time the plane landed at approximately 8:10 p.m. (*See id.* Exs. C, E). As such, neither of the defendants' statements can be suppressed "solely because of delay" in presentment. 18 U.S.C. § 3501(c).

The Court should reject the defendants' argument that the clock for § 3501(c)'s safe harbor began running when Haitian authorities arrested the defendants on the morning of November 10.[17] While defendants argue that under the Supreme Court's decision in *United States* v. *Alvarez-Sanchez*, 511 U.S. 350 (1994), the six-hour "clock" should begin running when they were detained by Haitian authorities, the case actually supports the Government's position here. In *Alvarez-Sanchez*, the defendant argued that his arrest on California narcotics charges triggered Section 3501(c) and required suppression of a confession made three days after the state-law arrest but prior to his arrest on federal charges. *Id.* at 353-54. The defendant argued that because Section 3501 "applies to persons in the custody of '*any*' law enforcement officer or law enforcement agency . . . the § 3501(c) 6-hour time period begins to run whenever a person is arrested by local, state, *or* federal officers." *Id.* at 357 (emphases in original). The Supreme Court rejected this argument, holding that the six-hour clock did not begin running until the defendant was arrested on federal charges. *Id.* at 358. In doing so, the Court reasoned that Section 3501(c) "can apply only when there is some 'delay' in presentment." *Id.* at 357 (quoting

---

[17] Flores claims that the defendants were arrested by Haitian authorities at approximately 9:45 a.m. (Flores Decl. ¶ 6; *see also* Campo Decl. ¶¶ 1-2). As noted above, as supported by contemporaneous notes of a DEA agent, the defendants were not actually arrested until approximately 11:15 a.m. (*See* Bove Decl. Ex. C at 1).

§ 3501(c)).  After analyzing the plain meaning of the word "delay," the Court concluded that a "'delay'" in presentment can occur only when "there is some obligation to bring [a defendant] before . . . a judicial officer in the first place." *Id.* at 358 (quoting § 3501(c)).  Because there was no obligation to bring the defendant before a federal magistrate when he was arrested only on state charges, Section 3501(c)'s six-hour clock had not even begun to run prior to his federal arrest. *Id.* at 359.

The reasoning of *Alvarez-Sanchez* applies with equal force to detention by a foreign sovereign.  The DEA lacked the authority to bring the defendants before a federal magistrate judge until the Haitian government agreed to transfer the defendants out of *BLTS* custody.  (*See* Bove Decl. Exs. A, B).  Thus, before approximately 4:00 p.m. on November 10— when the defendants were in Haitian custody, only—the DEA cannot be said to have "delayed" the defendants' presentments because the agents had no ability, and thus no obligation, to bring the defendants to a United States court.  *See Alvarez-Sanchez*, 511 U.S. at 357-58 ("To delay is to postpone until a later time or to put off an action; a delay is a postponement.  The term presumes an obligation to act.  Thus, there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place." (internal quotations and citations omitted)).

Nor is there any evidence that the DEA somehow colluded with Haitian officials to delay the defendants' presentment, such that the time in Haitian custody could be attributable to the DEA.  "[C]aselaw makes very clear that the Defendants bear the burden of establishing that [foreign] custody was improperly used to circumvent the rigors of Rule 5(a)" regarding

29

speedy presentment.  *United States* v. *Bin Laden*, 132 F. Supp. 2d 198, 209 (S.D.N.Y. 2001).

The defendants fail to meet that burden here.  Within a matter of hours after their detention by

Haitian authorities, the DEA formally requested that the defendants be transferred to United

States custody and, in response to that request, Haitian officials ordered the defendants expelled

from their country and transferred to DEA agents, who took the defendants to New York aboard

a waiting DEA plane.  (Bove Decl. Exs. A-C.)  Thus, the evidence demonstrates that the

Government took steps to promptly bring the defendants into DEA custody and to transport them

to the United States.  *Cf., e.g.*, *United States* v. *Abu Ghayth*, 945 F. Supp. 2d 511, 519 (S.D.N.Y.

2013) (rejecting argument that six weeks defendant spent in Turkish custody before being turned

over to U.S. authorities raised a speedy presentment issue because defendant presented no

"evidence that the United States colluded with Turkey or was otherwise involved in his arrest or

interrogation in that country in order to delay presentment").

        In sum, the defendants were not "arrested or detained" for purposes of Section

3501(c) until approximately 4:00 p.m. on November 10, the point when they were transferred to

DEA custody.  Because both defendants completed their confessions before the DEA plane

landed at approximately 8:10 p.m., they made their statements within Section 3501(c)'s safe

harbor and their statements cannot be suppressed on the basis of a purported delay in

presentment.

**b.  Any Purported "Delay" in Presentment Was Reasonable**

Even if the defendants are somehow deemed to have made their confessions outside Section 3501(c)'s safe harbor, there was no unreasonable delay in their presentment that renders the statements inadmissible.

The defendants vastly overstate the extent of any purported "delay" in presentment, claiming that 57 hours were attributable to unreasonable conduct by the Government between their arrests and presentment.  (*See, e.g.*, Defs. Suppression Br. at 25). Over half of this time, however, is explained by factors having nothing to do with the transportation of the defendants to the Southern District of New York.  24 hours of this purported delay were a federal holiday—Veterans' Day—when the Court was closed and the defendants could not have been presented.  *Cf.* Fed. R. Crim. P. 45(a)(6) (including Veterans' Day in the definition of "legal holiday" to be excluded from timing computations).  Further, on the late morning and afternoon of November 12, the defendants spent approximately six hours at the courthouse before being presented, not because of the actions of DEA agents, but instead as a result of the need for processing by Pretrial Services, issues arising from the defendants' initial desire to be represented by the same law firm, and congestion on the Magistrate Court's docket.[18]  As such, at least approximately 30 hours of the purported 57-hour delay had nothing to do the transportation of the defendants to this District or the actions of the arresting agents.

---

[18] Given defense counsels' collective experience in criminal matters in this District, it borders on the absurd to imply that, even though the defendants were brought to the courthouse on the morning of November 12, the Government was responsible for the fact that the defendants were

Further, defendants spent approximately 12 additional hours lodged overnight at the MCC on the nights of November 10 and November 11, time which is not generally considered part of any "delay" in presentment. *See, e.g.*, *United States* v. *Isom*, 588 F.2d 858, 862 (2d Cir. 1978) ("[O]vernight lodging at the MCC should not be counted in computing unnecessary delay . . . .").

The remaining time between the defendants' detention by Haitian authorities and their presentments in this District consisted mainly of: (i) several hours spent in Haitian custody while awaiting transfer to U.S. custody; (ii) approximately 3.5 hours spent flying from Haiti to New York; and (iii) the time required to process the defendants once they arrived in the United States and to transport them to the MCC. None of these events constituted "unreasonable delay" by the Government. *See United States* v. *Haouari*, No. 00 Cr. 15, 2000 WL 1593345, at *7 (S.D.N.Y. Oct. 25, 2000) ("The Second Circuit accepts the concept that the time spent interviewing a defendant and transporting and processing him is not unnecessary or unreasonable delay under Rule 5(a) and Section 3501."); *see also United States* v. *Collins*, 462 F.2d 792, 796 (2d Cir. 1972) ("No part of these detention periods was unnecessary. The conduct of the FBI and the New York City Police Department was at all times directed to processing Collins as expeditiously as possible for arraignment."). Moreover, there is absolutely no evidence that law enforcement used any "delay" for the purpose of extracting confessions from the defendants.

---

not actually presented until 6:30 p.m., and instead, could have arranged for the defendants to be "presented first thing in the morning," *i.e.*, without being processed by the Marshals or Pretrial Services. (Defs. Suppression Mem. at 26).

*See United States* v. *Gomez*, 758 F. Supp. 145, 152 (S.D.N.Y. 1991) (finding no unreasonable delay where "there was no purposeful postponement of arraignment and no lengthy, hostile, or coercive interrogation which caused [the defendant] to be prejudiced.").  To the contrary, as discussed in the preceding section, both defendants confessed within hours after being taken into custody by the United States and before landing at the airport in Westchester.  And although they were all made aware of the timing of the defendants' arrests, neither the defendants' attorneys nor Judge Cott raised any issue concerning the timing of the defendants' presentments.  (*See generally* Bove Decl. Ex. I).

Finally, while the defendants claim they should have been brought from Haiti to the District of Puerto Rico or another more southerly judicial district, the defendants did not leave Haiti until 4:30 p.m. on November 10.  At that point, it was extremely unlikely that presentment in *any* judicial district in the United States would have occurred until the following business day, November 12—the day they were in fact presented in this District.  As such, flying the defendants to New York, as opposed to Florida or Puerto Rico, did not meaningfully impact the timing of the defendants' presentments and did not result in unreasonable delay.[19]  Moreover, the operative indictment required that the defendants be "first brought to . . . the Southern District of New York" and that their "point of entry into the United States . . . be in the Southern

_____

[19] Section 3501(c) does not require that the defendants be "brought to the nearest available . . . magistrate judge," it merely makes the "distance to be traveled" to such judge one factor to consider in assessing the reasonableness of a delay in presentment.

District of New York."  (*See* Superseding Indictment ¶ 2 (dkt. no. 5 (citing 18 U.S.C. § 3238 and 21 U.S.C. § 959(c))).

In short, even assuming the defendants confessed outside of Section 3501(c)'s safe harbor, law enforcement officers acted reasonably in taking them before a magistrate judge, and this provision does not support defendants' suppression argument.

## II.  The Defendants' Spoliation Claims Are Meritless

The defendants' arguments regarding the alleged destruction of evidence are based almost entirely on guesswork and speculation.  As a result, they have not met their burden of demonstrating that *any* evidence was lost or mishandled, much less evidence whose exculpatory nature was apparent at the time when there was an opportunity for the DEA to collect it.  The issues they have raised do not rise to the level of a due process violation, and they can be addressed adequately at trial through questioning of witnesses and arguments to the jury. Accordingly, the defendants' motion to suppress based on claimed spoliation of evidence should be denied without a hearing.

### A.  Relevant Facts

### 1.  The Defendants' October 4, 2015 Meeting With CW-1 in Honduras

On or about October 3, 2015, CW-1 notified the DEA that two Venezuelans, *i.e.*, the defendants, were expected to travel to Honduras to discuss a cocaine-trafficking venture. The DEA did not provide CW-1 with equipment to record the meeting or arrange for others to attend the meeting and record it.  (*See* Gonzalez Decl. ¶¶ 3, 5-6).  As a result, the Government is unaware of any audio or video recordings relating to the meeting between CW-1 and the

defendants.  CW-1 did, however, send the DEA a photograph that appears to have been taken during the meeting by a third party, which was provided to the defendants during discovery. (*See id.* ¶ 7).  The individual who took the photograph was not acting at the direction of the DEA.  (*See id.* ¶¶ 5, 7, 9).  CW-1 was murdered in Honduras on or about December 4, 2015.  (*Id.* ¶ 8).

### 2.  The Cocaine Sample the Defendants Brought to the Confidential Sources

In late-October 2015, CS-1 and CS-2 traveled to Venezuela at the direction of the DEA in order to meet with the defendants to further discuss the cocaine-trafficking venture.  The DEA provided CS-1 and CS-2 with recording devices, which they used to record portions of at least three meetings with the defendants.  On or about October 27, 2015—during a recorded portion of the meeting and not, as counsel suggests, afterwards—the defendants provided the Kilo and watched as the CSes purported to test the purity of the cocaine through a physical inspection.  (*See* July 1, 2016 Decl. of Randall W. Jackson in Support of Defendants' Joint Motion to Suppress Evidence on the Basis of Spoliation (dkt. no. 50) (the "Jackson Decl.") ¶ 5).

### 3.  The Recordings Produced in Discovery

There were a total of six meetings in three countries for which the DEA used confidential sources to obtain recordings:

- Late-October 2015 Venezuela Meetings.  The defendants met with CS-1 and CS-2 in Venezuela on or about October 23, 26, and 27, 2015.

- Early-November 2015 Honduras Meetings.  Soto and others met with CW-1 and CS-3 in Honduras on or about November 5, 2015.  On or about November 6, 2015, Flores, Soto, and others met with CW-1 and CS-3 in Honduras.

- <u>November 10, 2015 Haiti Meeting</u>.  The defendants met with CS-1 in Haiti on or about November 10, 2015, prior to being taken into custody by the *BLTS*.

DEA agents subsequently met with the confidential sources to download the audio and video files obtained during the meetings.  For each of the six meetings, the DEA obtained from the sources one audio-only file and multiple video files (most of which also contain audio).  The audio files tend to be of longer duration than the video files and to overlap to some extent with the videos.

The Government subsequently produced those approximately 32 files in discovery, along with DEA reports describing the dates of the recordings and the general process by which the recordings were obtained.  (*See* Bove Decl. Exs. J (summary of discovery), K (DEA reports)).[20]

## B.  Applicable Law

In order to prevail on a due process claim relating to allegedly lost or destroyed evidence, the defendant must establish three requirements:

> (1) the "evidence must . . . possess an exculpatory value that was apparent before [it] was destroyed"; (2) "the defendant must be unable to obtain comparable evidence by other reasonably available means"; and (3) "the government must have acted in bad faith in destroying the evidence."

*United States* v. *Saleh*, No. 10 Cr. 623, 2011 WL 1210207, at *2 (S.D.N.Y. Mar. 24, 2011) (quoting *United States* v. *Tyree*, 279 F. App'x 31, 33 (2d Cir. 2008)); *see also Buie* v. *Sullivan*, 923 F.2d 10, 11-12 (2d Cir. 1990); *United States* v. *Henderson*, 442 F. Supp. 2d 159, 163

---

[20] The defendants claim incorrectly that there were only 25 files produced.  (*Compare* Defs. Spoliation Mem. at 9, *with* Bove Decl. Ex. J (listing the 32 files)).

(S.D.N.Y. 2006)  (noting that "defendants must show" that these requirements are met); *United States* v. *Sattar*, No. 02 Cr. 395, 2003 WL 22510435, at *2 (S.D.N.Y. Nov. 5, 2003) (noting that these requirements present a "showing that a defendant must make").

The "*possibility*" that evidence "*could have* exculpated [a defendant] if preserved or tested is not enough . . . ." *Arizona* v. *Youngblood*, 488 U.S. 51, 56 n.* (1988) (emphases added).  Moreover, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.*  Thus, where the evidence at issue "might have led in any number of directions," as opposed to being apparently exculpatory prior to its loss or destruction, the standard is not met.  *Id.*

## C.  Discussion

The defendants seek suppression of all audio and video obtained by the DEA of consensually recorded meetings, as well as the preclusion of testimony at trial regarding the defendants' October 4, 2015 meeting in Honduras and the Kilo that they brought to the meeting with CS-1 and CS-2 in Venezuela on or about October 27, 2015.  (Defs. Spoliation Mem. at 2). For the reasons set forth below, the motion should be denied without a hearing.

### 1.  There Was No Spoliation With Respect to the October 4, 2015 Meeting

The defendants claim that multiple "confidential informants either purposely refused to record, or subsequently destroyed the recording of" their October 4, 2015 meeting with CW-1 and others in Honduras.  (Defs. Spoliation Mem. at 7-8).  The claim is inaccurate in numerous respects and, as such, an insufficient basis to warrant any relief.

37

While the defendants are correct that the photograph of the October 4, 2015 meeting was not taken by CW-1, they are wrong that the picture was obtained by "someone working at the direction of the DEA." (Defs. Spoliation Mem. at 4). Rather, the photograph was taken by an associate of CW-1 who was unknown to the DEA and not authorized to act on behalf of United States law enforcement. (*See* Gonzalez Decl. ¶¶ 5, 7). Thus, the actions by CW-1's associate are not "chargeable to the State," *United States* v. *Rahman*, 189 F.3d 88, 139 (2d Cir. 1999), and not a basis for a due process claim premised on alleged spoliation.

Only one person—CW-1—acted at the direction of the DEA in Honduras in connection with the October 4, 2015 meeting. (*See* Gonzalez Decl. ¶¶ 5, 9). Due to, among other things, the short notice the DEA received from CW-1 about the timing of the defendants' travel to Honduras, the DEA was not able to timely deploy other individuals to act at the direction of United States law enforcement during the meeting. (*See id.* ¶ 6).[21] Moreover, in light of these timing issues as well as CW-1's physical limitations, the DEA did not provide CW-1 with "sensitive audio and video recording devices" for use during the meeting. (Defs.

---

[21] Contrary to the defendants' claims, CW-1 was not a confidential source acting at the direction of the DEA; rather, he was a defendant charged in this District with a drug-trafficking crime who had been providing information and assistance to the DEA since approximately May 2015. The distinction is critical. Professional confidential sources employed by the DEA are usually trained to use recording devices and typically, over time, become comfortable using them to record meetings with investigative targets. CW-1, on the other hand, received no such training, and had little experience at that point with consensually recorded meetings. The fact that he was wheelchair-bound exacerbated the risks associated with making such recordings, and the DEA did not provide him with any special recording equipment. (*See* Gonzalez Decl. ¶¶ 3, 5).

Spoliation Mem. at 2; *see also* Gonzalez Decl. ¶¶ 3(c), 4-5)).  Thus, with respect to the October 4, 2015 meeting with CW-1, the defendants have failed entirely to demonstrate any spoliation.

Even if the DEA had been in a position to cause CW-1, or someone else, to record the October 4, 2015 meeting, no constitutional principal required that the agents do so.  For example, in one case cited by the defendants, the Seventh Circuit Court of Appeals observed:

> This is certainly one of the few—if not the first—times a criminal defendant has complained about the government's *failure* to engage in electronic eavesdropping, and we are quite reluctant to hold that the government's failure to invade, or to invade enough, an individual's privacy during an investigation constitutes outrageous conduct.

*United States* v. *Feekes*, 879 F.2d 1562, 1564 (7th Cir. 1989) (emphasis in original) (cited in Defs. Spoliation Mem. at 9).  The *Feekes* court rejected an argument strikingly similar to the one the defendants now make.  There, the defendant was charged with a heroin-related offense committed inside a prison, and he unsuccessfully pressed an entrapment defense at trial.  *Id.*  On appeal, the defendant argued that the Government had engaged in outrageous conduct by failing "to wire or otherwise monitor the informant when he solicited [the defendant], and as a result essential evidence of entrapment—the evidence of what exactly the informant said to [the defendant] and what he replied—was unavailable."  *Id.*  In rejecting the claim, the court reasoned that risking the "unplanned discovery of the listening apparatus by the subject of the investigation" could "threaten the ultimate success of the investigation, as well as the safety of the informant" in a situation where "the chance of discovery runs high and the consequences severe."  *Id.* at 1565.  The Seventh Circuit's concerns regarding safety and operational integrity

apply with even more force here, as CW-1's physical characteristics put him at greater risk of detection, and he was assisting the DEA in one of the most dangerous countries in the world.[22]

        Finally, "[n]othing about the circumstances of this case or in defendants' meager proffer comes close to raising concerns that [the DEA's] decision not to record was made in bad faith." *United States* v. *Brimage*, 115 F.3d 73, 77 (1st Cir. 1997); *United States* v. *Ramirez*, No. 09 Cr. 446, 2011 WL 6945199, at *2 (S.D.N.Y. Dec. 23, 2011) (denying motion based in part on finding that "defendant proffers no evidence that any recordings—if they existed—were lost or destroyed intentionally or in bad faith"). Campo's declaration falls far short of demonstrating that the DEA acted in bad faith by proceeding in this fashion. (*See generally* July 1, 2016 Decl. of Efrain Antonio Campo Flores In Support of Defendants' Joint Motion to Suppress Evidence on the Basis of Spoliation (dkt. no. 51-1) (the "Campo Spoliation Decl.")). And Flores, who did

---

[22] *See* U.S. Dep't of State, *Honduras 2014 Human Rights Report* at 1 (2014) ("Pervasive societal violence persisted. Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders."); *see also* Marco Cáceres, *Drugs, Violence and Immigration: Think Twice, America*, Huffington Post (July 9, 2014), http://www.huffingtonpost.com/marco-caceres/drugs-violence-and-immigr_b_5571077.html ("'By U.N. statistics, Honduras is the most violent nation on the planet with a rate of 90 murders per 100,000 citizens. . . . These figures become more shocking when compared to those of declared combat zones such as Afghanistan or the Democratic Republic of the Congo (28 in 2012). Profits earned via the illicit drug trade have corrupted and destroyed public institutions . . . , and facilitated a culture of impunity—regardless of crime—that delegitimizes the state and erodes its sovereignty, not to mention what it does to human rights.'" (quoting General John F. Kelly, of the U.S. Southern Command, *Central America Drug War a Dire Threat to US National Security*, Mil. Times (July 8, 2014))).

not submit a declaration regarding this issue, has not even tried.  Therefore, no relief is warranted based on the defendants' arguments regarding the October 4, 2015 meeting.

### 2.  The Confidential Sources' Recordings Did Not Offend Due Process

With respect to the approximately 32 consensual recordings obtained by DEA confidential sources during approximately six meetings relating to the charged conspiracy, the defendants persist in the flawed assertion that the failure to capture each of their words requires suppression of all of the recordings.  Here, too, they are wrong.

There is no evidence that the Government instructed anyone to destroy or negligently handle *any* evidence, much less recordings whose exculpatory nature was apparent at the time the DEA sent confidential sources to the meetings.  The "notable examples" of issues with the recordings identified by the defendants include that:  (i) the "beginning[s]" of the meetings in Venezuela on October 23, 26, and 27 were "not captured on video"; (ii) there are three videos in which audio was not collected at all, or the audio is of poor quality; and (iii) "there are numerous videos from each meeting," "many" of which are "very short."  Put simply, these are not claims sounding in due process.  *See United States* v. *Chaudhry*, 850 F.2d 851, 857 (1st Cir. 1988) ("We see no basis for the imposition, by judicial fiat as it were, of an 'all-or-nothing' rule, requiring officers to record *all* conversations (heedless of risk, opportunity, or likely fruitfulness) or none, with no middle ground." (emphasis in original)).[23]  During their

---

[23] *Accord United States* v. *Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) ("While there is [a due process] obligation to preserve recordings once they have been created, there is no general duty to make recordings in the first place . . . ."); *United States* v. *Andreas*, No. 96 Cr. 762, 1998 WL

efforts to identify indicia of "deliberate manipulation" and "negligent misfeasance," the defendants failed to acknowledge that the Government also produced audio files related to each of the meetings. (*Compare* Defs. Spoliation Mem. at 9 & n.4 (failing to list the audio recordings), *with* Bove Decl. Ex. J (identifying both audio and video recordings)). Although these audio recordings do not appear to have captured the entirety of each meeting, they are longer in duration and captured parts of the meetings that the videos did not, which undercuts the defense argument that confidential sources selectively videotaped parts of the meetings and intentionally excised the supposedly exculpatory portions.

As with the lack of a recording of the October 4, 2015 meeting, the defendants' broader selective-recording argument fails for the independent reason that they have not presented facts suggesting that the Government acted in bad faith. *Cf. United States* v. *Saleh*, No. 10 Cr. 623, 2011 WL 1210207, at *3 (S.D.N.Y. Mar. 24, 2011) ("[The defendant's] conclusory allegation that the destruction was not inadvertent, but intentional, does not necessarily show bad faith on part of the Government; [the defendant] has offered no evidence of deliberate misconduct."); *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) ("Even if the government had been under an obligation to preserve the tapes, [defendant] has pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation.").

---

214666, at *3 (N.D. Ill. Apr. 22, 1998) ("The court is unaware of any authority which recognizes selective taping as a basis for a constitutional challenge to the admissibility of covert audio surveillance by the government.").

Thus, trial, not a motion to suppress, is the proper forum for the defendants to advance their selective-recording arguments.[24]

### 3. The Defendants' Cocaine Sample Is Damning Rather Than Exculpatory

The defendants' argument regarding purported spoliation of the cocaine sample that they presented to CS-1 and CS-2 in Venezuela is puzzling. As is made clear by the still images from the videos set forth above, the recordings of that portion of the meeting are highly incriminating, and even more so in light of the defendants' statements to CS-1, CS-2, CS-3, and the DEA. Campo admits that he obtained the Kilo on consignment ("without cost"), and brought it to the meeting with CS-1 and CS-2. (Campo Spoliation Decl. ¶ 6). The defendants presented the Kilo to CS-1 and CS-2 as an example of the type of cocaine that the defendants could provide to be imported into the United States. Thus, the Kilo lacked exculpatory characteristics prior to the time when the confidential sources departed the meeting and left the cocaine in the care of the defendants. *See United States* v. *Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989) (finding no due

---

[24] *See United States* v. *Ramirez*, No. 09 Cr. 446, 2011 WL 6945199, at *2 (S.D.N.Y. Dec. 23, 2011) ("Defense counsel has the ability to challenge, through cross-examination, the [cooperating witness's] testimony about statements made by the defendant . . . and his general practices with respect to recording such encounters, and can make arguments to the jury about whether the [cooperating witness] testified credibly about his recollection of the statements and his adherence to his general recording practices in this case."); *United States* v. *Henderson*, 442 F. Supp. 2d 159, 163 (S.D.N.Y. 2006) ("[D]efendants will also have every opportunity to cross-examine the government's witnesses as to [the failure to preserve a piece of evidence], so fundamental fairness is not implicated."); *United States* v. *George*, 839 F. Supp. 2d 430, 440 (D. Mass. 2012) (denying motion to dismiss where "the record does not support a conclusion that the allegedly selective recording, either standing alone or in combination with other evidence, amounted to outrageous misconduct" and "the defendant will be able to probe the [cooperating witness's] credibility and explore the significance (if any) of his or her failure to record certain conversations").

process violation where "neither the missing tapes nor the bid documents contained exculpatory evidence that was apparent before they were lost").[25] Once again, the defendants not even alleged that the Government acted in bad faith in connection with the failure of CS-1 and CS-2 to bring evidence from the Kilo back to the DEA. Therefore, the defendants' motion to suppress images of the Kilo and related testimony should be denied, and their evidentiary arguments regarding the presentation of this evidence at trial are both premature and meritless.[26]

---

[25] *Accord United States* v. *Welch*, --- F. App'x ----, Nos. 12 Cr. 4402, 12 Cr. 5004, 2016 WL 536656, at *2 (2d Cir. Feb. 11, 2016) (summary order) ("Defendants also allege a *Brady* violation, in that they argue that the government failed to preserve the marijuana plants, thereby depriving the defendants of the right to inspect the plants. The argument fails, as nothing about the marijuana evidence is exculpatory."); *United States* v. *Davis*, 491 F. App'x 219, 222 (2d Cir. 2012) (summary order) ("There is no showing that the unavailable DNA evidence would have been exculpatory. It was merely potentially useful."); *United States* v. *Ramirez*, 2011 WL 6945199, at *2 ("As to the bag in which the cocaine was transported, the defendant has failed to demonstrate its readily apparent exculpatory value. Nothing inherent in the bag itself that would suggest that the defendant did not participate in the charged conduct."); *United States* v. *Saleh*, 2011 WL 1210207, at *3 ("[The defendant] has failed to show any exculpatory value that was apparent before any of the evidence was destroyed."); *Steele* v. *Duncan*, No. 03 Civ. 477, 2004 WL 2334074, at *6 (S.D.N.Y. Oct. 14, 2004) ("The police do not have a duty to preserve all material that might be of conceivable evidentiary significance. This is especially true when the exculpatory value of the evidence is purely speculative." (internal quotation marks omitted)).

[26] Specifically, the defendants argue, in the alternative, that the Court should preclude the videos involving the Kilo and "any reference to the powdery substance" contained therein pursuant to Federal Rules of Evidence 403 and 802. (Defs. Spoliation Mem. at 13). The Government disputes the defendants' evidentiary arguments regarding this highly probative evidence, which are also premature and should not be resolved prior to the development of a trial record. *E.g.*, *United States* v. *Sanchez*, No. 01 Cr. 277, 2003 WL 1900851, at *4 (S.D.N.Y. Apr. 17, 2003) ("The Court will address [defendant's] evidentiary requests when and if they arise at or just prior to trial . . . ."). For example, the Government will offer statements by CS-1 and CS-2 during the meeting not for their truth, but rather as context for the defendants' responses. Moreover, the probative value of this evidence is enhanced substantially by, among other things, Campo's post-arrest admission that the Kilo contained cocaine. (*See* Bove Decl. Ex. F at 3). Thus, the

### 4.   No Hearing Is Warranted

Because the declarations submitted in support of the defendants' motion are speculative, vague, and to some extent contradicted by the record, no hearing on their spoliation claims is necessary.

"A defendant seeking a hearing on a suppression motion bears the burden of showing the existence of disputed issues of material fact." *United States* v. *Martinez*, 992 F. Supp. 322, 326 (S.D.N.Y. 2014) (internal quotation marks omitted). "[C]ourts have repeatedly stated that defendants must present a sworn affidavit from a person with knowledge of the underlying facts—and that in the absence of such an affidavit an[ ] evidentiary hearing is unnecessary." *United States* v. *Del Rosario*, No. 12 Cr. 81, 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012) (citations omitted); *see also United States* v. *Barrios*, 210 F.3d 355, 200 WL 419940, at *2 (2d Cir. 2000) (unpublished decision) (no evidentiary hearing required on motion to suppress in the absence of "an affidavit of someone alleging personal knowledge of the relevant facts"). The defendants have failed to make this threshold showing.

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks* v. *Delaware*, 438 U.S. 154, 171 (1978). Consistent with that first principle, nearly all of the cases cited by the defendants in support of their request for a hearing involved circumstances in which prosecutors conceded during discovery that evidence had been intentionally destroyed or

---

resolution of Campo's motion to suppress his confession is likely to impact the balancing of the probative value and any prejudice associated with the Kilo-related evidence.

negligently mishandled. (*See* Defs. Spoliation Mem. at 7, 11, 13). Hearings were typically conducted in those cases in order to examine the circumstances surrounding how exculpatory or potentially exculpatory evidence came to be unavailable. [27]

Here, however, the Government is unaware of any recordings—or other exculpatory evidence—once in the possession of the DEA that was subsequently lost. The declarations submitted in support of the defendants' motion fail to plausibly suggest otherwise. For example, both counsel and Campo assert—without first-hand knowledge, as they are not DEA agents—that there were multiple "confidential informants" at the October 4, 2015 meeting. (Jackson Decl. ¶ 3; Campo Spoliation Decl. ¶¶ 3, 5). They are wrong. (*See* Gonzalez Decl. ¶ 5). Similarly speculative is the claim that "confidential informants were equipped *at all stages of the investigation*" with recording devices. (Jackson Decl. ¶ 3 (emphasis added)). Here as well, counsel is incorrect. (*See* Gonzalez Decl. ¶¶ 3(c), 5). Finally, Campo does not assert that CS-1 or CS-2 left the meeting with any of the cocaine that the defendants brought, or the gloves that

---

[27] *United States* v. *Bufalino*, 576 F.2d 446, 448 (2d Cir. 1978) (undisputed that FBI agent "destroyed" recordings "from a back-up recorder"); *United States* v. *Kendrick*, No. 10 Cr. 6096, 2015 WL 627886, at *2 (W.D.N.Y. Feb. 10, 2015) (undisputed that Government was "unable to find any of the physical evidence" from a murder investigation); *United States* v. *Eldridge*, No. 09 Cr. 329-A, 2014 WL 4829146, at *4 (W.D.N.Y. Sept. 29, 2014) (undisputed that police did not maintain custody of previously seized vehicle containing potentially relevant evidence); *United States* v. *Dalisay*, No. 03 Cr. 1305, 2005 WL 1176115, at *1 (S.D.N.Y. May 17, 2005) (undisputed that package containing relevant evidence was seized and later destroyed); *United States* v. *Andreas*, No. 96 Cr. 762, 1998 WL 214666, at *3 (N.D. Ill. Apr. 22, 1998) (accusations of instructions by FBI to former cooperating witness "to destroy audiotapes which allegedly contained exculpatory evidence," which the witness presented "in various newspaper and other published articles" as well as a civil lawsuit); *United States* v. *Fishel*, 324 F. Supp. 429, 432 (S.D.N.Y. 1971) (undisputed that Government initially possessed, and then lost, two of three recordings involving statements of defendant).

they wore while handling it. (Campo Spoliation Decl. ¶ 6). That is because CS-1 and CS-2 did

not merely say that they "intended to test" the Kilo (*id.*); they in fact tested the cocaine in the

presence of the defendants during the meeting. Therefore, there is little more than conjecture

behind the defendants' claim that drug-related evidence from that meeting was collected and

then lost or destroyed by CS-1, CS-2, or the DEA.[28]

Nor is a hearing necessary to resolve the defendants' selective-recording

arguments. As stated above, due process did not require that the DEA obtain recordings of *all* of

the defendants' words, and the defendants have not provided a basis for their claim that the

incompleteness they attribute to the recordings resulted from intentional destruction or negligent

evidence handling practices. The CSes did not shut off their recorders, for example, when

discussing the defendants' supposed "lack of experience" while testing the Kilo, which the

defendants appear to view as exculpatory. (*See* Jackson Decl. ¶ 5(b)). Moreover, rather than

suggesting malfeasance, claims regarding audio that is "impossible to hear," or videos for which

---

[28] Other claims by Campo in the declaration are in significant tension with the record. For
example, Campo claims that he and Flores "lacked the ability to procure the cocaine," but admits
that the Kilo was "provided to me without cost." (Campo Spoliation Decl. ¶¶ 2, 6). He asserts
that he had "no way of knowing" what the Kilo contained; when the DEA showed him a photo of
it, however, he responded "you know what that is." (Bove Decl. Ex. F at 3). Although Campo
told the DEA during his confession that "Hamudi" put him in contact with a FARC-affiliated
cocaine suppler ("El Gocho") and a drug-trafficker in Honduras ("El Negrito"), he now claims
that he was "contacted by individuals whom I later learned were confidential informants" and
that he "lacked the capability to procure the cocaine that the informants wanted." (*Compare*
Bove Decl. Ex. F at 3, *with* Campo Spoliation Decl. ¶¶ 1-2). And despite the fact that the
defendants traveled to Honduras and Haiti via private aircraft in October and November 2015,
Campo claims that he told the supposed "informants" that he and Flores "had no access to means
of transporting drugs, like airplanes." (Campo Spoliation Decl. ¶ 2).

"there is no sound," simply highlight that the recording devices did not always function as intended by the DEA.  (Defs. Spoliation Mem. at 10).  The state of the resulting recordings is also entirely consistent with the CSes having used imperfect devices to record portions of meetings due to, among other things, storage limitations during multi-day trips to foreign countries in which they could not meet with law enforcement to download the files because such meetings would risk compromising the operation and their safety.  The defendants are free to suggest otherwise at trial, but courts have properly denied similarly speculative spoliation-related motions without an evidentiary hearing.  *See United States* v. *Ramirez*, No. 09 Cr. 446, 2011 WL 6945199, at *2 (S.D.N.Y. Dec. 23, 2011) (denying motion to preclude testimony without a hearing where "it is not clear that any [recordings] were ever made" and "the defendant proffers no evidence that any recordings—if they existed—were lost or destroyed intentionally or in bad faith").[29]  The defendants' motion should be met with the same fate.

### III.  The Defendants Are Not Entitled to a Bill of Particulars

The defendants' motion for a bill of particulars seeks to abuse Rule 7(f) as part of their strategic effort to gather information to which they are not entitled at this stage of the

---

[29] *Accord United States* v. *Cox*, 59 F. App'x 437, 440 (2d Cir. 2003) (summary order) (affirming denial of motion to exclude evidence based on spoliation argument based on the trial record, without a hearing, where defendant "neither alleged nor established that the government acted in bad faith in failing to preserve the substance"); *United States* v. *Saleh*, 2011 WL 1210207, at *2 (denying motion to dismiss indictment and for other sanctions based on spoliation argument without a hearing where, among other things, defendant "presented absolutely no evidence that the government acted in bad faith"); *see also United States* v. *Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989) (holding that a missing evidence claim "must fail" where the record was "barren of proof that the government lost the evidence in bad faith").

proceedings. In light of the nature of the charge, the limited timeframe of the alleged conspiracy, and the Government's detailed disclosures during discovery, the motion should be denied.

### A. Relevant Facts

The Government began to produce discovery in this matter on or about December 7, 2015. The initial production included the above-described consensual recordings arranged by DEA exhibit number; DEA reports (also arranged by DEA exhibit number) describing the dates of the recordings and information regarding the chain of custody; consensually recorded BlackBerry messenger communications between CS-1 and Campo that were arranged by date; draft summary translations of some of the consensually recorded materials; and DEA reports relating to the defendants' confessions. This production therefore provided to the defendants the approximate dates of the six recorded meetings in Venezuela, Honduras, and Haiti.

The Government's subsequent productions included search warrant materials authorizing searches of phones seized from the defendants in Haiti and certain electronic facilities (including email accounts used by the defendants), which also included narrative descriptions of the Government's evidence. (*E.g.*, Bove Decl. Ex. L). The Government has continued to provide counsel with additional and revised draft translations of the recordings that were produced during discovery, including as recently as July 22, 2016, and will continue to do so as additional draft translations are completed.

### B. Applicable Law

A bill of particulars is "required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States* v. *Wedd*, No. 15 Cr. 616, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (quoting *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)).   This is so because "[t]he purpose of the bill of particulars is to avoid prejudicial surprise at trial and give defendant[s] sufficient information to meet the charges against him." *Id.*   Thus, "a 'bill of particulars is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'" *United States* v. *Yun Lee*, No. 13 Cr. 290 (PAC), 2013 WL 4889178, at *1 (S.D.N.Y. Sept. 9, 2013) (quoting *United States* v. *Miller*, No. 12 Cr. 368 (PAC), 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012)).   "Nor is the proper scope and function of a bill of particulars to obtain disclosure of evidence or witnesses to be offered by the government at trial." *United States* v. *Dames*, 380 F. Supp. 2d 270, 274 (S.D.N.Y. 2005).

### C. Discussion

The defendants' requests are naked demands for discovery to which they are not entitled, and information that is well beyond what is necessary under Rule 7(f). Specifically, the defendants make six requests:

50

- <u>Request 1</u> seeks the identities of "any known, uncharged co-conspirators"[30];

- <u>Requests 2 and 3</u> seeks details regarding the formation of "the defendants' alleged agreement to import narcotics *into the United States*"; and

- <u>Requests 4, 5, and 6</u> seeks information regarding the Government's preliminary assessment of the "safety valve" provisions, *see* 18 U.S.C. § 3553(f), and the application of the factors set forth in the August 12, 2013 Memorandum of former Attorney General Eric H. Holder Jr. regarding Department of Justice Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (the "Holder Memorandum").

(Defs. Particulars Mem. at 2-3 (emphasis in original); *see also* Bove Decl. Ex. N (the Holder Memorandum)).

The defendants argue that all of this information is "necessary" to allow them to "assess due process concerns, prepare their defenses, and avoid surprise at trial." (Defs. Particulars Mem. at 5, 8). If the defendants think that this prosecution raises due process or jurisdictional issues, they are free to make a motion on that basis. *See United States* v. *Cohen*, 427 F.3d 164, 169 (2d Cir. 2005) (rejecting "casual invocation of constitutional . . . limitations on the extraterritorial application of federal laws designed to combat the distribution and importation of drugs into the United States"); *see also United States* v. *Al Kassar*, 660 F.3d 108,

---

[30] The defendants describe this request inconsistently in their motion papers, suggesting at least once that they are also seeking the identities of charged co-conspirators. (*Compare* Defs. Particulars Mem. at 6 (requesting identities of co-conspirators "whether indicted or not"), *with id.* at 4, 13 (requesting identities of "unindicted, but identified, co-conspirators")). Several case-specific reasons counsel strongly against the disclosure by the Government of all charged co-conspirators. To the extent the defendants are making that request, and if the Court is inclined to grant it, the Government requests permission to make an *ex parte* submission regarding the need for continued sealing.

51

119 (2d Cir. 2011) ("[C]onspiracy offenses . . . often result in no palpable harm. Jurisdictional nexus is determined by the aims of the conspiracy, not by its effects."). But their "concerns" do not warrant a bill of particulars. As alleged in the Indictment and made clear through discovery, this is a straightforward drug-trafficking case involving a conspiracy alleged to have existed for just two months with four core sets of meetings in Venezuela, Honduras, and Haiti. Further disclosures are unnecessary to allow the defendants to adequately prepare their defenses or avoid unfair surprise at trial.

More specifically, with respect to Request 1, the defendants are not entitled to information regarding individuals whom the Government presently considers to be uncharged co-conspirators. *See United States* v. *Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990) (affirming denial of request for identities of "other persons 'known and unknown' as alleged in . . . the indictment"). The defendants offer little by way of explanation as to why it is "critical" that they be provided this information, other than the conclusory—and inaccurate—claim that "all but one of the other people aside from the Defendants who were allegedly involved in the charged conspiracy were confidential informants." (Defs. Particulars Mem. at 6). Among the "others known and unknown" referenced in the Indictment are the individuals that the defendants identified to the DEA during their confessions, including men in Venezuela ("Hamudi," "Gocho," and "Pepero") and Honduras ("Negrito," a/k/a "Flaco"). There were also four other men on the plane with the defendants when they arrived in Haiti who have been identified to counsel. This information, as supplemented by the discovery, illustrates that the defendants have an adequate basis to assist counsel in conducting a factual investigation and preparing for trial.

52

The defendants' authority in support of their request for identification of uncharged co-conspirators consists principally of dated district court opinions relating to prosecutions that were more complex than this case. *See United States* v. *Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006) ("Defendants here have cited a contrary line of district court cases requiring disclosure of co-conspirators, but no appellate authority requiring such disclosure."). For example, the defendants rely on *United States* v. *Failla*, No. 93 Cr. 294, 1993 WL 547419 (E.D.N.Y. Dec. 21, 1993), which was a six-defendant, five-count case involving a RICO charge with four predicate racketeering acts, as well as murder and witness tampering charges. (Defs. Particulars Mem. at 6). There is ample authority supporting the denial of the defendants' request, too. *See, e.g.*, *United States* v. *Torres*, 901 F.2d at 233-34; *United States* v. *Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved.").[31] Thus, "a bill of particulars on this point is entirely a matter of the sound discretion of the court," *United States* v. *Mahaffy*, 446 F. Supp. 2d at 120, and the defendants

---

[31] *Accord United States* v. *Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991) ("A defendant may be indicted and convicted despite the names of his co-conspirators remaining unknown . . . ."); *United States* v. *DiCesare*, 765 F.2d 890, 897-98 (9th Cir. 1985) (holding that bill of particulars "not warrant[ed]" to obtain, among other things "the names of any unknown co-conspirators"); *United States* v. *Glisson*, No. 03 Cr. 148, 2003 WL 21709502, at *3 (S.D.N.Y. July 23, 2003) ("Courts have been highly reluctant to require a bill of particulars when a defendant has asked for specific identities as to co-conspirators or others allegedly involved in the crime."); *United States* v. *Rodriguez*, No. 99 Cr. 367, 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators); *United States* v. *Gallo*, No. 98 Cr. 338, 1999 WL 9848, at *5 (S.D.N.Y. Jan. 11, 1999) (same); *United States* v. *Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (same); *United States* v. *Muyet*, 945 F. Supp. at 599 (same).

have failed to demonstrate why they are entitled to the identification of uncharged-but-known co-conspirators, especially in light of the relatively brief duration of the charged conspiracy and the detailed information that the Government has already provided.

In Requests 2 and 3, the defendants seek particulars regarding "*when* (as well as where and with whom) the defendants allegedly agreed to import cocaine *into the United States*." (Defs. Particulars Mem. at 8 (emphases in original)).  Contrary to the defendants' claims, "[i]n this circuit, demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."  *United States* v. *Santana*, No. 13 Cr. 147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (internal quotation marks omitted).  Indeed, "[i]n the context of prosecutions of narcotics conspiracies, courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy."  *United States* v. *Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001); *see also United States* v. *Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge.").  As explained above in the Background section, the Government's theory of this case is that, at or before the October 4, 2015 meeting with CW-1 in Honduras—one of the principal transshipment points in the world for U.S.-bound cocaine produced in Colombia and dispatched from

54

Venezuela[32]—the defendants agreed with each other, among others, to participate in a cocaine transaction that would involve the importation of more than five kilograms into the United States. The defendants manifested their agreement through, among other things, electronic communications that have been produced during discovery and three sets of subsequent meetings with CS-1, CS-2, and/or CS-3. "The prosecution need not particularize all of its evidence." *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). Nevertheless, the discovery that has already been provided included detailed information regarding these communications and meetings, recordings of portions of the meetings, and draft transcripts of several of them. *See United States* v. *Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (holding that a defendant was "not entitled to anything more" where the Government "significantly condensed the voluminous discovery produced by the prosecution into a form that apprised [the defendant] of what the government would seek to prove at trial"). The defendants are not presently entitled to any further detail.

Request 4, which pertains to information relevant to the application of the safety valve, is meritless. "Gamesmanship is not the point of the safety valve." *Borras* v. *United States*, No. 99 Cr. 689, 2003 WL 21960991, at *2 (S.D.N.Y. Aug. 13, 2003). By its express terms, Section 3553(f) is to be applied by the Court (not the Government) at sentencing (not

---

[32] *E.g.*, United Nations Office on Drugs and Crime, *World Drug Report 2016* at 37-38 (2016), http://www.unodc.org/doc/wdr2016/WORLD_DRUG_REPORT_2016_web.pdf; *see also* Steven Dudley, *How Drug Trafficking Operates, Corrupts in Central America*, InSight Crime (July 6, 2016), http://www.insightcrime.org/news-analysis/how-drug-trafficking-operates-corrupts-in-central-america ("Central America has long been a bridge that connects the producer countries in South America to the consumer nations in the north, principally the United States.").

prior to trial). *See* 18 U.S.C. § 3553(f). Moreover, the defendants bear the burden of establishing eligibility for safety-valve relief. *E.g.*, *United States* v. *Tang*, 214 F.3d 365, 371 (2d Cir. 2000). And because the defendants have not "truthfully provided to the Government all information and evidence" that they have "concerning the offense," 18 U.S.C. § 3553(f)(5), the Government is not in a position to make the "recommendation" to the Court at sentencing called for by Section 3553(f). Thus, in the current procedural posture, the Government is under no obligation to disclose—and Rule 7(f) does not require the disclosure of—the basis for its preliminary views regarding the defendants' eligibility for this relief.[33]

Finally, with respect to Requests 5 and 6, as in every case involving an alleged violation of Title 21, the Government considered the factors set forth in the Holder Memorandum prior to presenting the charge to a grand jury. After doing so, the Government

---

[33] This Court's decision in *United States* v. *Jackson* is not to the contrary. (*See* Defs. Particulars Mem. at 10-11). In *Jackson*, the defendant was charged with being a felon in possession of a firearm, a crime that does not by itself carry a mandatory minimum sentence, but his criminal history put him at risk of facing a 15-year mandatory minimum sentence under the Armed Career Criminal Act ("ACCA"). No. 13 Cr. 142 (PAC), 2013 WL 4744828, at *1 (S.D.N.Y. Sept. 4, 2013). The defendant sought a pretrial ruling regarding the "purely legal" issue of whether his criminal history made him subject to ACCA; the Court found the issue to be ripe for decision, and then concluded that the defendant's convictions did not trigger ACCA. *Id.* at *2 (internal quotations marks omitted). Unlike in *Jackson*, the defendants in this case are charged with a crime that by itself carries a mandatory minimum sentence. *See* 21 U.S.C. § 960(b)(1)(B). There is no uncertainty in that respect—if they proceed to trial, that is one of the penalties they will face (although they can still pursue the safety-valve after trial). *Jackson* is also distinguishable in that further factual development is necessary to address the application of the safety valve in this case. Thus, *Jackson* in no way suggests that the defendants are entitled to particulars from the Government with respect to any of the factors set forth in Section 3553(f).

determined that charging the defendants with an offense involving a 10-year mandatory minimum sentence was consistent with those factors. Counsel cannot reasonably claim to be surprised by this decision. Indeed, they argue in their motions that the Government's allegations suggest "that the Defendants . . . were among the most powerful drug traffickers in the world . . . ." (Defs. Spoliation Mem. at 16 n.5). In any event, the Holder Memorandum states explicitly that it "is not intended to create or confer any rights, privileges, or benefits in any matter, case, or proceeding." (Bove Decl. Ex. N at 2 n.2 (Holder Mem. (citing *United States* v. *Caceres*, 440 U.S. 741 (1979))). Thus, the Holder Memorandum does not create for the Government any obligations beyond Rule 16, *Brady*, and *Giglio*. And although the Government has complied with the charging policy in this case, even "[n]on-compliance with internal departmental guidelines is not a ground for complaint." *United States* v. *Myers*, 692 F.2d 823, 846 (2d Cir. 1982) (citing *United States* v. *Caceres*, 440 U.S. at 741). Accordingly, Requests 5 and 6 are similarly meritless, and the defendants' entire motion for a bill of particulars should be denied.

## IV. The Request for *Brady* Material Is Moot and the Request for Early Production of *Giglio* Material Should Be Denied

Speculating that this prosecution is "possibly" motivated by "raw international politics," the defendants seek: (i) the "immediate disclosure" of *Brady* material; (ii) disclosure of the identities of the Government's confidential sources 90 days before trial; and (iii) the disclosure of impeachment material 90 days before trial. (Defs. Disclosures Mem. at 1). The Court should deny these motions. The Government's obligations to disclose evidence are defined, and limited, by well-established constitutional principles and statutory provisions. The

Government has complied with those obligations here and will do so going forward.  As such, there is no basis to order the broad, early disclosures that the defendants seek.

### A.   The Government Is In Compliance With Its *Brady* Obligations

Under *Brady* v. *Maryland*, 373 U.S. 83 (1963), the Government is obligated by the Due Process Clause of the Fifth Amendment "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).  Evidence is "material" under *Brady* only if disclosure of the evidence would lead to "a reasonable probability of a different result" in the outcome of a trial. *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

Courts, including this one, have denied defense requests for specific *Brady* material where the Government has made good-faith representations that it understands its discovery obligations and will comply with these obligations going forward.  *See, e.g.*, *United States* v. *Baldeo*, No. 13 Cr. 125 (PAC), 2013 WL 5477373, at *6 (S.D.N.Y. Oct. 2, 2013); *United States* v. *Young*, No. 10 Cr. 640 (PAC), 2011 WL 838907, at *4 (S.D.N.Y. Mar. 9, 2011) ("[The Government] asserts that it will provide [*Brady*] materials if discovered 'in time for [their] effective use at trial,' as required by *United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  This is sufficient.  Accordingly, the motion is moot."), *aff'd sub nom. United States* v. *Darling*, 519 F. App'x 58 (2d Cir. 2013).

The Government therefore reiterates the message that it communicated to defense counsel via email on June 16, 2016:  the Government is aware of its discovery obligations,

including its *Brady* obligations, has complied with those obligations, and will continue to do so going forward.  In light of that repeated undertaking, the defendants' motion should be denied.

## B.  The Defendants Are Not Entitled to Early Disclosures Regarding the Confidential Sources

The Government intends to make each of the confidential sources that was used during the investigation (the "Confidential Sources") available to defense counsel, either as witnesses at trial or on an attorneys-eyes-only basis no later than October 28, 2016.[34]  The defendants have failed to demonstrate a justifiable need for further, or earlier, disclosures.

### 1.  Applicable Law

The "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'"  *United States* v. *Shamsideen*, No. 03 Cr. 1313, 2004 WL 1179305, at *11 (S.D.N.Y. Mar. 31, 2004) (quoting *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957) and *United States* v. *Jackson*, 345 F.3d 59, 69 (2d Cir. 2003)).  To overcome this qualified privilege against disclosure—often referred to as the informant's privilege —"[t]he defendant bears the burden of showing the need for a disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived

---

[34] The Government reserves the right to move *in limine* for the imposition of protective measures with respect to any Confidential Source.  For example, a DEA confidential source was permitted to testify under a pseudonym in *United States* v. *Viktor Bout*, which also involved an international sting operation.  No. 08 Cr. 365 (SAS); *see also United States* v. *Taylor*, No. 11 Cr. 310 (PGG); *United States* v. *Ramirez*, No. 07 Cr. 135 (RPP); *United States* v. *Gardner*, No. 07 Cr. 1229 (JSR); *United States* v. *Smith*, No. 05 Cr. 922 (DLC); *United States* v. *Miranda*, No. 05 Cr. 189 (GBD); *United States* v. *Grant, et al.*, No. 04 Cr. 207 (BSJ).

of his right to a fair trial." *United States* v. *Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citation omitted).

Overcoming the informant's privilege requires the defendant to do more than simply show that the informant was a witness to the crime charged. *See United States* v. *Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (citing *United States* v. *Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986)); *United States* v. *Castro*, No. 94 Cr. 809, 1995 WL 6235, *2 (S.D.N.Y. Jan. 6, 1995). Nor can a defendant meet his burden by speculating about the Government's case, or the informant's role therein. *See United States* v. *Fields*, 113 F.3d at 324 ("Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden . . . ."). Instead, the defendant must make a specific showing that "the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause . . . ." *United States* v. *Saa*, 859 F.2d at 1073 (internal quotation marks omitted) (holding that defendant had made requisite showing where NYPD officers gave conflicting testimony regarding defendant's whereabouts during drug transaction, and informant could have provided additional information on defendant's location during transaction).

Since *Saa*, the Second Circuit has found disclosure at trial of the identity of informants, or the Government's production at trial of the informants for testimony, sufficient to permit a defendant to conduct a meaningful defense. *See DiBlasio* v. *Keane*, 932 F.2d 1038, 1043 (2d Cir. 1991) (permitting government to physically produce informant for testimony to address defendant's need to obtain informant's identity in presentation of entrapment defense).

## 2. Discussion

The Government's undertaking to make the Confidential Sources available to defense counsel on an attorneys-eyes-only basis by October 28, 2016, if they are not otherwise expected to testify at trial, is sufficient to permit them to prepare their defenses. *See United States* v. *Muyet*, 945 F. Supp. 586, 602 n.16 (S.D.N.Y. 1996) (reasoning that calling informants to testify at trial, coupled with production of impeachment material one week prior to testimony of each witness, allowed "defendants to conduct a meaningful defense").[35] The defendants' motion for earlier disclosure of the Confidential Sources' identities—90 days before trial—should be denied.

To begin with, the defendants have failed to overcome the informant's privilege because they have not made a specific showing as to how the identities of the Confidential Sources would be relevant and helpful to their defense. *See, e.g.*, *United States* v. *Prescott*, 125 F.3d 845 (2d Cir. 1997) (unpublished opinion) ("[T]he defendant must, at the very least, make some evidentiary showing demonstrating why the informant's testimony is significant to

---

[35] *Accord United States* v. *Philippeaux*, No. 13 Cr. 277, 2015 WL 405240, at *4 (S.D.N.Y. Jan. 30, 2015) ("[T]he Defendant has not demonstrated how he will lose his right to a fair trial considering the reality that Defendant will be able to cross-examine these informants at trial."); *United States* v. *Rodas*, No. 91 Cr. 1036, 1992 WL 30936, at *2 (S.D.N.Y. Feb. 13, 1992) ("However, the government is not required to disclose the names, addresses, social security numbers, and present whereabouts of the confidential informants. Instead, the government may produce them for an interview with defendant's counsel, leaving it to the confidential informants to determine whether they wish to be interviewed."); *see also DiBlasio* v. *Keane*, 932 F.2d at 1043 (requiring upon retrial, in case involving entrapment defense, that "the name of the informant be given to the defense, and his last known whereabouts disclosed" or that the informant be "physically produce[d] . . . for testimony").

determining the defendant's guilt or innocence."). The defendants offer only vague references to the need to decide whether to "seek to call" the Confidential Sources as defense witnesses, their desire to "adequately prepare to cross examine" them, and their interest in being "able to test the informants' actual knowledge of events that occurred in the past," which also sounds a lot like cross-examination. (Defs. Disclosures Mem. at 7). These arguments fail, as "mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *United States* v. *Santoro*, No. 03 Cr. 484, 2004 WL 2346621, at *3 (S.D.N.Y. Oct. 19, 2004); *see also United States* v. *Belin*, No. 99 Cr. 214, 2000 WL 679138, at *10 (S.D.N.Y. May 24, 2000) (rejecting argument that "in order to properly prepare a defense in this matter, it is important that the defense be aware of all information related to the informants' credibility and background" as "insufficient to show how confidential informants' potential testimony would be relevant to the defense, or even, what the defense would be"). Insofar as the defendants' anticipated entrapment defense is concerned, no Confidential Sources were present at the initial October 4, 2015 meeting, during which the defendants met with the now-deceased CW-1 to discuss the cocaine-trafficking venture after having traveled to Honduras. The defendants met with CS-1 and CS-2 weeks later in Venezuela, and CS-3 met with Flores, only, in Honduras after Flores had participated in at least *four* other meetings concerning the planned cocaine-trafficking venture. As such, the defendants have not established that the identities of, or testimony from, CS-1, CS-2, and, particularly, CS-3, are of anything more than marginal relevance to the issue of whether the defendants were unlawfully induced into participating in the charged conspiracy, and they have not overcome the informant's privilege to justify the early disclosures they seek.

Further, "[i]n narcotics cases, early disclosure of informants' true names with other identifying information can have repercussions that can prevent a fair trial." *United States* v. *Manley*, 781 F. Supp. 296, 298 (S.D.N.Y. 1992). Here, even if testimony or information from the Confidential Sources is relevant and helpful to the defense, there are significant safety concerns justifying more limited disclosures closer to trial. The Confidential Sources have participated in multiple significant international drug-trafficking investigations, including cases focused on some of the most violent places in the world targeting extremely violent criminals. As such, wide disclosure of the Confidential Sources' identities would put them, their relatives, and their associates at great personal risk. *See United States* v. *Jimenez*, 824 F. Supp. 351, 365 (S.D.N.Y. 1993) (where defendants failed to make sufficient showing as to how informants' testimony would be material to their defense, Government's interest in protecting informants' safety outweighed need to learn informants' identities). And disclosure of their identities 90 days prior to trial—where there is no guarantee that there will be a trial at all—would foist these risks upon the Confidential Sources and others under circumstances that may prove to have been entirely unnecessary.[36] Therefore, in light of the Government's undertakings to either call the Confidential Sources as witnesses at trial, or make them available to counsel on an attorneys-eyes-only basis by October 28, 2016, the defendants' request for earlier disclosures should be denied.

---

[36] (*E.g.*, Defs. Particulars Mem. at 11 (suggesting that defendants have not yet made "an informed judgment on whether to proceed to trial in this matter")).

### C. Early *Giglio* Disclosures Are Unwarranted

Taking another bite at the early-disclosures apple with respect to the Confidential Sources, the defendants also request an order compelling the production of *Giglio* material 90 days prior to trial; an order that would, in effect, require the Government to identify its witnesses within that timeframe.   The motion should be denied.   As with any *Brady* material, the Government is aware of its obligations under *Giglio* and—consistent with longstanding practices in this District—intends to comply with those obligations by making impeachment material relating to its anticipated trial witnesses available by October 28, 2016.

"Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."   *United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *United States* v. *Coppa*, 267 F.3d at 146.  As this Court has stated previously, the production of *Giglio* material "shortly prior to the commencement of trial" is "customary in this district."   *United States* v. *Miller*, No. 12 Cr. 368 (PAC), 2012 WL 4791992, at *2 (S.D.N.Y. Oct. 9, 2012).[37] There are sound reasons for this rule.   For one, impeachment material "does not ordinarily require any independent investigation in order to use it effectively at trial."   *United States* v. *Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000).

---

[37] *Accord United States* v. *Viera*, No. 14 Cr. 83, 2015 WL 171848, at *6 (S.D.N.Y. Jan. 14, 2015) (holding that production of *Giglio* material one week before trial and Jencks Act material for all witnesses on the Friday before trial "comports with the defendants' due process rights" (collecting cases)); *United States* v. *Davis*, 57 F. Supp. 3d 363, 369 (S.D.N.Y. 2014) (approving production of *Giglio* material, including with respect to a confidential informant and cooperating witness by "reveal[ing] their identities," one week before trial); *United States* v. *Davis*, No. 06 Cr. 911, 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009).

Also, requiring early disclosure of *Giglio* material would effectively require the Government to produce a witness list well in advance of trial. *See id.*

Here, the Government has agreed to produce any *Giglio* material by October 28, 2016, approximately 10 days before trial.[38]  This timeline is consistent with the Court's holding in *Miller*, as well as several recent trials in this District involving multi-country international sting investigations with confidential sources, cooperating witnesses, and conspiracies alleged to have occurred for longer than two months.  For example, in *United States* v. *Georgescu*, No. 14 Cr. 799 (S.D.N.Y. 2016), the Government provided *Giglio* and 3500 material on the Tuesday before jury selection, in a trial involving two cooperating witnesses, a confidential source, and charges of conspiracy to murder Americans and provide material support to the FARC between May 2014 and October 2014, with evidence relating to conduct in Romania, Montenegro, Italy, Germany, Albania, Poland, and Bulgaria.[39]  Thus, the defendants' urgings about the supposed

---

[38] The defendants also seek an order requiring "the confidential informants to submit to hair testing for use of narcotics."  (Defs. Disclosures Mem. at 10).  This request is baseless.  The defendants may cross-examine the Confidential Sources and agents, and make arguments to the jury, regarding the Confidential Sources' conduct in the meetings with the defendants.  (*See* Campo Spoliation Decl. ¶ 7).  But the Government's *Giglio* obligations extend only to information or data in its possession, custody or control.  *See United States* v. *Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152, at *4 (S.D.N.Y. Mar. 16, 2012) ("There is no affirmative duty upon the government to take action to discover information which it does not possess . . . [l]ikewise, the Government is not obliged to obtain evidence from third parties, including cooperators." (internal citations and quotations omitted)).  Thus, there is no basis for ordering the Government to obtain hair samples from the Confidential Sources.

[39] *Accord United States* v. *Muntslag*, No. 13 Cr. 635 (S.D.N.Y. 2016) (*Giglio* and 3500 material produced the week before drug-trafficking trial with conduct in Suriname, Trinidad, and Panama between approximately December 2011 and August 2013); *United States* v. *Garavito*, No. 12 Cr. 839 (S.D.N.Y. 2015) (*Giglio* and 3500 material produced four days before narcoterrorism and

complexities associated with this case do not warrant the early disclosures they seek, and the motion should be denied.

## V.  The Defendants Are Not Entitled to the Early Production of Translated Materials

The defendants' motion for "Early Production" of English translations is a transparently titled, but legally meritless, further attempt to force the Government to "identify the key evidence" 90 days prior to trial.  (Defs. Transcripts Mem. at 5).  Accordingly, the motion should be denied.

Contrary to the defendants' claim, Rule 16(a) does not require the Government to *create* materials such as translations; those provisions require the production of materials already in the Government's "possession, custody, or control."  No case the defendants cite holds otherwise, and their principal authority for this aspect of the motion—*United States* v. *Cashion*, No. 12 Cr. 20, 2013 WL 1791052 (W.D.N.C. Apr. 26, 2013)—did not involve translations of foreign-language materials.  (*See* Defs. Transcripts Mem. at 2).

The discovery produced by the Government, as detailed above, has provided a more-than-sufficient basis for counsel to conduct a constitutionally sufficient investigation and plan their defenses.  Most recently, on July 22, 2016, the Government made available draft translations and transcriptions of 22 of the approximately 32 recordings obtained by CS-1, CS-2,

---

drug-trafficking trial with conduct in Guinea Bissau, Colombia, and Holland between approximately May 2012 and January 2013); *United States* v. *Epskamp*, No. 12 Cr. 120 (S.D.N.Y. 2015) (*Giglio* and 3500 material produced 10 days before drug-trafficking trial with conduct in the Dominican Republic, Colombia, Belgium, and the Middle East between approximately January 2009 and December 2011—where one cooperating witness testified at trial via videoconference while incarcerated in Colombia).

and CS-3, as well as hundreds of pages of draft translations of additional electronic communications involving one or both of the defendants.  The Government will continue to provide counsel with draft translations that it considers potentially relevant as they are completed.  Moreover, on June 16, 2016, the Government notified counsel of its intention to offer expert testimony at trial regarding the preparation and accuracy of transcriptions and translations of certain of the foreign-language materials produced during discovery.  Thus, the defendants were put on notice—more than four months before trial—that they will need to be prepared to meet, in one way or another, the translations prepared by the Government's Spanish-language experts.

The defendants are free, of course, to prepare their own translations of materials they deem pertinent.  *See United States* v. *Gee*, 695 F.2d 1165, 1167 (9th Cir. 1983) (reasoning that defendant "does not allege and we find no reason to assume that [he] was prevented or disabled from producing a transcript for his own use in the same manner in which the Government was able to produce its own").  And their motion papers bely any suggestion that retained counsel from two large law firms have forgone the opportunity to do so.  (Jackson Decl. ¶ 5 ("I have also reviewed an English language translation of the recording.")).  The Spanish-speaking defendants are also well positioned to facilitate review of the evidence—much of which they have had since December 2015 and involves meetings they participated in and electronic devices and facilities they once controlled.  Therefore, the defendants' motion for "early production" of "all English-translated materials that [the Government] intends to use at trial" should be denied.

67

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should conduct a limited evidentiary hearing at which the Government will establish that the defendants' confessions were made knowingly, voluntarily, and intelligently, and deny the defendants' remaining motions without a hearing.

Dated: New York, New York
      July 22, 2016

                              Respectfully Submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

By:                          
                              Emil J. Bove III
                              Brendan F. Quigley
                              Michael D. Lockard
                              Assistant United States Attorneys

Cc:    Defense Counsel
        (Via ECF)

68