Exhibit L

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A Blue Samsung Galaxy 6 Edge and Stored<br>Electronic Communications | )<br>)<br>)<br>)<br>)<br>) |

Case No.

16 MAG 2799

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

located in the _____ Southern _____ District of _____ New York _____, there is now concealed *(identify the person or describe the property to be seized)*:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 812, 841, 843, 846,<br>952, 959, 963;<br>18 USC 924, 1956, 1957 | Drug trafficking crimes involving distribution, possession with intent to distribute,<br>manufacturing, and importation of controlled substances; firearms offenses;<br>money laundering crimes involving the proceeds of drug trafficking crimes |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Kimojha Brooks, DEA

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 05/02/2016 _____

City and state: New York, NY

*Judge's signature*

Honorable Paul A. Crotty, USDJ, SDNY

*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of an Application for
Search Warrants Relating to (i) a Blue
Samsung Galaxy 6 Edge; (ii) Four
Email Accounts; and (iii) an Apple
iCloud Account.

USAO Reference No. 2008R02282.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Affidavit in Support of Applications for Search Warrants for an Electronic Device and
Stored Electronic Communications**

STATE OF NEW YORK       )
                        ) ss.
COUNTY OF NEW YORK   )

KIMOJHA BROOKS, being duly sworn, deposes and states:

**I.    Introduction**

1.  I am a Special Agent of the Drug Enforcement Administration ("DEA") and have
been employed as a Special Agent since approximately 2000.  During my tenure as a Special
Agent with the DEA, I have conducted and participated in numerous investigations of criminal
activity, including the investigation of international narcotics, money laundering, and weapons
trafficking offenses, and of related crimes of violence.  During the investigation of these cases, I
have participated in the execution of numerous search warrants, including numerous e-mail
search warrants.

2.  I am familiar with the information contained in this Affidavit based on my review of
documents, conversations and other communications that I have had with law enforcement
officers in the United States about this matter, and my training and experience.  Because this
Affidavit is being submitted for the limited purpose of establishing probable cause to search the
device and accounts described below, I have not included each and every fact learned during the

1

course of this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.  Where actions, conversations, and statements of others are related, they are related in substance and in part, except where otherwise indicated.

## II.    The Subject Device

3.  I am respectfully submitting this Affidavit in support of an application for a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, authorizing a search of the blue Samsung Galaxy 6 Edge with IMEI ████████████ (the "Subject Device"), which is in the possession of the DEA in the Southern District of New York.

4.  Based on my training and experience, I know that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant (or "PDA") with email and other electronic-communications capabilities.

## III.    The Subject Email Accounts

5.  I am also respectfully submitting this Affidavit in support of an application for search warrants directed to (i) Microsoft Corporation ("Microsoft") and (ii) Google, Inc. and Google Payments Corp. (collectively, "Google," and with Microsoft the "Email Providers"), pursuant to Title 18, United States Code, Section 2703, for all content and other information associated with the following "Subject Email Accounts":

a.  The email account ████████████@gmail.com," with subscriber information unknown ("Subject Account-1"), which is maintained at premises controlled by Google.

2

b.  The email account ██████████ @hotmail.com," with subscriber information unknown ("Subject Account-2"), which is maintained at premises controlled by Microsoft.

c.  The email account ██████████ com," with subscriber "frank flores" ("Subject Account-3"), which is maintained at premises controlled by Google.

d.  The email account ██████████ @hotmail.com," with subscriber "Efrain Campos" ("Subject Account-4"), which is maintained at premises controlled by Microsoft.

6.  Based on my training, experience, and participation in this investigation, I know the following about the Email Providers:

a.  The Email Providers offer email services to the public.  In particular, the Providers allow subscribers to maintain email accounts under a variety of domain names, such as gmail.com or hotmail.com.  A subscriber using the Email Providers' services can access his or her email account from any computer connected to the Internet.

b.  The Email Providers maintain the following records and information with respect to every subscriber account:

i.  *Email contents*.  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Email Providers' servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Email Providers' computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on the Email Providers' servers for a certain period of time.

ii.    *Address book*.  The Email Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.    *Subscriber and billing information*.  The Email Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses.  The Email Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber.  Additionally, for paying subscribers, the Email Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.    *Transactional information*.  The Email Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (i.e., session) times and durations and the methods used to connect to the account (such as logging into the account through the Email Providers' websites).

v.    *Customer correspondence*.    The Email Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

vi.    *Preserved records*.  The Email Providers also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

## IV.    The Subject iCloud Account

7.  I am also submitting this affidavit in support of an application for a search warrant directed to Apple, Inc. ("Apple"), pursuant to Title 18, United States Code, Section 2703, for all

content and other information associated with the iCloud Account associated with User ID

██████████ hotmail.com" (the "Subject iCloud Account").

8.    Based on my training, experience, and participation in this investigation, I know the

following about Apple:

a.    Apple designs, manufactures, and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications. Apple's products and services include Mac, iPhone, iPad, iPod, Apple TV, a portfolio of consumer and professional software applications, the iOS and Mac OS X operating systems, iCloud, and a variety of accessory, service and support offerings. Apple also sells and delivers digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store.

b.    The iPhone is a line of smartphones designed and marketed by Apple.  It runs Apple's iOS mobile operating system.  The user interface is built around the iPhone's multi-touch screen, including a virtual keyboard.  The iPhone has wireless internet capabilities and can connect to many cellular networks around the world.  The iPhone can shoot video, send and receive email, browse the Internet, send text messages, provide navigation services via Global Positioning Satellite location technology, record notes, do mathematical calculations, and receive visual and audio voicemail.  Other functions such as video games, reference works, social networking—including Facebook and Twitter—can be enabled by downloading application programs ("apps" or, singular, "app").  Apple operates an App Store which offers more than one million apps by Apple and third parties, and is ranked as the world's second largest mobile software distribution network of its kind.

c.  iCloud is Apple's cloud service, a file hosting, storage, and sharing service that is provided for iCloud user account users and is linked to, associated with, and accessible using an iCloud email account.  This integration allows users to directly upload documents, files, photos, and other electronic data on Apple servers to the iCloud account, store them on iCloud, and share data with other users.  It also allows users to access their music, photos, documents, and more from all their devices and any computer with an Internet connection.  After uploading photos and/or files to iCloud, a subscriber can share the photos and other files with friends or to anyone on the iCloud network.  The user can send an email, using the user's iCloud email account, to other individuals inviting them to view the photos and files.  The service allows the user to keep the files private, share only with specific contacts, or make the files public. Subscribers can also use iCloud to back up third-party applications, often called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.  In my training and experience, evidence related to criminal activity of the kind described above may be found in these files and records.

d.   Apple provides iCloud subscribers with free electronic space to backup and/or store electronic data.  This electronic storage space on iCloud enables subscribers to back up their iOS devices to iCloud.  The electronic storage space is located on computers owned and maintained by Apple and can be used to sync and configure data on multiple iOS devices.

e.  iCloud subscribers obtain an account by registering online.   An iCloud subscription provides subscribers with a username, which may take the form of an email address. Based on my training and experience, I know that an Apple ID is an all-in-one email address that is used to log into various online systems that Apple offers for many of its products.  Users of

Apple products such as "iTunes" and "Photostream" can have one Apple ID that corresponds to their accounts, and iCloud has the capability to sync data across multiple Apple products.

f.   The following information may be available from iCloud:

i.   *Subscriber Information*.  When a customer sets up an iCloud account, basic subscriber information such as name, physical address, email address, telephone number, and other identifiers (such as alternative email addresses) may be provided to Apple. Subscribers who elect to purchase more than the standard amount of space must provide the means and source of payment, including a credit card or bank account number.  Consequently, the computers of Apple are likely to contain stored electronic communications—including retrieved and unretrieved email for iCloud subscribers—and information concerning subscribers and their use of Apple iCloud services, such as account access information, email transaction information, and account application information.  In addition, a subscriber's identifying information often includes the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, in my experiences in law enforcement, Apple—as a provider—likely maintains records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the iCloud account.

ii.  *Mail Logs*.  For each iCloud account, Apple maintains "mail logs," which are records of incoming and outgoing communications.  Mail logs specify the time, date, sender

email addresses, and recipient email addresses tied to particular communications. Apple retains these mail logs for a period of approximately 60 days.

         iii.   *Email Content*. iCloud stores the email a subscriber has elected to maintain in the account while the subscriber's account remains active. An undeleted message can therefore remain on Apple's servers indefinitely. By contrast, Apple will be unable to retrieve any deleted content. For undeleted content, email users can (and often do) store messages in personalized folders such as a "sent folder." Search warrants for email accounts and computer media may therefore reveal stored emails sent and/or received long before the date of the search.

         iv.   *Other iCloud Content. Photo Stream, Docs, Contacts, Calendars, Bookmarks, iOS, and Device Backups.* iCloud stores only content for the services that the subscriber has elected to maintain in the account while the subscriber's account remains active. Apple does not retain deleted content once it is cleared from Apple's servers. iCloud content may include stored photos, documents, contacts, calendars, bookmarks and iOS device backups. iOS device backups may include photos and videos in the users' camera roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail**.**

         v.   *Preserved records*. Apple typically maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

## V.   Jurisdiction and Authority to Issue Warrants Relating to the Subject Email Accounts and Subject iCloud Account

       9.  Pursuant to Title 18, United States Code, Sections 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Email Providers and Apple, to disclose all stored content and all

non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

10. A search warrant under Section 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

11. When the Government obtains records under Section 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## VI.    The Subject Offenses

12. For the reasons set forth below, I respectfully submit that there is probable cause to believe that the Subject Device, Subject Email Accounts, and Subject iCloud Account contain evidence, fruits, and instrumentalities of criminal offenses, including (i) drug trafficking crimes involving distribution, possession with intent to distribute, manufacturing, and importation of controlled substances, in violation of Title 21, United States Code, Sections 812, 841, 843, 846, 952, 959 and 963; (ii) money laundering crimes involving the proceeds of drug trafficking crimes, in violation of Title 18, United States Code, Sections 1956 and 1957; and (iii) weapons offenses, in violation of Title 18, United States Code, Section 924 (the "Subject Offenses").

## VII.    Probable Cause

### A.  The Offense Conduct

13. Since at least in or about 2013, the DEA has been investigating individuals based in Venezuela, Honduras and elsewhere who have participated in large-scale drug trafficking and money laundering activities relating to the importation of cocaine into the United States.

14. Based on my participation in this investigation and conversations with other DEA personnel who have participated in the investigation, I know, among other things, the following:

a.   Beginning in or about October 2015, Efrain Antonio Campo Flores ("Campo Flores") and Franqui Francisco Flores de Freitas ("Freitas") participated in recorded meetings outside the United States, with individuals acting at the direction of the DEA, relating to the transportation of a multi-hundred-kilogram load of cocaine from Venezuela to Honduras via aircraft, and the sale of a portion of the cocaine to purported Mexican drug traffickers (*i.e.*, certain of the confidential sources) who explained that they would import some or all of the cocaine into the United States.

b.   In or about October 2015, Campo Flores and Freitas met with two confidential sources acting at the direction of the DEA ("CS-1" and "CS-2") [1] outside the United States.  The meeting was audio and video recorded.  Based on my review of a draft summary translation of the meeting, I know that Campo Flores, Freitas, CS-1, and CS-2 discussed, in substance and in part, the distribution of narcotics and examined what appeared to be a kilogram package of cocaine.  Set forth below is a still image from one of the videos recorded during the meeting that appears to depict Campo Flores holding the kilogram package of cocaine:

---

[1] CS-1 and CS-2 are providing information and assistance to the DEA in exchange for monetary compensation.  Information provided to the DEA by CS-1 and CS-2 has proven to be reliable in that information provided by each of these confidential sources has been corroborated in part by, among other things, consensually recorded meetings and communications.



15. On or about November 4, 2015, Campo Flores and Freitas were charged in this District with participating in a conspiracy to import narcotics into the United States, in violation of Title 21, United States Code, Section 963.

**B. The Arrest of the Defendants and the Seizure of the Subject Device**

16. Based on my participation in this investigation, as well as conversations with other DEA personnel who have participated in the investigation and Haitian law enforcement personnel, I know, among other things, the following:

a. On or about November 10, 2015, Campo Flores and Freitas traveled to Haiti in a private Cessna 500 Citation aircraft in order to participate in a meeting relating to the then-pending cocaine transaction. The plane was also occupied by two pilots and two additional passengers.

b. CS-1 and others greeted Campo Flores and Freitas at the plane and escorted them through customs while the pilots and passengers remained in the vicinity of the plane.

c. On or about November 10, 2015, Campo Flores and Freitas were arrested by Haitian law enforcement, expelled from Haiti by Haitian authorities, and taken into custody in Haiti by the DEA.

d. Also on or about November 10, 2015, Haitian law enforcement provided the DEA with the **Subject Device**, as well as a black Samsung Note Edge cellular telephone (the

"Campo Flores Phone") and two iPhones, and explained that the four devices were seized in connection with the arrests of Campo Flores and Freitas.

      e.  Subsequently on or about November 10, 2015, Campo Flores, Freitas, and the **Subject Device** were transported to the Southern District of New York.  Campo Flores and Freitas are in custody based on the pending charge in the Indictment, and the **Subject Device** is in the possession of the DEA in the Southern District of New York.

17. On or about December 18, 2015, the Honorable Sarah Netburn, Magistrate Judge, issued a warrant authorizing searches of the **Subject Device**, the Campo Flores Phone, and the two additional iPhones that were seized incident to the arrests of Campo Flores and Freitas. Personnel from the U.S. Attorney's Office and the Drug Enforcement Administration have been unable to obtain the contents of the **Subject Device** and the two iPhones because they are encrypted.  Accordingly, I am seeking the requested warrant with respect to the **Subject Device** so that an outside technical expert acting under Government control can assist the Government in conducting a search of the **Subject Device**.

18. With respect to the **Subject Device**, I am aware, based on my training and experience, that:

      a.  Individuals engaged in international crimes generally need to remain in contact with other persons involved in their criminal activities.  These contacts are often maintained through cellular telephones (such as the **Subject Device**), laptop computers, or "tablet" devices.

      b.  The electronic memory of most cellular telephones contains records, including caller identification information, call log information (including records of the telephone numbers from which calls were received and to which calls were placed), telephone numbers,

address information, other identification information (including information from which the telephone number assigned to the cellphone may be ascertained), and received and sent text messages. Some cellular telephones may also store photographs and audio/video recordings. Such information may also be stored within a cellular telephone's SIM card or media card, located inside the phone.

c. People typically maintain lists of names, phone numbers, email addresses, and other contact information for their associates in address books that may be found in the computerized memory and/or SIM cards of cellphones, laptop computers, or similar "tablet" devices.

d. Many modern cellphones contain "caller ID" features that allow the user to identify their recent callers.

e. Many modern cellphones contain voicemail or voice mailbox features and/or text messaging features that allow callers to leave voice and/or alpha-numeric messages in the memory of the cellphone and/or SIM card.

f. Individuals engaged in international crimes typically maintain records related to their criminal activity on electronic data storage devices that can be easily transported. Cellular telephones (such as the **Subject Device**), Tablet computers, memory cards, thumb drives, and MP3 players may be used to store any electronic data, including digital photographs and/or audio/video recordings, documents, or other digital records.

g. Because tablet computers, memory cards, thumb drives, and MP3 players are small, portable, and may be "read" by multiple electronic devices, they are particularly useful for transferring data from one location and/or person to another.

13

### C. Subject Account-1 and Subject Account-2

19. Pursuant to the search warrant issued by Judge Netburn on December 18, 2015, law enforcement was able to search the Campo Flores Phone. Based on my review of materials obtained through the search, I know, among other things, the following:

     a.  The Campo Flores Phone was used to access **Subject Account-1**.

     b.  On or about March 31, 2015, **Subject Account-1** received an email from **Subject Account-2**. Although the search of the Campo Flores Phone did not reveal the contents of the message, the Spanish-language subject line of the email, translated roughly into English, stated: "Documents for Carrying Weapons."

     c.  Also on or about March 31, 2015, **Subject Account-1** received another email from **Subject Account-2**. Although the search of the Campo Flores Phone did not reveal the contents of the message, the Spanish-language subject line of the email, translated roughly into English, stated: "Requirements for Carrying Weapons."

     d.  The Campo Flores Phone contained the photograph set forth below, which appears to have been taken on or about May 1, 2015 and to depict Campo Flores using the Campo Flores Phone to take a picture of himself:



e.  The Campo Flores Phone contained the photograph set forth below, which appears to have been taken on or about September 20, 2015 and to depict two firearms as well as an Apple iPhone with a case similar to a case on one of the iPhones that was seized incident to the arrests of Campo Flores and Freitas in Haiti:



f.  The Campo Flores Phone contained the photograph set forth below, which appears to have been taken on or about September 25, 2015 and to depict a rocket launcher:



**D.  Subject Account-3**

20. On or about December 4, 2015, the Honorable Sarah Netburn, Magistrate Judge, authorized the Government to obtain non-content information, pursuant to Title 18, United States

15

Code, Section 2703(d), for communications stored in **Subject Account-3**.[2]  Based on my review

of information provided by Google in response to Judge Netburn's order and a grand jury

subpoena, I know, among other things, the following:

      a.  **Subject Account-3** is subscribed in the name "frank flores," which appears to

be a reference to Freitas.

      b.  **Subject Account-3** has subscribed to a number of services from Google,

including "Google Cloud Print," "Google Payments," "Google Photos," "Location History," and

"Web History."  Based on my training and experience, I know that these services entail the

following:

      i.  *Google Cloud, or Drive, content.*  Google provides users with a certain

amount of free "cloud" storage through a service called "Google Drive."  Users can use their

Google Drive to store email, attachments, videos, photographs, documents, and other content "in

the cloud," that is, online.  A user can access content stored on Google Drive by logging into his

or her Google account through any computer or other electronic device that is connected to the

Internet.  Users can also share files stored on Google Drive with others, allowing them to view,

comment, and/or edit the files.

      ii.  *Google Payments.*  Google allows for the storage of payment

information associated with a Google Account, including credit cards and bank accounts, and

contains information about all transactions made with a Google account, allowing for the

payment for goods (such as those purchased through Google Shopping) and bills, among other

features.

---

[2] Specifically, Judge Netburn's order authorized the Government to obtain:  (i) "any header information reflecting the names, usernames, or IP addresses of any sender(s) or recipient(s) of communications"; and (ii) "time/date stamps."

iii.    *Google Photos.*  Google provides users with a certain amount of free storage that allows for users to store and share digital photographs.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google.  This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

iv.    *Web History.*  Google maintains searches and account browsing activity, from Chrome, Google's proprietary web browser, as well as other Google applications.

v.    *Location History.*  Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.  For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

c.  **Subject Account-3** contains approximately 169 emails, from between on or about August 12, 2014 and on or about October 21, 2015, involving addresses associated with a foreign bank named Banco Caribe.

d.  **Subject Account-3** contains approximately 102 emails, from between on or about May 24, 2014 and on or about October 29, 2015, involving addresses associated with a foreign bank named Banesco Panama.

    e. **Subject Account-3** contains approximately 25 emails, from between on or about December 30, 2014 and on or about August 6, 2015, involving addresses associated with a foreign bank named Banesco Seguros.

**E. Subject Account-4 and Subject iCloud Account**

    21. Judge Netburn's December 4, 2015 order also authorized the Government to obtain non-content information, pursuant to Title 18, United States Code, Section 2703(d), for communications stored in **Subject Account-4**. Based on my review of information provided by Microsoft in response to Judge Netburn's order and a grand jury subpoena, I know, among other things, the following:

    a. **Subject Account-4** is subscribed in the name "Efrain Campos" from "Distrito Federal," Venezuela, which appears to be a reference to Campo Flores.

    b. **Subject Account-4** contains approximately three emails, from between August 1, 2014 and December 3, 2015, involving an address associated with a foreign bank named Banesco Panama.

    c. **Subject Account-4** contains approximately two emails, from December 1, 2015 and December 2, 2015, involving addresses associated with WhatsApp, an encrypted electronic messaging service.

    d. **Subject Account-4** contains an email, dated August 5, 2014, from the email address "appleid@id.apple.com." Based on my training and experience, I believe that this email indicates that Apple maintains electronically stored information related to Campo Flores and this email account in **Subject iCloud Account**.

    22. On or about April 20, 2016, the Government requested that Apple preserve electronic information in accounts associated with **Subject Account-1** and **Subject Account-4**. Apple

indicated in response, among other things, that it would preserve iCloud data associated with **Subject Account-4**—*i.e.*, the **Subject iCloud Account**—for 90 days.

23. As stated above, law enforcement has not been able to search the two iPhones seized incident to the arrests of Campo Flores and Freitas because they are encrypted.  However, based on my training and experience, I know that Apple permits users to store in an iCloud account, such as **Subject iCloud Account**, among other things, backup copies of information stored on electronic devices, contacts, application data, voicemails, and electronic communications (including iMessages, SMS, and MMS messages).  Therefore, **Subject iCloud Account** may contain not only contact information and communications relating to the Subject Offenses, but also the contents of at least one of the iPhones seized incident to the arrests of Campo Flores and Freitas.

## VIII.    Procedures for Searching Electronically Stored Information

24. Based upon the foregoing, I respectfully submit there is probable cause to believe that the items to be searched contain evidence, fruits, and instrumentalities of the Subject Offenses, including:

- evidence of the identity(ies) of individuals using, controlling, or accessing the items to be searched;

- evidence of participation in the Subject Offenses by individuals using, controlling, or accessing the items to be searched, and other suspected co-conspirators;

- evidence of the geographic locations of individuals using, controlling, or accessing the items to be searched at times relevant to the investigation of the Subject Offenses;

- evidence of travel by individuals using, controlling, or accessing the items to be searched in furtherance of the Subject Offenses;

- evidence related to banks and other financial institutions at which individuals using, controlling, or accessing the items to be searched conduct business, including, potentially, transactions in furtherance of the Subject Offenses;

- evidence of the identity(ies) and location(s) of co-conspirators in the Subject Offenses; and

- evidence of electronic facilities used to communicate, and communications transmitted, in furtherance of the Subject Offenses between co-conspirators and individuals using, controlling, or accessing the items to be searched.

25. Law enforcement personnel—including, in addition to law enforcement officers and agents, and depending on the nature of the Electronically Stored Information (or "ESI") and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control—will review the ESI contained in the items to be searched for information responsive to the requested warrants.

26. In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence, fruits, and instrumentalities of the Subject Offenses. Such techniques may include, for example:

a. surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b. conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

c. "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

d.   performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation.[3]

27. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrants.   Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI to locate all data responsive to the requested warrant.

28. If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data on the Subject Device, and that the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Device, upon request.   Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

---

[3] Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text.   Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

## IX.    Conclusion

29. Based on the foregoing, I respectfully request that the Court issue warrants to seize the items and information specified in the attachments to the proposed warrants.


_____
Special Agent Kimojha Brooks, DEA


Sworn to before me this
2nd day of May, 2016

_____
HONORABLE PAUL A. CROTTY
United States District Judge
Southern District of New York