UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        -v.-

EFRAIN ANTONIO CAMPO FLORES, and
FRANQUI FRANCISCO FLORES DE FREITAS,

              Defendants.

S2 15 Cr. 765 (PAC)

**THE GOVERNMENT'S POST-HEARING BRIEF IN FURTHER OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS**

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Brendan F. Quigley
Assistant United States Attorneys
   *Of Counsel*

## <u>TABLE OF CONTENTS</u>

I. The Defendants Have Not Carried Their Burden On Their Spoliation Claims ...................... 1

   A. Applicable Law ............................................................................................................ 1

   B. The October 3, 2015 Meeting in Honduras and CW-1 ...................................................... 2

     1. Relevant Facts ........................................................................................................ 2

     2. Discussion .............................................................................................................. 3

   C. The October 2015 Meetings in Venezuela and the November 2015 Meetings in Honduras ................................................................................................................. 5

     1. Relevant Facts ........................................................................................................ 5

     2. Discussion .............................................................................................................. 7

   D. The Kilogram of Cocaine in Caracas .......................................................................... 10

II. The Court Should Deny the Motion to Suppress the Defendants' Confessions ................. 11

   A. Factual Record ........................................................................................................... 11

   B. The Defendants Knowingly, Intelligently, and Voluntarily Waived Their *Miranda* Rights Before Confessing, and Their Confessions Were Otherwise Voluntary ......................... 14

   C. The Defendants Were Presented Without Unreasonable Delay ....................................... 19

   **CONCLUSION** ............................................................................................................ 20

The Government respectfully submits this memorandum in further opposition to the defendants' Motions to Suppress Post-Arrest Statements and to Suppress Evidence on the Basis of Spoliation. At the evidentiary hearing on September 8 and 9, the Government called nine witnesses, the defense none. The defendants' factual affidavits (two from defendant Campo and one from defendant Flores) were not received in evidence at the hearing and, in any event, are entitled to little, if any, weight relative to the live testimony of the Government's witnesses.[1]

The hearing record offers no basis for this Court to find that the Government destroyed any evidence, much less that exculpatory evidence was destroyed or that the Government acted in bad faith. The unrefuted evidence at the hearing also showed that the defendants' post-arrest statements were made voluntarily, after valid *Miranda* waivers, and there was no delay in presenting the defendants before a judge. Further, the agents did not conduct a deliberate "two-step" interrogation.

## I.  The Defendants Have Not Carried Their Burden On Their Spoliation Claims

The defendants assert that their due process rights were violated by the purported destruction of (i) recordings and (ii) a one-kilogram sample of cocaine that the defendants brought to a meeting in Caracas, Venezuela on October 27, 2015.

### A.  Applicable Law

To prevail on a motion based on the alleged spoliation of evidence, the defendants must show that: (i) "evidence has been lost and that this loss is chargeable to the State," *United States*

---

[1] *E.g.*, *United States* v. *Thompson*, No. 10 Cr. 94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) ("The assertions [in a defendant's affirmation] are sufficient to generate the hearing but thereafter, though defendant's decision not to testify may itself not be held against him, his hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much in the absence of corroboration, whether from the defendant or otherwise."); *United States* v. *Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999).

v. *Rahman*, 189 F.3d 88, 139 (2d Cir. 1999) (quotation omitted);  (ii) the destroyed evidence "possess[ed] an exculpatory value that was apparent before [it] was destroyed," *California* v. *Trombetta*, 467 U.S. 479, 489 (1984); (iii) the evidence was "of such a nature that the defendant[s] would be unable to obtain comparable evidence by other reasonably available means," *id.*; and (iv) the Government acted in bad faith, *Arizona* v. *Youngblood*, 488 U.S. 51, 58 (1988); *United States* v. *Greenberg*, --- F.3d ----, 2016 WL 4536514, at *5 (2d Cir. Aug. 31, 2016).  Only if the defendants meet their burden on each of these factors does the burden shift to the Government, which must then show that sanctions should not be imposed because the defendants were not prejudiced.  *United States* v. *Bufalino*, 576 F.2d 446, 449-51 (2d Cir. 1978).

## B.  The October 3, 2015 Meeting in Honduras and CW-1

### 1.  Relevant Facts[2]

On or about October 3, 2015, a cooperating witness, CW-1,[3] reported to Special Agent Sandalio Gonzalez via BlackBerry Messenger ("BBM") that a Venezuelan official was sending a

---

[2] Citations to "Tr." are to the transcript of the September 8 and 9, 2016 evidentiary hearing. Citations to "Campo Suppress. Decl." and "Campo Spol. Decl." refer to defendant Efrain Campo Flores' declarations in support of his motion to suppress and his spoliation motion, respectively. Citations to "Flores Decl." refer to the declaration submitted by defendant Franqui Francisco Flores de Freitas in support of his motion to suppress.

[3] CW-1 was a wheelchair-bound drug trafficker who was attempting to cooperate with the Government and the DEA in an effort to earn a cooperation agreement in connection with a criminal charge in this District.  Tr. 29-30.  CW-1 did not execute an agreement with the DEA in connection with his cooperation.  Tr. 163.  However, information provided to the DEA by CW-1 related to the investigation of the defendants was corroborated by other information obtained by

nephew to Honduras to discuss a drug-trafficking venture and that the meeting would take place in Honduras on the same day. Tr. 30-31, 83-84. Special Agent Gonzalez instructed CW-1 to record the meeting, and CW-1 indicated that he would do so using his personal phone. Tr. 31-32. In a further effort to obtain additional evidence relating to the meeting, Special Agent Gonzalez instructed CW-1 to contact another individual acting in Honduras at the direction of the DEA; CW-1 was unable to do so. Tr. 32-33. Special Agent Gonzalez also notified Honduras-based DEA agents of the imminent meeting, but it was not feasible for them to conduct surveillance because they were located in Tegucigalpa—several hours away from the meeting location. Tr. 31, 154-55.

Following the meeting, CW-1 informed Special Agent Gonzalez that Venezuelans, who were later identified as the defendants, wanted CW-1 to send representatives to Venezuela for further discussions. Tr. 35. CW-1 also reported that he had been unable to record the meeting but had someone else take photographs of meeting. Tr. 33. CW-1 later sent one of the photographs to Special Agent Gonzalez via BBM. Tr. 33; GX 4. The photograph shows CW-1 meeting with Campo, Flores, and others. GX 4; Tr. 34. The DEA did not obtain further evidence relating to the meeting, and is unaware of any recording of the meeting having been prepared. Tr. 34-35.

### 2. Discussion

**No recordings were destroyed.** First, no recordings were actually made, much less destroyed. In fact, CW-1 told Agent Gonzalez that that he had not recorded the meeting. Tr. 33.

---

the DEA, which tended to suggest that relatives of the President of Venezuela were actively involved in drug trafficking. Tr. 203-04.

There is no requirement that the DEA record the meeting. *See United States* v. *Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) ("While there is [a due process] obligation to preserve recordings once they have been created, there is no general duty to make recordings in the first place . . . ."); *United States* v. *Ramirez*, No. 09 Cr. 446 (CM), 2011 WL 6945199, at *2 (S.D.N.Y. Dec. 23, 2011) (denying motion for spoliation sanctions because, *inter alia*, "with respect to the alleged recordings, it is not clear that any were ever made").

**No apparent exculpatory value.** Second, defendants presented no evidence that anything exculpatory occurred during their early October 2015 trip from Venezuela to Honduras. Flores did not submit a declaration in support of the motion. Campo's declaration claims inaccurately that there were multiple "informants" at the meeting and is limited principally to the vague claim that "he was instructed" to "make numerous [unspecified] statements in a subsequent meeting to bolster the image that [he] was a significant drug trafficker." Campo Spol. Decl. ¶ 3.[4]

**There was no bad faith.** Finally, the record establishes the lack of bad faith by the Government. Special Agent Gonzalez directed CW-1 to record the meeting, and he also sought to find an additional cooperating witness to facilitate the recording. CW-1's noncompliance with

---

[4] The photograph provided by CW-1 is not exculpatory; it corroborates information from CW-1 that the defendants traveled to Honduras to discuss a drug transaction. There was no reason at the time, or now, to believe that the additional photographs referenced by CW-1 would exculpate either defendant. Thus, the DEA's failure to collect more pictures of the meeting did not violate the defendants' due process rights.

4

those instructions is not "chargeable to the State," *Rahman*, 189 F.3d at 139, and therefore there was no bad faith.

### C. The October 2015 Meetings in Venezuela and the November 2015 Meetings in Honduras

Defendants also claim the Government destroyed or "otherwise spoliated" recordings from (i) three meetings between them and two DEA confidential sources ("CS-1" and "CS-2"), which occurred in Venezuela on October 23, 26, and 27, 2015, and (ii) two meetings in Honduras in November 2015, at which a third DEA source ("CS-3") was present.[5]

#### 1. Relevant Facts

During the meeting with CW-1 in Honduras, the defendants asked that CW-1 send representatives of his drug-trafficking organization to Venezuela, so the defendants could further discuss the planned transaction. Tr. 35. The DEA instructed CS-1 and CS-2 to travel to Venezuela posing as members of a Mexican drug cartel and provided CS-1 and CS-2 with two recording devices—Device-1, an audio-video recorder, and Device-2, an audio-only recorder. Tr. 35-37.

Both Device-1 and -2 allow an operator to start or stop recording. Tr. 217, 219. Because of the large size of the files on Device-1, recordings stored on the Device are automatically broken

---

[5] CS-1 also met with the defendants on November 10, 2015 in Port-au-Prince, Haiti. *See* GX 5 at 3. Neither defendants' initial motion nor their reply brief makes any spoliation claim as to the November 10 meeting, other than an assertion that one of the audio files from the Haiti meeting was renamed to "FLORES CC RECORDING" before being produced in discovery. Defs.' Consol. Joint Reply in Further Support of Their Joint Pretrial Mots. at 12. The Government does not dispute this, but the fact that a file was renamed does not establish, or even suggest, that any evidence was lost or destroyed.

5

up into smaller files for storage and downloading purposes. Tr. 218. There are a number of steps required to retrieve and decrypt a recording file from Device-1; DEA informants are not trained on these steps, nor are they trained on how to access files on the Device itself. Tr. 218-19. Files on Device-2 can be accessed only by using specialized hardware and software, which was not given to CS-1 or CS-2. Tr. 219, 359, 415.

CS-1 and CS-2 met with the defendants four times in Venezuela and recorded three of those meetings, Tr. 41-43, 359-60, 405-06, each of which took place at a building belonging to Campo, Tr. 406-07. At each of the three recorded meetings, CS-1 started Device-2 before the meeting began by walking into a bathroom and, at the end of the meeting, also shut Device-2 off by going into the bathroom. Tr. 361, 406-08. CS-2 started and stopped Device-1 at various points throughout the meeting, to ensure that the device was recording and to conserve storage space for subsequent recordings. Tr. 360-61. The fourth meeting was not recorded because Campo told the CSes before the meeting that "business" would not be discussed and the meeting would be in a disco, which the CSes believed would make recording difficult. Tr. 362, 406. Following the meetings in Caracas, CS-1 and CS-2 returned to the United States and returned Device-1 and Device-2 to Agent Gonzalez at a debriefing in Virginia in early November 2015. Tr. 41, 365-66, 408.

After the meetings in Caracas, the DEA sent CS-3 to Honduras to participate in additional meetings regarding the cocaine deal. Tr. 45. CS-3 took Device-2, the audio-recorder, and another device, Device-3, which is an audio-video recorder. Tr. 45-46, 469-70. Device-3 can be turned

on and off by the operator. Tr. 294. However, it is not possible to delete or modify files on Device-3 until they are downloaded, and downloading recordings requires a passcode, which was not provided to CS-3. Tr. 294-95.

CS-3 used Device-2 and Device-3 to record two meetings in Honduras: (i) a November 5, 2015 meeting with CW-1 and co-conspirators of the defendants, and (ii) a November 6 meeting with defendant Flores, certain co-conspirators, and CW-1. *See* GX 5 at 2. CS-3 turned Device-2 on in the bathroom before the meetings and activated Device-3 while at the table where the meetings took place. Tr. 471-73. He shut both devices off when the meetings were over. Tr. 471-73. Following the meetings, CS-3 departed Honduras but accidentally left Device-3 in his hotel room. Tr. 473-75. With assistance from CW-1, the DEA promptly recovered Device-3. Tr. 293-94

### 2. Discussion

**No Recordings Were Destroyed**. As a threshold matter, no recordings of the meetings in Caracas or Honduras were destroyed or otherwise spoliated, much less any recordings with apparent exculpatory value. All three CSes testified that they did not destroy or alter any recordings. Tr. 366, 414-15, 475. And the record is essentially devoid of contrary evidence.[6] At

_____

[6] The defense spent a significant portion of the hearing attacking CS-1's and CS-2's "deception" for engaging in unauthorized drug transactions while working as DEA sources, bringing an unauthorized person to meetings in Venezuela, and failing to report CS-1's cocaine use and both CSes use of prostitutes. The Government, of course, does not condone any of this conduct. Upon learning of the unauthorized drug transactions, the Government began an aggressive investigation that resulted in both CSes being arrested and jailed on charges that carry a ten-year mandatory

most, Campo claims in his affidavit that, as to unspecified meetings in the "Fall of 2015," "numerous conversations my cousin and I had with the informants are missing from discovery." Campo Spol. Decl. ¶¶ 2, 4.[7] But again, while the failure to record all or some of a meeting may be a basis for cross-examination or argument to the jury at trial, it is not a due process violation. *United States* v. *Myers*, 692 F.2d 823, 845-46 (2d Cir. 1982) (rejecting due process challenge based on informant's "failure to record all of his conversations with all of the defendants and his loss and erasure of some audio tapes"); *United States* v. *Chaudhry*, 850 F.2d 851, 857 (1st Cir. 1988) (rejecting due process challenge based on purported "selective recording" and explaining that the "jury heard argument . . . concerning the import of the missing conversations and the failure to record them.  That was the proper venue for [defendant's] challenge to the completeness of the

---

minimum sentence, unless the Government files a motion under Section 5K1.1 of the Sentencing Guidelines.

That said, for purposes of this motion, the most salient fact is that, after a multi-day hearing and extensive cross-examination, no evidence contradicts the testimony of CS-1 and CS-2 that they did not destroy or alter any recordings.  Instead, their testimony is corroborated by the testimony of Special Agent Leith Habayeb that destroying or altering recordings on these devices requires multiple steps that sources are not trained on, and/or specialized equipment that was not provided to the sources.  Tr. 218-19, 415.

[7] Campo did not participate in the November meetings in Honduras, and Flores, who did participate in the November 6 meeting, did not submit any affidavit concerning the spoliation motion.  As such, the Government's evidence concerning the November meetings in Honduras is entirely uncontroverted.  Although the Device-2 recordings relating to the Honduras meetings begin at CCR_005.wav (and not, for example, CCR_001.wav), Special Agent Kevin Corcoran testified at the hearing that files CCR_001 through _004 related to a different investigation.  Tr. 295.

picture"); *United States* v. *Andreas*, No. 96 Cr. 762, 1998 WL 214666, at *3 (N.D. Ill. Apr. 22, 1998) (finding no authority "which recognizes selective taping as a basis for a constitutional challenge to the admissibility of covert audio surveillance . . . ."). In short, the defendants have failed to show that any recordings from Caracas or Honduras were spoliated, much less any exculpatory recordings.

**There Was No Bad Faith.** Additionally, there is no evidence that the DEA or the CSes acted in bad faith as to the recordings made in Venezuela and Honduras. Notably, as to each of these meetings, the DEA made sure that two recording devices were present, Device-1 and Device-2 in Venezuela, and Device-2 and Device-3 in Honduras, to ensure redundancy. *See generally* GX-5; *see also* Tr. 293 (explaining that the purpose of giving CS-3 two recording devices was to "make sure we capture the conversation. If one fails, we have a backup.").

Further, while CS-2 testified that he started and stopped Device-1 at certain points during the meetings in Caracas, he did so to ensure that the Device was recording and to conserve storage space, with the understanding that CS-1 was also recording the meeting, and not with the intent to destroy evidence. *See* Tr. 361.[8]

---

[8] Nonetheless, Device-1 was activated for most of the recorded meetings. *See* GX 5 at 1 (indicating that Device-1 recorded approximately 52 minutes of the October 23 meeting, compared to 73 minutes on Device-2; approximately 98 minutes of the October 26 meeting, compared to 103 minutes on Device-2; and approximately 31 minutes of the October 27 meeting, compared to 48 minutes on Device-2).

The fact that Device-1 contains multiple files for each of the meetings also resulted from the automatic breaking-up of recordings for storage purposes on Device-1. The fact that most of the

In short, the defendants have failed to show that any recordings from the meetings in Venezuela or Honduras were spoliated, much less that any of these recordings had apparent exculpatory value or that the Government acted in bad faith.[9]

### D.  The Kilogram of Cocaine in Caracas

Finally, the Court should reject the defendants' spoliation claim relating to the kilogram of cocaine.  Campo admits he brought the "block of a white powdery substance" to the meeting, *see* Campo Spol. Decl. ¶ 6,[10] and the defendants failed to establish at the hearing that CS-1 or CS-2 collected, or destroyed, any physical evidence relating to those narcotics.  Moreover, even if the confidential sources collected *and* destroyed evidence relating to Campo's cocaine, the defendants failed to demonstrate that the cocaine possessed apparent exculpatory characteristics.  *See, e.g.*, *United States* v. *Welch*, --- F. App'x ----, Nos. 12 Cr. 4402, 12 Cr. 5004, 2016 WL 536656, at *2 (2d Cir. Feb. 11, 2016) (summary order) (rejecting spoliation claim because "nothing about the

---

files on Device-1 are 19 minutes in length, *see* GX 1 at 5, suggests that most of the separate files resulted from this automatic process and not from CS-2 frequently starting and stopping recording.

[9] Although not a subject of the defendants' motion, CS-1 and CS-2 acknowledged deleting messages from their phones before leaving Venezuela because they believed the messages would reveal their status as DEA informants and would jeopardize their safety if they were stopped by the authorities leaving Venezuela.  Tr. 399-400, 463-64.  Nothing indicates or suggests that these messages would be exculpatory to the defendants and, under the circumstances, CS-1 and CS-2's deletions were not in bad faith.

[10] *See* Tr. 363 (CS-2 testimony that Campo "took out what looked to be . . . cocaine"); 409-10 (CS-1 testimony that the cocaine "was supposed to be a sample of the one-ton load of cocaine that Mr. Flores was going to send me into Honduras").

marijuana evidence is exculpatory").[11]  Indeed, both CS-1 and CS-2 testified they believed the substance was cocaine. Tr. 363, 410, 432.

Accordingly, the Court should deny the defendants' spoliation motion.

## II.  The Court Should Deny the Motion to Suppress the Defendants' Confessions

The Government established by a preponderance of the evidence that the defendants confessed only after knowingly, intelligently, and voluntarily waiving their *Miranda* rights; their confessions were otherwise voluntary and did not result from any unreasonable delay in bringing them before a magistrate judge.

### A.  Factual Record

The Haitian *Bureau de Lutte Contre Le Trafic de Stupefiants* ("BLTS") arrested the defendants at approximately 11:16 a.m. on November 10, 2015.  GX 18 at 1.  Three BLTS officers approached the defendants in the restaurant of the ServHotel in Port-au-Prince, Haiti, identified themselves as "Police," and handcuffed the defendants.  Tr. 9-10.  BLTS officers involved in the arrest operation wore tactical uniforms, including vests with "POLICE" written in large letters. GX 19; *see also* Tr. 6-7, 211-12 (testimony of Special Agent Habayeb that he took GX 19 the day of the defendants' arrest).

---

[11] At a conference prior to the hearing, defense counsel posited that "CW-1 orchestrated the entire event" and suggested that CW-1, who was in Honduras, somehow caused a kilogram of sham cocaine to be delivered to the defendants in Venezuela.  Sept. 7, 2016 Tr. 9.  There is no support in the record for that contention.

11

U.S. law enforcement played no role in actually executing the arrests. *See, e.g.*, Tr. 53, 239-40.[12]  Instead, once the defendants were in Haitian custody, the DEA formally requested that the defendants be expelled from Haiti and transferred to U.S. custody.  Tr. 310-11; GX 13-A, 13-B (formal request for expulsion).  At approximately 1:45 p.m. on November 10, Haitian authorities granted the request and signed documents authorizing the defendants' transfer.  Tr. 212, 311-12; GX 18 at 2.

Shortly thereafter, Haitian police took the defendants to another Haitian facility for final processing and then, at about 4 p.m., to the Port-au-Prince Airport, for transfer to the DEA.  GX 18 at 5; Tr. 59, 212-14.  Haitian officers involved in this part of the operation also wore uniforms that said "POLICE" in large letters, GX 6, and drove in marked police vehicles, GX 20, Tr. 214.

Once transferred to DEA custody, the defendants were placed on a waiting DEA Learjet, so they could be taken to the Southern District of New York.  Tr. 312.  The plane left Port-au-Prince at about 4:30 p.m.  GX 18 at 5; Tr. 215.  As the plane was taking off, DEA agents gave both defendants bottled water, and later on the flight, agents gave both defendants candy and observed them "drinking continuously."  GX 18 at 5.  Initially, the defendants sat in the back of the plane, with Special Agent Gonzalez and Special Agent Kimojha Brooks.  Tr. 243.

After the plane leveled off, Agent Brooks took out his laptop computer and began taking pedigree information from the defendants.  Tr. 243-45, 257; GX 15.  This information was

---

[12] Although the defendants were arrested based on U.S. warrants that had been issued as a result of a DEA investigation, DEA agents have no ability to make arrests in Haiti.  *See, e.g.*, Tr. 208.

necessary so the defendants could be brought into the United States and lodged in a jail, while awaiting their initial court appearance.  Tr. 243-44.  Around this time, Agent Gonzalez brought Campo to the front of the plane, where Agent Robert Zachariasiewicz was sitting.  Tr. 65, 246. Agent Gonzalez gave Campo a Spanish-language DEA form advising Campo of his *Miranda* rights.  *See* GX 10-A, 10-B; Tr. 65-66.  After Campo reviewed the form, Gonzalez went over it with him.  Tr. 65-66, 314-15.  At about 5:15 p.m., Campo signed the waiver form, acknowledging he had "read . . . the rights mentioned above and I understand what my rights are. At the present time I am willing to answer freely and voluntarily any questions without an attorney present."  GX 10-A, 10-B.  Before Campo waived his rights, the agents had not asked him any questions about the case, about drug trafficking, or about his criminal activity.  Tr. 67, 315.  Agents then interviewed Campo for approximately two hours.  Tr. 68, 315-16.   During the interview, Campo was "cooperative" and "very polite," Tr. 316, although he appeared shaken up and cried at several points, Tr. 346-47.

Because the plane was nearing New York, and at least in part because Campo indicated he wanted to let Flores speak to the agents, agents ended the interview with Campo, moved him to the back of the plane, and brought Flores to the front.  Tr. 69, 316. Once Flores was in the front of the plane with Agents Gonzalez and Zachariasiewicz, he too was given a Spanish-language *Miranda* form.  *See* GX 11-A, 11-B; Tr. 69-71.  Flores reviewed the form, and, at about 7:37 p.m., signed it, making the same acknowledgment as Campo had.  GX 11-A, 11-B; Tr. 71, 317.  Before Flores waived his rights, the agents had not asked him any questions about the case, about drug

13

trafficking, or about his criminal activity.  Tr. 71, 317-18.  Agents then interviewed Flores.  Tr. 71.

Agents ended the interview with Flores because the Learjet was beginning its final approach into

White Plains.  Tr. 71-72, 318.  The plane landed at the airport at about 8:10 p.m.  GX 18 at 5, Tr.

216; *see also* GX 12.  Agents allowed the defendants the opportunity to call Venezuela.  Tr. 73.

The defendants were then transported to the Metropolitan Correctional Center.  Tr. 251.

The defendants could not be brought to court the next day because it was Veterans Day, a court

holiday, and instead were presented on Thursday, November 12.  Tr. 252.

**B.   The Defendants Knowingly, Intelligently, and Voluntarily Waived Their *Miranda* Rights Before Confessing, and Their Confessions Were Otherwise Voluntary**

**The Defendants Waived Their *Miranda* Rights Before Confessing**.   A waiver of

*Miranda* rights is valid if it was the product of a knowing and voluntary choice, *i.e.*, if the defendant

understood his rights and chose to relinquish them without governmental coercion.  *Colorado* v.

*Connelly*, 479 U.S. 157, 169-70 (1986).

Here, it is undisputed that both defendants executed written, Spanish-language waivers of

their *Miranda* rights.  Neither defendant takes issue with the adequacy of the form nor claims that

he could not understand the form's contents.  *United States* v. *Plugh*, 648 F.3d 118, 127 (2d Cir.

2011) (signing of *Miranda* form, standing "alone, is enough to strongly support the finding that"

defendant knowingly and freely waived his rights).  While both defendants do assert that they were

questioned before waiving their rights, the Court should reject these claims, which are undercut by

the evidence at the hearing and by well-settled law.

14

First, Campo claims that Agent Gonzalez questioned him for "a substantial period of time," Campo Suppress. Decl. ¶¶ 9, 10, approximately an "hour or two," before advising Campo of his rights, and thereby engaged in a deliberate "two-step" interrogation in violation of *Missouri* v. *Seibert*, 542 U.S. 600 (2004). Def.'s Mem. of Law in Support of Mot. to Suppress at 7. But both Agents Gonzalez and Zachariasiewicz testified that Campo waived his rights before being asked any substantive questions (*i.e.*, questions not relating to pedigree information). Tr. 71, 315. The agents' testimony was corroborated by the *Miranda* waiver Campo executed, which was signed at around 5:15 p.m., just 45 minutes after the plane left Port-au-Prince, supporting the agents' testimony that Campo waived his rights relatively early in the flight, soon after the plane had reached cruising altitude. In short, there was no evidence at the hearing that the agents engaged in the type of conduct prohibited under *Seibert*—"*deliberately* set[ting] out to extract [a] pre-*Miranda* confession from [Campo] in order to make him feel 'locked into' those statements before administering the warnings and then 'cover[ing] the same ground a second time.'" *United States* v. *Montiel*, No. 12 Cr. 533 (PAC), 2013 WL 5904309, at *8 (S.D.N.Y. Nov. 4, 2013) (quoting *United States* v. *Williams*, 681 F.3d 35, 44 (2d Cir. 2012) (emphasis in original)).

Second, Flores asserts that Agent Brooks questioned him before Flores waived his *Miranda* rights. Flores Decl. ¶¶ 16-17. But Agent Brooks testified at the hearing that he asked Flores only pedigree questions, which were necessary so that the defendants could clear Customs when entering the U.S. and be lodged with the Bureau of Prisons. Tr. 243; *see United States* v. *Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (reasoning that "solicitation of information concerning a person's

15

identity and background does not amount to custodial interrogation prohibited by *Miranda*").[13]

Further, Agent Brooks candidly admitted that, at the time, he knew very little about the case and

was not in a position to substantively interview the defendants. Tr. 248-49. Agent Brooks'

testimony was corroborated by GX 15, a copy of notes from the agent's laptop, reflecting that he

asked Flores information about his date of birth, his passport, his roommate, and his family

members. Thus, the questions asked by Agent Brooks have no impact on the validity of Flores's

later waiver of his rights or the admissibility of his confession. Accordingly, both defendants

validly waived their *Miranda* rights before confessing.

**The Defendants' Confessions and Waivers Were Voluntary**. In addition, the

defendants' *Miranda* waivers—and their post-arrest statements more generally—were voluntary.

*See Seibert*, 542 U.S. at 608–09 ("[G]iving the warnings and getting a waiver has generally

produced a virtual ticket of admissibility . . . ."). "[C]oercive police activity is a necessary

predicate" to showing that a confession or a *Miranda* waiver "is not 'voluntary.'" *See Connelly*,

479 U.S. 157, 167, 169-70 (1986).

Here, the evidence at the hearing eviscerated any claim that law enforcement took actions

designed to coerce the defendants into waiving their rights and confessing. To the contrary, the

---

[13] Consistent with this case law, courts in this District have approved, for example, pedigree
inquiries that have addressed a defendant's "employment, bank account, and living arrangement,"
*United States* v. *Garcia*, No. 96 Cr. 115 (RPP), 1996 WL 544233, at *4 (S.D.N.Y. Sept. 25, 1996);
or "the ages and dates of births of his children, the telephone numbers of most of his relatives, and
bank account information," *United States* v. *Isiofia*, No. 02 Cr. 520 (HB), 2003 WL 21018853, at
*2 (S.D.N.Y. May 5, 2003), *aff'd*, 370 F.3d 226 (2d Cir. 2004).

DEA took steps to ensure the defendants' relative comfort under the circumstances: agents gave the defendants candy and water, which the defendants drank "continuously," Tr. 215-16; GX 18 at 5; agents allowed the defendants to use the bathroom, Flores Decl. ¶ 13; an emergency medical technician was present to look out for their well-being, Tr. 207; and at no point did agents yell at the defendants, physically threaten them, or display their weapons, Tr. 72, 216-17 249, 318-19. Indeed, after arriving in New York, Campo thanked for agents for "how well [they] had treated him. [Campo] wasn't expecting, obviously, to be treated that way." Tr. 73.

While the defendants may have been upset and scared about their arrests and the potential penalties they faced, this is not a basis for suppression. The evidence at the hearing established that—the defendants' affidavits notwithstanding—the Haitian officers who conducted the arrests identified themselves as law enforcement officers and wore clothing stating "POLICE" in large letters. *See* Tr. 11; GX 6, 19, 20.[14] Moreover, the defendants' confessions came hours after their arrests. *See, e.g.*, *United States* v. *Yao*, No. 05 Cr. 1114 (SAS), 2006 WL 1227771, at *5 (S.D.N.Y. May 3, 2006) (confessions voluntary where they came over an hour after arrests, noting "shock of the initial arrests had dissipated" and "[a]ny indicia of coercion were the by-products of the

---

[14] Further, as noted in the Government's pre-hearing brief, the necessary inquiry is whether U.S. officials—not foreign officials—engaged in some type of coercion. *United States* v. *Salameh*, 152 F.3d 88, 117 (2d Cir. 1998). Relatedly, while the defendants assert in their affidavits that their previous experiences with kidnappings made them fearful, there is no evidence that the agents knew about these experiences, much less sought to take advantage of them. Tr. 215, 313. As such, these experiences, even if true, are not a basis for a finding of Government coercion. *E.g.*, *United States* v. *Amery*, No. 02 Cr. 143 (GBD), 2002 WL 31027514, at *2 (S.D.N.Y. Sept. 10, 2002).

necessary showing of police authority, not the result of deliberately improper tactics"). Further, Agent Zachariasiewicz testified that, although Campo "appeared . . . shaken up" and cried "on several occasions," Agent Gonzalez took "a little time . . . and appeared to try to be somewhat comforting to him." Tr. 316. Moreover, the evidence does not suggest that despite crying, Campo was unable to understand the agents' questions or the *Miranda* form. To the contrary, Campo told Agent Gonzalez that he understood the *Miranda* form "and then commented that he was an attorney." Tr. 65; *see United States* v. *Jimenez*, 478 F.3d 929, 933 (8th Cir. 2007) ("The fact that Ms. Jimenez was visibly upset is not enough to override her specific consent to waive her rights and speak to Officer Oetter.").[15]

Accordingly, the defendants' waivers of their *Miranda* rights, and their confessions more generally, were voluntary and not the result of Government coercion.[16]

---

[15] *See also United States* v. *Siddiqui*, 699 F.3d 690, 706 (2d Cir. 2012) (finding that statements were voluntary, even though defendant had been shot in the stomach, was "tethered to her [hospital] bed to prevent her escape," and was "at times in pain and medicated," where "agents endeavored to meet [her] needs as best they could" and defendant "was coherent, lucid, and able to carry on a conversation"); *United States* v. *Dehghani*, 550 F.3d 716, 720 (8th Cir. 2008) (affirming admissibility of confession where, "although [defendant] cried, he did not cry uncontrollably or appear disoriented").

[16] At the hearing, defense counsel also extensively cross-examined the agents regarding (i) whether the DEA provided consular notification under the Vienna Convention and (ii) the agents' compliance with DEA policies. Neither of these issues is a basis for suppression. *See Sanchez-Llamas* v. *Oregon*, 548 U.S. 331, 351 (2006) (declining to suppress post-arrest statements based on failure to comply with Vienna Convention): *Myers*, 692 F.2d at 846 (explaining that "[n]on-compliance with internal departmental guidelines is not a ground for complaint").

18

### C.  The Defendants Were Presented Without Unreasonable Delay

Finally, the DEA did not unreasonably delay presenting the defendants to a magistrate judge.  For the reasons set forth in the Government's opposition brief, the six-hour safe harbor in 18 U.S.C. § 3501(c) should be measured from the time the defendants came into U.S. custody.[17] Here, based on unrebutted documentary evidence, the defendants came into DEA custody between 4 and 4:30 p.m.,[18] Campo waived his *Miranda* rights at 5:15, GX 10A/B, and Flores waived his *Miranda* rights at 7:37, GX 11A/B.  Accordingly, both confessions came well within § 3501(c)'s six-hour safe harbor.

But even if the confessions came outside the six-hour safe harbor, the Government established at the hearing that any presentment delay was reasonable.  The DEA took all steps within its power to promptly bring the defendants to a U.S. court after they were taken into custody on November 10, 2015.  *See, e.g.*, *United States* v. *Collins*, 462 F.2d 792, 796 (2d Cir. 1972) (finding no unreasonable delay where "the conduct of the [law enforcement] was at all times directed to processing Collins as expeditiously as possible for arraignment").  Although the defendants were not presented until November 12, that was only because November 11 was a

---

[17] *See also United States* v. *Gonzalez*, 764 F.3d 159, 168 (2d Cir. 2014) (explaining that, "in *Alvarez-Sanchez*, the majority's opinion rested on the 'duty, obligation, or reason' to bring the defendant in front of a judge for a given crime . . . .  Our inquiry, therefore, is when the obligation arose to present the appellant" to a magistrate judge for the charges at issue").

[18] *See* GX 18 at 5 (indicating that the defendants arrived at the airport at around 4 p.m. and left on the DEA plane at around 4:30).

19

holiday, and the hearing record established that the Government attempted to have them presented as soon as possible. *See, e.g.*, DX 3510-05 (indicating the Government had checked with the duty magistrate judge and been informed that no presentments would occur on November 11).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that defendants' motions should be denied in their entirety.

Dated: New York, New York
       September 26, 2016

                                        Respectfully Submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:    _____
                                        Emil J. Bove III
                                        Brendan F. Quigley
                                        Assistant United States Attorneys
                                        (212) 637-2444 / 2190

20