G98nflo1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 CR 765 (PAC)

5    EFRAIN ANTONIO CAMPO FLORES
     and
6    FRANQUI FRANCISCO FLORES De FREITAS,

7              Defendants.

8    ------------------------------x

9                                         New York, N.Y.
                                          September 8, 2016
10                                        9:35 a.m.

11

     Before:
12
                         HON. PAUL A. CROTTY,
13
                                          District Judge
14

15                      APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     EMIL BOVE
18   BRENDAN QUIGLEY
          Assistant United States Attorneys
19
     BOIES, SCHILLER & FLEXNER LLP
20        Attorneys for Defendant Efrain Antonio Campo Flores
     BY:  RANDALL W. JACKSON
21        JOHN T. ZACH
          JOANNA C. WRIGHT
22
     SIDLEY AUSTIN LLP
23        Attorneys for Defendant Franqui Flores De Freitas
     BY:  MICHAEL D. MANN
24        DAVID M. RODY
          ELIZABETH A. ESPINOSA
25   ALSO PRESENT:
     ERIKA DE LOS RIOS, Interpreter (Spanish)

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

G98nflo1

```
1              (Case called).

2              MR. QUIGLEY:  Good morning, your Honor.  Emil Bove and

3     Brendan Quigley for the government.  We have here with us Peter

4     Calabrese from our office, who is a paralegal.

5              MR. JACKSON:  Good morning, your Honor.  Randall

6     Jackson, John Zach, and Joanna Wright, for Mr. Campo Flores.

7              THE COURT:  Good morning.

8              MR. RODY:  Good morning, your Honor.  Dave Rody, Mike

9     Mann and Elizabeth Espinosa, for Mr. Flores De Freitas.

10             THE COURT:  Good morning.

11             Will the government call the first witness

12             MR. QUIGLEY:  Yes, your Honor.  The government calls

13    Officer No. 1, who is a government officer from the Haitian

14    police.

15             Your Honor, this is the interpreter.

16             THE COURT:  Come on up here, please.

17             You are a certified Haitian interpreter?

18             THE INTERPRETER:  Yes, your Honor.

19             THE COURT:  You work over in the state court?

20             THE INTERPRETER:  Yes.

21             THE COURT:  You were retained by the federal

22    government?

23             THE INTERPRETER:  Yes.

24             THE COURT:  Any objection, Mr. Jackson or Mr. Rody?

25             MR. JACKSON:  No, your Honor.
```

G98nflo1                              Officer No. 1 - direct

1              MR. RODY:  No, your Honor.

2              MR. QUIGLEY:  Your Honor, pursuant to a protective

3     order he's not going to give his name in the record.

4              THE COURT:  All right.

5      OFFICER NO. 1,

6           called as a witness by the Government,

7           having been duly sworn, testified as follows:

8                (Through interpreter)

9     DIRECT EXAMINATION

10    BY MR. QUIGLEY:

11             THE COURT:  Please sit down.

12             Pull yourself right up to the microphone.

13             Are you comfortable?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  Mr. Quigley.

16    BY MR. QUIGLEY:

17    Q.  Good morning, sir.  Where do you work?

18    A.  DCG BLTS.

19    Q.  Is BLTS a unit of the Haitian police?

20    A.  Yes.

21    Q.  What does BLTS stand for?

22    A.  Bureau to fight against illicit traffic of narcotics.

23    Q.  How long have you been with the Haitian police?

24    A.  Three years.

25    Q.  I want to focus your attention on November 10, 2015, were

1   you involved in an arrest that day?

2   A.  Yes.

3   Q.  How many people were arrested?

4   A.  Two people.

5   Q.  What role did you play in the arrest?

6   A.  I was responsible for the handcuffing.

7   Q.  Where did the arrest happen?

8   A.  In a hotel, the Servotel.

9   Q.  Is that in Port-au-Prince, Haiti?

10  A.  Yes.

11  Q.  What were you doing immediately before you went into the

12  Servotel to make that arrest?

13  A.  We were on standby in the hotel area.

14          MR. QUIGLEY:  Your Honor, may I approach?

15          THE COURT:  Yes, you may.

16  Q.  Officer, I'm handing you what's been marked for

17  identification as Government Exhibit 1.

18          Do you recognize that?

19  A.  Yes.

20  Q.  What is it?

21  A.  This is the Servotel court.

22  Q.  Does it fairly and accurately depict the outside area of

23  the Servotel?

24  A.  Yes.

25          MR. QUIGLEY:  Your Honor, the government offers

G98nflo1                          Officer No. 1 - direct

1   Government Exhibit 1.

2             THE COURT:  Any objection?

3             MR. JACKSON:  No objection.

4             MR. RODY:  No, your Honor.

5             THE COURT:  Government Exhibit 1 is received in

6   evidence.

7             MR. QUIGLEY:  Your Honor, may we publish Government

8   Exhibit 1?

9             THE COURT:  You may.

10            (Government's Exhibit 1 received in evidence)

11  Q.  Officer, where were you stationed when you were standing

12  by --

13            MR. RODY:  Your Honor, I apologize for interrupting.

14            Our video is not working on this side of the table.

15            THE COURT:  Do you have copies of the exhibits?

16            MR. QUIGLEY:  Yes, they have been provided to the

17  defense, your Honor.

18            THE COURT:  That is good enough.

19  Q.  Officer, can you say where in relation to this photo were

20  you standing by prior to the arrest.

21  A.  In this area.

22  Q.  Indicating towards the right side of the photo?

23  A.  Yes.

24  Q.  And how many other officers were with you?

25  A.  There were three officers.  There were three of us in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G98nflo1                              Officer No. 1 - direct

1    vehicle.

2    Q.  Were there other vehicles in addition to the vehicle that

3    you were in?

4    A.  Yes.

5    Q.  About how many?

6    A.  I think about two, besides the car I was in.

7    Q.  What were you and the officers you were with wearing that

8    day.

9    A.  The police uniform.

10          MR. QUIGLEY:  Your Honor, may I approach?

11          THE COURT:  Yes, you may.

12   Q.  I am handing you what's been marked for identification as

13   Government Exhibit 19.  Do you recognize that?

14   A.  Yes.

15   Q.  What is that a photograph of?

16   A.  This photograph was taken in the courtyard of BLTS.

17   Q.  Does that fairly and accurately depict the types of

18   uniforms you were wearing that day?

19   A.  Yes.

20          MR. QUIGLEY:  Your Honor, the government offers

21   Government Exhibit 19.

22          THE COURT:  Any objection?

23          MR. JACKSON:  No objection.

24          THE COURT:  19 is in evidence.

25          (Government's Exhibit 19 received in evidence)

G98nflo1                          Officer No. 1 – direct

1          MR. QUIGLEY:  Your Honor, may we publish it?

2          THE COURT:  Yes, you may.

3    Q.  Officer, what does it say on the back of the uniforms?

4    A.  Police.

5    Q.  Although we can't see it here, what does it say on the

6    front of your uniforms?

7    A.  BLTS.

8    Q.  Were you carrying a weapon that day?

9    A.  Yes.

10   Q.  What type of weapon?

11   A.  A pistol and a rifle, caliber 5 -- and a rifle, 56 M4.

12   Q.  Do you see an M4 rifle depicted anywhere in Government

13   Exhibit 19?

14   A.  Yes.

15   Q.  Where is that?

16          In the bottom, the individual who is on the leftmost

17   side of the photograph?

18   A.  In the right hand.

19   Q.  In the right hand of the individual who is on the left side

20   of the photograph?

21   A.  Yes, sir.

22   Q.  Did you have any grenades that day?

23   A.  No.

24   Q.  Does the BLTS even have any grenades?

25   A.  No.

G98nflo1                          Officer No. 1 – direct

1    Q.  Were you and the other officers wearing masks that day?

2    A.  Yes.

3    Q.  Why did you wear a mask in the course of your duties?

4    A.  To protect our face against the other criminals we are

5    operating against, because Haiti is a small place.

6    Q.  What's the significance of that, that it's a small place?

7    A.  It means that it is a city that is not as big as the United

8    States, not as big as New York, for example.

9    Q.  You sometimes see the people you arrest while you are off

10   duty?

11              MR. JACKSON:  Objection.

12              THE COURT:  Overruled.

13   A.  After they are released, it may happen that you bump into

14   them in the street, in the supermarket.

15   Q.  Returning to when you were standing by outside the

16   Servotel, did there come a time when you actually went into the

17   hotel?

18   A.  Yes.

19   Q.  What caused you to go into the hotel?

20              THE INTERPRETER:  Say it again, please.

21   Q.  What caused you to go into the hotel?

22              THE INTERPRETER:  What caused?

23   Q.  What caused you to go into the hotel?

24   A.  Unidentified white bridle, there is no police written on

25   it.

G98nflo1                              Officer No. 1 - direct

```
 1    Q.  Why did you go into the hotel?

 2    A.  We had to arrest two individuals who were in the hotel.

 3    Q.  Did you receive any communications or commands that caused

 4    you to go into the hotel?

 5    A.  Yes.  The supervisor received a comment that said the

 6    people, the individuals are there.

 7    Q.  How did you know who to arrest when you went into the

 8    hotel?

 9    A.  The supervisor was already informed of the individuals,

10    where they were seated, the clothes, the clothing they were

11    wearing.

12    Q.  Where specifically did you go in the hotel once you went

13    inside?

14    A.  In the restaurant.  The hotel's restaurant.

15    Q.  How many officers actually went into the restaurant?

16    A.  Approximately the three of us who went actually into the

17    restaurant, the hotel restaurant.

18            MR. QUIGLEY:  Your Honor, may I approach.

19            THE COURT:  Yes, you may.

20    Q.  I'm handing you what's been marked for identification as

21    Government Exhibit 3.

22            Do you recognize that?

23    A.  Yes.

24    Q.  What is that a photograph of?

25    A.  This is the restaurant in Servotel.
```

G98nflo1                            Officer No. 1 - direct

1    Q.  Does it fairly and accurately depict the Servotel

2    restaurant?

3    A.  Yes.

4            MR. QUIGLEY:  Your Honor, the government offers

5    Government's Exhibit 3.

6            THE COURT:  Any objection?

7            MR. JACKSON:  No objection, your Honor.

8            MR. RODY:  No, your Honor.

9            THE COURT:  3 is in evidence.

10           MR. QUIGLEY:  May I publish it, your Honor?

11           THE COURT:  Yes, you may.

12           (Government's Exhibit 3 received in evidence)

13   Q.  Officer, I think you testified that about three officers

14   actually went into the restaurant.  Why didn't more officers go

15   into the restaurant?

16           THE INTERPRETER:  Why didn't?  I'm sorry.

17   Q.  Why didn't more officers go into the restaurant?

18   A.  Not only is it a business, but we were not told that the

19   people we were going to arrest were dangerous people.

20   Q.  What, if anything, did you and the other officers say to

21   the defendants as you arrested them?

22   A.  The supervisor called out their name.  They answered, and

23   then he advised them of their rights.

24   Q.  At any point did he say "police"?

25           MR. RODY:  Objection.

G98nflo1                    Officer No. 1 - direct

1     A.  Yes.

2              THE COURT:  Overruled.

3     A.  When we walked in there, we said police.

4     Q.  Did you point your gun at the defendants at any point?

5     A.  No.

6     Q.  How did you go about handcuffing the defendants?

7     A.  After the supervisor spoke with them, one of them stretched

8     out his hands like this, because he had a problem in his hand.

9     Q.  So where did you cuff him?  In the front or the back?

10    A.  In front.

11    Q.  Once you had the defendants in custody, where did you take

12    them?

13    A.  One of them came into our vehicle and we took them to our

14    station.

15    Q.  How many vehicles were they taken to the station in?

16    A.  Two vehicles.

17    Q.  So they traveled in separate vehicles?

18    A.  Yes.

19    Q.  Did you ever any interaction with the defendants after you

20    brought them to your station?

21    A.  No.

22    Q.  At any point did you hit either of the defendants?

23    A.  No, no.

24    Q.  Did you see anyone else hit either of the defendants?

25    A.  No.

1              MR. QUIGLEY:  One moment, your Honor.

2              No further questions.

3              THE COURT:  Mr. Jackson.

4    CROSS EXAMINATION

5    BY MS. ESPINOSA:

6    Q.  Good morning, Officer?

7    A.  Good morning.

8    Q.  You testified that you have been an officer in the BLTS for

9    three years, correct?

10   A.  Yes.

11   Q.  In that time, how many DEA arrests have you participated

12   in?

13   A.  Several.

14   Q.  Have you ever testified in any of those cases previously?

15   A.  No.

16   Q.  So when did you first learn about this operation to arrest

17   the defendants?

18   A.  When I got to the office.  It was about 8 a.m.

19   Q.  Did you participate in any planning meetings with the DEA

20   regarding this operation?

21   A.  Yes.  Before every operation, there is a briefing.

22   Q.  So you participated in a briefing with the DEA agents in

23   this case?

24   A.  I don't recall.

25   Q.  You participated in a briefing the day prior to the arrest,

G98nflo1                              Officer No. 1 - direct

1   correct?

2   A.  No, I don't recall.

3   Q.  You testified that you arrived in a car with three other

4   officers, that's correct?

5   A.  Yes.

6   Q.  That there were two other vehicles as well?

7   A.  About two vehicles.

8   Q.  Two vehicles total or two vehicles in addition to the

9   vehicle you were in?

10  A.  Two vehicles and then my vehicle.

11  Q.  How many officers were in each of those other vehicles?

12          MR. QUIGLEY:  Objection.  Foundation.

13          THE COURT:  Overruled.

14  Q.  Were there officers in each of those other vehicles?

15  A.  Yes.

16  Q.  How many officers were in each of those other vehicles?

17  A.  I don't remember.

18  Q.  So could it have been six, seven, eight, nine officers?

19          THE COURT:  It could have been anything.

20          Do you know how many officers were in the other

21  vehicles?

22          THE WITNESS:  No, I don't know.

23          MR. QUIGLEY:  Can you please go back to Government

24  Exhibit 19, please.

25  Q.  Officer, was this photo taken on the day that the

G98nflo1                              Officer No. 1 - direct

1   defendants were arrested?

2   A.  I don't know.

3   Q.  Are you in this photo?

4              So we don't know whether this is what --

5              THE INTERPRETER:  I'm sorry.

6              THE COURT:  He's got to answer.

7              MS. ESPINOSA:  I apologize.

8   Q.  Your answer was no, correct?

9              MR. QUIGLEY:  Objection.

10             He didn't testify.

11             THE COURT:  Excuse me.  Sam, would you read back the

12  question.

13  A.  There was -- one of them looks like me, but I cannot say

14  for sure it is me.

15             THE COURT:  Could you please read back the question.

16             (Record read)

17  A.  Maybe, yes, this one looks like me, but I cannot say for

18  sure it is me.  I don't know when that photograph was taken.

19  Q.  You also said that you are not sure if this photo was taken

20  on the day the defendants were arrested, correct?

21  A.  Yes, I don't know.

22  Q.  So is it fair to say that this photo does not necessarily

23  show what you were dressed like when you arrested the

24  defendants?

25             MR. QUIGLEY:  Objection.

G98nflo1                              Officer No. 1 - direct

1           THE COURT:  Sustained.

2    Q.  Officer, does it say police on the front of your uniforms

3    or just on the back?

4    A.  Polices is written on the back of the uniform, BLTS in

5    front of the uniform.

6    Q.  Do the patches that say police come off your uniform?

7    A.  Yes.

8    Q.  Did you take them off that day?

9    A.  No.

10   Q.  Did any of other officers with you take their badges off?

11   A.  No.

12   Q.  Could you see all of the officers you were with at all

13   times?

14   A.  They are not allowed to remove this.  We were together in

15   the vehicle, and they all had their badges.

16   Q.  But could you see all of them during the entirety of the

17   arrest?

18   A.  Yes.  We are always together.  All of us we were together

19   in the vehicle, all three of us.

20   Q.  I apologize.  What was the last part you said?

21           THE INTERPRETER:  All three of us.

22   Q.  All three of you in the vehicle.

23           Could you see whether all of the other officers had

24   their badges on?

25   A.  No.

G98nflo1                              Officer No. 1 - direct

1   Q.  So you can't be sure that they all had their badges on?

2           MR. QUIGLEY:  Objection.  Asked and answered.

3   A.  They are not allowed, they are not entitled to remove the

4   police badge.

5   Q.  When you went into the hotel to arrest the defendants, how

6   were you carrying your weapon?

7   A.  The pistol was on my leg and the rifle in my hands.

8   Q.  Did you ever point the rifle at the defendants?

9   A.  No.  There was no signals that they were dangerous, that

10  they were carrying weapons.

11  Q.  In addition to the rifle and the pistol, were you carrying

12  any other weapons?

13  A.  No.

14  Q.  You testified that you were not carrying grenades, but were

15  you carrying flares or anything of that nature?

16          THE INTERPRETER:  Blares?

17          MS. ESPINOSA:  Flares?

18          THE COURT:  Flares.  F-l-a-r-e-s?

19          THE INTERPRETER:  Flares?

20          Can you help me with the word?  I don't know the

21  meaning of this word in French.  What do you mean by flares?

22  Q.  Any device that could produce smoke or light.

23  A.  No.

24          MS. ESPINOSA:  May I have a moment, your Honor.

25  Q.  Officer, when you handcuffed the defendants, you could see

G98nflo1                          Officer No. 1 - direct

1    that they were frightened, correct?

2    A.   Yes.

3    Q.   And they were asking you what was happening?

4    A.   They are more interacting with the supervisor.

5    Q.   Officer, do you speak Spanish?

6    A.   The supervisor speaks Spanish.

7    Q.   But you don't speak Spanish?

8    A.   No.

9    Q.   Did you tell the defendants why they were being arrested?

10   A.   The supervisor advised them in Spanish.

11   Q.   The supervisor told them that they were being arrested?

12   A.   What is it?

13   Q.   Did the supervisor tell them that they were being arrested?

14   A.   Yes.

15   Q.   But do you yourself understand Spanish, Officer?

16   A.   A little bit.

17   Q.   So did you hear him tell the defendants that they were

18   being arrested?

19   A.   Yes.  It is a common practice.

20   Q.   And you understood what he was saying in Spanish when he

21   told them that they were being arrested?

22   A.   This is a general practice.  You may not speak Spanish, but

23   this is very simple.

24   Q.   I'm asking, Officer, if you heard the supervisor

25   specifically tell these defendants that they were being

G98nflo1                        Officer No. 1 - direct

1   arrested, and you understood what he was saying?

2   A.  Yes.

3   Q.  Officer, did any of the other officers accompanying you

4   wear plain clothes, or were they all wearing fatigues?

5   A.  Generally the supervisor doesn't wear the uniform we wear.

6   He usually wears a T-shirt where it's written police.

7   Q.  Was he wearing that on the day he arrested the defendants?

8   A.  I don't remember.  Either he wears the T-shirt that says

9   police or he wears a uniform.  It's one or the other.

10  Q.  But you don't recall what he was wearing that day, right?

11  A.  No, I don't.

12  Q.  When you put the defendants in the car to transport them to

13  the next location, were they frightened?

14  A.  The one who was in the vehicle with me was no longer

15  afraid.

16  Q.  Was he asking questions?

17  A.  I don't remember.  Maybe he interacted with the supervisor,

18  because the supervisor is the one speaks Spanish.

19  Q.  Was your supervisor in the vehicle with you?

20  A.  Yes.

21  Q.  Officer, did you interact with any of the DEA agents at all

22  during the course of the arrest?

23  A.  No.  Not me.

24  Q.  Did you see them?

25  A.  I don't remember, but in general, they would be in the

G98nflo1                              Officer No. 1 - direct

1    station, in the office.

2    Q.   They were present outside the hotel or close to the hotel

3    when he was arrested, correct?

4              MR. QUIGLEY:  Objection.

5              THE COURT:  Sustained.

6    Q.   Were the DEA agents at the station when you arrived there?

7              MR. QUIGLEY:  Objection.  He said he didn't remember.

8              THE COURT:  Overruled.

9              MS. ESPINOSA:  One moment, your Honor.

10             I apologize.

11   Q.   Were the DEA agents at the station when you arrived there

12   with the defendants?

13   A.   In the station they have their own office.

14   Q.   Were they there on that morning?

15   A.   I don't know, but it's part of the practice.  They would

16   always be there.

17   Q.   But you don't know whether they were there that day?

18   A.   No, I don't know.

19             MS. ESPINOSA:  One moment.

20             No further questions.

21             THE COURT:  Mr. Quigley, do you have any?

22             MR. JACKSON:  Your Honor, may we have one moment?

23             THE COURT:  Excuse me.  Mr. Jackson.

24             MR. JACKSON:  May we have one moment?

25             THE COURT:  Yes.

G98nflo1                              Officer No. 1 – cross

1

2              MR. JACKSON:  Your Honor, Ms. Wright is just going to

3     ask a few additional questions.

4              THE COURT:  Ms. Wright.

5              MS. WRIGHT:  Good morning.

6     CROSS EXAMINATION

7     BY MS. WRIGHT:

8     Q.  Good morning, officer.

9     A.  Good morning.

10    Q.  I am just going to ask you a few additional questions, OK?

11    A.  OK.

12    Q.  You testified that you were aware when you showed up to the

13    hotel that the defendants were not dangerous, correct?

14    A.  Yes.

15    Q.  You also testified that when you made the arrest you were

16    wearing a balaclava, correct?

17             THE INTERPRETER:  You were wearing?

18    Q.  Your face was covered when you made the arrest?

19    A.  Yes.

20    Q.  And you wear that mask because Haiti is a small place and

21    when you make arrests, the person that you arrest could see you

22    later?

23    A.  Yes.

24    Q.  So it is a safety precaution?

25    A.  Yes.

G98nflo1                          Officer No. 1 - cross

1   Q.  But you knew these defendants were not dangerous?

2   A.  Yes.

3   Q.  So there was no reason to wear that mask to protect your

4   safety?

5              MR. QUIGLEY:  Objection.

6              THE COURT:  Sustained.

7   Q.  You testified that you don't remember whether you

8   participated in a briefing the day before.

9   A.  No, I don't recall.

10  Q.  And you don't remember if there were two or three vehicles

11  that day?

12             MR. QUIGLEY:  Objection.

13             THE COURT:  Sustained.

14             I think his testimony is pretty clear that there's two

15  vehicles in addition to his.  That makes three.

16  Q.  So there were three vehicles that day?

17             MR. QUIGLEY:  Objection.

18             THE COURT:  That's what he's testified to.

19             MS. WRIGHT:  Thank you, your Honor.

20  Q.  You are not sure if you are in the photo the government

21  displayed?

22             THE COURT:  You are referring to Government Exhibit

23  19?

24             MS. WRIGHT:  Yes, your Honor.

25  A.  As I said before, one of them looks like me.  Maybe it is

G98nflo1                        Officer No. 1 - cross

1   me.

2   Q.  Did you tell the government that you were worried about

3   embarrassing the defendants?

4   A.  Embarrass the government?  No, I never said that.

5   Q.  You never said I want to pick them up as nicely as possible

6   so as not to embarrass them?

7   A.  No, this is in a business place, the hotel.  There are

8   other people in the hotel.

9   Q.  So you did not want to embarrass the other people?

10  A.  Yes.  Exactly.

11  Q.  So when you walked into the hotel, you knew the defendants

12  were not dangerous?

13          MR. QUIGLEY:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15  Q.  So when you walked into the hotel, you knew the defendants

16  were not dangerous?

17  A.  Yes.

18  Q.  And you were worried about the other people in the

19  restaurant?

20  A.  But, you know, this is somebody's business.  You are not

21  going to come in there and be forceful or brutal in a business

22  place.  You have to do what you have to do very calmly, nicely,

23  and leave.

24  Q.  You were told to dress in BLTS that day?

25  A.  Whenever there is an operation, everybody has to wear the

G98nflo1                        Officer No. 1 - cross

1    uniform.  Only the supervisor has the choice of wearing it or

2    wearing a T-shirt.

3    Q.  And the supervisor told you what the defendants looked

4    like?

5    A.  The supervisor knows.  He's the one who knows who the

6    people are, and when he gets there he will say, here are the

7    people.  He's the one who knows the people.

8    Q.  So when did you first come in contact with the DEA?

9            MR. QUIGLEY:  Objection.  Foundation.

10            THE COURT:  Yes.  Sustained.

11   Q.  Well, you testified that the DEA has an office in your BLTS

12   office?

13   A.  Yes.

14   Q.  You testified that you have participated in several DEA

15   arrests?

16   A.  Yes.

17   Q.  And you testified that at some point you were advised to

18   wear a BLTS uniform?

19   A.  We always wear -- we always wear the BLTS uniform.  When

20   there is an operation, we have to wear the BLTS except the

21   supervisor, who may not.

22            MS. ESPINOSA:  Can we pull up GX19.

23   Q.  You explained that the BLTS badge is visible on the front

24   of the uniform.

25   A.  Yes.

G98nflo1                         Officer No. 1 - cross

1   Q.  Do you see the second officer standing in that picture, who

2   is, it looks like he's on his phone.

3          MS. ESPINOSA:  Can we zoom in on that a little bit,

4   please.

5   Q.  Do you see that officer?

6   A.  Yes, I do.

7   Q.  Can you point or explain where it says BLTS on the front of

8   his uniform.

9   A.  Maybe his hand is covering it.  Maybe -- I don't see it

10  covering it, but you see the cap has a BLTS on it.

11  Q.  I'm sorry?

12  A.  The cap, the hat.  These people were not with me, the cap,

13  the hat he's wearing has BLTS.  There were three of us only in

14  the car.

15  Q.  The back of the hat says BLTS?

16  A.  Yes.

17  Q.  You would never let the defendants get behind you during an

18  arrest, would you?

19         THE INTERPRETER:  I'm sorry.  Could you speak louder,

20  please.

21  Q.  You would never let the defendants get behind you during an

22  arrest?

23         MR. QUIGLEY:  Objection.

24         THE COURT:  Sustained.

25  Q.  You testified that you handcuffed them in the front,

G98nflo1                        Officer No. 1 - cross

1   correct?

2   A.  Yes.

3            MS. ESPINOSA:  No further questions.

4            Thank you.

5            THE COURT:  Mr. Quigley?

6            MR. QUIGLEY:  No redirect, your Honor.

7            THE COURT:  Tell the witness he's excused.

8            *Merci beaucoup*.  Thank you very much.

9            MR. QUIGLEY:  May I just collect the exhibits?

10           THE COURT:  Yes, please.

11           For the record could you say what your name is.

12           THE INTERPRETER:  Jose Voigt.

13           THE COURT:  You are a certified Haitian interpreter

14   for the state system?

15           THE INTERPRETER:  Yes.

16           THE COURT:  Thank you very much.

17           MR. BOVE:  Your Honor, the government calls Special

18   Agent Sandalio Gonzalez.

19           In order to expedite matters, I am going to put the

20   binder of exhibits up on the witness stand.

21           THE COURT:  Yes.

22           MR. BOVE:  Thank you, your Honor.

23           THE COURT:  Does the defense have a copy?

24     SANDALIO GONZALEZ,

25        called as a witness by the Government,

G98nflo1                          Gonzalez – direct

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. BOVE:

4     Q.  Sir, where do you work?

5     A.  I work in the DEA.

6     Q.  What is your current position at the DEA?

7     A.  I am a special agent.

8     Q.  In what part of the DEA do you work right now?

9     A.  I work at the special operations division, bilateral

10    investigations unit.

11    Q.  Is that sometimes referred to as SOD?

12    A.  Yes, sir.

13    Q.  What is SOD?

14    A.  It is a field division within DEA.

15    Q.  When did you start at SOD?

16    A.  I started SOD in the spring of 2010.

17    Q.  Has your work at SOD focused on any particular regions?

18    A.  Yes, it has.

19    Q.  What regions?

20    A.  Latin America.

21    Q.  Before you started to work at SOD, did you work in other

22    parts of the DEA?

23    A.  Yes, sir.

24    Q.  Could you please describe those?

25    A.  He first worked in San Ysidro, California, San Diego

G98nflo1                            Gonzalez - direct

1    California, followed by Caracas, Venezuela.

2    Q.   For how long did you work at those two California posts?

3    A.   Approximately six years between the two of them.

4    Q.   When, approximately, did you work for the DEA in Caracas,

5    Venezuela?

6    A.   From January 2006 until the spring of 2010.

7    Q.   What did you do before you joined the DEA?

8    A.   I was a Spanish-language linguist, contract for DEA.

9    Q.   Do you have any other formal language experience?

10   A.   No, sir.

11   Q.   Where did you grow up?

12   A.   I grew up United States Costa Rica, Mexico, Panama.

13   Q.   What language was spoken in your household?

14   A.   Spanish and English.

15   Q.   Are you familiar with the investigation of the two

16   defendants in this case?

17   A.   Yes.

18   Q.   How did that investigation begin?

19   A.   The end of September I was contacted by a cooperating

20   defendant indicating that there were some individuals who

21   wanted to send planes to Honduras.

22   Q.   Did that cooperating defendant say anything about the

23   purpose for sending those planes to Honduras?

24   A.   They were going to be filled with cocaine.

25   Q.   You said you were contacted in September?

G98nflo1                      Gonzalez - direct

1    A.  Yes, sir.

2    Q.  Of what year?

3    A.  2015.

4    Q.  Let's refer to that cooperating defendant as CW-1, OK?

5    A.  OK.

6    Q.  Do you know if he was charged with a drug trafficking

7    crime?

8    A.  Yes, he was.

9    Q.  When approximately did CW-1 begin to provide assistance to

10   the DEA?

11   A.  I believe it was April or May of 2015.

12   Q.  After he started to provide that assistance, did he also

13   disclose criminal conduct to the DEA?

14   A.  Yes.

15   Q.  What types of things did he disclose?

16   A.  Just his role in a drug trafficking organization involved

17   in bringing multiton quantities of cocaine from South America

18   to Central America.

19   Q.  Did you ever meet CW-1 in person?

20   A.  No, sir.

21   Q.  How did you typically communicate with him?

22   A.  Via BlackBerry Messenger service.

23   Q.  Did you find that there were any particular challenges that

24   you faced in managing this relationship with CW-1?

25   A.  Yes.

G98nflo1                          Gonzalez - direct

1    Q.  Please describe some of them.

2    A.  He was confined to a wheelchair and he had health

3    complications from that in addition to other health

4    complications.  He was always accompanied or surrounded by

5    either bodyguards or people that were helping him with his

6    condition.

7    Q.  Let's focus on that last aspect, the people that were

8    surrounding him.  Why did that pose a challenge to his

9    cooperation?

10   A.  Because he wasn't usually alone.  He always had somebody

11   there with him.

12   Q.  What is your understanding of whether those other people

13   were aware that CW is was providing assistance to DEA?

14   A.  My understanding is that they were not.

15              MR. JACKSON:  Objection.

16              THE COURT:  Overruled.

17   A.  It was my understanding that they were not.

18   Q.  In your communications with CW-1, did you get a sense of

19   where he was located?

20   A.  Yes.

21   Q.  Where generally was he?

22   A.  Roughly in the area around San Pedro Sula, Honduras.

23   Q.  Do you know whether CW-1 was ever provided recording

24   equipment by the DEA?

25   A.  Yes, I do.

G98nflo1                    Gonzalez – direct

1    Q.  Was he?

2    A.  No.

3    Q.  What is CW-1's current status?

4    A.  He is deceased.

5    Q.  When did you learn of that?

6    A.  Beginning of December 2015.

7    Q.  Let's return to the investigation.  You said that CW-1

8    contacted you in approximately late September of 2015?

9    A.  Yes.

10   Q.  Did he communicate with you after that about this

11   investigation?

12   A.  Yes, he did.

13   Q.  What in substance did he communicate to you?

14   A.  At the beginning of October he indicated that a Venezuelan

15   official by the name of Vladimir Flores was going to send his

16   nephew to Honduras to meet with CW-1.

17   Q.  And prior to this information being provided to you by

18   CW-1, had your SOD group targeted the defendants?

19   A.  No.

20   Q.  What, if any, additional information did CW-1 provide about

21   that anticipated meeting?

22   A.  He indicated that these individuals wanted to bring

23   drug-laden planes into Honduras with flight plans.

24   Q.  How soon after CW-1 initially told you about the meeting

25   was the meeting to take place?

1   A.  It was that same day.

2   Q.  Was that according to CW-1?

3   A.  Yes.

4   Q.  Where did CW-1 say the meeting was going to be?

5   A.  He said it was going to be in Lago Yajoa, Honduras.

6   Q.  And where in relation to San Pedro Sula is Lago de Yojoa?

7   A.  I believe it is to the south of San Pedro Sula.

8   Q.  Do you know if there is a DEA presence in Honduras?

9   A.  Yes.

10  Q.  Where is the main DEA office in Honduras?

11  A.  Tegulcicalpa.

12  Q.  Do you know if there is an office in San Pedro Sula?

13  A.  There is not.

14  Q.  When you learned about this potential meeting from CW-1,

15  did you think it was feasible to have DEA agents surveil that

16  meeting?

17  A.  No.

18  Q.  Why not?

19  A.  It's too far away, and I don't think they would be able to

20  do that themselves.

21  Q.  Did you give CW-1 any instructions with respect to that

22  anticipated meeting in early October of 2015?

23  A.  Yes.

24  Q.  What, in substance, did you direct him to do?

25  A.  I told them to record the meetings.

G98nflo1                         Gonzalez – direct

1   Q.  Did you ever any further communications with him about the

2   feasibility of recording the meeting?

3   A.  Yes.

4   Q.  What were some of the communications that were exchanged?

5   A.  Do you mean after the conclusion of the meeting?

6   Q.  Prior to the meeting?

7   A.  I am not sure I understand.

8   Q.  Did CW-1 say whether he intended to record the meeting?

9   A.  Yes, he said he was going to.

10  Q.  Did you ask him how?

11  A.  Yes, I did.

12  Q.  And how did CW-1 respond?

13  A.  He indicated he would use his telephone.

14  Q.  Did you take any other steps to try to collect evidence

15  relating to that anticipated meeting?

16  A.  Yes, I did.

17  Q.  What did you do?

18  A.  I asked CW-1 if he could locate another individual who was

19  also cooperating with DEA in order to see if he could attend

20  the meeting.

21  Q.  How did CW-1 respond to that instruction?

22  A.  That he would look into it.

23  Q.  Do you know if he was successful?

24  A.  He was not.

25  Q.  So, as far as you know, was there anyone other than CW-1

G98nflo1                    Gonzalez - direct

1    acting at the direction of the DEA at this meeting?

2    A.   No.

3    Q.   Did CW-1 report back to you following the meeting?

4    A.   Yes, he did.

5    Q.   What were some of the things that he said happened?

6    A.   He indicated that they had met, that he was unable to

7    record the meeting, but that someone had taken pictures of it.

8    Q.   What, if any, steps did you take to try to collect those

9    pictures or photographs?

10   A.   I asked CW-1 to send me the pictures.

11   Q.   Did he send them?

12   A.   Yes.

13   Q.   More than one?

14   A.   No.

15   Q.   So there is a binder in front of you with government

16   exhibits.  If you could please turn to tab 4.

17   A.   OK.

18   Q.   What is that?

19   A.   That is the picture that CW-1 sent me of the meeting.

20   Q.   How did CW-1 transmit this photo to you?

21   A.   Via the BBM messenger.

22              MR. BOVE:  Your Honor, the government offers

23   Government Exhibit 4.

24              MR. JACKSON:  No objection, your Honor.

25              MR. RODY:  No objection.

G98nflo1                            Gonzalez - direct

1            THE COURT:  Exhibit 4 is received in evidence.

2            (Government's Exhibit 4 received in evidence)

3            MR. BOVE:  Could we please publish Government Exhibit

4    4.

5            THE COURT:  Mr. Quigley, do you have an extra binder

6    of exhibits for the Court.

7            MR. QUIGLEY:  I do, your Honor.  Yes.

8            THE COURT:  Thank you.

9            4 is in evidence.  Do you have a question?

10           MR. BOVE:  Yes, your Honor.  Thank you.

11   Q.  Do you recognize anyone in Government Exhibit 4?

12   A.  Yes, I do.

13   Q.  Could you please describe who you recognize and where

14   they're situated in the photo?

15   A.  CW-1 is in the wheelchair.

16           The individual to his right with his foot up on the

17   bench is Mr. Campo.  The individual on the left with the red

18   shirt is Mr. Flores.

19   Q.  Did CW-1 ever provide a recording made outside the presence

20   of the DEA?

21   A.  Yes.

22   Q.  What did that recording relate to?

23   A.  It was a telephone conversation between CW-1 and another

24   target in Honduras of an unrelated investigation to this one.

25   Q.  What is your understanding of why CW-1 was able to make

G98nflo1                        Gonzalez – direct

 1    that recording?

 2    A.  It was a telephone conversation made in private.

 3    Q.  As far as you know, did CW-1 make or obtain any recordings

 4    of the meeting described with the defendants?

 5    A.  He did not.

 6    Q.  You can take Government Exhibit 4 down.  So based on this

 7    information from CW-1, in early October of 2015, what are some

 8    of the things that you did next in the investigation?

 9    A.  Well, CW-1 indicated that the individuals who he had met

10    with, Mr. Campo and Mr. Flores, had requested that he send a

11    representative to Venezuela to meet with them and see their

12    control of the airport.

13    Q.  What did you do based on that information?

14    A.  I contacted a confidential source that we had who could

15    possibly travel.

16    Q.  Travel to Venezuela?

17    A.  Yes.

18    Q.  And did that confidential source typically work with

19    another confidential source that you're familiar with?

20    A.  Yes.

21    Q.  So let's refer to one as CS-1 and the second confidential

22    source as CS-2, OK?

23    A.  OK.

24    Q.  Before this case, had you worked with CS-1 and CS-2 in

25    other investigations?

G98nflo1                          Gonzalez - direct

1   A.   Yes.

2   Q.   What types of investigations?

3   A.   Other international drug trafficking investigations with a

4   nexus to the United States where CS-1 and CS-2 were inserted to

5   conduct negotiations?

6   Q.   And what do you mean by inserted?

7   A.   They were introduced by another confidential source or

8   cooperating defendant.

9   Q.   And during your interactions with CS-1 and CS-2, were they

10  provided with instructions about recording meetings?

11  A.   Yes.

12  Q.   Please describe the instructions that they were provided.

13  A.   They were to record all conversations, negotiations, and

14  discussions of drug trafficking or money laundering.

15  Q.   Did CS-1 and CS-2 travel to Venezuela in connection with

16  this investigation?

17  A.   Yes, they did.

18  Q.   Were they provided with any equipment prior to doing so?

19  A.   Yes, they were.

20  Q.   What were they given?

21  A.   They were given two devices.

22  Q.   Generally speaking, what were the capabilities of those

23  devices?

24  A.   One of the devices was capable of recording audio and video

25  and the second device was capable of only recording audio.

G98nflo1                          Gonzalez - direct

1   Q.  Let's refer to the audio video recorder as device 1, and
2   the audio only recorder as device 2.
3   A.  OK.
4   Q.  Were CS-1 and CS-2 given any instructions about collecting
5   narcotics evidence outside of the United States?
6   A.  No.
7   Q.  From your perspective at the outset of this operation, was
8   that something that was feasible?
9   A.  No.
10  Q.  Why not?
11  A.  Because it would have been too dangerous for them to do
12  that in Venezuela.
13  Q.  Why would it have been too dangerous?
14  A.  Well, they had no -- meeting in Venezuela, operating in
15  Venezuela, they had no connection to U.S. law enforcement.
16  They had no protection from U.S. law enforcement.  If they were
17  to have taken possession of something, they could have gotten
18  stopped by police, thrown in jail, and covered their recording
19  equipment.
20  Q.  Let's unpack that a little bit.
21        You said that you didn't anticipate that CS-1 and CS-2
22  would have contact with U.S. law enforcement in Venezuela.
23  A.  Correct.
24  Q.  Why not?
25  A.  Not allowed to.

G98nflo1                          Gonzalez - direct

1    Q.  And what were some of the risks that would be associated
2    with the CS's having direct contact with law enforcement in
3    Caracas?
4    A.  It would have provided danger to the CS's as well as to our
5    personnel in Caracas.
6    Q.  Why?
7    A.  The CS's, they would have no, they would have no lifeline
8    to the U.S., and putting them in contact with our personnel in
9    Caracas would have caused problems.
10   Q.  You also said there was a risk they could be arrested?
11   A.  Correct.
12   Q.  What do you mean by that?
13   A.  Well, if they would have taken possession of narcotics,
14   they could have been stopped randomly in a car, in their hotel,
15   leaving an airport if they tried to transport it to the United
16   States.
17   Q.  What would be some of the risks associated with a DEA
18   confidential source being arrested abroad while in the
19   possession of narcotics evidence?
20   A.  They would have no ability to say that they were working
21   for law enforcement or DEA.  It would have been put them in
22   greater danger.
23   Q.  Did you take any further steps to prepare CS-1 or CS-2 to
24   travel to Caracas?
25   A.  Yes.

G98nflo1                        Gonzalez - direct

1   Q.  What did you do?

2   A.  I started a conference chat on the BBM messenger between

3   CW-1 and CS-1 and myself.

4   Q.  Why?

5   A.  So CW-1 could explain to CS-1 what had been discussed with

6   the individuals during the meeting in Honduras, so CS-1 would

7   be aware of the status of the negotiations.

8   Q.  You said that CS-1 was provided with device 1 and device 2?

9   A.  Yes.

10  Q.  How was that done?

11  A.  Via FedEx.

12  Q.  So the devices were mailed to CS-1?

13  A.  Yes.  The agent, one of the agents in my group sitting next

14  to me mailed the devices via FedEx to CS-1's residence.

15  Q.  As far as you know, were CS-1 and CS-2 given any other

16  equipment?

17  A.  No.

18  Q.  Did CS-1 and CS-2 eventually travel to Caracas?

19  A.  Yes.

20  Q.  When approximately?

21  A.  Approximately October 19.

22  Q.  Did you contact Venezuelan authorities regarding that

23  operation?

24  A.  No, I did not.

25  Q.  Why not?

G98nflo1                         Gonzalez - direct

1    A.  Because we don't do any sort of coordination on that type

2    of investigative matter with Venezuelan law enforcement.

3    Q.  Was there anything about this investigation that led you to

4    adhere to that path, that decision?

5    A.  I don't understand.

6    Q.  Was there anything about the nature of the targets that led

7    you not to notify the Venezuelan authorities about the

8    operation?

9    A.  Yes.

10   Q.  Please describe.

11   A.  The information that we had obtained was that the two

12   targets were politically connected to the highest levels of the

13   Venezuelan government.

14   Q.  Were you able to communicate with either CS-1 or CS-2 while

15   they were in Caracas?

16   A.  Yes, with CS-1.

17   Q.  How did you communicate with CS-1?

18   A.  Via BlackBerry Messenger.

19   Q.  Do you know if these confidential sources met with the

20   defendants in Caracas in October of 2015?

21   A.  Yes.

22   Q.  Approximately how many times?

23   A.  Approximately four times.

24   Q.  Do you know if any of those meetings involved discussions

25   about drug trafficking?

G98nflo1                         Gonzalez - direct

1  A.  Yes.

2  Q.  How many of the four meetings?

3  A.  Three of the meetings.

4  Q.  What happened after the last of the four meetings in

5  Caracas between the confidential sources and the defendants?

6  A.  The confidential sources departed Venezuela, returned to

7  Mexico and then the United States.

8  Q.  What happened after CS-1 and CS-2 returned to the U.S.?

9  A.  They traveled to our offices in Virginia to turn over the

10  recording equipment.

11  Q.  When approximately did that happen?

12  A.  This was beginning of November, November 1 or 2.

13  Q.  Were there any other purposes for that meeting in early

14  November of 2015?

15  A.  Yes.

16  Q.  What were some of the others?

17  A.  To speak to the CS-1 and CS-2 in person about their

18  meetings, as well as introduce a third confidential source to

19  them who was going to be traveling to Honduras for additional

20  meetings.

21  Q.  And during the debriefings of CS-1 and CS-2, did they

22  describe seeing any physical evidence in Caracas?

23  A.  Yes.

24  Q.  What did they say?

25  A.  They indicated that they saw and inspected a kilogram of

G98nflo1                          Gonzalez – direct

 1  cocaine.

 2  Q.  Did they say where that kilogram of cocaine came from?

 3  A.  Yes.

 4  Q.  What did they say?

 5  A.  They were provided it by Mr. Campo.

 6  Q.  Did CS-1 or CS-2 say whether they collected any evidence

 7  related to that kilogram?

 8  A.  Yes.

 9  Q.  What did they say about that?

10  A.  They did not.

11  Q.  Were you surprised by that?

12  A.  No.

13  Q.  Why not?

14  A.  Because they weren't instructed to do so.

15  Q.  Did CS-1 and CS-2 turn over any evidence during that

16  debriefing?

17  A.  Yes.

18  Q.  What did they provide?

19  A.  Device 1 and device 2.

20  Q.  What did you do with device 1 and device 2?

21  A.  I gave them to one of the agents that was there with me.

22  They were taken to our office, downloaded onto the network and

23  then I transferred them to a CD.

24  Q.  The contents of device 1 and device 2 were downloaded onto

25  the network?

G98nflo1                        Gonzalez - direct

1   A.  Yes.

2   Q.  And then what did you do with the files that were on the

3   network?

4   A.  The files, I downloaded them onto a CD and submitted them

5   as evidence.

6   Q.  If you could take a look at the binder at Government

7   Exhibit 5.

8           What is this?

9   A.  This is a summary of the recordings.

10  Q.  So it is a three-page document, correct?

11  A.  Correct.

12  Q.  What types of recordings does this summarize?

13  A.  Video recordings and audio recordings.

14  Q.  Does this fairly and accurately summarize all of the

15  recordings that are in DEA evidence related to this

16  investigation?

17  A.  Yes, it does.

18          MR. BOVE:  Your Honor, the government offers

19  Government Exhibit 5.

20          MR. JACKSON:  No objection, your Honor.

21          MR. RODY:  No objection.

22          THE COURT:  5 is in evidence.

23          (Government's Exhibit 5 received in evidence)

24  Q.  Starting with the column on the left, could you please

25  describe what the different columns in Government Exhibit 5

G98nflo1                          Gonzalez – direct

1    refer to.

2    A.   The first column on the left is the approximate date of

3    which each recording was taken.  The second column,

4    confidential source, who made the -- who took the recording.

5         The next column is the device that was used, either

6    device 1, device 2, or device 3.

7         The next column is the file name.

8         The next column is the exhibit number that was given

9    to the recording.

10        The next column is the recording, type whether it was

11   audio or video.

12        And, finally, the last column is the approximate

13   duration of each recording.

14   Q.   So page 1 of Government Exhibit 5 reflects the recordings

15   that were collected from CS-1 and CS-2 following the Caracas

16   meetings in October of 2015?

17   A.   Yes.

18   Q.   You mentioned a third confidential source, right?

19   A.   Yes.

20   Q.   Let's refer to him as CS-3.

21   A.   OK.

22   Q.   Was he present at any point during these early November

23   2015 meetings?

24   A.   Yes.

25   Q.   Why?

G98nflo1                          Gonzalez - direct

A.   Because CS-1 and CS-2 had to meet with him and explain what

it was that he was going to be doing when traveling to

Honduras.

Q.   What, in substance, was CS-3 instructed to do while

traveling to Honduras?

A.   During the negotiations in Caracas, the next step was that

the defendants were going to send pilots to Honduras to inspect

the airstrip where the plane was to land carrying the cocaine

and meet with the operators of the air traffic control tower in

Honduras.

Q.   Following the initial meeting with CS-3, did he travel to

Honduras?

A.   Yes, he did.

Q.   What, if any, equipment did he take with him?

A.   He was provided with recording equipment.

Q.   And what were the general capabilities of the equipment

that he was provided with?

A.   Again, a device that was capable of recording audio and

video and then a second device capable of recording audio.

Q.   Let's start with the audio-only recording.  Was that the

same type of audio-only recorder that was given to CS-1 and

CS-2?

A.   Yes.

Q.   So that's -- the type of device is device 2?

A.   Yes.

G98nflo1                          Gonzalez – direct

1    Q.   You said there was also an audio video recorder?

2    A.   Correct.

3    Q.   Was that a different type of device than the one that was

4    used during the Caracas meetings?

5    A.   Yes, it was.

6    Q.   So let's refer to that one as device 3.

7    A.   OK.

8    Q.   Did CS-3 travel to Honduras in connection with the

9    investigation?

10   A.   Yes, he did.

11   Q.   Were you in contact with him during that trip?

12   A.   Very briefly.

13   Q.   Did CS-3 obtain evidence in Honduras?

14   A.   Yes, he did.

15   Q.   What types of evidence?

16   A.   Audio video recordings and audio recordings.

17   Q.   Take a look at page 2 of Government Exhibit 5.

18            Are these the recordings acquired by CS-3 in Honduras?

19   A.   Yes.

20   Q.   Were you involved directly in the acquisition of this

21   evidence?

22   A.   No, I was not.

23            (Continued on next page)

24

25

1  BY MR. BOVE:

2  Q.  When were CS-3's meetings in Honduras?

3  A.  November 5 and 6.

4  Q.  Did he eventually return to the U.S.?

5  A.  He returned home.

6  Q.  Thank you.  What happened after CS-3 returned home?

7  A.  We began making plans for travel to Haiti.

8  Q.  When, approximately, did that planning process begin?

9  A.  Again, that first week of November.

10 Q.  And at some point were arrest warrants obtained related to

11 this offense?

12 A.  Yes.

13 Q.  You said you were planning an operation in Haiti.  How did

14 you plan the operation?

15 A.  We -- after, around the same time as obtaining the arrest

16 warrants, we conducted our several offices who would be

17 involved in this and began laying out a rough operational plan.

18 Q.  Did you instruct any of the confidential sources that we

19 discussed to participate in that operation?

20 A.  Yes.

21 Q.  Which one?

22 A.  CS-1.

23 Q.  And what was CS-1 instructed to do?

24 A.  CS-1 was instructed to request the defendants to travel to

25 port of prince Haiti.

G98SFLO2                        Gonzalez - direct

1  Q.  Did you travel to Haiti in connection with that operation?

2  A.  Yes, I did.

3  Q.  When?

4  A.  November 9, I believe.  It was a Monday.

5  Q.  Was that November 9 of 2015?

6  A.  Yes.

7  Q.  Did any other agents from SOD travel to Haiti in that time

8  frame?

9  A.  Yes.

10  Q.  Who else went?

11  A.  My supervisor at the time, Zachariasiewicz, and Special

12  Agency Habayeb.

13  Q.  I think for the sake of everyone, we will refer to Chavez

14  as Group Supervisor Zach, is that OK?

15  A.  OK.  Thank you.

16  Q.  And you said Special Agent Habayeb?

17  A.  Yes.

18  Q.  Was anyone else from the DEA, that was United States based,

19  a part of the operation?

20  A.  Yes.

21  Q.  Who?

22  A.  Special Agent Brooks from the New York field division.

23  Q.  Why was there an agent from the New York field division

24  that went to Haiti?

25  A.  Well, because we do most of our investigations jointly with

G98SFLO2                          Gonzalez – direct

1    the New York field division, and SA Brooks in particular.

2    Q.   Did you possess a weapon at any point during that trip?

3    A.   No.

4    Q.   Why not?

5    A.   Because we are not authorized to carry weapons abroad.

6    Q.   You said you went to Haiti on November 9?

7    A.   Yes.

8    Q.   Were there any meetings related to the investigation on

9    that day?

10   A.   Yes.

11   Q.   What happened?

12   A.   On the evening of November 9, we met with CS-1 at the

13   hotel.

14   Q.   Why?

15   A.   Just to find of see how he was doing and see the status of

16   the defendant's travel to Haiti.

17   Q.   Did CS-1 have any equipment in connection with this

18   investigation?

19   A.   Yes.

20   Q.   In particular in Haiti?

21   A.   Yes.

22   Q.   What equipment did CS-1 have?

23   A.   Again, he had audio-video recording equipment and audio

24   recording equipment.

25   Q.   So for the audio-video recording, was he provided with

G98SFLO2                     Gonzalez - direct

1    device one?

2    A.   Yes.

3    Q.   For the audio only recorder, device two?

4    A.   Yes.

5    Q.   Let's now focus on November 10 of 2015.

6    A.   OK.

7    Q.   How did that day begin as it related to the investigation?

8    A.   We introduced CS-1 to a patient undercover police officer

9    who was going to be driving him around, then we traveled to the

10   Haitian police office, where we met with the Haitian

11   counterparts.

12   Q.   What was the purpose of the meeting with the Haitian

13   counterparts?

14   A.   Just to go over the operational plan for the day, catch him

15   up to speed, and come up with a joint game plan, basically.

16   Q.   And from your perspective, what were the objectives that

17   day?

18   A.   To meet with Mr. Campo and Mr. Flores in Haiti and have the

19   Haitians take them into custody following the meeting.

20   Q.   Did the DEA have authority to effect an arrest in Haiti?

21   A.   No.

22   Q.   After this operational briefing, what was your

23   understanding of what was to take place?

24   A.   The defendants were arriving at that time.  There was

25   another Haitian official who worked at the airport who was

G98SFLO2                          Gonzalez – direct

1   going to receive the defendants at their airplane and then walk

2   them over to meet with CS-1 and the undercover official, and

3   then take them to the hotel where they were to meet.

4   Q.  Did the defendants arrive in Haiti that day?

5   A.  Yes, they did.

6   Q.  How?

7   A.  Via private aircraft.

8   Q.  How did you find out about that?

9   A.  CS-1 notified me.

10  Q.  After operational briefing with the Haitian counterparts,

11  where did you go?

12  A.  I got into one of the vehicles and we proceeded to the

13  hotel.

14  Q.  Who were you with at that point in the vehicle?

15  A.  I was with the Haitian team leader, the police team leader.

16  Q.  You referenced the hotel.  Is that the Servotel?

17  A.  Yes, sir.

18  Q.  Can you please turn to tab two marked for the document

19  marked Government Exhibit 2 in the binder.

20          What is that document?

21  A.  It's a picture of the front of the hotel.

22  Q.  Which hotel?

23  A.  The Servotel.

24  Q.  Does it fairly and accurately depict the way the hotel

25  looked?

G98SFLO2                          Gonzalez - direct

1    A.  Yes, sir.

2              MR. BOVE:  The government offers Government Exhibit 2.

3              MR. JACKSON:  No objection.

4              MR. RODY:  No objection.

5              THE COURT:  2 is in evidence.

6              (Government's Exhibit 2 received in evidence)

7    BY MR. BOVE:

8    Q.  You said after the operational briefing, you went to the

9    Servotel.

10   A.  Yes.

11   Q.  Where initially were you posted?

12   A.  We were parked off to the side and in the rear of the hotel

13   in a parking lot.

14   Q.  Can you describe where in relation to the Government

15   Exhibit 2 you were located?

16   A.  If you're looking at the picture, it would be off to the

17   right.

18   Q.  What happened next?

19   A.  We sat in the car and waited while CS-1 met and had

20   breakfast or lunch, I forget, with the defendants.

21   Q.  You mentioned that three other DEA agents made the trip to

22   Haiti?

23   A.  Yes.

24   Q.  Were they in the vehicle with you?

25   A.  No, they were not.

G98SFLO2                    Gonzalez - direct

1    Q.   Where were they?

2    A.   They were in another vehicle parked somewhere else.

3    Q.   What happened next?

4    A.   CS-1 notified me that the meeting was almost concluded, and

5    then he notified me that the meeting was concluded, and I

6    notified the BLTS team leader.

7    Q.   What was that purpose of that notification from you to the

8    BLTS team leader?

9    A.   To let them know that it was safe to go in and take the

10   defendants into custody.

11   Q.   After you made that notification to the BLTS team leader,

12   what happened?

13   A.   We drove up to the front of the hotel, the team leader

14   asked everybody to wait in the car, he exited, went into the

15   front to speak -- he indicated he was going to go speak to the

16   manager to let them know what was about to happen.

17   Q.   What happened next?

18   A.   Moments later, the other team members got out of the

19   vehicle and entered the hotel.

20   Q.   Did you go into the hotel?

21   A.   At that time, I did not.

22   Q.   What happened next?

23   A.   A short time after, the BLTS officers returned with

24   Mr. Campo and Mr. Flores.

25   Q.   At the time that the group of the BLTS personnel entered

G98SFLO2                        Gonzalez - direct

1   the hotel, how was the team leader dressed?

2   A.  He was dressed in plainclothes.

3   Q.  How were the other BLTS people dressed?

4   A.  They were dressed in -- I think it was like urban

5   camouflage gear with helmets and vests and the police patch on

6   their vest.

7   Q.  Were there any other markings on the uniforms?

8   A.  I can't recall.  I remember seeing a black patch with white

9   letters that says police.

10  Q.  Did you see the defendants at some point at the hotel?

11  A.  Yes.

12  Q.  When did you see them?

13  A.  As they were walking out.

14  Q.  Were they restrained in any way?

15  A.  Yes, they were.

16  Q.  How?

17  A.  I believe they were cuffed in the front.

18  Q.  Did any other DEA agents go into the hotel during the

19  arrest?

20  A.  No.

21  Q.  Where were the defendants taken at that point?

22  A.  They were placed inside of the vehicle.

23  Q.  What did you do?

24  A.  At that point, I went inside the hotel to meet with CS-1

25  and retrieve the recording equipment.

G98SFLO2                          Gonzalez - direct

1    Q.  So that's device one and device two?

2    A.  Yes.

3    Q.  Did you leave the hotel at some point?

4    A.  Yes.

5    Q.  Did you have any contact with either defendant at the

6    Servotel?

7    A.  No.

8    Q.  Where did go when you left?

9    A.  We went back to the BLTS office where we had started the

10   morning.

11   Q.  Did you speak to the defendants at that BLTS office?

12   A.  No.

13   Q.  Did you see them?

14   A.  Yes.

15   Q.  Describe what you saw.

16   A.  I saw Mr. Campo sitting in a chair in one of the front

17   offices of the -- I guess of the building, the house.

18   Q.  Did you see Mr. Flores?

19   A.  Not that much.  I saw him go into another room.

20   Q.  While you were at this BLTS office, did anyone from the

21   BLTS speak to you about either defendant?

22   A.  Yes.

23   Q.  What was said?

24   A.  One of the other BLTS supervisors walked out holding a

25   piece of paper, and he said that they had asked -- the

G98SFLO2                        Gonzalez – direct

1    defendants had asked to make a phone call to Venezuela.

2    Q.  How did you respond?

3    A.  I asked them if they allowed the defendant to make the call

4    to Venezuela.  The BLTS officials said they had not.

5    Q.  Did you have any further contact with the BLTS for request

6    of calls from the defendants?

7    A.  He showed me a piece of paper that, I believe, was written

8    by one of the defendants asking the BLTS officials to make a

9    phone call on their behalf to Venezuela.

10   Q.  Now, how was that request resolved, to be clear?

11   A.  I don't know.  The BLTS officer said he was going to ask

12   his supervisor.

13   Q.  At some point, who was with you from the DEA at this BLTS

14   office?

15   A.  Officer Brooks and Officer Habayeb were with me, GS Zach

16   and SA Flores were at the beginning.

17   Q.  That's the first time you mentioned Special Agent Flores.

18   Who is he?

19   A.  He is one of the DEA special agents assigned to the

20   Port-au-Prince office.

21   Q.  Did any DEA personnel leave that BLTS office before you

22   did?

23   A.  Yes.

24   Q.  Who?

25   A.  GS Zach and SA Flores.

G98SFLO2                        Gonzalez – direct

1    Q.  What was your understanding why?

2    A.  It was my understanding they were going to the

3    U.S. Embassy.

4    Q.  For what purpose?

5    A.  To draft a letter to the Haitian authorities requesting

6    that they turn over the defendants to DEA.

7    Q.  If you could please turn in the binder to tab 13A.  There

8    is a document behind that tab marked as Government Exhibit 13A.

9    Do you recognize that?

10   A.  Yes.

11   Q.  What is it?

12   A.  It is a letter on DEA letterhead from the country of Haiti

13   to -- looks like someone from the Ministry of Justice and

14   Public Safety in Haiti.

15   Q.  Can you tell what language that letter marked Government

16   Exhibit 13A is in?

17   A.  I think it is in French.

18   Q.  Have you reviewed a translation of the letter?

19   A.  Yes.

20   Q.  Is that the document marked next in the binder as 13B?

21   A.  Yes.

22   Q.  Based on your review of that translation marked 13B, what

23   is this letter?

24   A.  It's a letter from the country attaché, DEA attaché in

25   Haiti, to the Ministry of Justice and Public Safety in

G98SFLO2                          Gonzalez - direct

1    Port-au-Prince, requesting the transfer of Mr. Campo and

2    Mr. Flores to DEA.

3           MR. BOVE:  Your Honor, the government offers 13A and

4    the corresponding translation, 13B.

5           MR. JACKSON:  No objection, your Honor.

6           MR. RODY:  No objection.

7           THE COURT:  13A and 13B are received in evidence.

8           (Government's Exhibits 13A and 13B received in

9    evidence)

10   BY MR. BOVE:

11   Q.  You can now turn to Government Exhibit 14A in the binder.

12   What is that?

13   A.  That's a letter to the country attaché in Port-au-Prince

14   from the Haitian minister.

15   Q.  Have you reviewed a translation of this document as well?

16   A.  Yes.

17   Q.  That's the document marked 14B?

18   A.  Yes.

19   Q.  Based on your review of the translation, what was the

20   purpose of this letter?

21   A.  This was a letter from the ministry notifying Mr. Wilhite,

22   the country attaché, that the Haitians had approved and

23   authorized the transfer of the two individuals to the

24   United States.

25          MR. BOVE:  Your Honor, the government offers 14A and

G98SFLO2                         Gonzalez - direct

1    the corresponding translation, 14B.

2            THE COURT:  Any objection?

3            MR. JACKSON:  No objection, your Honor.

4            MR. RODY:  No, your Honor.

5            THE COURT:  14A and 14B are received in evidence.

6            (Government's Exhibits 14A and 14B received in

7    evidence)

8    BY MR. BOVE:

9    Q.  Were you present during the process of GS Zach helping to

10   make that request for the expulsion?

11   A.  No, I was not.

12   Q.  Where were you?

13   A.  I was at the BLTS office.

14   Q.  Did you leave the BLTS office at some point?

15   A.  Yes.

16   Q.  Why?

17   A.  After we were notified that the expulsion had been

18   approved, we had to go to another BLTS office.

19   Q.  As far as you could tell, for what purpose?

20   A.  I was just told that they had to undergo processing prior

21   to being transferred.

22   Q.  Did you participate in the processing of the defendants at

23   that second BLTS office?

24   A.  No.

25   Q.  Did you speak with either of them?

G98SFLO2                        Gonzalez – direct

1    A.  No.

2    Q.  What happened when the processing was completed?

3    A.  We drove to the airport.

4    Q.  What happened at the airport?

5    A.  We went onto the tarmac where the DEA plane was waiting and

6    we deplaned, went to got in front of the plane, took pictures

7    of the defendants, and the Haitian officials and boarded the

8    plane and departed.

9    Q.  Can you please turn in the binder to Government Exhibit 6.

10   Do you recognize that document?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's a picture that I took of the defendants with the

14   Haitian police officers.

15            MR. BOVE:  The government offers 6, your Honor.

16            MR. JACKSON:  No objection.

17            MR. RODY:  Brief voir dire, your Honor?

18            THE COURT:  Yes.

19   VOIR DIRE EXAMINATION

20   BY MR. RODY:

21   Q.  Agent Gonzalez, are you in this photo?

22   A.  No, sir.

23   Q.  Were you present when the photo was taken?

24   A.  Yes.

25   Q.  Did you or anyone else direct any staging of this

G98SFLO2                         Gonzalez - direct

1    photograph before it was taken?

2    A.   How do you mean staging?

3    Q.   The uniforms or anything?

4    A.   No, sir.

5         MR. RODY:  No further questions.

6         THE COURT:  Exhibit 6 is received in evidence.

7         (Government's Exhibit 6 received in evidence)

8    BY MR. BOVE:

9    Q.   Towards the center of this photo, there is someone wearing

10   a jacket marked DEA.  Do you see that?

11   A.   Yes.

12   Q.   Who is that?

13   A.   That's Special Agent Flores.

14   Q.   Now, at any time prior to the DEA taking custody of these

15   defendants at the airport, did you see anyone threaten either

16   defendant?

17   A.   No.

18   Q.   Before the DEA took custody of the defendants at the

19   airport, did you see anyone strike them?

20   A.   No.

21   Q.   What happened after this photo was taken?

22   A.   We boarded the plain.

23   Q.   Who went on the plane?

24   A.   The two defendants, myself, Special Agent Brooks, Special

25   Agent Habayeb, GS Zach, and the pilots.

G98SFLO2                        Gonzalez – direct

1   Q.  How many pilots were there?

2   A.  I believe there were two.

3   Q.  Before you boarded the plane, did you talk to anyone about

4   interviewing the defendants?

5   A.  No.

6   Q.  If you could take a look at the binder at Government

7   Exhibits 7 through 9, please.  What are those?

8   A.  Those are the pictures of the interior of the plane.

9   Q.  Is this the plane that was used to transport the defendants

10  on November 10?

11  A.  Yes.

12          MR. BOVE:  Your Honor, the government offers 7

13  through 9.

14          MR. JACKSON:  No objection, your Honor.

15          MR. RODY:  No objection.

16          THE COURT:  Exhibit 7 through 9 are received in

17  evidence.

18          (Government's Exhibits 7 through 9 received in

19  evidence)

20          MR. BOVE:  Thank you.

21  BY MR. BOVE:

22  Q.  Could we please publish Government Exhibit 8.  This is the

23  one of the photographs of the plane that was used?

24  A.  Yes.

25  Q.  Do you remember where you were sitting at the time of

G98SFLO2                    Gonzalez - direct

1    takeoff?

2    A.  I was in one of those four rear seats.

3    Q.  You said four rear seats.  How is this photograph oriented

4    between the rear of the plane and the cockpit?

5    A.  The two -- the two seats that you see when you look at the

6    picture are facing the front of the cockpit, their backs are to

7    the rear of the cockpit.

8    Q.  So the top of the photograph is directed at the rear of the

9    plane?

10   A.  Yes, sir.

11   Q.  Do you remember where the defendants were sitting in

12   relation to you at the time of takeoff?

13   A.  One of them was in front of me and the other one was

14   diagonal to me.  I don't remember which one was where.

15   Q.  Were they handcuffed at that time?

16   A.  Yes, they were.

17   Q.  Please describe the demeanor of each defendant at the time

18   of takeoff.

19   A.  They were talking with each other.

20   Q.  What happened next?

21   A.  At some point when they were talking, I believe I looked

22   up, causing Mr. Campo -- they were speaking in Spanish, excuse

23   me.  And at one point in the conversation I looked up, causing

24   Mr. Campo to look at me and ask me if I spoke Spanish.

25   Q.  Did you respond?

1    A.  Yes, I did.

2    Q.  How?

3    A.  I told him that I did speak Spanish.

4    Q.  What happened next?

5    A.  He said if he could ask me some questions and talk to me.

6    Q.  What did you say?

7    A.  I told him that I had to make him aware of his rights prior

8    to doing so.

9    Q.  Was there any further conversation at that point?

10   A.  Yes.

11   Q.  What was that?

12   A.  He asked me if I had to make him aware of his rights, and I

13   said that I did.

14   Q.  What happened next?

15   A.  I told him we had to wait until the plane took off and we

16   would level off before talking.

17   Q.  What do you mean by level off?

18   A.  After the ascent, when the plane levels off.

19   Q.  What happened when the plane did level off?

20   A.  I asked Mr. Campo if he wanted to go move to the front of

21   the plane and talk, so we shuffled people around so we could

22   sit up at the bench.

23   Q.  Can we publish Government Exhibit 9.  What is this?

24   A.  That's a picture of the bench seats where Mr. Campo and

25   I sat.

G98SFLO2                      Gonzalez - direct

1   Q.  Could you describe Mr. Campo's demeanor, what he looked

2   like, as he moved up towards this bench seat?

3   A.  He was very antsy.  He wanted to get there, sit down and

4   start talking.

5   Q.  What happened after he sat down?

6   A.  I provided him with an advice of rights form in the Spanish

7   language and asked him if he wanted me to read it to him.

8   Q.  Did he respond?

9   A.  Yes, he did.

10  Q.  What did he say?

11  A.  He indicated that he -- that he didn't need me to read it,

12  he would read it.

13  Q.  What happened next?

14  A.  As he read it, I asked him if he understood it, and he said

15  that he did and then he commented that he was an attorney.

16  Q.  What happened next?

17  A.  He signed the form, gave it to me, I signed it and I gave

18  to it GS Zach to sign it.

19  Q.  Where was GS Zach on the plane at this point?

20  A.  He was sitting -- I guess it would be in front of us from

21  the bench seats.

22  Q.  If you could turn in the binder now to Government Exhibit

23  10A, please.  What's this?

24  A.  This is the advice of rights form in the Spanish language

25  that I provided to Mr. Campo.

G98SFLO2                        Gonzalez - direct

1    Q.  If you could please take a look at 10B.  What's that?

2    A.  10B, it looks like an English translation of the Spanish

3    advice of rights form.

4              MR. BOVE:  Your Honor, the government offers 10A and

5    10B.

6              MR. JACKSON:  No objection, your Honor.

7              THE COURT:  10A is in received in evidence.  10B is,

8    too.

9              MR. BOVE:  Thank you, your Honor.

10             (Government's Exhibits 10A and 10B received in

11   evidence)

12             MR. BOVE:  Would you please publish 10A.

13   BY MR. BOVE:

14   Q.  Could you please describe the writing in the top right-hand

15   corner of this form?

16   A.  The top right-hand corner are the initials of Mr. Campo.

17   Q.  What's below that?

18   A.  Location, where it was read.  I put in Lear, the date

19   11/10/15, and the time, 5:15 p.m.

20   Q.  If you could go to the bottom of the form.  What do we see

21   here?

22   A.  The box checked that he had read his rights and the

23   signatures.

24   Q.  So where is your signature on this?

25   A.  It's on the bottom left, the first witness signature.

G98SFLO2                        Gonzalez – direct

1   Q.   What's the second witness signature?

2   A.   GS Zach's signature.

3   Q.   And you said that Mr. Campo signed this form?

4   A.   Yes.

5   Q.   Where is that?

6   A.   On the right, the bottom of the right.

7   Q.   If you could zoom back out, please.  Do you remember who

8   made the checks on this form?

9   A.   No, I don't.

10  Q.   Before Campo signed the form, had you asked him any

11  questions about drug trafficking?

12  A.   No.

13  Q.   Before you signed this form, did you ask him any questions

14  about the evidence in the case?

15  A.   No.

16  Q.   What happened after Campo signed the form?

17  A.   I took some basic biographical information, which we refer

18  to as 202 information, and then I interviewed him.

19  Q.   Let's focus on the first part there.  Why do you refer to

20  that biographical information as 202 information?

21  A.   The DEA form for biographical information is called a

22  DEA 202 form.

23  Q.   Why did you start with biographical information on that

24  day?

25  A.   Well, the biographical information is something we always

G98SFLO2                      Gonzalez - direct

1   have to take down from someone.  It would be necessary, as

2   well, upon entry to the United States for the customs and

3   border protection to process them into the country.

4   Q.  Is biographical information necessary when you process the

5   defendants at a place of detention?

6   A.  Yes, as well.

7   Q.  What language was spoken during your interview of Campo?

8   A.  Spanish.

9   Q.  Did GS Zach participate in any way?

10  A.  Not really.

11  Q.  Did you speak with GS Zach during the interview?

12  A.  Yes.

13  Q.  For what purpose?

14  A.  Just to relay to him some of the things that Mr. Campo was

15  saying.

16  Q.  About how long did your interview of Campo take place?

17  A.  I think it was maybe a little over two hours.

18  Q.  Where was Defendant Flores on the plane while you were

19  interviewing Campo?

20  A.  Somewhere towards the back of the plane.

21  Q.  Could you see what he was doing?

22  A.  Yes.

23  Q.  What was he doing?

24  A.  He was speaking with Special Agent Brooks.

25  Q.  Please describe what you observed about Flores' demeanor

G98SFLO2                           Gonzalez - direct

1    when you saw him speaking with Special Agent Brooks.

2    A.  At first, it was kind of serious, and then shortly after,

3    it became, like, more relaxed, joking and laughing.

4    Q.  Did you hear what Special Agent Brooks and Flores were

5    speaking about?

6    A.  No.

7    Q.  Did you speak to Flores at some point during the flight?

8    A.  Yes.

9    Q.  What happened?

10   A.  After speaking with Mr. Campo for quite some time, he had

11   indicated that he wanted to give Mr. Flores an opportunity to

12   speak with me also, so he switched -- we had him switch places

13   with Mr. Flores.

14   Q.  So Flores moved to the bench seats you described earlier?

15   A.  Yes, sir.

16   Q.  What happened after Flores sat down on the bench?

17   A.  I provided him with the same advice of rights form in the

18   Spanish language.

19   Q.  What happened next?

20   A.  I asked him if he wanted me to read him the form.  He

21   indicated that he did not and he proceeded to read the form.

22   Q.  What happened after he read the form?

23   A.  He signed the form.  I asked him if he understood it.  He

24   said he did.  He signed the form, I signed it, I gave it to

25   GS Zach, and he signed it.

G98SFLO2                          Gonzalez – direct

1    Q.  If you could please take a look at Government Exhibits 11A

2    and 11B.  Do you recognize those?

3    A.  Yes.

4    Q.  What are they?

5    A.  It's the advice of rights form that I provided to

6    Mr. Flores.

7    Q.  That's 11A?

8    A.  Yes, sir.

9    Q.  What is 11B?

10   A.  Translation to English of the document.

11           MR. BOVE:  Government offers 11A and 11B, your Honor.

12           MR. JACKSON:  No objection.

13           MR. RODY:  No objection.

14           THE COURT:  11A and 11B are received in evidence.

15           (Government's Exhibits 11A and 11b received in

16   evidence)

17   BY MR. BOVE:

18   Q.  Can we please take a look at 11A and zoom in on the top

19   right.  What do we see here?

20   A.  Mr. Flores' initials, the place, which was the Lear, the

21   date 11/10/15 and the time, 7:35 p.m.

22   Q.  With respect to the time entry on 11A, as well as 10A, did

23   you make those entries?

24   A.  Yes.

25   Q.  This interview began at approximately 7:35 p.m.?

G98SFLO2                         Gonzalez – direct

1    A.   That's when I gave him the form.

2    Q.   Now if we could take a look at the bottom.  Who signed

3    this?

4    A.   GS Zach signed it, I signed it, and then on the right,

5    Mr. Flores signed it.

6    Q.   So the witness signature on top is GS Zach?

7    A.   Yes, sir.

8    Q.   What was Flores' demeanor like when he signed the form?

9    A.   Again, he wanted to talk to me.  He was eager to sit down

10   and talk.

11   Q.   Before he signed that form, had you asked him any questions

12   about drug trafficking?

13   A.   No.

14   Q.   Before Flores signed 11A, had you asked him any questions

15   about the evidence in the case?

16   A.   No.

17   Q.   At any point, did you tell Flores that signing this form

18   was for his own good?

19   A.   No.

20   Q.   What happened after Flores signed 11A?

21   A.   I interviewed him.

22   Q.   Approximately how long was that interview?

23   A.   I think maybe approximately an hour.

24   Q.   Now I would like to ask you some questions about the time

25   period between when the DEA took custody of the defendants at

G98SFLO2                         Gonzalez - direct

1   Port-au-Prince and the time when the plane landed in the United

2   States.  OK?

3   A.  OK.

4   Q.  During that time period, did you threaten either of the

5   defendants?

6   A.  No.

7   Q.  Did you see anyone threaten the defendants in that time

8   frame?

9   A.  No.

10  Q.  Did you see any weapons in that time frame?

11  A.  No.

12  Q.  What happened after the plane landed?

13  A.  We were met by other DEA agents from the New York field

14  division.  We deplaned and we proceeded into the customs and

15  border protection offices, where the defendants were, I guess.

16  We call it paroled into the country.  And the paper -- they

17  prepared the paperwork to allow them to enter the United

18  States.

19  Q.  Was some of the biographical information that was collected

20  on the plane used at that point?

21  A.  I believe so.

22  Q.  Did you speak with either defendant again after you exited

23  the plane?

24  A.  Yes.

25  Q.  Describe what happened.

1    A.  Mr. Campo asked us if we would allow him to make a phone

2    call to his family to let them know what had happened so that

3    they knew that he was OK.

4    Q.  How did you respond to that request?

5    A.  We discussed it and we thought it would be the right thing

6    to do to let him call.  He didn't want to speak to his wife.

7    He wanted to speak to, I believe, his father-in-law to let him

8    know.  We allowed him to make a phone call.

9    Q.  What happened after the call?

10   A.  It was very emotional.  Mr. Campo spoke to his family.

11   Afterwards, he was very grateful, he was thankful, and he

12   commented how well we had treated him.  He wasn't expecting,

13   obviously, to be treated that way.

14   Q.  You said you gave Campo an opportunity to make a telephone

15   call?

16   A.  Yes.

17   Q.  Did you have any conversations with Flores?

18   A.  Yes.

19   Q.  What was the substance of those conversations?

20   A.  We then asked Mr. Flores if he wanted to call back to

21   Venezuela, and he indicated that he did not.

22   Q.  What happened after that interaction?

23   A.  The two defendants were processed or finished being

24   processed, and I believe they were transported to MCC.

25   Q.  Did you play it any role in that transport?

G98SFLO2                    Gonzalez – direct

1    A.  No.

2    Q.  Who was principally responsible for that?

3    A.  SA Brooks.

4    Q.  You testified earlier that you retrieved device one and

5    device two from CS-1 on November 10 of 2015?

6    A.  Yes.

7    Q.  What happened with those devices?

8    A.  I gave them to Special Agent Habayeb.

9    Q.  After you returned to the United States, what happened with

10   devices?

11   A.  The devices were downloaded onto our network, and then I

12   burned copies of the recordings onto a CD and submitted them as

13   evidence.

14   Q.  If we could take a look at page three of Government

15   Exhibit 5.  What do we see here?

16   A.  These are -- this is a list of the recordings from the

17   November 10 meeting in Haiti.

18   Q.  Now, the third entry in that chart, the file name reads

19   Flores CC recording.  Do you see that?

20   A.  Yes.

21   Q.  Is that the file name format that typically is attributed

22   to a file on device two?

23   A.  No.

24   Q.  Do you know who renamed the file?

25   A.  No.

G98SFLO2                        Gonzalez - direct

1   Q.   You testified about both CS-1 and CS-2.  Do you know what

2   their current status is?

3   A.   Yes.

4   Q.   What is it?

5   A.   They're incarcerated.

6   Q.   How did that happen?

7   A.   Several months ago we received information that CS-1 and

8   CS-2 were engaged in drug traffic -- domestic drug-trafficking

9   activity, so we investigated them, and they were subsequently

10  charged.

11  Q.   You obtained information that they were engaged in

12  unauthorized criminal activity?

13  A.   Correct.

14  Q.   What types of things did you do in connection with the

15  investigation?

16  A.   We followed down, we looked into the information, and we

17  interviewed CS-1 and CS-2 on multiple occasions.

18  Q.   After the investigation was complete, what happened?

19  A.   CS-1 and CS-2 were charged with drug trafficking and were

20  incarcerated.

21  Q.   Do you know what the status of those charges is today?

22  A.   I believe they have pled guilty.

23  Q.   Do you know where they are today?

24  A.   In jail.

25           MR. BOVE:  If I could have a moment, your Honor?

G98SFLO2                          Gonzalez – cross

1              THE COURT:  Yes.

2              MR. BOVE:  Nothing further.

3              THE COURT:  We will take our morning recess now and

4     resume in 15 minutes.

5              (Recess)

6              THE COURT:  Mr. Jackson.

7              MR. JACKSON:  Thank you very much, your Honor.

8     CROSS-EXAMINATION

9     Q.  Good morning, Agent Gonzalez.

10    A.  Good morning, sir.

11    Q.  Agent Gonzalez, how long have you been a DEA agent?

12    A.  Approximately 16 years.

13    Q.  And during the time that you were stationed in Caracas, can

14    you tell us, in a very general level, what your

15    responsibilities were?

16    A.  Quite a few responsibilities within the office.  Some of

17    them was just field any questions from domestic offices

18    regarding Venezuela, a liaison with the state department,

19    occasionally meet with Venezuelan officials, and just handle

20    various administrative functions within the office.

21    Q.  Did you participate in any investigations while you were in

22    the Caracas office?

23    A.  Yes.

24    Q.  Did you participate in the debriefing of sources while you

25    were in the Caracas office?

G98SFLO2                          Gonzalez – cross

1    A.  Yes.

2    Q.  At any point during your time in the Caracas office, were

3    you ever involved in the seizure of any narcotics?

4    A.  Myself personally?

5    Q.  Yes.

6    A.  No.

7    Q.  Was any other DEA agent, while you were there, did you

8    observe them involved in the seizure of narcotics?

9    A.  Not that I recall.

10   Q.  Were you ever working on investigations with Venezuelan

11   officers who were involved in the seizure of narcotics?

12   A.  Not that I recall.

13   Q.  So just to be clear, during your entire time there, you

14   have no recollection of any seizures of narcotics that you or

15   other DEA officers were involved in?

16   A.  We are not authorized to seize any narcotics overseas.

17   Q.  Now, it's a fact, isn't it, Agent Gonzalez, that a number

18   of things in this investigation went very wrong?

19   A.  What do you mean by very wrong?

20   Q.  In your estimation, there were things, there were things in

21   this investigation, that you considered to be investigative

22   failures, correct?

23   A.  Like what?

24   Q.  It's just a question.

25   A.  Possibly.

G98SFLO2                    Gonzalez – cross

1    Q.  Possibly?

2    A.  Yes.

3    Q.  There were things that you considered to have gone less

4    than optimally?

5    A.  Yes.

6    Q.  One of the things that you considered to have gone less

7    than optimally was your relationship with the confidential

8    sources involved in this investigation, right?

9    A.  You mean CS-1 and CW -- and the CW?

10   Q.  Let's start with that.  One of the things that you believed

11   had gone wrong in the investigation was your relationship with

12   CS-1 and CS-2, correct?

13   A.  No.  My relationship?  No.

14   Q.  Your handling of CS-1 and CS-2 you think had operated in a

15   suboptimal fashion, correct?

16   A.  My handling?  No.

17   Q.  You would agree with me, though, that CS-1 and CS-2's

18   conduct during the time period of the investigation, in your

19   own view, was deplorable?

20   A.  CW's conduct?  No.

21   Q.  I said CS-1 and CS-2, sir.

22   A.  CS-1 and CS-2, I apologize.  Yes.

23   Q.  And during the time period of this investigation, CS-1 and

24   CS-2 were critical in terms of the sting operation that you

25   were putting together, right, Agent Gonzalez?

G98SFLO2                    Gonzalez - cross

1    A.  Yes.

2    Q.  And during that exact time period, unbeknownst to you, they

3    were engaging in deep deception of you and the other DEA

4    agents, correct?

5    A.  How so?

6    Q.  It's a yes-or-no question, sir.

7    A.  They weren't deceiving me.

8    Q.  You don't believe that, during the time period of the

9    investigation, that CS-1 and CS-2 were in any way deceiving

10   you?

11   A.  With regards to this investigation in particular?

12   Q.  Sir, my question, very respectfully, is just, during the

13   time period of the investigation, were CS-1 and CS-2 deceiving

14   you?

15   A.  Oh, yes.

16   Q.  Yes, they were, right?

17   A.  Yes.

18   Q.  And they weren't just deceiving you, right?

19   A.  Correct.

20   Q.  They were also deceiving Special Agent Rob Zach, right?

21   A.  Yes.

22   Q.  Zachariasiewicz, right?

23   A.  Yes.

24   Q.  Your group supervisor?

25   A.  Yes.

G98SFLO2                          Gonzalez - cross

1    Q.  And as a result of the deceptions of you, you had to

2    communicate information to your group supervisor that was

3    flawed, right?

4    A.  The deception based on the investigation?

5    Q.  Well, one of the fundamental, one of the fundamental

6    aspects of this investigation, correct, was your belief that

7    CS-1 and CS-2 were reliable informants that could be trusted,

8    correct?

9    A.  Yes.

10   Q.  And that turned out to be false, right?

11   A.  Partially, yes.

12   Q.  Let me just ask you openly.  How can reliability be

13   partial?

14   A.  Well, they were reliable in the job that they were

15   undertaking for us when they were in Caracas.

16   Q.  So what you're saying is, you believed that they were

17   deceiving you with regard to a bunch of things, but you

18   believe -- so they were unreliable with regard to those things,

19   but they were reliable with regard to the investigation?

20   A.  Correct.

21   Q.  And you made that determination, even though you actually

22   have no idea whether or not there their reliability extended

23   throughout the investigation, right?

24   A.  No.

25   Q.  You don't know, do you?

G98SFLO2                    Gonzalez - cross

1   A.  No.

2   Q.  You have no way of knowing exactly what they were up to

3   occurring the course of the investigation, right?

4   A.  I know what they were up to when they made the recordings.

5   Q.  Well, it's a fact, isn't it, Agent Gonzalez, that there

6   were a number of things that they did during the course of the

7   investigation that weren't recorded, right?

8   A.  Yes, there were some things.

9   Q.  And for many of those aspects in the investigation, you

10  were relying on them telling you the truth about what was

11  happening during the course of the investigation, right?

12  A.  Yes.

13  Q.  And you now have determined that both CS-1 and CS-2 are

14  liars, right?

15  A.  Yes.

16  Q.  In fact, you are aware that they have both been charged

17  very recently with violating Section 1001 of the United States

18  Code, correct?

19  A.  I don't know what Section 1001 of the United States Code

20  is.

21  Q.  So you spoke a little bit on direct about your awareness

22  that they have been forced to go to jail, right?

23  A.  Yes.

24  Q.  Now, they're in jail because of illegal activity that they

25  were engaging in during the time period of the investigation,

G98SFLO2                        Gonzalez – cross

1    right?

2    A.  Yes.

3    Q.  So they were actively committing crimes behind your back

4    during the time period of the investigation?

5    A.  Yes.

6    Q.  One of the crimes that they were committing was that they

7    were lying to you and other federal agents, correct?

8    A.  Correct.

9    Q.  That's a federal violation in and of itself, isn't it?

10   A.  I believe so.

11   Q.  Right.  Have you seen their cooperation materials?

12   A.  No.

13   Q.  You haven't seen any of their charging materials?

14   A.  No.

15   Q.  So you're not familiar with Section 1001?

16   A.  No.

17   Q.  We can move past that.  Let me just talk for a moment about

18   CW-1.  I am going to come back to CS-1 and CS-2.

19            CW-1 was another critical informant during this

20   investigation, right?

21   A.  Yes.

22   Q.  And there were serious problems with CW-1 during the course

23   of the investigation, too, right?

24   A.  I wouldn't call it serious problems.

25   Q.  Would you call them minor problems?

G98SFLO2                      Gonzalez - cross

1    A.  Yes.

2    Q.  So there were minor problems with CW-1, right?

3    A.  Yes.

4    Q.  And there were serious problems with CS-1 and CS-2, right?

5    A.  There were problems.  You can characterize them how you

6    want.

7    Q.  No, I'm asking for your characterization.  There were

8    serious problems with CS-1 and CS-2, right?

9    A.  We later came to find out, yes.

10   Q.  So the answer is yes?

11   A.  Yes.

12   Q.  And with CW-1, you would characterize the problems as

13   minor, correct?

14   A.  Yes.

15   Q.  Now, one of the problems that you had, Agent Gonzalez, is

16   that CW-1 orchestrated the very first meeting with the

17   defendants, right?

18   A.  He didn't orchestrate it, they were brought to him.

19   Q.  Well, CW-1 told you about this meeting, right?

20   A.  Yes.

21   Q.  And he told you about it with less than 24 hours' notice,

22   correct?

23   A.  Yes.

24   Q.  Now, he could have told you about it sooner than that,

25   rights?

G98SFLO2                        Gonzalez – cross

1    A.  I don't think so.

2    Q.  When is your understanding of when CW-1 learned that the

3    meeting was going to happen where individuals were going to fly

4    from another country to meet him at a location of his choice in

5    Honduras?

6    A.  I believe it was right around the time of October 3.

7    Q.  When you say right around the time, Agent Gonzalez, if you

8    could, could you give us any more specificity about what your

9    understanding is as to when CW-1 learned that this meeting was

10   going to happen?

11   A.  I don't recall.

12   Q.  You have no recollection of anything that he told you about

13   when this meeting was going to occur?

14   A.  He told me on October 3 that the meeting was going to

15   occur.

16   Q.  Right.  You did participate in a number of debriefings with

17   him, though, during that time period, right?

18   A.  No, I did not.

19   Q.  So you didn't debrief him at all after October 3?

20   A.  CW-1?

21   Q.  Yes.

22   A.  No.  We were in contact via the BlackBerry, but I didn't go

23   do a physical debriefing.

24   Q.  Did you do any phone debriefings with him?

25   A.  Yes.

G98SFLO2                        Gonzalez - cross

1    Q.  So in addition to the BlackBerry that you talked about on

2    direct examination, you also spoke on the phone with CW-1,

3    right?

4    A.  Yes.

5    Q.  How many times did you speak on the phone with him?

6    A.  I believe two or three times.

7    Q.  Did you record any of those phone calls?

8    A.  No.

9    Q.  Did you take contemporaneous notes of any of those phone

10   calls?

11   A.  I don't think I did.

12   Q.  You are aware, Agent Gonzalez, of the DEA manual, correct?

13   A.  Yes.

14   Q.  You've read the manual?

15   A.  I'm familiar with it.

16   Q.  Have you ever read it?

17   A.  I have read parts of it.

18   Q.  You were instructed on it at Quantico, right?

19   A.  Yes.

20   Q.  One of the things that you know is that when you have a

21   phone call with a cooperating witness like CW-1, you're

22   required to take contemporaneous notes of that phone call,

23   correct?

24   A.  I believe so.

25   Q.  And you failed to do that?

G98SFLO2                          Gonzalez - cross

1    A.   Correct.

2    Q.   So at this point, we have no indication of what the

3    communication was between you and CW-1, right?

4    A.   Other than my recollection.

5    Q.   And your recollection on that is poor, right?

6    A.   No.

7    Q.   You remember what was said between -- everything that was

8    said between you and CW-1 on the two or three phone calls that

9    you had with him?

10   A.   I recall the general nature of the conversations.

11   Q.   Do you remember everything that was said?

12   A.   No.

13   Q.   So your recollection is flawed on those phone calls?

14   Withdrawn.

15           Your recollection is incomplete on those phone calls?

16   A.   OK.

17   Q.   Yes?

18   A.   Yes.

19   Q.   And you should have taken notes, correct?

20   A.   Yes.

21   Q.   Now, just to be very clear, there is an affidavit that you

22   submitted in connection with the government's opposition to the

23   briefing related to the motions at issue in this hearing,

24   correct?

25   A.   I don't know.  I would have to see the document.

G98SFLO2                         Gonzalez - cross

1    Q.  Do you have any recollection of putting together an

2    affidavit with the AUSAs in this case?

3    A.  Yes.

4    Q.  You recall that it was because of the suppression motions

5    that have been filed, right?

6    A.  OK.

7    Q.  Yes?

8    A.  Yes.

9    Q.  One of the affidavits that you put together related to your

10   contact with CW-1, correct?

11   A.  I don't recall.

12   Q.  You don't remember at all what was in it?

13   A.  Do you have the affidavit that I may look at this?

14   Q.  I'm asking a question, do you remember it?

15   A.  No, I don't remember it right now.

16   Q.  We may get to that in a minute.  I want to try to see if

17   we can answer these questions as well as we can with your

18   recollection.

19         Let me just ask you, knowing what you know now -- and

20   let me just back up.

21         You have had an opportunity to prepare for this

22   hearing with the AUSAs, correct?

23   A.  Yes.

24   Q.  And you have gone over your testimony a number of times,

25   right?

G98SFLO2                          Gonzalez - cross

```
 1    A.  Yes.
 2    Q.  And you went over a number of the documents in this case,
 3    right?
 4    A.  Yes.
 5    Q.  You went through the 3500 material with AUSAs Bove and
 6    Quigley, right?
 7    A.  Yes.
 8    Q.  And the reason that you were doing that was because you all
 9    acknowledge there were some things that you had missed during
10    the course of the investigation, right?
11    A.  That's not why we went over the documents.
12    Q.  Now, you would agree with me there are some things that you
13    missed during the course of the investigation?
14    A.  With respect to what?
15    Q.  Just in general.
16    A.  I don't know what you mean.
17    Q.  Were there things that you missed during the course of the
18    investigation?
19            THE COURT:  Do you want to give him an example of what
20    you think he missed?
21    Q.  Investigative cues that you think now are important?
22    A.  Not that I'm aware of.
23    Q.  Just focusing on the statement, the affidavit that you
24    submitted in connection with the briefing, have you gone back
25    over all the 3500 material, would you agree with me now that
```

G98SFLO2                    Gonzalez - cross

1    the statement that you submitted to the court was misleading?

2    A.  I would have to see the document.  I don't know what you're

3    referring to.

4    Q.  You're not sure whether or not anything misleading was in

5    your own affidavit?

6    A.  No, I wouldn't do anything misleading.

7    Q.  You don't believe anything in it was misleading?

8    A.  No.

9    Q.  Let me ask you about one or two things.

10          MR. JACKSON:  Just one moment, your Honor.

11   Q.  Now, there was a paragraph in the affidavit, correct, where

12   you stated CW-1 indicated that he would attempt to record the

13   meeting using a cellular telephone.  Following the meeting,

14   however, CW-1 informed me that he did not record the meeting,

15   correct?

16   A.  That is true.

17   Q.  And that's what you wrote in your sworn affidavit, right?

18   A.  I would have to see the affidavit.

19   Q.  Well, you're saying that you don't remember.

20   A.  I don't remember everything I put in the affidavit, no.

21   Q.  I want to show you something and I just want you to take a

22   look at it.  I'm going to place it on the ELMO, if it is

23   acceptable to the court.  I'm going to ask if it refreshes your

24   recollection, and you can take a look at it and let me know, if

25   that's all right.

G98SFLO2                         Gonzalez – cross

1          THE COURT:  For the record, you want to identify what

2     it is, Mr. Jackson?

3          MR. JACKSON:  Yes, your Honor.  This is a document

4     that I will mark as D37 containing an excerpt from another

5     document.  I just want to ask the witness if he would look at

6     it and let us know whether it refreshes his recollection.

7     A.  Yes, it does.

8     Q.  So let me reask the question then.

9          You stated in your affidavit that CW-1 indicated that

10    he would attempt to record the meeting using a cellular

11    telephone following the meeting, however, CW-1 informed me that

12    he did not record the meeting; yes?

13    A.  Yes.

14    Q.  That's not a complete description of what actually happened

15    between you and CW-1, is it?

16    A.  Why not?

17    Q.  I'm asking you a question.

18    A.  That did happen.

19    Q.  That's not a complete description, Agent Gonzalez, of what

20    actually happened between you and CW-1, though, is it?

21          MR. BOVE:  Objection, your Honor.

22          THE COURT:  Sustained.

23    BY MR. JACKSON:

24    Q.  In fact, you instructed CW-1 to record the meeting, didn't

25    you?

G98SFLO2                          Gonzalez – cross

1    A.  Yes.

2    Q.  And nowhere in your affidavit did you notify the court that

3    you had actually given CW-1 a specific instruction that he was

4    to record the meeting, right?

5    A.  No, I did not write that in the affidavit.

6    Q.  You would agree with me that that is important information

7    with regard to the question of whether or not CW-1 would have

8    recorded the meeting?

9              MR. BOVE:  Your Honor, I object to the

10   characterization of what the question was for purposes of this

11   declaration.

12             THE COURT:  Sustained.

13             MR. JACKSON:  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

G98nflo3                          Gonzalez - cross

1    Q.  Let me just ask you, Agent Gonzalez, why did you ask him to

2    record the meeting?

3    A.  To obtain evidence.

4    Q.  Well, it's true, isn't it, that one of the things that you

5    talked about on direct examination is the idea that there were

6    concerns about CW-1's status as a person who had a disability?

7    A.  Yes.

8    Q.  And that is not something that gave you any concern in

9    terms of his ability to record this meeting, right?

10              MR. BOVE:  Objection.

11              Mischaracterizes the testimony.

12              THE COURT:  Sustained.

13   Q.  Did CW-1's status as a person with a disability pose any

14   concerns for you in terms of his ability to record the meeting?

15   A.  Yes.

16   Q.  Those concerns, though, were not so significant that you

17   believed that it would be improper to instruct him to record

18   the meeting?

19   A.  Correct.

20   Q.  In fact, you didn't believe that by instructing him to

21   record the meeting you were going to be placing him in grave

22   danger, right?

23   A.  Correct.

24   Q.  In fact, you didn't believe that you would be placing him

25   in danger at all by instructing him to record the meeting with

G98nflo3                          Gonzalez - cross

1    his phone?

2    A.  Well, there was some danger in doing that, yes.

3    Q.  Right.  But you didn't believe that that would be creating

4    an additional dangerous situation to him beyond the general

5    danger of operating in an informant, right?

6    A.  Well, an informant in his particular condition, yes.

7    Q.  It is a fact, though, that during this time period, CW-1 I

8    think you mentioned had recorded another thing during the

9    investigation with his phone?

10   A.  It is a separate investigation.

11   Q.  When was it that he made that recording?

12   A.  I believe it was in September.

13   Q.  So this was prior to this meeting occurring that you

14   already knew that CW-1 had the capability to record things with

15   his phone?

16   A.  Yes.

17   Q.  Just to be clear, CW-1 was not some helpless, low-level

18   individual, right?

19   A.  What do you mean by low level?

20   Q.  Well, I think what you described on direct testimony is

21   that CW-1 was a person who had been involved in multiton

22   shipments of narcotics, correct?

23   A.  Correct.

24   Q.  And so the fact of the matter is he was one of the most

25   significant traffickers operating in that part of the world,

G98nflo3                          Gonzalez – cross

1    right?

2    A.  I believe so.

3    Q.  And he was charged by the U.S. Attorney's Office, right?

4    A.  Yes.

5    Q.  And he was proffered?

6    A.  Yes.

7    Q.  And the proffer didn't require him to come in to New York

8    to be proffered, right?

9              MR. BOVE:  Objection.  Foundation.

10             THE COURT:  Overruled.

11   A.  Correct.

12   Q.  He was proffered over a phone call?

13   A.  No.

14   Q.  OK.  People went to him to proffer him?

15   A.  Yes.

16   Q.  That's not the typical procedure for a proffer, is it?

17   A.  It depends.

18   Q.  Most proffers take place at the site of the government,

19   right?

20   A.  Again, it depends on the investigation.

21   Q.  OK.  So people travel to proffer him and during the course

22   of those proffers he admitted to you that he was engaged in

23   significant activity?

24             MR. BOVE:  Objection.  Foundation.

25             The witness testified he never met CW-1.

G98nflo3                          Gonzalez - cross

1           THE COURT:  Sustained.

2      Q.  You are aware of the proffers, right?

3      A.  Yes.

4      Q.  That was an important part of your knowledge in terms of

5      your ability to operate as one of his handlers, right?

6      A.  Yes.

7      Q.  Understanding the nature of what he had been up to?

8      A.  Yes.

9      Q.  And your understanding is that this is an individual who

10     was involved in multi-million-dollar sophisticated laundering

11     of money that he had made in the narcotics business, right?

12     A.  Yes.

13     Q.  And it's fair to say you saw in CW-1 a level of

14     sophistication that far outpaced any of the other players in

15     this investigation, right?

16     A.  Not necessarily.

17     Q.  Certainly CW-1 was a bigger drug trafficker even than CS-1

18     and CS-2, right?

19     A.  Yes.

20     Q.  He had made many millions of dollars trafficking in drugs?

21     A.  I don't know how much money he made.

22     Q.  You are aware that he made millions, right?

23     A.  Again, I don't know how much he made.

24     Q.  You haven't seen any information indicating that he made

25     millions of dollars?

G98nflo3                          Gonzalez – cross

1    A.  No.

2    Q.  You have seen information about his laundering of money,

3    though, right?

4    A.  I don't recall.

5    Q.  OK.  One of the other things that CW-1 told you about that

6    first meeting that took place in Honduras was objectively

7    false, right?

8    A.  What part?

9    Q.  Do you remember anything that was objectively false that he

10   told you?

11   A.  During this first meeting in Honduras?

12   Q.  His relaying to you of what happened in the first meeting?

13   A.  No.  I don't remember anything that was false.

14   Q.  After the meeting, one of the first things that you asked

15   him was were you able to record the meeting, correct?

16   A.  Yes.

17   Q.  And the reason that that was one of the first things that

18   you asked him was because that recording you believed was going

19   to be very important evidence in this case, right?

20   A.  Yes.

21   Q.  And his response was:  No, sir, I only took pictures.  That

22   was impossible in that restaurant.

23        Right?

24   A.  Yes.

25   Q.  And he said, I took my female friend, and she took pictures

G98nflo3                          Gonzalez – cross

1    of them.  Correct?

2    A.  Correct.

3    Q.  Now, at some point after he said that, Agent Gonzalez, you

4    asked him to send you the pictures, right?

5    A.  Yes.

6    Q.  And so he had acknowledged that there were at least

7    multiple pictures made, right?

8    A.  Yes.

9    Q.  Based on your analysis of the pictures that you have seen,

10   you have no idea whether this is actually a still photo or an

11   image lifted from a video capture, do you?

12   A.  I do not know.

13   Q.  It's entirely possible that it's from a video capture based

14   on your analysis, right?

15   A.  I haven't analyzed it, but it's possible.

16   Q.  So at some point after he said that it was impossible, you

17   said to him, send me the pictures, right?

18   A.  Yes.

19   Q.  And he refused to send you all the pictures, didn't he?

20   A.  Yes.

21   Q.  At some point he agreed after you asked him several times

22   to send you one photo, right?

23   A.  Yes.

24   Q.  You are aware that that is not the complete evidence that

25   he obtained during the course of that meeting, right?

G98nflo3                            Gonzalez – cross

1    A.  Correct.

2    Q.  And he never sent you the rest of the stuff?

3    A.  Correct.

4    Q.  And the one photo that he sent you was objectively not in a

5    restaurant, right?

6    A.  It wasn't inside a restaurant, no.

7    Q.  Just looking at the photo that's already been admitted in

8    evidence, this is a photo in the middle of a field, right?

9    A.  I don't know if it's in the middle of a field.  It's

10   outdoors.

11   Q.  You haven't analyzed, sir, where this took place?

12   A.  I'm looking at the picture.

13   Q.  After you got this, he told you what resort this took place

14   in, right?

15   A.  I don't recall.

16   Q.  Was it the Finca de las Glorias, correct?

17   A.  OK.

18   Q.  Do you remember that now?

19   A.  Yes, I do.

20   Q.  I'm sure in the course of your investigation you understood

21   that it would be important to at least understand the setting

22   that he had selected, correct?

23   A.  Yes.

24   Q.  You looked into the Finca de las Glorias?

25   A.  No, I did not.

G98nflo3                         Gonzalez – cross

1          MR. JACKSON:  Your Honor, may I approach?

2          THE COURT:  Yes.

3   Q.  I just want to position this photograph here and ask you to

4   take a look at it.

5          Based on this photograph, do you at all recognize

6   what's depicted here?

7   A.  No.

8   Q.  No.  OK.

9          THE COURT:  For the record, Mr. Jackson, do you want

10  to give that a number.

11         MR. JACKSON:  Yes, your Honor.  I was going to say

12  we'll mark as that D 1000.

13         THE COURT:  OK.  D 1000.  Thank you.

14         MR. JACKSON:  For the record, this is a satellite

15  photograph blown up.

16  Q.  Just to be clear, with regard to the photo that you did

17  look at, the one photo that CW-1 sent you, at the point that

18  you received this, it was obvious that CW-1 had lied to you

19  about why he didn't record the meeting, correct?

20  A.  No.

21  Q.  Well, he said that the reason that he didn't record the

22  meeting is that it was impossible in the restaurant, right?

23  A.  Yes.

24  Q.  And once you received the photo later on, after pestering

25  him, you could see clearly that he had lied about the meeting

G98nflo3                    Gonzalez - cross

1  taking place in the restaurant, right?

2  A.  No.

3  Q.  But the meeting that is depicted in the photo was not in a

4  restaurant?

5  A.  No.

6  Q.  And there's nothing that is apparent in the photograph that

7  you received that would explain impossibility in terms of

8  recording the meeting, right?

9  A.  Correct.

10  Q.  Did you ask him any follow-up questions at all about what

11  was going on here?

12  A.  No.

13  Q.  You didn't ask him why he told you a restaurant and now he

14  had sent you a photograph in the middle of what looks like a

15  field?

16  A.  No.

17  Q.  You didn't ask him who these other people were that were

18  there?

19  A.  He explained who they were.

20  Q.  Did you ask him about the person who took the photograph?

21  A.  About the female?

22  Q.  Yes.

23  A.  No.

24  Q.  He told you that there was another person basically working

25  on his behalf during an operation, right?

G98nflo3                          Gonzalez – cross

1        MR. BOVE:  Objection to the characterization, your

2   Honor.

3        THE COURT:  Overruled.

4   A.  Can you please be more specific.

5   Q.  He told you that there was other person working on his

6   behalf during the course of this meeting taking photographs,

7   right?

8   A.  You mean the female?

9   Q.  That is what he told you, right?

10  A.  Yes.

11  Q.  And you didn't ask him who that person was?

12  A.  No.

13  Q.  You never asked to speak with that person?

14  A.  No.

15  Q.  You never asked if you could handle the equipment that she

16  had utilized to take this photo or video?

17  A.  No.

18  Q.  So at this point you have no idea even to this day who the

19  person was who was assisting CW-1 in surveillance of the

20  meeting?

21  A.  No.

22  Q.  Have you analyzed the metadata that's associated with this

23  photograph?

24  A.  What's metadata?

25  Q.  You have no idea what metadata is, sir?

G98nflo3                        Gonzalez - cross

1    A.  No, I do not.

2    Q.  During the course of your investigations you've never

3    looked at the data that accompanies photographs?

4    A.  What do you mean?

5    Q.  Well, you are aware that this is a digital photograph that

6    was transmitted to you, right?

7    A.  Yes.

8    Q.  You are aware that digital photographs are comprised of

9    data, right?

10   A.  OK.

11   Q.  You are not aware of that?

12   A.  No.

13           THE COURT:  We will need tutelage here from Judge

14   Scheindlin.

15           MR. JACKSON:  Yes, your Honor.

16   Q.  Let me move on.

17           Just out of curiosity, Agent, how many times did you

18   ask -- we've referred to him as CW-1, but he was also known as

19   el Cintato?

20   A.  Yes.

21   Q.  How many times did you ask el Cintato to send you the

22   photographs before he ultimately sent you the single

23   photograph?

24   A.  I don't remember.

25   Q.  I want to show you something.  Tell me if it refreshes your

G98nflo3                     Gonzalez - cross

1  recollection.

2  A.  OK.

3  Q.  Having taken a look at that, does that refresh your

4  recollection about how many times you asked him to send you the

5  multiple photographs from the meeting?

6  A.  Yes.

7  Q.  How many times did you ask him?

8  A.  What you showed here reflects me asking him three times.

9  Q.  So it's your recollection that you asked him at least three

10 times, right?

11 A.  What you are showing me here is three times, yes.

12 Q.  I'm only asking you about your independent recollection,

13 not the document.  If it refreshes your recollection, then I

14 would like you to tell me whether or not you remember that you

15 asked him at least three times?

16 A.  Yes.

17 Q.  OK.  There were other things that CW-1 was lying to you

18 about during the time period of the investigation, right?

19 A.  Like what?

20 Q.  I'm just asking you if you are aware of other things that

21 he lied to you about?

22 A.  I'm not sure.

23 Q.  Prior to CW-1's untimely demise, had he told you at any

24 point that he owed someone over a million dollars?

25 A.  I don't recall him telling me that.

1   Q.  Right.  That's something that you learned after he died,

2   right?

3   A.  Yes.

4   Q.  And so this is information that he was required to disclose

5   as a cooperating witness, right?

6          MR. BOVE:  Objection to the characterization of the

7   cooperation relationship.

8          THE COURT:  Sustained.

9   Q.  At no point do you recall, though, just to be clear, him

10  disclosing to you that he had a drug debt to someone unrelated

11  to this investigation of over a million dollars?

12  A.  Correct.

13  Q.  Now, in terms of your communications with CW-1, you are

14  aware that the DEA manual specifically requires that at all

15  times communications with a confidential source must maintain a

16  level of professionality, right?

17  A.  I am not aware of that exact verbiage.

18  Q.  You are aware of that principle, though, right?

19  A.  I don't know if it specifies how that relationship is

20  supposed to be.

21  Q.  Do you not know, or do you not recall?

22  A.  I don't recall.

23  Q.  I want to show you something, and I want to ask you if it

24  refreshes your recollection.

25          This is a document marked as D 8.

G98nflo3                         Gonzalez – cross

1           I just want to ask you to take a look at it briefly

2     and let me know whether that refreshes your recollection as to

3     whether or not the DEA manual requires that in your contacts

4     with an informant that they be of a strictly professional

5     nature?

6     A.   OK.

7     Q.   Does that refresh your recollection?

8     A.   Yes.

9     Q.   It is true, isn't it, that you're required with your

10    contacts with the source, with an informant to be of a strictly

11    professional nature, right?

12    A.   Yes.

13    Q.   And you failed in that during the course of this

14    investigation in terms of your dealings with CW-1, right?

15    A.   No.

16    Q.   There were a number of communications that you had with

17    CW-1 that veered into what you would agree was the deeply

18    unprofessional, correct?

19    A.   Like what?

20    Q.   Well, at some point -- I apologize for the language -- but

21    there were points where CW-1 made racist comments to you in his

22    communications, right?

23    A.   CW-1?

24    Q.   I'm sorry.  CS-1.

25    A.   Yes.

G98nflo3                          Gonzalez – cross

1    Q.  CS-1 made racist comments?

2    A.  Yes.

3    Q.  CS-1 made comments discussing sexual violence that he would

4    commit?

5    A.  That I don't recall.

6    Q.  CS-1 made comments of a general sexually degrading nature

7    about the targets of the investigation, right?

8    A.  Yes.

9    Q.  So you are aware that at various points CS-1 said things to

10   you like the defendants could "suck his dick"?

11   A.  I would have to see the Spanish --

12   Q.  Do you recall that?

13   A.  That specifically, like that, no, I don't.

14   Q.  Do you recall him saying that he would like to fuck the

15   first lady of Venezuela?

16   A.  I remember reading that recently.

17   Q.  Right.  And at no point in your communications with him

18   when he said that to you did you say to him this is improper?

19   A.  No.

20   Q.  The reason that you didn't is because you lost control of

21   the interaction between CS-1 and yourself, right?

22   A.  Incorrect.

23   Q.  Well, just to back up, I just want to ask you to take a

24   look at one document and ask you if it refreshes your

25   recollection about the specific statement that we are talking

G98nflo3                          Gonzalez - cross

1    about.  This is a document marked as D 43.

2                Does that refresh your recollection?

3    A.  Yes.

4    Q.  So he did say to you that the defendants could "suck his

5    dick"?

6    A.  Yes.

7    Q.  And he laughed about it?

8    A.  Yes.

9    Q.  And that is something that you didn't instruct him was an

10   improper communication at any point?

11   A.  No.

12   Q.  Now, that is not the only time that he said something like

13   that during the course of your communications, right?

14   A.  Correct.

15   Q.  He said numerous things like that?

16   A.  Yes.

17   Q.  And this is an individual, by the way, who was deceiving

18   you about massive drug trafficking that he was engaged in

19   behind your back, right?

20   A.  Yes.

21   Q.  So you would agree that, whatever your intentions, your

22   actual management of CS-1 failed, right?

23   A.  No.

24   Q.  Just to be clear, also, the racist comment that we are

25   talking about was a comment where he made reference to, he made

G98nflo3                          Gonzalez - cross

1    a racist comment with regard to the Haitian people during the

2    very time period that you were having him interact with

3    Haitians in Haiti, operating on behalf of the DEA in Haiti,

4    right?

5    A.  Yes.

6              THE COURT:  Mr. Jackson are you suggesting that in the

7    conduct of an investigation you have to be politically correct?

8              MR. JACKSON:  I am not, your Honor.

9              THE COURT:  The thought police have invaded criminal

10   investigations?

11             MR. JACKSON:  Not at all, your Honor.

12             THE COURT:  All right.

13   Q.  Now, I want to ask you about the meetings where CS-1 met

14   with the defendants in Venezuela.

15             Do you recall testifying about those meetings?

16   A.  Yes.

17   Q.  One of the things that you talked about was the idea that,

18   I think what you said, the question that was posed to you was

19   were you surprised that CS-1 and CS-2 hadn't collected a sample

20   of the narcotics, the alleged narcotics that they had seen,

21   correct?

22   A.  Correct.

23   Q.  And your answer was that you were not surprised, right?

24   A.  Correct.

25   Q.  And the reason that you said that you weren't surprised was

G98nflo3                    Gonzalez - cross

1    because they were not told to do so, right?

2    A.  Correct.

3    Q.  To be clear, you didn't tell them not to collect the

4    sample, did you?

5    A.  Correct.

6    Q.  So they could have collect a sample, right?

7    A.  Technically, yes.

8    Q.  That is a decision that they made not collect the sample --

9    A.  Yes.

10   Q.  -- as far as you understand?

11   A.  Yes.

12   Q.  In a normal situation when dealing with an informant, you

13   are aware that DEA procedure requires searching the informant

14   before they go into a meeting with a target, right?

15   A.  Domestically?  Yes.

16   Q.  Sure.  In the typical domestic situation you search the

17   informant before they go into a meeting with a target, right?

18   A.  Yes.

19   Q.  And you search them immediately afterwards --

20   A.  Yes.

21   Q.  -- right?

22   A.  Yes.

23   Q.  The reason that you do is because it's understood that you

24   cannot trust an informant to handle contraband in a situation

25   like that and not compromise the contraband, right?

G98nflo3                          Gonzalez - cross

1   A.  I'm not sure if trust is the reason for it.

2   Q.  What is your understanding of the reason why you search the

3   informant typically?

4   A.  Chain of custody.

5   Q.  A chain of custody is about maintaining the integrity of

6   the evidence, right?

7   A.  Correct.

8   Q.  So the whole point is you have to search the person;

9   otherwise the integrity of the evidence is questionable?

10  A.  Correct.

11  Q.  No one was on the ground to search CS-1 and CS-2 before

12  they went into this meeting where they were shown an alleged

13  sample of narcotics, right?

14  A.  Correct.

15  Q.  You testified that the reason was you had concerns about

16  the political connections of the targets, right?

17  A.  That was one of the reasons, yes.

18  Q.  You also didn't contact anyone in the Venezuela office,

19  though, right, in the Venezuela country office of the DEA,

20  right?

21  A.  No, I didn't.

22  Q.  You didn't have anyone from that office coordinate with

23  CS-1 and CS-2?

24  A.  No.

25  Q.  As far as you are aware, no one from that office met with

1   them immediately prior or immediately after this meeting where

2   they were allegedly shown a sample of narcotics?

3   A.  Correct.

4   Q.  Now, that's something that you could have done if you

5   wanted to, right?

6   A.  No.

7   Q.  Certainly, it would not have been impossible for someone

8   from the Venezuela office to meet with CS-1?

9          MR. BOVE:  Objection.  Asked and answered.

10          THE COURT:  Sustained.

11  Q.  Why would it have been impossible for someone from the

12  Venezuela office to meet with CS-1 after the meeting?

13  A.  They don't have contact with informants in Venezuela.

14  Q.  So you are saying it's the official policy of the Venezuela

15  office not to have contact with informants?

16  A.  Yes.

17  Q.  During the time period that you were there you never have

18  any contact with the informants?

19  A.  Yes, I did.

20  Q.  But the policy has changed?

21  A.  Yes.

22  Q.  OK.  You are also aware of equipment that's used to field

23  test narcotics, right?

24  A.  Yes.

25  Q.  And you sometimes outfitted CS's or informants with field

G98nflo3                    Gonzalez – cross

1    testing equipment, right?

2    A.  I have not, no.

3    Q.  You are aware that other agents sometimes gave people field

4    testing equipment?

5    A.  I have never heard of agents giving them to informants, no.

6    Q.  You have heard of agents using field testing equipment,

7    right?

8    A.  Yes.

9    Q.  Field testing equipment in and of itself is not contraband,

10   is it?

11   A.  No, not that I am aware of.

12   Q.  Right.  You are not aware of any laws anywhere that would

13   make it illegal for someone to possess field testing equipment?

14   A.  Correct.

15   Q.  So you could have provided CS-1 and CS-1 with field testing

16   equipment, right?

17   A.  No.

18   Q.  OK.  There are a number of factors which could increase the

19   level of concern that you as a handling agent would have in

20   terms of allowing an individual to handle narcotics, correct?

21           MR. BOVE:  Objection.

22           THE COURT:  Sustained.

23   Q.  Well, if you had known, for example, Agent Gonzalez, at the

24   time of this operation that CS-1 was a very serious cocaine

25   addict that would have amplified your level of concern in terms

1    of sending him into a meeting where he was supposed to handle

2    narcotics, right?

3    A.  Yes.

4    Q.  In fact, at the time that you orchestrated that operation

5    you didn't believe that he was a cocaine addict, right?

6    A.  Correct.

7    Q.  You believed that he didn't use cocaine at all, right?

8    A.  Correct.

9    Q.  Since the time period that the motions in this case have

10   been filed, you are aware that he's been confronted about

11   cocaine use, right?

12   A.  Yes.

13   Q.  And you are now aware that he as fully admitted to, for

14   periods of years, using cocaine every single day, right?

15   A.  I don't know the extent of his cocaine use.

16   Q.  Right.  But you are aware that he was using cocaine at

17   least occasionally throughout the last 20 years, right?

18   A.  I don't know for how many years.  I was told that he

19   admitted to using cocaine.  I don't know the extent or the

20   frequency.

21   Q.  Right.  Agent Gonzalez, you are aware, though, you were

22   told that he admitted to using cocaine the day before he was

23   arrested?

24   A.  Yes.

25   Q.  OK.  So right up until the day that he was arrested, he's

G98nflo3                          Gonzalez – cross

1    using cocaine?

2    A.   Yes.

3    Q.   And if you had known that, that would have altered your

4    analysis of the risk associated with sending him into a meet

5    where evidence could be compromised related to alleged

6    substances, right?

7              MR. BOVE:  Objection to the characterization.

8              THE COURT:  Sustained.

9    Q.   Would that have elevated your level of concern about

10   sending him into the meet?

11   A.   Yes.

12   Q.   OK.  Why?

13   A.   We don't typically utilize informants who are drug users.

14   Q.   Why is that?

15   A.   I don't know the exact reason.  We just don't.

16   Q.   What is your understanding of the reason?

17   A.   Well, we work for the DEA.  We are not going to have people

18   working for us that abuse drugs.

19   Q.   Right.  One of the reasons also is you believe that they

20   could compromise the investigation, right?

21   A.   Well, you wouldn't know when they're actually abusing

22   drugs.

23   Q.   Right.  So, if CS-1 had been honest with you about his drug

24   addiction, you would have never sent him into that meeting?

25   A.   Correct.

G98nflo3                        Gonzalez - cross

1    Q.  And that decreases your level of confidence about whether

2    or not he obtained a sample of the substance during the course

3    of that meeting, right?

4    A.  No.

5    Q.  All right.  Now, you are aware that during the course of

6    that meeting he did take into his hands some of the alleged

7    substance that was displayed during the course of that meeting,

8    right?

9    A.  Yes.

10   Q.  And you are aware that he had gloves that were covered with

11   residue from the substance, right?

12   A.  I know he had gloves on.

13   Q.  Right.  And you have no idea where those gloves are today,

14   right?

15   A.  No.

16   Q.  And you have no idea what ultimately happened, right, with

17   the substance?

18   A.  With the kilogram brick?  Is that what you're referring to?

19   Q.  Yes.

20   A.  No, I don't.

21   Q.  I want to flash to the time period of the arrest in Haiti

22   briefly, OK?

23       Now, when was the decision made to use Haiti as the

24   place where you would lure the defendants for their arrest?

25   A.  I don't remember the exact day.

G98nflo3                         Gonzalez - cross

1    Q.  What is your approximate understanding of when that

2    happened?

3    A.  End of October, beginning of November.

4    Q.  By the way, just to clarify with regard to what we were

5    talking about, you have no way of confirming that the substance

6    that was displayed at that meeting was cocaine, right?

7    A.  Correct.

8    Q.  You have no idea really what that was?

9    A.  Correct.

10   Q.  All right.  Now, you said at the beginning of November,

11   right?

12   A.  Sometime around there, yes.

13   Q.  Now, it was you that selected Haiti, right?

14   A.  No.

15   Q.  Who selected Haiti?

16   A.  I don't recall.

17   Q.  It was the DEA, though, right?

18   A.  Yes.

19   Q.  There were points at which you were debating different

20   locations in terms of where you wanted the arrest to happen,

21   right?

22   A.  Yes.

23   Q.  You debated Panama, right?

24   A.  Yes.

25   Q.  You debated the Dominican Republic?

G98nflo3                        Gonzalez – cross

1    A.  Yes.

2    Q.  And you decided on Haiti, right?

3    A.  Yes.

4    Q.  One of the reasons that you decided on Haiti is you

5    believed that that was a place where you would have the full

6    cooperation of the government, right?

7    A.  Yes.

8    Q.  And you believed that you would have their full cooperation

9    as far as them expelling the defendants to the United States in

10   your custody, right?

11   A.  We hoped, yes.

12   Q.  Well, you more than hoped, right, because you had done it

13   before?

14   A.  Yes.

15   Q.  How many times prior to this had you gotten the agreement

16   of the Haitian government to expel defendants to the United

17   States?

18   A.  I'm only aware of one time.

19   Q.  But you are aware that SOD was in communication with people

20   in Haiti about whether or not the Haitian government would be

21   willing to expel these people before you ever got the

22   defendants to agree to come to Haiti, right?

23   A.  I'm not sure of the exact sequence, but I think so.

24   Q.  You believed that it had been confirmed before?

25   A.  Yes.

G98nflo3                        Gonzalez – cross

1    Q.  When was it that you first spoke to someone from the

2    Haitian government about coordinating the arrest?

3    A.  The morning of November 10, I believe.

4    Q.  The morning of November 10 was the very first time you

5    spoke with anyone from the Haitian government about

6    coordinating the arrest?

7    A.  Yes.

8    Q.  Didn't you testify earlier that there was an op meeting on

9    the 9th?

10   A.  Yes.

11   Q.  Were there Haitian officers there?

12   A.  No.

13   Q.  No Haitians participated in the op meeting?

14   A.  Yes.

15   Q.  So on the 10th, that's the first time you communicated with

16   anyone from Haiti?

17   A.  Yes.

18   Q.  And are you aware of anyone else from your group

19   communicating with anyone from Haiti before the 10th?

20   A.  No.

21   Q.  It is a fact, isn't it, that as early as November 4 you

22   already believed that Haiti was going to be the location?

23   A.  I don't know.  I told you I don't remember the exact date.

24   Q.  Well, it's a fact, isn't it, that by November 4 you were

25   just in the process of just confirming that it would be Haiti,

G98nflo3                          Gonzalez - cross

1    right?

2    A.  I don't remember the exact date.

3    Q.  I want to show you something which is marked as D 59, and I

4    want to ask you if it refreshes your recollection.

5           Agent Gonzalez, having taken a look at that, does that

6    refresh your recollection?

7    A.  Yes.

8    Q.  So, as early as November 4, you were basically in the

9    process of final confirmation with Haiti, right?

10   A.  It was not confirmed at that time.

11   Q.  Right.  My question was, as early as November 4, you were

12   in the process of final confirmation with Haiti, right?

13   A.  I don't know if it was final confirmation, but we were in

14   the process.

15   Q.  You were in the process of confirming it?

16   A.  Yes.

17   Q.  Now, there are a number of governments in the Caribbean

18   with which the DEA has friendly relations, right?

19          MR. QUIGLEY:  Objection.

20          THE COURT:  Overruled.

21   A.  I believe.

22   Q.  OK.  Just to be clear, another reason you chose Haiti is

23   because it would be something of an intimidating location in

24   terms of being arrested, right?

25   A.  No.

G98nflo3                              Gonzalez - cross

1          THE COURT:  Intimidating?

2          MR. JACKSON:  Yes, your Honor.

3    Q.  That was a no?

4    A.  No.

5    Q.  There was a point on the day of the arrest after the

6    defendants had been arrested when you communicated with CS-1

7    about what had transpired, right?

8    A.  What do you mean, what had transpired?

9    Q.  Well, there was a point at which CS-1 asked you how the

10   defendants were doing, correct?

11   A.  Yes.

12   Q.  And CS-1 said to you that they were, excuse my language,

13   but scared shitless?

14   A.  Yes.

15   Q.  And you confirm that that was the case, correct?

16   A.  Yes.

17   Q.  Because at the time that they were arrested that was your

18   opinion of the situation, they were scared shitless, right?

19   A.  Yes.

20   Q.  And by that you mean they were extraordinarily frightened

21   about what had happened?

22   A.  Yes.

23   Q.  Earlier in your testimony when you described the *policía* on

24   the vest.  I think you gestured to your chest in terms of

25   seeing policía?

G98nflo3                          Gonzalez - cross

1    A.  Yes.

2    Q.  To be clear, you don't have a clear recollection at this

3    point as to whether or not the actual police who came in during

4    the time period of the arrest had *policía* on the front of their

5    uniforms?

6    A.  No, I do not.

7    Q.  The fact of the matter is, this also happened very fast,

8    right?

9    A.  What?

10   Q.  The point at which they came in and grabbed the defendants.

11   A.  Yes.

12   Q.  How many seconds did it take?

13   A.  I don't know.

14   Q.  Now, after they were arrested -- by the way, one of the

15   reasons that you said that they were scared shitless is because

16   you saw that they were crying?

17   A.  At the point of the arrest, I don't remember them crying.

18   Q.  You remember at some point during the course of that day

19   you saw them crying, right?

20   A.  Yes.

21   Q.  And you saw that they were very emotionally torn up with

22   about what was happening.  I think you used the word very

23   emotional?

24   A.  That is when they made the phone call to their family, yes,

25   or when Mr. Campo was making the phone call.

G98nflo3                          Gonzalez – cross

1    Q.  But even earlier you saw that they were very emotional

2    about what had happened?

3    A.  Yes.

4           MR. JACKSON:  Can we switch that off and can we have

5    GX 12.

6           MR. BOVE:  Judge, this is not in evidence.

7           MR. JACKSON:  I'm sorry.  Take it down.

8           I'm sorry, Judge.

9           THE COURT:  I don't think the jury is going to mind.

10          MR. JACKSON:  Can we have GX 6.

11   Q.  OK.  You have a binder.  Let's just move quickly to GX 6.

12          Could you take a look at that quickly, please, Agent

13   Gonzalez.

14   A.  OK.

15   Q.  You said this is a photograph that you took?

16   A.  I believe so.

17   Q.  What kind of phone did you take this with?

18   A.  My work phone.

19   Q.  What kind of phone is that?

20   A.  A Samsung.

21   Q.  A Samsung what?

22   A.  I known.

23   Q.  You don't know what the model is?

24   A.  No.

25   Q.  Does it operate the Android operating system?

 1            MR. BOVE:  Objection.

 2            Relevance.

 3            THE COURT:  Overruled.

 4   A.  I believe so.

 5   Q.  You believe it does.  It is a phone that was purchased in

 6   the last couple of years?

 7   A.  I don't know when it was purchased.

 8   Q.  OK.  It is a phone that you had with you on the flight,

 9   though, correct?

10   A.  Yes.

11   Q.  Were there any other photographs that you took during the

12   flight or after the flight?

13   A.  Not that I recall.

14   Q.  Have you gone back and looked to check?

15   A.  Yes.

16   Q.  So you are not aware of any other photographs you took

17   except for this one?

18   A.  On the flight?

19   Q.  On the flight, before the flight, or after the flight.

20   A.  Yes.  There was another picture that I took before the

21   flight.

22   Q.  What's depicted in the other picture that you took?

23   A.  It's just a picture of the truck driving to the airport.

24   Q.  Is that a picture that you turned over to the government?

25   A.  Yes.

1    Q.  One of the things that you said about the expulsion flight

2    is that you didn't talk to anyone about the plan to debrief the

3    defendants during the course of the flight, correct?

4    A.  Correct.

5             MR. BOVE:  Objection.

6             Mischaracterizes the testimony.

7             THE COURT:  Overruled.

8    Q.  So you were the person, though, that was going to be the

9    lead, it was just understood was going to be the lead

10   interrogator for the flight, right?

11            MR. BOVE:  Objection.

12            He just testified there was no discussion about it.

13            THE COURT:  Sustained.

14   Q.  It was your understanding that you would be leading the

15   interrogations?

16   A.  Yes.

17   Q.  And your understanding that you would be leading the

18   interrogations was based on the fact that you had been the

19   person with primary contact with CS-1 and CS-2?

20   A.  I don't understand the question.

21   Q.  Well, you are the agent who had the most significant

22   contact with CW-1, CS-1 and CS-2, right?

23   A.  Correct.

24   Q.  And so that's the reason that you understood that you would

25   be the person who would be conducting the debriefings on the

G98nflo3                          Gonzalez - cross

1   plane, right?

2   A.  No.  That's not the reason.

3   Q.  Were you the case agent for this investigation?

4   A.  Yes.

5   Q.  OK.  So that was probably the reason, then, right?

6   A.  And the reason I spoke Spanish.

7   Q.  Right.  Let me ask you about that very quickly.  Have you

8   been tested by the DEA in terms of your Spanish proficiency?

9   A.  Yes, I have.

10  Q.  Where did you come out at?

11  A.  4.

12  Q.  Out of what?

13  A.  5.

14  Q.  Did anyone else on the plane speak -- I know you said that

15  one person spoke a little Spanish, but could you just tell us

16  what your understanding was of the Spanish-speaking

17  capabilities of the other people on the plane?

18  A.  It was limited.

19  Q.  Limited.  Did you understand that Agent Brooks spoke

20  Spanish?

21  A.  A little bit, yes.

22  Q.  A little bit.  But you would not say that he was a fluent

23  speaker?

24  A.  No.

25  Q.  Would you rate him as conversational?

G98nflo3                    Gonzalez – cross

1    A.   Possibly.

2    Q.   Somewhere between conversational and perhaps a little

3    beneath that?

4    A.   Correct.

5    Q.   What about Agent Zachariasiewicz?

6    A.   Below conversational.

7    Q.   Below Agent Brooks?

8    A.   Yes.

9    Q.   Fare to say there was no way for Agent Zach to understand

10   the interview that you were having in any complete way without

11   you acting essentially as a translator for him?

12   A.   Correct.

13   Q.   So, in your view, you were the only person on the plane who

14   likely fully understood what the conversation was between the

15   defendants and yourself, right?

16   A.   Yes.

17   Q.   Now, at some point you made a decision not to record the

18   interviews that took place on the flight, right?

19   A.   Yes.

20   Q.   You are aware of DOJ policy that indicates there is a

21   presumption that a postarrest interview should be recorded

22   except in certain limited exceptional situations, right?

23   A.   Yes.

24   Q.   And you are also aware that even where the exceptions

25   apply, you have the discretion to record an interview if you

G98nflo3                        Gonzalez - cross

1    believe that it will serve the investigative goals of the

2    investigation?

3    A.  Yes.  Right.

4    Q.  So you utilize your discretion to decide not to record the

5    interview, right?

6    A.  Correct.

7    Q.  And at this point, you are going into that interview

8    equipped with information from CW-1, CS-1, CS-2 and CS-3,

9    right?

10   A.  Yes.

11   Q.  That was part of the bedrock of the information that you

12   were going to utilize to question the defendants, right?

13   A.  Part, yes.

14   Q.  Information that you now know is flawed, right?

15   A.  No.

16   Q.  Well, just to be clear, all of them had communicated to you

17   that the defendants were lacking in experience in terms of

18   narcotics trafficking, right?

19   A.  I remember CS-1 saying that.

20   Q.  And CW-1 also communicated that, didn't he?

21   A.  I don't remember that.

22   Q.  You are aware of CS-1 communicating to CS-1 that the

23   defendants lacked experience?

24   A.  I don't remember that.

25   Q.  OK.  But you do remember CS-1 telling you that these were

G98nflo3                        Gonzalez - cross

1    inexperienced individuals who he thought it was their first

2    time ever being involved in something like this?

3    A.  He said it was their second time according to them.

4    Q.  Well, but you remember him saying that he believed that it

5    was their first time, right?

6    A.  He corrected himself after that and said that they claimed

7    they had previously done a deal, and this was their second one.

8    Q.  So, he said that his view was that they were experienced --

9    inexperienced, right?

10   A.  Yes.

11   Q.  He initially said that he believed that this was their

12   first time doing it, and then you said that he corrected

13   himself and said second?

14           MR. BOVE:  Objection.  Asked and answered.

15           THE COURT:  That is fair summary.

16           Is that a fair summary of what you said?

17           THE WITNESS:  Yes, your Honor.

18           MR. JACKSON:  Thank you, your Honor.

19   Q.  Now, the decision that you made to not record the interview

20   was not one based on the lack of equipment, right?

21   A.  No.

22   Q.  You had plenty of equipment on the airplane with which you

23   could have recorded the interview, right?

24   A.  Yes.

25   Q.  You had multiple phones with video and audio recording

G98nflo3                          Gonzalez - cross

1    equipment, right?

2    A.   Audio.  I don't know if video.

3    Q.   You are not aware if your phone can record video?

4    A.   Oh, yes.

5    Q.   You also had the recorders that were used surreptitiously

6    during the course of the investigation, at least some of them,

7    right?

8    A.   Yes.

9    Q.   You could have used any of those to record the interview on

10   the flight, right?

11   A.   Yes.

12   Q.   The reason that you decided not to is because you wanted

13   your testimony to be the evidence of the interrogation,

14   correct?

15          MR. BOVE:  Objection.

16          THE COURT:  Sustained.

17   Q.   The fact of the matter is you weren't taking notes during

18   the course of the interview, right?

19          MR. BOVE:  Objection.  Foundation.

20          MR. JACKSON:  It is a question, your Honor.

21          THE COURT:  Overruled.

22   A.   What was your question?

23          THE COURT:  Did you take notes during the interview?

24          THE WITNESS:  Yes.

25   Q.   You were taking notes?

G98nflo3                          Gonzalez - cross

1    A.  Yes.

2    Q.  And there was someone else also taking notes as you were

3    interviewing them, right?

4    A.  Of my interview?

5    Q.  Yes.

6    A.  I don't know that.

7    Q.  Agent Brooks was also typing some information that you were

8    communicating to him on a computer, right?

9            MR. BOVE:  Objection.

10           Mischaracterizes the testimony.

11           THE COURT:  Overruled.

12   A.  No, I don't believe that Special Agent Brooks was taking

13   notes of what I was talking to Mr. Campo about.

14   Q.  So you're taking notes of the interview while you are

15   conducting the interview, right?

16   A.  Yes.

17   Q.  You would agree with me that, because you were taking notes

18   while you were conducting the interview, your notes are far

19   from a verbatim transcription of what happened during the

20   course of that conversation, right?

21   A.  Correct.

22   Q.  It would be impossible for you to conduct an interview like

23   that and make a verbatim transcript, right?

24   A.  Correct.

25   Q.  And no one else is making a verbatim transcript on this

G98nflo3                    Gonzalez – cross

1  flight, right?

2  A.  Correct.

3  Q.  In fact, your notes contain a relatively, a small subset of

4  everything that was said over the course of the two-hour

5  interview, right?

6  A.  I wouldn't say small.

7  Q.  Well, you recorded what you believed was important in your

8  notes, right?

9  A.  Yes.

10  Q.  Now, there are a number of things that were said that you

11  simply didn't record, right?

12  A.  Yes.

13  Q.  Including some of the information that the defendants

14  communicated to you that you viewed as self-exculpatory, right?

15  A.  No.

16  Q.  Well, the defendants communicated to you, Mr. Campo Flores

17  communicated to you that he had only been making about $800 a

18  week before expenses were taken out before this all transpired,

19  right?

20  A.  Yes.

21  Q.  You put that into your notes?

22  A.  Yes.

23  Q.  He also communicated to you that they had told el Cintato

24  that that they didn't have capability to do this, right?

25  A.  I don't remember him saying that.

G98nflo3                        Gonzalez - cross

1    Q.  You have no recollection one way or the other?

2    A.  I don't remember him saying that, no.

3    Q.  You are not saying that he didn't, you are just saying that

4    you don't have a recollection of it?

5    A.  Correct.

6    Q.  Because you didn't write everything in your notes, there's

7    no way of determining whether or not that was said?

8    A.  Correct.

9    Q.  And because there's no video, there's no way of determining

10   whether or not that was said?

11   A.  Correct.

12   Q.  Now, you testified that you started interviewing Mr. Campo

13   Flores after the flight leveled off, right?

14   A.  Yes.

15   Q.  The flight left Haiti at 4:30 p.m., correct?

16   A.  Correct.

17   Q.  And the interview began at 5:15 p.m., correct?

18   A.  Correct.

19   Q.  Did it take 45 minutes for the plane to level off?

20   A.  No.

21   Q.  It took a lot less than that, right?

22   A.  I don't know how long it took.

23   Q.  This is a DEA Leer jet, correct?

24   A.  Yes.

25   Q.  By the way, you had to arrange for the Leer to be available

1    to you, right?

2    A.  Yes.

3    Q.  The DEA has several different planes that it can use for

4    extradition, correct?

5    A.  Yes.

6    Q.  And some of them are like propeller planes?

7    A.  Yes.

8    Q.  Those are suboptimal for the purposes that you had in mind

9    for this particular flight, right?

10   A.  Not at all.

11   Q.  Well, you would have preferred to use the Leer, right?

12   A.  We have no preference.  We can't determine which one we get

13   and which one we don't.

14   Q.  When was it that the Leer was booked to come to Haiti?

15   A.  I don't know.

16   Q.  Were you involved in that at all?

17   A.  I don't remember.

18   Q.  Safe to say it was more than a couple of days before,

19   right?

20   A.  Sometimes it is just a couple of days before.

21   Q.  But you have no recollection of when it was?

22   A.  No, sir.

23   Q.  While you are on the flight, you said that it did not take

24   45 minutes for the flight to level off, right?

25   A.  No, I don't think so.

G98nflo3                        Gonzalez – cross

1   Q.  About how long do you think it took for the flight to level

2   off?

3   A.  I don't know.

4   Q.  What is your estimate?

5   A.  I really have no idea.

6   Q.  You have no recollection whatsoever?

7   A.  No, I do not.

8   Q.  Do you think it was more than 20 minutes?

9           MR. BOVE:  Objection.

10          THE COURT:  Sustained.

11  Q.  If it didn't take 45 minutes, what is the additional amount

12  of time, what were you doing during the additional amount of

13  time after the flight leveled off before you began interviewing

14  Mr. Campo Flores?

15  A.  Sitting on the plane.

16  Q.  Sitting quietly?

17  A.  Yes.

18  Q.  Why did you wait to start interviewing him for a while

19  after the flight leveled off?

20  A.  No particular reason.

21  Q.  You just weren't in a hurry?

22  A.  No.

23  Q.  Well, you did realize that this was a relatively short

24  flight?

25  A.  I don't remember how long it was.

1   Q.  Well, you knew before you got on the airplane that this was

2   going to be approximately a four-hour flight, right?

3   A.  OK.

4   Q.  Did you know that?

5   A.  I don't remember if I knew that or not.

6   Q.  But you've flown from the Caribbean to New York before?

7           THE COURT:  Do you want to get on to something that's

8   important, Mr. Jackson.

9           MR. JACKSON:  Yes, your Honor.

10          I'll wrap this part up very quickly.

11  A.  I don't remember if I've ever flown from the Caribbean to

12  New York.  I've flown from the Caribbean to Washington.

13  Q.  That's fine.  But the point is you understood that every

14  moment, that the amount of time that you had, the time window

15  that you had was limited in order to conduct these

16  interrogations, right?

17  A.  Yes.

18  Q.  And everyone in the squad had talked about how hopeful you

19  were about being able to cooperate these defendants?

20          MR. BOVE:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  You had heard other people in the group talk about how

23  hopeful -- you had been involved in communications about how

24  hopeful people were about cooperating these defendants?

25          MR. BOVE:  OK.

G98nflo3                              Gonzalez - cross

1              THE COURT:  Sustained.

2    Q.  Now, once you started talking to Mr. Campo Flores, what was

3    the first thing that you said to him?

4    A.  Before I gave him the form?

5    Q.  Yes.

6    A.  Nothing.

7    Q.  Nothing at all?

8    A.  No.

9    Q.  You simply handed him the form?

10   A.  I testified that I asked him if he wanted me to read him

11   the form.

12   Q.  Right.  And what did he say?

13   A.  He said no.

14   Q.  You say he filled out the form?

15   A.  He read the form and then he signed it.

16   Q.  After he had signed the form, what was the first thing that

17   you said to him?

18   A.  I asked him his biographical information.

19   Q.  At any point during the course of that flight did you talk

20   to him about the potential penalties that would be associated

21   with the crimes here?

22   A.  I don't remember.

23   Q.  You are not sure?

24   A.  No.

25   Q.  OK.  Had you talked to defendants about the potential

G98nflo3                          Gonzalez – cross

1    penalties they face in interrogations before?

2    A.  In interrogations?

3    Q.  In interviews.

4    A.  Oh, yes.

5    Q.  So in postarrest interviews in the past it's not uncommon

6    for you to mention the penalties?

7              MR. BOVE:  Objection to the characterization.

8              THE COURT:  Overruled.

9    A.  No.

10   Q.  One of the reasons that you do that is because that's a

11   framing device in order to have the defendant understand the

12   context of what he's facing, right?

13   A.  Yes.

14   Q.  At the time you gave Mr. Campo Flores the form you hadn't

15   even told him why he was being transported to the United

16   States, right?

17   A.  I don't recall if I did or not.

18   Q.  You testified that your recollection is that the very first

19   substantive thing that you said to him was just handing him the

20   form, right?

21   A.  Yes.

22   Q.  So it is your recollection that you hadn't even told him at

23   the time you gave him the form why he was being brought to the

24   United States?

25   A.  Correct.

G98nflo3                         Gonzalez – cross

1    Q.   Had you told him he was going to the United States?

2    A.   I don't remember if I did.

3    Q.   Had you told him that what he was charged with?

4    A.   I don't remember if I did or not.

5    Q.   Do you believe that it is possible for a defendant to fully

6    understand his form without knowing any of that information?

7              MR. BOVE:   Objection.

8              Relevance.

9              THE COURT:   Sustained.

10   Q.   At some point in the flight you also talked to him about

11   his family, right?

12   A.   How so?

13   Q.   I'm just asking if you asked about his family at all.

14   A.   Yes.

15   Q.   And you told him that there could be a potential for him

16   not to see his children, right?

17   A.   No.

18   Q.   You talked to him about his -- you talked to him about his

19   aunt?

20   A.   Yes.

21   Q.   And you talked about the potential implications of this in

22   terms of his family?

23   A.   Yes.

24   Q.   What did you say to him?

25   A.   I asked him what he thinks would happen when news of this

G98nflo3                         Gonzalez – cross

1    hit his family.

2    Q.  Were there any things that you said during the course of

3    that interview that you said in order to try to convince him to

4    talk to you more fully?

5    A.  No.

6    Q.  Nothing at all --

7    A.  No.

8    Q.  -- during the course of your interview?

9    A.  No.

10            MR. JACKSON:  OK.

11            THE COURT:  Mr. Jackson, is this a convenient place to

12   take our luncheon break?

13            MR. JACKSON:  Yes, it is, your Honor.

14            THE COURT:  Mr. Gonzalez, you are on

15   cross-examination.  So don't talk about this case with the

16   attorneys.  All right?

17            THE WITNESS:  Yes, sir.

18            THE COURT:  He will we will resume at 2 o'clock.

19            Have the agent step outside.  I would like to talk to

20   counsel at the sidebar.

21            (At sidebar)

22            THE COURT:  For scheduling purposes only, how much

23   more time do you have?

24            MR. JACKSON:  Your Honor, less than an hour.

25            THE COURT:  I have in mind a rule that I don't know

G98nflo3                          Gonzalez – cross

1    how clear it is or whether it can be sustained, but the

2    government took about an hour.  You are now at an hour and a

3    half.

4              MR. JACKSON:  OK.

5              THE COURT:  How much do you have?

6              MR. RODY:  Certainly far less than him.  It will just

7    be cleanup.  He's covering a lot of the things that I intend to

8    cover.  If there are a few leftover things, I couldn't say

9    right now, Judge.  Maybe half an hour.

10             THE COURT:  OK.

11             MR. JACKSON:  It will be substantially less than an

12   hour, your Honor.

13             THE COURT:  Thanks very much.

14             MR. JACKSON:  Thank you, your Honor.

15             THE COURT:  Enjoy your lunch.

16             (Luncheon recess)

17

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                   2:00 p.m.

1          (In open court)

2          THE COURT:  Mr. Jackson.

3          MR. JACKSON:  Thank you very much, your Honor.

4   BY MR. JACKSON:

5   Q.  Good afternoon, again, Agent Gonzalez.

6   A.  Good afternoon, sir.

7   Q.  Sergeant Gonzalez, I just have a handful of additional

8   topics for you.

9          First I'll just ask you, Agent Gonzalez, one of the

10  things that you've talked about, that we have talked about a

11  little bit in your testimony, is the photograph that was sent

12  by El Sentado?

13  A.  Yes.

14  Q.  I know that you said that you hadn't looked at the data

15  associated with that, right?

16  A.  Correct.

17  Q.  Do you know what type of phone El Sentado had?

18  A.  No.

19  Q.  You said that he communicated with you through BlackBerry

20  messenger, right?

21  A.  Yes.

22  Q.  That's a program that's available on Apple iPhones?

23  A.  I believe that there is an app, yes, for that.

G98nflo3                         Gonzalez - cross

1    Q.   You use that on your Samsung?

2    A.   Yes.

3    Q.   And that's also available, obviously, on BlackBerrys?

4    A.   Yes.

5    Q.   And you talked a little bit about the file that was sent

6    where El Sentado did a different recording in September?

7    A.   OK, yes.

8    Q.   Do you know what type of file that was?

9    A.   That was an audio file.

10   Q.   Right.  Do you know what the recording format was of it?

11   A.   No, I do not.

12   Q.   Do you know if it was a recording format native to Apple

13   phones?

14   A.   I don't know.

15   Q.   Now, there were points during your communications with CS-1

16   where you talked about the fact that if the defendants agreed

17   to send the merchandise before you received money, that that

18   would be a big problem for them, right?

19   A.   For who?

20   Q.   For the defendants.

21   A.   I don't know if I said it was a big problem.  I don't

22   remember.

23   Q.   But regardless, initially, before you decided on the

24   November 10 Haiti arrest date, one of the goals of the

25   operation was to ascertain the 800 kilograms of alleged

G98nflo3                         Gonzalez - cross

1    cocaine, right?

2    A.  Yes.

3    Q.  And at some point a decision was made to abandoned that

4    goal, right?

5    A.  Yes.

6    Q.  And the decision was made to arrest the defendants before

7    the DEA had taken custody of any narcotics whatsoever?

8    A.  Correct.

9    Q.  And so I guess my question is, why did you decide to

10   conduct those interviews on November 10 before receiving any

11   narcotics?

12             MR. BOVE:  Objection, relevance.

13             THE COURT:  Overruled.

14   A.  Which interviews on November 10?

15   Q.  Well, the arrest and interviews that you did on

16   November 10.

17   A.  Why did I interview them?

18   Q.  Why did you decide to have the op on that day when you

19   would arrest and interview the defendants before you received

20   any narcotics?

21   A.  Because they were already charged.

22   Q.  Were there any other reasons?

23   A.  Not that I'm aware of.

24   Q.  Now, just briefly, after you discovered that the

25   confidential sources had been deceiving you for six years in

G98nflo3                          Gonzalez – cross

1    one circumstance, you and the other DEA agents decided to take

2    some relatively different measures than typical in order to

3    respond to that, right?

4           MR. BOVE:  Objection to this characterization and

5    scope.

6           THE COURT:  Sustained.

7           MR. JACKSON:  Thank you, your Honor.

8    BY MR. JACKSON:

9    Q.  At some point, you concluded that CS-1 and CS-2 had been

10   engaged in deception for years, right?

11   A.  Yes.

12   Q.  And part of that had to do with the fact that every single

13   year they had been filling out confidential source agreements

14   in which they promised not to engage in that type of deceptive

15   activity, right?

16   A.  Could you repeat your question, please?

17   Q.  Well, they had filled out each year, for several years,

18   forms swearing that they would abide by the rules of being

19   confidential informants, right?

20   A.  Yes.

21   Q.  And they lied in all those forms?

22   A.  Yes.

23   Q.  And you figured out that these lies had been going on for

24   years, right?

25   A.  Yes.

G98nflo3                          Gonzalez - cross

1    Q.  And it is safe to say that, at that point, that was the

2    greatest deception that you personally ever dealt with in terms

3    of confidential sources?

4            MR. BOVE:  Objection.

5            THE COURT:  Sustained.

6    Q.  At that point, you made a decision -- you and the other

7    agents involved in this -- made a decision to try to understand

8    the scope of the lies that they had told during the course of

9    the investigation, right?

10   A.  You mean with respect to that separate drug-trafficking

11   activities?

12   Q.  I mean in general.

13   A.  I don't understand what you mean.

14   Q.  Well, I guess you found out that they had been deceiving

15   you, right?

16   A.  Yes.

17   Q.  And that covered the time period of the investigation --

18   A.  Yes.

19   Q.  -- right?

20          So it was important to you to figure out how much they

21   had been deceiving you during that time period, right?

22   A.  Yes.

23   Q.  It was important to the DEA, right?

24   A.  Yes.

25   Q.  One of the things that you did to look into that was that

G98nflo3                          Gonzalez - cross

1   you actually recorded interviews with those guys, right?

2   A.  We recorded --

3            THE COURT:  Those guys meaning?

4            MR. JACKSON:  I'm sorry, your Honor.

5   Q.  CS-1 and CS-2.

6   A.  I believe we recorded a interview.

7   Q.  So you're aware of one interview of one of the confidential

8   sources being videotaped?

9   A.  Not videotaped, audio.

10  Q.  You're aware of the audio?

11  A.  Yes.

12  Q.  Have you heard the audio?

13  A.  No.

14  Q.  Just a question.  In any other investigation that you have

15  dealt with, have you utilized or been aware of the DEA

16  utilizing those procedures?

17  A.  Which procedures?

18  Q.  Recording interviews with confidential sources in order to

19  determine how much they had been lying.

20  A.  I had not.

21  Q.  Now, I think we spoke earlier about the fact that

22  El Sentado communicated to you certain information indicating

23  that the defendants' lacked capacity to carry out the deal that

24  was being orchestrated, right?

25  A.  I don't remember him saying that.

G98nflo3                         Gonzalez - cross

1    Q.  I want to show you something.  I am going to ask you if it

2    refreshes your recollection.

3            This is a document which, in this form is D43, which

4    contains an excerpt from 3504-3, page 59.

5            I'm sorry, Agent Gonzalez.  Can you see that?

6    A.  Yes.

7    Q.  I just would like you to take a look at that for a moment

8    to yourself.

9            Have you had an opportunity to take a look at it?

10   A.  Yes.

11   Q.  Having looked at that, does that refresh your recollection?

12   A.  Yes, it does.

13   Q.  El Sentado communicated to you that the defendants lacked

14   capacity, he understood the defendants to lack capacity to do

15   some of the things related to this deal?

16   A.  Actually, initially, he said the defendants had an aircraft

17   and pilots available, and then later he said that they did not

18   have the airplanes any longer.

19   Q.  Right.  So let me focus on the second thing.

20           This is something that you said and this is something

21   that you said to CS-1, correct?

22   A.  Correct.

23   Q.  And you told CS-1 that Sentado said that the defendants

24   don't have airplanes?

25   A.  Correct.

G98nflo3                          Gonzalez - cross

1    Q.  So Sentado had communicated to you that the defendants

2    lacked this necessary part of the deal, right?

3    A.  Yes.

4    Q.  And did that communication between you and Sentado take

5    place over BBM or did it take place over the telephone?

6    A.  I believe it was over BBM.

7    Q.  And is there a recording of the meeting where the

8    defendants communicated that information to El Sentado?

9    A.  No.

10   Q.  It's your understanding that this is something that was

11   communicated to El Sentado at the first meeting that El Sentado

12   had which was not recorded, right?

13   A.  No.

14   Q.  Well, it is your understanding that this was communicated

15   in an unrecorded setting to El Sentado, right?

16   A.  Via BBM was my understanding.

17   Q.  Via BBM?

18   A.  Yes.

19   Q.  Do you have the BBMs where El Sentado had these

20   communications allegedly with the defendants?

21   A.  I'm not sure.  I have some BBMs, but I don't recall if I

22   have that one.

23   Q.  You're not certain, as you sit here today, that that

24   information that El Sentado communicated to you is not based on

25   communications that El Sentado had at the first meeting, are

G98nflo3                      Gonzalez - cross

1    you?

2              MR. BOVE:  Objection to form.

3              THE COURT:  Overruled.

4    A.  Actually, he said after the first meeting that they did

5    have access to planes.  It was after the first meeting that he

6    then came back and said that the pilots had backed out and they

7    lost the ability to procure an aircraft.

8    Q.  At some point subsequently, is it your testimony that this

9    is based on something only subsequent to that?

10   A.  Yes.

11   Q.  But you don't actually have any record of what was actually

12   communicated during the course of the first meeting?

13   A.  Correct.

14   Q.  Because it wasn't recorded?

15   A.  Correct.

16   Q.  And you didn't do a full debrief of El Sentado after that

17   meeting, did you?

18   A.  Yes, I did.

19   Q.  You did a formal debriefing of him?

20   A.  It was via BlackBerry messenger.

21   Q.  That is not the formal debriefing of him that is required

22   by the DEA manual, is it?

23   A.  No.

24   Q.  In fact, you were expected to take a statement of him with

25   two agents in such a situation, correct?

G98nflo3                        Gonzalez - cross

1   A.  That was impossible in this situation.

2   Q.  That's what the manual instructs you to do, correct?

3   A.  Yes.

4   Q.  And you didn't do that?

5   A.  No.

6   Q.  Now, you would not claim that the BBM chat that you had

7   with El Sentado on October 3 and October 5 would be equivalent

8   to a full debriefing, would you?

9           MR. BOVE:  Objection, mischaracterizes the testimony.

10          THE COURT:  Is it a full debriefing?

11          THE WITNESS:  I believe it was.

12  BY MR. JACKSON:

13  Q.  You believe that that is a full debriefing?

14  A.  Yes.

15  Q.  Now, just to clear, one thing that you talked about a

16  little bit before lunch, I know that you identified a few

17  different reasons why informants are searched, right?

18  A.  Yes.

19  Q.  The official reason listed in the DEA manual for searching

20  informants is to preclude questions as to the validity or

21  integrity of the evidence, right?

22  A.  I don't have the manual in front of me.

23  Q.  I am going to show you something and ask if it refreshes

24  your recollection.  This is a document marked as D16.  I would

25  like you to just take a look at it for a moment.

G98nflo3                          Gonzalez - cross

1          Have you had a chance to take a look at that, Agent

2    Gonzalez?

3    A.  Yes.

4    Q.  And the reason for searching informants, as identified in

5    the DEA manual, is to preclude questions as to the validity and

6    integrity of the evidence, right?

7    A.  That actually was in respect to purchasing controlled

8    substances.  They were not purchasing any controlled

9    substances.

10   Q.  So you believe that the reasoning here doesn't apply to

11   what you're talking about?

12   A.  You're asking me if it does, and it is a different

13   scenario.

14   Q.  My only question is -- I'm not asking you about the

15   document, it is not in evidence -- I'm asking if it refreshes

16   your recollection based on your understanding of the DEA manual

17   and the training?

18   A.  I don't know how recent of a manual this is.  Our manual

19   was updated recently.

20   Q.  That's fine.  If it doesn't refresh your recollection, it

21   doesn't.

22   A.  OK.

23   Q.  Now, just taking a very brief look at the document which is

24   already in evidence, the photograph that Sentado sent you --

25          MR. JACKSON:  Your Honor, I believe that the

G98nflo3                              Gonzalez - cross

1    government stipulated, simply for the purposes of this hearing

2    before your Honor, that what is depicted here in D1000 is a

3    Google Earth satellite view of the location of the Finca Las

4    Glorias?

5            MR. BOVE:  I take Mr. Jackson at face value.  I just

6    want to note that nothing in the record right now about the

7    timing of the photo or its scale.

8            MR. JACKSON:  We agree with that, your Honor.

9            THE COURT:  All right.

10           MR. JACKSON:  Thank you.

11           THE COURT:  You want this in evidence?

12           MR. JACKSON:  Your Honor, may I offer this in

13   evidence?

14           THE COURT:  Yes.

15           MR. BOVE:  Subject to our ongoing relevance objection?

16           THE COURT:  Correct.

17           (Defendant's Exhibit D1000 received in evidence)

18           MR. JACKSON:  Your Honor, is it all right if I place

19   this on the easel?

20           THE COURT:  Yes.

21           MR. JACKSON:  Thank you.

22   BY MR. JACKSON:

23   Q.   Now, Agent Gonzalez, you can see, when you look at the

24   El Sentado photo, that this is depicting -- you can see the

25   structure.  Can you see the structure as depicted on the

G98nflo3                          Gonzalez - cross

1    satellite?  Are you able to match up this, looking at the two?

2    A.  Not really.

3    Q.  Well, can you see that there is an area right here where

4    there is a tall structure, and then there is a field, and then

5    there is an area that's, essentially, like a basketball court?

6              THE COURT:  I have no idea what you're talking about,

7    Mr. Jackson.

8              MR. JACKSON:  I'm sorry, your Honor.  I'll just take

9    30 seconds to attempt this, your Honor.  May I approach?

10             THE COURT:  Yes.

11   BY MR. JACKSON:

12   Q.  You can see, if you're looking at the photo here by

13   El Sentado --

14             THE COURT:  That's Exhibit 4?

15             MR. JACKSON:  Yes, your Honor, Exhibit 4.

16   Q.  -- Exhibit 4, you see there is a gray area that roughly

17   matches the area, the gray area all the way on the left of

18   D1000?

19             MR. BOVE:  Objection to Mr. Jackson's testimony.  He

20   said he did not recognize.

21             THE COURT:  He is pointing it out to him.

22             What's your question?

23             MR. JACKSON:  My question is if he can look and see

24   the structure that is right there and see that that is, based

25   on the angle, the same structure that's depicted from this area

G98nflo3                        Gonzalez - cross

1   right here.

2              THE COURT:  If you can do that, fine.

3              Can you do it, Agent Gonzalez?

4              THE WITNESS:  This structure in this picture looks a

5   lot smaller.  It looks very small, that looks really big.

6              THE COURT:  That's it.

7              MR. JACKSON:  Thank you, your Honor.  Thank you for

8   indulging me.

9   BY MR. JACKSON:

10  Q.  Now, just to be clear, how far in time was the DEA country

11  office in Honduras from the hotel Finca Las Glorias?

12  A.  I don't know.

13  Q.  You haven't taken a look at that at any point during the

14  investigation?

15  A.  No.

16  Q.  I think one of the things that you said in your affidavit

17  was that the -- I believe the capital is pronounced

18  Tegucigalpa -- was too far away from the location where Sentado

19  was meeting in order for you to send someone else to provide

20  him with equipment or to monitor it, right?

21  A.  Yes.

22  Q.  What was your understanding of how far away it was?

23  A.  San Pedro Sula is approximately, I would say, three to four

24  hours a away, and I believe this is nearby San Pedro Sula.

25  Q.  So it is your testimony that it would have been impossible

G98nflo3                    Gonzalez - cross

1    for somebody to drive those three hours?

2    A.  On that day, yes.

3    Q.  Why, what was happening that day?

4    A.  On October 3?

5    Q.  Yes.

6    A.  It was a Saturday.

7    Q.  So there wasn't investigative resources, you're saying,

8    because it was the weekend?

9    A.  Yes.

10   Q.  So you had your day off?

11   A.  I wasn't in Honduras.

12   Q.  The agents in Honduras had their day off?

13   A.  Yes.

14   Q.  Did you attempt to contact any of them?

15   A.  Yes.

16   Q.  Who did you attempt to contact?

17   A.  One of the agents in Honduras.

18   Q.  And what did he say?

19   A.  I just notified him that a meeting was going to occur.

20   Q.  Did you ask him if he was willing to drive the two to three

21   hours?

22   A.  I don't believe that I did.

23   Q.  So you didn't inquire as to that?

24   A.  I don't recall doing so.

25   Q.  It is a fact, isn't it, Agent Gonzalez, that in a lot of

G98nflo3                          Gonzalez - cross

1   the foreign country offices, agents will work on weekends?

2   A.   In the embassy.  I don't think they had the authority to go

3   cover meetings in Honduras.

4   Q.   But my question was, agents do work on weekends, correct?

5   A.   Yes.

6   Q.   Now, when you started interviewing Mr. Flores de Freitas,

7   what time was it?

8   A.   Can I refer back?

9   Q.   If you don't recall, that's fine.  Do you not remember?

10  A.   I don't recall the exact time.

11  Q.   Would it be accurate to say that, in your report, you

12  indicated that it was 7:35 p.m.?

13  A.   If that's what it says in my report.

14          MR. JACKSON:  Do you have the 3500 material there?

15          Just one moment, your Honor.

16  Q.   Let me ask you, while we're pulling the document out, how

17  much time do you believe was remaining in the flight when you

18  began to interview Mr. Flores de Freitas?

19  A.   Knowing now or knowing then?

20  Q.   I'm just asking your understanding of it now.  What is your

21  understanding now of how much time remained in the flight?

22  A.   It was a little bit over an hour, I believe.

23  Q.   You believe there was an hour left in the flight?

24  A.   A little over an hour.

25  Q.   Do you remember how long the conversation being?

G98nflo3                          Gonzalez - cross

1    A.  I think it was approximately an hour.

2    Q.  The flight landed at approximately 8:00, right?

3    A.  I don't remember the exact time it landed.

4    Q.  But you do remember that, before the flight landed, the

5    plane began to move into landing procedures, right?

6    A.  Yes.

7    Q.  And in the same way that you talked about earlier, you

8    didn't conduct an interview while the plane was taking off?

9    You weren't conducting an interview as the plane was landing,

10   right?

11   A.  I don't recall what time exactly I stopped the interview.

12   Q.  Right.  But what I am asking you is, you wouldn't interview

13   the guy as the plane was hitting the runway, right?

14   A.  No.

15   Q.  And the reason for that is that's a potential unsafe

16   situation, right?

17          THE COURT:  Landing is an unsafe situation?

18   Q.  To be in the position where you would be interviewing

19   someone while the plane is landing, right?

20   A.  Not necessarily.  We were seated in our seats.

21   Q.  The reason for that is, it would be potentially jarring for

22   somebody to try to focus while the plane is landing?

23          MR. BOVE:  Objection.

24          THE COURT:  Sustained.

25   Q.  Well, what is the reason that you wouldn't do that?

G98nflo3                        Gonzalez - cross

1   A.  Wouldn't do what?

2   Q.  You just said that you wouldn't be interviewing someone as

3   the plane was making its final landing.  I am just asking why.

4   A.  We were just landing.

5   Q.  Right.  But my question to you is, why wouldn't you

6   interview someone during that time period?

7            MR. BOVE:  Objection.

8            THE COURT:  Mr. Jackson, we have got to go on to

9   something that is relevant, please.

10           MR. JACKSON:  OK, your Honor.  I only have a couple

11  more questions, your Honor.

12           THE COURT:  All right.

13  BY MR. JACKSON:

14  Q.  Now, over the course of the time that you were dealing with

15  CS-1 and CS-2, how much money did you promise them they would

16  be paid in exchange for bringing in the defendants?

17  A.  I didn't promise them anything.

18  Q.  Did you suggest to them at any point that they would

19  receive a bounty or a reward for their work in the

20  investigation?

21  A.  Yes.

22  Q.  How much did you suggest they could receive?

23  A.  I did not.

24  Q.  You didn't suggest a figure?

25  A.  No.

G98nflo3                         Gonzalez – cross

1   Q.   Do you know how much money CS-1 and CS-2 have received from

2   the DEA over the course of their time as confidential sources?

3   A.   Not off the top of my head.

4   Q.   You do know that it exceeds $1 million, right?

5   A.   I don't know that.

6   Q.   You're not aware of that personally?

7   A.   I don't know the exact amount.

8   Q.   There had been a number of occasions, though, where you

9   personally sent to them increments of $10,000?

10  A.   Yes.

11  Q.   And some of that was allegedly for expenses?

12  A.   Yes, it was.

13  Q.   You're aware, at this point, that they didn't pay taxes on

14  the reward money that they had received in the past, right?

15  A.   I'm not aware of that.

16  Q.   Have you taken any steps to verify whether the information

17  that they communicated to you about expenses was all

18  legitimate?

19  A.   Yes.  We asked them to provide us with receipts.

20  Q.   And did they ever receive any money for expenses that was

21  not tied to a specific receipt?

22  A.   As in food?

23  Q.   Any money for expenses that was not tied to a specific

24  receipt.

25  A.   Yes.

G98SFLO4                         Gonzalez – cross

1    Q.  Do you know how much?

2    A.  No.

3    Q.  Have you taken any steps to attempt to verify whether or

4    not that was the case?

5    A.  Whether what was the case?

6    Q.  Whether they actually spent that money on food.

7    A.  No.

8    Q.  At this point, you're not sure whether any of the money

9    that was given to CS-1 and CS-2 was utilized to purchase

10   narcotics, right?

11   A.  Can you repeat the question, please?

12   Q.  Sure.  At this point, you're not sure whether any of the

13   money that was provided by the DEA to CS-1 and CS-2 was used to

14   purchase narcotics?

15   A.  No, I do not know.

16           MR. JACKSON:  Just a moment, your Honor.

17           Your Honor, I have no additional questions at this

18   time.

19           THE COURT:  Thank you, Mr. Jackson.

20           MR. JACKSON:  Thank you.

21           THE COURT:  Mr. Rody or Mr. Mann.

22           MR. RODY:  Thanks, your Honor.

23   CROSS-EXAMINATION

24   BY MR. RODY:

25   Q.  Agent Gonzalez, I just want to make sure I have in mind

G98SFLO4                          Gonzalez - cross

1    exactly what your role was in this matter.

2              Were you the case agent for the investigation?

3    A.  Yes.

4    Q.  And you were also the official DEA handler for CS-1?

5    A.  I was one of them.

6    Q.  Is it the case that CSs have multiple handlers, or was

7    there one handler, the official or primary point of contact?

8    A.  There are multiple.

9    Q.  So you were one of the handlers for CS-1.

10             Were you also one of the handlers for CS-2?

11   A.  I believe so.

12   Q.  You don't know?

13   A.  I would have to look at the paperwork.

14   Q.  What paperwork would you look at to determine that?

15   A.  Their source establishment form.

16   Q.  So the official -- withdrawn.

17             One of the ways to determine who the points of contact

18   are, one of the handlers for a CS, is the source agreement?

19   A.  Yes.

20   Q.  That's where that information would be?

21   A.  The source agreement is who is there witnessing them

22   signing the source agreement.

23   Q.  That doesn't necessarily equate with who their handlers

24   are, right?

25   A.  Correct.

G98SFLO4                    Gonzalez – cross

1    Q.  What I am trying to determine is, who was the person at the

2    DEA that was in primary contact with CS-1?  That was you,

3    correct?

4    A.  For this operation, yes.

5    Q.  Are there other DEA acts who are in frequent contact with

6    CS-1 for other operations?

7    A.  I believe so.

8    Q.  You don't know?

9    A.  Yes.

10   Q.  Were you one of the points of contact or one of the

11   handlers for CS-2?

12   A.  I'm not sure.

13   Q.  Did you have communication and contact with CS-2?

14   A.  If I did, it was very limited.  I didn't really deal with

15   him much.

16   Q.  Was that Agent Mahoney's role?  Was he the handler for

17   CS-2?

18   A.  Yes.

19   Q.  How about CS-3, were you the handler for CS-3?

20   A.  No.

21   Q.  Who was that?

22   A.  I believe it was Agent Cochran and Agent Peterson.

23   Q.  Kevin Cochran?

24   A.  Yes, sir.

25   Q.  And how about CW-1, were you the handler for CW-1?

G98SFLO4                    Gonzalez - cross

1   A.  Not technically.

2   Q.  What does that mean?

3   A.  He never signed a confidential source establishment.

4   Q.  So he was trying to cooperate with the United States

5   Attorney's office, correct?

6   A.  Yes.

7   Q.  And he had signed a type of letter that indicated that he

8   was going to be out working to attempt to provide assistance to

9   the government, correct?

10  A.  I'm not sure what letter he signed.

11  Q.  But you do know that he did not sign a DEA source

12  agreement, correct?

13  A.  Correct.

14  Q.  Now, I want to make sure that I understand your testimony

15  from earlier.  Is it true that, sitting here today, you do not

16  agree that your handling of CS-1 and CS-2 was less than

17  optimal?

18  A.  No.

19  Q.  You disagree with that?

20  A.  Yes.

21  Q.  And is it also true that you disagree that your actual

22  management of the CSs had not failed?

23  A.  Correct.

24  Q.  Sir, both of your sources ending up pleading guilty to

25  serious federal narcotics crimes, right?

G98SFLO4                        Gonzalez – cross

1    A.  Yes.

2    Q.  And you're a DEA agent, right?

3    A.  Yes.

4    Q.  And you believe your handling of them was not a failure?

5           MR. BOVE:  Asked and answered.

6           THE COURT:  Overruled.

7    A.  For this particular operation, no.

8    Q.  So that's the way you divide it, you divide it by the

9    results of the operation, is that right?

10   A.  Yes.

11   Q.  So the fact that they lied to you repeatedly for years

12   doesn't indicate that you failed to manage them appropriately?

13   A.  I didn't know them for years, sir.

14   Q.  You were managing them for how long?

15   A.  I don't know.

16   Q.  You have no idea?

17   A.  No.

18   Q.  Was it a week?

19   A.  No.

20   Q.  Was it a month?

21   A.  No.

22   Q.  It was at least a year, right?

23   A.  Yes.

24   Q.  Was it more than a year?

25   A.  I believe so.

G98SFLO4                          Gonzalez - cross

1   Q.  How do you not know this, sir?  You're a DEA agent.

2   A.  I wasn't in contact with them every day, sir.

3   Q.  You're supposed to be in frequent contact with them, aren't

4   you?

5   A.  Yes.

6   Q.  Aren't you supposed to do about quarterly debriefings --

7   withdrawn -- yeah, quarterly debriefings of your sources?

8   A.  Quarterly debriefings of them were done.

9   Q.  How?

10  A.  They were interviewed.

11  Q.  In person?

12  A.  I believe so.

13  Q.  You didn't do it?

14  A.  No.

15  Q.  But you said for over a year you were their handler?

16  A.  I was one of their handlers, yes.

17  Q.  Let's limit it to CS-1.

18  A.  OK.

19  Q.  For over a year, you were one of his handlers, correct?

20  A.  Yes.

21  Q.  Did you perform quarterly debriefings of CS-1?

22  A.  No.

23  Q.  Why not?

24  A.  Because other agents did it.

25  Q.  Like who?

G98SFLO4                        Gonzalez – cross

1   A.  Other agents that they worked with.

2   Q.  Can you name one of them?

3   A.  Special Agent Mahoney possibly debriefed them, other agents

4   where they lived.

5   Q.  You have no idea, do you?

6   A.  You don't have to be the primary handler in order to

7   debrief them.

8   Q.  Who had responsibility for CS-1's actions at the DEA?

9   A.  How so?

10  Q.  In terms of the name of the person who had responsibility

11  for CS-1's actions as the DEA agent.

12  A.  I don't know if anybody has responsibility for their

13  actions.

14  Q.  You don't have responsibility for their actions?  In fact,

15  you said earlier, I believe, that you thought that they had

16  been reliable on the job in Caracas, is that right?

17  A.  Yes.

18  Q.  But during the job in Caracas, they were using cocaine,

19  right?

20  A.  Yes.

21  Q.  And going to strip clubs, right?

22  A.  That, I don't know.

23  Q.  You don't know that they admitted to going to strip clubs

24  while they were in Caracas?

25  A.  No.

G98SFLO4                         Gonzalez - cross

1    Q.  Did you know that they were using prostitutes in Caracas?

2    A.  I later learned that, yes.

3    Q.  And you think that they did a reliable job in Caracas when

4    they were doing those things?

5    A.  They provided the evidence to us from the meetings they

6    attended.

7    Q.  And don't you agree, sir, that reliability has to do with

8    the constitution of a person?

9    A.  Yes.

10   Q.  By the way, you paid for all their expenses in Caracas,

11   right; flights to get there, correct?

12   A.  Yes.

13   Q.  Hotel money, right?

14   A.  Yes.

15   Q.  Money for food --

16   A.  Yes.

17   Q.  -- right?

18           And as you just answered in responding to questions

19   from Mr. Jackson, you have no idea if any of the money you gave

20   them was used on cocaine, strip clubs, and prostitutes, right?

21   A.  I do not know.

22   Q.  There were times when CS-1 was in Caracas when you were

23   communicating with him on BlackBerry messenger, correct?

24   A.  Yes.

25   Q.  And let's face it, that's the only way you communicated

1    with that guy, right?

2    A.   Pretty much.

3    Q.   You didn't meet with him in person to check up on him,

4    did you?

5    A.   When he was in Caracas?

6    Q.   No, ever.

7         MR. BOVE:   Objection, mischaracterizes the testimony.

8         THE COURT:   Sustained.

9    BY MR. RODY:

10   Q.   Have you ever met in person with CS-1?

11   A.   Yes.

12   Q.   How many times?

13   A.   I don't know.

14   Q.   You met with him in Virginia after the op, correct?

15   A.   Correct.

16   Q.   Is that the only time you ever met him in person?

17   A.   No.

18   Q.   When they were in Caracas, you were in communication with

19   CS-1 by BlackBerry messenger, correct?

20   A.   Yes.

21   Q.   And there were multiple occasions when he said things to

22   you to the effect that he was hung over, right?

23   A.   I don't recall that.

24   Q.   Do you remember him telling you that he felt *crudo* or raw?

25   A.   No.

G98SFLO4                        Gonzalez - cross

1    Q.  Do you remember him telling you that he got drunk without

2    paying?

3    A.  No.

4            MR. RODY:  One moment, your Honor.  This is 3508-45.

5    Actually, there is multiple copies of the same exhibit,

6    basically.  This is 3508-45, page 63.  I am just going to point

7    to a part of.

8            May I approach, your Honor?

9            THE COURT:  Yes, sir.

10   BY MR. RODY:

11   Q.  I'll ask you if this refreshes your recollection.  Don't

12   read it out loud.

13           Let me know if the part that I am referring to

14   refreshes your recollection that while he was in Caracas, CS-1

15   told you when he woke up one morning, that he felt raw.

16   A.  Yes.

17   Q.  And then he laughed about that, right?

18   A.  Yes.

19   Q.  And then he said he had a few drinks the night before,

20   correct?

21   A.  Yes.

22   Q.  And then page 70 of the same exhibit, page 70 of this same

23   exhibit, take a look at this portion.

24           Let me know if that refreshes your recollection that

25   he told you that he had gotten drunk the night before without

G98SFLO4                          Gonzalez - cross

1   paying?

2   A.  No, it does not.

3   Q.  That does not?

4   A.  No, those words aren't there.

5   Q.  He said, I even got -- something -- without paying, right?

6   A.  Yeah.  He didn't say what.

7   Q.  You had no idea what that meant, right?

8   A.  No, I did not.

9   Q.  Looking back on it now, you don't think to yourself, he

10  wasn't drunk, he was out using cocaine?

11  A.  Looking back now, it could have been that, yes.

12  Q.  So you already stated that you agreed that you were

13  deceived by CS-1 and CS-2.  One of the reasons for that is that

14  you got too close to CS-1, isn't that right?

15  A.  No.

16  Q.  When you are trained at the DEA academy, you're taught --

17  it is drilled into you, right, that you can't get too close to

18  a confidential source, right?

19  A.  Yes.

20  Q.  And then when you become a practicing agent, that is told

21  to you by older, more experienced agents, right?

22  A.  Sometimes.

23  Q.  It's a known risk factor for DEA agents who work in the

24  field with confidential sources, right?

25  A.  Yes.

G98SFLO4                           Gonzalez - cross

1    Q.  That you can become too close to the source, right?

2    A.  Yes.

3    Q.  And then bad things happen, right?

4    A.  Yes.

5    Q.  And with CS-1, your testimony is that you do not believe

6    you became too close to him?

7    A.  No.

8    Q.  You guys wished each other Happy Thanksgiving, right?

9    A.  Yes.

10   Q.  Merry Christmas, right?

11   A.  Yes.

12   Q.  Happy New Year, right?

13   A.  Yes.

14   Q.  He told you he was looking to buy a house, right?

15   A.  Yes.

16   Q.  With the reward money he anticipated getting for the arrest

17   of the defendants?

18   A.  Yes.

19   Q.  And there, actually, were steps you could have taken to

20   ensure that you didn't get deceived, correct?

21            THE COURT:  Didn't get what?

22            MR. RODY:  Deceived.  I'm sorry, your Honor.

23   A.  In what regard?

24   Q.  Well, you could have done things to check up on CS-1,

25   right?

G98SFLO4                      Gonzalez - cross

1    A.  Are you talking with the drug-trafficking activities he was

2    doing on the side?

3    Q.  Yep.

4    A.  I don't know how I could have.

5    Q.  Well, first of all, you could have attended quarterly

6    debriefing, right?

7    A.  I was not required to do so.

8    Q.  The DEA could have met with him and polygraphed him, right?

9    A.  Out of the blue?

10   Q.  Sure.

11   A.  Just to polygraph him?

12   Q.  Right, to determine if he is telling you the truth about

13   his activities?

14   A.  No, that is not our practice.

15   Q.  Do you ever conduct surveillance on your sources to see

16   where they are and what they're doing?

17   A.  No, I do not.

18   Q.  Do you ever conduct home visits at their houses?

19   A.  No, I do not.

20   Q.  These are things you could have done or another agent could

21   have done to check up and make sure that they were doing what

22   they were supposed to be doing, as opposed to trafficking in

23   thousands of kilograms of cocaine?

24   A.  I'm not aware of any agent that does that.

25   Q.  You're not aware of any agents who drug test their sources?

G98SFLO4                    Gonzalez - cross

1   A.  No.

2   Q.  It would be a good practice, right?

3   A.  It could be.

4   Q.  Because, otherwise, you'll end up with an agent using drugs

5   when he is on assignment in Caracas, right?

6               MR. BOVE:  Objection.

7               THE COURT:  Sustained.

8   Q.  How many phones did CS-1 have?

9   A.  I don't know.

10  Q.  Isn't that a big problem, that you don't know how many

11  phones he had?

12  A.  No.

13  Q.  Do you know the numbers of any other phones that he had,

14  other than the phone he was using to BlackBerry message you?

15  A.  No.

16  Q.  So you had no control over -- withdrawn.

17              You had no way to observe whether he was in

18  communication with people he should not have been in

19  communication with, right?

20  A.  Correct.

21  Q.  And the result of this was he was dealing drugs on the

22  side, right?

23  A.  Yes.

24  Q.  And Sentado, did you ever meet with Sentado in person?

25  A.  No.

G98SFLO4                          Gonzalez - cross

1    Q.  So your supervision of him was even less rigorous than your

2    supervision of CS-1, correct?

3    A.  What do you mean by rigorous?

4    Q.  Well, you kept zero tabs on Sentado, right?

5    A.  I could not.

6    Q.  You knew he was a risk, right?

7    A.  What kind of risk do you mean?

8    Q.  A risk to not do what he was supposed to be doing as a DEA

9    cooperating witness.

10   A.  No, I did not know that.

11   Q.  Well, you knew that he was unreliable, right?

12   A.  I did not know that.

13   Q.  Didn't you, in fact, tell CS-1 that you knew that CW-1 was

14   unreliable?

15   A.  I may have.  I don't remember.

16   Q.  Do you recall CS-1 asking you if CW-1 was always like this?

17   A.  Yes.

18   Q.  And you said yes, right?

19   A.  Yes.

20   Q.  And that's because you couldn't get ahold of the guy,

21   right?

22   A.  Correct.

23   Q.  You didn't know what he was doing, right?

24   A.  Correct.

25   Q.  You lost control of him, right?

G98SFLO4                    Gonzalez - cross

1    A.  I don't think so.

2    Q.  Well, he's dead, right?

3    A.  Yes.

4    Q.  By the way, just one point on the photograph that CW-1 sent

5    you.  You said you're not familiar with metadata.  I understand

6    that.  But are you familiar with the concept that when you take

7    a photograph with a digital camera, there is information that

8    comes along with the photograph that can tell you, for example,

9    the date the photograph was taken on?

10   A.  Yes.

11   Q.  And the location where the photograph was taken?

12   A.  OK.

13   Q.  Do you understand that to be true?

14   A.  I don't know if that's true for all phones or all devices.

15   Q.  But the question is, with the image that you received from

16   Sentado, that image didn't carry with it any such information,

17   correct?

18   A.  Correct.

19   Q.  Did you do anything to that photograph before you passed it

20   on to the United States Attorney's office?

21   A.  No.

22   Q.  How did you convey it to them?

23   A.  What do you mean convey?

24   Q.  Give, send.

25   A.  I believe via e-mail.

G98SFLO4                        Gonzalez – cross

1    Q.  So Sentado BlackBerry messengered it to you?

2    A.  Yes.

3    Q.  And then you e-mailed that to the U.S. Attorney's office?

4    A.  Yes.

5    Q.  And you did nothing to strip any information out of it

6    before you did that?

7    A.  No.

8    Q.  One more thing, I'm sorry, about CS-1.

9           You acknowledge that he was addicted to cocaine,

10   right?

11   A.  Yes.

12   Q.  And you said that the DEA doesn't typically use drug

13   addicts as informants, right?

14   A.  Yes.

15   Q.  And that's because they're unreliable, right?

16   A.  Yes.

17   Q.  And reliability is absolutely critical for informants,

18   right?

19   A.  Yes.

20   Q.  And CS-1 was unreliable, right?

21   A.  Yes.

22   Q.  Drug addiction, as you know from your work as an agent, is

23   an incredibly powerful motive, right?

24           MR. BOVE:  Objection.

25           THE COURT:  Sustained.

G98SFLO4                         Gonzalez - cross

 1   Q.  Are you familiar -- withdrawn.

 2             In your work as a DEA agent, you have encountered many

 3   subjects or targets who are addicted to narcotics, correct?

 4             MR. BOVE:  Objection.

 5             THE COURT:  Sustained.

 6   Q.  The DEA learned that CS-1 and CS-2 were lying to them and

 7   committing crimes on the side originally through another

 8   confidential source, is that right?

 9   A.  Yes.

10   Q.  Did you participate in debriefing that other confidential

11   source?

12   A.  Yes.

13   Q.  And that debriefing occurred in mid April 2015, correct?

14   A.  I don't recall exactly when it occurred.

15   Q.  One moment, your Honor.

16             Withdrawn.  I believe I said 2015.  I meant mid April

17   2016.

18             Does that refresh your recollection?

19   A.  I'm still not sure of the exact date, sir, but it was 2016.

20   Q.  And where did that debriefing take place?

21   A.  California.

22   Q.  And you're based out of Virginia?

23   A.  Yes.

24   Q.  So you traveled to California for that, correct.

25   A.  Yes.

G98SFLO4                     Gonzalez – cross

1   Q.  And, in fact, CS-1 is based in California, right?

2   A.  Yes.

3   Q.  So you could have shown up at CS-1's house to check up on

4   him unannounced anytime you wanted to, right?

5   A.  Yes.

6   Q.  But you didn't do that?

7   A.  No.

8   Q.  I'm going to show you a document.

9          MR. RODY:  May I approach, your Honor?

10          THE COURT:  Yes.

11  Q.  3503-08, take a look at this and let me know if this

12  refreshes your recollection about when the debrief of that

13  other CS occurred.

14  A.  It was April 18, 2016.

15          Would you like me to read the entire document?

16  Q.  No, just the date of it.  April 18, 2016?

17  A.  Yes.

18  Q.  But the DEA did not confront CS-1 or CS-2 with this

19  information that they had been selling drugs and using drugs

20  and committing crimes until June 29, is that correct?

21  A.  I don't know the exact date that we confronted them.

22  Q.  Did you participate in the debriefing or the interview when

23  did you confront them?

24  A.  Yes.

25          MR. RODY:  May you approach, your Honor.

G98SFLO4                    Gonzalez – cross

1           THE COURT:  Yes.

2    Q.  Just showing you a document.  Take a look at this, take a

3    look at the date up there, and let me know if this refreshes

4    your recollection of the date when you confronted CS-1 and CS-2

5    about their narcotics trafficking, please.

6    A.  Yes.

7    Q.  So June 29, 2016 was the date?

8    A.  Yes, sir.

9    Q.  Why did you wait two and a half months to confront them

10   when you knew these guys were selling narcotics on the side?

11   A.  We were trying to investigate the information that we

12   received.

13   Q.  And you could not have done that any sooner than two and a

14   half months?

15   A.  That's how long it took us.

16   Q.  Even when you confronted CS-1 about his activities, he lied

17   to you even then, right?

18   A.  The first time?

19   Q.  On June 29, when you confronted him about his illegal

20   activities, he lied to you even then, correct?

21   A.  I didn't think he did.  I thought he confessed during that

22   time.

23   Q.  He certainly lied to you about the amount of cocaine he had

24   been involved in trafficking over the previous four years,

25   right?

G98SFLO4                    Gonzalez – cross

1   A.  I don't remember if he was completely forthcoming in that

2   interview or not.

3   Q.  Isn't it true, sir, that he told you that he was only

4   involved in trafficking about three kilograms of cocaine from

5   some guy named Javi?

6   A.  I don't think that is all he said, no.

7   Q.  He mentioned other drugs, right?

8   A.  Yes.

9   Q.  He talked about that he had been selling heroin on the

10  side, right?

11  A.  I believe so.

12  Q.  Marijuana, right?

13  A.  I believe so.

14  Q.  Crystal meth?

15  A.  Yes.

16  Q.  Put all that stuff aside, just on the cocaine, he said

17  basically it was one deal with Javi for three kilos in LA,

18  right?

19  A.  I don't know if that is all he said.

20  Q.  This is the same document I showed you before, the June 29

21  document.  Isn't it true -- take a look at this paragraph here

22  and then take a look through there.

23        Let me know if that refreshes your recollection that

24  the only cocaine deal CS-1 told you about --

25  A.  Can I read this?

G98SFLO4                          Gonzalez – cross

1   Q.   Sure.  Let me just put the question to you and see if it

2   refreshes your recollection.

3          The only cocaine deal he told you about was one for

4   three kilograms from Javi.

5          Have you finished looking at that, Agent?

6   A.   Yes.

7   Q.   Does that refresh your recollection that the only cocaine

8   deal that CS-1 told you about on June 29 was this one

9   three-kilo deal from Javi in Mexico?

10  A.   I don't remember if he told us anything more than that.  I

11  didn't write that report.

12  Q.   The answer is this does not refresh your recollection?

13  A.   I remember him saying that, yes.  I don't remember if that

14  is all he told us.  I would have to read the entire document.

15  Q.   Some DEA agent wrote this, right?

16  A.   Yes.

17  Q.   It was not you?

18  A.   No.

19  Q.   And you think they wrote it inaccurately?

20  A.   No.

21  Q.   They didn't put down everything he said?

22  A.   No.

23          MR. BOVE:  Objection, Judge.

24  Q.   You think that the agent failed to record CS-1 describing

25  additional cocaine deals?

G98SFLO4                         Gonzalez – cross

1          MR. BOVE:  May I have a ruling on the first objection?

2          THE COURT:  Sustained.

3     Q.  In any event, that day when you confronted the two CSs,

4     right --

5          MR. RODY:  May I have one moment to speak to

6     government counsel?

7          (Pause)

8     BY MR. RODY:

9     Q.  In any event, after June 29, when you confronted both CSs

10    about their lies, they were not arrested at that time, right?

11    A.  No.

12    Q.  They were allowed to go home to California, right?

13    A.  Yes.

14    Q.  Why?

15    A.  We didn't have enough evidence to charge them.

16    Q.  They had admitted to you that they were dealing all

17    different kinds of drugs, right?

18    A.  Yes.

19    Q.  That was completely illegal, right?

20    A.  Yes.

21    Q.  Not only is it a violation of their source agreements, it

22    is a violation of federal narcotics laws, right?

23    A.  Yes.

24    Q.  Why didn't you arrest them?

25    A.  We had no proof otherwise.

G98SFLO4                        Gonzalez - cross

1    Q.  Other than just their word?

2    A.  Yes.

3    Q.  And you couldn't trust their word, I understand.

4              THE COURT:  Strike the observation.

5              MR. RODY:  A couple more questions about CW-1.  I

6    apologize for moving back and forth, Judge.  I am trying to

7    pick up the pieces from the earlier testimony.

8    BY MR. RODY:

9    Q.  You said at one point that CW-1 did not orchestrate the

10   first meeting in Honduras with the defendants, is that right?

11   A.  Yes.

12   Q.  But he chose the location, correct?

13   A.  Correct.

14   Q.  He chose the time to meet, correct?

15   A.  Correct.

16   Q.  He chose who he would bring on his side, right?

17   A.  Yes.

18   Q.  And is it your testimony that he had no control over what

19   day it occurred?

20   A.  It would appear so.

21   Q.  Well, he could have told those people he couldn't meet on

22   that day, right?

23   A.  I guess he could have.

24   Q.  So he planned out many aspects of that meeting, correct?

25   A.  Yes.

G98SFLO4                          Gonzalez - cross

1   Q.  But to you, that means still that he did not orchestrate

2   the meeting?

3   A.  Yes.

4   Q.  Now, you said that you were communicating with CW-1 by

5   BlackBerry messenger, correct?

6   A.  Yes.

7   Q.  And you asked him whether he was saving his communications

8   with other targets, right?

9   A.  Yes.

10  Q.  And you asked him to send you those communications, right?

11  A.  Yes.

12  Q.  But he never sent them to you, right?

13  A.  Correct.

14  Q.  So you have no idea what those communications were?

15  A.  Correct.

16  Q.  All you have is what CW-1 told you, right?

17  A.  He sent me some communications, yes.

18  Q.  He did send you some?

19  A.  Yes.

20  Q.  But he never sent you all the checks, right?

21  A.  Correct.

22  Q.  And you asked him to, right?

23  A.  Yes.

24  Q.  You said that when the CSs were in Venezuela for meetings,

25  you said that there were four meetings, I believe, with the

1  defendants, is that right?

2  A.  Yes.

3  Q.  And you said that you have recordings for three of those

4  meetings, right?

5  A.  Yes.

6  Q.  And you said that your understanding was that three of

7  those meetings involved discussions of narcotics.  And I assume

8  by that, did you mean that the fourth meeting did not?

9  A.  Yes.

10  Q.  But you have absolutely no way to know whether that is true

11  or not, right?

12  A.  Correct.

13  Q.  Because you weren't there, right?

14  A.  Yes.

15  Q.  And the CSs didn't record it, right?

16  A.  Correct.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1   Q.  There were a number of questions about the planning for the

2   arrests in Haiti, Agent Gonzalez, and you talked about the

3   objectives of that operation.

4           Do you recall your testimony before on that?

5   A.  Yes.

6   Q.  You recall being asked questions about the objectives of

7   the arrest in Haiti, right?

8   A.  Yes.

9   Q.  Other than the safety of the officers involved, your

10  primary objective was to get the defendants to cooperate,

11  correct?

12  A.  No.  That was not the primary objective.

13  Q.  Your primary objective I guess was to arrest them, right?

14  A.  Yes.

15  Q.  Once you arrested them, your goal was to get them to

16  cooperate, right?

17  A.  I didn't arrest them.

18  Q.  Right.  So Haitian officers arrested them, right?

19  A.  Yes.

20  Q.  But that was all planned out in conjunction with the DEA,

21  correct?

22  A.  Yes.

23  Q.  The Haitians never would have gone into that restaurant and

24  arrested them if the DEA hadn't set up the whole operation,

25  right?

G98nflo5                        Gonzalez – cross

1          MR. BOVE:  Objection.  Calls for speculation.

2          THE COURT:  Sustained.

3   Q.  The DEA alerted the Haitian authorities to the presence of

4   a meeting, correct?

5   A.  Correct.

6   Q.  These types of operations are meticulously planned out,

7   right?

8   A.  Yes.

9   Q.  You had agents flying into Port-au-Prince from all over the

10  country, right?

11         MR. BOVE:  Objection.

12         THE COURT:  Do you want to rephrase it, please.

13  Q.  Agents flew in to Haiti from all over the United States,

14  right?

15  A.  No.

16  Q.  Where did you fly in from?  Virginia?

17  A.  Virginia.

18  Q.  Where did Agent Brooks fly in from?

19  A.  New York.

20  Q.  The CS's flew in from where?

21  A.  California.

22  Q.  So from the East Coast and from California, is that where

23  folks that were participating in this operation flew in from?

24  A.  Yes.

25  Q.  This was planned out days in advance, right?

G98nflo5                          Gonzalez – cross

1   A.  Yes.

2   Q.  You were in contact with the Haitian authorities, correct?

3   A.  I was not, no.

4   Q.  The DEA was, right?

5   A.  Yes.

6   Q.  You had to coordinate with the DEA air wing, correct?

7   A.  Yes.

8   Q.  To make sure there was a plane available, right?

9   A.  Yes.

10  Q.  By the way, you have participated in expulsions from other

11  countries aside from Haiti, correct?

12  A.  Correct.

13  Q.  How many total expulsions have you participated in?

14          Can you estimate?

15  A.  I don't know.

16  Q.  More than a dozen?

17  A.  I don't think so.

18  Q.  About a dozen?

19  A.  I would say less.

20  Q.  Has the DEA ever been denied authority to expel the

21  defendants?

22          MR. BOVE:  Objection.

23          THE COURT:  Sustained.

24  Q.  Well, sir, you mentioned -- at one point you said that

25  Agent Zach and I believe another agent went to the U.S.

G98nflo5                         Gonzalez - cross

1   embassy, and you said to draft a letter to the Haitian

2   authorities to get the Haitian authorities to turn the

3   defendants over, right?

4   A.  Yes, I believe I said that.

5   Q.  You said to draft a letter, right?

6   A.  Yes.

7   Q.  You guys didn't already have the letter drafted?

8   A.  No.

9   Q.  They went to a typewriter in the U.S. embassy and typed out

10  a letter?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13  Q.  The question, Agent, wasn't this already prepared?  Didn't

14  the DEA come prepared to make a request to expel the

15  defendants?

16          MR. BOVE:  Objection.  Asked and answered.

17          MR. RODY:  That has not been asked and answered,

18  Judge.

19          THE COURT:  Overruled.

20  A.  Can you repeat the question, please.

21  Q.  Sure.  Didn't the DEA come to Haiti prepared already to ask

22  Haitian authorities to expel the defendants?

23  A.  Yes, we were going to ask them.

24  Q.  And you didn't have the letter already drafted?

25          MR. BOVE:  Objection.  Asked and answered.

1          THE COURT:  Sustained.

2          MR. RODY:  He has not answered it.

3          THE COURT:  Overruled.

4   A.  To my knowledge, the letter was not drafted.

5   Q.  Was it a real surprise when the Haitians agreed to expel

6   the defendants?

7   A.  Yes, kind of.

8   Q.  Really?

9   A.  Yes.

10  Q.  You thought there was a chance that the Haitians were going

11  say, no, we are going to expel them?

12  A.  It all depended on if the Venezuelan government was

13  notified after the arrests.

14  Q.  I'm sorry.  I didn't hear your answer.

15  A.  It depended if the Venezuelan government was notified after

16  the arrests.

17  Q.  How so?

18  A.  In prior instances the Venezuelan government has interfered

19  in attempted expulsions or extraditions of Venezuelan nationals

20  from other countries outside of Venezuela to the United States.

21  Q.  So you didn't know whether they were going to get expelled?

22  That is your testimony?

23  A.  Yes.

24  Q.  Who was it that chose November 10 as the day for the

25  arrests?

G98nflo5                          Gonzalez - cross

1    A.  I don't know.

2    Q.  Was it you?

3    A.  I don't remember.

4    Q.  The DEA chose that day, correct?

5    A.  I believe so.

6              MR. RODY:  One moment, your Honor.

7              Your Honor, there is a stipulation by the parties that

8    November 10 was a Tuesday.

9              THE COURT:  All right.

10   Q.  Agent, you could have come the day before, on November 9, a

11   Monday, right?

12   A.  I don't know if we could have or couldn't have.

13   Q.  How do you not remember whether you made the decision to

14   make it on November 10?

15             THE COURT:  Sustained.

16   Q.  Now, the Haitian troops who arrested, or Haitian police

17   officers who arrested the defendants you agree were wearing

18   military-style garb?

19   A.  Yes.

20   Q.  Camouflage, right?

21   A.  Yes.

22   Q.  M4s, correct?

23   A.  I believe so.

24   Q.  Helmets?

25   A.  Yes.

G98nflo5                          Gonzalez - cross

1   Q.  Sidearms, vests, etc.?

2   A.  Yes.

3   Q.  You know from your experience that, as you testified in

4   this case, defendants are frightened when they are arrested in

5   that manner, correct?

6   A.  Yes.

7   Q.  It is a terrifying experience for them, correct?

8   A.  I imagine.

9   Q.  That is helpful to the agents, because it encourages people

10  to cooperate, doesn't it?

11  A.  Not necessarily.

12  Q.  So some experienced narcotics traffickers, they won't talk

13  no matter what, right?

14  A.  Some people talk, some people don't.  I don't think it has

15  on bearing on their level of experience.

16  Q.  But the intimidating manner of the arrest -- withdrawn.  I

17  will rephrase it.

18          The manner of the arrest by armed police officers in

19  military garb encourages cooperation in your experience, isn't

20  that right?

21          MR. BOVE:  Objection.  Calls for speculation.

22          THE COURT:  Sustained.

23  Q.  You have been in foreign countries and there have been

24  arrests by local authorities that were dressed in similar

25  fashion, right?

G98nflo5                           Gonzalez - cross

1   A.  I don't know if I've participated in arrests in other

2   foreign countries.

3   Q.  You have not been ops where there have been arrests in

4   other foreign countries?

5   A.  No, we don't participate in arrests.

6   Q.  But you are present, you are there on the ground, right?

7   A.  Some agents are.

8   Q.  But you said that you have participated operations where

9   there have been expulsions, right?

10  A.  Yes.

11  Q.  Have you been in the countries when those expulsions

12  occurred?

13  A.  Yes.

14  Q.  So you are on the ground in the vicinity of the arrest,

15  correct?

16  A.  Well, an expulsion isn't necessarily conducted always at

17  the same time as an arrest.

18  Q.  Understood.  But the question is, you have been on the

19  ground when there have been arrests, correct?

20  A.  I can't recall if I have been present for other arrests in

21  foreign countries.

22          MR. RODY:  One moment, your Honor.

23  Q.  You did participate in a briefing with the Haitian

24  authorities before the operation that morning, correct?

25  A.  Yes.

G98nflo5                         Gonzalez - cross

1   Q.  And you saw the way they were dressed, right?

2   A.  Yes.

3   Q.  I mean, they were in uniform at the meeting, correct?

4   A.  I don't know if they were in uniform at the meeting.  I

5   don't recall exactly.

6   Q.  When they made the arrests, sir, it did not say police on

7   the front of their uniforms, correct?

8   A.  I can't say that.

9   Q.  You saw them before the arrest, didn't you?

10  A.  Yes.

11  Q.  You don't recall whether it said police on the front of

12  their uniforms?

13          MR. BOVE:  Objection.

14          Asked and answered.

15          THE COURT:  Sustained.

16  Q.  The photograph that we saw --

17          MR. RODY:  Can we get Government Exhibit 19, please.

18          Sorry.  Yes.

19  Q.  Take a look at this.  Did you take this photograph, Agent?

20  A.  No, sir, I did not.

21  Q.  Do you know where this photograph was taken?

22  A.  No, sir, I do not.

23  Q.  Do you know if it was taken the day of the arrests?

24  A.  I do not know.

25          MR. RODY:  Can we have Government Exhibit 5.  Wrong

1    one.  6.  Thank you.

2    Q.  So you took this photograph?

3    A.  Yes, I believe so.

4    Q.  Before this photograph was taken, did these officers tear

5    the patch off the back of their uniform and put it on the

6    front?

7    A.  No, I don't recall them doing that.

8            MR. RODY:  You can take that down.  Thanks.

9    Q.  After the defendants were arrested, you said they were

10   first taken to a BLTS office, is that right?

11   A.  Yes.

12   Q.  But then, once the authority came through to expel them,

13   they were taken to a different BLTS office you said for

14   processing, is that right?

15   A.  I don't know if it was another BLTS office or another

16   police office or a government office.  I don't know exactly

17   what it was.

18   Q.  But suffice it to say they could not be processed at the

19   first location, is that right?

20   A.  I don't know if they were processed there or not.

21   Q.  I thought you said you went inside the first location?

22   A.  Yes.  It was like a gated compound.

23   Q.  Right.  But it wasn't like a traditional police office like

24   you would see in the United States where they would have

25   equipment for fingerprints and stuff like that, was it?

G98nflo5                          Gonzalez - cross

1    A.  I didn't go inside to the areas where they had taken the

2    defendants, so I don't know exactly what they had back there.

3    Q.  You don't know if that was just a safe house for the BLTS?

4    A.  Yeah, I don't know.

5    Q.  You testified previously that the Haitian officer told

6    either you or Agent Zach, that Mr. Campo Flores wanted to make

7    a phone call home, is that right?

8    A.  Yes.

9    Q.  Did he say that to you or to Agent Zach?

10   A.  I don't know who else was there.

11   Q.  But you heard it being said?

12   A.  Yes.

13   Q.  Was it the DEA that denied the request to make that phone

14   call?

15   A.  No.

16   Q.  The Haitians denied it?

17   A.  Yes.

18   Q.  By the way, did you participate in searching the plane that

19   the defendants had come in on, or is that other agents that did

20   that?

21   A.  Searching the plane?

22   Q.  Correct.

23   A.  I did not.

24   Q.  OK.  Now, at the time that you took off with the

25   defendants, by that time they had been under arrest for about

1  five or six hours, is that correct?

2  A.  I don't know exactly how long.

3  Q.  But they were arrested, according to the DEA, about an hour

4  before noon, is that right?

5        MR. BOVE:  Objection to the characterization of the

6  arrest time.

7        THE COURT:  Overruled.

8        MR. BOVE:  Your Honor, we think this presents a legal

9  question as to the term arrest.

10        THE COURT:  Read the question back, please, Sam.

11        MR. RODY:  I can rephrase, your Honor.

12        THE COURT:  OK.  Go ahead.

13  Q.  The Haitians took the defendants into custody before noon,

14  correct?

15  A.  I believe so.  I don't remember the exact time.

16  Q.  It was somewhere around 11 o'clock.  Is that what you

17  recall?

18  A.  I would have to see the report where it was documented.

19  Q.  You took off at 4:30, right?

20  A.  It was around 4 o'clock, 4:30, yes.

21  Q.  That is a small plane that you are in there, right?  It's

22  cramped quarters on the plane, correct?

23        MR. BOVE:  Compound, Judge.

24        THE COURT:  You want to ask him if it's cramped

25  quarters on the plane?

G98nflo5                              Gonzalez - cross

1       MR. RODY:  That would be a good question.

2       THE COURT:  Cramped quarters on a Leer jet?

3   A.  I was comfortable.

4   Q.  You were comfortable.  You weren't in handcuffs, right?

5   A.  No, I was not.

6   Q.  Do you have any idea whether prior to the plane taking off

7   the defendants had been given any food or water the whole day?

8   A.  I believe they ate at the restaurant in the morning with --

9   Q.  What do you base that belief on?

10  A.  When we went in there to collect the evidence I saw the

11  table where they were, and it looked like there had been food

12  on there.

13  Q.  You are the person who read the Miranda warnings or

14  provided the Miranda warnings to both defendants, is that

15  right?

16  A.  Yes.

17  Q.  When you did that, did you advise either defendant that

18  they had the right to speak to the Venezuelan consul before

19  making any statements to you?

20  A.  No, I did not.

21  Q.  You understand that that is required under the Vienna

22  Convention, correct?

23  A.  No.

24  Q.  You are not aware of that?

25  A.  No, I'm not.

G98nflo5                          Gonzalez - cross

1    Q.  I want to go back to the point about cooperation.  You were

2    saying that that was one of your objectives, right?

3              MR. BOVE:  Objection.

4              Mischaracterizes the testimony.

5              THE COURT:  Sustained.

6    Q.  You were hoping they were going to cooperate, right?

7    A.  Yes.

8    Q.  You talked about that with CS-1 in chats the night before,

9    right?

10   A.  I don't recall that.

11   Q.  Do you recall CS-1 telling you that you needed to get rest

12   so that the next day the defendants could throw up or spit up

13   what they had left in the last Hollywood?

14   A.  Yes, I remember him saying that.

15   Q.  You laughed on the chat when he said that, right?

16   A.  It's possible.

17   Q.  Do you recall sending an e-mail to your team the day before

18   the arrests talking about what you planned to do with respect

19   to the Haitians to buy some time if and when our two guys

20   decide to cooperate?

21   A.  With respect to the Haitians?

22   Q.  Yeah.

23   A.  No, I don't --

24   Q.  You were going to ask the Haitians to hold them for as long

25   as possible.

1    A.  I don't recall saying hold them for as long as possible.

2    Q.  All right.  Do you recall telling everyone that you were

3    going to ask the Haitians to detain the pilots and the folks

4    who came along in the plane for as long as possible if and when

5    the defendants decided to cooperate?

6    A.  Yes, I remember that.

7    Q.  So this was something you were talking about with your

8    fellow DEA agents the day before the arrest, right?

9    A.  I don't know the date of that e-mail.

10            MR. RODY:  May I approach, your Honor.

11   Q.  3508-5.  See if that refreshes your recollection about the

12   date that you were discussing whether the defendants would

13   cooperate.

14   A.  Yes, it does.

15   Q.  And the date was November 9, right?

16   A.  Yes, it was.

17   Q.  So that was a goal coming into the arrests, right?

18   A.  Yes.

19            MR. RODY:  One moment, your Honor.

20   Q.  By the way, Agent, did you testify in the grand jury in

21   this matter?

22   A.  No, I did not.

23            MR. RODY:  Your Honor, I am going cut some things out.

24            THE COURT:  I hope so.  The agent was on the stand on

25   direct for an hour.  We are now approaching two and a

G98nflo5                          Gonzalez - cross

1   three-quarter hours on cross-examination.

2              MR. RODY:  I'll wrap it up.

3              THE COURT:  It's disproportionate.  You better finish

4   it up.

5   Q.  Agent, you know that CS-3 met with the defendants in

6   Honduras on November -- well, withdrawn.  CS-3 met with another

7   defendant in Honduras on November 5, correct?

8              MR. BOVE:  Objection to the characterization of

9   defendant.

10             THE COURT:  Do you want to rephrase the question,

11  please.

12             MR. RODY:  Sure.

13  Q.  CS-3 met with a target on November 5 in Honduras, correct?

14  A.  Yes.

15  Q.  That person is now a defendant in a case, right?

16  A.  Yes.

17  Q.  The next day, November 6, CS-3 met with Mr. Flores De

18  Freitas, correct?

19  A.  Correct.

20  Q.  And CS-3 produced recordings of the first meeting on the

21  5th and also the meeting on the 6th, correct?

22  A.  Correct.

23  Q.  The meeting on the 6th CW-1 was there, correct?

24  A.  I don't recall if he was there.

25  Q.  Do you recall that there was a breakfast meeting the next

G98nflo5                        Gonzalez - redirect

1    morning, on November 7?

2    A.  No, I don't recall.

3    Q.  Do you recall CW-1 saying during the meeting on the 6th

4    that there would be a breakfast meeting the next day?

5    A.  I recall something about a breakfast meeting.

6    Q.  But you received no recordings of a breakfast meeting on

7    the 7th, correct?

8    A.  I didn't receive any of the recordings from CS-3.

9    Q.  The DEA did not receive a recording of any meeting on the

10   7th, correct?

11   A.  I do not know.

12           MR. RODY:  No further questions, your Honor.

13           Thank you?

14           THE COURT:  Mr. Bove, do you have any redirect?

15           MR. BOVE:  Yes, your Honor.  Thank you.

16   REDIRECT EXAMINATION

17   BY MR. BOVE:

18   Q.  Special Agent Gonzalez, you were asked some questions about

19   policies and procedures in the DEA's Caracas office.  Do you

20   recall those questions?

21   A.  Yes.

22   Q.  How, if at all, did those policies change from the time you

23   started working in Caracas, between that time and the time you

24   initiated this investigation?

25   A.  They have changed quite a bit.

G98nflo5                          Gonzalez - redirect

1    Q.  How so?

2    A.  Well, the abilities of our personnel in Caracas have been

3    reduced dramatically, like what they are allowed to do, who

4    they are allowed to talk to.

5    Q.  What do you mean by that?

6    A.  Well, they are no longer allowed to deal with confidential

7    sources in Caracas.

8    Q.  Why?

9    A.  It's too dangerous of an environment for both of them to do

10   so.

11   Q.  What makes the environment dangerous?

12   A.  The targeting by the Venezuelan government of DEA personnel

13   in the country.

14   Q.  You were also asked some questions about the reliability of

15   information provided to you by CW-1 in October of 2015.

16            Do you recall those questions?

17   A.  Yes.

18   Q.  In that same time frame, did you receive other information

19   from other sources that led you to make a judgment about the

20   reliability of the information from CW-1?

21   A.  Yes.

22   Q.  What was some of the information that informed that call

23   about the reliability of CW-1?

24   A.  There were other DEA investigations being carried out at

25   that time that reflected that the defendants, or they were

G98nflo5                     Gonzalez - redirect

1   described as the nephews of the president of Venezuela were

2   actively involved in drug trafficking.

3   Q.  Mr. Jackson asked you some questions about whether you

4   believed that CW-1 "outpaced" the other targets of the

5   investigation.  Do you recall that question?

6   A.  Yes.

7   Q.  Was there any evidence developed during your investigation

8   that led you to believe that the defendants here were at the

9   same level of drug trafficker as CW-1?

10  A.  Yes.

11  Q.  What were some of those things?

12  A.  First off, they indicated that they would be able to obtain

13  an aircraft.  They also indicated that they had the ability to

14  procure initially 1600 kilograms of cocaine and later 800

15  kilograms of cocaine.  They asked CW-1 if they could purchase

16  weapons from him as well.

17  Q.  What about access to aircraft?

18  A.  Yes.  All the trips that they made to Honduras and to Haiti

19  were on private aircraft.

20  Q.  What about access to airports in Venezuela?

21  A.  They indicated that they basically had the run of the main

22  airport in Caracas and could easily dispatch a drug-laden

23  aircraft out of the presidential ramp.

24  Q.  You were asked a number of questions about assistance and

25  information provided by CS-1 and CS-2.

1             Do you remember those questions?

2   A.   Yes.

3   Q.   During the course of the relationship between SOD and those

4   two confidential sources, were the sources also working for

5   other groups and components of the DEA?

6   A.   Yes, they were.

7   Q.   And where were some of those groups based?

8   A.   Riverside, Los Angeles, Richmond, Las Vegas.

9   Q.   You were asked some questions about chats with CW-1 and

10  with CS-1 regarding the availability of CW-1.

11            Do you recall those questions?

12  A.   Yes.

13  Q.   What, if anything, did CW-1 communicate to you about why he

14  was unavailable at times during October of 2015?

15  A.   He had physical ailments that he was dealing with, and, in

16  addition, his mother was ill and in the hospital, and he was

17  trying to help her as best he could.

18  Q.   Lastly, you were asked some questions about access to

19  prostitutes by CS-1 and CS-2 in Venezuela.

20  A.   Yes.

21  Q.   What is your understanding of who paid for those

22  prostitutes in Venezuela?

23  A.   I believe CS-1 and CS-2 subsequently said that it was the

24  defendants that paid for the prostitutes.

25            MR. BOVE:  Nothing further.

G98nflo5                          Habayeb – direct

1                THE COURT:  You are excused.  Thank you.

2                THE WITNESS:  Thank you, sir.

3                (Witness excused)

4                THE COURT:  We will take a short recess.  You have

5       another witness?

6                MR. QUIGLEY:  Yes, we do, your Honor.

7                Special Agent Habayeb.

8                (Recess)

9                MR. QUIGLEY:  The government calls Special Agent Leith

10      Habayeb.

11       LEITH HABAYEB,

12           called as a witness by the Government,

13           having been duly sworn, testified as follows:

14      DIRECT EXAMINATION

15      BY MR. QUIGLEY:

16      Q.  Good afternoon, sir.  Where do you work?

17      A.  I work for the special operations division of the Drug

18      Enforcement Administration.

19      Q.  What is your title.

20      A.  Special agent.

21      Q.  How long have you been assigned to the DEA special

22      operations division?

23      A.  For two years.

24      Q.  How long have you been a DEA special agent?

25      A.  For 11 years.

G98nflo5                          Habayeb – direct

1    Q.   What did you do before you became a DEA agent?

2    A.   I was in the Marine Corps for five years.

3    Q.   What training have you received as a DEA agent?

4    A.   As a DEA agent I have been trained as a criminal

5    investigator and an emergency medical technician.

6    Q.   Do you speak any language other than English?

7    A.   I do not.

8    Q.   I want to focus your attention to November 9, 2015.  What

9    were you doing that day?

10   A.   That day I was traveling to Haiti.  I was traveling to

11   Haiti to conduct an operation.  DEA had arrest warrants for the

12   defendants, and the Haitian police had agreed to conduct an

13   arrest of the defendants and turn over custody of the

14   defendants to DEA.

15   Q.   What, if any, involvement had you had in the investigation

16   prior to November 9?

17   A.   I had no involvement.

18   Q.   At any point have you been or were you involved in any

19   discussions with the Haitian government about the operation?

20   A.   No.

21   Q.   What equipment did you bring with you to Haiti?

22   A.   I brought a EMT bag which consisted of basic medical

23   equipment.

24   Q.   Why did you do that?

25   A.   As part of my collateral duty for this operation.

G98nflo5                      Habayeb - direct

1   Q.  Did you bring your gun?

2   A.  No, I did not.

3   Q.  Why not?

4   A.  I wasn't allowed to have a gun in Haiti.

5   Q.  Why is that?

6   A.  I was not allowed to conduct enforcement in operations in

7   Haiti.

8   Q.  So is arresting someone a type of enforcement operation?

9   A.  Yes, it is.

10  Q.  What was your understanding of who would actually be

11  conducting any arrest in Haiti?

12  A.  My understanding is that the Haitian police would be

13  conducting the arrest in Haiti.

14  Q.  Focusing on the next day, the morning of November 10, how

15  did that morning begin for you with respect to this operation?

16  A.  The morning started with a meeting between the DEA agents

17  who had flown into Haiti and the DEA agents who were in the

18  Haiti DEA office at the embassy.

19  Q.  Who were the other agents in addition to yourself who had

20  flown into Haiti?

21  A.  It was Agent Sandalio Gonzalez.  It was Agent Robert

22  Zach -- Rob Zach and Agent Mo Brooks.

23  Q.  Did there come a time when you left the U.S. embassy?

24  A.  Yes, there was.

25  Q.  Where did you go after that?

G98nflo5                          Habayeb - direct

1   A.  After that we went to meet with local counterparts at their

2   office which was the Haitian police.

3   Q.  Were you personally involved in any of those meetings or

4   briefings?

5   A.  No, I was not.

6   Q.  Where did you go once you left the local counterparts'

7   office?

8   A.  After that meeting we went to the location where the

9   meeting was being conducted between an informant and the

10  defendants.

11  Q.  What, if anything, were you doing to keep a record of what

12  was going on?

13  A.  I was keeping written notes of the time of the events as

14  they were happening.

15  Q.  Is there a binder in front of you there?

16  A.  There is.

17  Q.  Could you take a look at Government Exhibit 18.

18          Do you recognize that?

19  A.  Yes, I do.

20  Q.  What is that?

21  A.  Those are the notes that I took on that day.

22  Q.  Did you keep those contemporaneously with the events as

23  they were occurring?

24  A.  Yes, I did.

25          MR. QUIGLEY:  Your Honor, the government offers

G98nflo5                         Habayeb - direct

1   Government Exhibit 18.

2              MR. JACKSON:  No objection.

3              THE COURT:  18 is in evidence.

4              (Government's Exhibit 18 received in evidence)

5              MR. QUIGLEY:  Can we publish Exhibit 18.

6   Q.  Special Agent, I want to focus on just the first two

7   entries there, where there is a time written and an S next to

8   that.

9              What is the S, the note?

10  A.  The S is written there to state that that time, or that

11  note was given to me by Special Agent Sandalio Gonzalez.  The S

12  is his first name.

13  Q.  How was that being communicated to you?

14  A.  It was communicated to me over the radio.  He was in a

15  separate vehicle than I was.

16  Q.  Focusing your attention to the entries or 11/12 and 11/16,

17  what happened at that time?

18  A.  At that time, the informant had given the arrest signal

19  to -- at the meeting with the defendants, and then the BLTS

20  went into the meeting and arrested the defendants.

21  Q.  Were you involved in, did you see the defendants actually

22  being taken into custody?

23  A.  No, I did not.

24  Q.  That happened at 11:16, based on your notes?

25  A.  Yes, it did.

1    Q.  Where did you go after you learned that the defendants had

2    been taken into custody?

3    A.  After the defendants were taken into custody, I went into

4    the hotel and the restaurant area of the hotel that they had

5    been removed from.

6    Q.  What did you do there?

7    A.  I just went into the area and looked around at the area,

8    made sure it was clear of any other people.

9    Q.  Where did you go after that?

10   A.  After that we went to the BLTS compound.

11            MR. QUIGLEY:  Mr. Calabrese, can we put up on the

12   screen what is in evidence as Government Exhibit 19.

13   Q.  Do you recognize that photo, Agent?

14   A.  Yes, I do.

15   Q.  What is that?

16   A.  That is a photo of the arresting officers at the BLTS

17   compound after the arrest was conducted.

18   Q.  So when was that picture taken?

19   A.  After the arrest at the hotel.

20   Q.  On November 10, 2015?

21   A.  Correct.

22   Q.  Who took that picture?

23   A.  I did.

24   Q.  Are these uniforms the same uniforms you saw the officers

25   wearing in the vicinity of the hotel?

G98nflo5                         Habayeb - direct

1   A.  Yes, I did.  Yes, they are.

2   Q.  What did you do during the time you spent at the BLTS

3   compound?

4   A.  I continued taking notes, and I was receiving information

5   from the phones of the passengers that were on the airplane

6   other than the defendants.

7        MR. QUIGLEY:  Mr. Calabrese, if you could shift back

8   to Government Exhibit 18 and go to page 2.

9   Q.  Focusing on the top of page 2, what happened at around 1:45

10  p.m., Agent?

11  A.  Paperwork was signed to transport the defendants from

12  Haiti.

13  Q.  How do you know that paperwork was signed?

14  A.  I was given that information by other agents.

15  Q.  Were you involved in getting it signed?

16  A.  No, I was not.

17        MR. QUIGLEY:  Mr. Calabrese, if we could go to page 5

18  of these notes.

19  Q.  Directing your attention to the top entry, what happened at

20  around 3:30 p.m.?

21  A.  The defendants were transported to the police headquarters

22  for processing after leaving the BLTS compound.

23  Q.  That was the second police location that they were taken

24  to?

25  A.  Correct.

G98nflo5                          Habayeb - direct

1   Q.  Was that a Haitian police location?

2   A.  Yes, it was.

3   Q.  Did you go there also?

4   A.  Yes, I did.

5   Q.  Can you take a look at the exhibit binder, at Exhibit 20,

6   Government Exhibit 20.

7        Tell me if you recognize that.

8   A.  Yes, I do.

9   Q.  What is that?

10  A.  That is a picture of a BLTS officer on the back of a police

11  pickup truck at the police headquarters before going to the

12  airport.

13  Q.  It was the second location you went to after you got off

14  the BLTS compound?

15  A.  Yes.

16  Q.  Who took that photo?

17  A.  I did.

18  Q.  Does that fairly and accurate depict what you saw November

19  10, 2015?

20  A.  Yes, it does.

21        MR. QUIGLEY:  Government your Honor the government

22  offers Government Exhibit 20 into evidence.

23        MR. JACKSON:  No objection.

24        THE COURT:  20 is in evidence.

25        MR. QUIGLEY:  Can we publish Government Exhibit 20.

1          (Government's Exhibit 20 received in evidence)

2     Q.  Agent, looking at the back of the pickup truck in

3     Government Exhibit 20, what does it say just below the white

4     bar there?

5     A.  It says the word police.

6     Q.  About how long did you spend at the second police facility?

7     A.  I believe it was 30 minutes, but I could refer to my notes

8     to be more accurate.

9          MR. QUIGLEY:  Mr. Calabrese, could we take that down

10    and put back up 18 and go to page 5.

11    Q.  What does the entry for 4 p.m. say?

12    A.  4 p.m. says we departed the police headquarters and went to

13    the airport which was right next to the police headquarters.

14    Q.  What happened once you got to the airport?

15    A.  Can you repeat the question.

16    Q.  What happened once you got to the airport?

17    A.  At the airport, the defendants were transferred from the

18    Haitian police custody to the custody of DEA agents and they

19    boarded a DEA air wing airplane.

20    Q.  Did you get on the plane with them?

21    A.  Yes, I did.

22    Q.  Between the time the defendants were taken into custody by

23    the Haitians and 4 p.m., did you have any interaction with

24    them?

25    A.  No, I did not.

G98nflo5                              Habayeb - direct

1    Q.  To your knowledge, did you see or hear any other DEA agents

2    interacting with them?

3    A.  No, I did not.

4    Q.  At any point were you aware or did you hear that the

5    defendants had any experiences with kidnappings?

6    A.  No, I did not.

7    Q.  Did either defendant at any time you were with them that

8    day state anything about their experience with kidnappings?

9    A.  Not to my knowledge.

10   Q.  How would you describe the defendants' appearance when they

11   came into DEA custody a little after 4 p.m.?

12   A.  They were walking, walking toward the airplane.  They were

13   wearing the clothes that they had been wearing during the time

14   of their arrest, and they seemed healthy.

15   Q.  Did they appear to be in any physical distress?

16   A.  No.

17   Q.  What happened at around 4:30?

18   A.  At around 4:30, the DEA airplane left Haiti.

19   Q.  And what did you note that happened about that same time or

20   about 4:31?

21   A.  4:31 both of the defendants were given bottles of Walter.

22   Q.  What happened about 20 minutes after that?

23   A.  They were given hard candy that was on the airplane.

24   Q.  What did you observe at about 5:40 p.m.?

25   A.  At 5:40 they were drinking water from the water bottles and

1   then they continued drinking water until the flight was over.

2              MR. QUIGLEY:  Can we publish what is in evidence as

3   Government Exhibit 7.

4   Q.  Agent, what is this a photograph of?

5   A.  That is a photograph of the inside of the airplane.

6   Q.  Do you remember where you were sitting on this plane on

7   November 10, 2015?

8   A.  No, I don't.

9   Q.  Were you involved in any debriefing of the defendants?

10  A.  No, I was not.

11  Q.  Do you speak any Spanish?

12  A.  No, I don't.

13  Q.  Have you had any involvement in the case before you went to

14  Haiti?

15  A.  No, I didn't.

16  Q.  Go back to 18 real quick, the last page.

17             What happened at about 8:10 p.m.

18  A.  8:10 p.m., the airplane landed in White Plains, New York.

19  Q.  Was there any time change between New York and Haiti?

20  A.  There was not.

21  Q.  What, if any, contact did you have with the defendants

22  after they got to White Plains?

23  A.  I had no contact with them.

24  Q.  At any point while you were on the plane from Haiti to

25  White Plains, did you hear anyone yelling at the defendants?

G98nflo5                        Habayeb - direct

1    A.  No, I did not.

2    Q.  Did you see anyone physically threaten the defendants?

3    A.  No, I did not.

4    Q.  Did you see any of the defendants trembling or shaking?

5    A.  No, I did not.

6    Q.  Did you see either defendant crying?

7    A.  I did not.

8    Q.  I am going to shift topics for a second.  In your work as a

9    DEA special agent, have you become familiar with particular

10   types of recording devices which I will refer to as device 1

11   and device 2?

12   A.  Yes.

13   Q.  Have you been involved in investigations where these

14   devices have been used to make recordings?

15   A.  Yes, I have.

16   Q.  And device 1 is an audio video recorder?

17   A.  Yes, it is.

18   Q.  And device 2 is an audio-only recorder?

19   A.  Correct.

20   Q.  As to device 1, can the operator of the device start and

21   stop recording?

22   A.  Yes, they can.

23   Q.  What happens when the operator initiates or reinitiates a

24   recording?

25   A.  When an operator initiates a recording, the recording will

G98nflo5                        Habayeb - direct

1    start a new file.  Then once the recording is stopped, that

2    file is stopped, and once the device is started again a new

3    file will be created.

4    Q.  What's your understanding of how recordings are saved on to

5    device 1?

6    A.  Device 1, since it is an audio and video recorder, uses up

7    a lot of memory.  So what the device will do is, after a

8    certain time frame, it will segment a part of the recording

9    into one file and then continue on to another file.  Those

10   segments are created so that it is easier for the device to be

11   downloaded and the files to be downloaded off the device to a

12   computer rather than having one very large recording.

13   Q.  When you say after a certain time frame, you mean a certain

14   length of a recording?

15   A.  Certain length of recording or a memory used up of the

16   recording.

17   Q.  How does someone retrieve files from device 1?

18   A.  Files are retrieved from device 1 by plugging the device

19   into a computer using a USB cable.  The files have to be found

20   through a certain sequence of processes to get into the device,

21   and then those files can be downloaded onto the computer.  Once

22   they're downloaded onto a computer, they have to be decrypted

23   before they can be opened.

24   Q.  Is that, to your knowledge, the only way to open or alter a

25   recording on device 1?

G98nflo5                        Habayeb – direct

1    A.   That is correct.

2    Q.   Are confidential sources trained on those procedures about

3    how to retrieve files from device 1?

4    A.   No, they are not.  They are told how to turn on and off the

5    device, but not how to recover the filings on the device.

6    Q.   Let's shift to device 2, the audio-only recorder.

7         As to device 2, how does the operator -- sorry -- can

8    the operator start and stop recording?

9    A.   Yes.

10   Q.   Can the operator manipulate or control the device in any

11   other way other than turning it on and off?

12   A.   No, they can't.

13   Q.   What happens when the operator initiates or reinitiates the

14   recording?

15   A.   Once a the device is turned on, a file is started on the

16   device; and once it's turned off that file is saved as one

17   separate file in the memory.  Then if the device is turned back

18   on a new file is created.

19   Q.   Can you generally describe how files or recordings or

20   downloaded from device 2?

21   A.   Yes.  The device needs a proprietary hardware and software

22   hooked up to a computer.  The device is then attached to that

23   hardware, and the software is used to recover the files from

24   the device to the computer.

25        MR. QUIGLEY:  One moment, your Honor.

G98nflo5                          Habayeb - cross

1          THE COURT:  Yes.

2          MR. QUIGLEY:  No further questions.

3          THE COURT:  OK.

4          MR. JACKSON:  May I inquire, your Honor?

5          THE COURT:  Yes, you may, Mr. Jackson.

6   CROSS EXAMINATION

7   BY MR. JACKSON:

8   Q.  Good afternoon, Special Agent.

9   A.  Good afternoon.

10  Q.  Now, sir, I think you testified that you at some point

11  worked as an EMT for the DEA?

12  A.  Correct.

13  Q.  Can you just explain what an EMT's roles are for the DEA?

14  A.  EMT's role for the DEA can vary, but for the purposes of

15  this operation I was there to provide any life-threatening care

16  to a person if they were injured during a flight or became

17  sick.

18  Q.  One of the reasons that an EMT is deployed in situations

19  like this is that sometimes people who are arrested can

20  experience very dramatic responses to being arrested, right?

21          MR. QUIGLEY:  Objection.

22          THE COURT:  Overruled.

23  A.  I'm sorry.

24  Q.  One of the reasons that the DEA deploys an EMT in this

25  situation is because you are aware that sometimes people have

G98nflo5                          Habayeb – cross

very traumatic reactions to the experience of being arrested?

A.  That is not my role there for somebody who have a traumatic

incident.  It has to be a life-threatening incident.

Q.  Right.

So if someone, for example, had a heart attack, if the

defendant had a heart attack when they were arrested, it would

be the role of the EMT to try reduce any harm that was

associated with that, right?

A.  Correct.

Q.  During the course of your time working as an EMT, have you

ever had to deal with anyone having a serious reaction to the

experience of being arrested?

A.  No, I haven't.

Q.  Have you been trained on how to respond if such a thing

happens?

A.  If somebody had a -- could you explain further, please.

Q.  Sure.  If someone had a panic attack or a heart attack,

have you been trained on how to respond if something like that

happened?

A.  If somebody had a heart attack, yes, I do.

(Continued on next page)

G98SFLO6                         Habayeb - cross

1    BY MR. JACKSON:

2    Q.  And because you were the EMT, one of your responsibilities,

3    right, was watching the defendants and making sure, as best as

4    you could, that they were OK?

5    A.  Correct.

6    Q.  And in your observation, one of the things that you said is

7    that you didn't see that they were crying?

8    A.  That's correct.

9    Q.  You did see, though, that at the time that they were going

10   onto the airplane, they were very upset?

11   A.  I don't remember that.

12   Q.  Can you describe what their demeanor was at the time that

13   they were going onto the airplane?

14   A.  They seemed calm and quiet.

15   Q.  Both defendants seemed calm?

16           THE COURT:  That's what he said.

17           MR. JACKSON:  Thank you, your Honor.

18   Q.  Had you observed them at any point prior to that?

19   A.  I had not.

20   Q.  So throughout the flight, your observation was that they

21   appeared calm?

22   A.  I don't remember if they had any demeanor change during the

23   flight.

24   Q.  So there were points during the flight when you weren't

25   paying close attention to them?

G98SFLO6                        Habayeb - cross

1           MR. BOVE:  Objection.

2           THE COURT:  Sustained.

3    Q.  Were you paying close attention to them throughout the

4    entire flight?

5    A.  How close is close?  Because I wasn't on top of them the

6    entire flight.  I was observing their behavior, and they did

7    not seem to be in any type of distress.

8    Q.  All I am asking is, from your own opinion, you were doing

9    other things during the course of the flight, right?

10   A.  Yes.

11   Q.  You weren't just watching the defendants closely throughout

12   the entire flight?

13   A.  Correct.

14   Q.  And you were doing some of your own work in relationship to

15   the investigation, right?

16   A.  No, I was not doing any of my own work in relation to the

17   investigation.

18   Q.  Now, you also mentioned the fact that you did not speak

19   Spanish, right?

20   A.  Correct.

21   Q.  The only language that you speak is English?

22   A.  That's correct.

23   Q.  Prior to being selected as part of the team that would

24   participate in the expulsion, was there any discussion of the

25   fact that you did not speak Spanish?

G98SFLO6                     Habayeb - cross

1   A.  No.

2   Q.  Was there any discussion of the possibility that an

3   additional Spanish-speaking agent should be included?

4   A.  Not to my knowledge.

5   Q.  You weren't involved in any such discussions?

6   A.  No.

7   Q.  But as far as you know, the only person who spoke fluent

8   Spanish on that aircraft was Special Agent Gonzalez, correct?

9   A.  I don't know if he was the only person who spoke Spanish on

10  that plane.

11  Q.  You're aware that he speaks fluent Spanish, right?

12  A.  Yes, I am.

13  Q.  Are you aware of anyone else on the plane who spoke fluent

14  Spanish?

15          MR. QUIGLEY:  Objection, asked and answered.

16          THE COURT:  Sustained.

17          MR. JACKSON:  OK.

18  Q.  Now, we took a look at a photo that you took of several

19  BLTS officers.  Do you remember that?

20  A.  Yes, I do.

21          MR. JACKSON:  Your Honor, may I inquire of the

22  government to remind me what the GX number is of that photo.

23          19?  Thank you.

24          Could we look at GX 19 in evidence.  Is it all right,

25  may I ask if we could zoom in on just the officers in this?

G98SFLO6                      Habayeb – cross

1   BY MR. JACKSON:

2   Q.  Now, what time was it when you took this specific photo?

3   A.  I don't remember.

4   Q.  Do you remember approximately when, in relationship to the

5   events of that day, this photo was taken?

6   A.  That photo was taken after the defendants were arrested by

7   BLTS officers and before they were transferred to the police

8   headquarters.

9   Q.  Now, there is an officer, there is one officer who we can

10  see the front of his uniform clearly, correct?

11  A.  I can't see the front of his uniform clearly.

12  Q.  Well, there is one officer who we can see the front of his

13  uniform at all, right?

14  A.  Could you be more specific, please?

15  Q.  I am just asking, is there more than one person in this

16  photograph who you can see the front of their uniform?

17  A.  No.

18  Q.  The one whose front of the uniform we can see --

19  A.  Actually --

20  Q.  -- there is nothing on the front that indicates police,

21  that you can see, right?

22  A.  His hands would be blocking the location where a patch

23  would be.

24  Q.  Right.  So as far as you can see, there is nothing on the

25  front that says police?

G98SFLO6                        Habayeb - cross

1    A.  On that particular officer, correct.

2    Q.  Right.  And there is nothing on the front of his uniform

3    that indicates BLTS, right?

4    A.  That's correct.

5    Q.  The other officers that are depicted have police and BLTS

6    on the backs of their uniforms?

7    A.  The officer on the far right appears to have a patch on the

8    front of his uniform, as well.

9    Q.  You can't see what that patch says?

10   A.  Correct.

11   Q.  Now, were these all of the officers who participated in the

12   arrest?

13   A.  I don't know that information.

14   Q.  Did you see any other officers when you took this photo,

15   apart from the six or seven that are depicted here?

16   A.  Did I see any other officers?

17   Q.  Yes.

18   A.  I'm sure there were other officers around, but I don't

19   remember where they were or how many there would have been.

20   Q.  Sure.  I am not asking for a precise number.

21        Your testimony is that you took this photograph, there

22   were other BLTS officers around that are not depicted in this

23   photograph, but you don't know how many?

24   A.  Correct.

25   Q.  Now, there was a question posed to you about whether the

G98SFLO6                              Habayeb - cross

1    defendants said anything about experience with kidnapping?

2    A.  Yes.

3    Q.  And, I'm sorry, I apologize for any confusion, but my

4    understanding of the question was whether you heard any

5    reference to experience with kidnapping?

6    A.  Correct.

7    Q.  Now, you don't speak Spanish, right?

8    A.  Correct.

9    Q.  So it would have been impossible for you to hear if

10   kidnapping had been mentioned, right?

11   A.  From the defendants, correct.

12   Q.  Right.  But you are an agent in the special operations

13   division?

14   A.  Correct.

15   Q.  And this is one of the most sophisticated and elite aspects

16   of the DEA, correct?

17   A.  Yes.

18   Q.  SOD, as it is called, does operations all throughout the

19   world, right?

20   A.  Correct.

21   Q.  So in that role, part of your job is having familiarity

22   with the political and the criminal climate, if you will, in

23   various countries where SOD operates?

24   A.  Not necessarily.

25   Q.  But you do have that familiarity with regard to some

G98SFLO6                         Habayeb – cross

1    countries?

2    A.   Some countries.

3    Q.   Right.  And you are aware that Venezuela is one of the

4    locations in the world with the greatest incident of kidnapping

5    of anywhere in the world?

6            MR. QUIGLEY:  Objection.

7    A.   I don't know that.

8            THE COURT:  The answer came out.  He doesn't know.

9            MR. JACKSON:  Thank you, your Honor.

10           THE COURT:  You're welcome.

11   BY MR. JACKSON:

12   Q.   Now, you mentioned a couple of devices, device one and

13   device two?

14   A.   Yes.

15   Q.   And just for clarity sake, those are the only two devices

16   that you discussed on your direct testimony, right?

17   A.   Correct.

18   Q.   Are those the only two devices that you had any dealings

19   with during the course of the investigation?

20   A.   I didn't have any dealings with those devices during this

21   investigation.

22   Q.   So your testimony was based on your general familiarity

23   with those devices?

24   A.   Correct.

25   Q.   Now, based on your understanding of how those devices

G98SFLO6                    Habayeb - cross

1   operate, is there any reason that someone in a wheelchair

2   couldn't use device one or device two?

3   A.   Is there -- could you repeat the question again?

4   Q.   Sure.

5        THE COURT:   Somebody in a wheelchair used device one

6   or device two?

7        THE WITNESS:   Yes.

8   BY MR. JACKSON:

9   Q.   Someone could use those?

10  A.   That is correct.

11  Q.   And you mentioned the fact that, with regard to device one,

12  I believe -- and please correct me if I am getting it wrong; it

13  is technical information, I'm trying my best, I don't want

14  to --

15       THE COURT:   Just ask the question, please.

16       MR. JACKSON:   Thank you.

17  Q.   Device one, things have to be retrieved by plugging the

18  device into a computer with the USB port?

19  A.   Correct.

20  Q.   At that point, there are some additional procedures to

21  actually getting the information off of this?

22  A.   Correct.

23  Q.   Now, there's no passcode, right, when this is plugged in

24  via USB?

25  A.   That is correct.

G98SFLO6                          Habayeb - cross

1   Q.  So a person doesn't have to know a specific password in

2   order to access these files, right?

3   A.  They don't need a password to access the files.  They do

4   need to find the files on the device.

5   Q.  Right.  But it is conceivable, right, that even without a

6   passcode, someone could plug this in and access the files?

7               MR. QUIGLEY:  Objection, calls for speculation.

8               THE COURT:  Overruled.

9   A.  Just by accessing the device by plugging it in, you cannot

10  necessarily access the files, because the files have to be

11  decrypted.

12  Q.  So let me ask you this.  The encryption that you're talking

13  about is in terms of being able to actually see the files?

14  A.  To see the content of the file, correct.

15  Q.  And what is used to decrypt those files if it is not a

16  passcode?

17              MR. QUIGLEY:  Objection, your Honor.  I think this

18  goes to some of the issues that were discussed.

19              THE COURT:  Overruled.

20  A.  Could you repeat the question?

21              MR. QUIGLEY:  Could we get a sidebar?

22              THE COURT:  No.  Ask the questions quicker.

23              Do you want to rephrase the question?

24              MR. JACKSON:  Yes, your Honor.

25  BY MR. JACKSON:

G98SFLO6                          Habayeb – cross

1   Q.  I am not asking for any, you know, codes or anything like

2   that.  I am just asking, in a general way, what is utilized to

3   decrypt the files that are on this?

4   A.  The file needs to be renamed in a certain way and then it

5   can be accessed.

6   Q.  Now, there are confidential sources that the DEA has shown

7   how to use, how to access those files, right?

8          MR. QUIGLEY:  Objection.

9   A.  I don't know that information.

10  Q.  Even if you're not able to open the files, it would be

11  possible to delete files without the encryption scheme, right?

12  A.  It would be possible to delete the file if you could find

13  it on the device.

14  Q.  Right.  You wouldn't need to know the encryption scheme in

15  order to delete files, right?

16  A.  Correct.

17  Q.  I just have a couple more questions for you.

18          You mentioned, I believe, that candy was provided to

19  the defendants?

20  A.  Yes.

21          THE COURT:  Hard candy.

22          MR. JACKSON:  Pardon me, your Honor?

23          THE COURT:  Hard candy.

24          MR. JACKSON:  Yes.

25  BY MR. JACKSON:

G98SFLO6                          Habayeb - cross

1   Q.  Hard candy was provided to them?

2   A.  Correct.

3   Q.  For clarity sake, what kind?

4   A.  I don't have a brand name.  It was hard sugar candy.

5   Q.  Can I ask you why candy was provided to defendants, as

6   opposed to any other food?

7   A.  It was offered to them and they accepted it.

8   Q.  Is there any enforcement reason that the food that is

9   provided is candy?

10  A.  No.

11          THE COURT:  As opposed to a bologna sandwich, you

12  mean?

13          MR. JACKSON:  Yes, your Honor.

14  Q.  As opposed to sandwich or fruit, that is what was

15  available?

16  A.  No.  That it is what was offered to them and that is what

17  they accepted.

18  Q.  This is my last area of questioning.

19          Were you involved in any discussions about whether or

20  not the interviews on the airplane would be recorded?

21  A.  Was I a part of those discussions?

22  Q.  Yes.

23  A.  No.

24  Q.  You're aware the DEA policy requires a presumption of

25  recording on a post-arrest interview, right?

1    A.  That's not necessarily true if you're outside the

2    United States.

3    Q.  Right.  There are certain exceptions to the policy that

4    exists, correct?

5    A.  Correct.

6    Q.  One of the exceptions to the policy is that if you're

7    outside of the United States?

8    A.  Correct.

9    Q.  But it's your understanding that, during the substantial

10   part of the interviewing that was taking place on this flight,

11   the plane was within the United States, right?

12   A.  I don't know where the plane was.

13   Q.  You hadn't taken a look at the flight path?

14   A.  No.

15   Q.  My point is, you don't know whether that specific exception

16   was applicable, right?

17   A.  Correct.  However, another exception is --

18   Q.  I am only asking you that question.

19   A.  You're correct.

20   Q.  So the question that I have is, at any point, did anyone

21   express to you why the decision had been made not to record the

22   interview on the flight?

23   A.  No.

24   Q.  And you had your phone on the airplane, correct?

25   A.  My phone?

G98SFLO6                    Habayeb – cross

1    Q.  Yes.

2    A.  Yes, I did.

3    Q.  What model phone is that?

4    A.  I don't remember what it was at the time.

5    Q.  Was it a smartphone, can I ask you?

6    A.  Yes.

7    Q.  It was a phone that had recording capability?

8    A.  Yes.

9    Q.  Also, one of the devices that you talked about earlier,

10   either device one or device two, was on the airplane, correct?

11   A.  I don't know that information.

12            MR. JACKSON:  May I have one moment, your Honor?

13            THE COURT:  Yes, you may.

14            MR. JACKSON:  I have no further questions, your Honor.

15            MR. MANN:  Very brief, your Honor.

16            Can you pull up Government Exhibit 18, please.  I'm

17   sorry, 18.  These are the notes.

18   CROSS-EXAMINATION

19   BY MR. MANN:

20   Q.  Agent, you testified a few minutes ago that these were

21   notes that you took while on the ground in Haiti, is that

22   correct?

23   A.  While on the ground in Haiti and while on the plane.

24   Q.  Understood.

25            Were these contemporaneously taken?

G98SFLO6                         Habayeb – cross

1    A.  Yes, they were.

2    Q.  I note there is some space here on the first page.  This is

3    page 106 from GX18.  You have Haiti and then there is a space

4    before the entry for 10:25 a.m.?

5    A.  Yes.

6    Q.  Is there a reason why there is spacing there?

7    A.  No.

8    Q.  Then you have spacing again between 10:25 and 10:30?

9    A.  OK.

10   Q.  Is there a reason for that?

11   A.  No, there is not.

12   Q.  If you turn to page five of this document. is this 4:30 or

13   4:31, you wrote both parties given bottle of water.  It looks

14   like it was crossed out.

15   A.  It was a 4:30, and then I checked my watch and it was 4:31.

16   Q.  So immediately upon boarding the plane, they got a bottle

17   of water, correct?

18   A.  That is correct.

19   Q.  And you wrote down at 4:30?

20   A.  I wrote that they received bottles of water at 4:31.

21   Q.  And then at 4:50 you wrote that they were both given candy,

22   right?

23   A.  That is correct.

24   Q.  And then at 8:10, you said they landed in White Plains,

25   right?

G98SFLO6                          Brooks - direct

1    A.  Correct.

2              MR. MANN:  No further questions.

3              MR. QUIGLEY:  No redirect, your Honor.

4              THE COURT:  Agent, thank you very much.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  Next witness.

8              MR. BOVE:  The government calls Special Agent Kimojha

9    Brooks.

10             THE DEPUTY CLERK:  Agent, please state your full name

11   and spell your full name for the record.

12             THE WITNESS:  Kimojha Brooks.  K-i-m-o-j-h-a.  Brooks,

13   B-r-o-o-k-s.

14    KIMOJHA BROOKS,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17             THE COURT:  Agent, please sit down and make yourself

18   comfortable.  All set?

19             THE WITNESS:  Yes.

20             THE COURT:  Mr. Bove.

21             MR. BOVE:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MR. BOVE:

24   Q.  Where do you work, sir?

25   A.  For the Drug Enforcement Administration.

G98SFLO6                         Brooks - direct

1   Q.  When did you start at the DEA?

2   A.  August of 2000 -- I'm sorry -- October of 2000.

3   Q.  What is your current position?

4   A.  Special agent.

5   Q.  Special agent with any particular component?

6   A.  Yes.  I'm assigned to the New York organized drug

7   enforcement strike force.

8   Q.  I am going to refer to that as the strike force.

9           When did you start on the strike force?

10  A.  May of 2013.

11  Q.  Have you had any overseas posts with the DEA?

12  A.  Yes.

13  Q.  Where?

14  A.  From 2006 until 2013, I was stationed in the Port of Spain

15  country office, Port of Spain, Trinidad.

16  Q.  Do you speak Spanish?

17  A.  I have a working knowledge of Spanish.

18  Q.  When, approximately, did you join the investigation that's

19  at issue in this case?

20  A.  Late October, early November of 2015.

21  Q.  How did you get involved?

22  A.  I received a call from Special Agent Gonzalez and Group

23  Supervisor Zach asking for assistance in an international

24  investigation that possibly had enforcement activity in Haiti

25  and New York.

G98SFLO6                    Brooks - direct

```
 1  Q.  Now, Group Supervisor Zach and Special Agent Gonzalez are
 2  with the DEA special operations division, correct?
 3  A.  Correct.
 4  Q.  What is your understanding of why SOD reached out to the
 5  strike force for assistance in this case?
 6  A.  Because some of the enforcement activity would occur in the
 7  Southern District of New York.  Normally other districts reach
 8  out to New York based districts to assist in that.
 9  Q.  What types of enforcement activity did you anticipate
10  occurring in the Southern District of New York?
11  A.  Extradition.
12  Q.  Can you travel to Haiti in connection with this
13  investigation?
14  A.  Yes.
15  Q.  When approximately did you travel?
16  A.  On November 9th, 2015.
17  Q.  Did you bring a weapon with you?
18  A.  No.
19  Q.  Why not?
20  A.  Because only agents that are assigned to the Port-au-Prince
21  country office are allowed to carry in country.
22  Q.  I would like to focus on the next day, November 10 of 2015.
23  Did you have any meetings related to the investigation on that
24  day?
25  A.  Yes.
```

G98SFLO6                           Brooks - direct

1   Q.  Please describe the first one.

2   A.  The first meeting was at the embassy.  We were there for

3   several minutes.  And then from the embassy, we went to the

4   Haitian federal law enforcement office, where we met with

5   members from the embassy, as well as members from the Haitian

6   federal law enforcement different units.

7   Q.  What was the purpose of that second meeting?

8   A.  The second meeting was to discuss operational plans for

9   what would take place that day.

10  Q.  What did you do after that?

11  A.  After that meeting, we went to a location near the

12  Servotel.

13  Q.  Who went with you?

14  A.  Myself and Special Agent Leith were in the vehicle with

15  one -- with some of the Haitian national federal police

16  officers.

17  Q.  You referred to Special Agent Leith, I believe.  Is that

18  Special Agent Habayeb?

19  A.  Correct.

20  Q.  When you're at this location in the vicinity of the

21  Servotel, is that correct?

22  A.  Correct.

23  Q.  What happened next?

24  A.  We were there for several minutes, and then eventually

25  Special Agent Gonzalez notified us that the CS was safe in the

G98SFLO6                        Brooks - direct

1    location and that members of the Haitian federal law

2    enforcement affected an arrest.

3    Q.  Do you know where that arrest took place?

4    A.  Inside of the Servotel.

5    Q.  Were you present for the arrest?

6    A.  No.

7    Q.  Where were you?

8    A.  At the beginning part of it, we were still at the location

9    nearby, and then we eventually went to the Servotel.

10   Q.  When you got to the Servotel, did you see the defendants?

11   A.  No.

12   Q.  What did you do when you pulled up?

13   A.  When we entered the location, we went past the lobby, and

14   then we eventually went into the back where the restaurant was,

15   and then we spoke with the CS.

16   Q.  Is that CS-1?

17   A.  Yes.

18   Q.  Who was present for the conversation with CS-1?

19   A.  It was myself, Special Agent Gonzalez, Group Supervisor Rob

20   Zach, Special Agent Leith.

21   Q.  What happened next?

22   A.  We secured the recording device and also secured -- made

23   sure that the CS was safe, and then we left the location.

24   Q.  Where did you go to from the Servotel?

25   A.  From the Servotel, we went to the headquarters of the

1   Haitian federal police.

2   Q.  What happened there?

3   A.  From there, we waited several hours until we went to the

4   airport.

5   Q.  Did you speak to the defendants at that location?

6   A.  No.

7   Q.  Did you see them?

8   A.  Yes.

9   Q.  Describe what you saw.

10  A.  I saw the two defendants in, like, a general area, maybe,

11  like, either the command center or, like, a sergeant's desk

12  where they were in front of the desk and there was people

13  walking in and out of the area.

14  Q.  Could you please describe the defendants' demeanors at that

15  first Haitian law enforcement location?

16  A.  They seemed normal, from what I could see.  It was a

17  distance.  Maybe not as far as where you are.  It was still

18  somewhat of a distance, and the door was opening and closing.

19  Q.  Did you leave that location at some point?

20  A.  Yes.

21  Q.  Where did you go next?

22  A.  From there, we went to -- it seemed like it was maybe a

23  local precinct, a local Haitian police precinct.

24  Q.  What happened there?

25  A.  From there, my understanding was they were being

1    out-processed because, at that point, the government had agreed

2    to expel them or whatever, so they needed to be processed by

3    the Haitian police.  And then from there, we went to the

4    airport, where they were turned over to us.

5    Q.  Before we get to the airport, did you participate in what

6    was described as the out-processing of the Haitian law

7    enforcement officers?

8    A.  No.

9    Q.  What happened what you arrived at the airport?

10   A.  When we arrived the airport, the prisoners were searched

11   and then handcuffed, several photographs was taken of them

12   prior to boarding the plane, and then we boarded the plane.

13   Q.  Was there a change in custody prior to boarding the plane?

14   A.  Yes.  Once we got there and when we did -- we actually did

15   the searching and huffing, the prisoners went from the Haitian

16   police to us.

17   Q.  Now, after the DEA took custody of the defendants, what did

18   you consider to be your responsibilities?

19   A.  My responsibility was -- because the arrest was coming into

20   the Southern District of New York -- was the booking, the

21   processing, and ensuring the transportation to MCC later on in

22   New York.

23   Q.  Prior to the plane departing Haiti, had you spoken with any

24   agents about interviewing the defendants on the plane?

25   A.  No.

G98SFLO6                    Brooks - direct

1    Q.   Inside the plane, where were you sitting in relation to the

2    defendants?

3    A.   Inside the plane, I was directly in front of Mr. Flores de

4    Freitas and diagonally across from Mr. Campo Flores.

5    Q.   Did you speak to either of the defendants during the

6    flight?

7    A.   Yes, to both of them.

8    Q.   Whom did you speak to first?

9    A.   Originally, I spoke with Mr. Flores de Freitas first

10   because he was in front of me.

11   Q.   What language did you communicate with Mr. Flores?

12   A.   It was both Spanish and English.

13   Q.   What was the purpose of your conversation with Mr. Flores?

14   A.   The purpose of my conversation was to gather the pedigree

15   information on both defendants, which would assist once we

16   entered into the U.S. with CBP and the U.S. Marshals.

17   Q.   So during that initial conversation with Flores, the focus

18   was on pedigree?

19   A.   Yes.

20   Q.   Why?

21   A.   Because that information is needed immediately once you

22   land all the way up until when he is being -- when they're

23   being housed the night before.

24   Q.   Why is the pedigree information needed when you land?

25   A.   Because CBP is using that information, as well as the

G98SFLO6                          Brooks – direct

1    fingerprints and photos, to process them as entering into the

2    U.S. legally.

3    Q.   Is pedigree information necessary if there is a further

4    change in custody with respect to these defendants?

5    A.   Yes.  That same information is used once we house them

6    overnight at either correctional facility, and then again in

7    the morning once we present them in pretrial and to the

8    marshals.

9    Q.   Is there any DEA form that calls for pedigree information?

10   A.   Yes.  We also use that as part of our arresting and

11   processing.

12   Q.   And during the conversation with Mr. Flores that you

13   referred to, did you take any notes?

14   A.   Yes.

15   Q.   How?

16   A.   I took the notes on my laptop in a notepad application.

17   Q.   There is a binder to your left.  If you could turn to

18   tab 15, please.

19   A.   OK.

20   Q.   What is this document?

21   A.   This is an e-mailed copy of the information that was taken

22   in that application, an e-mail to you.

23   Q.   Are these your notes?

24   A.   Yes.

25   Q.   How did you retrieve them from your laptop?

G98SFLO6                          Brooks - direct

1    A.   The application allows the feature to export the

2    information and send it in an e-mail.

3              MR. BOVE:   The government offers Government

4    Exhibit 15.

5              MR. MANN:   One moment, your Honor.

6              MR. ZACH:   No objection.

7              MR. MANN:   No objection.

8              THE COURT:   15 is in evidence.

9              (Government's Exhibit 15 received in evidence)

10             MR. BOVE:   Could you publish that, please.

11   BY MR. BOVE:

12   Q.   These are the notes that you took on the plane using your

13   laptop?

14   A.   Correct.

15   Q.   Describe the features of the first entries.

16   A.   So the first entries is, again, like we spoke before, with

17   Mr. Flores de Freitas.  His name, passport information -- thank

18   you -- address, parents' information, cell phone number, etc.,

19   etc.

20   Q.   Please describe Flores' demeanor while you asked him

21   questions relating to the pedigree information.

22   A.   He was calm and compliant.

23   Q.   Did there come a time when passengers on the flight changed

24   seats?

25   A.   Yes.

G98SFLO6                         Brooks - direct

1   Q.  Describe the first time.

2   A.  The first change is when Special Agent Gonzalez moved from

3   where we were sitting to talk with Group Supervisor Rob Zach.

4   Q.  What happened after that?

5   A.  Shortly after their conversation, he returned back to

6   Mr. Campo Flores, and then both Special Agent Gonzalez and

7   Mr. Campo Flores returned to where Group Supervisor Zach was at

8   to sit.

9   Q.  Did you see what happened next with respect to Campo and

10  Special Agent Gonzalez?

11  A.  I could -- I could see them talking.

12  Q.  Could you hear what was being said?

13  A.  No.

14  Q.  What did you do after Campo moved to the bench on the

15  plane?

16  A.  I continued to talk to Mr. Flores de Freitas.

17  Q.  What happened next?

18  A.  Shortly after the second seating change, Special Agent

19  Leith sat in the seating where Special Agent Gonzalez was

20  sitting to provide additional security with the remaining

21  prisoner.

22  Q.  At any point during this flight, did you tell Flores that

23  you thought his crime was very serious?

24  A.  No.

25  Q.  At any point during the flight, did you tell Flores that he

1    could go to jail for life?

2    A.  No.

3    Q.  Did you observe any change in Flores' demeanor when Campo

4    shifted seats and moved from the area where you were to the

5    bench?

6    A.  No.

7    Q.  Was there another seat change during the flight?

8    A.  Yes.  So, at some point, Special Agent Gonzalez and

9    Mr. Campo Flores returned to the area where we were sitting,

10   and then Mr. Flores de Freitas and Special Agent Gonzalez went

11   to where Group Supervisor Zach was and engaged in a

12   conversation.

13   Q.  Were you able to hear what was being discussed between

14   Special Agent Gonzalez and Flores?

15   A.  No.

16   Q.  What did you do when Campo returned to your area on the

17   plane?

18   A.  We would have continued talking about some of the pedigree

19   information.

20   Q.  And is that aspect of the interview reflected in Government

21   Exhibit 15?

22   A.  Yes.

23   Q.  If we could publish the bottom of page one of Government

24   Exhibit 15, a little bit further down.

25   A.  It's at the very bottom and then on the next page, I think.

G98SFLO6                        Brooks - direct

 1            MR. BOVE:  I'm sorry, the very last entry referring to

 2    Campo.

 3            THE WITNESS:  Beneath the line.

 4            THE COURT:  What are you referring to?

 5            THE WITNESS:  The very bottom, beneath the line.  It

 6    is a long line.

 7            There we go.

 8            THE COURT:  OK.

 9    BY MR. BOVE:

10    Q.  Do those notes continue onto page two of this exhibit,

11    Government Exhibit 15?

12    A.  Yes.

13    Q.  Did you ask either defendant any questions about drug

14    trafficking during this flight?

15    A.  No.

16    Q.  Did you ask either defendant any questions relating to the

17    evidence in this case at any point during the flight?

18    A.  No.

19    Q.  Were you in a position to know much about the case on

20    November 10, 2015?

21    A.  No.

22    Q.  Why not?

23    A.  That was -- I was in an assistant role, so my scope of what

24    my responsibilities were, were limited to at that point in

25    time, the processing and also transporting the prisoners.

G98SFLO6                         Brooks - direct

1    Q.  Did you see anyone display any weapons during the flight?

2    A.  No.

3    Q.  Did you see or hear any threats made?

4    A.  No.

5    Q.  What happened when the plane landed?

6    A.  Prior to us landing, I notified my supervisor to let him

7    know that we were coming in on our final approach.  We were met

8    at the plane by members of my group.  The prisoners were

9    brought off the plane, several photographs were taken as we

10   landed, and then the prisoners were escorted to the CBP

11   processing area.

12   Q.  Would you please turn in the binder to Government

13   Exhibit 12.  What's this?

14   A.  It's a picture of the two defendants being escorted by two

15   members of my group.

16   Q.  When, during the operation, was this photograph taken?

17   A.  Immediately after we were able to depart the airplane.

18   Q.  In White Plains?

19   A.  Yes, in White Plains.

20           MR. BOVE:  The government offers Government

21   Exhibit 12.

22           MR. ZACH:  No objection.

23           MR. MANN:  No objection.

24           THE COURT:  12 is in evidence.

25           (Government's Exhibit 12 received in evidence)

1    BY MR. BOVE:

2    Q.   What happened after the defendants' exited the plane?

3    A.   After they exited the plane, we escorted them to the CBP

4    processing area and CBP processed them first.

5    Q.   What happened next?

6    A.   Then custody was transferred over to me and members of my

7    group where we escorted them to a secondary processing room and

8    we processed them, fingerprinted them, photographed them, and

9    that was pretty much it.

10   Q.   What happened after that processing?

11   A.   After they were processed, I think we took them to the

12   restroom, and then from there, we transported them to MCC.

13   Q.   Were you involved in that transportation?

14   A.   Yes.

15   Q.   Please describe how it was conducted.

16   A.   So in the transport, Special Agent Corey Conyers was the

17   driver, and I sat in the rear of the seat with both defendants,

18   and we were followed by other members, additional members of

19   the group.

20   Q.   Was there any conversation during that transportation?

21   A.   Yes.

22   Q.   Would you please describe it?

23   A.   At that point, it was small talk.  As we got into the

24   vehicle, I made it clear to the defendants that I wasn't

25   allowed to discuss the case with them as far as any details,

G98SFLO6                           Brooks - direct

1    but if they had questions about either the process of where

2    they would be housed at night or what time court started or

3    when we they see their attorneys the following day, I could

4    answer those questions.

5    Q.  What was the tone in the conversation in the car?

6    A.  It was -- it was normal.  I think maybe at some points they

7    even laughed, you know.

8    Q.  What time, approximately, did you get to the MCC?

9    A.  Approximately 12, 12:30.

10   Q.  Was that 12 or 12:30 crossing into November 11?

11   A.  Yes.

12   Q.  Were the defendants taken to court the next day?

13   A.  No.

14   Q.  Why not?

15   A.  It was a federal holiday.

16   Q.  Did you eventually complete relate to the defendants'

17   pedigree information?

18   A.  Yes.

19   Q.  I'll ask you to take a look at Government Exhibits 16

20   and 17.  What are these?

21   A.  These are copies of the DEA 202 forms that were completed.

22   Q.  It is DEA form 202 entitled personal history report?

23   A.  Correct.

24   Q.  When did you begin to prepare these?

25   A.  On the 11th.  November 11th, 2015.

G98SFLO6                          Brooks – cross

1        MR. BOVE:  The government offers 16 and 17.

2        MR. MANN:  No objection.

3        MR. ZACH:  No objection.

4        THE COURT:  Numbers 16 and 17?

5        MR. BOVE:  Yes, your Honor.

6        THE COURT:  16 and 17 are received in evidence.

7        (Government's Exhibits 16 and 17 received in evidence)

8    BY MR. BOVE:

9    Q.  Were the defendants eventually taken to the courthouse?

10   A.  Yes.

11   Q.  When did that happen?

12   A.  On November 12.

13   Q.  How did that take place?

14   A.  Other members of the group went to MCC that morning and

15   provided the necessary paperwork, and the Bureau of Prisons

16   released the prisoners to our custody, and then they were

17   transported to the Southern District of New York.

18       MR. BOVE:  May I have a moment, your Honor?

19       THE COURT:  Yes.

20       MR. BOVE:  Nothing further.  Thank you.

21       MR. RODY:  Just a few, your Honor.

22       THE COURT:  Please.

23       MR. RODY:  One moment, Judge.

24   CROSS-EXAMINATION

25   BY MR. RODY:

G98SFLO6                    Brooks - cross

1  Q.  Agent Brooks, you were not a case agent for this matter, is

2  that correct?

3  A.  Correct.

4  Q.  You are essentially an agent in the New York field office

5  who is handling matters that would involve the DEA in New York,

6  correct?

7  A.  I'm an agent that was asked to exist the BIU in this

8  investigation.

9  Q.  To assist the BIU with matters that would take place in the

10  Southern District of New York, correct?

11  A.  Well, no, it was -- I was asked to participate in the

12  matters in Haiti, as well as in New York.

13  Q.  Do you know why you were asked to participate in Haiti,

14  as well as New York?

15  A.  No.  You would have to ask Special Agent Gonzalez that.

16  Q.  So the case agent is Gonzalez or Zach?

17  A.  Special Agent Gonzalez.

18  Q.  Is the case agent.

19        And the supervisor is Agent Zach?

20  A.  Correct.

21  Q.  Have you ever had any communications with CS-1 other than

22  in the restaurant that day in Haiti?

23  A.  No.

24  Q.  Have you ever had any conversations with CS-2?

25  A.  No.

G98SFLO6                    Brooks - cross

1   Q.  Now, in connections with the arrests in Haiti, I take it

2   that was not the first time you ever participated in a arrest

3   in a foreign jurisdiction?

4   A.  Correct.

5   Q.  And the goal of a DEA investigation, is it not, is to

6   disrupt and dismantle major drug traffic organizations?

7   A.  Say that again.

8   Q.  The goal of the DEA in such international operations is to

9   disrupt and dismantle drug organizations, correct?

10  A.  I mean, our goal is to investigate those organizations

11  wherever the investigation may lead.

12  Q.  You hope to disrupt and dismantle them, right?

13  A.  We hope to investigate and lead to being -- the defendants

14  being asked and prosecuted in the most, I guess, prudent

15  jurisdiction.

16  Q.  When the defendants were arrested in this case, the goal of

17  the agents, one of the goal of the agents was to get them to

18  confess, correct?

19          MR. BOVE:  Objection, calls for speculation.

20          THE COURT:  Overruled.

21  A.  Would you repeat your question?

22  Q.  Sure.  One of the goals of the agents was to get the

23  defendants to confess, correct?

24  A.  It's not -- that's not correct.

25  Q.  But you go through a whole procedure of reading the Miranda

G98SFLO6                        Brooks - cross

1   rights, correct?

2   A.  Um-hmm.

3   Q.  And you hope that they will give a confession, right?

4   A.  I mean, those are their rights.  When they are arrested,

5   they are informed of their rights.

6   Q.  But are you saying it is not one of your objectives to get

7   them to confess?

8   A.  You're asking me what's my objective in this investigation,

9   or what's the objective when a defendant is arrested?

10  Q.  In this investigation.

11  A.  Well, in this investigation, that wasn't my role.

12          When the defendants were arrested, at that point, they

13  were being transported back to the U.S.

14  Q.  So you're saying that you didn't participate in questioning

15  them post Miranda?

16  A.  No.

17          THE COURT:  You didn't participate in the questioning

18  pre Miranda either?

19  BY MR. RODY:

20  Q.  Well, you did participate in questioning them pre Miranda,

21  didn't you, Agent Brooks?

22  A.  I don't know when they were Miranda -- I couldn't answer

23  that question.

24  Q.  You didn't advise the defendants of their rights, did you?

25  A.  No.

G98SFLO6                         Brooks - cross

1   Q.  But you had a lengthy conversation with Mr. Flores de

2   Freitas, correct?

3   A.  I don't know if I would call it lengthy at that point.

4   Again, I don't know when they were Mirandized.  It is kind hard

5   to say if it was a lengthy conversation or short conversation.

6   I had a discussion -- I had a discussion with them about

7   pedigree information, which is --

8   Q.  Right.  So you were questioning him, correct?

9   A.  Yes.

10  Q.  About his family members, right?

11  A.  I asked him pedigree information about himself, as well as

12  his family members, name, date of birth.

13  Q.  Right.  But you went into more detail about his family

14  relations, didn't you?

15  A.  No.  I asked him the questions that I notated in my notes.

16  Q.  But those questions involve who he is related to, correct?

17  A.  Well, no.  As we were talking to them, they made it clear

18  that they were cousins.  I knew that they were cousins.  But

19  until I spoke to each individual person, did I know who the

20  other family members were.

21  Q.  Did anybody assist you in taking that pedigree information,

22  any other agents?

23  A.  Yes.

24  Q.  Who?

25  A.  Special Agent Gonzalez.

1    Q.  I thought you said earlier that when you were speaking to

2    Mr. Flores, that Special Agent Gonzalez was at the bench seat

3    with Mr. Campo Flores?

4            MR. BOVE:  Objection, mischaracterizes the testimony.

5            THE COURT:  Sustained.

6    BY MR. RODY:

7    Q.  You said at some point there was a change in the seating,

8    right?

9    A.  At some point.

10   Q.  Right.  And prior to that, your testimony is Agent Gonzalez

11   was helping you take the pedigree information from Mr. Flores?

12   A.  Yes.

13   Q.  Was he asking the questions?

14   A.  I think we both were.  I mean, the point that I'm

15   describing is, once the flight came to a safe altitude, I took

16   my laptop out and started filling out the pedigree information.

17   So it was -- I'm sorry, go ahead.

18   Q.  For Mr. Flores?

19   A.  Initially, yes.

20   Q.  You said you have a working knowledge of Spanish.  You

21   would not describe yourself as fluent, correct?

22   A.  I can ask -- I can request questions, I can have a

23   conversation, I can give instructions.  So I don't know how you

24   would classify that.  I classify that as working knowledge.

25   Q.  You're able to get the gist of what people are saying,

G98SFLO6                          Brooks - cross

1    correct?

2                  MR. BOVE:  Objection to the characterization.

3                  THE COURT:  Overruled.

4    A.  Am I able to get the gist of what people are saying?

5    Q.  Correct.

6    A.  Correct.

7    Q.  But are you able to obtain a detailed understanding of what

8    people are saying in Spanish?

9    A.  I have debriefed sources in Spanish.

10   Q.  Now, you asked information, did you not, that went beyond

11   pedigree information of Mr. Flores, night?

12   A.  That's not correct.

13   Q.  You asked him about his relationship to the family of the

14   first lady of Venezuela, correct?

15   A.  That's not correct.

16   Q.  Did you ask him about whether he had ever done deals with

17   anybody else in the family?

18   A.  That's not correct.

19   Q.  You asked him specifically about his son, correct?

20   A.  Yes.  That's the part of his pedigree.

21   Q.  The fact that he has a son, right?

22   A.  I would have asked him -- I can't recall if he had a son or

23   daughter.  I would have asked him was he married, did he have

24   any kids, what was the kids' names and ages.

25   Q.  You asked further questions about the son, though, didn't

1    you?

2    A.  I don't recall beyond that.  Like I said, whatever I would

3    have asked, I would have inputted it on the exhibit.

4    Q.  It's your testimony that you did not laugh at Mr. Flores

5    and tell him he was in big trouble?

6    A.  No, I didn't.

7    Q.  Did you advise either defendant of the penalties they faced

8    for a (b)(1)(A) narcotics charge in the United States?

9    A.  No, I didn't.

10   Q.  You didn't tell them they faced ten to life?

11   A.  I didn't tell them that.

12   Q.  When the defendants moved to the bench seat to be

13   Mirandized and questioned, you didn't see anybody videotaping

14   that statement, correct?

15   A.  No.

16   Q.  Was there any discussion on the airplane among the agents

17   about whether to videotape the defendants' statements?

18   A.  I was in another location, so all I could do is see them,

19   but I didn't engage in any conversation to be able to answer

20   that question.

21   Q.  You understand that it is DEA policy that there is a

22   presumption to videotape post-arrest statements of defendants,

23   correct?

24   A.  I don't know if there is a policy on the plane.

25   Q.  Say that again?

G98SFLO6                          Brooks - cross

1    A.  I don't know if there is a DEA policy for interviewing on

2    the plane.

3    Q.  You don't know?

4    A.  No.

5    Q.  You certainly had devices with which you could have

6    recorded a post-arrest statement, correct?

7    A.  I'm not sure what -- we should have.  I'm not sure what we

8    had.

9    Q.  You had smartphones, right?  You can record with a

10   smartphone, correct?

11   A.  Yeah, you could.

12   Q.  The laptop you were using, was that equipped with a camera

13   that could record?

14   A.  No.  I don't think the laptop has where you can record on

15   it.  You would have to have Internet connection.

16   Q.  I want to go back before the statements to the arrest.

17              You first learned that you were going to be involved

18   in this arrest when, what date?

19   A.  I don't know exact date.  I mean, it was at the end of

20   October, maybe beginning of November, give or take.

21   Q.  And you flew to Haiti on November 9th?

22   A.  Yes.

23   Q.  You knew about it weeks before that?

24   A.  I don't know if it was weeks before that, but I would have

25   had enough time to put in a 501 request to travel.

G98SFLO6                        Brooks - cross

1    Q.  How long does that usually take to come through?

2    A.  A 501?  It could be a day, could be a week.  It just

3    depends on the chain of command.

4    Q.  Now, you mentioned a number of meetings that took place

5    between the DEA and the Haitian authorities on the ground the

6    morning of the arrest, correct?

7    A.  I mentioned a meeting.

8    Q.  I thought you said there was two different meetings, one

9    was the embassy and one was --

10   A.  That was all embassy personnel at the embassy.  We were

11   transported to the embassy that morning where we would have met

12   with the country attaché, and I think we transferred vehicles,

13   and we eventually went to where the Haitian national police

14   were.

15   Q.  There were no Haitians involved in the first meeting?

16   A.  No.

17   Q.  But this was closely coordinated with the Haitian

18   authorities, correct?

19   A.  I don't speak their language, so I don't...

20   Q.  But you met with them and you had a briefing section?

21   A.  Yeah, we went to their location.

22   Q.  Do you know why November 10 was chosen for the day of the

23   arrest?

24   A.  No, I don't.

25   Q.  Do you know who chose that day?

G98SFLO6                        Brooks - cross

1    A.  No, I don't.  I mean, we got there November 9 in the

2    evening, so I don't know.

3    Q.  Right.  You could have gotten there on the 8th and done the

4    arrest on the 9th, right?

5    A.  I don't know what day of the week that was, so I don't

6    know.

7    Q.  I'm sorry.  Did you see the BLTS officers either before

8    they arrested the defendants or after they arrested the

9    defendants?

10   A.  The actual arresting officers?

11   Q.  Correct.

12   A.  I don't know who arrested them because I wasn't there at

13   the arrest, so --

14   Q.  You saw a number of officers dressed in uniform, correct,

15   that day?

16   A.  Actually, no.  I saw the officers that we rode with.  We

17   went to the location, and then the next time I saw anyone is

18   when we went into the restaurant.  So no, I didn't see the

19   officers.

20   Q.  Did you participate in searching the plane at some point?

21   A.  No.

22   Q.  You didn't search the plane that the defendants arrived on?

23   A.  No.

24   Q.  You mentioned going to two different BLTS locations after

25   the defendants' arrest, is that correct?

G98SFLO6                    Brooks - cross

1    A.  No.  We were at the BLTS, I am assuming their headquarters.

2    Then from there, we went to, looks like, a regular police

3    department.

4    Q.  So you're saying the second location was not a BLTS

5    location?

6    A.  To the best of my knowledge.  Like I said, it has police

7    vehicles and just looks like regular police.

8    Q.  But the first place did not, right?

9    A.  No.

10   Q.  You mentioned that when the defendants got on the plane,

11   that their demeanor was calm and compliant, is that right?

12   A.  I think when the question was asked, it was for one

13   specific defendant.

14   Q.  Mr. Flores de Freitas?

15   A.  Correct.

16   Q.  And he was scared, right?

17   A.  I don't know.

18   Q.  He didn't look scared to you?

19   A.  When I spoke to him at that particular point in time that I

20   was referring to, no.

21   Q.  You're a big guy, Agent Brooks.  About how tall are you?

22   A.  Almost six two.

23   Q.  How much do you weigh?

24          THE COURT:  You're under oath now.

25   BY MR. RODY:

G98SFLO6                          Brooks - cross

1    Q.  Over 225?

2    A.  Yes.

3    Q.  Neither of these defendants is over about five eight,

4    correct?

5    A.  I'm not sure how tall Mr. Flores de Freitas is.

6    Q.  These guys are much smaller than you, correct?

7    A.  Correct.

8    Q.  And you're in tight quarters on that plane, right?

9    A.  I don't know if it was that tight.  It seated at least,

10   what, four, five people.

11   Q.  I am not talking about the seating capacity.

12        I am saying were sitting directly across from

13   Mr. Flores de Freitas, right?

14   A.  Correct.

15   Q.  Do you have any knowledge if either defendant received any

16   food or water the entire day before they got on the plane?

17   A.  Before they got on the plane?

18   Q.  Correct.

19   A.  I think they were eating at the Servotel when they were

20   arrested.  They were at a restaurant.

21   Q.  Right.  That was five or six hours before you guys got on

22   the plane, correct?

23   A.  I don't know I would say six.  It was several hours, but I

24   can't remember -- I wasn't taking the time.  And then just to

25   further answer your question, they were given water on the

G98SFLO6                         Brooks - cross

1    plane.

2    Q.  Now, you prepared a number of reports after this arrest

3    operation, correct?

4    A.  Yes.

5    Q.  You wrote reports summarizing the evidence that was seized,

6    correct?

7    A.  I would have to look back, but there would have been a DEA

8    arrest 6 and a 202s and then some internal documents.

9    Q.  You said you would have prepared an arrest 6.  That is a

10   DEA report that summarizes the events that occurred that day?

11   A.  Yes.

12   Q.  And it also contained a section where you described custody

13   of certain evidence that was obtained by the DEA?

14   A.  Correct.

15   Q.  And you didn't seize any drugs, right?

16   A.  No.

17   Q.  The evidence that you listed was recording devices that

18   were seized, right, or taken into custody by the DEA, right?

19   A.  Correct.

20   Q.  And you wrote these on what day, November 11?

21   A.  I would have to look.  It would have been the date at the

22   top, the date it was prepared.

23   Q.  I'll show you that in one second.

24   A.  But if -- I mean, from the 202s, I think it was at least

25   started on November the 11th.

G98SFLO6                          Brooks - cross

1    Q.  When you write the 6 of the investigation, do you speak to

2    other agents to get information for that 6?

3    A.  Well, yes, depending on if there were other agents involved

4    in the case.  If this -- Special Agent Leith was the one that

5    was taking notes.  I would have gotten a copy of his notes,

6    which would have pretty much detailed what happened from Haiti

7    up until we got to New York.

8             MR. RODY:  I apologize, your Honor.

9    Q.  You said you would have filled out an arrest 6 and what was

10   the other 6 you described?

11   A.  Exhibit 16 and 17, the 202s.

12   Q.  But no other 6s, no other DEA 6s?

13   A.  For that event?

14   Q.  Correct.

15   A.  No.

16   Q.  Again, I asked you the question earlier about the source of

17   information that you used to fill out the 6.

18             Isn't it true that you wrote in your 6 that, during

19   the course of the negotiations, that CS-1 and CS-2 explained to

20   the defendants that the cocaine shipment would be sold in New

21   York, New York, and the drug proceeds received in New York,

22   New York, and would be paid in United States Currency?

23   A.  I don't recall writing that.

24   Q.  So this is 3502-12, page two.

25   A.  I need to see the front page.

G98SFLO6                          Brooks - cross

1    Q.  Sure.

2          By the way, I am showing you the front page.  Does

3    that refresh your recollection that you wrote that report on

4    November 11?

5    A.  Correct.

6    Q.  Take a look again at the second page starting in paragraph

7    four there.  Take a look at that.

8    A.  OK.

9    Q.  So, again, the question is, you wrote in the 6, did you

10   not, during the course of the negotiations, CS-1 and CS-2

11   explained to the defendants that the cocaine shipment would be

12   sold in New York, New York, and the drug proceeds received in

13   New York, New York, to be paid in United States Currency; is

14   that true?

15   A.  Correct.

16   Q.  Upon what information did you base that statement?

17   A.  This little bit of information that would have been

18   provided by the BIU unit.

19   Q.  By other agents?

20   A.  Yes.

21   Q.  Did you listen to any recordings --

22   A.  No.

23   Q.  -- of any meetings -- let me finish the question.

24          Did you listen to any recordings of any meetings

25   between CS-1 and the defendants before you wrote that?

G98SFLO6                          Brooks – cross

1    A.  No.

2    Q.  Do you recall which other agents of BIU you spoke to in

3    order to get that information that CS-1 told the defendants

4    that the shipment would be sold in New York?

5    A.  I would have spoken with Special Agent Gonzalez and also

6    Group Supervisor Rob Zach.

7    Q.  And is it your understanding that, in making that

8    statement, Agent Gonzalez had listened to the recordings?

9              MR. BOVE:  Objection.

10              THE COURT:  Overruled.

11   A.  What was your question?

12   Q.  You said that you got this information from Agent Gonzalez,

13   correct?

14   A.  Um-hmm.

15   Q.  Do you know whether Agent Gonzalez listened to the

16   recordings of the meetings between CS-1 and the defendants

17   before he told you that information?

18   A.  I would have known that Special Agent Gonzalez spoke with

19   the CS at the minimum.  If he had listened to the recordings or

20   not, I would not know that.

21   Q.  So your understanding was that this information that

22   Special Agent Gonzalez got came from the CSs themselves, right?

23   A.  I can only assume.  Like I said, when I spoke with Special

24   Agent Gonzalez, he would have given me an overview.  So where

25   he got the information from or how he got the information, I

G98SFLO6                          Brooks - cross

1    wouldn't know.

2    Q.   Did you testify in the grand jury in this matter?

3    A.   I think Special Agent Gonzalez did.

4    Q.   You believe --

5            THE COURT:  The question is, did you?

6            THE WITNESS:  Did I?

7            THE COURT:  Did you?

8            THE WITNESS:  For the indictment for the two

9    defendants?

10   Q.   Correct.

11   A.   No.  I think Special Agent Gonzalez did.

12   Q.   But, again, the judge's point, you did not, sir, as far as

13   you know?

14   A.   As far as I can recall.  I'm sorry.

15           MR. RODY:  Now, I'm almost done, Judge.

16   Q.   You filed a number of search warrants affidavits in this

17   matter, correct?

18   A.   Correct.

19   Q.   Those were search warrant affidavits primarily for phones?

20   A.   Correct.

21   Q.   To enable the DEA to search for the contents of phones that

22   were seized, correct?

23   A.   Phones and maybe some e-mails.

24   Q.   And you recall filing one search warrant affidavit in

25   December of 2015?

G98SFLO6                          Brooks - cross

1    A.  Not off the top I my head, I don't.  If you have

2    documentation?

3    Q.  That is not important.

4            Do you recall filing another one in May of this year,

5    2016?

6    A.  The same thing, if --

7    Q.  Did you become aware at some point that the DEA learned

8    that CS-1 and CS-2 had been selling drugs on the side for

9    years?

10   A.  I'm sorry.  Could you repeat the question?

11   Q.  Sure.  Did you learn at some point that the DEA became

12   aware that CS-1 and CS-2 had been selling drugs on the side for

13   years?

14   A.  I'm sorry, yes.

15   Q.  And you learned that CS-1 at least this been using drugs

16   for years, correct?

17   A.  Correct.

18           (Continued on next page)

19

20

21

22

23

24

25

1   Q.  They had been lying to the DEA for years, correct?

2   A.  Correct.

3   Q.  Now, I asked you earlier if you recalled swearing out a

4   search warrant in May of 2016.  Do you recall swearing out

5   search a warrant on May 2, 2016?

6   A.  Again, we've done several.  I don't remember the dates or

7   which ones.  So if you have documentation, I'm happy to look at

8   it to confirm.

9   Q.  Sure.  Showing you what's marked as 3502-13.

10          MR. RODY:  I have a copy for Court, if you don't have

11  it, Judge.

12          THE COURT:  I've got it right here.

13          Thank you very much.

14  Q.  Does that help you recall that you did swear out a search

15  warrant affidavit on May 2, 2016?

16  A.  Yes.

17  Q.  That was after the DEA learned that CS-1 and CS-2 had been

18  selling drugs on the side and lying to the DEA, correct?

19  A.  Your question is -- well, I don't know if when I signed

20  this, if I knew completely what -- the CS had or hadn't because

21  it was a process in which that was discussed which I wasn't

22  always a part of.  So I can't say when I signed this I knew

23  that the CS did or was or wasn't being completely truthful.

24  Q.  You are saying that you are not sure that you knew

25  completely.  Did you know somewhat that the DEA had learned

1    that they had been selling drugs and lying to the DEA?

2    A.  I think I did have an idea.  There were some initial

3    discussions about it, but at that point it was going to be

4    corroborated.

5    Q.  You mean signed up as cooperating witnesses?

6    A.  No.  From the conversation that I was privy to, there were

7    some discrepancies that needed to be corroborated.

8    Q.  Corroborated.  Got you.

9            So the DEA was trying to investigate whether they

10   really had been selling drugs on the side?  Is that the idea?

11   A.  Again, I wasn't part of that, so I can't speak for what was

12   being done.  I mean, if it is a source and there is some

13   question with behavior, it is going to be investigated.

14   Q.  Do you recall that in the search warrant affidavit that we

15   are talking about, the one you swore out on May 2, do you

16   recall that you relied on CS-1 and CS-2 in connection with that

17   affidavit?

18   A.  OK.

19   Q.  In fact, on page 10 at footnote 1, you said that CS-1 and

20   CS-2 were providing information and assistance to the DEA in

21   exchange for monetary compensation and that information

22   provided to the DEA by CS-1 and CS-2 has proven to be reliable

23   in that it's been -- sorry -- has proven to be reliable and

24   information provided by each of these confidential sources have

25   been corroborated in part by, among other things, consensually

G98nflo7                        Brooks - cross

1    recorded mings and communications.

2              That is what you wrote there in the affidavit, right?

3    A.  Yes.

4    Q.  And a federal judge signed this warrant granting you the

5    search warrant, correct?

6    A.  Correct.

7    Q.  If you knew what you know now about CS-1 and CS-2 you would

8    not have relied on CS-1 and CS-2 to fill out this affidavit,

9    correct?

10   A.  That is not true.  Whatever CS-1 and CS-2 provided about

11   the defendants was not what was in question.  It was the

12   behavior prior to that.

13   Q.  You understood that their activity, their illegal activity

14   was going on throughout the time that they were participating

15   in the investigation of the defendants, correct?

16   A.  No.  At the time of this?

17   Q.  Yes.

18   A.  I don't think I would have been aware of the full extent

19   of, one, what the criminal activity was or, two, the length of

20   time that it had been going on.

21   Q.  I get that you would not have been aware fully in May of

22   2016 of the extent of CS-1 and CS-2's illegal activity.  I

23   understand that.

24             The question is, if you knew what you know today,

25   about CS-1 and CS-2, you would not have relied on them in this

G98nflo7                          Brooks - cross

1   affidavit, would you, sir?

2   A.  Your question is if I knew what I knew, would I still use

3   their information?

4   Q.  Today, correct.

5   A.  Today?

6           MR. BOVE:  Objection.  Relevance.

7           THE COURT:  Overruled.

8   A.  That's not totally my call because again I wasn't the case

9   agent.  So those decisions would have been discussed and then

10  that decision would have been made.  That conversation would

11  have been discussed and the decision would have been made.

12  Q.  I understand.  I am not trying to put you in a bad spot,

13  but you are the affiant on the search warrant, right?

14  A.  Yes.

15  Q.  You are relying on two guys who are now admitted liars and

16  drug dealers, right?

17  A.  Correct.

18  Q.  So I assume that you would not rely on them today?

19  A.  That is not true.  I mean, most of the CS's that we work

20  with at some point have been those same people.

21  Q.  No question.  No question.  These guys, CS-1 and CS-2, were

22  drug dealers at the highest levels of the profession, right?

23  A.  I don't know if I would say that.

24  Q.  The point is CS's are not supposed to be selling drugs

25  while they are acting as CS's unless and except with the

1   express authorization of the DEA, correct?

2   A.  Correct.  But your question was would I still use them.

3   Q.  Right.

4   A.  So, again, based on what I knew at the time and based on

5   the discussion of with the case agent and the group supervisor,

6   that wasn't solely my call.

7            MR. RODY:  Understood.

8            One moment.  One moment, Judge.

9            No further questions.

10            MR. ZACH:  Very briefly, your Honor.

11            THE COURT:  OK.  Mr. Zach.

12   CROSS EXAMINATION

13   BY MR. ZACH:

14   Q.  Special Agent Brooks, did you testify that, on occasion at

15   least, you debriefed informants or others in the Spanish

16   language?

17   A.  Yes.

18   Q.  After you debriefed those informants using Spanish, would

19   you memorialize that in a DEA 6, or did you feel good enough

20   about your understanding that you would memorialize what you

21   had done in a DEA 6?

22   A.  It was A case-by-case basis.  If during that conversation I

23   understood what the source was staying, then yes.  If not, I

24   would get a Spanish speaker to assist.

25   Q.  So I just want to take you back to the day of the arrest in

G98nflo7                          Brooks - cross

1   Haiti and when you guys took off in the airplane.  About how

2   long did it take from when the plane took off to when Special

3   Agent Gonzalez started speaking with the defendant, to

4   Mr. Campo?  About how long did that take?

5   A.  When he started speaking to him or when I started speaking

6   to him.

7   Q.  When he started to speaking to him?

8   A.  Like I said earlier, once we got to a safe altitude I think

9   there was a brief discussion between myself and Special Agent

10  Gonzalez, OK, I'm taking out the laptop, let's get the pedigree

11  information.  I don't know the time frame, but wherever, once

12  we leveled off.

13  Q.  Well, how long did it take you guys to level off?  Do you

14  know?

15  A.  No.  I mean, usually it's what?  I don't know, 10, 15.  I

16  don't know.

17  Q.  10, 15 minutes?  Is that a fair estimate?

18  A.  Approximately.

19  Q.  For about how long did Special Agent Gonzalez interview

20  Mr. Campo?

21  A.  He didn't interview him.  We together spoke with the

22  defendants.  I was the one keeping the, taking down the

23  information.  So it wasn't like there was a separate

24  conversation and a separate conversation.  We were doing it

25  together because Special Agent Gonzalez' Spanish is better than

G98nflo7                          Brooks - cross

mine.  Some of the information I would have gotten with his

assistance.  Some of it I wouldn't.  But it was an on and off

process.  It wasn't a one and done.

Q.  How long did that process that you have just described

take?

A.  It happened throughout the plane.  I mean, because at some

point when there was the seating break, then I would have

continued to speaking with Mr. Flores De Freitas and then vice

versa once Mr. Campo came back.

Q.  I got you.  So, as you sit here today, can you put any

estimate about how long it was from when you started speaking

with Special Agent Gonzalez to Mr. Campo before there was that

seating change?

A.  I can't give a time on it.  I mean, if I had -- I don't

know.  Maybe an hour, hour and a half into the flight, give or

take.

        I don't know, because, again, I wasn't in charge of --

first, I wasn't in charge of maintaining the times, so you

would have to speak with Special Agent Leith to see if he would

have jotted the time of the seating change.  So I would

basically be eyeballing whatever I saw, not with a watch to

tell you, it was this time.

Q.  When there was a seating change and Mr. Campo was then

speaking with Mr. Gonzalez alone -- not you, when you're

back -- how long did that conversation between Special Agent

G98nflo7                           Brooks - cross

1    Gonzalez and Mr. Campo go on for?

2    A.   You said they were speaking alone?

3    Q.   Not alone, but after the seating change and they were

4    talking.

5    A.   The seating change happened, and Special Agent Gonzalez was

6    with group supervisor Rob Zach and Mr. Campo.  So he wasn't

7    alone.

8    Q.   I get you.  It's a small plane.  I get everybody's kind of

9    there.  I'm focusing you on the seating change on that bench,

10   right?

11   A.   Originally you said alone, so I am a little bit confused.

12   Q.   All right.  Let me rephrase the question and maybe make it

13   more clear.

14           When Mr. Campo moved to the bench and was speaking

15   with Special Agent Gonzalez and Group Supervisor Zach, about

16   how long did that go on for?

17   A.   Did the conversation go on?

18   Q.   Yes.

19   A.   Again, I wasn't the timekeeper, so I am -- I can give you

20   an approximate.

21   Q.   Yes.  Approximately.  I just want your best recollection.

22   A.   I don't know.  Maybe an hour and a half, two hours.

23   Q.   I believe you testified --

24   A.   Approximately.

25   Q.   Approximately, OK.

G98nflo7                          Brooks - cross

1          I believe you testified earlier that during the flight

2     you never, you never observed the Miranda warnings being given

3     to either defendant, is that fair?

4     A.  I wasn't looking either, so, no.  Again, my focus was to

5     get the pedigree information for processing and smooth

6     transition once we landed on the ground.

7     Q.  Right.  So, setting that aside, as you sit here today, you

8     did not observe the Miranda waiver actually occur, right?

9     A.  I didn't observe, nor did I look.

10    Q.  Fair enough.  You weren't looking up.  I got you.

11         I want to just jump back quickly to something else,

12    which is when you -- can you guys call up, can the government

13    please call up the picture of the second location they went to,

14    I believe it's GX 18.  That's totally wrong.

15         MR. QUIGLEY:  It's 20.

16         MR. ZACH:  20.  No.  They are all in the courtyard.

17    Yeah.

18         MR. QUIGLEY:  19.

19    Q.  This is the second location that you went to, right after

20    the hotel?

21    A.  Correct.

22    Q.  Can you just describe what this place looked like in

23    general?

24         THE COURT:  Excuse me.

25         This is the second location you went to?

G98nflo7                          Brooks - cross

1             MR. ZACH:  Yes.

2             THE COURT:  Pardon me?

3             MR. ZACH:  After the hotel.

4             THE COURT:  I thought the testimony was this was the

5      courtyard of the restaurant.

6             MR. ZACH:  No, this is the headquarters of the Haitian

7      police.

8             THE COURT:  OK.

9             THE WITNESS:  You did say the courtyard.

10            MR. ZACH:  I did say courtyard, but they are in that

11     little courtyard is what I meant.

12     Q.  Could you just describe, being it is not a picture of the

13     building itself, could you just describe what it looked like

14     inside?

15     A.  You are asking me to describe the picture or the actual

16     location?

17     Q.  The actual place.

18     A.  Based on my experience of an overseas post, it looked like

19     probably the headquarters or a compound of a law enforcement

20     unit.

21     Q.  It wasn't some sort of glass office building, right?

22     A.  Most of the time, when it's like that, are enclosed, for

23     the safety of the officers there because they may have

24     undercover officers or they may be preparing for operational

25     matters, so it is not an open glass building.

1   Q.  Right.  Did it have more of a residential feel to it?

2   A.  I want to say, from what I can recall, I think it was like

3   in a commercial area.  It wasn't in a residential area.

4   Q.  The structure itself, did it feel more like an office or

5   did it feel more like --

6   A.  Well, outside of the initial meeting, I never went back

7   into the facility.  I went from outside to a conference room.

8   Q.  Now, when you are taking the pedigree information from

9   Mr. Campo, you asked him about how many kids he had, if he was

10  married, all that stuff, right?

11  A.  Correct.

12  Q.  In connection with that, did you say anything to him about

13  not seeing his family for a long time because of the charges?

14  A.  No.

15  Q.  Did you hear anyone else make any such statement?

16  A.  No.

17  Q.  Now, in connection with CS-1 and CS-2, there was a

18  complaint that was prepared by the U.S. Attorney's Office,

19  right?

20  A.  Yes.

21  Q.  That's what sort of led, ultimately led to their arrest,

22  right?

23  A.  Correct.

24  Q.  You were the affiant on that complaint, is that right?

25  A.  I would have to see the complaint.

G98nflo7                          Brooks - cross

1    Q.  Did you swear it out?  Did you go to mag. court and swear

2    it out?

3    A.  I can't remember.  If you have the complaint, then I --

4    Q.  Yeah.  I've got it.

5    A.  Actually, you know what, yes.

6    Q.  OK.  Thank you.

7            In that complaint, you refer to interviews that were

8    conducted of CS-1 and CS-2 by the DEA.

9            Do you recall that being in the complaint?

10   A.  Yes.  Without it being in front of me, yes.

11   Q.  One thing that is not in the complaint is that during one

12   set of those interviews the DEA surreptitiously taped them

13   while the interview was going on.

14           MR. BOVE:  Objection, your Honor.

15           Relevance.

16           THE COURT:  Overruled.

17   Q.  Did you know that that happened?

18   A.  Which interview are you referring to?

19   Q.  In the summer of 2016, a few months back, when CS-1 and

20   CS-2 were being reinterviewed by the DEA, they were also being

21   filmed.  Did you know that?

22   A.  So you are saying the summer of 2016.  That is kind of

23   vague.  What I do know is that when they were being

24   interviewed, because they were interviewed multiple times,

25   there would have been some type of recording, whether it was in

G98nflo7                         Brooks - cross

1   writing or via recorder.

2   Q.  Did you participate at all in the videotaping of, or those

3   interviews at all?

4   A.  The videotaping?

5   Q.  Yes.

6   A.  Or the recording?

7   Q.  Either.

8   A.  I was there the day that they were arrested, which is

9   the -- would have been an interview and recording and arrest.

10  Q.  So were they arrested immediately after that interview?

11  A.  Yeah.

12          MR. ZACH:  No further questions.

13          MR. BOVE:  Nothing further, your Honor.

14          THE COURT:  OK.  Agent, you are excused.  Thank you.

15          (Witness excused)

16          THE COURT:  OK.  We will break for the day.

17          When we resume for tomorrow, what do you have on

18  schedule, Mr. Bove?

19          Are we going to be able to finish tomorrow?

20          MR. BOVE:  I expect so, your Honor.

21          THE COURT:  We are going to have to pick up the pace.

22          MR. QUIGLEY:  Certainly the direct examinations that

23  are expected tomorrow will be concise.

24          THE COURT:  OK.  We will resume at 9:30 tomorrow.

25          MR. JACKSON:  Thank you very much, your Honor.

G98nflo7                          Brooks - cross

1            May I ask one logistical question?

2            THE COURT:  Yes.

3            MR. JACKSON:  The government stated earlier that they

4    weren't sure if they were going to call the CS's as their

5    witnesses or they were going to ask us to call them.  I only

6    ask for clarification, because we have one very short expert

7    witness who is going to be traveling up to New York.  If that

8    person, if they are not going to call the CS's, we would call

9    that witness first so that they can travel, give their short

10   testimony in the morning, and then move on to the other

11   witnesses.

12           THE COURT:  What is he or she an expert in?

13           MR. JACKSON:  Your Honor, this is an expert who is an

14   expert in forensic examination of digital photographs who is a

15   former FBI forensic examiner who is just going to offer brief

16   testimony about the photograph that was taken by CW-1.

17           THE COURT:  What is that exhibit number?

18           That's the one where the fellow's in the wheelchair?

19           MR. JACKSON:  Yes, your Honor.

20           THE COURT:  OK.  How long is that testimony going to

21   be?

22           MR. JACKSON:  About ten minutes, if that.

23           THE COURT:  He's going to say what?

24           MR. JACKSON:  I expect he's going to say, based on the

25   data that is available there in the photo, he believes that

1    this is an image taken from a video capture.

2              THE COURT:  OK.  He doesn't have any knowledge about

3    the metadata for the picture, does he?

4              MR. JACKSON:  There's data in the photo that he's

5    testifying about.  Now whether you characterize that as

6    metadata or just regular data, that is a technical distinction

7    that's frankly beyond me, your Honor.  But based on that,

8    that's his conclusion.

9              THE COURT:  And I guess the nature of your request is,

10   because he's flying from a long distance and he is a short

11   witness, you want him on and off the stand tomorrow?

12             MR. JACKSON:  Yes, your Honor.

13             THE COURT:  Does the government have any objection to

14   accommodating that request?

15             MR. BOVE:  That the expert be permitted to testify

16   first tomorrow?

17             THE COURT:  Yes.  Not first, but sometime tomorrow so

18   he's on and off.

19             MR. BOVE:  No, your Honor.

20             THE COURT:  OK.

21             MR. BOVE:  I would note, however, that although the

22   defense has provided us with a summary that was rather similar

23   in content to what Mr. Jackson just said, we don't believe that

24   we received what we are entitled to with respect to the bases

25   of the opinions that are going to be offered and any analysis.

G98nflo7                          Brooks - cross

1           THE COURT:  What are you entitled to?

2           MR. BOVE:  What the rules provide with respect to

3      expert notice.

4           THE COURT:  Well, with regard to this particular

5      witness, what do you think you are entitled to that you haven't

6      received?

7           MR. BOVE:  The report that he's prepared, witness

8      statements relating to that report, and some kind of summary in

9      detail of the analysis that he's conducted so that we can be

10     prepared to meet it and make decisions about whether we need to

11     call further witnesses.

12          THE COURT:  OK.

13          Mr. Jackson?

14          MR. JACKSON:  Your Honor, we provided them with a

15     three-page summary of his qualifications as well as his

16     conclusion and the basis for the conclusion.

17          We also provided them with his curriculum vitae.  He's

18     an expert that's testified and been qualified on this subject

19     in many cases, including on behalf of the government.  We told

20     them yesterday, before yesterday that we would be prepared to

21     meet with them before court and answer any additional questions

22     that we could, but that we didn't have any -- we didn't have

23     the technical expertise, so if they provided us with additional

24     questions, we would reach out to the expert and try to get

25     answers.  We were provided with no additional questions.

G98nflo7                          Brooks - cross

1          THE COURT:  I'm prepared tomorrow morning, if anybody

2     wants to submit any submissions on what your objections are,

3     Mr. Bove, what the government's objections are, and why you

4     think, Mr. Jackson, notwithstanding the objections, the expert

5     ought to be allowed to testify.

6          MR. JACKSON:  Thank you.

7          THE COURT:  Then I will be prepared to rule.

8          MR. BOVE:  We will take Mr. Jackson up on that offer

9     to speak with expert.

10          THE COURT:  That's fine.

11          If you can to work it out amongst yourselves, that's

12     fine too as well.

13          MR. BOVE:  Thank you.

14          MR. JACKSON:  Thank you very much.

15          THE COURT:  See you in the morning.

16          (Adjourned to Friday, September 9, 2016 at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

OFFICER NO. 1

Direct By Mr. Quigley . . . . . . . . . . . . 3

Cross By Ms. Espinosa . . . . . . . . . . . .12

Cross By Ms. Wright . . . . . . . . . . . . .20

 SANDALIO GONZALEZ

Direct By Mr. Bove . . . . . . . . . . . . . .26

Cross Q. . . . . . . . . . . . . . . . . . . .76

Cross By Mr. Rody . . . . . . . . . . . . . 160

Redirect By Mr. Bove . . . . . . . . . . . . 202

LEITH HABAYEB

Direct By Mr. Quigley . . . . . . . . . . . 206

Cross By Mr. Jackson . . . . . . . . . . . . 220

Cross By Mr. Mann . . . . . . . . . . . . . 234

KIMOJHA BROOKS

Direct By Mr. Bove . . . . . . . . . . . . . 236

Cross By Mr. Rody . . . . . . . . . . . . . 252

Cross By Mr. Zach . . . . . . . . . . . . . 275

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1   . . . . . . . . . . . . . . . . . . . . 5

 19   . . . . . . . . . . . . . . . . . . . 6

 3   . . . . . . . . . . . . . . . . . . . .10

 4   . . . . . . . . . . . . . . . . . . . .34

```
1    5   . . . . . . . . . . . . . . . . . . .43

2    2   . . . . . . . . . . . . . . . . . . .52

3    13A and 13B  . . . . . . . . . . . . . . .58

4    14A and 14B  . . . . . . . . . . . . . . .59

5    6   . . . . . . . . . . . . . . . . . . .61

6    7 through 9  . . . . . . . . . . . . . . .62

7    10A and 10B  . . . . . . . . . . . . . . .66

8    11A and 11b  . . . . . . . . . . . . . . .70

9    18  . . . . . . . . . . . . . . . . . . 210

10   20  . . . . . . . . . . . . . . . . . . 214

11   15  . . . . . . . . . . . . . . . . . . 245

12   12  . . . . . . . . . . . . . . . . . . 249

13   16 and 17  . . . . . . . . . . . . . . . 252
```

14                    DEFENDANT EXHIBITS

15   Exhibit No.                         Received

```
16   D1000  . . . . . . . . . . . . . . . . 152
```

17

18

19

20

21

22

23

24

25