1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                           15 CR 765 (PAC)

5  EFRAIN ANTONIO CAMPO FLORES and
   FRANQUI FRANCISCO FLORES De FREITAS,
6
                Defendants.
7
   ------------------------------x
8
                                      New York, N.Y.
9                                     September 9, 2016
                                      9:30 a.m.
10

11 Before:

12                   HON. PAUL A. CROTTY,

13                                        District Judge

14
                          APPEARANCES
15
   PREET BHARARA
16      United States Attorney for the
        Southern District of New York
17 EMIL BOVE
   BRENDAN QUIGLEY
18      Assistant United States Attorneys

19 BOIES, SCHILLER & FLEXNER LLP
        Attorneys for Defendant Efrain Antonio Campo Flores
20 BY:  RANDALL W. JACKSON
        JOHN T. ZACK
21      JOANNA C. WRIGHT

22 SIDLEY AUSTIN LLP
        Attorneys for Defendant Franqui Flores De Freitas
23 BY:  MICHAEL D. MANN
        DAVID M. RODY
24      ELIZABETH A. ESPINOSA

25 ALSO PRESENT:
   ERIKA DE LOS RIOS

G99SFLO1                    Corcoran - direct

1          (Hearing resumed)

2               THE COURT:  Call your next witness.

3               MR. BOVE:  Yes, your Honor.  Thank you.

4               The government calls Special Agent Kevin Corcoran.

5     KEVIN CORCORAN,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8               THE COURT:  Please proceed, Mr. Bove.

9               MR. BOVE:  Thank you, your Honor.

10    DIRECT EXAMINATION

11    BY MR. BOVE:

12    Q.  Where do you work, sir?

13    A.  I work for the Drug Enforcement Administration.

14    Q.  When did you start at the DEA?

15    A.  November of 2003.

16    Q.  Are you familiar with the DEA's special operations

17    division?

18    A.  I am.

19    Q.  Have you worked in that division?

20    A.  I have, from November of 2008 until August 2016.

21    Q.  I would like to direct your attention to early November of

22    2015.

23          Did you meet with any confidential sources in that

24    time frame in connection with this investigation?

25    A.  I did, in northern Virginia.

1    Q.  What was the purpose of that meeting?

2    A.  To introduce a third confidential source into the

3    investigation and introduce that third source to the original

4    two.

5    Q.  Let's refer to that third confidential source as CS-3,

6    all right?

7    A.  OK.

8    Q.  Did CS-3 bring any recording equipment to the meeting in

9    Virginia?

10   A.  Yes, he did.

11   Q.  What were some of the basic capabilities of the equipment

12   that he brought to you?

13   A.  On the equipment that he had in his possession, it did

14   audio and video recording.

15   Q.  Was that an audio-video recording device that the DEA had

16   previously provided to CS-3?

17   A.  Yes, it is.

18   Q.  Let's refer to that as device three.

19   A.  Yes, sir.

20   Q.  Why was CS-3 in possession of device three prior to that

21   meeting?

22   A.  That particular CS number three was actively involved in

23   other investigations taking place at the same time.

24   Q.  He used device three to make other recordings in unrelated

25   investigation?

1    A.  Yes, he had.

2    Q.  Was CS-3 also provided with other equipment during the

3    meeting?

4    A.  Yes.  He was supplied with an audio recorder.

5    Q.  Let's refer to that audio-only recorder as device two.

6    A.  OK.

7    Q.  What was the purpose of providing CS-3 with two devices or

8    ensuring that he had two devices?

9    A.  Just to make sure we capture the conversation.  If one

10   fails, we have a backup.

11   Q.  What happened after the meeting in Virginia?

12   A.  The CS was dispatched to Honduras.

13   Q.  Were you in communication with CS-3 while he was in

14   Honduras?

15   A.  No, I did not, only while he was in transit.

16   Q.  Do you know what happened with device three after CS-3 left

17   Honduras?

18   A.  Yes.  CS number three left it in the hotel room he was

19   staying at.

20   Q.  Was device three eventually re-acquired by the DEA?

21   A.  Yes, it was.

22   Q.  How?

23   A.  It was turned over to Special Agent Passmore in Honduras,

24   who then Fed Ex'd the device to me.

25   Q.  What did you do with device three when it arrived at your

1    office?

2    A.   I downloaded the content onto a DVD.

3    Q.   Are you familiar with some of the basic features of device

4    three?

5    A.   Yes, sir.

6    Q.   Let's talk about some of them.  Can the operator of device

7    three start and stop recording?

8    A.   Yes, he can.

9    Q.   How?

10   A.   There is a mechanism to turn on and turn off.

11   Q.   What happens if the operator of the device initiates a

12   second recording after hitting stop first?

13   A.   It initiates a new file on the device.

14   Q.   Is it possible to delete files stored on device three

15   before they're downloaded from the device?

16   A.   No, they are not.

17   Q.   Is it possible to modify files stored on device three

18   before they are downloaded from the device?

19   A.   No, sir.

20   Q.   Could you please describe the process for downloading files

21   from device three?

22   A.   Sure.  Device number three is a plug-and-play device.  It

23   means you just plug it into a computer and it opens a screen.

24   Then you have to put in a numeric password, which then opens a

25   secondary file to view the media that is stored on the device.

G99SFLO1                    Corcoran - cross

1    Q.  Was CS-3 provided with a password associated with device

2    three necessary to download files?

3    A.  No, sir.

4    Q.  Now, you said that before CS-3 went to Honduras.  He was

5    also provided with device two?

6    A.  Yes, sir.

7    Q.  Did you also recover recordings by CS-3 from device two?

8    A.  Yes.

9    Q.  How?

10   A.  They were Fed Ex'd to me from Special Agent Adame in

11   Mexico, who sent a disk with the audios on it.

12   Q.  What happened when you received that disk?

13   A.  I reviewed the disk and found that there were more audios

14   than believed there should have been on there.  We reviewed

15   them and noted that there were audios from a different

16   investigation from another agent.  We removed those and just

17   entered the audios from this investigation onto the disk for

18   evidence.

19            MR. BOVE:  Nothing further, your Honor.

20            THE COURT:  Any cross?

21            MR. JACKSON:  Very brief, your Honor.

22   CROSS-EXAMINATION

23   BY MR. JACKSON:

24   Q.  Good morning, Agent Corcoran.

25   A.  Good morning.

1  Q.  Now, Agent Corcoran, can you just explain to us what your

2  technical training is?

3  A.  Just basic technical training.

4  Q.  When you say basic technical training, what do you mean?

5  A.  We are able to, you know, remove audio files from digital

6  recording devices.

7  Q.  Agent Corcoran, what is your degree in?

8  A.  Criminal justice.

9  Q.  From where?

10  A.  Downstate.

11  Q.  Did you take any courses while you were in college related

12  to electronics or related to computer programming?

13  A.  Computer programming.

14  Q.  Are you a computer programmer?

15  A.  No, sir.

16  Q.  Do you know how to write in C++?

17  A.  No, sir.

18  Q.  Do you know how to read code in C++?

19  A.  No, sir.

20  Q.  What is the code that is utilized for the files for the

21  system that is on device three?

22          MR. BOVE:  Objection.  Scope, Judge.

23          THE COURT:  Overruled.

24  A.  I don't know.

25  Q.  You're not familiar with the code?

1    A.  No, sir.

2    Q.  You don't know what language is used for that?

3    A.  No, sir.

4    Q.  Do you know anything about the technical sophistication of

5    the confidential informants who were involved in this case?

6    A.  Basic.  They just had basic understanding of the devices

7    that we give them.

8    Q.  Have you spoken to those people?

9    A.  The confidential sources?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And you debriefed them on their technical sophistication?

13   A.  No.

14   Q.  You don't know what type of training that they have?

15   A.  Only the stuff that we provide them.

16   Q.  Beyond that, you don't know, right?

17   A.  No, sir.

18   Q.  You also have no idea what resources they have in terms of

19   technical access beyond any communications that they had with

20   you, right?

21   A.  Correct.

22   Q.  You are aware, aren't you, that -- you are a member of SOD,

23   right?

24   A.  No.  I am no longer a member of SOD.

25   Q.  You were a member of SOD?

G99SFLO1                     Corcoran - cross

1    A.  I was.

2    Q.  SOD is one of the elite units of the DEA?

3    A.  I would think so.

4    Q.  It deals with a tremendous amount of sophisticated

5    drug-trafficking issues throughout the world, right?

6    A.  Yes, sir.

7    Q.  One of the things that you're familiar with is that a

8    number of the cartels that have operated in South and Central

9    America and southern North America have employed computer

10   programmers, right?

11            MR. BOVE:  Objection, relevance.

12            THE COURT:  Sustained.

13   BY MR. JACKSON:

14   Q.  To be clear, you have no idea what computer programmers,

15   any of the confidential informants or sources in this case, had

16   contact with, right?

17   A.  I do not.

18   Q.  To be clear, you're also aware that the confidential

19   sources in this case engaged in a year's long deception related

20   to their work?

21            MR. BOVE:  Objection.  The question is ambiguous.

22            THE COURT:  The question is what?

23            MR. BOVE:  Ambiguous because of the reference to the

24   sources.

25            THE COURT:  Overruled.

1            Are you aware of that?

2            THE WITNESS:  Can you repeat the question, sir?

3   BY MR. JACKSON:

4   Q.  Sure.  You're aware that the confidential sources in this

5   case were engaged in a year's long deception of DEA agents?

6   A.  All three sources?

7   Q.  At least two of the sources, right?

8   A.  I am aware of that now, yes.

9   Q.  You don't know all the details of the specific nature of

10  the deception these confidential sources went into, right?

11  A.  No, I have no idea.

12  Q.  And you have no idea whether there was any deception with

13  regard to their level of technical sophistication?

14            MR. BOVE:  Judge, I object.  The witness hasn't

15  testified about devices handled by CS-1 and CS-2.

16            THE COURT:  Overruled.

17  BY MR. JACKSON:

18  Q.  You have no idea, right?

19  A.  No, I do not.

20  Q.  Now, one of the things that you mentioned, one of the

21  things that you were questioned about on direct, is whether it

22  was possible to delete files on device three, correct?

23  A.  Yes.

24  Q.  And I think your answer was no?

25  A.  Correct.

1    Q.  The files can't be deleted on device three?

2    A.  Just from the device, the answer is no.  After I get it and

3    put it on the computer, then they're removed.

4    Q.  Would it be possible for any computer, for a computer other

5    than your computer, to delete files?

6    A.  Only if they have the password.

7    Q.  So only if they have the password would it be possible for

8    them to delete files?

9    A.  Correct.

10   Q.  Now, just to be very clear, Agent Corcoran, you don't

11   understand the computer language that is at issue with regard

12   to device three, right?

13   A.  Correct.

14   Q.  So you can't tell us from a technical perspective whether

15   your understanding of whether it would be possible to delete

16   data is complete, right?

17   A.  Correct.

18   Q.  You have a basic understanding of how these devices are

19   accessed and downloaded?

20   A.  Yes, sir.

21   Q.  Now, it is true, isn't it, that in some investigations, the

22   DEA has provided confidential sources with the passwords

23   necessary to access the devices on these devices?

24              MR. BOVE:  Objection.

25              THE COURT:  Sustained.

1    BY MR. JACKSON:

2    Q.  There was one part during the direct examination where

3    there was discussion of the fact that device three was -- I

4    think the words that you used were -- was eventually recovered?

5    A.  Yes.

6    Q.  What was the amount of time between up until the device was

7    recovered -- first of all, what do you mean by eventually

8    recovered?

9    A.  Special Agent Passmore received it after it was recovered

10   from the hotel.

11   Q.  And where was it before that?

12   A.  In a hotel.

13   Q.  How long was it there before it was eventually recovered?

14   A.  I don't know.

15   Q.  Do you know what the amount of time was between when the

16   confidential sources or the confidential source who had device

17   three last had it and when you received it?

18   A.  I don't know.

19   Q.  You were involved in training of certain of the

20   confidential sources in this case on how to use the devices?

21   A.  Basic understanding, correct.

22   Q.  And how long did it take you to do that training with them?

23           MR. BOVE:  Objection.

24           THE COURT:  Overruled.

25           How much time did you spend?

G99SFLO1                    Corcoran - cross

1          THE WITNESS:  It's hard to say exact how much time,

2    because it's every time we meet with the sources, we re-eval --

3    re-initiate the training, tell them how to operate it.  So it's

4    every time we see them for several minutes each time.

5    BY MR. JACKSON:

6    Q.  Less than ten minutes, right?

7    A.  It's hard to say.  It could be longer.

8    Q.  But it could be less than ten minutes to do the training?

9    A.  It could be.  If the confidential source is proficient with

10   it, it could be less.

11   Q.  And what is the maximum amount of time that you think it

12   could take to do that training?

13   A.  For the basic understanding, it's hard to say.  It all

14   depends.

15   Q.  An hour?

16   A.  It could.

17   Q.  Have you ever had the training last longer than an hour?

18   A.  No.

19          MR. JACKSON:  May I have one moment, your Honor?

20          THE COURT:  Yes.

21   BY MR. JACKSON:

22   Q.  Sir, Special Agent Corcoran, if you know, why did CS-3

23   leave the device in the hotel?

24   A.  It was an accident.

25   Q.  An accident?

1    A.  Um-hmm.

2    Q.  What do you mean by that?

3           THE COURT:  He forgot it you meant?

4           THE WITNESS:  Yes, sir.  He forgot it.

5    Q.  Do you know if it was retrieved by any of the other

6    confidential sources before it was given to Agent Passmore?

7    A.  I don't know exactly who recovered it.

8    Q.  You do know, right, that the confidential source known as

9    CW-1 was involved in the chain of custody with this?

10   A.  I don't know for sure.  I don't.

11   Q.  Has that been told you to you by any agents?

12   A.  It was told to me by one of the agents that it was CW-1 or

13   an associate.

14   Q.  Or an associate of CW-1?

15   A.  Correct.

16   Q.  One of the individuals he had working for them?

17   A.  Correct.

18   Q.  You're aware that CW-1 was a major and sophisticated

19   international drug trafficker?

20   A.  Yes.

21   Q.  And so what was told to you by one of the agents was that

22   after CS-3 accidentally left the device in the hotel, at some

23   point either CW-1 or an associate of CW-1 retrieved it?

24   A.  Yes, sir.

25   Q.  Do you know anything about what the communications were

1    between CS-3 and CW-1 involved in that?

2    A.  I do not.

3    Q.  Who was the agent that told you that?

4    A.  Special Agent Passmore from Honduras.

5    Q.  Do you know if that was based on direct knowledge by

6    Special Agent Passmore or if someone told him that?

7    A.  I don't.

8            MR. JACKSON:  One brief moment.

9            (Pause)

10   BY MR. JACKSON:

11   Q.  Just one last question, sir.

12           During the training, my understanding is that you

13   instructed the confidential sources to record all meetings,

14   am I correct on that?

15   A.  Relevant meetings in the investigation, yes.

16   Q.  Why did you give them that instruction?

17   A.  I give every informant those instructions.

18   Q.  Right.  But why?

19   A.  That's what we do.  We give them audio and video recording

20   devices to record those meetings, to capture evidence.

21   Q.  The question is, why was there a specific instruction to

22   record all meetings?

23   A.  Because that's what we do.

24           THE COURT:  Excuse me, that is not what he said.  He

25   said all relevant meetings.

G99SFLO1                    Corcoran - cross

1          MR. JACKSON:  All relevant meetings, correct, your

2     Honor.

3     BY MR. JACKSON:

4     Q.  Why was there a specific instruction to record all relevant

5     meetings?

6     A.  We tell them all, we always say that.

7     Q.  I don't mean to badger you about it.

8     A.  That's fine.

9     Q.  I am just asking, is there an investigative reason for

10    that?

11    A.  We want to capture all the evidence that is relevant to the

12    investigation whether it's regarding drug conversations or

13    anything.

14          MR. JACKSON:  Thank you.

15          No further questions, your Honor.

16          MS. ESPINOSA:  No questions, your Honor.

17          THE COURT:  Do you have anything, Mr. Bove?

18          MR. BOVE:  No, your Honor.

19          THE COURT:  Thank you, Agent Corcoran.

20          (Witness excused)

21          MR. QUIGLEY:  Your Honor, the government calls

22    Agent Robert Zachariasiewicz.

23          THE COURT:  Is that the gentleman we call Zach?

24          MR. QUIGLEY:  Yes, your Honor.  I'll just call him

25    Agent.

1    ROBERT ZACHARIASIEWICZ,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Please sit down.  Make yourself

5    comfortable.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Mr. Quigley.

8    DIRECT EXAMINATION

9    BY MR. QUIGLEY:

10   Q.  Good morning, sir.  Where do you work?

11   A.  I'm a special agent with Drug Enforcement Administration.

12   Q.  How long have you been a DEA agent?

13   A.  For approximately 18 years.

14   Q.  And directing your attention to November of 2015, where

15   were you working at that time?

16   A.  I was assigned to the DEA special operation division in

17   Chantilly, Virginia.

18   Q.  In what capacity?

19   A.  I was a group supervisor for the bilateral investigations

20   unit.

21   Q.  How long did you have that job for?

22   A.  For approximately three years.

23   Q.  And before you became a DEA agent, prior to becoming a

24   group supervisor in the BIU, what other positions did you old

25   in the DEA?

1   A.  I was an investigating agent in the BIU for approximately

2   eight years, and I spent another three years in the special

3   operations division, and prior to that, I was assigned to the

4   New York field division for five years.

5   Q.  What did you do before you joined the DEA?

6   A.  Upon graduating from Villanova University, I served as an

7   officer in the United States Navy for approximately four years.

8   And upon my honorable discharge, I attended the University of

9   Denver College of Law.

10  Q.  Agent, back in 2011, did a judge in this district, Judge

11  Scheindlin, make an adverse credibility finding against in a

12  suppression hearing?

13  A.  Yes.

14  Q.  What happened the day after that finding was made?

15  A.  The finding was withdrawn.

16  Q.  Shifting back to November 2015, specifically November 9,

17  2015, did you travel to Haiti in connection with this case?

18  A.  I did.

19  Q.  Did any other US-based agents travel to Haiti on

20  November 9?

21  A.  Yes.  Two of the agents in my group and one agent that we

22  work with from New York.

23  Q.  Who selected those agencies?

24  A.  I did personally.

25  Q.  And who went?

1    A.  From my group was Special Agent Sandalio Gonzalez and

2    Special Agent Leith Habayeb, and from New York, Special Agent

3    Kimojha Brooks.

4    Q.  Why did you select those agents to go?

5    A.  Special Agent Gonzalez was the lead case agent on the

6    investigation we were conducting, and he was also a fluent and

7    native Spanish speaker.  And Special Agent Habayeb had had some

8    medical training.  And as for Special Agent Brooks, he had a

9    team in New York that was waiting to support us upon return to

10   New York, if it was needed.

11   Q.  Did you anticipate making any arrests in Haiti?

12   A.  We did.

13   Q.  Who was going to conduct the arrest operation?

14   A.  The special unit of the Haitian national police, known as

15   the BLTS that we were working with through our local DEA agent

16   station in Haiti.

17   Q.  Focusing on November 10, the next day, how did that day

18   begin for you?

19   A.  I was picked up at the hotel pretty early by one of our

20   agents stationed in Haiti, Jacinto Flores, and taken to the

21   United States Embassy, where we met with the country attaché,

22   Mike Wilhite, to go over the day's events.

23   Q.  And the country attaché is who?

24   A.  The country attaché is DEA's, basically, liaison that is

25   stationed in our foreign offices who he interacts with our U.S.

1    Embassy, as well as with foreign government officials, and most

2    specifically with foreign law enforcement that DEA interacts

3    with.

4    Q.   Where did you go after you left the U.S. Embassy?

5    A.   After the U.S. Embassy, we went to the headquarters for the

6    BLTS for an operational meeting.

7    Q.   Based on your meetings at the Embassy and your meetings

8    with the BLTS, what did you understand the Haitians wanted to

9    see before undertaking any operation?

10   A.   The Haitians agreed to participate in an operation with us,

11   but they first requested that we provide copies of US-based

12   arrest warrants from the Southern District of New York.

13   Q.   Did you do that?

14   A.   We did.

15   Q.   Where did you go after you left the BLTS?

16   A.   At approximately ten in the morning, we relocated to an

17   area about a quarter of a mile away from the Servotel hotel in

18   Haiti, and the BLTS set up on the hotel grounds.

19   Q.   Was the Servotel the location where you thought the arrest

20   was going to take place?

21   A.   It was.

22   Q.   Did there come a time when you learned that the defendants

23   had been arrested?

24   A.   We did.  We had BLTS member with us in the off site, and

25   Special Agent Gonzalez was in direct communications with our

G99SFLO1                        Zachariasiewicz – direct

1    undercover confidential source.

2    Q.   Where did you go once you heard the defendants were

3    arrested?

4    A.   We immediately traveled a short distance over to the

5    Servotel hotel.

6    Q.   What did you see when you got there?

7    A.   There was a fair number of BLTS tactical members on the

8    outside of the hotel who had set up a secure perimeter, then we

9    entered the hotel, and I observed the defendants being escorted

10   out of the hotel by BLTS members.

11   Q.   Where did you go once you left the Servotel?

12   A.   We followed BLTS units again back to their headquarters.

13   Q.   Did there come a time when you went somewhere else or you

14   left the BLTS compound?

15   A.   Yes.  A short time after returning, sometime after noon, I

16   traveled with Country Attaché Wilhite and Special Agent Flores,

17   and we traveled to meet with several high-ranking Haitian

18   police officers and the Haitian ministry of justice.

19   Q.   How long did it take to get from the BLTS compound to the

20   ministry of justice?

21   A.   Approximately 45 minutes to an hour.

22   Q.   And what happened when you got there?

23   A.   We went to the office of the ministry of justice, we

24   briefed several of his aides, and then the ministry of justice

25   himself came in.  We briefed him on the operation, who the

 1    defendants were, and why we were requesting custody be

 2    transferred to the DEA.  And then Country Attaché Wilhite

 3    presented a formal written request on behalf of the DEA and on

 4    behalf the Embassy requesting removal to the United States.

 5            MR. QUIGLEY:  Mr. Calabrese, can we publish what is in

 6    evidence as Government Exhibit 13A.

 7    Q.  Do you recognize that, Agent Zach?

 8    A.  I do.

 9    Q.  What is that?

10    A.  That's a copy of the formal letter that Country Attaché

11    Wilhite has prepared and submitted to the ministry of justice.

12    Q.  What happened after Agent Wilhite submitted this to the

13    ministry of justice?

14    A.  The minister of justice reviewed it, reviewed the facts

15    with us, and then orally agreed to transfer custody to the DEA.

16    And he excused himself and said he was preparing a document of

17    his own that would be a written concurrence to the transfer.

18    Q.  Did you get that written concurrence?

19    A.  He did.  He returned a short time later and presented us

20    with a letter.

21            MR. QUIGLEY:  Mr. Calabrese, can we publish what is in

22    evidence as Government Exhibit 14A.

23    Q.  Do you recognize that, Agent Zach?

24    A.  I do.  That's a copy of the written letter provided by the

25    Haitian minister of justice.

1    Q.  After you left the ministry of justice, where did you go?

2    A.  We traveled to a different police headquarters.  There was

3    a police headquarters of the Haitian national police, which is

4    a short distance away from the BLTS headquarters.

5    Q.  Is that where the defendants had been moved?

6    A.  They had been relocated there for final processing and

7    preparation for turnover to DEA.

8    Q.  Where did you go after the Haitian national police?

9    A.  A short time after being there, we followed a Haitian

10   national police convoy to a private section of the airport in

11   Port-au-Prince, where we had a DEA aircraft waiting for

12   removal.

13   Q.  What happened when you got to the airport?

14   A.  The cars pulled up very, very close to the aircraft, the

15   defendants were removed from the Haitian vehicles, custody was

16   turned over to us, Haitian restraints were taken off the

17   defendants, our own DEA restraints were put on the defendants,

18   and they were placed in the aircraft.

19   Q.  When the defendants came into the U.S. custody, were they

20   physically injured in any way?

21   A.  Not in any way.

22   Q.  Did you know what, if anything, the Haitian police had told

23   them at the time of their arrests?

24   A.  I was not present for that.

25   Q.  Did you know anything about whether the defendants had been

1    kidnapped in the past?

2    A.  I have no knowledge of that.

3         MR. QUIGLEY:  Mr. Calabrese, can we publish what is in

4    evidence as Government Exhibit 7.

5    Q.  Agent Zach, do you recognize this?

6    A.  I do.

7    Q.  What is that photograph?

8    A.  That's a photograph of the interior of the DEA air one

9    Learjet.

10   Q.  Which direction is the camera facing in this photo, the

11   front or to the back of the plane?

12   A.  The camera is projecting from the front to the back.  You

13   can see the back wall is the rear of the plane.

14   Q.  When the plane took off from Haiti, where were you sitting?

15   A.  I was sitting in the front area, which is pretty much

16   behind the cockpit, the area where you can kind of see a couch

17   on the left and a chair on the right.

18   Q.  Where were the defendants sitting?

19   A.  They were sitting catacorner on the back of the aircraft,

20   as I recall.

21   Q.  Did there come a time when Efrain Campo Flores was moved to

22   the front of the plane where you were sitting?

23   A.  He was.

24   Q.  And approximately how long into the flight did that happen?

25   A.  It was approximately 30 to 45 minutes or so into the

1    flight, just after five p.m., I believe.

2    Q.  And who, if anyone, began speaking to him when he got to

3    the front of the plane?

4    A.  We sat him down, he was -- he had a seatbelt put back on

5    him, and SA Gonzalez spoke to him in Spanish.

6    Q.  Do you speak any Spanish?

7    A.  Minimally.

8    Q.  So were you relying on Agent Gonzalez to translate what was

9    being said?

10   A.  I was relying on Agent Gonzalez to translate.

11   Q.  When Campo Flores got to the front of the plane, what,

12   if anything, did Agent Gonzalez provide him with?

13   A.  Agent Gonzalez provided him with what we call a DEA form

14   13B, which is an advisement of rights, Miranda rights.

15   Q.  And what did you see Campo Flores do with respect to that

16   form?

17   A.  The form was in Spanish.  Agent Gonzalez presented it to

18   him, and I saw agent -- I saw, excuse me, Mr. Campo review the

19   form.

20   Q.  What did you do after that?

21   A.  After a minute or two, Agent Gonzalez began to speak with

22   him in Spanish, and then I observed them review the form

23   together.  Agent Gonzalez appeared to go through the form

24   physically line by line pointing to each line, and then

25   appeared to be getting concurrence from Mr. Campo that he

1   understood each line and they went through it.

2              MR. QUIGLEY:  Can we publish what is in evidence as

3   Government Exhibits 10A, Mr. Calabrese.

4   Q.  What is that, Agent Zach?

5   A.  That's the DEA form 13B that we were just discussing.

6   Q.  Next, you see the bottom of the form, towards the bottom of

7   the form, where it says *firma* there?

8              THE COURT:  It says what?

9              MR. QUIGLEY:  *Firma*.  That's signature in Spanish.

10  Q.  Who signed that portion of the form?

11  A.  Mr. Campo, in my presence.

12  Q.  What did he do after he signed the form?

13  A.  Both Agent Gonzalez and I signed the form, and then Agent

14  Gonzalez time-stamped it.

15  Q.  Based on your communications with Agent Gonzalez and your

16  observations of Mr. Campo Flores, was Campo Flores asked any

17  questions about this case before he signed this Miranda waiver?

18  A.  Not to my knowledge.

19  Q.  Was he asked any questions about drug trafficking or other

20  criminal activity before he signed this Miranda waiver?

21  A.  Not to my knowledge.

22  Q.  What happened once he signed this form?

23  A.  After he signed the form, he and Agent Gonzalez began to

24  speak, have a fairly lengthy conversation in Spanish.  Agent

25  Gonzalez stopped very regularly and translated to me.  I

1    actually presented some of the questions in English, which

2    Agent Gonzalez presented in Spanish and then gave me the

3    answers back in English.

4    Q.  How would you describe the Defendant Campo Flores' demeanor

5    during this conversation?

6    A.  He was -- he was very cooperative, very polite.  He

7    appeared to be shaken up from the day's events.  He cried on

8    several occasions, at which point Agent Gonzalez would take a

9    little time and, you know, try -- appeared to try to be

10   somewhat comforting to him.

11   Q.  Why did the conversation involving you, Agent Gonzalez, and

12   Defendant Campo Flores end?

13   A.  Excuse me, why did it end?

14   Q.  Yes.

15   A.  They had been speaking for some time, and we knew, based on

16   how long we anticipated the flight, that we didn't have too

17   much more time, and we wanted to provide the second defendant,

18   Mr. Flores, an opportunity to speak if he wished to.

19   Q.  And so once the conversation with Campo Flores ended, where

20   did Campo Flores go?

21   A.  Mr. Campo was walked to the back of the plane and then

22   seatbelted back into his seat in the back of the plane, and we

23   brought Mr. Flores up to the front of the plane.

24   Q.  And that is Mr. Flores de Freitas?

25   A.  Yes, it is.

G99SFLO1                    Zachariasiewicz - direct

1    Q.  Once Mr. Flores de Freitas got to the front of the plane,

2    what, if anything, did Agent Gonzalez give to him?

3    A.  Very similar to Mr. Campo, he was presented with a DEA form

4    13B, that I observed him review.

5    Q.  Did you observe him sign it?

6    A.  I did.

7            MR. QUIGLEY:  Mr. Calabrese, if you could publish what

8    is in evidence as Government's Exhibit 11A.

9    Q.  What is that?

10   A.  That's the DEA form 13B that Mr. Flores de Freitas signed.

11   Q.  What did he do after you signed this form?

12   A.  Special Agent Gonzalez and I also signed and time-stamped

13   it in the same manner as before, and Special Agent Gonzalez

14   began to have a conversation in Spanish with Mr. Flores in the

15   same manner as earlier.

16   Q.  So based on your communications from Agent Gonzalez and

17   your observations of the conversation, was Flores asked any

18   questions about this case before he signed this Miranda waiver

19   form?

20   A.  Not to my knowledge.

21   Q.  Was he asked any questions about drug trafficking or other

22   criminal activity prior to signing --

23   A.  No, not to my knowledge.

24   Q.  Let me finish the question.

25           Did he ask any questions about drug trafficking or any

1  other criminal activity before he signed this Miranda form?

2  A.  No, not to my knowledge.

3  Q.  What happened once he signed this form?

4  A.  Very similar to Mr. Campo, Agent Gonzalez initiated a

5  conversation, translated regularly with me.  I presented some

6  of the questions in the same manner, and he presented the

7  questions in Spanish and came back and gave me the answers in

8  English and filled me in on the conversation.

9  Q.  Why was the conversation with Mr. Flores de Freitas

10  briefer?

11  A.  It was briefer because, at some point, maybe 45 minutes or

12  so, the pilots came and alerted us that we would soon be

13  landing in New York and to make preparations for landing.  So

14  we took Mr. Flores and put him back in the back of the plane,

15  secured him in his seat for landing, and prepared to land.

16  Q.  Did you land in New York?

17  A.  We did.

18  Q.  And at any point while you were on the plane, did you hear

19  anyone yelling at the defendants?

20  A.  Absolutely not.

21  Q.  Did you hear anyone -- see anyone physically threaten the

22  defendants in any way?

23  A.  Absolutely not.

24  Q.  Were there any weapons displayed during the flight?

25  A.  We had no weapons.

1   Q.  What, if any, contact did you have with the defendants once

2   you got to New York?

3   A.  Very, very minimal.  We were met on the tarmac by agents

4   from Special Agent Brooks' group along with immigration and

5   some HSI officials that had some processing to do upon entry.

6   We walked the defendants off the plane, and then all those

7   individuals took custody, and I had very minimal contact within

8   the building from that point.

9           MR. QUIGLEY:  One moment, your Honor.

10          No further questions.

11          THE COURT:  Mr. Zach.

12          MR. ZACH:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MR. ZACH:

15  Q.  Good morning, Special Agent Zach.

16  A.  Good morning, sir.

17  Q.  Now, sir, during the course of this investigation, you

18  were the supervisor over the unit that was managing the

19  investigation, right?

20  A.  That's correct.

21  Q.  So you had primary responsibility for overseeing all the

22  agents that were involved in the investigation, is that right?

23  A.  Not all the agents in the investigation, but the agents

24  within my group that were involved in the investigation.

25  Q.  Well, would you list for us what agents were you in charge

1    of overseeing in connection with this investigation?

2    A.   Mainly special Agent Gonzalez, Special Agent Corcoran, to a

3    lesser degree Special Agent Habayeb, more specifically for the

4    portion in Haiti.  I believe Special Agent Peterson might have

5    participated to some degree.

6    Q.   And to be clear, your involvement in the case wasn't

7    limited simply to this trip to Haiti that you just testified

8    about on direct, right?

9    A.   No, it was not.

10   Q.   You were involved from the outset of the investigation,

11   right?

12   A.   I was.

13   Q.   And you were responsible for overseeing the agents that

14   were in charge of handling the various confidential sources

15   that were contributing to the investigation, right?

16   A.   That's correct, sir.

17   Q.   And throughout the course of the investigation, these

18   agents reported to you directly, right?

19   A.   They did.

20   Q.   And I take it that you would expect from them to have

21   regular updates on what is going on with the status of the

22   case, right?

23   A.   Correct.

24   Q.   And would it be fair to say, sir, that your overall job as

25   the agent in charge of the investigation was to ensure the

1    integrity of the investigation?

2    A.  I oversaw the investigation and ensuring to the greatest

3    degree possible integrity is part of that.

4    Q.  You're the supervisor?

5    A.  Correct.

6    Q.  It's your job to make sure everything is going, right,

7    right?

8            MR. QUIGLEY:  Objection.

9            THE COURT:  Sustained.

10   Q.  As the supervisor, sir, your job is to make sure that the

11   agents working under you are following the proper protocols,

12   right?

13   A.  To the greatest extent possible.

14   Q.  And part of your responsibility is evaluating whether or

15   not they're carrying out their jobs appropriately, right?

16   A.  Yes.

17   Q.  Now, and you're still in charge of the investigation as you

18   sit here today, right?

19           MR. QUIGLEY:  Objection, beyond the scope.  This is

20   not --

21           MR. ZACH:  Your Honor --

22           THE COURT:  Overruled.

23           MR. ZACH:  Just to be clear, may we have a sidebar on

24   that?

25           THE COURT:  Wait a minute.  You've got a question

1   pending.  Do you want an answer?

2            MR. ZACH:  Yes, please.

3   A.  I am not currently in charge of the investigation.  I

4   transferred offices two weeks ago.

5   Q.  But as of two weeks ago, you were in charge of the

6   investigation?

7   A.  Correct.

8            MR. ZACH:  Your Honor, may we have a brief sidebar?

9   Unless they are going to continue to make scope objections, I

10  would like to have a brief sidebar to clear some things up.

11           THE COURT:  No.

12           MR. ZACH:  OK.

13  BY MR. ZACH:

14  Q.  I would like to turn your attention to April 18 of 2016.

15  A.  Yes, sir.

16  Q.  As of April 18, 2016, isn't it a fact, sir, that the DEA

17  learned that two of the confidential sources that were part of

18  the investigation were essentially deceiving the DEA?

19  A.  At about that time, my group received information that

20  concerned us as to some activities that the confidential

21  sources may have been engaged in.

22  Q.  And who was it that notified your group of this

23  information?

24  A.  Another confidential source that works with the group.

25  Q.  I am going to refer to that source as CS-6.

1    A.  OK.

2    Q.  Is that OK?  Do you understand who I am referring to if I

3    say that?

4    A.  I do.

5    Q.  Thank you.

6              How long had CS-6 been an informant for the group?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Agent, I am going to interrupt your

9    examination.  Do you want to go back in the room?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  I am not going to have a sidebar.  I'll

12   discuss this in open court.

13             (Witness not present)

14             THE COURT:  Your objection is what?

15             MR. QUIGLEY:  Your Honor, I mean, he requests a

16   spoliation, not about the DEA's investigation of CS-1 and CS-2.

17   They are going to testify this afternoon.  We had two and a

18   half hours on this with Agent Gonzalez yesterday.  I think it

19   is beyond the scope of the issues of the hearing.

20             THE COURT:  Mr. Zach.

21             MR. ZACH:  Your Honor, we are here for two things, for

22   spoliation, which is what we are going to do this afternoon,

23   and we are here for the statements.

24             Special Agent Zach interviewed CS-1 and CS-2 after it

25   was determined that they were lying.  He was the one that

1    headed up the investigation that developed all the impeachment

2    material toward them, which is directly relevant to their

3    testimony today.  That is why we politely suggested that the

4    CSs go first.

5             So what they're trying to do --

6             THE COURT:  Yes.  I rejected that, right?

7             MR. ZACH:  Right.

8             But now they're going to object to scope.  We can

9    recall him as a witness after the CSs speak, but they called

10   him here.  We should proceed now.

11            MR. QUIGLEY:  Judge, if they want to impeach him on a

12   CS's statement, they're entitled to recall somebody.  They are

13   not entitled to extraneous impeachment on collateral matters,

14   such as the CS's drug-dealing.  This is about spoliation,

15   whether the CSs destroyed any recordings, or whether that

16   substance was cocaine or whether it had an inherently --

17            THE COURT:  What is it that you intend to establish

18   with the witness?

19            MR. ZACH:  Your Honor, I am trying to establish a

20   number of things, but what is going to be critical to the

21   evaluation of the spoliation motion is the credibility of

22   CS-1 and CS-2.

23            THE COURT:  Are they taking the stand?

24            MR. ZACH:  Yes.  They are taking the stand today.

25            THE COURT:  I sustain the objection.

1          Call the witness back.

2          (Witness present)

3          THE COURT:  Thank you, Agent.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Mr. Zach.

6          MR. ZACH:  Thank you, your Honor.

7   BY MR. ZACH:

8   Q.  Now, Special Agent Zach, prior to departing for Haiti,

9   isn't it a fact that one of the goals of the DEA was to attempt

10  to gain the cooperation of the defendants in this case?

11  A.  The goal of the trip to Haiti was to apprehend the

12  defendants.

13  Q.  Well, the DEA had more than one goal, right?

14  A.  The goal of the DEA was to apprehend the defendants.  What

15  happens after, you never know.

16  Q.  Well, did the DEA, the agents, you as the supervisor, have

17  an interest in obtaining the cooperation of the defendants?

18  A.  The goal was to apprehend the defendants.  In every case

19  that we make, you take it where it leads you.  But the goal,

20  the immediate goal, was simply to apprehend the defendants.

21          We had no idea if the defendants would be willing to

22  cooperate.  We had no idea if we were going to be able to

23  apprehend the defendants.

24  Q.  I would like to show you -- well, in this case, was an

25  attempt made to obtain their cooperation?

1   A.   The defendants voluntarily cooperated.

2   Q.   My question was, were you attempting to obtain that?  Was

3   that something you were open to?

4   A.   It naturally occurred after the defendants voluntarily

5   waived their Miranda rights.  They requested to speak to us and

6   asked how cooperation worked and requested to cooperate with

7   us.

8   Q.   I would like to start by showing you a document, 3510-06.

9   Sorry, I was grabbing it.

10          MR. ZACH:  Can I approach, your Honor?

11          THE COURT:  Yes, you may.

12   Q.   Now, sir, have you seen that e-mail before?

13   A.   Yes.

14   Q.   You see it is an e-mail from -- it's initially an e-mail

15   from Mr. Gonzalez to, I think, a group of people.  It's hard to

16   tell.  You're eventually copied on that, right?

17   A.   Yes, sir.

18          MR. ZACH:  The defendants offer 3510-06.

19          MR. QUIGLEY:  No objection.

20          THE COURT:  3510-06 is received in evidence.

21          (Defendant's Exhibit 3510-06 received in evidence)

22   BY MR. ZACH:

23   Q.   Now, sir, looking at this e-mail, I have a couple of

24   questions I would like to ask you about it.

25          You start off saying -- Special Agent Gonzalez starts

1   off by saying that they're en route in Haiti, that the bad guys

2   confirmed they'll be there tomorrow, along with two additional

3   guys.

4           Do you see that?

5   A.  I do.

6   Q.  And that the CS will meet the targets tomorrow upon arrival

7   prior to their arrest.

8           Do you see that?

9   A.  I do.

10  Q.  What CS is being referenced there, do you know?

11  A.  I believe, in this case, he is being referred to as CS-1.

12  Q.  CS-1, right.

13          And then it says, if two additional guys participate

14  in a meeting -- and let me put this up on the ELMO so it is

15  easier to follow for the court.

16          You see it says, if two additional guys participate in

17  the meeting then we will knowledge them up.

18          Do you see that?

19  A.  Yes.

20  Q.  And, sir, isn't "knowledge them up" a term that is used

21  within the DEA when using CSs?

22          MR. QUIGLEY:  Objection, relevance.

23          THE COURT:  Sustained.

24  Q.  Well, this e-mail relates to the preparation for the arrest

25  of the defendants in Haiti, right?

1    A.  Yes.

2    Q.  And this is part of the planning that goes into the arrest

3    in Haiti among the DEA agents that you supervise, right?

4    A.  Just part of trying to be prepared for anything that might

5    unfold.

6    Q.  That's right.

7          And here, Special Agent Gonzalez is explaining sort of

8    the tactics that they're going to use once they're in Haiti,

9    right?

10   A.  I wouldn't call them tactics.  He is basically preparing,

11   hey, there are two new guys we aren't anticipating, they may

12   show up at the meeting, and here is how we are going to handle

13   that.

14   Q.  How you'll handle additional people there during the

15   arrest, right?

16   A.  Yes, sir.

17   Q.  One of the ways to handle that is to to knowledge them up,

18   right?

19          MR. QUIGLEY:  Objection, relevance.

20          THE COURT:  Sustained.

21   Q.  Now, the next thing he goes on to say is, we will ask the

22   Haitians to detain the two new guys and pilots for as long as

23   their law permits.

24          Do you see that?

25   A.  I do.

1   Q.  And that was another sort of planning item that you and the

2   agents you supervise were employing in connection with this

3   arrest, right?

4   A.  It's a security measure.

5   Q.  Well, OK, but that's not how Mr. Gonzalez sees it, right?

6   A.  That's exactly how Mr. Gonzalez sees it.

7   Q.  It's a security measure in case the defendants cooperate,

8   right?

9   A.  It's a security measure across the board so that the

10  operation wouldn't leak out.  Mr. Gonzalez didn't have to

11  explain in gross detail that it was a security measure, because

12  all the peoples involved in this arrest were professionals and

13  they already knew what that meant.  So it was completely

14  understood that, as a security measure, they would detain these

15  guys, and then we would see what happened.

16  Q.  Let's go on and look at what is actually in the e-mail,

17  right?

18  A.  OK.

19  Q.  He goes on to say, we will ask the Haitians to detain the

20  two new guys and pilots for as long as their law permits in

21  order to buy us some time to make calls if/when our two guys

22  decide to cooperate.

23          Do you see that?

24  A.  I do.

25  Q.  It doesn't say security measure.

1    A.  It didn't have to say security measures, because if they

2    don't detain these guys and go out and make calls back to

3    Venezuela, then the two defendants decide to cooperate, the

4    cooperation would be completely blown.

5            And, actually, the defendants, who may have decided to

6    cooperate, which they did on the way home, would be in a very

7    bad position with the folks back at home, while they're making

8    calls and trying to cooperate proactively, when everyone knows

9    that they're already cooperating with the government because

10   they got given up.

11   Q.  But you would agree with me, sir, this e-mail which

12   predates the arrest of the defendants --

13   A.  Yes, sir.

14   Q.  -- demonstrates that one of the goals of the DEA was to

15   obtain the cooperation of the defendants?

16            MR. QUIGLEY:  Objection.

17            THE COURT:  Sustained.

18   Q.  Now, did you eventually alert the Haitian authorities to

19   the presence of the two new guys and seek to delay their

20   release?

21            MR. QUIGLEY:  Objection, relevance.

22            THE COURT:  Overruled.

23   A.  The Haitian authorities actually alerted us.

24   Q.  Who were the two new guys?

25   A.  I believe at least one of them was a pilot, and then

1   another occupant of the plane, bodyguard, representative.

2   Q.  Were those individuals detained by the Haitian authorities?

3   A.  They were.

4   Q.  And for how long were they detained?

5   A.  I believe it was less than 24 hours or right around

6   24 hours total by the time they were released.

7   Q.  Thank you.  You can set that aside.

8          Now, did you meet with CS-1 prior to the arrest in

9   Haiti?

10  A.  I met with CS-1 prior to going to Haiti.  As for meeting

11  with him prior to the arrest, I got in later on the 9th than

12  everyone else, and I don't recall if I physically met with the

13  CS prior.

14  Q.  Do you know whether or not -- you knew that CS-1 was

15  traveling to Haiti around the same time as you were?

16  A.  I did.

17  Q.  Do you know whether or not any of the agents that you

18  supervised met with CS-1 prior to the arrest of the defendants

19  in Haiti?

20  A.  I -- I'm just not certain if they physically met with him

21  in Haiti.  They certainly met with him before.  But due to

22  operational security, we may have -- I think they did, but they

23  may have also -- they tried to keep the face to face to an

24  absolute minimum in country.

25  Q.  You would agree there would have been some sort of

1    communication or planning between the agents on the one hand

2    and CS-1 on the other in anticipation of the arrest, right?

3    A.   Yes.

4    Q.   That's just common sense, you have to do that.  Everyone is

5    going to be there for the arrest, right?

6    A.   Yes.

7    Q.   OK.   Thank you.

8         Now, was an instruction given by the DEA to CS-1 to

9    not record the actual arrest when it occurred?

10        MR. QUIGLEY:  Objection, your Honor.  He didn't recall

11   whether he was at any meetings with CS-1.

12        THE COURT:  Overruled.

13   A.   Not to my knowledge.

14   Q.   So you did not tell any of your agents that, to instruct

15   CS-1 not to videotape the actual arrest?

16   A.   I did not.

17   Q.   And none of your agents told you that they had given that

18   sort of instruction to CS-1?

19   A.   No.

20   Q.   Now, part of your job in setting up an arrest is to

21   evaluate the safety of everyone involved, right?

22   A.   Yes.

23   Q.   You want the arrest to happen as safely as possible, right?

24   A.   Absolutely.

25   Q.   And part of that requires making some sort of assessment of

1    the defendants who you're targeting?

2    A.   One possible.

3    Q.   Well, you considered the nature of the target in setting up

4    the arrest, right?

5    A.   Right.

6    Q.   Now, in this case, sir, isn't it a fact that the DEA

7    understood that these defendants were not experienced drug

8    dealers at all?

9    A.   We did not understand that.

10   Q.   There was no information being conveyed to you -- I'm just

11   talking about information conveyed to the DEA -- from the

12   confidential informants that the targets that you were seeking

13   to arrest were new?

14   A.   In our experience, it was quite the opposite.

15   Q.   Well, let me show you.  You understood, sir, didn't you,

16   that Special Agent Gonzalez was in communication with CS-1 in

17   planning both the meetings in Venezuela and in the arrest?

18   A.   Yes.

19   Q.   And would Special Agent Gonzalez regularly report to you

20   the substance of the communications between himself and CS-1?

21   A.   The important parts.

22   Q.   So Special Agent Gonzalez would pick what he thought was

23   important and then convey that to you?

24             MR. QUIGLEY:  Objection.

25             THE COURT:  Sustained.

1    Q.  So you just used the term, sir, whatever was important.

2    How was that determined?

3    A.  Special Agent Gonzalez did not relay every single word,

4    every gross detail, that he exchanged with the informant.  He

5    would give me the hard facts of the operation, and we would

6    discuss what we needed to discuss.

7    Q.  And so my point is a simple one.  Special Agent Gonzalez

8    was picking what he would tell you?

9               MR. QUIGLEY:  Objection, relevance.

10              THE COURT:  Sustained.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Let me show you -- I'm showing you page 76 of 3508-45.

2          MR. QUIGLEY:  Your Honor, I am going to object.  This

3  isn't proper impeachment.  It's not his statement, and he

4  didn't say he lacked recollection.

5          MR. ZACH:  He hasn't even seen the document, your

6  Honor.

7          MR. QUIGLEY:  He shouldn't see the document.  He

8  hasn't made a prior inconsistent statement, and it's not his

9  statement, and he hasn't said he needed his recollection

10  refreshed.

11          THE COURT:  What is the document?

12          MR. ZACH:  Your Honor, it is one of the chats.

13          THE COURT:  Give me the number, please.

14          MR. ZACH:  Sorry, your Honor.

15          THE COURT:  It is 3508-45, page 76.

16          MR. QUIGLEY:  These are chats between CS-1 and Agent

17  Gonzalez.

18          THE COURT:  Page what?

19          MR. ZACH:  Page 76, your Honor.

20          THE COURT:  76.

21          Objection sustained.

22  Q.  So, sir, you said certain hard facts were conveyed to you

23  by Special Agent Gonzalez prior to the arrest occurring, right?

24  A.  Yes.

25  Q.  Was one of the hard facts that was conveyed to you that

1   CS-1 stated that the defendants were new, that they wanted to

2   start, and that they were inexperienced?

3            MR. QUIGLEY:  Objection.

4            Relevance.

5            THE COURT:  Overruled.

6   A.   I don't recall that, but when I answered before and I said

7   in our experience they weren't, they had no experience, it

8   takes a lot of weight to be able to put 800 kilos together and

9   arrange for secure delivery in a country like Honduras and to

10  get to a high-level person that can make that all happen.

11  Regardless of what the informants' opinion may have been, we

12  found these guys to be players in the game if they get to that

13  level, even if it was within a short period of time.

14  Q.   To be clear was there ever 800 kilograms of real cocaine in

15  this case?

16  A.   I believe there was.

17  Q.   You have, the DEA, seized 800 kilograms of real cocaine?

18  A.   We did not.

19  Q.   Did any DEA agent see 800 kilograms of real cocaine in this

20  case?

21  A.   We did not.

22  Q.   Did any CS see 800 kilograms of real cocaine in this case?

23  A.   Not to my knowledge.

24  Q.   Sir, just jumping ahead, since we are on the topic, at some

25  point you were privy to a discussion with both of defendants on

1    the airplane, right?

2    A.   I had a discussion translated to me.

3    Q.   Yeah.  I mean, I understand.  You don't speak Spanish, but

4    Special Agent Gonzalez would be speaking to one of the

5    defendants and interpreting to you?

6    A.   Yes, sir.

7    Q.   Was he giving a line-by-line interpretation, or was he

8    summarizing the substance as he heard it to you?

9    A.   I think it was somewhere in the middle.  There were clearly

10   parts where he turned right back to me and said -- I believe

11   said exactly what was just said, but then there were times

12   where he gave summaries because they were speaking a little

13   longer.

14   Q.   To be clear, is your Spanish sufficient enough that you can

15   understand on your own what either of the defendants were

16   saying?

17   A.   I am not fluent in Spanish.

18   Q.   You required Special Agent Gonzalez to translate and

19   interpret what they were saying, right?

20   A.   Yes.

21   Q.   So, absent sort of Special Agent Gonzalez as an

22   intermediary, you wouldn't know what they were saying?

23   A.   I would miss some finer points.

24   Q.   Well, miss some finer points is different than having a

25   minimal conversational knowledge of Spanish, right?

1  A.  Understood.  I can't testify to Spanish, so I absolutely

2  needed Special Agent Gonzalez to translate.

3  Q.  I'm not asking you if you are a court-authorized

4  translator.  I'm asking you what you understood based on your

5  working knowledge of Spanish.

6          Wasn't your working knowledge of Spanish, sir,

7  insufficient to understand what the defendants were saying

8  absent Special Agent Gonzalez as an intermediary?

9          MR. QUIGLEY:  Objection.

10          Asked and answered.

11          THE COURT:  Sustained.

12          In other words, Agent, you couldn't interview the

13  Spanish-speaking defendants, could you?

14          THE WITNESS:  Nothing that I would be prepared to

15  testify to, your Honor.

16          THE COURT:  OK.  But you couldn't --

17          THE WITNESS:  I have a basic --

18          THE COURT:  Your Spanish-language capability is such

19  that you could not conduct a DEA interview of the defendants in

20  Spanish?

21          THE WITNESS:  No.

22  Q.  There may be another way to ask it.

23          THE COURT:  I don't want another way to ask it.

24          I want you to go on to something else.

25          MR. ZACH:  Your Honor, can I ask one last question

1    that other witnesses have be asked.

2           THE COURT:  Go ahead.

3    Q.  The DEA has a Spanish rating system for people that speak

4    it?

5    A.  They do.

6    Q.  Have you ever taken that examination?

7    A.  I have not.

8    Q.  So you don't even have a Spanish rating?

9    A.  I don't.

10   Q.  Thank you, sir.  Getting back to the point about their

11   experience level, after conversations on the plane, you sent an

12   e-mail to various people in the investigation, including some

13   of the AUSAs, relating to their experience level, didn't you?

14   A.  I don't think it was necessarily to their experience level.

15   I think I was referring to the degree of access they may or may

16   not have had.

17   Q.  OK.  By access you mean their access to actual drug

18   traffickers, right?

19   A.  No.  Access to anybody immediately who they may be able to

20   proactively cooperate against.

21   Q.  Right.  And the sorts of individuals -- in a typical case,

22   the DEA would look to see if someone who is arrested has an

23   active connection to a supplier, right that would be a typical

24   person you would have someone reach out to, right?

25   A.  It depends on the case.  That might be one thing you look

1    at.

2    Q.  Sir, I mean, how many cases have you worked on where you

3    cooperated someone?

4    A.  You said an actual supplier.  A lot of the people that --

5    we might have an actual supplier.  So if we have an actual

6    supplier, we might not be going to try to figure out who actual

7    supplier is because we already have them.

8    Q.  You would agree with me, sir, that one of the priorities if

9    you have someone that was recently arrested and that you wanted

10   to proactively cooperate, would be an actual supplier of

11   cocaine, right?

12   A.  I just said that might be one of the things we would look

13   at.

14   Q.  In this case you determined there was no actual supplier

15   that you had access to, right?

16              MR. QUIGLEY:  Objection.

17              Mischaracterizes his testimony.

18              THE COURT:  Sustained.

19              MR. ZACH:  Your Honor, I am asking him a question

20   about --

21              THE COURT:  I ruled.

22              Do you want to ask another question.

23              MR. ZACH:  Your Honor, I apologize.  I didn't hear the

24   ruling.  Sustained?

25              THE COURT:  I sustained the objection.

1    Q.  Let me show you 3510-05.

2         MR. ZACH:  Your Honor, may I approach?

3         THE COURT:  Yes, you may.

4         MR. ZACH:  Thank you.

5    Q.  This is an e-mail from you to one of the AUSAs, right?

6    A.  Yes.

7    Q.  This is reporting sort of in a few sentences the substance

8    of what occurred while on the plane, right?

9    A.  Yes.

10        MR. ZACH:  Your Honor, the defense offers DX 3510-05.

11        MR. QUIGLEY:  No objection.

12        THE COURT:  3510-05 is received in evidence.

13        (Defendant's Exhibit 3510-05 received in evidence)

14   Q.  What you say, sir -- first you say "No, completely onboard

15   but no real juice," right?

16   A.  Yes.  The no is in response to the prosecutor's question

17   about if they, we had to make arrangements for the following

18   day.

19   Q.  That would relate to if they were -- to cooperation, right?

20   A.  If they were to immediately proactively cooperate, yes.

21   Q.  And then you say, "but the family relationships are real,"

22   right?

23   A.  Yes, sir.

24   Q.  And then you say, "I'll let Sandalio fill you in."

25        That's Special Agent Gonzalez that you're referring

1   to, right?

2   A.  Yes, sir.

3   Q.  Did you understand, when the AUSA said "not JW," what "JW"

4   referred to?

5   A.  I do.

6   Q.  You do?

7   A.  Yes.

8   Q.  What did it refer to?

9   A.  A hotel.

10  Q.  Now, one of the things that you were interested in

11  exploring with the defendants was their family relationships,

12  right?

13  A.  Yes.

14  Q.  That was one of the reasons that the DEA was interested in

15  these defendants as targets, correct?

16  A.  No.

17          MR. QUIGLEY:  Objection.

18          THE COURT:  He's already answered.  The answer is no.

19  Q.  So your testimony, sir, is that -- you gave your answer.

20          Now, I want to shift gears to your interactions with

21  the Haitian authorities, right?

22  A.  Yes, sir.

23  Q.  When you landed in Haiti, did you have any doubt that the

24  Haitian government would agree to expel the defendants to the

25  United States?

g99nflo2                    Zachariasiewicz – cross

1   A.  I was confident, but there were some doubts left.

2   Q.  How substantial were those doubts?

3   A.  More substantial than I would have wished they were.

4   Q.  Have you ever set up a CS meeting in a different country

5   where the agents arrived and the defendants arrived and that

6   country does not expel?

7   A.  Yes.

8   Q.  How many times has that happened to you?

9   A.  Multiple.

10  Q.  What countries?

11  A.  I believe we have had it happen out of Colombia, actually

12  in a Venezuelan case, had it happen out of Panama, somewhat

13  similar situation out of Aruba, Curacao, Honduras, Mexico,

14  Romania.  Possibly one or two more.

15  Q.  Never out of Haiti?

16          THE COURT:  You asked about countries other than

17  Haiti.

18  Q.  But with respect to Haiti, sir, has it ever happened to you

19  there?

20  A.  I don't believe it's happened to me personally in Haiti.

21  Q.  Can we pull up, please, the interior picture of the plane.

22  That was on direct, where it's from the cabin looking backward,

23  please.

24          THE COURT:  Government Exhibit 7.

25          MR. ZACH:  Yes.  Thank you, your Honor.

1    Q.  I have some questions, general questions about the plane.

2    A.  Yes, sir.

3    Q.  When you are inside the cabin and you're -- let's say you

4    were seated where you were, which is sort of up front near the

5    pilots.

6    A.  Yes, sir.

7    Q.  Are you able to hear what is going in the chairs behind

8    you?

9    A.  No, not really.

10   Q.  Is that because -- we have all flown on airplanes --

11   there's sort of a rumbling and a noise from just flying in the

12   air?

13   A.  Yes, the acoustics are pretty good on this particular

14   plane, but with the seats blocking you and whatnot, you can't

15   hear really clearly.  Maybe the two seats right behind you, but

16   the further seats in the back would be tough.

17   Q.  I believe you testified that when you first boarded the

18   plane you were up in this front portion and the defendants were

19   sitting catty corner in the back portion, right?

20   A.  I believe that's right.

21   Q.  For the time period when you were in front and they were in

22   back, were you in a position to overhear what was going on

23   behind you?

24   A.  No, but I was monitoring the situation.

25   Q.  Sorry.  You were or you were not?

1   A.  I was -- visually I could see what was going on in the

2   back.

3   Q.  There were discussions among the people behind you, right?

4   Back there, right?

5   A.  Excuse me?

6   Q.  People were talking, right?

7   A.  The agents were only talking amongst themselves from what I

8   saw, and I actually instructed them that -- the defendants

9   attempted to speak with each other, and I instructed them to --

10  I instructed SA Gonzalez to tell them no communications.

11  Q.  So it's your testimony that no one was communicating with

12  one another -- strike that.

13          It's your testimony that none of the agents were

14  speaking or addressing the defendants --

15          MR. QUIGLEY:  Objection.

16          That's mischaracterizing his testimony.

17          MR. ZACH:  Can I finish the question.

18          THE COURT:  Yes.  You would help if you wouldn't just

19  restate what he says and ask him is that right.  His testimony

20  is on the record as to what he said.

21          MR. ZACH:  I know, your Honor.

22          THE COURT:  It is a waste of time just to repeat what

23  he says.

24          MR. ZACH:  Your Honor, I'm trying.

25          THE COURT:  Trying to put your own slant on it.

g99nflo2                    Zachariasiewicz - cross

1   Q.  My question to you, sir, is did you observe -- the agents

2   who were in the back part of the plane near the defendants, did

3   you observe them speaking to the defendants during the time

4   period when you were sitting up front and they were in the

5   back?

6           MR. QUIGLEY:  Objection.

7           THE COURT:  Overruled.

8   A.  I did not observe them speaking with the defendants.

9   Q.  And you did not hear them speaking either?

10  A.  I did not.

11  Q.  You mentioned earlier that the defendants started crying at

12  different points during the plane ride, right?

13          MR. QUIGLEY:  Objection.

14          Mischaracterizes his testimony.

15          THE COURT:  That is a mischaracterization.

16  Q.  You observed Mr. Campo crying during parts of the plane

17  ride, right?

18  A.  I did.

19  Q.  Was that when you were talking to them about the penalties

20  that they may face?

21  A.  It was during the time when SA Gonzalez was speaking with

22  them.  It was actually on several occasions.  So I think there

23  was more than one topic.

24  Q.  How many times did you observe Mr. Campo crying?

25  A.  At least three.

g99nflo2                    Zachariasiewicz - cross

Q.  And what, when he was crying, was Mr. Gonzalez conveying to

you, Special Agent Gonzalez conveying to you, that he had been

saying to Mr. Campo at that point?

A.  I believe on one of the occasions Special Agent Gonzalez

told me something to the effect of Mr. Campo was asking him

what the potential penalties could be, and Special Agent

Gonzalez told him, you know, the range of how severe the

penalties could be.  But my understanding was it was upon

Mr. Campo requesting the information.

Q.  That was something that would have been translated to you

by Special Agent Gonzalez, right?

A.  That's correct.

Q.  Was one of those times when Special Agent Gonzalez was

speaking to Mr. Campo about whether or not Mr. Campo would see

his family again?

A.  Not to my knowledge.

Q.  That's not something that Special Agent Gonzalez said to

him?

          MR. QUIGLEY:  Objection.

          Asked and answered.

          THE COURT:  Sustained.

Q.  As to the other instances of crying, do you know what the

topic was that prompted that?

A.  I don't recall it being a specific topic, just, again, kind

of the gravity of the situation every once in a while seemed to

1    maybe wash over him a little bit.

2    Q.  When you met with the Haitian minister of justice, on

3    direct you said that you described to the minister of justice

4    who the defendants were.  Do you recall that?

5    A.  I don't know -- I don't believe it was me personally, but,

6    yes, that was part of the discussion with the minister of

7    justice.

8    Q.  How did you describe the defendants to the Haitian minister

9    of justice?

10   A.  I believe it was explained to the minister of justice who

11   they were claiming to be.

12   Q.  Well, who did you understand them to be claiming to be?

13   A.  I believe at that time Mr. Campo was claiming to be the son

14   of Cilia Flores, the first lady of Venezuela.

15   Q.  So when you were talking to the minister of justice, one of

16   the things you highlighted was this allegedly stated connection

17   to the Venezuelan family, right?

18   A.  Due to the extreme pressures Venezuela puts on countries in

19   these types of situations, we felt it was only fair that the

20   minister of justice was prepared for the potential political

21   ramifications.

22   Q.  Now, as you sit here today, for how long were you and

23   Special Agent Gonzalez speaking with Mr. Campo on the plane, in

24   your best estimation?

25   A.  I believe it was somewhere in the neighborhood of two

1    hours.

2    Q.  And subsequent to that two-hour conversation, that's when

3    Mr. Flores came forward, right?

4    A.  I'm sorry.  Can you restate that.  I lost you for a second.

5    Q.  Sorry.  After that two hours of speaking with Mr. Campo --

6    A.  Yes, sir.

7    Q.  -- you then spoke with Mr. Flores, right?

8    A.  We did.

9    Q.  At some point that conversation was cut off because you had

10   to land, right?

11   A.  Yes, sir.

12   Q.  And that's because during the descent you have to put your

13   seatbelt back on --

14   A.  Yes.  Secure locations, exactly.

15   Q.  Isn't it fair to say that the conversation with Mr. Flores

16   was actually a little bit shorter than you testified, it was

17   more like 20 to 25 minutes and not around 45 minutes?

18   A.  I believe, looking at the Miranda form before, I think he

19   signed that at some time -- I think it said 7:37 p.m., and we

20   landed sometime after eight so it could have been a little

21   shorter than 45.

22   Q.  It's possible that it is he was more 20 to 25, is that fair

23   right?

24   A.  I think it was more than 20 minutes, but somewhere between

25   20 and 45 is not unfair.

1           MR. ZACH:  One second.

2    Q.  Now, Special Agent Zach, at any point during the interview

3    of Mr. Campo, did Special Agent Gonzalez reveal to him that he

4    had been caught up in a sting operation?

5    A.  Not in those terms.

6    Q.  At any point did Special Agent Gonzalez reveal that the

7    people that Mr. Campo and others had been meeting with were

8    confidential sources?

9           MR. QUIGLEY:  Objection.

10          THE COURT:  Overruled.

11   A.  We don't usually talk about confidential sources, so I

12   don't know if he put it in those terms.  But he did explain to

13   him that it was a DEA undercover operation.

14   Q.  By undercover operation you mean involving individuals that

15   were working on the behest of the U.S. government?

16   A.  Special Agent Gonzalez alerted to, upon answering a

17   question of Mr. Campo, he responded that all the meetings that

18   he had been attending with Mexican traffickers had been

19   recorded.

20   Q.  When during the conversation was that stated by Special

21   Agent Gonzalez?

22   A.  Very early on.

23   Q.  Now, on the day of these proceedings in Haiti, were you in

24   communication with your agents that you were supervising via

25   text message?

1     A.   Probably not text, but probably some form of electronic

2     communications.

3     Q.   As I understand it from the 3500, at some point your

4     phone -- I think the word that is used is melted?

5     A.   For where I was that sounds right.

6     Q.   Could you just describe what happened to your phone that

7     would have -- would that phone have contain those messages?

8     A.   I am not sure exactly the time frame you're referring to.

9     Q.   I'm referring to the arrest and preceding the arrest.

10    A.   As to the 3500 material.

11    Q.   Oh.  As part of the 3500 material we were provided with

12    notes --

13    A.   Yes, sir.

14    Q.   -- that were written by the AUSAs, and they indicate that

15    you are no longer in possession of your phone because, the word

16    that's used is it melted?

17    A.   I just want to make sure we are talking about the right

18    time frame.  I have been through more than one phone, but,

19    yeah, I have had at least one of my phones melt down over the

20    last however many months.  It just got wiped clean.

21    Q.   When did that occur?

22    A.   The last time it occurred was in July when I was in Bar

23    Harbor.

24    Q.   When you say melted, do you mean crashed?  There was an

25    electronic problem with it or --

1  A.  Every app got wiped out.  Everything that was on my phone

2  got removed, and I had to start from scratch.

3  Q.  Did that phone or would that phone have contained text

4  messages relevant to this case?

5  A.  I really don't know.  No text messages.  I really don't

6  know that it -- at that point still had anything on it.

7  Q.  Now, in connection with the interview of both defendants,

8  did you ever advise them that they have a right to speak to a

9  consular officer?

10       MR. QUIGLEY:  Objection to relevance.

11       THE COURT:  Overruled.

12  A.  We did.

13       Obviously, that was impossible on the plane because it

14  was explained to them when we got back that we would -- Special

15  Agent Gonzalez asked the defendants if they would like their

16  consular officer notified.  In some instances when people are

17  cooperating -- and at this point they were -- they don't want

18  the consular officer notified.

19  Q.  When you say cooperating, when you say they were

20  cooperating, what do you mean by that?

21  A.  That means their rights were explained to them.  They asked

22  to talk to us, they asked how cooperation would work, and they

23  were very honest to the facts as we knew them in the case.

24  They appeared to be very honest, and they basically admitted to

25  their conduct.

1    Q.  Your testimony is that they declined to speak to the

2    consular?

3    A.  Agent Gonzalez asked them if he would like, if they would

4    like him to contact their consular officer to tell them what

5    happened, and I believe that Mr. Campo did in fact want the

6    consular officer notified, and I believe that Agent Gonzalez

7    ended up speaking to someone in the consolate the next day.

8    Q.  You understand that it's DEA policy that -- now -- that

9    postarrest interviews are meant to be recorded, right?

10   A.  In some circumstances.

11   Q.  Were you part of any discussion among your team not to

12   record the interviews of Mr. Campo and Mr. Flores?

13   A.  We didn't have to have that discussion.

14   Q.  There was no discussion that there was going to be no

15   recording?

16   A.  There was no discussion with my team there would be no

17   recording.  We do not record during transport on aircraft

18   during removals.

19   Q.  So you --

20   A.  As per the policy.

21   Q.  So you're saying, then, that you made the decision I guess

22   as the group supervisor to not record?

23          MR. QUIGLEY:  Objection.  Mischaracterizes his

24   testimony.

25          THE COURT:  Sustained.

1    Q.  You would agree with me, sir, that you had the capability

2    for recording the conversation on that airplane, right?

3    A.  I don't know that we did.  Perhaps we could have used a

4    cell phone.

5    Q.  You collected a number of recording devices, right?

6              MR. QUIGLEY:  Objection.

7              He didn't testify to that.

8              THE COURT:  Sustained.

9    Q.  Are you aware that a number of recording devices had been

10   collected?

11   A.  I don't know where the recording devices were, whether they

12   came back with us or with another agent.

13   Q.  But if you had other recording devices they, of course,

14   could have been used to record the interview, right?

15   A.  They would not.  As per policy we would not record

16   interviews on air -- during transport.

17   Q.  I understand that is your testimony.  I'm asking a

18   different question, sir, which is could have recorded them

19   using those devices, right?

20   A.  If those devices were present, they potentially could have

21   been used to record.

22   Q.  You also could have used any smart phone to record them,

23   right?

24   A.  Probably so.

25   Q.  The decision was made, by policy or however else you want

1   to testify about it, not to do that, right?

2            MR. QUIGLEY:  Objection.

3            THE COURT:  Sustained.

4            MR. ZACH:  No further questions.

5            MR. MANN:  Two questions, your Honor.

6            THE COURT:  Yes, sir.

7   CROSS EXAMINATION

8   BY MR. MANN:

9   Q.  Special Agent, you just testified that Special Agent

10  Gonzalez told the defendants that they had the right to speak

11  with their consulate, correct?

12           MR. QUIGLEY:  Objection.  Asked and answered.

13           THE COURT:  He's just orienting him.  The objection is

14  overruled.

15  A.  I don't believe that's what I -- I believe that I said that

16  Special Agent Gonzalez offered to contact their consular for

17  them.

18  Q.  Was that before -- was that before Special Agent Gonzalez

19  read them their Miranda rights?

20  A.  No.

21  Q.  When did that occur?  Was that on the airplane that he made

22  that offer?

23  A.  I believe it was when we were getting into the airport,

24  because we were going to be separated from them.  So he said,

25  hey, would you like this?  This is, you know, we offer this to

1    you.  If you want we will contact the consular.

2    Q.  So after they had already made statements to you, correct?

3    A.  Correct.

4    Q.  Was Haiti selected as a country to effect this arrest

5    because it was more likely that you would get the defendants

6    expelled?

7    A.  Haiti was one of several countries that we were evaluating

8    based on our relationship with the local police and local

9    government.

10   Q.  It was one of many options?

11   A.  It was one of multiple options.

12   Q.  One of the factors for making one of those options was in

13   fact that it was more likely that the defendants would get

14   expelled?

15   A.  It was a country that we had a relationship with where we

16   had a good chance of getting, gaining custody of our

17   defendants.

18            MR. MANN:  Thank you.  No further questions.

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Mr. Quigley.

21            MR. QUIGLEY:  No redirect, your Honor.

22            THE COURT:  Thank you very much.

23            THE WITNESS:  Thank you, your Honor.

24            THE COURT:  We will take our morning recess now.  We

25   will resume at 10 after.

1           (Witness excused)

2           (Recess)

3           THE COURT:  Mr. Bove, do you want to call your next

4   witness.

5           MR. BOVE:  Yes, your Honor, the government calls

6   confidential source 2.

7    CONFIDENTIAL SOURCE 2,

8       called as a witness by the Government,

9       having been duly sworn, testified as follows:

10          (Through interpreter)

11  DIRECT EXAMINATION

12  BY MR. BOVE:

13          THE COURT:  Mr. Bove.

14          MR. BOVE:  Thank you, your Honor.

15  Q.  How old are you, sir?

16  A.  34 years old.

17  Q.  What country were you born in?

18  A.  Mexico.

19  Q.  What is your native language?

20  A.  Spanish.

21  Q.  Do you speak any other languages?

22  A.  Some English.

23  Q.  Now I would like to direct your attention to October of

24  2015.  Were you working as a DEA confidential source at that

25  time?

1   A.  Yes.

2   Q.  In connection with that work for the DEA, did you travel to

3   Caracas, Venezuela?

4   A.  Yes.

5   Q.  Was that in October of 2015 also?

6   A.  That's right.

7   Q.  Why did you go to Caracas?

8   A.  For a work meeting regarding drugs.

9   Q.  What do you mean by a work meeting?

10  A.  I was given the instructions to go to Caracas and to wait

11  for some people, to talk about issues related to drug

12  trafficking.

13  Q.  Did you travel to Caracas with any other confidential

14  sources?

15  A.  Yes.

16  Q.  Let's refer to him as CS-1, OK?

17  A.  OK.

18  Q.  Were you and CS-1 provided with any recording equipment by

19  the DEA before you left for Caracas?

20  A.  Yes.

21  Q.  Generally speaking, what types of equipment were you

22  provided with?

23  A.  System number one was audio and video, and system number

24  two was to record only audio.

25  Q.  Let's refer to the audio video recorder as device 1.  Is

1    that all right?

2    A.  OK.

3    Q.  Let's refer to the audio-only recorder as device 2.

4    A.  OK.

5    Q.  Were you provided with any other equipment by the DEA?

6    A.  No.

7    Q.  Did you have any equipment that could be used to download

8    recordings from device 1 or device 2?

9    A.  No.

10   Q.  Do you know how to download recordings from either of those

11   devices?

12   A.  No.

13   Q.  How did you travel to Caracas?

14   A.  From Mexico city in a commercial flight.

15   Q.  Did you and CS-1 eventually meet with the defendants in

16   Caracas in October of 2015?

17   A.  Yes.

18   Q.  Approximately how many times did you meet with the

19   defendants?

20   A.  Approximately four.

21   Q.  Was drug trafficking discussed at any of those four

22   meetings?

23   A.  Yes.

24   Q.  How many of the four meetings that you had involved

25   discussions of drug trafficking?

1    A.   Three.

2    Q.   Where were those three meetings held?

3    A.   I'm not familiar with the city, but it was in something

4    between a house and an office.

5    Q.   How did you get to -- well, excuse me.  Were each of the

6    three meetings at that house or office?

7    A.   Yes.

8    Q.   I'm referring now to the three meetings where drug

9    trafficking was discussed.

10   A.   That's right.

11   Q.   How did you get to that office?

12   A.   CS-1 and myself were at a hotel, and they sent some people

13   to pick us up by car and motorcycles.

14   Q.   What, if anything, did you observe about the motorcycles?

15   A.   They were police.

16   Q.   Did you use device 1 during the three meetings at which

17   drug trafficking was discussed with the defendants?

18   A.   Yes.

19   Q.   Were there times during those three meetings when you shut

20   device 1 off?

21   A.   Yes.

22   Q.   Why?

23   A.   First of all, to verify that it was recording because there

24   was no other way to verify that it was recording.  So I would

25   turn it on and then turn it off to verify that it was

1  recording.  And, second of all, according to my experience, the

2  capacity for video on this is not very long.  And that was

3  during a meeting, so as the meeting proceeded, and I knew there

4  was going to be another meeting, so I would turn it off when we

5  were talking about things that did not have to do with drug

6  trafficking.

7  Q.  Was CS-1 also present at the meetings where drug

8  trafficking was discussed?

9  A.  Yes.

10  Q.  What is your understanding of whether CS-1 took any steps

11  to create recordings in these three meetings?

12  A.  Yes.

13  Q.  Please describe your understanding of what CS-1 did?

14  A.  Before going into the office, he would ask to go to the

15  bathroom.  There he would turn on No. 2.  And when the meeting

16  ended, before leaving the house/office, he would ask to go to

17  the bathroom again to turn off the device.

18  Q.  You said you met with the defendants for a fourth time in

19  Caracas?

20  A.  Yes.

21  Q.  Where?

22  A.  At a discotheque.

23  Q.  Did anyone go with you to that meeting?

24  A.  Yes.

25  Q.  Who accompanied you?

1    A.  CS-1 and a friend.

2    Q.  How did you encounter this friend?

3         THE INTERPRETER:  How did you what?

4    Q.  How did you encounter the friend you just mentioned?

5    A.  He was on the flight from Mexico to Venezuela, and we were

6    at the hotel.  Basically he was at the same hotel where we

7    were.  When we were waiting for the meeting, several days

8    elapsed, so we established a stronger friendship, and that's

9    why we went to the discotheque with him.

10   Q.  Did you tell this friend the true reason that you were in

11   Caracas?

12   A.  No.

13   Q.  Did you tell him that you were a confidential source?

14   A.  No.

15   Q.  Now, with respect to the fourth meeting that you just

16   mentioned in the club, did you take any steps to record that

17   meeting?

18   A.  No.

19   Q.  Why not?

20   A.  Because before we left for the club, Ephrain sent a message

21   to CS-1 and told him that we were not going talk about business

22   and we were just going to go out and have fun, and taking into

23   account that the music was going to be loud and it was a dark

24   place, I decided not take it with me.

25   Q.  During the period that you were in Caracas during October

1   of 2015, did you see any substances that you believed to be

2   narcotics?

3   A.  Yes.

4   Q.  When approximately?

5   A.  During the third meeting about drugs.

6   Q.  Please describe what happened?

7   A.  Upon arriving to the meeting, Ephrain pulled out like a

8   small bag or a small suitcase and he took out what looked to be

9   like cocaine, one kilo, and showed it to CS-1.  Then they start

10  to open it up to see the quality and to see what the drugs

11  looked like.

12  Q.  What happened after CS-1 and the man that you referred to

13  as Ephrain, inspected the kilo?

14          THE INTERPRETER:  I didn't hear well, I'm sorry.

15  Q.  What happened after CS-1 and the man you referred to as

16  Ephrain inspected the kilo?

17  A.  Well, they considered it to be something of good quality.

18  And the meeting ended.  I don't remember exactly what happened

19  after that, but they agreed that they were going to meet again.

20  Q.  Based on what you saw and what you heard during that

21  meeting, what did you believe was contained in that kilo

22  package?

23  A.  Cocaine.

24  Q.  Did you touch it?

25  A.  No.

1    Q.  Did anyone else in the meeting touch it?

2    A.  Ephrain and CS-1.

3    Q.  What was on their hands at the time they handled the

4    substance?

5    A.  Gloves.

6    Q.  What happened to those gloves at the end of the meeting?

7    A.  They stayed in the room where the meeting was held.

8    Q.  Did you take any steps to try and collect a sample of the

9    substance that was in the kilo package?

10   A.  No.

11   Q.  As far as you know, did CS-1 take any steps to collect a

12   sample from the substance in the kilo package?

13   A.  No.

14   Q.  Did you or CS-1 make any efforts to recover the gloves that

15   you just described?

16   A.  No.

17   Q.  Why didn't you take any steps to try and collect evidence

18   from the kilo or the gloves?

19   A.  Because if I took a sample I would possibly be arrested by

20   the police or stopped by the police.  And on the way home at

21   the border, if I had a sample, I could be arrested.

22   Q.   Would you have felt comfortable had you been arrested in

23   Venezuela or at the border disclosing that you were a

24   confidential source?

25   A.  No.

1    Q.   Why not?

2    A.   Given the circumstances, the people that I had met with,

3    they mentioned that they were relatives to the first lady of

4    Venezuela.  And if I told them that I was an informant or that

5    I work for some kind of law enforcement, eventually that

6    information can reach them.

7    Q.   Did you leave Caracas eventually?

8    A.   Yes.

9    Q.   When approximately?

10   A.   Approximately at the end of October.

11   Q.   What type of transportation did you use to leave Caracas?

12   A.   Commercial flight.

13   Q.   Did you eventually return to the U.S.?

14   A.   Yes.

15   Q.   Did you have any meetings with the DEA upon your return to

16   the U.S.?

17   A.   Yes.

18   Q.   Please describe the first one.

19   A.   It was CS-1 and myself to give them device No. 1 and device

20   No. 2, and it was also to tell them what had happened at each

21   one of the meetings, a sort of a summary of what had happened.

22   Q.   When approximately was that meeting?

23   A.   I don't remember.  It was at the end of October or early

24   November.

25   Q.   You said that you returned device 1 and device 2 to the

1    agents?

2    A.  Yes.

3    Q.  Before you did so, did you take any steps to try to alter

4    or delete files from either device?

5    A.  No.

6    Q.  Let's focus on the trip to Caracas on October 5, 2015.  Did

7    you engage in any unauthorized activities there?

8    A.  Yes.

9    Q.  What happened?

10   A.  The meeting at the discotheque, we were invited to the

11   club, and there were women inside, and as we were leaving we

12   were going to the hotel, that is, myself, my friend and CS-1,

13   and we were escorted by several cars including Francisco in one

14   of them.  When we got off at the hotel three women got out of

15   one of the cars, and Francisco said that that was a gift for

16   us.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. BOVE:

2    Q.  What do you mean by that?

3    A.  It would seem that they were sex servants, prostitutes.

4    Q.  Did you have relations with one of those prostitutes on

5    that night?

6    A.  Yes.

7    Q.  Did you pay the prostitute?

8    A.  No.

9    Q.  What is your understanding of who paid for the prostitute?

10   A.  Francisco.

11   Q.  Did you use any illegal drugs while you were in Caracas?

12   A.  No.

13   Q.  Did you ever use drugs?

14   A.  Yes.

15   Q.  What kind of drugs?

16   A.  Marijuana.

17   Q.  When was the last time you used marijuana?

18   A.  I don't remember what day, but it was in the '90s.

19   Q.  Where do you live right now, sir?

20   A.  In jail.

21   Q.  Why?

22   A.  For having committed crimes.

23   Q.  Have you pleaded guilty to those crimes?

24   A.  Yes.

25   Q.  What crimes have you pleaded guilty to?

1  A.  Conspiracy to introduce drugs into the United States,

2  conspiracy to distribute drugs within the United States, and

3  also for withholding information from the DEA, not give it to

4  them.

5  Q.  Before you were arrested and you were still working as a

6  confidential source, were you paid by the DEA and local law

7  enforcement?

8  A.  Can you repeat the question, please?

9  Q.  While you were working as a confidential source, were you

10  paid by the DEA and local law enforcement?

11  A.  Yes.

12  Q.  Approximately how much money were you paid by law

13  enforcement during your work as a confidential source?

14  A.  Approximately 400,000 and change.  I don't have the

15  information.  That's more or less.

16          MR. BOVE:  Your Honor, may I have one moment?

17          THE COURT:  Yes.

18          MR. BOVE:  Nothing further.

19          THE COURT:  Cross-examination?

20          MR. ZACH:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. ZACH:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  Now, sir, for how long have you been a confidential

1    informant?

2    A.   Approximately 2010.

3    Q.   And in connection with being a confidential informant, you

4    often worked with someone who we have been referring to as CS-1

5    in this case, right?

6    A.   Correct.

7    Q.   And CS-1 is your father, right?

8    A.   Correct.

9    Q.   And in your activity as a confidential informant, you're

10   often paired with your father as sort of a team, isn't that

11   fair?

12   A.   Correct.

13   Q.   And your father is also paid for his work, right?

14   A.   Yes.  Before this job, yes.

15   Q.   So do you have an understanding how much money your father

16   has made in addition to what you made as you worked together as

17   a team?

18   A.   I don't have his exact amount.

19   Q.   Now, does he share some of the money he obtains as a

20   confidential informant with you?

21   A.   Well, yes.  Not necessarily, but yes, you could say so.

22   But it doesn't mean that I get the money directly from him.  I

23   take my part.  Sometimes I get it by check and he gets his part

24   by check.

25   Q.   But he sometimes shares the proceeds he is getting from the

1  government with you?

2  A.  Yes.

3  Q.  Now, since you've been working as a confidential informant,

4  have you had any real day job?

5  A.  Yes.

6  Q.  Wherever you worked, what sort of institution have you

7  worked?

8          THE INTERPRETER:  Institution?

9          MR. ZACH:  Strike that.

10  Q.  What other employment have you had besides being a

11  confidential informant since 2010?

12  A.  From 2010 up until now, is that right?

13  Q.  Yes.

14  A.  I worked putting in security systems, that is selling

15  security systems, alarms, and installing cablevision systems.

16  Q.  When you say you put in security systems and alarms, was

17  that in residential homes?

18  A.  Yes, but I did not install them.  I only sold them.

19  Q.  And did you declare that as income in tax returns that you

20  submitted?

21  A.  I did not do that correctly.

22  Q.  So there is there no tax record of you actually having

23  those jobs, is that fair?

24  A.  Yes, there are records.

25  Q.  So you were paid by check or by cash?

1    A.   In cash.

2    Q.   And did you get a tax income slip that would prove that you

3    were paid in cash and actually worked there?

4    A.   Well, I honestly don't remember what you call the form that

5    I was given, and that's where they reported how much they had

6    given me.  I was a subcontractor.

7    Q.   Now, in connection with this case, did you have contact

8    with a DEA agent?

9    A.   The Flores case?

10   Q.   Yes, the case that you're here testifying about.

11   A.   Yes.

12   Q.   What was the name of the DEA contact you had?

13   A.   Special Agent Gonzalez.

14   Q.   And how would you communicate with Special Agent Gonzalez?

15   A.   When I would see him personally.

16   Q.   How many times in 2015 and 2016 did you see Special Agent

17   Gonzalez personally?

18   A.   I don't have an exact amount.  I don't remember how many

19   times it was, but there were several interviews with him.

20   Q.   Less than five?

21   A.   I don't have an exact amount.

22   Q.   Are you able to even give an estimate of how many times you

23   met?

24           THE INTERPRETER:  I'm sorry, Counselor.  Can you

25   repeat that, please?

1   BY MR. ZACH:

2   Q.  Are you able to even give an estimate of how many times you

3   met with him?

4   A.  No, I don't have that exact amount in my head.  No.

5   Q.  You don't, as you sit here today, you can't remember how

6   many times you met with him in 2015 and 2016?

7           MR. BOVE:  Objection, Judge.

8           THE COURT:  Sustained.

9   BY MR. ZACH:

10  Q.  Now, aside from meeting with Special Agent Gonzalez in

11  person, did you also communicate with him via text message?

12  A.  No.

13  Q.  You never text messaged with Special Agent Gonzalez?

14          MR. BOVE:  Objection, asked and answered.

15          THE COURT:  Overruled.  You can answer.

16  A.  Not during -- not on the case while I was in Venezuela, no.

17  Q.  During that time period, did your father text message with

18  Special Agent Gonzalez?

19  A.  Yes.

20  Q.  And would your father communicate to you about what the

21  substance of those text messages were?

22  A.  Not always.

23  Q.  From time to time, would he?

24  A.  Yes.

25          THE WITNESS:  May I have some water?

1          THE COURT:  Excuse me.  All right?

2          THE WITNESS:  Yes.

3          THE COURT:  OK, Mr. Zach.

4          MR. ZACH:  Thank you, sir.

5   BY MR. ZACH:

6   Q.  Now, you did have communications, sir, with a different

7   agent, right, other than Special Agent Gonzalez, in connection

8   with your work as an informant between October and this summer,

9   October 2015 and the summer?

10  A.  Yes.

11  Q.  What was the name of that agent?

12  A.  Special Agent Mahoney.

13  Q.  How were you put in contact with Special Agent Mahoney?

14  A.  Over the phone.

15  Q.  Did you ever meet with Special Agent Mahoney in person?

16  A.  Do you mean did I ever do it during this case or did I ever

17  do it in my lifetime?

18  Q.  Let's start with this case.

19          How many times did you meet with Special Agent Mahoney

20  in connection with this case?

21  A.  I don't recall, but around -- well, I don't recall, but

22  approximately three to four times, but I don't really remember

23  the exact number.

24  Q.  Outside of this case, how many times have you had

25  communication with Special Agent Mahoney?

1    A.  I don't have an exact amount.

2    Q.  Now, it was your father who first told you about traveling

3    to Venezuela, right?

4    A.  That's right.

5    Q.  Isn't it a fact, sir, that your father advised you that the

6    targets of your trip to Venezuela were individuals connected

7    with the first family of that country?

8    A.  That's correct.

9    Q.  And isn't it a fact that your dad told you that this was a

10   big fish and would likely reward you with a lot of money if it

11   worked out?

12   A.  I never discussed them paying us a lot of money or anything

13   like that with him.

14   Q.  Well, the reason that you worked as a confidential

15   informant, sir, was because you want to make money, right?

16   A.  That's right.

17   Q.  And, sir, you understand that the higher the profile of the

18   target, the more money you stand to earn as a confidential

19   informant, right?

20   A.  Possibly.  Possibly, but there's never any guarantee.

21          THE INTERPRETER:  Interpreter's correction.

22   A.  No one ever guaranteed me anything as far as how much I was

23   going to get, that's why.

24   Q.  But before you even set out to Venezuela, in your mind,

25   sir, you thought, because these were high-profile targets, you

1  stood to make a lot of money?

2  A.  No, I never thought about it.  I really never thought about

3  the amount of money.  I thought that I would make something,

4  that I would be paid, but I never had how much money I would be

5  paid in mind.

6  Q.  So you thought you would be making the same amount of money

7  traveling to Venezuela as a confidential informant as you would

8  helping out local law enforcement in your prior activities?

9  A.  I don't know.  I made a lot of money working with local law

10  enforcement, and I never thought about how much I was going to

11  earn.

12  Q.  Now, sir, you've made $400,000 as a confidential informant?

13  A.  Approximately.

14  Q.  How much of that has been from the DEA?

15  A.  I don't have an exact amount on how much was from them.

16  Q.  Can you estimate how much was from the DEA?

17  A.  No.

18  Q.  Can you estimate if it was more or less than you made from

19  local law enforcement?

20            MR. BOVE:  Objection.  He said he couldn't estimate.

21            THE COURT:  Overruled.

22            THE INTERPRETER:  Can the question please be repeated

23  for the interpreter?

24  BY MR. ZACH:

25  Q.  Sir, can you even estimate whether you made more of the

1    $400,000 based on work from the DEA, as opposed to local law

2    enforcement?

3    A.  Approximately the same.  I think it might be half.

4    Q.  Now, did you have discussions with your dad about how you

5    were going to approach your job as a confidential informant

6    prior to heading out to Venezuela?

7    A.  I don't understand the question.

8    Q.  Well, did you make plans with your dad as to how you were

9    going to carry out pretending to be someone different when you

10   went down to Venezuela to meet with the defendants in this

11   case?

12   A.  Well, yes.  He was a drug trafficker.  I was his son.  That

13   was it.  I did not speak in the meetings.  I did not negotiate

14   anything.

15   Q.  Well, sir, that is not my question.

16        My question is, before you went down there, did you

17   plan out with your dad the approach you were going to take; yes

18   or no?

19   A.  Once we were down there, we said -- we talked about it,

20   what it would be, but it was not a plan.  It was just according

21   to whenever the first interview was, but there was never a

22   plan.

23   Q.  As part of those discussions, did you learn about an

24   individual named Sentado?

25   A.  Yes.

1   Q.  Did you ever speak to Sentado on the phone?

2   A.  No.

3   Q.  But your father spoke to Sentado on the phone multiple

4   times, didn't he?

5   A.  Probably.

6   Q.  But your dad would tell you about conversations he had on

7   the phone with Sentado, right?

8   A.  Not necessarily.

9   Q.  Well, sir, did he, yes or no, tell you about conversations

10  that he had with Sentado?

11  A.  Yes.

12  Q.  Now, when you first arrived in Caracas, what hotel did you

13  go to?

14  A.  Marriott.

15          MR. ZACH:  I'm sorry.  One second.

16          (Pause)

17  BY MR. ZACH:

18  Q.  Now, did you and your father stay in the same room or have

19  separate rooms?

20  A.  Separate rooms.

21  Q.  And before meeting with the defendants, did you agree with

22  your father who was going to do most of the speaking?

23  A.  No.

24  Q.  So you could have spoken as much as you wanted to and he

25  could have spoken as much as he wanted to at the meeting?

1       MR. BOVE:  Objection.

2       THE COURT:  Sustained.

3  Q.   Did you have a discussion with your father before going to

4  this meeting about what was going to be said to the targets?

5  A.   Well, yes.

6  Q.   There were a number of things that you and your father were

7  meant to say to the targets when they met with them, right?

8       MR. BOVE:  Objection, relevance.

9       THE COURT:  Overruled.

10 A.   I did not understand the question.

11 Q.   Before you met with the targets, there were certain

12 subjects that you knew you had to discuss with them, right?

13 A.   Yes.

14 Q.   And the most important of those was to mention the

15 United States when you met with them, right?

16      MR. BOVE:  Objection, Judge.

17      THE COURT:  Overruled.

18 A.   Yes.

19 Q.   And that was an instruction that was given to you by the

20 DEA, right?

21 A.   Yes.

22 Q.   And did you and your father plan how to best attempt to

23 carry out that instruction, didn't you?

24      MR. BOVE:  Objection, Judge.  This hearing is not

25 about the defendants participating in an entrapment offense.

```
 1              THE COURT:  Overruled.

 2   A.   It was not planned.  It simply came out at one point in the

 3   meeting.

 4   Q.   Now, you were instructed, you and your father were

 5   instructed, to record all of the meetings you had with the

 6   targets when you went down to Caracas, isn't that right?

 7   A.   Of course.

 8   Q.   And no one from the DEA ever told you that you could not

 9   take a sample of any alleged substance that you saw, right?

10   A.   Please repeat the question.

11   Q.   Sure.  No one from the DEA told you that you could not take

12   a sample of any alleged cocaine that you saw, right?

13   A.   Right.

14   Q.   Now, when you actually met with the targets in this case,

15   you didn't actually record the entire conversation, did you?

16   A.   Correct.

17   Q.   In fact, at various times, you would decide to turn on or

18   turn off the recording device, right?

19   A.   Yes.

20   Q.   And you would pick the time yourself when you decided to

21   record what was happening in the conversation with the targets

22   in this case, right?

23   A.   Yes.

24   Q.   It was your discretion, right?

25   A.   Yes.
```

1   Q.  Now, at times you even left part of the meeting to go out

2   and have a cigarette, for example, right?

3   A.  Yes.

4   Q.  Now, while you were in Caracas with your father carrying

5   out these conversations, you would communicate back and forth

6   with your dad using text messages, right?

7   A.  Yes.

8   Q.  And you would use those text messages to assist you in

9   carrying out your work as a confidential informant, right?

10  A.  I don't understand.

11  Q.  Well, you would use it to meet up with your dad or to pass

12  messages along to your dad while you were there, right?

13  A.  Yes.

14  Q.  But before you left Caracas, you wiped your entire phone,

15  right, and got rid of those messages?

16  A.  Yes.

17  Q.  So as we sit here today, you destroyed any messages that

18  would have gone between your father and yourself while you were

19  in Caracas, right?

20          MR. BOVE:  Objection.

21          THE COURT:  Sustained.

22  Q.  Now, you didn't forward any of those messages to any of the

23  DEA agents, did you?

24  A.  No.

25  Q.  And your father didn't forward any of those communications

1    to DEA agents, did he, that you're aware of?

2    A.  I don't know.

3    Q.  Now, you testified on direct examination about having sex

4    with a prostitute while down there?

5    A.  Yes.

6    Q.  Now, you said that you didn't use drugs while you were down

7    there, right?

8    A.  Yes.

9    Q.  But your father, in fact, used drugs while he was down in

10   Caracas, didn't he?

11   A.  I don't know.

12   Q.  Your father, you know, however, your father used cocaine

13   for many years, right?

14   A.  Yes.

15   Q.  Now, when you left Caracas and returned, when you left

16   Caracas, you took the recording devices with you, right?

17   A.  Yes.

18   Q.  And eventually you met with the DEA, right?

19   A.  Yes.

20   Q.  And when you met with the DEA, you turned those recording

21   devices over to them, right?

22   A.  Correct.

23   Q.  And you also were debriefed about what had gone on in

24   Caracas, right?

25   A.  Yes.

1   Q.  And you were asked about everything that happened when you

2   were in Caracas, right?

3   A.  That's right.

4   Q.  And when you were asked about everything you did in

5   Caracas, you didn't tell them, the DEA, that you had slept with

6   a prostitute, right?

7   A.  They didn't ask me that.  They asked CS-1.

8   Q.  Well, you were debriefed with CS-1 at the same time, right?

9   A.  No.

10  Q.  So you were never debriefed by the DEA?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13  Q.  Were you debriefed by the DEA?

14  A.  For just -- for just for a very short few minutes.  There

15  really wasn't questioning or debriefing, it was just for me to

16  give them the devices.

17  Q.  Where did this take place?

18  A.  At a hotel.

19  Q.  And that was in the Washington, DC area?

20  A.  Yes.

21  Q.  You went there with your father, right?

22  A.  Yes.

23  Q.  And your father had a longer debriefing with the DEA that

24  you were not a part of, is that right?

25  A.  Yes.  I would go in and out.  I wasn't present.

G99SFLO3                    Confidential Source 2 - cross

1    Q.  Well, going in and out is being present, right?

2    A.  Well, it was when they wanted to talk to him by himself.

3    First, they spoke to the two of us about nonspecific subjects,

4    and then I left when they started to talk to him.

5    Q.  And did you ever come in and speak to them specifically

6    about what happened in Caracas?

7    A.  No.

8    Q.  So you never told the DEA anything about the details of

9    what occurred in Caracas when you went to this meeting in

10   November of 2015?

11   A.  Yes.

12   Q.  Now --

13           THE COURT:  Do you have much more, Mr. Zach?

14           MR. ZACH:  A little bit more, your Honor.

15   Q.  To be clear, sir, during this time period, November,

16   December 2015 and into early October 2016, you were regularly

17   speaking with DEA agents, right?

18           THE INTERPRETER:  Excuse me.  May you repeat the time

19   period?  I missed the last part.

20   Q.  In 2015 and 2016, you were reporting to DEA agents about

21   your work as a confidential informant, right?

22   A.  Yes.

23   Q.  And during those meetings, you never disclosed that you and

24   your father were actually selling drugs on the side, right?

25   A.  That's right.

1   Q.  You were lying to the DEA in 2015, right?

2   A.  Yes.

3   Q.  And you were lying to the DEA in 2016, as well, right?

4   A.  Yes.

5   Q.  At the same time you were doing that, you were trying to

6   get them to trust you so you could continue working on cases

7   with them, right?

8   A.  Yes.

9   Q.  And at some point in June of 2016, you were confronted with

10  your drug dealing on the side, right, by the DEA?

11  A.  That's right.

12  Q.  And at that meeting, they said that the prosecutors were

13  concerned about your conduct, right?

14  A.  Yes.

15  Q.  And they told you that it was very important that you come

16  clean and divulge all of the ways that you had been lying to

17  them, right?

18  A.  Regarding the lies I had told them?

19  Q.  Yes.

20  A.  Repeat the question, please.

21  Q.  When you met with DEA agents in the summer of 2016, the

22  agents told you that it was important that you come clean and

23  tell them about all of the lies you had been telling them,

24  right?

25  A.  Correct.

1  Q.  And that it was critical that you tell them everything at

2  that point, right?

3  A.  They focused us on 2016.

4  Q.  But you had been selling drugs even before 2016, right?

5  A.  Yes.

6  Q.  You had been lying to them for years, right?

7  A.  Yes, I did lie to them.

8  Q.  And even in this meeting, sir, you didn't come clean and

9  you still lied to them and kept information back, didn't you?

10 A.  Because that's what they asked me about, 2016, and they

11 said that we were going to have another meeting to talk about

12 other things.

13 Q.  So at that initial meeting, they didn't tell you that you

14 had to come clean about everything that you had been lying

15 about; that's not your testimony?

16 A.  No.  They did tell me to tell them the truth about what had

17 been happening.

18 Q.  Now, I want to shift back to the night in Caracas, OK.

19         Now, on the night that you went to the club and that

20 you did not bring a recorder, you didn't plan to talk business;

21 that was your testimony, right?

22         THE COURT:  Mr. Zach, are you going to wind this up

23 shortly?  I understand the interest you have in this.  I don't

24 understand the relevance to what we're discussing here.

25         MR. ZACH:  Your Honor, I have a couple quick topics in

1   Caracas and I'll move on.

2           THE COURT:  I've heard enough about the fourth visit

3   to the discotheque.  Can you go on to the next topic.

4           MR. ZACH:  Can I ask two questions, your Honor?

5           THE COURT:  No.  Go on to something else, please.

6   BY MR. ZACH:

7   Q.  So I want to focus on the meeting where there was the

8   alleged cocaine, OK?

9   A.  OK.

10  Q.  You testified on direct that, at that meeting, CS-1 was

11  wearing gloves, right?

12  A.  Yes.

13  Q.  And you testified that CS-1 actually picked up a sample of

14  cocaine, right?

15          MR. BOVE:  Objection, mischaracterizes the testimony.

16          THE COURT:  Sustained.

17  Q.  Did you observe CS-1 touch the cocaine?

18  A.  Yes.

19  Q.  Did you observe CS-1 pick up the cocaine?

20  A.  Yes, put it in his hand -- put it on his hand to see the

21  quality.

22  Q.  So he actually put it into his hand, right?

23  A.  Yes.

24  Q.  And what did you and your father do with the cocaine he

25  took into his hands?

G99SFLO3          Confidential Source 2 - cross

1    A.  He took a small amount of cocaine, he ground it, and it

2    disappeared.

3    Q.  And then what did he do with the gloves that he had on his

4    hand?

5    A.  He gave them to Efrain and they remained in the room where

6    we were.

7    Q.  You said remained.  Where exactly did you observe them

8    being put?

9    A.  Just somewhere on the table.  I don't remember exactly what

10   spot.

11   Q.  Do you remember what color the gloves were?

12            THE INTERPRETER:  What color?

13            MR. ZACH:  Yes.

14   A.  No.

15   Q.  Do you recall what they were made of?  Were they rubber or

16   were they latex?

17            MR. BOVE:  Objection.

18            THE COURT:  Sustained.

19            MR. ZACH:  Thank you, your Honor.  No further

20   questions.

21            THE COURT:  Do you have any questions?

22            MR. RODY:  I do, Judge.

23            THE COURT:  OK.

24   CROSS-EXAMINATION

25   BY MR. RODY:

1   Q.  Sir, I want to focus your attention on the time you spent

2   down in Caracas in the fall of 2015.

3          You talked about the night that you and your father

4   went out to a club with the defendants and your father used

5   cocaine, correct?

6          MR. BOVE:  Objection.

7          THE COURT:  Sustained.

8   Q.  Sir, isn't it true that you also used cocaine that night?

9   A.  No, that's not true.

10  Q.  Isn't it true that you used cocaine on another night when

11  you were down in Caracas?

12  A.  No, that's not true.

13  Q.  You went out to a club a different night when you were down

14  in Caracas, correct?

15  A.  Yes.

16  Q.  That was a club called Trio?

17  A.  That's right.

18  Q.  And that was the night when you did not go out with the

19  defendants, correct?

20  A.  That's right.

21  Q.  And the defendants essentially gave you a car with their

22  bodyguards to take you to that club, right?

23  A.  That's right.

24  Q.  And that was a strip club, right?

25  A.  That's right.

G99SFLO3                    Confidential Source 2 - cross

1   Q.  And you were with a prostitute that night as well, correct,

2   sir?

3   A.  No.

4   Q.  Your father was with a prostitute that night?

5   A.  He was, yes.

6   Q.  And the defendants didn't pay for that, right?

7   A.  The security guards did.

8   Q.  And did you tell the prosecutors and the DEA about the

9   other club you went out to?

10  A.  Yes, I think so.  I think CS-1 did.

11  Q.  Did your father also tell the prosecutors and the DEA that

12  it was a strip club and that he had used a prostitute?

13          MR. BOVE:  Objection, foundation.

14          THE COURT:  Overruled.

15          THE INTERPRETER:  Please, can you --

16  Q.  Did your father also tell the prosecutors and the DEA that

17  it was a strip club and that he used prostitutes?

18  A.  I don't know.

19  Q.  By the way, it's not uncommon in Caracas for people to have

20  bodyguards, correct?

21  A.  I don't know.

22  Q.  Well, sir, you mentioned going to the club with another man

23  that you met on your flight, is that right?

24  A.  Not that I met him on the flight.  I already knew him, but

25  he was traveling on that flight.

1    Q.  Did he go there purposely to be there with you and your

2    father in Caracas?

3    A.  Not that I know, no.

4    Q.  You did not plan beforehand for him to accompany you and

5    your father to Caracas?

6    A.  No.

7    Q.  Did the government pay for his flights?

8    A.  Who?

9    Q.  Your friend in Caracas.

10   A.  No.

11   Q.  And you said that he went with you and your father to the

12   club, correct?

13   A.  Correct.

14   Q.  And you said that you did not tell him that you and your

15   father were acting as informants, correct?

16   A.  That's right.

17   Q.  Isn't it true, sir, that that man accompanied you and your

18   father to each of the four meetings that you had with the

19   defendants in Caracas?

20   A.  He accompanied us, but he never came in.  Only the last

21   meeting.

22   Q.  You told the defendants that he was your bodyguard, right?

23   A.  No.

24   Q.  I just want to be clear.  He went with you to the meetings

25   at the office building or the house, is that your testimony?

1      A.   Yes.

2      Q.   All three of them?

3      A.   No.

4      Q.   How many of the three meetings that you had with the

5      defendants in this office building or house did that other man

6      go to?

7      A.   I don't remember if it was two, and with the discotheque or

8      the club, that would be three.

9      Q.   Your testimony is that he did not participate in the

10     meetings that you had with the defendants?

11     A.   That's right.

12     Q.   Was he in the room?

13     A.   The last time, he was.

14     Q.   I'm not talking about the club.  Put that out of your mind.

15     I am talking about the meetings you had in this office

16     building, when you met with the defendants and you say you

17     talked about drugs.

18     A.   Yes.

19     Q.   Was that other man in the same room where the meeting was

20     taking place?

21     A.   Yes, because the door was open and there was a space where

22     he was sitting in the back.

23     Q.   So describe the room you were in where you had these

24     meetings.  How big was it and where was this man in relation to

25     you?

1    A.   Once you go into the office location, you go down the

2    stairs.  There were some chairs and then there were two doors.

3    One of them was like an office, and there were seats in the

4    back, a table, and another seat or chair in the front, and two

5    chairs on the sides.

6    Q.   And where did the friend sit?

7    A.   In the back.

8    Q.   And you say that you did not tell the defendants that he

9    was your bodyguard?

10   A.   No.

11   Q.   Who did you say he was?

12   A.   A friend.  They never asked.

13   Q.   So you say you were there to talk about a big drug deal,

14   right?

15   A.   Yes.

16   Q.   And you just brought another guy, right?

17   A.   Yes.

18   Q.   And you never told the defendants why he was there or what

19   his purpose was at the meeting?

20          MR. BOVE:  Objection.

21          THE COURT:  Overruled.

22   A.   No.

23   Q.   You're supposed to be having sensitive discussions about a

24   major narcotics deal, right?

25   A.   Yes.

1    Q.  You said you did not tell this man that you were an

2    informant, right?

3    A.  That's right.

4    Q.  Weren't you concerned about him overhearing the

5    conversations?

6    A.  No.

7    Q.  Do you think that he understood you to be real drug

8    dealers?

9    A.  Yes.

10   Q.  Is he a drug dealer?

11   A.  No.

12   Q.  What's his name?

13            MR. BOVE:  Objection.

14            THE COURT:  You objected?

15            MR. BOVE:  Yes.

16            THE COURT:  Sustained.

17   Q.  You never told the government about this other man being at

18   those meetings when you discussed narcotics, you say, with the

19   defendants, correct?

20   A.  Yes, I did tell them that he was at the last meeting with

21   us.  It was in the last meeting where he was in the back.

22   Q.  When did you tell the DEA that that man was at any of these

23   meetings?

24   A.  To the DEA?  No.  I spoke with the prosecutor, not with the

25   DEA.

1    Q.  So you never told that to the DEA, correct?

2    A.  Right.

3    Q.  You withheld that information from the DEA, right?

4    A.  Correct.

5    Q.  When did you tell the prosecutors that information?

6    A.  This past week, within the last ten days.

7    Q.  After you got arrested on your current charge, correct?

8    A.  Right.

9    Q.  Did you tell it to the government before or after you pled

10   guilty?

11   A.  Before.

12   Q.  Having that man in the room while you were engaging in

13   conversations on behalf of the DEA was completely unauthorized,

14   correct?

15   A.  That's right.

16   Q.  That was another way in which you were deceiving the DEA?

17   A.  Right.

18   Q.  Now, a question when you were debriefed by the DEA in the

19   end of June of 2016.  Do you have that meeting in mind?

20   A.  I do not understand.

21   Q.  You were confronted by the DEA on June 29 about your side

22   dealing in narcotics, correct?

23   A.  Yes.

24   Q.  Were you debriefed by the DEA at the same time as your

25   father?

1   A.  No.

2   Q.  So they talked to you separately?

3   A.  Yes.

4   Q.  Who did they talk to first?

5   A.  With me.

6   Q.  Did they talk to both of you together for any period of

7   time before they split you up?

8   A.  Yes.

9   Q.  What did they say when you were together?

10  A.  Well, we had arrived late to the meeting, and they said

11  that was not right.  And they said that they had to speak about

12  some things that were going on with us, but it had to be

13  individually.

14  Q.  I want to make clear that we are talking about the same

15  meeting.

16          There were no prosecutors at this meeting, correct?

17  A.  What was the date of the meeting?  I'm sorry.  I'm mistaken

18  about that meeting.

19  Q.  The end of June, June 29, 2016.  So, to be clear, I am not

20  talking about the meeting when you met with the prosecutors in

21  August.

22          MR. BOVE:  Objection, Judge.  This mischaracterizes

23  the record.

24          THE COURT:  Sustained.

25          Do you want to reframe the question?

1              (Discussion off the record)

2    BY MR. RODY:

3    Q.  Again, we are talking about the June meeting.  OK?

4    A.  Yes.

5    Q.  Prior to that meeting, did you discuss with your father

6    what you were going to admit to in terms of drug trafficking?

7    A.  No.

8    Q.  And I'm not talking about any other drugs other than

9    cocaine.  But at that meeting in terms of cocaine, you admitted

10   one three-kilogram deal with some guy named Javi, correct?

11   A.  Yes.

12   Q.  And you said that the kilograms were bad, correct?

13   A.  Correct.

14   Q.  By the way, one of the ways you determined that was that

15   some other drug dealer named Ramón tested them and determined

16   they were bad, right?

17   A.  Yes, correct.

18   Q.  So getting back to what you told the government, you said

19   that was the only cocaine deal you had been involved in that

20   was unauthorized, correct?

21   A.  I never said it was the only one, it was just that that

22   was -- that I had mentioned that one and that was it.

23   Q.  Sir, isn't it true -- withdrawn.

24              Again, you were told to tell the truth at that meeting

25   about the unauthorized narcotics deals you had been engaged in,

1    right?

2    A.  Yes.

3    Q.  And that's the only cocaine deal you mentioned, right?

4    A.  If I'm not mistaken, yes.

5    Q.  And, in fact, between 2012 and 2016, you were engaged with

6    your father in many other cocaine deals, right?

7    A.  Illegal?

8    Q.  Correct, unauthorized.

9    A.  Not many.

10   Q.  Well, sir, you've said that you are on the phone all day

11   long talking to drug dealers, right?

12   A.  Right.

13   Q.  And you said that you sort of put these drug dealers off

14   and that you don't go through with the deals?

15   A.  A lot of them, yes.  Yes.

16   Q.  But they keep talking to you even though you never

17   consummate any deals with them?

18   A.  Yes.

19   Q.  Isn't it true that you and your father attempted multi-ton

20   cocaine deals that didn't work out for one reason or another?

21   A.  Please repeat that question for me again.

22   Q.  Isn't it true that you and your father attempted multi-ton

23   unauthorized drug deals that did not work out for one reason or

24   another?

25   A.  Well, as far as tons go, I am referring only to one in

1   particular, not multiple deals.

2   Q.  Getting back to the June meeting.  At the June meeting, you

3   said to the DEA, did you not, that you were not involved with

4   your father in any unauthorized deals?

5   A.  Yes.

6   Q.  And you told the DEA that the only drug deals you were

7   involved in with your father were real reverses with the police

8   and cases with the DEA?

9   A.  That's right.

10  Q.  And that was a lie, right?

11  A.  Yes.

12          THE COURT:  I think I have your point now, Counsel.

13          MR. ZACH:  In a moment, I'll be done, Judge.  Let me

14  just make sure.

15  Q.  Sir, you did not go to Haiti in November 2015?

16  A.  No.

17  Q.  But you got money from the DEA for that operation, did you

18  not?

19  A.  For which operation?  I'm sorry.

20  Q.  For the arrest of the defendants in Haiti.

21  A.  Was I paid?  I was not paid any money.

22  Q.  Did you receive any money from your father for that

23  operation?

24  A.  No.

25  Q.  Did you understand that Agent Gonzalez had given your

1  father thousands of dollars for you for that operation?

2  A.  Well, I knew that they had paid expenses, the plane fare

3  and things like that, but nothing beyond that.

4  Q.  They paid for your father's expenses, right?

5  A.  Because he went.

6  Q.  Right.  But you didn't go, right?

7  A.  That's right.

8  Q.  There was no reason for the DEA to pay expense money to

9  you, correct?

10  A.  They owed me money that I had spent or excess money that I

11  had spent in the trip from Mexico to Caracas, and I showed them

12  what I had spent, and they reimbursed me for my expenses.

13          MR. ZACH:  No further questions, Judge.

14          THE COURT:  Any redirect?

15          MR. BOVE:  Very briefly, your Honor.

16          THE COURT:  All right.

17  REDIRECT EXAMINATION

18  BY MR. BOVE:

19  Q.  You were asked some questions by defense counsel about

20  whether you deleted any messages on your phone before you left

21  Caracas in October of 2015?

22  A.  Yes.

23  Q.  Why did you do that?

24  A.  That it would not be --

25          THE INTERPRETER:  Interpreter's question.

1  A.  Because it would not be in my interest to have those kind

2  of questions, in case the police stopped me and reviewed the

3  messages of the activities in Venezuela, then I could have

4  problems.

5  Q.  Could you please describe what you mean by it would not be

6  in your interest?

7  A.  I mean that it would not be in my interest because of the

8  circles that the people we were dealing with were in, and that

9  if the police or any member of any police enforcement agency

10  were to stop me and review the messages, then they could see

11  that I was involved in the case in which the two of us were

12  involved.

13          MR. BOVE:  Nothing further, your Honor.

14          THE COURT:  You're excused.  Thank you very much.

15          (Witness excused)

16          THE WITNESS:  Thank you.

17          THE COURT:  We'll take our break for lunch now.  We

18  will resume at two o'clock.

19          Before we break, what is the schedule for this

20  afternoon?  Are you finished?

21          MR. QUIGLEY:  Your Honor, we have CS-1, who I think

22  the direct will be the similar length as CS-2, and then CS-3,

23  who I think will be the shorter than CS-1 and CS-2.

24          THE COURT:  Will we finish today?

25          MR. QUIGLEY:  I hope so, your Honor.  We think we have

1    about less than an hour of direct left.

2                    MR. JACKSON:  Your Honor, just to clarify.

3                    THE COURT:  Yes.

4                    MR. JACKSON:  We notified the government last night

5    that we decided not to call the expert witness, so that is off

6    the table.

7                    THE COURT:  You decided not to call who?

8                    MR. JACKSON:  The expert witness.

9                    THE COURT:  The expert witness.  OK.

10                   Do you have a case you're going to put in?

11                   MR. JACKSON:  At this point, your Honor, I would just

12   reserve.  We are going to confer about some of this, but right

13   now, we don't have witnesses today.

14                   THE COURT:  All right.  Do you have anything to say?

15                   MR. RODY:  No.

16                   THE COURT:  Thank you.  See you at two o'clock.

17                   (Luncheon recess taken)

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                        (2:00 p.m.)

3    CONFIDENTIAL SOURCE 1,

4           called as a witness by the Government,

5           having been duly sworn, testified as follows:

6               (Through interpreter)

7    DIRECT EXAMINATION

8    BY MR. QUIGLEY:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon.

11   Q.  Sir, how old are you?

12   A.  55 years old.

13   Q.  Sir, in October of 2015, did you go to Venezuela?

14   A.  Yes, sir.

15   Q.  Why did you go there?

16   A.  I went to do an operation to make some recordings of

17   Mr. Flores and Francisco.  I learned their names later on.

18   Q.  Were you working as a DEA confidential source in that

19   operation?

20   A.  Yes, sir.

21   Q.  Before you went to Venezuela, what, if any, equipment did

22   the DEA give you?

23   A.  Some recording equipment.

24   Q.  Can you describe it?  What is it audio recording equipment

25   or video recording equipment?  Can you describe it?

1    A.   There were two pieces of equipment.  One was for audio

2    recording and the other one was for audio and video recording.

3    Q.   How did you get that equipment before you went to

4    Venezuela?

5    A.   They were mailed -- or interpreter's correction -- it was

6    mailed to me.

7    Q.   You mentioned an audio recorder and a video recorder.

8    We'll call the audio recorder device two and the video recorder

9    device 1.

10            Is that all right?

11   A.   That's fine.

12   Q.   Did another DEA confidential source travel to Venezuela

13   with you?

14   A.   Yes, sir.

15   Q.   During the meetings which recording device did he use?

16   Device 1 or device 2?

17   A.   Number two.

18   Q.   Which device did he use, not you?  Which device did he use?

19            MR. JACKSON:  Objection.  Asked and answered.

20            THE INTERPRETER:  Your Honor, the interpreter is

21   waiting because there was an objection.

22            THE COURT:  Who objected?

23            MR. JACKSON:  Objection.

24            Your Honor, I objected.  Asked and answered.

25            THE COURT:  Overruled.  You can answer it.

1   A.  Could you please repeat the question.

2          THE COURT:  Let's stop for a moment.

3          Did you object, Mr. Jackson?  I didn't hear you

4   object.

5          MR. ZACH:  I object.  I'm sorry.  I am sometimes too

6   loud, and I think there I was too quiet.

7          THE COURT:  I didn't want to miss it.  OK.

8          Mr. Quigley, let's start all over again.

9   Q.  Let's resituate ourselves.  You said that the DEA provided

10  you with two recording devices before you went to Venezuela.

11         Is that correct?

12  A.  Yes, sir.

13  Q.  Device 1 which was an audio video recorder and device 2,

14  which was an audio-only recorder?

15  A.  That's correct.

16  Q.  Which of those devices did you use when you went to

17  Venezuela?

18  A.  Number 2, the audio recorder.

19  Q.  And who used device 1?

20  A.  The other DEA informant.

21  Q.  Now, have you previously used a device like device 2 while

22  working as a DEA informant?

23  A.  Yes.

24  Q.  Before you went to Venezuela, about how many times had you

25  used a device like device 2?

1    A.   Around seven or eight times, at least, around that amount.

2    Q.   And is the operator of the device able to start and stop

3    recording on device 2?

4    A.   They are able to turn it on and turn it off, just that.

5    Q.   And what was your understanding of how long the battery on

6    device 2 lasted?

7    A.   According to what I've heard, 24 hours or so,

8    approximately.

9    Q.   And how long did you expect to be in Venezuela for?

10   A.   Until we reached our goal, which could have been two to

11   three days or more.  There wasn't a specific number of days.

12   Q.   Given the battery life on the recorder, were you going to

13   record every moment of your trip to Venezuela?

14            MR. JACKSON:  Objection.  Leading.

15            THE COURT:  Overruled.

16            THE INTERPRETER:  I'm sorry.  Can the question be

17   repeated for the interpreter.

18   Q.   Given the battery life on the recording device, were you

19   going to be able to record every minute of your trip to

20   Venezuela?

21   A.   No, sir.

22   Q.   Now, you said that two people you met with Mr. Flores and

23   Francisco.  How many times in total did you meet with Flores

24   and Francisco in Venezuela?

25   A.   Four times.

1    Q.   How many of those meetings did you record?

2    A.   Three.

3    Q.   And what was the meeting you didn't record?

4    A.   One in which we were invited out to a club.

5    Q.   And why didn't you record that meeting?

6    A.   Well, in the first place, Mr. Flores was not going to go,

7    and he had just asked for Francisco to take care of us.  And

8    before going he said that he probably would stop by at the

9    meeting, at the club, and spend a little while with us, but he

10   said, he asked us to please not discuss any subject regarding

11   drug trafficking there.

12         And I also thought it would be wise to not make a

13   recording with the audio device because it would be very noisy

14   inside of the club and the voices would get lost, and all I

15   would accomplish would be to waste the battery.

16   Q.   Now, let's focus on the other three meetings.

17         Did you discuss narcotics trafficking at those other

18   three meetings?

19   A.   Yes, sir.

20   Q.   Where did these other three meetings take place?

21   A.   In one of Mr. Flores' buildings.  He mentioned to me that

22   it belonged to him.

23   Q.   At the first of those meetings when you discussed narcotics

24   trafficking, at what point did you activate device 2?

25   A.   When I entered into the property which I was told belonged

1    to Mr. Flores, I went inside of a bathroom that was to the left

2    of the entranceway.

3    Q.  Was that before or after the meeting started?

4    A.  Before the meeting started.

5    Q.  And what did you do after the meeting was complete?

6    A.  Before leaving the building I asked to go to the bathroom

7    to take care of my needs and I deactivated device No. 2.

8    Q.  At the second meeting where you discussed narcotics

9    trafficking what did you do before the meeting with respect to

10   device 2?

11   A.  I'm sorry.  Can you please repeat the question.

12   Q.  At the second meeting where you discussed narcotic

13   trafficking, where did you activate device 2?

14   A.  Right when I entered the building, just like the first

15   time, inside of the bathroom.

16   Q.  And was that before or after the meeting started?

17   A.  Before the meeting started.

18   Q.  And at what point did you deactivate device 2?

19   A.  When I was leaving after the meeting was over, but before I

20   left the building, I requested to use the bathroom again, and I

21   turned off the device.

22   Q.  So let's focus on the final meeting at Mr. Flores' building

23   where you discussed narcotics trafficking.  At what point did

24   you activate device 2?

25   A.  On arriving at the building, just the same as I had the

1    first and second time inside of the bathroom.

2    Q.  Was that before the meeting started?

3    A.  Yes, sir.

4    Q.  At what point did you deactivate device 2?

5    A.  When the meeting ended and we said goodbye to each other,

6    before leaving the building, and, once again, inside the

7    bathroom.

8    Q.  At some point after the final meeting in Venezuela where

9    you discussed narcotics trafficking, did you return to the

10   United States?

11   A.  Yes, sir.

12   Q.  What did you do with device 2 when you got back to the

13   United States?

14   A.  I gave it to Special Agent Gonzalez in the state of

15   Virginia in the United States.

16   Q.  Do you remember approximately when that was?

17   A.  I don't have an exact date, but it was towards the end of

18   October or the beginning of November.  I don't know exactly

19   what date.

20   Q.  I want to step back for a second and focus on the final

21   meeting you had in Venezuela where you discussed narcotics

22   trafficking.

23   A.  Yes, sir.

24   Q.  Did you see any drugs present at that meeting?

25   A.  Yes, sir.

1    Q.  What kind of drugs?

2    A.  Cocaine.

3    Q.  What quantity?

4    A.  One kilo.

5    Q.  When did you first see that kilogram of cocaine at the

6    meeting?

7    A.  After I arrived at the meeting the third time, on that day,

8    that was the third work-related meeting, around 15 to 20

9    minutes later after arriving approximately.

10   Q.  Who brought the cocaine into the meeting?

11   A.  It was there in the building, and Mr. Flores told me that

12   he had it in his possession then and that he was going to show

13   it to me.

14   Q.  So who actually brought it into the room?

15   A.  I'm sorry.  Could you explain that question to me.

16   Q.  Who brought the cocaine into the room?

17   A.  I don't know.

18   Q.  Was it one of Mr. Flores' associates?

19            MR. JACKSON:  Objection.

20            THE COURT:  You have to wait until he gets the

21   question out.

22            Go ahead.  Finish the question.

23   Q.  Was it one of Mr. Flores' associates?

24            MR. JACKSON:  Objection.

25            Leading.

1           THE COURT:  Overruled.

2     A.  Yes, sir.  That's what he mentioned to me.

3     Q.  What was your understanding --

4           MR. JACKSON:  Objection, your Honor.

5           The witness's testimony, I would just ask that last

6     answer be stricken because he clearly indicates that there was

7     no foundation for it.

8           THE COURT:  OK.  That's overruled.

9     Q.  What was your understanding of why that brick of cocaine

10    was being brought into the meeting?

11    A.  Because it was supposed to be a sample of the one-ton load

12    of cocaine that Mr. Flores was going to send me into Honduras.

13    Q.  What did you do with the cocaine?

14    A.  This is a question.  You mean that was inside of the

15    building?

16    Q.  Yes.  What did you do with that cocaine?

17    A.  I opened up the package in order to check the quality, the

18    color and the sparkliness of the cocaine.

19    Q.  Why did you need to do that?

20    A.  In order to confirm that what Mr. Flores was trying to show

21    me was in fact cocaine.

22    Q.  Did it appear to be cocaine to you?

23    A.  Yes, sir.

24    Q.  What, if anything, did you put on your hands before you

25    touched the cocaine?

1   A.  Some latex gloves.

2   Q.  How did you get those gloves?

3   A.  Mr. Flores gave them to me.

4   Q.  When you were done touching the cocaine, what did you do

5   with the gloves?

6   A.  After I was finished, I left them on the desk and either

7   Mr. Flores or Francisco threw them into the garbage can.  It

8   was one of the two of them.  I don't remember which.

9   Q.  At the end of the meeting, what happened to that kilogram

10  of cocaine?

11  A.  It was left in Mr. Flores' property.

12  Q.  Why didn't you take to take either the kilogram of cocaine

13  or the latex gloves with you out of the meeting?

14  A.  Because if I had taken them along, that would have posed

15  great risk to me, because I had to fly from Caracas, Venezuela,

16  into the United States, and if I had gotten arrested then I

17  could have been held for a possession of cocaine.

18  Q.  Were you authorized to carry cocaine in Venezuela or

19  Mexico?

20  A.  No, sir.

21  Q.  Sir, when you were in Venezuela, did you have sexual

22  relations with prostitutes?

23  A.  Yes, sir.

24  Q.  How many times?

25  A.  Two times.

G99nflo4                     Confidential Source 1 - direct

1    Q.   Did you disclose one of those times to the government for

2    the first time during the lunch break about a half an hour ago?

3    A.   Yes, sir.

4    Q.   Did you use cocaine while you were in Venezuela?

5    A.   Yes, sir.

6    Q.   How many times?

7    A.   Two times.

8    Q.   In addition to you, the other DEA -- strike that.  Focusing

9    on the three meetings where you discussed narcotics

10   trafficking --

11   A.   Yes, sir.

12   Q.   -- in addition to you, the other DEA informant, Flores, and

13   Francisco, who else was present at those meetings?

14   A.   There was a friend of the other informant along with around

15   three people inside and five people, four to five people

16   outside.  There was always armed security there for Mr. Flores

17   and Francisco.  I would like to clarify that when I'm saying

18   inside, I mean inside the property.  I mean not inside of the

19   meeting room.

20   Q.   Before the lunch break, at any point had you disclosed to

21   the government that the other informant's friend was at those

22   meetings?

23   A.   No, sir.

24   Q.   You testified that after the meetings in Venezuela you met

25   with the DEA in Virginia.

1           Do you remember that?

2     A.  Yes, sir.

3     Q.  Shortly after the meeting in Virginia, did you again travel

4     outside the United States on this case?

5     A.  Yes, sir.

6     Q.  Where did you go?

7     A.  To Port-au-Prince, Haiti.

8     Q.  Why did you go to Haiti?

9     A.  In order to meet with Mr. Flores and Francisco.

10    Q.  When you got to Haiti, and before you met with Flores and

11    Francisco, did you meet with anyone within the DEA?

12    A.  Yes, sir.

13    Q.  And what, if any, equipment did that person give you?

14    A.  Two pieces of equipment.  One of them was similar to

15    equipment No. 1, the other one to No. 2, which I had used in

16    Venezuela.

17    Q.  So device 1 and device 2?

18    A.  Yes, sir.

19    Q.  We've talked about your use of device 2 before, but before

20    you got to Haiti, had you ever used device 1 before in your

21    work for the DEA?

22    A.  No, sir.

23    Q.  Is the user of device 1 able to turn it on and off?

24    A.  Yes, sir.

25    Q.  Did you meet with Flores and Francisco in Haiti?

1    A.  Yes, sir.

2    Q.  Where did you first meet them?

3    A.  At the airport in Port-au-Prince, Haiti.

4    Q.  And where did you go with them after the airport?

5    A.  To a hotel near the airport.  It was about ten minutes away

6    approximately.

7    Q.  What happened when you got to the hotel?

8    A.  When we got to the hotel, I invited them to have something

9    to eat if they wanted to have a snack or have a drink.  And as

10   they were ordering whatever they wanted to eat or drink, I went

11   into the bathroom and activated device 1 and device 2.

12   Q.  At what point did you turn -- at any point during the

13   meeting did you intentionally turn device 1 off?

14   A.  No, sir.

15   Q.  When did you turn device 2 off?

16   A.  After the meeting with them was over and I received

17   instructions from Special Agent Gonzalez that I should leave

18   the meeting, I turned off the device, but I don't remember

19   exactly whether it was -- I don't remember exactly when that

20   was, but it was before I handed it over to him.

21   Q.  After the meeting, what did you do with device 1 and device

22   2?

23   A.  I gave them to Agent Gonzalez.

24   Q.  Sir, at any point in this case did you attempt to delete

25   any recordings from either device 1 or device 2?

G99nflo4                    Confidential Source 1 - direct

1   A.  No, sir.

2   Q.  Do you know whether it's even possible to delete recordings

3   from device 1 or device 2?

4   A.  I don't know if you could erase or not.

5   Q.  Do you have any special computer hardware or software that

6   relates to device 2?

7   A.  No, sir.

8   Q.  Did you attempt to manipulate recordings on device 1 or

9   device 2 in any way?

10  A.  No, sir.

11  Q.  Sir, when did you begin working for the DEA?

12  A.  In 2003.

13  Q.  Since 2003, about how much money have you received from the

14  DEA?

15  A.  Around $750,000.

16  Q.  Have you also worked as an informant for local law

17  enforcement agencies?

18  A.  Yes, sir.

19  Q.  About how much money have you received from local law

20  enforcement agencies?

21  A.  Around $250,000 to $300,000.

22  Q.  Do you expect to receive additional payments from the DEA?

23  A.  No, sir.

24  Q.  Why not?

25  A.  Because I committed a crime, I committed crimes, and I am

1   being processed, and I've lost all of my rights.

2   Q.  And what crimes did you commit?

3   A.  I helped some people to bring drugs from other countries,

4   from Mexico into the United States, and I assisted other people

5   in distributing drugs within the United States.  And I also

6   lied to the DEA.

7   Q.  Did you plead guilty to committing those crimes?

8   A.  Yes, sir.

9   Q.  When was that?

10  A.  Approximately last week.  I don't have the exact date.

11  Q.  Sir, you testified that you used drugs in Venezuela.  When

12  was the first time you used drugs?

13  A.  In my lifetime?

14  Q.  Yes.

15  A.  Around 1985.

16  Q.  When was the last time you used drugs?

17  A.  August 3, 2016.

18  Q.  What happened to you the next day?

19  A.  I was arrested.

20          MR. QUIGLEY:  One moment, your Honor.

21          Nothing further.

22          THE COURT:  Mr. Jackson?

23          MR. ZACH:  May I inquire, your Honor?

24          THE COURT:  Yes.

25          MR. JACKSON:  Thank you.

1   CROSS EXAMINATION

2   BY MR. JACKSON:

3   Q.  *Buenos días.  ¿Como esta?*

4   A.  *Bien*.

5            MR. QUIGLEY:  Objection.

6            THE COURT:  We are going to conduct this proceeding

7   today in English, Mr. Jackson.

8            MR. JACKSON:  Thank you.

9   Q.  How are you doing today, sir?

10  A.  Good, sir.

11  Q.  Great.

12           Now, my colleague, Mr. Rody, is going to ask you some

13  other questions later more extensively.  I want to ask you

14  about three simple subjects.

15  A.  Yes, sir.

16  Q.  The first thing I want to ask you about, sir, is your

17  communications with the person known as El Sentado.

18  A.  Yes, sir.

19  Q.  Do you know who I'm talking about?

20  A.  Yes.

21  Q.  This is an individual also known as CW-1, correct?

22           MR. QUIGLEY:  Objection.  Foundation.

23           THE COURT:  Overruled.

24  A.  I don't know that.  I don't know that.  I only know him as

25  Sentado.

1  Q.  OK.  For the purposes of today's hearing if I refer to CW-1

2  or El Sentado, you understand that I'm referring to the same

3  person?

4  A.  Yes, sir.

5  Q.  Before you pled guilty in this case, to be clear, you had

6  some conversations with the AUSAs in this case, right?

7  A.  Yes, sir.

8  Q.  And they told you that if you made any additional false

9  statements you would face severe penalties, didn't they?

10  A.  Yes, sir.

11  Q.  In fact, Mr. Bove yelled at you about the lies that you had

12  already told, didn't he?

13  A.  Yes, sir.

14  Q.  And he threatened you that you would be in severe trouble

15  if you told additional lies, correct?

16  A.  Well, it wasn't a threat.  He just told me that I had to

17  tell the truth because I was facing a very serious problem.

18  Q.  Right.  And you told Agent Gonzalez that the conversation

19  was so intense it felt like he was a Sinaloan, right?

20  A.  Repeat the question.  I didn't understand.

21  Q.  You told Agent Gonzalez that the conversation was so

22  intense you felt like he was a Sinaloan?

23  A.  I don't remember that fact.

24  Q.  Let me show you something.  You just tell me if this

25  refreshes your recollection.

1    A.  It's not clear.

2              MR. JACKSON:  Just give me a moment, please.

3    Q.  Do you recognize the excerpts of the conversations that you

4    are looking at in this document which I'll mark as D 81, sir?

5    A.  Yes, sir.

6    Q.  I want you to look at them very briefly for a moment to

7    yourself.

8    A.  OK.

9              THE COURT:  The question is?

10   Q.  Having seen that, does that refresh your recollection that

11   you told Agent Gonzalez that the conversation was so intense he

12   seemed Sinaloan?

13   A.  No, sir.

14   Q.  OK.  You had a number of direct conversations with El

15   Sentado, right?

16   A.  Only by -- well, yes, but only through BlackBerry.

17   Q.  You never spoke to El Sentado on the phone?

18   A.  I'm remembering now that I did have one or two calls with

19   him.  I don't remember, but what I remember is it was mainly

20   through BlackBerry, never personally, in person.

21   Q.  Right.  So, to be clear, you had BlackBerry conversations

22   with him and you had phone calls, right?

23   A.  I can't be absolutely sure about the phone calls, but if I

24   listen to a conversation and it's mine, I would tell you.  I

25   don't really remember well.

1    Q.   OK.

2    A.   But you think it's possible that you also had phone calls

3    in addition to the BlackBerry calls.

4              MR. QUIGLEY:  Objection, your Honor.

5              THE COURT:  Overruled.

6    A.   Could be.  But I can't be absolutely sure.

7    Q.   You didn't record certainly any phone calls if they did

8    happen between you and El Sentado?

9    A.   If I had a call with him, I don't remember having recorded

10   it.

11   Q.   Right.  Now, it's a fact that the reason that you were

12   speaking to El Sentado was to get a briefing on the defendants

13   before you met with them?

14             MR. QUIGLEY:  Objection.  He said he didn't remember

15   whether he was speaking to him.

16             THE COURT:  Overruled.

17             THE INTERPRETER:  Can you repeat the question, please.

18             MR. JACKSON:  Yes.

19   Q.   The reason that you were communicating with El Sentado was

20   to get a briefing from him on the defendants before you met

21   with them?

22   A.   Repeat the question, please.

23   Q.   The reason that you were communicating with El Sentado was

24   to get a briefing on the defendants before you met with them?

25   A.   Yes, sir.

1    Q.  It was critical that you understand their level of

2    sophistication, right?

3    A.  What are you referring to when you say sophistication?

4    Q.  It was critical that you understand how sophisticated they

5    were in terms of their drug trafficking?

6    A.  Once again, I don't understand the word sophisticated.

7    Q.  You do understand, sir, that there are some drug

8    traffickers who are more experienced than others, right?

9    A.  Yes, sir.

10   Q.  You are a very experienced drug trafficker, correct?

11   A.  Yes, sir.

12   Q.  One of the things that you need to know before you go into

13   an operation is how experienced the drug traffickers are that

14   you are targeting, right?

15   A.  Not precisely.  I don't need to know whether they're

16   experienced or not.

17   Q.  You were representing yourself as a member of the Sinaloan

18   cartel, correct?

19   A.  Yes, sir.

20   Q.  So it would be a problem if the people that you were

21   meeting with had direct contacts with the Sinaloan cartel,

22   wouldn't it?

23   A.  I don't understand the question.

24   Q.  Well, sir, you're concerned about your own personal safety

25   when you are doing an operation, right?

1   A.  Yes, sir.

2   Q.  It would pose a threat to your safety if you were to meet

3   with people who knew that your back story was false?

4   A.  Of course, yes.

5   Q.  Right.  So one of the things that you got from El Sentado

6   was an understanding of how sophisticated the defendants were,

7   right?

8   A.  The only thing I spoke about with El Sentado is that there

9   were people who were trying to send a load from Venezuela and

10  they were relatives to the presidential family.  He told me

11  that the Flores guys had the ability to not undergo an

12  inspection at the airport because they controlled the police.

13  Q.  Well, he also told you that they were young, right?

14          MR. QUIGLEY:  Objection.  Relevance.

15          THE COURT:  Overruled.

16  A.  I don't remember that.

17  Q.  He also told you that they didn't -- they told him they

18  didn't have airplanes, right?

19  A.  I don't remember that.

20  Q.  So you just don't remember one way or another whether El

21  Sentado told you that?

22  A.  I don't remember.

23  Q.  OK.  You came to your own determinations, though, about the

24  level of sophistication of the defendants, didn't you?

25  A.  When you're referring to sophistication, can you explain to

1    me once again, what is sophistication?

2    Q.  I am talking about the level of experience, sir.

3    A.  OK.

4    Q.  And you determined on your own that the defendants were

5    relatively inexperienced, right?

6    A.  In the end, yes, but not that they were unfamiliar with the

7    job or the work in itself.  Compared to me, I understood that

8    they didn't have the same capacity, because they were young.

9    Q.  Right.  You told Agent Gonzalez that it was your belief

10   that it was their first time, right?

11   A.  That they acted as if, not -- that they acted as if it was

12   the first time, not that it was the first time.  Not that it

13   was the first time, because they had already told me that it

14   was not the first time.

15   Q.  Right.  You were saying that based on the way they acted

16   your perception was that it was the first time?

17            MR. QUIGLEY:  Objection.  Mischaracterizes his

18   testimony.

19            THE COURT:  Sustained.

20   Q.  That matched up with the information that you had gotten

21   from El Sentado.

22            MR. QUIGLEY:  Objection.  Leading.

23            THE COURT:  Overruled.

24   A.  No.

25   Q.  Now, El Sentado told you that he had met with the

1    defendants in Honduras, right?

2    A.  I don't remember exactly if he mentioned that.

3    Q.  You don't remember whether he even told you that he had had

4    a meeting?

5    A.  No.  He just told me that he knew them, not that he had a

6    meeting with them around that time, that he had a direct line

7    with them.

8    Q.  OK.  So didn't you tell Agent Gonzalez that it was

9    important for you to have all the facts before you went into

10   this meeting?

11   A.  Yes, sir.

12   Q.  Right.  And one of the critical facts was that they had met

13   with El Sentado in Honduras, right?

14            MR. QUIGLEY:  Objection.

15            THE COURT:  Overruled.

16   A.  Can you repeat the question, please.

17   Q.  One of the critical facts was that they had met with El

18   Sentado in Honduras?

19   A.  I don't remember that.  I don't remember him having said

20   that.

21   Q.  OK.  El Sentado did tell you, though, that he had a

22   recording of a meeting with them, right?

23   A.  I don't remember that as well.

24   Q.  OK.  Now, one of the things that you talked about on direct

25   examination is the fact that there was a meeting you attended

1   where you saw an alleged brick of cocaine, right?

2   A.  In what direct?

3   Q.  I'm sorry.  During your examination by the prosecutors a

4   moment ago.

5   A.  Yes, sir.

6   Q.  What was the date of that meeting?

7   A.  Not exactly, but it was in October of 2015.  I don't have

8   the exact date.

9   Q.  Before that meeting, you had seen cocaine many times,

10  correct?

11  A.  Yes, sir.

12  Q.  In fact, you had used cocaine many times before that

13  meeting, right?

14  A.  Yes, sir.

15  Q.  You had both snorted and smoked cocaine, right?

16  A.  Only snorted, not smoked.

17  Q.  On no occasion did you ever smoke cocaine?

18  A.  No, sir.

19  Q.  So you had used it the day before the meeting, right?

20  A.  No, sir.  Let me remember.  Please allow me.  No, sir.

21  Q.  When was it in relationship to that meeting that you used

22  cocaine in Venezuela?

23  A.  At the club that I was invited to by Mr. Flores and

24  Mr. Francisco.

25  Q.  Was that before or after the meeting where you saw the

1    alleged brick of cocaine?

2    A.   Before.

3    Q.   So this is the day before the meeting, right or is it --

4    withdrawn.

5            How far before this meeting was it?

6            MR. QUIGLEY:  Objection.  He said he didn't remember.

7            MR. JACKSON:  I'm sorry.  What?

8            THE COURT:  Overruled.

9    A.   I didn't understand the question.

10   Q.   How long before the meeting where you saw the alleged brick

11   had you been using cocaine?

12   A.   That I had used or used.  I don't understand the question.

13   Q.   How long before you saw this alleged brick was it that you

14   used cocaine?  Was it the day before?  Two days before?

15   A.   Two or three days before.

16   Q.   OK.  So during the time period where you were about to do,

17   do the meeting where you would see this alleged brick, you knew

18   that the purpose was to obtain a sample, right?

19   A.   He was going to show it to me during -- as of the second

20   meeting, he was going to show me the kilo, but he was not able

21   to get it.  It wasn't until the third meeting, work meeting

22   that he showed it to me.

23   Q.   Right.  It was important to you that you obtain all useable

24   evidence that you could in this investigation, right?

25   A.   Yes, sir.

1    Q.  The reason it was important to you is because you were

2    expecting a big payout at the end of the case, right?

3    A.  Yes, sir.

4    Q.  When you went into this meeting, you actually took the

5    alleged cocaine into your hands, right?

6    A.  From the one that Mr. Flores showed me?

7    Q.  Yes.

8    A.  Yes.

9    Q.  If that had actually been cocaine, that would be important

10   evidence, right?

11   A.  Yes, it was cocaine.

12   Q.  Right.  But you didn't perform any chemical test on it in

13   that room, did you?

14   A.  No, sir.

15             MR. QUIGLEY:  Objection.

16             THE COURT:  What was the objection?

17             MR. QUIGLEY:  Relevance, your Honor.

18             THE COURT:  It's overruled.

19   Q.  The answer is no?

20   A.  No, sir.

21   Q.  It's your testimony that you didn't snort any of that

22   cocaine, right?

23   A.  No, sir.  In other words, I didn't inhale it.  I just

24   smelled it, I saw it, and I touched it.

25   Q.  Right.  You didn't actually take any of that cocaine,

1  right?

2  A.  I didn't take it in, but I saw it and I smelled it.  It was

3  cocaine.

4  Q.  Right.  But actually snorting it would have allowed you to

5  confirm that it was cocaine, right?

6          MR. QUIGLEY:  Objection.

7          THE COURT:  Sustained.

8          Don't answer it.

9  Q.  Now, you testified that the reason you didn't bring the

10  sample out of the meeting is that you were concerned about

11  being arrested, right?

12  A.  Correct.

13  Q.  Right.  But you have carried cocaine on you numerous times

14  throughout your life, right?

15  A.  But not at airports.  Not at airports or in other

16  countries, only the one that I would have for my own personal

17  use, not to transport it or carry it.

18          (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. JACKSON:

2    Q.  Sir, it is a yes-or-no question.

3         You have carried cocaine a number of times in your

4    life; yes or no?

5    A.  I don't understand the question.

6    Q.  You don't understand -- all right.  Never mind.

7    Never mind.

8         You just said that you have held cocaine for your

9    personal use, right?

10   A.  Yes, sir.

11   Q.  You have also held cocaine that you were going to sell,

12   right?

13   A.  I don't understand that question.

14   Q.  While you were in Venezuela, if you were using cocaine, why

15   were you so much more afraid of carrying it outside of that

16   meeting?

17        THE INTERPRETER:  Can the question be repeated for the

18   interpreter, please?

19        MR. JACKSON:  Yes.

20   Q.  Since you had been using cocaine down in Venezuela, why

21   were you so much more afraid to carry it out of the meeting?

22   A.  Because it's not the same thing to bring to use some drugs

23   that someone has brought to you and has offered you to use as

24   it is to be carrying it around or them around in your pocket

25   out on the street.

1    Q.  But the point is, there are chemical tests that you could

2    have done after the meeting with household supplies, right?

3          MR. QUIGLEY:  Objection.

4          THE COURT:  Sustained.

5          MR. JACKSON:  Your Honor, may I just ask for the

6    basis.  I just want to make sure that I don't run afoul of

7    that, because I don't understand the issue with the question,

8    for my subsequent question.

9          THE COURT:  Go ahead.  Ask your next question, and

10   I'll rule on that.

11         MR. JACKSON:  All right.  I'm sorry.

12   BY MR. JACKSON:

13   Q.  You have tested --

14         THE COURT:  I think I understand your point that you

15   have made, that there is alternatives to testing that you think

16   he should have tested, but he didn't test.  I understand the

17   argument.  I think you're beating a dead horse now.

18         MR. JACKSON:  Translator, can I ask you not to

19   translate what the judge is saying between us?

20         THE COURT:  No, I am saying this on the record.  It

21   doesn't make a difference whether the witness understands it.

22   I have your point, Mr. Jackson.

23         MR. JACKSON:  OK.  Thank you, your Honor.

24   BY MR. JACKSON:

25   Q.  Now, to be clear, sir, you bribed someone in customs while

1    you were down there, right?

2    A.  I don't recall.

3    Q.  Have you ever bribed someone in customs?

4    A.  Yes, but not in Venezuela.

5    Q.  In what country?

6    A.  In Mexico.

7    Q.  And have you ever brought cocaine across any border?

8    A.  Yes, sir.

9    Q.  When?

10   A.  In the past, many years ago when I was trafficking drugs

11   between 1991 and 2000.  And between 2012 and 2016, I helped

12   some people to import drugs into the United States.

13   Q.  Right.  And you knew when you did that that you were facing

14   serious penalties if you were caught, right?

15   A.  Yes, sir.

16   Q.  Now, during the meeting that you had where you looked at

17   the cocaine sample, you told the defendants that you were going

18   to perform a test on it, didn't you?

19   A.  I'm sorry.  Please repeat that.

20   Q.  During the meeting where you looked at the alleged brick of

21   cocaine, you told Mr. Campo and Mr. Flores that you were going

22   to perform a test on it, right?

23   A.  Yes, sir.

24   Q.  And you told them that that was to determine the

25   percentage, right?

1    A.   Yes.

2    Q.   Right.  And you had separately told Agent Gonzalez that

3    it's impossible to determine the percentage without doing a

4    chemical test, right?

5    A.   I don't recall that.

6    Q.   You don't remember during a meeting that you had with the

7    DEA saying that it's impossible to determine the percentage of

8    cocaine, the purity percentage of cocaine, without performing a

9    chemical test?

10   A.   I don't recall that, but you might be right about that.

11   If you do not do a chemical test, it may not be possible to

12   determine the purity.  But based on my own experience -- but

13   I can say that, based on my experience, that was cocaine of

14   excellent quality, and I could tell that because of its color,

15   because it sparkled, and because of its consistency.  Because

16   when you put it on your hand and when you rub the cocaine onto

17   your hand, then it will release oil.  And when I did that, it

18   was pure oil, and so that's why I told Mr. Flores and Francisco

19   that the quality of the cocaine was good.  And they told me

20   that that was the quality that they were going to have, that

21   they liked to work --

22            THE INTERPRETER:  Interpreter's correction.

23   A.   -- they always worked with that quality, because they did

24   not like having any trouble, and that that was the quality of

25   the ton that they were going to send me.

1    Q.  Sir, where did you learn that test?

2    A.  Out of my use, out of having worked in drug trafficking for

3    so long, and from the years that I used the cocaine.

4          THE INTERPRETER:  Interpreter's correction.

5    A.  That I snorted cocaine.

6    Q.  To be clear, no one from the DEA told you not to take a

7    sample out of that room, right?

8    A.  No, sir.  No one told me.

9    Q.  That's an independent decision that you made?

10   A.  Yes, sir, for my safety.

11   Q.  Now, you told us during your direct testimony that there

12   was a meeting with -- I'm sorry -- that there was a meeting at

13   the club, the one where you were using cocaine, right?

14   A.  Yes, sir.

15   Q.  And you said that the reason that you didn't bring a

16   recorder was because you were told that there wouldn't be any

17   discussion of business?

18   A.  Yes, sir.

19   Q.  But, in fact, you knew that the discussion of business was

20   a possibility at this meeting, right?

21   A.  No.

22   Q.  You didn't think there was any possibility that there could

23   be a discussion of business?

24   A.  No, sir.

25   Q.  Well, it turns out you were wrong, right?

1    A.  No, I don't think so.

2    Q.  Isn't it true that at that meeting at the club, there was

3    discussion about your role as one of the bigger guys in the

4    Sinaloa cartel?

5    A.  I don't recall that.

6    Q.  Just one moment.

7    A.  Yes, sir.

8    Q.  I want to show you something, and I want to ask you if it

9    refreshes your recollection.

10           This is a document I'll mark as D80, which is an

11   excerpt from 3508-1, pages 70 and 71.  I would like you to take

12   just a moment and take a look at that.

13   A.  Yes, sir.

14   Q.  Now, does this refresh your recollection about this part of

15   the meeting?

16   A.  Yes, but that's not the one that he was mentioning.  This

17   was not discussed in that meeting, that I was bigshot in the

18   Sinaloa cartel.  This is something I mentioned to Agent

19   Gonzalez after the club, because the meeting, the first meeting

20   was around eight or nine p.m.

21           And around 10 or 11 p.m., that's when we went out to

22   the club, and I was not able to be in touch with

23   Mr. Gonzalez -- Agent Gonzalez at that time, because I knew it

24   was late.  And down here, where I mention until -- I got one

25   without paying, I am recalling now that that is because I was

G99SFLO7                    Confidential Source 1 - cross

1   telling Agent Gonzalez that I was invited at the club and that

2   I did not have to pay.

3   Q.  So just to be clear, just to orient ourselves, during this

4   conversation you are telling Agent Gonzalez about the fact

5   that, based on what you seen, the people in Venezuela that you

6   have been meeting with respect Mexicans, right?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Sustained.

9   Q.  Let me direct your attention to an earlier portion of the

10  conversation, which is marked as 3508-1.  Just one moment.

11             Can you see that?

12  A.  Yes, sir.  I'm looking at it.

13  Q.  Do you see at about the third entry it says, he took me to

14  a joint that had been his, but he sold it, but you can imagine,

15  he had VIP treatment for me, double VIP?

16  A.  VIP, double VIP.

17  Q.  Right.  You're talking about a trip to the club right

18  there, right?  Yes or no?

19  A.  We were inside -- no, that -- that occurred -- this was an

20  event that occurred inside of the club.

21  Q.  Right.  When you're talking about the VIP treatment, you're

22  talking about a trip to the club, right?

23  A.  It was about the attention that they gave me at the club.

24  Q.  Right.  And shortly, in this exact same conversation, as

25  you're recounting what happened in the club, you say to Agent

1    Gonzalez, he told everyone I was one of the top guys of the

2    Mex. Sinaloa cartel, right?

3    A.  Yes, sir.

4    Q.  So you lied a minute ago when you said that there was no

5    discussion about business at the club?

6              MR. QUIGLEY:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.  You were incorrect a moment ago?

9              MR. QUIGLEY:  Objection.

10             THE COURT:  Sustained.

11   Q.  That's a discussion about business in the club, right?

12             MR. QUIGLEY:  Objection.

13             THE COURT:  Sustained.

14   Q.  What was the context of the conversation in the club where

15   he was telling everyone you were one of the top guys in the

16   Sinaloa cartel?

17             MR. QUIGLEY:  Objection, relevance.

18             THE COURT:  Sustained.  You have got to go on to

19   something else that may be relevant.

20             MR. JACKSON:  That's fine.  Thank you, your Honor.

21   BY MR. JACKSON:

22   Q.  I am going to defer in a moment.  I just really have one

23   last area of questions.

24             You pleaded guilty to a violation of 1001, right?

25   A.  I'm not familiar with that 1001.  I don't know or don't

G99SFLO7          Confidential Source 1 - cross

1    understand that term.

2    Q.  You read your cooperation agreement?

3            THE COURT:  Why don't you just tell him what 1001 is.

4            MR. JACKSON:  I will.

5            THE COURT:  Put me out of my misery.  He probably

6    doesn't walk around with the U.S. Code.

7            MR. JACKSON:  Fare enough, your Honor.

8    BY MR. JACKSON:

9    Q.  How many different lies to the DEA was that violation of

10   1001 based on?

11           MR. QUIGLEY:  Objection.

12           THE COURT:  Overruled.

13   A.  I don't understand the question.

14   Q.  Sure.  You pled guilty to lying to the DEA, right?

15   A.  Yes, sir.

16   Q.  How many different lies did you tell that led to that

17   guilty plea?

18   A.  Lies?

19   Q.  Yes.

20   A.  No.  For that agreement?

21   Q.  No.  You pled guilty to lying to the DEA, right?

22   A.  Yes, sir.

23   Q.  How many different lies did you tell that led to the guilty

24   plea?

25   A.  I don't understand the question.

1    Q.  You told more than one lie to the DEA, right?

2    A.  Yes, sir.

3    Q.  That's why you pled guilty?

4    A.  That was one of the charges, having lied to the DEA.

5    Q.  And it was more than 20 lies, right?

6    A.  I don't know.  More than 20?

7    Q.  You don't know how many lies you told?

8    A.  I don't recall exactly right now, but I did lie to them.

9          MR. JACKSON:  Just one moment, your Honor.

10         No further questions at this time.

11         THE COURT:  Mr. Rody.

12         MR. RODY:  Yes, Judge.

13         Judge, do you want to break now?

14         THE COURT:  No.  Why don't you go ahead.

15         MR. RODY:  OK.

16   CROSS-EXAMINATION

17   BY MR. RODY:

18   Q.  Sir, you pled guilty pursuant to your cooperation agreement

19   one week ago yesterday, right?

20   A.  Approximately.

21   Q.  You pled guilty to three counts, right?

22   A.  Yes, sir.

23   Q.  The first count was importing drugs into the U.S., right?

24   A.  Yes, sir.

25   Q.  The second count was distributing drugs in the United

1  States, right?

2  A.  Yes, sir.

3  Q.  The third count was the one that you were just discussing

4  with Mr. Jackson that concerned your lies to the government,

5  right?

6  A.  Yes, sir.

7  Q.  You admit that you are a liar?

8  A.  Not right now.

9  Q.  But you pled guilty to being a liar, right?

10  A.  Yes, sir.

11  Q.  And you had intentionally deceived the DEA and the

12  government for years, right?

13  A.  Well, I deceived them.

14  Q.  You schemed with your own son to deceive the government,

15  correct?

16  A.  Yes, sir.

17  Q.  You even tried to get other confidential sources to scheme

18  with you to deceive the government, right?

19  A.  I don't understand that.

20  Q.  If I refer to someone as CS-6, do you understand who that

21  is?

22  A.  No, sir.

23  Q.  Wasn't there another CS who was based where you are from

24  whom you tried to get to go into unauthorized drug deals with

25  you?

1    A.  I don't recall that fact.

2    Q.  In any event, you were successful at deceiving the

3    government, right?

4    A.  For a while.

5    Q.  For at least four years, right?

6    A.  Yes, sir.

7    Q.  Now, before you pled guilty pursuant to your cooperation

8    agreement, the government told you that there were severe

9    penalties if you broke the agreement, right?

10   A.  Yes, sir.

11   Q.  They said you had to tell them the truth, right?

12   A.  Yes, sir.

13   Q.  About all of your prior misconduct, right?

14   A.  Yes, sir.

15   Q.  That you could not withhold any information, right?

16   A.  Yes, sir.

17   Q.  And you understand that withholding material information is

18   the same thing as lying, right?

19   A.  Yes, sir.

20   Q.  And you said you were telling the truth, right?

21   A.  I'm sorry.  I did not hear you.

22   Q.  You said that you were telling the government the full

23   truth, right?

24   A.  I told them that I would tell them everything that I was

25   able to remember.  It is sometimes impossible for someone to

1   remember every single fact, but I am being honest.

2   Q.  Right.  It's impossible to remember every detail of your

3   drug-trafficking career, right?

4   A.  Yes, sir.

5   Q.  And the government told you that if they found out that you

6   had been lying after you pled guilty, that your agreement would

7   get ripped up, right?

8   A.  Yes, sir.

9   Q.  And you understood what they were telling you, right?

10  A.  Yes, sir.

11  Q.  But you still lied to them, right?

12  A.  Not intentionally.  If something happens to make me

13  remember something in the future, then I am going to tell them.

14  But I have been -- but I have told them what I remember before

15  signing the agreement.  I told them everything I remember, and

16  if I remember anything else in the future, I will tell them,

17  because I do not want to break that agreement, because I want

18  to get a 5K.

19  Q.  Today at lunch was the first time that you ever told the

20  government that you brought an unauthorized man into your

21  operation in Venezuela, correct?

22  A.  I had told them about that person, but not in detail that

23  he had entered into the meeting.

24  Q.  Right.  So, again, today at lunch was the first time you

25  ever told the government that you had brought an unauthorized

1    man into your operation in Venezuela, correct?

2    A.  Yes, sir.

3    Q.  Today at lunch was the first time that you ever told the

4    government that you had used prostitutes in Caracas on that

5    trip not once, but twice, right?

6    A.  Yes, sir.

7    Q.  Has the government told you that they are ripping up your

8    cooperation agreement?

9    A.  Not that they were going to rip it, just that they were

10   extremely unhappy about it, and they were going to review

11   everything that I told them.  And they told me that I have to

12   remember and be honest with them because this is an agreement.

13   That's what I'm doing now, I'm being honest.

14   Q.  So now you're being honest?

15   A.  Yes, sir.

16   Q.  You understand that your agreement might be ripped up

17   because you lied again to the government, right?

18   A.  That's the prosecutor's decision.

19   Q.  Now, you were first confronted about your lies to the

20   government in late June of this year, right?

21   A.  Yes, sir.

22   Q.  And this was the meeting when the prosecutors were very

23   angry at you, right?

24   A.  Yes, sir.

25   Q.  That you discussed in texts later with Agent Gonzalez,

1   right?

2   A.  Yes, sir.

3   Q.  And they told you at that meeting that you had to tell the

4   truth, right?

5   A.  Yes, sir.

6   Q.  And you lied to them at that meeting, right?

7   A.  Not intentionally.

8   Q.  Sir, over the -- withdrawn.

9           You claim you were engaging in unauthorized drug deals

10  only for about four years before 2016, right?

11          THE INTERPRETER:  Before what?

12          MR. RODY:  2016.

13  A.  No, sir.  I didn't say that.

14  Q.  Sir, you admitted to the government, did you not, that you

15  were engaged in unauthorized drug deals between about 2012 and

16  2016, right?

17  A.  Yes, sir.

18  Q.  That's what you pled guilty to, right?

19  A.  Yes, sir.

20  Q.  In fact, you were engaged in unauthorized drug deals far

21  before that, right, before 2012?

22  A.  I don't remember.

23  Q.  Between 2012 -- withdrawn.

24          So you may have engaged in unauthorized drug deals

25  before 2012, correct?

1    A.  I don't remember.

2    Q.  Between 2012 and 2016, you trafficked in many, many

3    kilograms of cocaine that were unauthorized, right?

4    A.  From 2012 to 2016?

5    Q.  Yes.

6    A.  Yes, sir.

7    Q.  But at that meeting in late June 2016, you told the

8    government that the only cocaine deal that you had been

9    involved in was three kilos that you got from your friend Javi

10   in Mexico, right?

11   A.  Yes, sir.

12   Q.  And that was a lie, right?

13   A.  Yes, sir.

14   Q.  Now, the government didn't know it was a lie at the time,

15   right?

16   A.  No, sir.

17   Q.  So when you first got charged in a complaint in August,

18   they didn't charge you with a lot of cocaine, right?

19          MR. QUIGLEY:  Objection.

20          THE COURT:  Overruled.

21          THE INTERPRETER:  Can you repeat the question, please?

22   BY MR. RODY:

23   Q.  When you got first arrested in August pursuant to a

24   complaint, the government did not charge you with having

25   distributed a lot of cocaine, correct?

1    A.  I'm sorry.  I didn't understand the question.

2    Q.  In August when you got arrested, you were charged pursuant

3    to a document called a complaint, right?

4    A.  Yes.  Well, could you show me the document?

5    Q.  Sure.  3504-01.

6         MR. RODY:  May I approach, your Honor?

7         THE COURT:  Yes, you may.

8    Q.  That's the complaint that the government first filed

9    against you when they arrested you in August, correct?

10   A.  That's correct.

11   Q.  And if you look on page two in this complaint, it says that

12   you were responsible for distributing only 500 grams and more

13   of mixtures and substances containing cocaine?

14   A.  500 grams?

15   Q.  500 grams, right?

16   A.  Yes.

17   Q.  That's what was in the complaint, right?

18   A.  Yes.

19   Q.  Right.  And in the information that you just pled guilty

20   to, that charges you with five kilograms and more of cocaine,

21   right?

22   A.  Yes.  Because, as I told you before, it was impossible to

23   remember everything.  And as I remembered things, I told the

24   prosecutor when I remembered more facts and more events.  I

25   told them the truth.

1  Q.  Sir, when the government fully debriefed you, you revealed

2  lots and lots of drug deals or hundreds and hundreds of

3  kilograms of cocaine, right?

4  A.  During what meeting?

5  Q.  In August 2016.

6  A.  During the first meeting, we spoke about the facts or the

7  events that I had carried out without telling the government.

8  And, initially, it is what I remembered, was the first three

9  kilos, some kilos of methamphetamine, and some kilos of heroin.

10        And the following day or subsequently, I remembered

11  that there had been other events with Javier as well, but I

12  never had the intention of lying to them.  It's just as time

13  passed and I remembered, I told them I tried to remember and

14  tell them as much as I remember.

15  Q.  Did you talk to your son before you were confronted by the

16  DEA in June?

17  A.  In June?  No.  Well, I mean, we spoke, but not regarding

18  the arrest.  That was a surprise for me.

19  Q.  Isn't it true, sir, that you and your son --

20        THE COURT:  Let's take our afternoon break.

21        MR. RODY:  OK, Judge.

22        (Witness not present)

23        THE COURT:  How much longer do you have, Mr. Rody?

24        MR. RODY:  A bit, sir.

25        Part of the difficulty is him not understanding the

1    question and having to repeat the question.

2         THE COURT:  But what's the point?  You're asking him

3    about events in 2016.  I understand there was a substantial

4    problem with regard to his credibility.  This deals with the

5    issue of whether or not the evidence back in 2015, in October

6    and November, was spoiled.  And in that connection, I suppose

7    it is relevant to go into his credibility.  I understand the

8    attack on his credibility.

9         MR. RODY:  One of the critical factors here, Judge --

10        THE COURT:  It is not a jury.  I can understand your

11   point.  There is a substantial question as to his credibility.

12        What this has to do with his events in 2015 is a

13   separate question.  The government has a pending motion on

14   that.  You'll have an opportunity to respond.

15        How much more do we have to hear this?  I get the

16   point.

17        MR. RODY:  Judge, I really am trying to move on.

18        Part of the difficulty is that he will not admit

19   things and he claims not to understand the question repeatedly.

20   I really am trying to move on to the substance of 2015.  We

21   think that his credibility is critically relevant to your

22   assessment of what he did in 2015.

23        THE COURT:  I understand.  *Falsus in uno, falsus in*

24   *omnibus.  Falsus* for the eternity.  Look, that is what you're

25   going to tell me.  You've already told me that.  I get the

1    drift.

2            MR. RODY:  Judge, look, I am going to ask him

3    questions about what he did with the recordings and how he made

4    them --

5            THE COURT:  That may be relevant, but that happened in

6    2016.  And his cooperation agreement and his compliance with

7    the cooperation agreement, whether he told the whole truth or

8    half the truth or he is so used to lying, he can't tell the

9    truth --

10           MR. RODY:  We would be happy to enter into a

11   stipulation with the government to that fact, Judge.

12           THE COURT:  I can make my own assessment.  I'm telling

13   you now I have my own assessment and it is getting cumulative.

14   It is wasting my time.

15           If you want to focus in on what he did with recordings

16   in 2015 and the issue of spoliation, that's fine, too.

17           MR. RODY:  Understood, Judge.  We just got 3500 today

18   about what happened at lunch, so I'm moving on.

19           THE COURT:  How did you get 3500 material before it

20   happened?

21           MR. QUIGLEY:  Judge, they got four lines of 3500

22   material.

23           THE COURT:  If it happened at lunch, it happened at

24   lunch.

25           What time did you get it, before you finished your

1    tuna fish sandwich?

2              MR. RODY:  I am moving on, Judge.

3              THE COURT:  How much longer is it going to be?

4              MR. RODY:  That's hard to say, your Honor.

5              THE COURT:  You better make it fast.

6              Does the government have any more witnesses after

7    this?

8              MR. BOVE:  We have one financial witness that has also

9    been subpoenaed by the defense, your Honor, is Confidential

10   Source 3.  My direct exam of Confidential Source 3 is

11   approximately 15 to 20 minutes.

12             THE COURT:  Well, we are going to break at 5:00.  Are

13   we going to get done by 5:00?

14             MR. BOVE:  Depending on when we start, yes, we are.

15   We will make every opportunity to do so.

16             THE COURT:  See you in ten minutes.

17             (Recess)

18             THE COURT:  OK, Mr. Rody.

19             MR. RODY:  Thank you, Judge.

20   BY MR. RODY:

21   Q.  Sir, during your meetings in Venezuela, you had with you

22   device one, correct?

23             MR. QUIGLEY:  Objection, mischaracterizes his

24   testimony.

25             THE COURT:  Overruled.

G99SFLO7          Confidential Source 1 - cross

1   A.  No, sir.

2   Q.  You had device two?

3   A.  Yes, sir.

4   Q.  And you had the ability to turn that device on and to turn

5   it off, correct?

6   A.  Yes, sir.

7   Q.  You controlled when it was recording and when it was not,

8   correct?

9   A.  I don't understand the question.

10  Q.  You controlled when to turn the recording on and when to

11  turn the recording off, correct?

12  A.  Yes, sir.

13  Q.  There was no DEA agent that started the recording for you,

14  correct?

15  A.  No, sir.

16  Q.  And you did not record any of the full meetings that you

17  attended with the defendants, correct?

18  A.  I don't understand the question.

19  Q.  You said that you recorded three meetings in Venezuela with

20  the defendants, right?

21  A.  Yes, sir.

22  Q.  For each of those three meetings, you did not record the

23  entire meeting, correct?

24  A.  I recorded it completely, yes.

25  Q.  Sir, you said that when you would get to the meetings, you

1  had to turn on the device, correct?

2  A.  Yes, sir.

3  Q.  You claim that you would do this in a bathroom at the

4  beginning of the meeting, right?

5  A.  Yes, sir.

6  Q.  But you did not do this exactly at the beginning of every

7  meeting, correct?

8  A.  As soon as I went into the building, I turned on the

9  equipment, and then I would meet with Mr. Flores.  Because it

10  would be impossible to turn on the device sitting in front of

11  Mr. Flores.

12  Q.  So your testimony is that, before even meeting with the

13  defendants, you would go into the bathroom and turn the device

14  on?

15  A.  Yes, sir.

16  Q.  So immediately after coming into the building, before

17  seeing the defendants, you turned the device on; that's your

18  testimony?

19          MR. QUIGLEY:  Objection.

20          THE COURT:  I think his testimony is that he went in

21  the building, he went to the bathroom, turned it on, and then

22  went into the meeting.

23  BY MR. RODY:

24  Q.  Is that your testimony?

25  A.  Yes, sir.

1   Q.  So on the recordings, we should hear you greeting the

2   defendants after you come out of the bathroom, correct?

3   A.  The defendants were not there as I exited the bathroom, the

4   defendants were in a room inside the building.  After I turned

5   it on, I would walk 20 meters, yes, and then I would meet with

6   Mr. Flores.

7   Q.  Right.  And when you first met them, that would be the

8   first time you had seen them at that meeting, right?

9   A.  Can you repeat the question, please?

10  Q.  You would go to the bathroom, right?

11  A.  OK.

12  Q.  You would come out, right?

13  A.  Yes, sir.

14  Q.  You would walk 20 meters, right?

15  A.  Approximately.

16  Q.  Approximately.  And then you would see the defendants for

17  the first time at that meeting, right?

18  A.  Yes, sir.  Yes, sir.

19  Q.  So you would greet them, right?

20  A.  Yes, sir.

21  Q.  And you would say something like -- withdrawn.

22          You would say something to start the meeting, right?

23  A.  That's right, sir.

24  Q.  Let's talk business.

25  A.  Yes, sir.

1   Q.  So your testimony is that the beginning of each meeting is

2   going to be on those recordings, right?

3   A.  I turned on the equipment.  I didn't manipulate it.  It

4   could have recorded it.  I mean, I was carrying it on my body.

5            I couldn't activate the device in front of Mr. Flores.

6   I had to do it in the moment I went into the building and

7   deactivate it when I left the building.

8   Q.  I understand that you couldn't activate it when you were in

9   front of Flores, but the question is whether you activated it

10  before you started the meetings or whether you activated it

11  after the meetings had already started.

12  A.  Before the meeting started.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  So your testimony is that the entirety of all three

2  meetings were recorded by you?

3  A.  Before leaving the building, yes, everything that was

4  spoken about with Mr. Flores was recorded.  That's what I

5  think.

6          That's what I did.  I recorded it.  I don't know if it

7  recorded or not, if it recorded the entire thing.  I don't

8  know.

9  Q.  Sir, are you lying right now?

10          MR. QUIGLEY:  Objection.

11  A.  No, sir.

12          THE COURT:  Sustained.

13  Q.  The meeting in Haiti, did you -- withdrawn.

14          At the meeting in Haiti, when did you turn on the

15  recording?

16  A.  After we got to the hotel, to the area of the restaurant,

17  inside the bathroom.

18  Q.  And did you turn it on before or after you started meeting

19  with the defendants?

20  A.  After I met them and sat them at the table and offered them

21  something to drink and to eat.  Then I went to the bathroom and

22  activated both devices.

23  Q.  What do you mean you offered them something to eat or

24  drink?

25  A.  Something to drink, a soda or a lemonade, and something to

1  eat, because they had come flying from Caracas to Haiti.  Well,

2  that's what they had told me.

3  Q.  But it is a restaurant, sir, weren't there waiters?

4  A.  Yes, sir.

5  Q.  And the meeting in Haiti, when did you turn off the

6  recording?

7  A.  Before giving it over to Agent Gonzalez.

8  Q.  Isn't it true that you turned it off before the defendants

9  got arrested?

10          MR. QUIGLEY:  Objection.

11          THE COURT:  Overruled.

12  A.  No, sir.  That's not true.

13  Q.  Where were you when the defendants got arrested?

14  A.  Inside the bathroom.

15  Q.  What was the arrest signal?

16          THE INTERPRETER:  What was the arrest what?

17          MR. RODY:  Signal.

18  A.  When I was sitting at the restaurant with Mr. Flores and

19  Mr. Francisco, I received a message from Agent Gonzalez telling

20  me to leave, that they were going to do the remaining part of

21  the job.

22  Q.  So you got a BlackBerry message from Agent Gonzalez?

23  A.  I don't remember if it was a call or if it was a message,

24  but I received the notification from him.

25  Q.  What did you do at that point and what did you say at that

1    point, if anything, to the defendants?

2    A.  I asked them to give me a minute, that I was going to go

3    upstairs to one of the rooms to meet with one of my friends.  I

4    had told Mr. Francisco and Mr. Flores that he was there with

5    $20 million, 20 million that he was going to give to me and I

6    was going to give to him to give to his mother for the campaign

7    for Congress in Venezuela in exchange for the ton that he was

8    going to send me from Venezuela to Honduras.  That would have

9    been the first job, because we spoke about others that would

10   follow the first one.

11   Q.  So that should be on the recording of the meeting with them

12   in Haiti, right?

13   A.  Supposedly, yes.  Because I recorded it.

14   Q.  And then you went into the bathroom and so you were not

15   present when the defendants got arrested, right?

16   A.  No, sir.

17   Q.  Isn't it true that you told Agent Gonzalez that they were

18   scared when they got arrested?

19   A.  No.  It was a question.  It was a question.  I asked Agent

20   Gonzalez, How did they look to you?  Were they scared?  I don't

21   remember what he answered.

22   Q.  This occurred when you met up with Agent Gonzalez in the

23   hotel, correct?

24   A.  I don't remember.

25   Q.  Then you sent a text to Agent Gonzalez later that day

G99nflo6                    Confidential Source 1 - cross

1    saying that the defendants were scared shitless, right?

2    A.  I don't remember what time that message happened, but I do

3    remember telling him that when they got to the airport they

4    were very scared because some of the -- it was either police,

5    the Haitian police, or I don't know if they were Haitian DEA

6    agents had seized their passports, and they were afraid because

7    their understanding was that when they got to Haiti I was going

8    to receive them with all the comforts.

9    Q.  So your testimony is that when you sent the text to Agent

10   Gonzalez saying that the defendants were fucked up and scared

11   shitless that was before -- you were referring to when they

12   arrived in Haiti that morning?

13            MR. QUIGLEY:  Objection.  The document is not in

14   evidence.

15   A.  I don't understand the question.

16            THE COURT:  He doesn't understand the question.

17            MR. RODY:  May I approach, your Honor?

18            THE COURT:  Yes, you may.

19   Q.  3504-03, pages 224 to 225.

20            Take a look at this, sir.  Start at the line where I'm

21   pointing with my finger, and let me know if that refreshes your

22   recollection that you texted to Agent Gonzalez that --

23   withdrawn, that you asked Agent Gonzalez whether the defendants

24   were fucked up and scared shitless.

25            THE COURT:  What page do you have there, Mr. Rody?

G99nflo6                    Confidential Source 1 - cross

1              MR. RODY:  224, your Honor.

2              THE COURT:  Thank you.

3              THE INTERPRETER:  You are going to have to repeat the

4     question, I'm sorry, because he interrupted.

5     Q.  Take a look at where I'm pointing my finger and read that

6     on to this page and let me know if that refreshes your

7     recollection that you told Agent Gonzalez that the defendants

8     were fucked up and scared shitless.

9     A.  No, sir.  It wasn't on those terms.  I did mention being --

10    I did comment this, but it was in the form of a question.

11    Q.  And his response was, "Totally"?

12    A.  Yes.

13    Q.  And he was --

14    A.  Because it was a question.

15    Q.  And you were talking about after they got arrested, right?

16    A.  Yes, sir.

17    Q.  Not when they arrived at the airport at Haiti in the

18    morning, right?

19    A.  No, sir.

20    Q.  Going back to that meeting in the restaurant in Haiti,

21    isn't it true that you did not start the recording that morning

22    until about 15 minutes had gone by in the meeting?

23              MR. QUIGLEY:  Your Honor, objection.  He testified

24    that there are two sets of recordings for that meeting.

25              MR. RODY:  I'm talking about his recording.

1        MR. QUIGLEY:  He testified that he had two recording

2   devices in that meeting.

3        THE COURT:  What is the question?

4        MR. RODY:  The question is that he did not start the

5   recording until 15 minutes had gone by in the meeting.

6   A.  It was at the hotel.

7   Q.  Right.  You didn't start the recording until 15 minutes had

8   gone by in the hotel?

9   A.  No.  15 minutes from the time we -- from the time they

10  arrived from the airport to the hotel, to the restaurant, not

11  15 minutes after that.

12  Q.  So you admit, first of all, that you did not record your

13  meeting with them at the airport, correct?

14  A.  No, sir.

15  Q.  Then you went to the hotel to have the breakfast meeting,

16  right?

17  A.  It wasn't for breakfast.  I don't know.  It was any kind of

18  snack.  I don't remember.  I don't remember the time.

19  Q.  In fact, you didn't see the defendants actually eat

20  anything at that meeting, correct?

21  A.  Yes.

22  Q.  The question is whether you started the recordings only

23  after you had been at the restaurant for about 15 minutes.

24  A.  Please ask me that question again.

25        THE COURT:  Wasn't the testimony that the 15 minutes,

1    according to him, was from the airport to the hotel, and at the

2    hotel he turned on the machine, or am I missing something?

3         MR. RODY:  He's answering whatever questions he wants

4    to answer, respectfully, Judge.  He is not answering question

5    that is put.

6         THE COURT:  Question the you put to him was about the

7    15 minutes, and he said the 15 minutes reflected the time from

8    the airport to the hotel.

9         MR. RODY:  If the answer is no, I just want him to say

10   no.  I'm asking him, very simply, once they sat down at the

11   table, once they arrived at the restaurant, was it not 15

12   minutes before he started the recording.

13        THE COURT:  I think he's already answered, but he can

14   answer again.

15        THE WITNESS:  Should I answer?

16        THE COURT:  Yes, please.

17   A.  Yes.  The 15 minutes were from the time Mr. Flores and

18   Francisco arrived at the airport with their escorts.  It took

19   them -- or bodyguards -- it took them to arrive at the hotel.

20   And from there it took to two or three minutes for them to get

21   seated, for us to say hello to each other, and for them to get

22   comfortable.  And then I invited them to have whatever they

23   wanted, a soft drink or coffee, a little snack.  That took

24   about 15 minutes, and then I went into the bathroom to turn on

25   device 1 and device 2.

1    Q.  So, after getting to the restaurant, it only took about two

2    to three minutes, your testimony is, before you turned on the

3    recording device?

4    A.  Approximately.

5    Q.  Now, in any of your recorded meetings with the defendants,

6    did you mention any of your real drug trafficking that you were

7    hiding from the DEA?

8    A.  I don't understand the question.

9    Q.  You said you had three recorded meetings with the

10   defendants in Venezuela, right?

11   A.  Yes, sir.

12   Q.  And one in Haiti, right?

13   A.  Yes, sir.

14   Q.  In any of those meetings did you mention your real drug

15   trafficking that you were hiding from the DEA to the

16   defendants?

17   A.  I don't understand your question.

18   Q.  You were selling drugs on the side in unauthorized

19   transactions in 2015, correct?

20   A.  Yes, sir.

21   Q.  Including around the same time as when you were meeting

22   with the defendants in Venezuela and Haiti, right?

23   A.  Yes, sir.

24   Q.  Did you mention any of that unauthorized drug dealing in

25   your meetings with the defendants?

1    A.  No, sir.

2    Q.  Why not?

3    A.  Not about those specifically.  From what I told them --

4    well, I couldn't tell them about unauthorized deals because

5    then it would have come out that I was a DEA informant.  What I

6    did tell him is that all of the drugs that I would be receiving

7    from him sent from Venezuela to Honduras I would bring through

8    Mexico into the United States, and then I would be selling them

9    in my main market, which was on the east coast, specifically

10   New York.  That is what I did tell Mr. Flores.

11   Q.  So that should be on the recording, right?

12   A.  I would imagine so, yes.

13   Q.  Just the way you put it, right?

14            MR. QUIGLEY:  Objection.

15            THE COURT:  Overruled.

16   A.  I don't know whether it was with the same words, but that

17   was the same intention.

18   Q.  Sir, isn't it true you never said to them explicitly that

19   all of your drugs were going to get sold into the east coast of

20   the United States?

21            That's not true, is it?

22            MR. QUIGLEY:  Objection.  Beyond the scope of the

23   hearing.

24            THE COURT:  Overruled.

25            THE INTERPRETER:  Can that question be repeated for

1    the interpreter, please.

2              MR. RODY:  Sure.

3    Q.  It is not true, sir, that you said to them that all the

4    drugs they gave to you would be sold to the east coast of the

5    United States?

6    A.  No, sir.  I did tell them that the drugs would be sold in

7    California and on the east coast, specifically New York, and

8    some other cities that I don't recall.

9    Q.  So we should be able to hear that on the recording, right?

10   A.  I would assume so.  My intention was to record that in the

11   meeting.  I activated the device in order to record it, and

12   then I turned it off when the meeting was over.  I don't know

13   if it didn't record.  I don't have any control over that.

14   Q.  So you don't know if that part was recorded?

15             MR. QUIGLEY:  Objection.

16             Asked and answered.

17             THE COURT:  Sustained.

18   Q.  Sir, is it true that were you communicating with your son

19   while you were in Venezuela by text messages?

20   A.  Are you asking if I was communicating with my son?

21   Q.  Yes.

22   A.  I don't recall, but I must have done that.

23   Q.  And when you left Caracas you wiped your phone clean of all

24   those communications, correct?

25   A.  Yes, sir.

1    Q.  And --

2    A.  All of them.

3    Q.  Right.  And before you did that you did not forward your

4    communications with your son to the DEA?

5    A.  Some of them -- well, I knew that Agent Gonzalez had them

6    because I would forward him messages, but there were times and

7    moments when I could not.  If it was a weekend, I did not want

8    to bother him, even though I knew he was always available to

9    me.  So then I did delete them, and I did that for my own

10   security.

11              As an example --

12              MR. RODY:  Your Honor, he's answered the question.

13   A.  OK.

14              THE COURT:  Did you finish?

15              THE WITNESS:  No.

16              THE COURT:  Mr. Rody?

17   Q.  Just to be clear, I am only talking about your

18   communications with your son, CS-2.

19   A.  No.  I did not send the communications that I had with my

20   son.  I was only sending my personal communications that I had

21   with Mr. Flores and Francisco and -- or, rather, interpreter's

22   correction, with the Flores -- only the communications I had

23   with Mr. Flores, not with my son.  My son was doing his job.  I

24   don't know what communications he had, but the only thing I was

25   concerned with at that time were my communications with

1    Mr. Flores.  Agent Gonzalez never asked me to send my

2    communications between my son and myself.  He never requested

3    that.

4    Q.  Device 2 recorded audio only, correct?

5    A.  Yes, sir.

6    Q.  And the quality of the recordings it produced was very

7    poor, correct?

8              MR. QUIGLEY:  Objection.

9              THE COURT:  Overruled.

10   A.  I am not aware of that.

11   Q.  Did you ever listen to the recordings that you produced?

12   A.  Yes, sir.

13   Q.  You are aware that the audio recording -- withdrawn.

14             You are aware that device 2 produced poor quality

15   recordings, right?

16   A.  Well, you could say so.  It sounds like it's from far away

17   because of the way I was hiding it as I carried it.  I'm not

18   aware of whether or not it was.

19   Q.  I don't want you to say anything about where you were

20   hiding it or how you were hiding it.  Can we be clear about

21   that?

22   A.  OK.

23   Q.  But the fact is there was a significant amount of

24   interference with the recording that was recorded on device 2,

25   correct?

1          MR. QUIGLEY:  Objection.

2          THE COURT:  Sustained.

3          MR. RODY:  One last question, Judge.

4    Q.  Do you recall, sir, that you came to New York to meet with

5    the prosecutors and the agents in late June of this year,

6    right?

7    A.  Yes.

8    Q.  And then you went back home, right?

9    A.  Yes, sir.

10   Q.  This was when the prosecutors had been very mad at you for

11   lying to them, right?

12   A.  Yes, sir.

13   Q.  And you talked over text message with Agent Gonzalez about

14   the fact that they had been mad at you, right?

15   A.  I guess I mentioned to him that I was very surprised to see

16   the prosecutor so upset.  I mentioned that I was surprised

17   because he had always been very respectful and a very well

18   mannered person, so it was upsetting to me to see that, and I

19   apologized.

20   Q.  You were surprised that he was angry to learn that you had

21   been lying for years to the DEA?

22         MR. QUIGLEY:  Objection.

23         Relevance.

24         THE COURT:  Sustained.

25   Q.  After you said that to Agent Gonzalez, he said, Don't

1    worry, right?

2    A.  That's correct.

3    Q.  And then you said to him, We have to organize that thing

4    with nephew very well so that he forgives us.

5    A.  What I mentioned to him about was that we had to work very

6    hard to finish up the case we had been working on.  I said that

7    we had to work very hard on that case because I felt like we

8    were working as a team, and I felt that I had put it at risk

9    and that we had to finish the job that we had started.

10   Q.  When you said so that he forgives us, the he you were

11   talking about was the prosecutor, right?

12              MR. QUIGLEY:  Objection.

13              THE COURT:  Overruled.

14   A.  Yes, but not --

15   Q.  It's a yes-or-no question.

16   A.  -- specifically that he forgive us, not specifically

17   because of what we had done, but because we had arrived late at

18   the meeting.

19              We had arrived late at the meeting because of traffic

20   problems, and I am a very punctual person.  And because I had

21   arrived at late at the meeting, I said, let's work hard to

22   resolve that, but never with the intention of making a good

23   impression on him and then doing something illegal, but only to

24   take care --

25              THE COURT:  I don't understand the answer.

1   A.  -- of everything, finish up the job, tell the truth, and

2   talk about what I had experienced regarding the facts with

3   Mr. Flores.

4           THE COURT:  Strike the answer as not responsive.

5           MR. RODY:  No further questions, Judge.

6           THE COURT:  OK.

7           Anything from the government?  Mr. Quigley?

8           MR. QUIGLEY:  No redirect, your Honor.

9           THE COURT:  You are excused.  Thank you.

10          THE WITNESS:  Thank you.

11          (Witness excused)

12          THE COURT:  Call your last witness.

13          MR. BOVE:  Thank you, your Honor.  The government

14  calls Confidential Source 3.

15   CONFIDENTIAL SOURCE 3,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18          (Through interpreter)

19  DIRECT EXAMINATION

20  BY MR. BOVE:

21  Q.  How old are you, sir?

22  A.  47.

23  Q.  What country were you born in?

24  A.  Colombia.

25  Q.  What is your native language?

1    A.  Spanish.

2    Q.  Do you also speak some English?

3    A.  Yes, that is correct.

4    Q.  What do you do for work?

5    A.  I work as a DEA informant.

6    Q.  About how long have you been a DEA informant?

7    A.  Since 2009.

8    Q.  I would like to direct your attention to November of 2015.

9         Did you do anything in that month to assist the DEA

10   with this investigation?

11   A.  That's correct.

12   Q.  Describe what happened first?

13   A.  I had a meeting in Virginia with some agents at the DEA

14   offices and also two DEA informants.

15   Q.  Generally speaking, what was discussed during that meeting?

16   A.  It was to go and take a trip to Honduras in order to cover

17   drug trafficking, a meeting.

18   Q.  Did you bring any equipment to that meeting?

19   A.  Yes.

20   Q.  What type of equipment?

21   A.  Two pieces of equipment.  One was to -- just to --

22   interpreter's correction -- audio recordings and the other one

23   recorded in both audio and video.

24   Q.  So let's refer to the device that recorded audio and video

25   as device 3, OK.

1    A.  Right.

2    Q.  Did you have device 3 before this meeting that you are

3    describing?

4    A.  Yes.

5    Q.  Why?

6    A.  I had just come back from another job, and I used that

7    device on that job.

8    Q.  And you said there was also an audio-only recorder?

9    A.  Yes.  That's correct.

10   Q.  Let's refer to that as device 2.

11              When were you provided with device 2?

12   A.  At the time when I was at the meeting in Virginia.

13   Q.  After the meeting in Virginia, what did you do next to

14   assist the investigation?

15   A.  I traveled to Honduras the day after the meeting.

16   Q.  What happened when you arrived in Honduras?

17   A.  I arrived, I checked into the hotel, and I was picked up to

18   go to the first meeting during that evening.

19   Q.  Who picked you up?

20   A.  The contact I had there was Mr. Sentado.

21   Q.  Who actually picked you up?

22   A.  Mr. Sentado sent two of his drivers to come pick me up at

23   the hotel.

24   Q.  Where did they take you?

25   A.  To a restaurant.

1    Q.  What happened at the restaurant?

2    A.  When I arrived at the restaurant, Mr. Sentado was there

3    along with two other people who were sitting at the table and

4    his drivers, or driver, and workers.

5    Q.  Did you take any steps to record that meeting?

6    A.  That's right.

7    Q.  Describe what you did?

8    A.  I took device 2.  I got up and went into the bathroom and I

9    turned it on.

10   Q.  What happened next?

11   A.  I returned to the table, and while I was at the table I

12   turned on device 3.

13   Q.  Did you shut device 2 off at some point?

14   A.  That is correct.

15   Q.  When?

16   A.  At the moment that I felt that the meeting was over.

17   Q.  Did you shut device 3 off at some point?

18   A.  That's right.

19   Q.  When?

20   A.  The same.  When I felt that the meeting was over.

21   Q.  Did you participate in any other meetings relating to drug

22   trafficking in Honduras?

23   A.  That's right.

24   Q.  When was the next meeting?

25   A.  The next night.

1    Q.  Where was it?

2    A.  At the same restaurant.

3    Q.  Who was there at the restaurant for the meeting?

4    A.  At the beginning when I arrived, Mr. Sentado was there, and

5    shortly after that, the time I got there, two people from

6    Venezuela and a Colombian arrived.

7    Q.  Did you use device 2 during this second meeting?

8    A.  That's correct.

9    Q.  Please describe how you used device 2.

10   A.  I got up from the table, went into the bathroom, turned it

11   on, and came back to sit at the table.

12   Q.  Do you remember who that was at the meeting when you stood

13   up to go to the bathroom to turn device 2 on?

14   A.  Right.

15   Q.  Who was there?

16   A.  Mr. Sentado was at the table.  There was a man who worked

17   at the airport there in Honduras, one of the people who had

18   come from Venezuela, and the man from Colombia.

19   Q.  How did you use device 3 during this meeting?

20   A.  I turned that one on while I was at the table.

21   Q.  Who was present at the table when you turned on device 3?

22   A.  The man from the airport, Mr. Sentado, the guy from

23   Venezuela, and the one from Colombia.

24   Q.  Please describe when during the meeting you shut off device

25   2.

1   A.   At the moment when I felt that the meeting had ended.   We

2   had already spoken about the drug trafficking topic, so when

3   that ended I turned it off.

4   Q.   When did you shut off device 3?

5   A.   Approximately at the same time.

6   Q.   Did you leave Honduras at some point?

7   A.   Yes.

8   Q.   When?

9   A.   The following day.

10  Q.   Did you forget anything when you left?

11  A.   Yes.

12  Q.   What were some of the things that you forgot?

13  A.   I forgot my phone and device 3.

14  Q.   Where did you forget your phone and device 3?

15  A.   In the room at the hotel.

16  Q.   What did you do when you realized that you had left those

17  items in the hotel?

18  A.   Approximately half hour after I had left, I called the

19  hotel to let them know that I had left something in the room.

20  Q.   Did you speak with anyone else about having left the items

21  in the hotel?

22  A.   After I hung up, I called somebody from the DEA office to

23  let them know that I had left the device behind.

24  Q.   Did anyone at the DEA give you any instructions about what

25  to do in order to recover these items?

1    A.   That's right.

2    Q.   What were you instructed to do?

3    A.   After I hung up, I called the hotel back approximately five

4    minutes later to see if they had found the device.

5    Q.   What did you learn during that call?

6    A.   That they had found it, and they were holding it in a bag

7    in the lobby.

8    Q.   What did you do next?

9    A.   I called the office to tell them that they had found it,

10   and they told me to call Mr. Sentado to go and get it at the

11   hotel.

12   Q.   Did you do that?

13   A.   That's right.

14   Q.   What happened next?

15   A.   I went on a trip, and I left Honduras.

16   Q.   Did you later speak with Sentado about whether your items

17   had been retrieved from the hotel?

18   A.   Yes.  He had them.  He was holding them, and somebody from

19   the office was going to go get them.

20   Q.   When approximately did he tell you that?

21   A.   Approximately 20 minutes after I had told him.

22   Q.   Did Sentado later confirm that device 3 had been provided

23   to the DEA?

24   A.   That's right.

25   Q.   When approximately was that?

1   A.  About two days later.

2   Q.  Did you bring device 2 with you when you left Honduras?

3   A.  Correct.

4   Q.  What did you do with device 2 after you left Honduras?

5   A.  When I got back from my trip, I gave it to the DEA agents.

6   Q.  Are you able to access recordings stored on device 2 or

7   device 3?

8   A.  No.

9   Q.  At any point have you ever tried to delete any part of a

10  recording that you made at the direction of the DEA?

11  A.  No.

12  Q.  Have you ever tried to alter a recording that you made at

13  the direction of the DEA?

14  A.  No.

15  Q.  During the course of your work as a confidential source,

16  have you been paid by the DEA?

17  A.  Yes.

18  Q.  Approximately how much have you been paid?

19  A.  During the time that I have worked, approximately $400,000.

20          MR. BOVE:  Nothing further, your Honor.

21          MR. MANN:  Real quick, your Honor.  I think I can do

22  it in the ten minutes that we have.

23          THE COURT:  Yes, sir.

24  CROSS EXAMINATION

25  BY MR. MANN:

1    Q.   Good afternoon, CS-3, how are you?

2    A.   Very well.  Thanks.

3    Q.   Good.  Could you do me a favor and just stand up for one

4    second.

5         Can you look around this courtroom and tell me if you

6    recognize anyone that is in the courtroom today that was in

7    that second meeting that you attended in Honduras?

8              MR. BOVE:  Objection.

9              THE COURT:  Sustained.

10             Please sit down.

11   Q.   Sir, at the November 5 meeting in Honduras, which I believe

12   is the second meeting that you attended, was there any --

13             MR. BOVE:  Objection to the testimony.

14             THE COURT:  I think he's trying to locate a point in

15   the testimony.

16             MR. MANN:  Yes, your Honor.

17   Q.   The second meeting that you attended in Honduras, sir, was

18   there a discussion of a breakfast that was to occur the next

19   day at the hotel with the defendants?

20   A.   Not that I know of.

21   Q.   You don't recall any discussion of the breakfast?

22   A.   No.

23   Q.   Is it fair to say then that you didn't attend a breakfast

24   the day after that meeting?

25   A.   That's right.

1   Q.  Sir, I'm going to just quickly show you one document that

2   might refresh your recollection that there was a discussion of

3   a breakfast on November --

4            MR. MANN:  I'm sorry.  The second meeting, your Honor,

5   was November 6, so this would have been a breakfast on the day

6   after, on November 7.

7            For the record this is a draft transcript dated

8   November 6, 2016 of file No. 11062238_0023.

9            May I approach, your Honor?

10           THE COURT:  Do it have a 3500 number?

11           MR. MANN:  I'm sorry?

12           THE COURT:  Does it have a 3500 number.

13           MR. MANN:  It does not.  It is a draft transcript

14   provided by the government, your Honor.

15           THE COURT:  OK.

16           MR. MANN:  May I approach, your Honor.

17           THE COURT:  Yes.

18           MR. BOVE:  Your Honor?

19           THE COURT:  Yes.

20           MR. BOVE:  May I speak with counsel about this for a

21   moment.

22           THE COURT:  Yes.

23           (Counsel conferred)

24   Q.  So you don't remember any discussion at that meeting with

25   the defendants on November 6 about a breakfast the next morning

1  where there would be further discussion of additional business?

2  A.  Not that I remember.

3  Q.  You're sure that you were at the meeting with one of the

4  defendants?

5  A.  That's right.

6  Q.  Where were you sitting at the meeting?

7  A.  In front of him.

8  Q.  Directly in front of him?

9  A.  Yes.

10 Q.  What did the restaurant look like?

11 A.  It was somewhat rustic, the table and chairs were made of

12 wood.  It had like a veranda on the outside.

13         MR. MANN:  One moment, your Honor.

14 Q.  What did you understand the target of your investigation's

15 name to be?

16         MR. BOVE:  Objection.

17         THE COURT:  Overruled.

18 A.  The order that I was given was to go and cover a drug

19 transaction that was going to take place.

20 Q.  So you didn't have any names of any individuals you were

21 supposed to meet with?

22         THE INTERPRETER:  I'm sorry.  I didn't hear you.

23 Q.  You didn't have the names of any of the individuals you

24 were going to meet with?

25 A.  Only Mr. Sentado.  That's all.

1    Q.  At the time of that meeting, you didn't know that

2    Mr. Sentado was actually a cooperating witness, right?

3    A.  I did know.

4    Q.  When did you find out that Mr. Sentado was a cooperating

5    witness?

6    A.  Before arriving in Honduras.

7              MR. MANN:  One moment, your Honor.

8    BY MR. MANN:

9    Q.  Sir, were you told that Sentado was a cooperating witness

10   at the meeting in Virginia with the DEA?

11   A.  That's correct.

12   Q.  Sir, didn't you tell the U.S. Attorney's Office that you

13   were not told that Sentado was a cooperating witness?

14   A.  When you say cooperating witness, I don't understand

15   exactly what that means.

16   Q.  Someone working with the government.

17             THE INTERPRETER:  One moment.

18   A.  I know that he was cooperating to make the transaction.

19   Q.  Understood.  But at the time of your arrival in Honduras,

20   did you understand that El Sentado was working with the DEA?

21   A.  That he worked for the DEA such as I did, not exactly.

22   Q.  What do you mean by not exactly?

23   A.  When I arrived there and I spoke with him, Mr. Sentado told

24   me that they had already signed him up to work for the DEA.

25   Q.  You knew that upon your arrival in Honduras?

1    A.   Yes.

2    Q.   So you never told the U.S. Attorney's Office that you were

3    not told at the time that Sentado was a cooperating witness?

4         THE INTERPRETER:  I'm sorry.  Between the negatives

5    and the positives, can you clarify please.

6         MR. MANN:  Yes, I'll repeat it.

7    Q.   So you never told, sir, the U.S. Attorney's Office that you

8    were not aware that Sentado was a cooperating witness at the

9    time of your arrival in Honduras?

10   A.   I don't remember.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MANN:

2   Q.  You don't remember telling the U.S. Attorney's office that?

3   A.  At what moment, now?

4   Q.  Recently, last week.

5   A.  I didn't understand exactly if I had told the office that

6   Mr. Sentado worked for the DEA.

7   Q.  As a confidential source for the DEA?

8   A.  Yes.

9   Q.  Yes.  You told the United States Attorney's office that you

10  did not know that Sentado was a confidential course for the DEA

11  before you arrived in Honduras?

12  A.  That, I did know.

13          MR. MANN:  No further questions, your Honor.

14          MR. JACKSON:  Your Honor, I have less than one minute

15  of questions.

16          THE COURT:  Sure.  Go ahead, Mr. Jackson.

17  CROSS-EXAMINATION

18  BY MR. JACKSON:

19  Q.  Good afternoon, sir.

20  A.  Good afternoon.

21  Q.  When was it that you first met El Sentado?

22  A.  The day that I arrived in Honduras, he sent for me at the

23  hotel, and I saw him for the first time at the restaurant.

24  Q.  And what was the approximate date of that, if you remember?

25  A.  The early days of November, between around the 5th or 6th

1   of November.

2   Q.  Did El Sentado tell you anything about his earlier meetings

3   with the defendants?

4   A.  No.

5   Q.  He did tell you about his estimation of their level of

6   experience, right?

7           MR. BOVE:  Objection.

8           THE COURT:  Overruled.

9   A.  No.

10  Q.  Did he tell you whether he had made any recordings in the

11  course of the investigation?

12  A.  No.

13  Q.  Did he tell you whether he had used any other individuals

14  to help him during the course of the investigation?

15  A.  No.

16  Q.  Last question.  Did he have a phone with him while he was

17  with you?

18          THE INTERPRETER:  Did he have a phone with him?

19          MR. JACKSON:  Yes, did El Sentado have a phone.

20  A.  Yes.

21  Q.  What kind of phone was it?

22  A.  A BlackBerry.

23  Q.  And did it look like a recent model BlackBerry?

24  A.  Honestly, I'm not familiarized with BlackBerrys.  I

25  couldn't tell you if it was new or old.

1          MR. JACKSON:  Just one moment.

2     Q.  Sir, the tablecloth at the meeting that you participated

3     in, it was red, right?

4     A.  Honestly, I don't remember.

5          MR. JACKSON:  No further questions.  Thank you.

6          THE COURT:  Mr. Bove.

7          MR. BOVE:  Nothing further.

8          THE COURT:  You're excused.  Thank you very much.

9          THE WITNESS:  Thank you.

10         (Witness excused)

11         THE COURT:  Does the government rest?

12         MR. BOVE:  Yes, your Honor.  Thank you.

13         THE COURT:  Does the defense have any case?

14         MR. JACKSON:  Just one moment, your Honor.

15         THE COURT:  Yes.

16         MR. JACKSON:  We have no witnesses for the court at

17    this time.

18         THE COURT:  At this time?

19         MR. JACKSON:  For the remainder of this hearing.

20         THE COURT:  Is there any interest in submitting

21    post-hearing briefs?

22         MR. JACKSON:  Your Honor, we would request the

23    opportunity to submit a post-hearing brief.

24         THE COURT:  What length do you have in mind?

25         MR. JACKSON:  Your Honor, we could --

1          THE COURT:  I don't think you need one on the bill of

2     particulars.  We covered that one well.

3          MR. JACKSON:  We agree, your Honor.

4          THE COURT:  Same with the Giglio, Brady and 3500

5     material, the transcripts.

6          MR. JACKSON:  We don't need any additional briefing on

7     that.

8          THE COURT:  I don't think you need any briefings on

9     confessions.  I think I have enough there.

10          But on the other one, on the evidence, you may want to

11     focus on that, the spoliation issue.

12          MR. JACKSON:  Your Honor, what we would request is a

13     brief of 15 pages or less that we will primarily focus on the

14     spoliation issues, but with the opportunity to address within

15     that any statement issues that we think require additional

16     focus on what we think is appropriate for the court to call

17     attention to the court from the hearing.

18          THE COURT:  Is that all right with you, Mr. Rody?

19          MR. RODY:  That's all I was going to say, Judge.  We

20     would like the opportunity to brief both issues.

21          THE COURT:  Does the government have any view,

22     Mr. Bove?

23          MR. BOVE:  If I could have just one moment, your

24     Honor?

25          THE COURT:  Yes.

1          MR. BOVE:  That approach sounds sensible to us, your

2     Honor.  We would ask for an increased page limit because we are

3     responding to arguments from both defendants.

4          THE COURT:  Mr. Jackson, 15 pages, is that enough?

5          MR. JACKSON:  15 pages from us?

6          THE COURT:  Yes.

7          MR. JACKSON:  Yes, that's enough.

8          THE COURT:  15 pages from you, Mr. Rody?

9          MR. RODY:  Sure.  Thanks.

10          THE COURT:  How much do you want, 20?

11          MR. BOVE:  20 would be fine.

12          THE COURT:  When will we do this?

13          MR. JACKSON:  Your Honor, may we have two weeks?

14          THE COURT:  The 26th?

15          MR. JACKSON:  Yes, your Honor.

16          THE COURT:  That's before the religious holidays.  We

17     get it out of the way before Rosh Hashanah.  One round of

18     briefing and then I'll proceed to decision.

19          Anything else?

20          MR. JACKSON:  No.  Thank you very much, your Honor.

21          THE COURT:  Thank you very much.

22          (Adjourned)

23

24

25

1              INDEX OF EXAMINATION

2    Examination of:                        Page

3    KEVIN CORCORAN

4    Direct By Mr. Bove . . . . . . . . . . . . . . 291

5    Cross By Mr. Jackson . . . . . . . . . . . . . 295

6    ROBERT ZACHARIASIEWICZ

7    Direct By Mr. Quigley . . . . . . . . . . . 306

8    Cross By Mr. Zach . . . . . . . . . . . . 319

9    Cross By Mr. Mann . . . . . . . . . . . . 355

10   CONFIDENTIAL SOURCE 2

11   Direct By Mr. Bove . . . . . . . . . . . . . 357

12   Cross By Mr. Zach . . . . . . . . . . . . 368

13   Cross By Mr. Rody . . . . . . . . . . . . . 387

14   Redirect By Mr. Bove . . . . . . . . . . . 399

15   Direct By Mr. Quigley . . . . . . . . . . 402

16   Cross By Mr. Jackson . . . . . . . . . . . 417

17   Cross By Mr. Rody . . . . . . . . . . . . . 438

18   CONFIDENTIAL SOURCE 3

19   Direct By Mr. Bove . . . . . . . . . . . . . 468

20   Cross By Mr. Mann . . . . . . . . . . . . 475

21   Cross By Mr. Jackson . . . . . . . . . . . 481

22              DEFENDANT EXHIBITS

23   Exhibit No.                        Received

24    3510-06  . . . . . . . . . . . . . . . . . 326

25    3510-05  . . . . . . . . . . . . . . . . . 341