UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                                    Defendants.

S5 15 Cr. 765 (PAC)


**THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANTS' MOTIONS *IN LIMINE***


PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Brendan F. Quigley
Assistant United States Attorneys
    *Of Counsel*

## **TABLE OF CONTENTS**

DISCUSSION ............................................................................................................. 3

I. Limited Evidence of the Defendants' Financial Status Is Admissible at Trial ...................... 3

II. CS-1 and CS-2 May Offer Lay Witness Testimony Regarding the Cocaine
That the Defendants Brought to Their Meeting .......................................................... 4

III. The Court Should Deny the Defendants' Motion to Excise Portions of
Campo's Confession and Recorded Statements ......................................................... 6

    A. Applicable Law ................................................................................................. 7

    B. Campo's Admission to Special Agent Gonzalez Regarding the FARC ........................... 8

    C. "At War" and "Jail" References ......................................................................... 12

IV. Limited Evidence Regarding Statements and Actions of CW-1 is Admissible ................. 17

V. CW-1's Statements Are Not Admissible Against the Government as Party Admissions ... 18

CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Costantino* v. *Herzog*, 203 F.3d 164 (2d Cir. 2000) ....................................................... 7

*United States* v. *Arroyo*, 600 F. App'x 11 (2d Cir. 2015) ................................................. 5

*United States* v. *Artis*, 523 F. App'x 98 (2d Cir. 2013) .................................................... 5

*United States* v. *Bramson*, 139 F.2d 598 (2d Cir. 1943) ................................................ 16

*United States* v. *Bryce*, 208 F.3d 346 (2d Cir.1999) ....................................................... 5

*United States* v. *Carneglia*, 256 F.R.D. 104 (E.D.N.Y. 2009) ................................. 11, 16

*United States* v. *Check*, 582 F.2d 668 (2d Cir. 1978) ............................................... 17, 18

*United States* v. *Figueroa*, 750 F.2d 232 (2d Cir. 1984) .......................................... 17, 18

*United States* v. *Gaskin*, 364 F.3d 438 (2d Cir. 2004) .................................................... 5

*United States* v. *Peters*, 543 F. App'x 5 (2d Cir. 2013) ................................................... 3

*United States* v. *Quattrone*, 441 F.3d 153 (2d Cir. 2006) ............................................... 3

*United States* v. *Royer*, 549 F.3d 886 (2d Cir. 2008) .................................................... 11

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998). ........................................... 7, 11

*United States* v. *Santos*, 372 F.2d 177 (2d Cir. 1967) .................................................. 19

*United States* v. *Thompson*, 633 F. App'x 534 (2d Cir. 2015) ........................................ 5

*United States* v. *Yildiz*, 355 F.3d 80 (2d Cir. 2004) ...................................................... 19

**Statutes**

21 U.S.C. § 801 ............................................................................................................... 15

**<u>Other Authorities</u>**

Weinstein's Federal Evid. § 403.04 ............................................................................. 11

**<u>Rules</u>**

Fed. R. Evid. 403 ....................................................................................................... 7

Fed. R. Evid. 701 ....................................................................................................... 6

Fed. R. Evid. 801 ....................................................................................................... 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                    Defendants.

S5 15 Cr. 765 (PAC)

The Government respectfully submits this response to the defendants' motions *in limine* ("Defs.' Mot. *In Limine*") to: (i) Exclude Evidence or Argument Regarding Defendants' Financial Status or Lifestyle, Dkt. No. 90; (ii) Exclude Informant Testimony on the Identity of a White Powdery Substance, Dkt. No. 91; (iii) Preclude Admission of Reference to the FARC in the Post-Arrest Statements and Hearsay Statements of the Government's Informants, Dkt. No. 92; and (iv) Preclude Various Statements Made by the Confidential Informants and Defendants in the Recordings, Dkt. No. 93, filed by defendants Efrain Antonio Campo Flores ("Campo") and Franqui Francisco Flores de Freitas ("Flores").

The Government will establish at trial that the defendants sought to monetize their political connections and authority in Venezuela by using one of the largest airports in the country to dispatch huge loads of cocaine that were destined for the United States. Having argued since July 2016 that the defendants lacked the ability, the means, and the inclination to participate in the charged conspiracy, the defense now seeks to preclude evidence that demonstrates just the opposite. Similarly, having argued since July 2016 that confidential

sources selectively recorded their statements, and without any indication that they will abandon that argument at trial, the defendants seek to force the Government to present the jury with only excerpts of recorded meetings while at the same time arguing that missing segments contain exculpatory material.  The defendants cannot have it both ways.

Moreover, the evidence at issue—principally, the defendants' recorded statements and Campo's confession—demonstrates the defendants' motives to commit the crime (a mix of the financial and political), the access afforded to them by their wealth and status to the tools necessary to carry out the crime (such as private jets that could arrive in and depart Venezuela without scrutiny), and their connections to drug traffickers who could supply them with the quantities of cocaine they discussed with the confidential sources (*i.e.*, the FARC).  Thus, the challenged evidence is not unduly prejudicial because it consists, in the main, of the defendants' own words and intentions regarding how and why they planned to carry out the crime they are charged with committing.  And this highly probative proof will not unduly lengthen the trial, as it will be presented principally through recordings and witness testimony that is already central to the Government's anticipated case-in-chief.  Accordingly, for the reasons set forth below, the Court should deny the defendants' motions.

**DISCUSSION**

**I.  Limited Evidence of the Defendants' Financial Status Is Admissible at Trial**

Although the defendants previously argued that they were living "modest" lifestyles in Venezuela prior to their arrests,[1] they now seek to preclude evidence relating to the sources of their wealth, as well as arguments that the defendants "supported a lifestyle beyond their legitimate income and, therefore, that the defendants must have been supporting themselves through illegitimate means."  Defs. Mot. *In Limine* No. 1 at 1, 3, Dkt. No. 90.  The Government does not intend to make such arguments at the upcoming trial.

However, certain aspects of the defendants' wealth—and in particular, their access to and ability to procure private aircraft—are highly relevant and admissible at trial.  *See United States* v. *Quattrone*, 441 F.3d 153 (2d Cir. 2006) ("While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth."); *see also United States* v. *Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) (summary order) ("The record shows, however, that the district court appropriately limited the prosecution's references to the defendant's lifestyle, and that some evidence of the defendant's wealth was relevant to the question of motive. . . .  Evidence of the defendant's wealth and business savvy was also relevant to refuting the defense's characterization of him as an honest

---

[1] *See* Defs.' Joint Motion to Suppress Evidence on the Basis of Spoliation, Dkt. No. 48, at 2 ("At the time of these initial conversations, neither of the Defendants was engaged in the business of drug trafficking, but rather were living modestly in Venezuela.").

businessman who was duped by a simple accounting scheme." (citing *Quattrone*)).    The Government will demonstrate through recorded statements, as well as electronic communications, photographs, and videos from the defendants' phones, that one or both of them used private aircraft to travel to meetings in furtherance of the charged conspiracy in Honduras (twice) and Haiti.  The defendants also discussed using private aircraft to transport cocaine with, among others, the confidential sources and the individual identified in the suppression hearing as CW-1.  This evidence becomes particularly relevant in light of the defense theory that the defendants lacked the ability to contibute to a drug-trafficking conspiracy.[2]    Thus, limited evidence of the defendants' wealth—whatever its source—is probative of their participation in the charged cocaine importation conspiracy and their ability to facilitate the dispatch of large loads of cocaine out of Venezuela.

## II.   CS-1 and CS-2 May Offer Lay Witness Testimony Regarding the Cocaine That the Defendants Brought to Their Meeting

For the reasons stated in the Government's October 20, 2016 motions *in limine*, the individuals identified at the suppression hearing as CS-1 and CS-2 should be permitted to offer lay witness testimony that they believed the substance the defendants brought to their October 27, 2015 meeting in Caracas was cocaine.  The Second Circuit has repeatedly relied on its 1999

---

[2] *E.g.*, July 1, 2016 Decl. of Efrain Antonio Campo Flores in Support of Defs.' Joint Motion to Suppress Evidence on the Basis of Spoliation (the "Campo Spoliation Decl."), Dkt. No. 50-1, ¶ 2 (Campo asserting that he "explained" to unspecified "informants" that he and Flores "had no access to means of transporting drugs, like airplanes"); Defs.' Joint Motion to Compel Prompt Production of *Brady* and *Giglio* Material and the Identities of Confidential Informants, Dkt. No. 49, at 1 (arguing that the defendants suffer from a "lack of capacity to transport the quantities of drugs being asked of them").

4

holding in *United States* v. *Bryce*, 208 F.3d 346 (2d Cir. 1999), where the court reasoned that "a defendant *may be convicted of narcotics possession* if some evidence—direct, circumstantial, or otherwise—establishes the defendant's possession of the illegal substance." *Id.* at 353 (emphasis added); *see also United States* v. *Arroyo*, 600 F. App'x 11, 16 (2d Cir. 2015) (summary order) (citing *Bryce*); *United States* v. *Thompson*, 633 F. App'x 534, 537-68 (2d Cir. 2015) (summary order) (citing *Bryce*); *United States* v. *Artis*, 523 F. App'x 98, 100 (2d Cir. 2013) (citing *Bryce*); *United States* v. *Gaskin*, 364 F.3d 438, 460 (2d Cir. 2004) (citing *Bryce*).  In *Bryce*, the Second Circuit reasoned in *dicta* that the testimony of a lay witness, McCausland, that "he purchased powder cocaine from [the defendant]" was "clearly sufficient to establish Bryce's possession and distribution of cocaine in March and July of 1997."[3]  If the Government may sustain a conviction for drug possession beyond a reasonable doubt by relying on lay witness testimony and circumstantial evidence, such testimony should also be admissible as probative of the defendants' guilt on a narcotics-conspiracy charge.

    In arguing otherwise, the defendants pounce on a straw man of their own making by emphasizing that CS-1 and CS-2 did not experience the substance's effects.  Defs. Mot. *In Limine* No. 2 at 3, Dkt. No. 91.  They cite no case supporting the claim that ingestion is the *sine qua non* for lay witness testimony regarding the identity of a substance, and the Government is

_____

[3] The *Bryce* court concluded that McCausland's testimony about incidents prior to the charged crime failed to establish the defendant's possession of cocaine during the time period alleged in the indictment.  208 F.3d at 352.  The proffered testimony of CS-1 and CS-2 suffers from no such deficiency, however, because the defendants brought the kilogram to a meeting on October 27, 2015, during the timeframe alleged in the Indictment.

not aware of one.  Moreover, testimony from these confidential sources that the kilogram contained cocaine will be corroborated by other circumstantial evidence—and therefore not unduly prejudicial under Rule 403—including the defendants' statements before and during the meeting, as well as Campo's highly inculpatory statement to Special Agent Gonzalez regarding a photograph of the kilogram:  "you know what that is."

The remainder of the defendants' motion misses the mark because it is devoted principally to challenging the confidential sources' ability to offer expert testimony on this issue pursuant to Rule 702.  The Government is not seeking to qualify any of the confidential sources as experts.  Indeed, the Advisory Committee Notes to Rule 701, titled Opinion Testimony by Lay Witnesses, state that "courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established" and that "[s]uch testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon the layperson's personal knowledge."  Fed. R. Evid. 701 advisory committee's note (2000 Amendments) (explaining that lay opinion testimony "'results from a process of reasoning familiar to everyday life'" (quoting *State* v. *Brown*, 836 S.W.2d 530, 549 (1992)). Accordingly, the Court should reject the defendants' arguments.

## III.  The Court Should Deny the Defendants' Motion to Excise Portions of Campo's Confession and Recorded Statements

The defendants also move to excise: (i) a portion of Campo's confession in which he indicated that "the FARC," or the *Fuerzas Armadas Revolucionarias de Colombia*, was

supplying the cocaine at issue in this case; and (ii) statements to the effect that "we" are "at war" with the United States and statements about putting people in jail or sending them to jail.

As set forth in more detail below, the defendants seek to exclude their own words about the manner in which they intended to commit the crime for which they are about to stand trial. This highly probative evidence—Campo's admissions, on tape and to a DEA agent—explains the defendants' source of supply for the planned drug transaction that is central to the crime charged, their motives in carrying out the transaction, their ability to carry out the deal, and their knowledge that the deal would impact the United States. Given the relevance of the challenged statements and their connection to the charged conduct, the probative value of these statements is not "*substantially outweighed* by a danger of . . . unfair prejudice [or] confusing the issues," Fed. R. Evid. 403 (emphasis added), and the statements should be admitted into evidence.

## A. Applicable Law

Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is *substantially outweighed* by the danger of," among other things, "unfair prejudice [or] confusing the issues." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial. *Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (emphasis in original)). Moreover, "[p]robative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States* v. *Salameh*, 152 F.3d 88, 122-23 (2d Cir. 1998).

**B.   Campo's Admission to Special Agent Gonzalez Regarding the FARC**

Campo's admission to Special Agent Gonzalez that the FARC, via Campo's associate, "El Gocho," supplied the cocaine at issue, should be admitted.   With respect to El Gocho, the Government seeks to elicit from Special Agent Gonzalez that:  (i) Campo said that an individual named "Hamudi" had introduced Campo to El Gocho in Caracas approximately two months prior to Campo's arrest; (ii) Campo said that he had met with El Gocho approximately five times; (iii) Campo said that El Gocho provided Campo with the kilogram that he brought to the October 27 meeting; (iv) when Campo was asked where he was storing the 800 kilograms of cocaine, Campo stated that El Gocho had not provided the full 800 yet, and had instead only given Campo the single kilogram; (v) Campo said that El Gocho had been reluctant to provide the cocaine on credit, but that El Gocho was going to provide the kilograms and Campo would pay him after Campo received payment; and (vi) when Special Agent Gonzalez asked Campo if he knew who supplied the cocaine to El Gocho, Campo stated that El Gocho told Campo that the cocaine was supplied by the FARC.

The defendants are simply wrong in arguing that "[n]either Defendant ever met or even spoke to anyone associated with the FARC."  Defs. Mot. *In Limine* No. 3 at 4, Dkt. No. 92.[4]  As

_____

[4] Similarly, the defendants' unsubstantiated claims that "[t]he cocaine that was supposedly going to be supplied in this case was never produced," and "there will be no evidence adduced at trial that it ever actually existed," are squarely refuted by Campo's admission that El Gocho actually possessed the 800 kilograms of cocaine.  The defendants' inaccurate arguments are telling, however, in that they further demonstrate the defense strategy of claiming that the charged conspiracy did not exist and that the defendants lacked the ability to participate in such a crime, while at the same time seeking to preclude the Government from offering admissible evidence to the contrary.

stated above, Campo admitted during his confession that the cocaine was being supplied by El Gocho, who had obtained the drugs from the FARC.  Moreover, during the recorded meeting between the defendants and CS-1 just prior to their arrests in Haiti, Campo referred to a "commander for the FARC," who "is supposedly a high-ranked one" and a "very serious person," and explained to CS-1 that he had "placed a person"—*i.e.*, El Gocho—"to put me in touch with them."  *See* Ex. A, Excerpt of Draft Transcript of 11/10/15 Recording.  Campo indicated that he had not met the FARC commander, but assured CS-1 that the FARC commander "already knows who we are."  *Id.*[5]

Statements regarding the source of supply for the drugs at issue would be probative in any narcotics case.  But here Campo's statements to the DEA and CS-1 regarding the FARC are even more probative given the defendants' other arguments.  Throughout the relatively extensive pre-trial litigation in this case, the defense has repeatedly argued or intimated that DEA confidential sources induced the defendants into committing the transaction and that the defendants lacked the resources and sophistication necessary to conduct such a deal.  For example, in support of his pretrial motions, Campo asserted that "I expressed on a number of occasions that we [*i.e.*, Campo and Flores] lacked the capability to procure the cocaine that the

---

[5] Campo's statements regarding the participation of El Gocho in the conspiracy are corroborated by evidence from the defendants' phones.  For example, as explained in the Government's Motions *in limine*, an associate wrote to Flores on November 1, 2015 that "el gocho" was "the best" because he had offered to provide 800 kilograms of cocaine ("the 800" // "the chairs") and "the transportation fee" on consignment ("without putting up a single bolivar").  On the same day, the same associate sent both Campo and Flores a screenshot from his phone reflecting calls with "Gocho N."  The associate then wrote to Campo, "[t]here is the call I made my friend."

informants said they wanted." Campo Spoliation Decl. ¶ 2. Similarly, at a September 7, 2016 conference, when asked by the Court why the defense believed the "white powdery substance" that the defendants brought to the October 27, 2015 meeting with CS-1 and CS-2 was exculpatory, Campo's counsel stated: "Your Honor—essentially, your Honor, we believe that the CW[-]1 orchestrated the entire event, the entire stream of events that followed. The CS[es] received this and destroyed a sample after receiving it." Tr. 9/7/16 Conf. at 9.[6] In light of these anticipated defenses, evidence that Campo had access to drugs produced by the FARC, the "world's largest supplier of cocaine," *United States* v. *Viglakis*, No. 12 Cr. 585 (KBF), 2013 WL 4477023, at *1 (S.D.N.Y. Aug. 14, 2013), is extremely probative of Campo's involvement in the charged conspiracy because it demonstrates that he did, in fact, have access to 800 kilograms of cocaine.[7]

Finally, the probative value of Campo's statement regarding the FARC is not substantially outweighed by the danger of unfair prejudice. "When a defendant is 'being prosecuted for exactly what [the evidence] depicts,' courts consistently have rejected Rule 403

---

[6] *See also, e.g.*, Defs.' Joint Motion to Suppress Evidence on the Basis of Spoliation, Dkt. No. 48, at 16 n.5 ("Indeed, to put the purported 800 kilogram conspiracy into perspective, the ability to facilitate such a transaction would mean that the Defendants, both relatively young men with no criminal records, were among the most powerful drug traffickers in the world—this quantity of high-purity cocaine would have a wholesale value of over $30,000,000, and a street value that was tens of millions of dollars higher."); Defs' Post-Suppression Hearing Mem. of Law, Dkt. No. 66, at 5 ("The Defendants are not sophisticated or experienced operators . . . ."); *id.* at 20-21 (referring to the defendant's "lack of experience and capacity").

[7] The evidence is also probative because it is consistent with anticipated expert testimony that cocaine shipped out of Venezuela is often obtained from Colombia, which is the base of operations for the FARC.

challenges." Weinstein's Federal Evid. § 403.04 (quoting *United States* v. *Hanna*, 630 F.3d 505, 512 (7th Cir. 2010)).   Here, Campo's admission regarding the FARC relates directly to conduct that is at the heart of the charged conspiracy to import cocaine into the United States.  As such, the cases cited by the defendants regarding "'conduct more inflammatory than the charged crime'"[8] are inapposite, because the evidence at issue is not "other acts" evidence.

United States v. *Carneglia*, 256 F.R.D. 104 (E.D.N.Y. 2009), cited by the defendants, illustrates this distinction.  *See* Defs. Mot. *In Limine* No. 3 at 4, Dkt. No. 92.  There, the district court declined to admit, under Rule 403, evidence of the defendant's use of acid in disposing of bodies in uncharged murders.  246 F.R.D. at 112-13.  But the district court admitted evidence of the defendant's use of acid in *charged* kidnappings, reasoning that, although prejudicial, "the government's evidence of the use of acid in the commission of the act of kidnapping relates directly and inextricably to the charged crime."  *Id.* at 113-14; *accord United States* v. *Salameh*, 152 F.3d 88, 122-23 (2d Cir. 1998)  (affirming admission of "shocking" photographs and testimony from victims of 1993 World Trade Center bombing in light of probative value with respect to charged crime).  So too here.  Campo's admissions about the source of supply for the cocaine "relate directly and inextricably to the charged crime," *Carneglia*, 246 F.R.D. at 113-14, and the high probative value is not "substantially outweighed" by the danger of unfair prejudice.

United States v. *Royer*, 549 F.3d 886 (2d Cir. 2008), also cited by the defendants, is likewise inapposite.  *See* Defs. Mot. *In Limine* No. 3 at 4, Dkt. No. 92.  To begin with, that case

---

[8] *See* Defs.' Mot. in Limine at 4 (quoting *United States* v. *Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)).

involved a corrupt FBI agent illegally passing confidential information regarding numerous investigations to a co-conspirator and, contrary to the defense's arguments here, did not "focus[] on the [co-conspirator's] actions profiting from direct, advance knowledge of the" 9/11 attacks. *Id.*; *cf. Royer*, 549 F.3d at 902 (noting that the co-conspirator was "*wrongly*" "suspected . . . of having advance knowledge of the 9/11 attacks" (emphasis added)). In any event, there was no connection between either co-conspirator in *Royer* and al Qaeda. Here, in stark contrast, Campo admitted that the FARC was the source of supply for the cocaine at issue, and had discussed his ties to the FARC with CS-1 prior to his arrest. In addition, references to the FARC do not carry anywhere near the same potential prejudice as a reference to al Qaeda—an organization responsible for the murder of thousands of Americans just blocks from the courthouse. Nonetheless, to eliminate any possibility of prejudice, the Government will not refer to the FARC as a "designated foreign terrorist organization," and instead only elicit that the FARC is a paramilitary organization operating in Colombia, Venezuela, and Ecuador that is one of the largest producers of cocaine in the world.

Accordingly, the Court should deny the defendants' request to excise Campo's reference to the FARC in his confession.

### C.   "At War" and "Jail" References

Early in the meeting with CS-1 and CS-2 on October 23, 2015, Campo stated "we want to take possession again of the . . . National Assembly and several . . . several places with power . . . that we haven't . . . haven't lost . . . but we don't want to lose them." *See* Ex. B, Excerpt of Draft Transcript of 10/23/15 Recording at 2-3. Campo added that he was referring to "key places" and

12

stated "[w]e put them in jail over here . . . we send them to jail for 15 years."  *Id.* at 3 (the "Jail Statement").

Later, after noting that "we are being attacked a lot," and the fact that his "mother," Celia Flores, "is running again" for "National Assembly," Campo explained the "we need the money . . because the Americans are hitting us hard with money . . . the opposition . . . is getting an infusion of a lot of money . . . . and that's why we are at war with them."  *Id.* at 4-5.  Following up on this later in the conversation, CS-1 stated that "we have to be very careful" in the upcoming cocaine transaction "because of that internal war you're in with the Americans."  *See* Ex. C, Excerpt of Draft Transcript of 10/23/15 Recording at 2-3.  The defendants then attempted to allay CS-1's concerns: Campo stated that "[w]e have a . . . war with the Americans[,] with the opposition[,]" and Colombia ("our brother country"), but Flores explained that, despite the "war," "the DEA is not here . . . they don't come in here," and Campo added "Americans don't come in . . ."  *See* Ex. C, Excerpt of 10/23/15 Recording at 3 (collectively, the "War Statements").

The War Statements are highly probative for multiple reasons.  First, they provide evidence of the defendants' motives for wanting to engage in a multi-million-dollar drug deal in the run up to the December 2015 Venezuelan National Assembly elections—to counteract what they believed was the "infusion" of money that the "opposition" was purportedly getting from "Americans."  Second, they are necessary to explain and place into context Flores's statement that "the DEA is not here."  This statement itself is highly probative of (i) the fact the defendants

13

knew they were engaging in a *drug* transaction with CS-1 and CS-2[9] and (ii) the defendants'
capacity and ability to safely send a large shipment of cocaine out of Venezuela—an area they
believed was not covered by the DEA.  Further, to the extent the defendants attempt to impeach
Government witnesses by criticizing the handling of CS-1 and CS-2 while they were in
Venezuela, Flores's statement corroborates likely Government witness testimony that the DEA's
operations in Venezuela are significantly restricted.[10]

More generally, the defendants' references to the "DEA" and the "Americans" reflect
their understanding that their drug trafficking affected American interests—because, as the
Government will establish through expert testimony at trial, the vast majority of cocaine
dispatched from Venezuela to Central America is imported into the United States—and that U.S.
law enforcement would seek to interdict drug shipments out of Venezuela if permitted to do so.
This evidence is therefore extremely probative, as it proves the defendants' awareness of the
objects of the charged conspiracy, *i.e.*, the importation of cocaine into the United States and the
manufacture and distribution of cocaine knowing and intending that it would be imported into

_____

[9] Once again, the probative value of this evidence is even higher in light of the defendants' likely
defenses, as suggested through pre-trial litigation.  In particular, the defendants have suggested
that they did not know they were engaging in a cocaine transaction with CS-1 and CS-2.  *See,
e.g.*, Declaration of Efrain Campo Flores in Support of Defs.' Join Motion to Suppress Evidence
on the Basis of Spoliation ¶ 6 ("I have no way of knowing what the [white powdery] substance
[brought to a meeting with CS-1 and CS-2] was. . . .  I have no expertise with regard to the
appearance or qualities of drugs.").  However, Flores's reference to the DEA would make little
sense in the context of a transaction for other goods or services.

[10] *See, e.g.*, Supp. Hr'g Tr. 76-77 (cross examination of Special Agent Gonzalez regarding DEA
activities in Caracas, Venezuela).

14

the United States.  And the probative value of these statements by the defendants' is even greater in light of their positions, as reflected in their Proposed Jury Instructions, that they were entrapped and "the Government unilaterally injected the element of the United States into the charged conspiracy."   Defs.' Proposed Jury Instructions at 24, 26-27, Dkt. No. 101.   For example, CS-1 made clear at the outset of the October 23, 2015 meeting—his first meeting with the defendants, and the gathering during which the War Statements and the Jail Statement were uttered—that the cocaine in the transaction would be imported into the United States.  The War Statements are therefore relevant to demonstrate the defendants' state of mind with respect to this country, which in the context of the entrapment defense being pressed by the defendants is probative of their predisposition to participate in the charged crime.

Nor is the immense probative value of the War Statements "substantially outweighed" by the considerations in Rule 403.  For one, the importation of millions of dollars of cocaine into the United States, if consummated, would have had a "substantial and detrimental effect" on U.S. citizens as a result of addiction, drug-related violence, and other harms associated with the cocaine trade.  *See* 21 U.S.C. § 801(2) (congressional finding that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people").  Thus, that Campo alluded to being at "war" with the "Americans" is not unfairly prejudicial

15

against the backdrop of the charged conduct, the effect of which would have been to destroy American lives and families.[11]

Additionally, the War Statements—by revealing the defendants' knowledge of the very objects of the charged narcotics conspiracy—"relate directly and inextricably to the charged crime," *Carneglia*, 246 F.R.D. at 113-14, and that highly probative value cannot be said to be "substantially outweighed" by the danger of unfair prejudice.

Further, the evidence will not "require the jury to unravel the convoluted and tense relationship between the United States and Venezuela." Defs.' Mot. *In Limine* No. 4 at 3, Dkt. No. 93. The salient fact is that the defendants *believed*—regardless of whether that belief was accurate—that U.S. funding of the opposition required them to obtain a large amount of cash before the elections to support their family's efforts to remain in power ("we need the money"), and this belief explains the defendants' motive for joining the charged conspiracy. *Carneglia*, 256 F.R.D. at 114 (evidence of "defendant's utilization of a corrosive, burning substance" admissible under Rule 403 where "[i]ts inclusion was integral to the government's case showing motive and details lending verity to testimony describing the [charged crime]"). As such, there

---

[11] *United States* v. *Bramson*, 139 F.2d 598 (2d Cir. 1943), cited by the defense, is distinguishable. *See* Defs.' Mot. *In Limine* No. 4 at 4, Dkt. No. 93. That case involved allegations of mail fraud and mail fraud conspiracy, and a defense witness was asked her connections to the Communist Party, an issue that had no apparent connection to the charged conduct. *See* 139 F.2d at 599-600. Here, by contrast, Campo's efforts to obtain money in advance of the Venezuelan elections are central to his motive for engaging in the charged conspiracy.

16

is no risk of confusion of the issues that would "substantially outweigh[]" the probative value of the evidence.

Accordingly, for all the above reasons, the Court should deny the defendants' motion with respect to the War Statements.

Similarly, the Jail Statement is also highly probative. The Jail Statement, which takes place in the context of other statements by the defendants about their political connections and "places" that "we don't want to lose" in the upcoming National Assembly election, *see* Ex. B at 2-4, demonstrates the defendants' belief that they operated with impunity in Venezuela and would continue to do so if the election results were favorable to them. Put simply, Campo was touting his authority within Venezuela to the confidential sources in order to demonstrate that he was a worth partner. Moreover, particularly when viewed in the context of the defendants' other statements regarding their ties to the Venezuelan government, the Jail Statement is not unfairly prejudicial.

## IV.  Limited Evidence Regarding Statements and Actions of CW-1 is Admissible

For the reasons set forth in the Government's motions *in limine*, the Court should permit the Government to introduce limited testimony regarding statements made by CW-1 for the non-hearsay purposes of providing context for investigative steps taken by the DEA and establishing the background of the investigation.

The cases cited by the defendants—*United States* v. *Check*, 582 F.2d 668 (2d Cir. 1978) and *United States* v. *Figueroa*, 750 F.2d 232 (2d Cir. 1984)—are both inapposite. In *Check*, the district court allowed a case detective to testify about numerous statements made by a

17

confidential informant regarding, among other things, the terms and conditions of a drug transaction with the defendant, the defendant's concerns about operational security, the purity of the cocaine that the defendant was going to provide, the defendant's "runner," the fact that the defendant dealt heroin in addition to cocaine, and the fact that the defendant was having trouble with his cocaine suppliers. *See* 582 F.2d at 678 (summarizing 17 different hearsay statements that were admitted). Similarly, in *Figueroa*, the Second Circuit held that the hearsay statements of a confidential informant were incorrectly admitted for the truth of the matter asserted where the hearsay "testimony supplied information critical to the prosecution's case." 750 F.2d at 238-39. In contrast, the statements of CW-1 that the Government seeks to elicit are extremely limited[12] and are offered not for the truth of the matters asserted, but rather simply to explain the case agent's subsequent actions in investigating the defendants, in particular the decision to send CS-1 and CS-2 to Venezuela to meet with the defendants, and to provide context for the photograph that CW-1 sent to Special Agent Gonzalez on or about October 5, 2015.

## V.  CW-1's Statements Are Not Admissible Against the Government as Party Admissions

Citing out-of-Circuit authority, the defendants contend they can admit unspecified statements purportedly made by CW-1 for the truth of the matter asserted as statements of a party

---

[12] The Government does not intend to elicit, for example, that CW-1 told Special Agent Gonzalez that: (i) the defendants wanted to send drug flights to Honduras with legitimate flight plans; (ii) one of the defendants claimed to be the son of the First Lady of Venezuela; (iii) CW-1 and the defendants negotiated to send 1,600 kilograms of cocaine from Venezuela to Honduras; (iv) the defendants explained that the person who used to handle the "radar codes" in Venezuela, *i.e.*, Vassyly Kotosky Villarroel-Ramirez, a/k/a "El Potro"—had recently been arrested; and (v) numerous other statements relating to the terms and conditions of the planned transaction that CW-1 discussed with the defendants at the October 3 meeting.

18

opponent under Federal Rule of Evidence 801(d)(2)(D).  *See* Defs.' Mot. In Limine No. 3 at 9, Dkt. No. 92 (citing *United States* v. *Branham*, 97 F.3d 835, 851 (6th Cir. 1996)).  The law in the Second Circuit, however, is clear: "[T]he out-of-court statements of a government informant are not admissible in a criminal trial pursuant to Rule 801(d)(2)(D) as admissions by the agent of a party opponent."  *United States* v. *Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004); *accord United States* v. *Santos*, 372 F.2d 177, 180 (2d Cir. 1967).  Therefore, the defendants are wrong, and their application to offer statements from CW-1 as party opponent admissions should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein and deny the defendants' motions *in limine*.

Dated: New York, New York
          October 26, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:  _____
     Emil J. Bove III
     Brendan F. Quigley
     Assistant United States Attorneys

Cc:    Defense Counsel
       (Via ECF)

19