GB95flo1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                       15 Cr. 765 (PAC)

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

             Defendants.
------------------------------x

                               New York, N.Y.
                               November 9, 2016
                               9:40 a.m.

Before:

                 HON. PAUL A. CROTTY,

                               District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
EMIL J. BOVE III
BRENDAN F. QUIGLEY
    Assistant United States Attorneys

BOIES, SCHILLER & FLEXNER LLP
    Attorneys for Defendant Campo Flores
RANDALL W. JACKSON
JOHN T. ZACH
JOANNA CHRISTINE WRIGHT

SIDLEY AUSTIN LLP
    Attorneys for Defendant Flores de Freitas
DAVID M. RODY
ELIZABETH A. ESPINOSA
MICHAEL D. MANN

ALSO PRESENT:

HUMBERTO GARCIA
MERCEDES AVALOS
ERIKA DE LOS RIOS
MIRTA HESS
Spanish Interpreters

GB95flo1

1          (Trial resumed)

2          THE COURT:  Are you all set, Mr. Rody?

3          MR. RODY:  I am, Judge.

4          THE COURT:  Okay.

5          MR. BOVE:  Your Honor, if I could raise one matter

6    before we proceed with the jury?

7          THE COURT:  Okay.

8          MR. BOVE:  Pursuant to the Court's ruling regarding

9    Special Agent Gonzalez' notes and reports relating to the

10   defendant's post-arrest statements, we provided to defense

11   counsel versions of those documents with proposed redactions to

12   implement the Court's additional rulings with respect to

13   *Bruton*.  It is my understanding that the parties are in

14   agreement with respect to those redactions that the documents

15   that are now in evidence comply with both aspects of the

16   Court's ruling, the prior consistent statements ruling and the

17   *Bruton* ruling.

18          THE COURT:  Is that right, Mr. Jackson?  Mr. Zach?

19   Mr. Rody?

20          MR. JACKSON:  I think we had largely reached agreement

21   on the redactions.  I was a little confused, your Honor, by

22   Mr. Bove's statement.  He said -- I'm not sure how the prior

23   consistent statements ruling impacted any of the redactions.

24          MR. BOVE:  There are some limited additional

25   redactions with respect to things like confidential source

GB95flo1

1    numbers and other identifying information or notes within the

2    reports that are not directly related to defendant's statements

3    that we do not seek to offer as prior consistent statements of

4    the witness.  Those additional materials are redacted.

5               THE COURT:  Marlon, call in the jury.

6               THE DEPUTY CLERK:  Yes, your Honor.

7               MR. JACKSON:  Yes, your Honor.  I think that we have

8    agreement.  There is one little piece of that before any

9    document goes, ultimately, at the end of the case but we will

10   confirm with the prosecutors but we are basically in agreement.

11              THE COURT:  Thank you very much.

12              Is Agent Gonzalez available?

13              (Witness resumes the stand)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

GB95flfo1                    Gonzalez – cross

1              (Jury present)

2              THE COURT:  Good morning.

3              THE JURY:  Good morning.

4              THE COURT:  Thanks for being on time.  Please, be

5      seated.

6              Mr. Rody?

7              MR. RODY:  Thanks, Judge.

8              THE COURT:  Agent, you are still under oath.

9              THE WITNESS:  Yes.

10      SANDALIO GONZALEZ, resumed.

11   CROSS EXAMINATION

12   BY MR. RODY:

13   Q.  Agent Gonzalez, I have put before you a few of the

14   documents we were referring to yesterday during your testimony.

15   Do you see those there?

16   A.  Yes, sir.

17   Q.  Among those are documents that have been marked for

18   identification as Government's Exhibits 210 through 213T.  Do

19   you see those?

20   A.  Yes, sir.

21   Q.  We will get to those in a minute, we are just going to set

22   the stage.  Those documents are transcripts of recordings that

23   were made during the meeting on October 27th, 2015 in Caracas;

24   is that correct?  Please look at the first page of each.

25   A.  Yes, sir.

GB95flfo1                          Gonzalez - cross

1    Q.   Okay.  So, we will come back to that in a moment.

2              I just want to go back to the meeting that you held in

3    early November 2015 with Jose, Sr. and Jose, Jr., the two

4    confidential sources near SOD headquarters in Virginia, okay?

5    A.   Okay.

6    Q.   This was on November 2nd, 2015; is that right?

7    A.   2nd or 3rd?

8    Q.   Okay.  Well I saw you referring to your notes.  If you

9    refer to your notes of that meeting and you look on page 7, I

10   believe, let me know if that refreshes your recollection that

11   the meeting was on November 2nd, 2015.

12   A.   Yes, sir.

13   Q.   Okay.

14             Now, first of all, one thing is that was the date on

15   which Jose, Sr. and Jose, Jr. gave you the recording devices

16   they had used in Venezuela, correct?

17   A.   Yes, sir.

18   Q.   And you said that you downloaded the contents essentially

19   onto a DEA server or something like that?

20   A.   Yes, sir.

21   Q.   And you made disks of those recordings?

22   A.   Yes, sir.

23   Q.   Were those disks sent out for translation?

24   A.   No.  The disks were not.

25   Q.   Okay.

GB95flfo1                     Gonzalez – cross

1          What else was done with the disks at that time?

2     A.   They were submitted to the evidence.

3     Q.   Submitted to evidence, gotcha.

4          Now, can you listen to the recordings from the

5     recording devices themselves?

6     A.   I don't believe so.

7     Q.   Okay.

8          And you eventually listened to those recordings at

9     some point, correct?

10    A.   Yes, sir.

11    Q.   Approximately when was that?

12    A.   I don't recall the exact date.

13    Q.   Can you give us any estimate about that?

14    A.   No, sir.  I don't recall the exact date.

15    Q.   You certainly have reviewed the recordings and the

16    transcripts before your testimony today, correct?

17    A.   Yes, sir.

18    Q.   So now, going back to that meeting near SOD headquarters,

19    Jose, Sr. -- the confidential source -- was describing for you

20    what he said his conversations were with the defendants,

21    correct?

22    A.   Yes, sir.

23    Q.   And you took notes of that, correct?

24    A.   Yes, sir.

25    Q.   And one of the things he said was something about how the

GB95flfo1                              Gonzalez – cross

1    people at the meeting should wear gloves so they didn't leave

2    fingerprints.

3            Do you recall that conversation with Jose, Sr.?

4    A.  Yes, sir.

5    Q.  And is it not true that Jose, Sr. told you that he told the

6    defendants not to touch the kilo because it could end up seized

7    up in the United States and they would have their prints?

8    A.  That's what he said.

9    Q.  That's what he said, right?

10   A.  Yes, sir.

11   Q.  Okay.

12           Now, having reviewed those transcripts for your

13   testimony, you know that he lied to you then, right?

14   A.  No, sir.  I don't know that.

15   Q.  He never connected prints to the United States; isn't that

16   true?

17   A.  How so?

18   Q.  Well, he never said to the defendants that if their prints

19   were on the kilo the prints would end up in the United States,

20   did he?

21           MR. BOVE:  Objection, Judge.  We are going to have

22   these recordings in evidence to be reviewed.

23           THE COURT:  He can ask.  The objection is overruled.

24           THE WITNESS:  Can you repeat the question?

25           THE COURT:  Can you repeat the question, please?

GB95flfo1                         Gonzalez - cross

1    BY MR. RODY:

2    Q.  Jose, Sr. never said during any of those meetings --

3    withdrawn.

4         Jose, Sr. never said during the October 27th meeting

5    where they were looking at the alleged kilo: *Don't get your*

6    *prints on it because your prints could end up in the United*

7    *States,* right?

8    A.  I can't say for certain.

9    Q.  Would you mind taking a look at the transcripts and seeing

10   if that refreshes your recollection that he never said that

11   during those meetings?

12        THE COURT:  Do you want him to look at all of the

13   transcripts, Mr. Rody?

14        MR. RODY:  I apologize, Judge.

15        THE COURT:  Do you want him to look at all of the

16   transcripts?  There is a lot of them there.

17        MR. RODY:  There are.  This is where we ended

18   yesterday.  It may take him a few minutes.  He should be

19   familiar with them, with the Court's indulgence, with a few

20   minutes.  I really have very few areas to go into.

21        (pause)

22        THE WITNESS:  There are some talks here about gloves

23   and fingerprints and some unintelligible parts.

24        MR. RODY:  May I approach, your Honor?

25        THE COURT:  Yes.

GB95flfo1                        Gonzalez – cross

1   Q.  Can you show me where you say it is unintelligible?  Right.

2   That's where he is asking where do you have the gloves, right?

3   A.  I don't know what he says after that.

4   Q.  Uh-huh?

5   A.  Unintelligible there, unintelligible there, unintelligible

6   there.

7   Q.  The recordings are very difficult to hear, correct?

8   A.  They're difficult in some parts.

9   Q.  Right.

10          Let me refer you to one part.

11          THE COURT:  You have been at this now for five

12  minutes, Mr. Rody.

13          MR. RODY:  Okay.

14          THE COURT:  Bring it to an end.

15          MR. RODY:  I will bring it to an end.

16  Q.  I want to refer you to that one line there.

17          (pause)

18          THE COURT:  Do you have a question pending?

19  Q.  Agent, having looked at that, does it refresh your

20  recollection that although Jose talked about not wanting to

21  leave prints on the substance, he never said don't leave prints

22  because they might end up in the United States, right?

23  A.  I can't say he never said it.  There is an unintelligible

24  part here.  He could have said it, it just didn't turn up in

25  the print.

GB95flfo1                    Gonzalez - cross

1    Q.  Okay.

2           Now, he lied to you at that meeting about some things

3    for sure, correct?

4    A.  Yes, sir.

5    Q.  And, in particular, he lied to you about the fact that

6    they, as we discussed yesterday, brought this unidentified

7    third man to these meetings in Caracas, right?

8    A.  Yes, sir.

9    Q.  Now, as you sit here -- withdrawn.

10           At the debriefing session in Virginia you asked him

11   who attended those meetings in Caracas, right?

12   A.  I believe so.

13   Q.  You asked him direct questions about that, correct?

14   A.  Yes, sir.

15   Q.  And Jose, Sr. gave you a direct answer about who attended

16   the meetings, right?

17   A.  I would have to look at the notes to be sure, sir.

18   Q.  Sure.  Take a look at your notes at the page, I think it is

19   the first page, page 7.  You asked him directly who was there,

20   right?

21   A.  Actually, I asked him who he met with and he said he met

22   with Efrain and his cousin.

23   Q.  Right, but he talked about other people being there; the

24   security guy, right?

25   A.  Yes, sir.

GB95flfo1                          Gonzalez - cross

1    Q.   So, he lied to you about who was there, right?

2    A.   He did not tell me about the other individual he brought,

3    correct.

4    Q.   So he lied to you about who was there, correct?

5    A.   Correct.

6    Q.   And do you know if the two sources and that third man were

7    there to do some other drug deal in Caracas?

8    A.   No.

9    Q.   You have no idea, right?

10   A.   No, I don't.

11   Q.   Now, and this was in November 2015, correct?

12   A.   Yes, sir.

13   Q.   You did not learn about the third man until 11 months

14   later, correct, or 10 months later, right?

15   A.   I'm not sure of the exact amount of months but it was a

16   while later, yes.

17   Q.   He didn't learn about the third man until September 2016,

18   correct?

19   A.   I'm not sure if that's the exact month.

20   Q.   Do you recall that you testified in a prior proceeding in

21   this matter in September 2016?

22   A.   Yes, sir.

23   Q.   And that's the first time that you learned about that third

24   man, correct?

25   A.   I didn't learn about that third man when I was testifying,

GB95flfo1                    Gonzalez - cross

1    no.

2    Q.  That's not when you learned about it?

3              THE COURT:  Had you learned about it before?

4              THE WITNESS:  I believe so.

5    Q.  When did you learn about it?

6    A.  I don't recall the exact date, sir.

7    Q.  Can you estimate at all when you learned about the third

8    man?

9    A.  It was before September.

10   Q.  Well, how long before?  Over the summer?

11   A.  I don't recall the exact date, sir.

12   Q.  Who did you learn it from?

13   A.  I'm not sure if it was the prosecutors or Special Agent

14   Zach.  I don't recall, exactly.

15   Q.  Just to be clear, there was a two day proceeding, correct,

16   and you testified on one of those days, right?

17   A.  Yes, sir.

18   Q.  And your testimony is that before your testimony you knew

19   about the third man coming to the meetings?

20   A.  I don't recall if I testified to that in the proceeding,

21   sir.

22   Q.  It doesn't matter whether you testified to it, I am asking

23   about when you learned it, when you knew it.

24   A.  I don't remember the exact day, sir.

25   Q.  Okay.  We will come back to that.

GB95flfo1                          Gonzalez - cross

1          Going back to November, after that debriefing, shortly

2     after that, you and the government seek an indictment in this

3     matter, correct?

4     A.  Yes, sir.

5     Q.  Did you testify in the grand jury in this matter?

6     A.  No, sir.

7     Q.  Do you know if anyone from the DEA testified in the grand

8     jury in this matter?

9               MR. BOVE:  Objection.  Relevance.

10              THE COURT:  Sustained.

11    Q.  Did you speak with other DEA agents who testified in the

12    grand jury in this matter?

13              MR. BOVE:  Objection.

14              THE COURT:  On that objection, same ruling; sustained.

15    Q.  Prior to the grand jury you had not reviewed the

16    transcripts of the recordings, had you, sir?

17              MR. BOVE:  Object to all questions about grand jury

18    proceedings.

19              THE COURT:  Sustained.

20    Q.  Is it true, Agent, that prior to November 4th, 2015, your

21    only source of information about what occurred in Caracas

22    between October 19th and October 29th, was your conversations

23    with the two sources, Jose, Sr. and Jose, Jr.?

24    A.  No, sir.

25    Q.  You had not listened to the recordings before November 4th,

GB95flfo1                          Gonzalez - cross

1   correct?

2           MR. BOVE:  Judge, because November 4th this is the

3   same line of questioning --

4           THE COURT:  Overruled.

5   A.  No, I had not, but I received text messages about three

6   months into this.

7   Q.  Okay, but those came from the sources, correct?

8   A.  Not just from those two, from the others as well.

9   Q.  Okay.

10          But you hadn't listened to the recordings, right?

11  A.  No, sir.

12  Q.  By the way, yesterday we were talking about --

13          MR. RODY:  One moment, Judge.

14          (pause)

15  Q.  You discussed yesterday that the DEA first became alerted

16  to the fact that Jose, Sr. and Jose, Jr. were involved in

17  illegal, unauthorized drug dealing in April 2015, correct?

18          THE COURT:  April 2015.

19  Q.  I keep saying the wrong date.  April 2016.

20          Thank you, Judge.

21  A.  I believe that was the time.

22  Q.  That was significant information, correct?

23  A.  Yes, sir.

24  Q.  Significant, negative information about those sources,

25  correct?

GB95flfo1                       Gonzalez – cross

1   A.  Yes, sir.

2   Q.  And at that time did you seek a wiretap on either of their

3   phones?

4           MR. BOVE:  Objection.

5           THE COURT:  Sustained.

6   Q.  Did you conduct a search of either of their homes after

7   learning that in April?

8           THE COURT:  Sustained.

9   Q.  What investigation did you do to try to substantiate

10  whether they -- whether those allegations were true?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13  Q.  Now, your team on this case continued their investigation

14  of these defendants, correct, after April 2016, right?

15  A.  Yes, sir.

16  Q.  And, among other things, you sought search warrants in this

17  matter after April 2016, correct?

18          MR. BOVE:  Objection.

19          THE COURT:  Sustained.

20  Q.  Sir, isn't it a fact that you sought a search warrant in

21  May 2016, based on the word of the confidential sources?

22          THE COURT:  Sustained.

23  Q.  We were discussing yesterday that the way you learned about

24  the problem with CS-1 -- Jose, Sr. -- in April, was from

25  another confidential source, correct?

GB95flfo1                     Gonzalez - cross

1    A.  Yes, sir.

2    Q.  And I asked a question about whether that other

3    confidential source conveyed that Jose, Sr. had tried to

4    involve him -- the other source -- in illegal drug dealing,

5    right?

6    A.  I believe you asked that question, yes.

7    Q.  And you said you didn't know the answer?

8    A.  I don't recall exactly.

9    Q.  Let me show you what's marked as 3504-07 and see if this

10   refreshes your recollection.  One moment.  (pause)

11          In this document Jose, Sr. is referred to as Senior;

12   is that true?

13   A.  I believe so but I didn't write this document.

14   Q.  Understood.

15          Take a look at that and let me know if that refreshes

16   your recollection that the source who told you that Jose, Sr.

17   was engaged in illegal drug dealing said that Jose, Sr. had

18   invited him into an illegal drug deal.

19   A.  No.  That does not refresh my recollection.

20   Q.  Okay.

21          We discussed yesterday that you confronted Jose, Sr.

22   and Jose, Jr. on June 29th, 2016; correct?

23   A.  I don't recall the exact date.

24   Q.  Well, we went over this yesterday.  Do you recall looking

25   at your chats with Jose, Sr. to refresh your recollection that

GB95flfo1                          Gonzalez - cross

1   it was on June 29th that you confronted them?

2   A.  Okay.  Yes.

3   Q.  And at that point you said that you did not arrest them,

4   correct?

5   A.  Correct.

6   Q.  You said you did not have enough evidence to arrest him at

7   that point?

8   A.  I believe that's what I said.

9   Q.  You said, I believe, that their statements to you were

10  incomplete.  Do you recall saying that yesterday?

11  A.  Yes, sir.

12  Q.  And when you say "incomplete," they lied, right?

13  A.  Yes, sir.

14  Q.  Were you at the meeting when they were confronted on June

15  29th?

16  A.  If that's the one that was here in New York I was in and

17  out of the meeting.  I wasn't there for the entire time.

18  Q.  You were in and out.  You were doing other stuff?

19  A.  Yes, sir.

20  Q.  Well, did you instruct them during that meeting to tell the

21  truth?

22  A.  I don't remember saying that.

23  Q.  Did you hear others, when you were there, instruct them to

24  tell the truth?

25  A.  I don't remember that, no.

GB95flfo1                        Gonzalez – cross

1    Q.  You think nobody told him to tell the truth?

2    A.  I don't know.

3    Q.  But you understand, don't you, that omitting information

4    material to an investigation is the same thing as lying,

5    correct?

6    A.  Yes.

7    Q.  Now, what did you do in order to obtain the necessary

8    evidence to ultimately arrest them if you didn't have it on the

9    29th?

10              MR. BOVE:  Objection.

11              THE COURT:  Sustained.

12   Q.  Did you ultimately obtain enough evidence to arrest them?

13              MR. BOVE:  Objection.

14              THE COURT:  Sustained.

15   Q.  Did you ultimately arrest them?

16   A.  Yes.

17   Q.  When was that?

18   A.  I don't recall the exact date, sir.

19   Q.  Was it August 4th, 2016?

20   A.  It could be.

21   Q.  You have no idea?

22   A.  I don't have that date memorized; no, sir.

23   Q.  And what changed between June 29th and August 4th?

24              MR. BOVE:  Objection.

25              THE COURT:  Sustained.

GB95flfo1                          Gonzalez – cross

1    Q.  Did you determine whether they were continuing to engage in

2    narcotics trafficking between June 29th and August 4th?

3             MR. BOVE:  Objection.

4             THE COURT:  Sustained.

5    Q.  Do you have any idea whether they were engaging in

6    narcotics trafficking between June 29th and August 4th?

7             THE COURT:  Objection sustained.

8             MR. RODY:  One moment, your Honor?

9             (pause)

10   Q.  Now, after Jose, Sr. and Jose, Jr. were arrested, they were

11   permitted to attempt to cooperate with the government, right?

12   A.  Yes, sir.

13   Q.  And did you assist in debriefing them during their proffer

14   sessions with the government?

15   A.  I don't believe I did, no.

16   Q.  You attended none of those proffer sessions?

17   A.  I don't recall if I did.  I don't think so.

18   Q.  Jose, Jr. testified in that same proceeding you testified

19   in, correct?

20   A.  I wasn't in the room.  I'm not sure.

21   Q.  Whether or not you were in the room you were the case

22   agent, right?

23   A.  Yes, sir.

24   Q.  And weren't you on top of what was going on in the case?

25   A.  Yes, sir.

GB95flfo1                          Gonzalez - cross

1    Q.  You know that Jose, Jr. lied on the stand in the

2    proceeding, correct?

3           MR. BOVE:  Objection.

4           THE COURT:  Sustained.

5    Q.  You know that that proceeding was the first time that Jose,

6    Jr. admitted bringing the third man into meetings, correct?

7           MR. BOVE:  Objection.  This is not an appropriate time

8    to impeach Jose, Sr. or Jose, Jr.

9           THE COURT:  Sustained.

10   Q.  Agent, during the many hours of preparation that you spent

11   in advance of your testimony today, did you review with the

12   prosecutor certain subjects in particular?

13   A.  I don't know what you mean.

14   Q.  Did you focus on certain subjects in particular when you

15   prepared for your testimony?

16   A.  Again, I'm not sure what you mean, sir.

17   Q.  Were there any aspects of the case, any aspects of the

18   investigation that you focused on in your preparation for your

19   testimony?

20   A.  No.  I don't think so.

21   Q.  You just reviewed it all evenly?

22   A.  Yes, sir.

23   Q.  Did you prepare any answers in particular on any certain

24   subjects?

25   A.  No, sir.

1    Q.  Did anyone tell you that you needed to change any of your

2    answers from your prior testimony?

3    A.  No, sir.

4    Q.  Did anyone suggest to you that you needed a better answer

5    to any of your prior testimony?

6    A.  No, sir.

7    Q.  Didn't somebody tell you that you could have done a better

8    job in managing your sources?

9    A.  We all discussed that.  There are lessons to be learned,

10   yes.

11   Q.  And so, you prepared an answer about those lessons learned

12   for this testimony, correct?

13              MR. BOVE:  Objection.

14              THE COURT:  Sustained.

15   Q.  Did you talk about the fact that you hadn't recorded the

16   defendant's post-arrest statements during your preparations?

17   A.  Not really, sir.  No.

18   Q.  When you say not really, that means not at all?  What does

19   that mean, not really?

20   A.  We didn't record them.

21   Q.  So, nobody told you you needed to come up with an

22   explanation for why you didn't record the statements?

23              MR. BOVE:  Objection.

24              THE COURT:  Sustained.

25              MR. RODY:  One moment, Judge?

GB95flfo1                        Gonzalez – cross

 1              (pause)

 2              MR. RODY:  Your Honor, if I may pose a yes or no

 3    question about whether the Agent discussed with the prosecutors

 4    his reason for not recording the defendant's post-arrest

 5    statements?

 6              THE COURT:  May you inquire?

 7              MR. RODY:  Yes.

 8              THE COURT:  I think you can inquire, subject to

 9    objection.

10              MR. RODY:  Okay.

11    BY MR. RODY:

12    Q.  Agent, did you discuss with the prosecutors your reason --

13    just yes or no.  Did you discuss with the prosecutors your

14    reason for not recording their statement?

15    A.  Yes.

16    Q.  And based on that discussion, did you change your answer?

17              MR. BOVE:  Objection.

18              THE COURT:  Sustained.

19              MR. RODY:  One moment, Judge?

20              (pause)

21              MR. RODY:  No further questions at this time, Judge.

22    Thanks.

23              THE COURT:  Mr. Bove.

24              MR. BOVE:  Thank you, your Honor.  May I inquire, your

25    Honor?

1           THE COURT:  Yes, you may.

2     REDIRECT EXAMINATION

3     BY MR. BOVE:

4     Q.  Special Agent Gonzalez, yesterday Mr. Jackson asked you

5     some questions about his client seeking to obtain "tiger or

6     lion cubs."

7           Do you remember that question?

8     A.  Yes, sir.

9     Q.  Do you have any experience with drug traffickers seeking to

10    obtain exotic animals?

11    A.  Yes, sir.

12    Q.  Can you please tell the jury about the Joya Grande Zoo?

13          MR. JACKSON:  Your Honor, I am objecting.  This was

14    objected to during my questioning.

15          THE COURT:  Mr. Bove, I sustained your objections to

16    this.

17          MR. BOVE:  There was one objection that was not a

18    sustained objection at page 292, lines 9 through 12.

19          MR. JACKSON:  Object.  It was objected to.

20          THE COURT:  Can I see the transcript?  What page,

21    Mr. Bove?

22          MR. JACKSON:  You know, your Honor, I withdraw my

23    objection.

24          THE COURT:  Okay.

25          MR. JACKSON:  If he wants to go into this I will

1    address it with the Court later.  Thank you.

2                 THE COURT:  At page 292, lines 9 through 12 the

3    question was asked and not objected to, so go ahead.

4    BY MR. BOVE:

5    Q.  Please tell the jury about the Joya Grande Zoo.

6    A.  The Joya Grande Zoo, I believe it is one of the largest

7    zoos in central America, located in Honduras and has a lot of

8    lions, tigers, all sorts of animals.

9    Q.  Who used to own the Joya Grande Zoo?

10   A.  Devis and Leonel Rivera Maradiaga.

11   Q.  Who are they?

12   A.  They are two Honduran drug traffickers, probably one of the

13   larger drug traffickers in Honduras.

14   Q.  And based on your investigation of these drug traffickers,

15   what type of funds were used to pay for the animals at the zoo?

16   A.  Drug proceeds.

17                 MR. JACKSON:  Objection.  There is no foundation.

18                 THE COURT:  Sustained.

19   Q.  So, in your experience --

20                 THE COURT:  The only reason the question wasn't

21   objected to is Mr. Jackson didn't get on his feet quickly

22   enough.  He objected to all the other questions and they were

23   sustained.  The only reason that the question Mr. Jackson asked

24   yesterday wasn't objected to is because you didn't get on your

25   feet fast enough.  The subsequent questions were objected to

GB95flfo1                          Gonzalez - redirect

1    and I sustained them.

2              So, we have heard enough about lions and tigers and

3    zoos.

4              MR. BOVE:  Thank you, Judge.

5              THE COURT:  The objection is sustained.

6    BY MR. BOVE:

7    Q.  Mr. Rody asked you a question yesterday about whether there

8    were photos on his client's phone from Universal Studios.

9              Do you recall those?

10   A.  Yes, sir.

11   Q.  Have you reviewed evidence from a phone that appears to

12   have belonged to Mr. Flores?

13   A.  Yes, sir.

14   Q.  And in conducting that review, did you encounter

15   photographs that were definitely not taken at Universal

16   Studios?

17   A.  Yes, sir.

18   Q.  Did you encounter photographs of firearms?

19   A.  Yes, sir.

20             MR. RODY:  Objection.

21             THE COURT:  Overruled.

22             MR. RODY:  Again, this was objected to, Judge.  This

23   line of questioning about Universal Studios was objected to

24   yesterday.

25             MR. BOVE:  This is at page 420, your Honor.

GB95flfo1                          Gonzalez - redirect

1              THE COURT:  Your objection is overruled, Mr. Rody.

2    BY MR. BOVE:

3    Q.  Did you encounter photographs of firearms on Mr. Flores'

4    phone?

5              MR. JACKSON:  Object also to the leading, your Honor.

6              THE COURT:  Overruled.

7    A.  Yes, sir, I did.

8    Q.  Do you remember what kinds of firearms?

9    A.  Some of them.

10   Q.  What kinds of firearms?

11   A.  I remember some Uzis, seeing pictures of Uzis, some sort of

12   long rifle, machine gun-type.  I believe some handguns.

13   Q.  You were asked questions by Mr. Rody this morning about the

14   meeting in Caracas on October 27 of 2015.  Do you recall those

15   questions?

16   A.  Yes, sir.

17   Q.  Some of the questions focused on a conversation between

18   Mr. Santos Peña and Mr. Campo about fingerprints.

19              Do you recall those questions?

20   A.  Yes, sir.

21   Q.  Mr. Calabrese, can we take a look at Government Exhibit 210

22   and play from 9:30 to 10:05 to get a sense of what was going on

23   in the meeting at that point?

24              MR. RODY:  Objection.  I don't believe it is in

25   evidence, Judge.

GB95flfo1                    Gonzalez – redirect

1            MR. BOVE:  It is in evidence.  I offered it into

2     evidence during Special Agent Gonzalez' direct.

3            THE COURT:  It is in evidence.

4            What do you want him to look at?

5            MR. BOVE:  It is a recording, your Honor, on disk

6     Government Exhibit 230 -- excuse me 210 -- I apologize -- and I

7     ask that the excerpt from 9:30 to 10:05 be played.

8            THE COURT:  All right.

9            (video played)

10    BY MR. BOVE:

11    Q.  Thank you.

12            Now, you were asked a lot of questions on

13    cross-examination about your notes and reports of the

14    defendants' post-arrest statements.

15            Do you recall those questions?

16    A.  Yes, sir.

17    Q.  Mr. Calabrese, can we take a look at Government Exhibit

18    2000, please?  What is this document?

19    A.  Those are my notes.

20    Q.  Of what?

21    A.  Oh, sorry.  From the post-arrest interview of Mr. Campo on

22    November 10, 2015.

23    Q.  Where did you take these notes?

24    A.  On the plane.

25    Q.  Mr. Calabrese, can we take a look at page 2, please, and if

GB95flfo1                      Gonzalez - redirect

1   you can zoom in?

2         I would like to direct your attention, there are two

3   columns here to the bottom of the left-handed column beginning

4   with the reference El Gocho?

5   A.  Yes, sir.

6   Q.  To help the jury understand your handwriting, can you

7   please read that to them?

8   A.  "El Gocho" provided the drugs.  Hamudi put the defendant in

9   contact with him.  Dead now.

10  Q.  Now, there is a reference there to a D that you read as

11  defendant; is that right?

12  A.  Yes, sir.

13  Q.  In your notes, what does D refer to?

14  A.  Mr. Campo.

15  Q.  And now if you could start at the top of the column on the

16  right?

17  A.  Two months that Gocho in CCS -- which is short for

18  Caracas -- intermediary "blond" "Jose."  Gocho gave the

19  defendant kilo.  Did not receive full amount yet.

20  Q.  Please, continue.

21  A.  Gocho was going to front kilos and defendant would pay

22  after getting paid.  Couldn't get drugs out because of who he

23  is.  Did you tell anyone about what you were doing?  Question.

24  They would kill me.  Jealously among family.  He could have

25  done this easily because of the access he has at the airport.

GB95flfo1                    Gonzalez - redirect

1   He didn't need to get, coordinate with anyone.  Why did you get

2   in business/deal with the Mexican selling dope?  To the Mexican

3   to go to the U.S.  Arrow.  Didn't know going to U.S.

4   Q.  Mr. Calabrese, can we now take a look at page 3?

5          Please, continue reading.

6   A.  That never came out of my mouth.  But you know that he said

7   it, it was going there.  Yes, but I didn't emphasize it.  I

8   didn't say it.  He offered to take me to the U.S. but I said

9   no.  Why did you get in this deal?  Because I don't have even

10  $10,000.

11         Continue?

12  Q.  Please.

13  A.  Who introduced you to guy in HD -- Honduras.  Arrow.

14  Hamudi info to "El Negrito."  Again, Hamudi killed 15 days ago.

15  Wanted to make money on this deal and go live in U.S.  Travel

16  to Panama, 20 taxis, $800 per week.  How is it going to play

17  out when this hits the VZ press regarding political campaign?

18  I know I said that but in reality it was for me.  Friends in

19  drug business told me to be careful not to get robbed so said

20  that for protection regarding mom campaign.  Gocho told

21  defendant dope coming from FARC.  Met with Gocho approximate

22  five times.  Gocho wanted upfront money because they had never

23  worked before.  Negrito is Flacco, met him for first time in

24  Honduras.  Think Negrito Colombian.

25  Q.  Those last two entries on your notes, HD stands for what?

GB95flfo1                    Gonzalez - redirect

1    A.  Honduras.

2    Q.  And CB stands for what?

3    A.  Colombia.

4    Q.  Thank you, Mr. Calabrese.  We can take that down.  And if

5    we can now take a look at Government Exhibit 2002?

6            What is this document?

7    A.  These are my notes of the post-arrest interview of

8    Mr. Flores.

9    Q.  There are some initials on the top left.  Do you see those?

10   A.  Yes, sir.

11   Q.  What are those reference to?

12   A.  My initials and Special Agent Zach's initials.

13   Q.  Could you please start reading at the top?

14   A.  Yes, sir.

15           Why get into this deal?  To make money.  How much?  $5

16   million, $560 to FF -- Franqui Flores -- undisclosed amount to

17   Mexican.  800 kilos.

18   Q.  Let me stop you there for a minute.  The reference to FF is

19   a reference to who?

20   A.  Mr. Flores.

21   Q.  Now, if you can begin reading at the entry below the

22   redaction box 12,000?

23   A.  $12,000.  Mexican was buying.  Mexican said take to Mexico

24   and many other places including U.S.A., mentioned many cities.

25   How getting dope out of VZ.  They were going to do it

GB95flfo1                        Gonzalez – redirect

1    themselves.  Money not going to campaign.  Who else knew?  The

2    body guards, approximately six.  They were going to help load.

3    Q.  If I could stop you there.  The parenthetical reference to

4    six.  What does that indicate in your notes?

5    A.  The amount of body guards that he said that they had.

6    Q.  Please, continue.

7    A.  We are not going to ask for any help from military.  Who

8    introduced to Gocho?  Pepero introduced, said they had this

9    deal in mind and he said Gocho could help.  They met at Thai

10   restaurant in Tolon.  Pepero in Caracas.

11   Q.  What's Tolon?

12   A.  Tolon is a mall in Caracas.

13   Q.  CCS is a reference to Caracas?

14   A.  Yes, sir.

15   Q.  Please continue with the next entry.

16   A.  Hamudi introduced via BEM to El Sentado in Honduras.

17   Hamudi was kidnapped and killed about 20 days ago,

18   approximately.  El Sentado introduced him to Mexican.

19   Colombian El Flacco in Honduras introduced by Hamudi.  Flacco

20   worked for El Sentado.  He is called that because in

21   wheelchair.  Convo ended landing plane.  Didn't have many

22   questions.  Offered to allow call girlfriend or baby mamma but

23   declined.

24   Q.  Thank you.  You can take that down.

25              So, did you prepare reports of these interviews as

GB95flfo1                    Gonzalez - redirect

1    well?

2    A.  Yes, sir.

3    Q.  When, approximately, did you begin working on those

4    reports?

5    A.  When I got back to my office.

6    Q.  When was that?

7    A.  I'm not sure the exact day, sir.

8    Q.  Let's take a look at Government Exhibit 2001.  There is a

9    date -- there are a couple dates on the bottom of this document

10   if you can zoom in.  The date is November 13th, 2015.

11          Do you see that?

12   A.  Yes, sir.

13   Q.  What does that indicate?

14   A.  That's the date when the form was generated.

15   Q.  And then there is a reference to Special Agent

16   Zachariaswicz below your name?

17   A.  Yes.

18   Q.  And the date November 24th, 2014; do you see that?

19   A.  Yes, sir.

20   Q.  What does that date refer to?

21   A.  That's the date he approved the report.

22   Q.  If we can take a look at page 3 of this document,

23   Government Exhibit 2001?  If we can also put up on the screen

24   Government Exhibit 60?

25          Staying with 2001, which is on the left side of the

1   screen, at the top here is a carry over paragraph, paragraph 5

2   of the report, right?

3   A.  Yes, sir.

4   Q.  And there is a reference in the first full sentence on this

5   page to a still image.  Do you see that?

6   A.  Yes, sir.

7   Q.  Is that a reference to Government Exhibit 60?

8   A.  Yes, sir.

9   Q.  Could you please read the last two sentences of this

10  paragraph to the jury?

11  A.  Yes, sir.

12          SA Gonzalez asked Campo who the person in the video

13  was to which Campo replied, "it is me."  SA Gonzalez asked

14  Campo what he was holding in the picture and Campo stated, "you

15  know what that is."

16  Q.  Now, you were asked some questions by Mr. Jackson whether

17  at this point you had "essentially revealed the nature of the

18  investigation"  To Campo during this interview.

19          Do you recall that question?

20  A.  Yes, sir.

21  Q.  Had you revealed the nature of the investigation to

22  Mr. Campo at that point?

23  A.  I guess by showing him the kilo -- not the entire

24  investigation but, yes, that it was a cocaine investigation;

25  yes.

Q.  Had you identified any of the confidential sources to him?

A.  No, sir.

Q.  At any point in the interview did Mr. Campo say anything about El Sentado having coached him about what to say to Mexicans?

A.  No, sir.

Q.  Now, could you please read paragraph 6?

A.  SA Gonzalez asked Campo who provided him with the drugs and Campo stated that "El Gocho provided them."  SA Gonzalez asked Campo what "Gocho's real name was" and Campo stated that he did not know.  Campo further stated that "Hamudi" put him in contact with "El Gocho" approximately two months ago in Caracas.  Campo added that a/k/a Juan, a/k/a Jose, was the intermediary.  SA Gonzalez asked Campo where he was holding the 800 kilograms and Campo stated that, quote, Gocho only gave him the one kilo.  Campo had not received the full amount yet.

        Campo stated that, quote, Gocho was reluctant to provide the full amount on credit to him because this was the first time they were doing business together.  Campo further stated that, quote, Gocho was going to provide the kilograms to catch Campo and Campo would pay Gocho after he received payment.

        SA Gonzalez asked Campo if he knew who was supplying the cocaine to "Gocho" and Campo replied that Gocho him it was coming from the FARC.  Campo added that he only met with

GB95flfo1                         Gonzalez – redirect

1    "Gocho" approximately five times.  SA Gonzalez later asked him

2    who put him in contact with the drubbing traffickers in

3    Honduras and Campo replied that the same "Hamudi" put him in

4    contact with "Negrito a/k/a Flacco" in Honduras and Campo met

5    him for the first time when he traveled to Honduras last month.

6    SA Gonzalez asked Campo if he knew quote Hamudi's name and

7    Campo stated that he did not adding that "Hamudi" was killed

8    approximately 15 days ago.

9    Q.  Can we please go to the next page, Mr. Calabrese, and we

10   can take down Government Exhibit 60 as well.

11        Does this aspect of the report further relate to the

12   interview that you conducted on the plane?

13   A.  Yes, sir.

14   Q.  There is a reference in, at the end of paragraph 8 to

15   PDVSA.  Do you see that?

16   A.  Yes, sir.

17   Q.  What is PDVSA?

18   A.  PDVSA is a Venezuelan state-run oil company.

19   Q.  Thank you, Mr. Calabrese.  You can take that down.

20        We can look at Government Exhibit 2003 now.  What is

21   this document?

22   A.  This is a report I wrote of the post-arrest interview of

23   Mr. Flores.

24   Q.  If we can take a look at the bottom of page 1?

25        So there is a date here, November 16th, 2015?

1   A.  Yes, sir.

2   Q.  What does that date indicate?

3   A.  That's the date for the report.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB99FLO2                    Gonzalez - redirect

1  Q.  And then Special Agent Zachariasiewicz approved it on the

2  24th; is that correct?

3  A.  Yes, sir.

4         MR. BOVE:  Thank you.  If we could zoom back out now.

5  And take a look at page two.

6         You can take that down, please.

7  Q.  Yesterday Mr. Rody asked you whether this case was more

8  exciting to you than any other one that you've done.  Do you

9  recall that question?

10  A.  Yes, sir.

11  Q.  Have you worked on cases previously involving targets with

12  political connections?

13  A.  Yes.

14         MR. JACKSON:  Objection.

15         THE COURT:  Sustained.

16  Q.  Well for a moment let's put aside the issues with Sentado

17  and the confidential sources.  In the context of the last few

18  years of your career, is there anything exceptional about the

19  status of the defendants in this case?

20  A.  Yes, sir.

21  Q.  How are these defendants any different from other

22  defendants in cases that you worked on?

23  A.  Well --

24         MR. JACKSON:  Your Honor, I'm just going to object.

25  This is not -- comparing to other investigations isn't

GB99FLO2                          Gonzalez – redirect

1    appropriate.

2              THE COURT:  Objection is overruled.

3              MR. BOVE:  I can move on.

4              THE COURT:  The question is withdrawn?

5              MR. BOVE:  Yes.  Thank you.

6    Q.  Yesterday Mr. Rody asked you about the DEA's choice to

7    pursue the expulsion of the defendants from Haiti rather than

8    to request an extradition.  Do you recall that question?

9    A.  Yes, sir.

10   Q.  Do you know who Hugo Carvajal is?

11   A.  Yes, sir.

12   Q.  Did you participate in an investigation relating to Hugo

13   Carvajal?

14             MR. RODY:  Objection.

15             THE COURT:  Sustained.

16             Was he involved in this investigation, Mr. Bove?

17             MR. BOVE:  Mr. Carvajal?

18             THE COURT:  Yes.

19             MR. BOVE:  No, your Honor.

20             THE COURT:  The objection is sustained.

21   Q.  Mr. Jackson asked you a question about your decision to ask

22   Sentado to record that meeting on October 3, 2015 and asked you

23   to compare that to your decision not to record the interviews

24   of the defendants on the plane from Haiti.  Do you recall those

25   questions?

1    A.  Yes.

2    Q.  I believe you answered that those were two totally

3    different scenarios?

4    A.  Yes, sir.

5    Q.  Could you please explain how.

6    A.  Well in the scenario with Sentado this was an initial

7    meeting he was going to have with targets that we didn't know

8    about.  And the postarrest we were flying in a plane at

9    30,000 feet.

10   Q.  You were also asked some questions about an incident in

11   which Sentado did make a recording in another investigation.

12   Do you recall those questions?

13   A.  Yes, sir.

14   Q.  Was that -- what type of recording did Sentado make in that

15   other investigation?

16   A.  It was a private telephone conversation.

17   Q.  And what is the difference between recording a meeting and

18   recording a call?

19   A.  Recording a telephone conversation is done in private.

20   Nobody is there.  Can have his phone out to record it.  A

21   meeting with targets, there were multiple people there that

22   could have seen what he was doing in addition to the body

23   guards that were there with him.

24   Q.  You were asked yesterday about whether Sentado ever sent

25   you chats relating to this investigation.  Do you recall those

GB99FLO2                        Gonzalez - redirect

1    questions?

2    A.  Yes, sir.

3    Q.  And do you recall whether Sentado did ever send you chats?

4    A.  Yes, sir.

5    Q.  Do you remember the exact word-by-word text of the chats

6    that Sentado sent you?

7    A.  No, sir.

8    Q.  I'm showing you what's been marked for identification as

9    3508-38.  Take a look at that, please.

10   A.  Yes, sir.

11   Q.  Does that refresh your recollection about chats Sentado did

12   send you?

13   A.  Yes, sir.

14   Q.  I'm showing you what's been marked for identification as

15   Government Exhibit 3508-38.  These are selected pages from the

16   document that I just showed you 3508-38.  What are these?

17   A.  This is a picture that was sent to me by Sentado of a chat

18   with Mr. Flores, a picture -- I guess the picture of

19   Mr. Flores' phone and some pictures of other individuals from a

20   different investigation, I believe.

21   Q.  So, those are photographs that Sentado sent to you?

22   A.  Yes, sir.

23        MR. BOVE:  Your Honor, the government offers

24   Government Exhibit 3508-38.

25        MR. RODY:  Objection.

GB99FLO2                          Gonzalez - redirect

1              THE COURT:  Overruled.  3508-38 is received in

2      evidence.

3              (Government's Exhibit 3508-38 received in evidence)

4              MR. RODY:  Judge, may we take this up before he goes

5      into this at the next break because -- about the content of

6      what is in these because it's in Spanish.

7              MR. BOVE:  I've got a draft translation I can show

8      counsel.

9              THE COURT:  The objection is overruled.

10             MR. JACKSON:  Your Honor, just to clarify.  The

11     witness said that this was a picture from another

12     investigation.  Just wanted to clarify that.

13             THE COURT:  The objection is overruled.

14             MR. BOVE:  Thank you, your Honor.

15     Q.  So you said that one of these photos is a photo from

16     another investigation?

17     A.  Yes, sir.

18     Q.  Is that page three?

19     A.  Yes, sir.

20     Q.  Of this exhibit?

21     A.  And that's not mine.  It wasn't my investigation.

22             MR. BOVE:  Your Honor, the government withdraws page

23     three of 3508-38.

24             MR. RODY:  May I ask a question on voir dire about the

25     chat that was sent?  I just wasn't clear on what it purports to

GB99FLO2                          Gonzalez - redirect

1    be.

2               THE COURT:  Go ahead.

3    VOIR DIRE EXAMINATION

4    BY MR. RODY:

5    Q.  Agent, this was a picture of a chat that Sentado sent you?

6    A.  It's a picture of a phone containing a chat.

7    Q.  But does the chat contain Sentado's words, this is what

8    Sentado said?

9    A.  I believe it does.

10              MR. RODY:  Objection.  Hearsay.

11              MR. BOVE:  If I may?

12              THE COURT:  Yes.

13              MR. BOVE:  Ask a follow-up.

14   BY MR. BOVE:

15   Q.  Does it also contain statements by somebody using the

16   BlackBerry screen name HRCF?

17   A.  Yes, sir.

18   Q.  Who do you understand to have used that screen name in this

19   investigation?

20   A.  Mr. Flores -- I mean Mr. Campo, excuse me.

21              MR. RODY:  If there is evidence of an admission

22   against a defendant that may be appropriate but, the -- there's

23   a hearsay objection to the --

24              THE COURT:  It's overruled.

25              (Continued on next page)

GB99FLO2                    Gonzalez - redirect

1    REDIRECT EXAMINATION

2    BY MR. BOVE:

3    Q.  Special Agent Gonzalez, do you remember when exactly

4    Sentado sent those two photographs that are now in evidence as

5    Government Exhibit 3508-38 to you?

6    A.  No, I do not.

7    Q.  I'm showing you a document marked for identification as

8    3508-3A and I'd ask you to look at page 8 and page 11 and see

9    if that helps refresh your recollection about the approximate

10   timeframe in which Sentado sent these two photographs to you.

11   A.  Yes, sir.

12   Q.  Take that back.

13         When approximately did Sentado send these two

14   photographs marked as Government Exhibits 3508-38?

15   A.  October 5 and October 12.

16   Q.  You were asked some questions yesterday about what was

17   referred to as a test flight to Honduras.  Do you remember

18   those questions?

19   A.  Yes, sir.

20   Q.  How -- what happened with respect to the test flight that

21   was being described yesterday?

22   A.  Some pilots flew to Honduras to meet with Sentado.

23         MR. JACKSON:  Objection, your Honor.  This was another

24   subject that they objected to us proving yesterday.

25         THE COURT:  Overruled.

GB99FLO2                         Gonzalez - redirect

1   Q.  Do you recall testifying yesterday that that incident

2   occurred on November 5 of 2015?

3   A.  Yes, sir.

4   Q.  Where?

5   A.  I believe it was San Pedro Sula.

6          MR. BOVE:  Could you please publish Government Exhibit

7   66.

8   Q.  What happened on the day after the test flight?

9   A.  Mr. Flores traveled to San Pedro Sula.

10  Q.  And I believe you testified on direct examination that the

11  person on the right is Roberto Soto?

12  A.  Yes, sir.

13  Q.  Where is he today?

14  A.  Incarcerated.

15  Q.  Where?

16  A.  Honduras.

17         MR. BOVE:  We can take that down.

18  Q.  You were asked some questions about whether you could have

19  instructed the sources to ask the defendants to bring 30 or

20  40 kilograms of cocaine to Haiti.  Do you recall those

21  questions?

22  A.  Yes, sir.

23  Q.  And I believe your testimony on cross-examination was that

24  requesting such a sample is not an option?

25  A.  Correct.

GB99FLO2                    Gonzalez - redirect

1    Q.  Why not?

2    A.  Because the defendants had stated that they had to receive

3    money upfront and that the plane was going to go to Honduras.

4    There was never a discussion about cocaine going to Haiti.

5    Q.  Mr. Jackson asked you yesterday about what would happen if

6    the defendants had sent the drugs without an upfront payment.

7    Do you recall those questions?

8    A.  Yes, sir.

9    Q.  To be clear is that what they elected to do?

10   A.  Elected to?

11   Q.  Did they decide to send drugs without an upfront payment?

12   A.  Ultimately, no.

13   Q.  How, if at all, does the decision not to send the drugs

14   before receiving payment affect your assessment of the

15   defendants' sophistication in the drug trade?

16   A.  It doesn't change it.

17   Q.  Mr. Jackson asked you about a comment that you made to

18   Santos Peña on October 23 of 2015 regarding the defendants not

19   having planes.  Do you recall that question?

20   A.  Yes, sir.

21   Q.  Later in the investigation did the defendants demonstrate

22   the ability to gain access to private aircraft?

23   A.  Yes, sir.

24   Q.  How?

25   A.  I believe they spoke to Santos Peña about getting planes

1    and buying planes.  They sent pilots.

2    Q.  Now, Mr. Rody asked you some questions yesterday about

3    whether you concluded that the defendants are, quote, amateurs.

4    Do you recall those questions?

5    A.  Yes, sir.

6    Q.  Are you more familiar with the evidence in this case now

7    than you were in October of 2015?

8    A.  Yes, sir.

9    Q.  How has a complete review of the evidence affected your

10   view of whether the defendants had experience in drug

11   trafficking?

12              MR. JACKSON:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  They have been involved in drug

15   trafficking.  No one can put together 800 kilos being an

16   amateur.  And there is evidence on their phones of drug

17   trafficking activity.

18   Q.  Are there features of the evidence that reflect

19   sophistication in drug trafficking to you?

20   A.  Yes.

21              MR. RODY:  Objection to form.

22              THE COURT:  Overruled.

23   Q.  What are some of those features?

24   A.  They tried to be careful with their phones.  They weren't

25   talking openly on all their phones, switching phones.

GB99FLO2                        Gonzalez - redirect

1   Q.  Were there aspects of the negotiations that reflect

2   sophistication?

3   A.  Yeah.  They did perform some pretty difficult negotiations

4   and oftentimes they -- in many other investigations people send

5   drug shipments first.  They were pretty --

6           MR. RODY:  Objection.

7           THE COURT:  Overruled.

8           MR. RODY:  Other investigations.

9           THE COURT:  Overruled.

10          THE WITNESS:  They were pretty tough with the

11  negotiations and were demanding money upfront, significant

12  amount of money upfront.  And they went back and forth quite a

13  while on how to establish the payments.

14  Q.  What, if any, significance does the use of airports in the

15  context of the investigation have on your assessment of the

16  defendants' sophistication?

17  A.  Well they're able to depart and enter the largest main

18  international airport and the ability to ship drugs out of an

19  international airport like that is something that doesn't

20  happen very often.  It's a pretty unique ability to have.

21  Q.  You were asked some questions this morning about the timing

22  of your review of the recording evidence in this case.  Do you

23  recall those questions?

24  A.  Yes, sir.

25  Q.  Were draft summaries of the recordings prepared at some

GB99FLO2                    Gonzalez – recross

1    point?

2    A.  Yes, sir.

3    Q.  And were those prepared in late October of 2015?

4    A.  I believe so.

5    Q.  Did you have an opportunity to review them when they were

6    prepared?

7    A.  Yes, sir.

8            MR. BOVE:  Nothing further, your Honor.

9            THE COURT:  Mr. Jackson.

10           MR. JACKSON:  Thank you, your Honor.

11   RECROSS EXAMINATION

12   BY MR. JACKSON:

13   Q.  Good morning again, Agent Gonzalez.

14   A.  Good morning, sir.

15   Q.  Now, Agent Gonzalez, one of the things that you just told

16   us is that the photo that you showed us of a phone where you

17   could see the chat on the phone is a phone -- is a picture that

18   was sent to you by Sentado, right?

19   A.  Yes, sir.

20   Q.  And so Sentado took a picture of his phone with another

21   phone?

22   A.  It would appear so, yes, sir.

23   Q.  So he had at least two different phones at the time that

24   you asked him to record with the phone the key initial meeting

25   in this case?

GB99FLO2                      Gonzalez - recross

1    A.  I don't know when he got the second phone.

2    Q.  You're not sure when he got it?

3    A.  No, sir.

4    Q.  When did he send you that picture?

5    A.  October 5.

6    Q.  So the meeting took place like right before that, right?

7    A.  Two days prior.

8    Q.  So within that exact same time period he had at least two

9    phones in his possession, right?

10   A.  He had two phones two days after, yes.

11   Q.  I see.  He also had a woman unauthorized, working at his

12   direction, who also had a phone or some other device capable of

13   recording, right?

14   A.  She had a device that could take pictures, yes.

15   Q.  Right.  You're not aware of any modern devices capable of

16   taking digital pictures that don't have recording ability, are

17   you?

18   A.  I don't know.

19   Q.  You're not aware of it, right?

20   A.  Of what?

21   Q.  Any modern devices capable of taking pictures that don't

22   have recording ability, right?

23   A.  I don't think so.

24   Q.  Right.  So there were at the time of -- that you asked

25   Sentado -- that you gave him explicit instructions to record

GB99FLO2                         Gonzalez - recross

1   that first meeting, he had at least two phones of his own and

2   he had a third person working an op unauthorized who also had a

3   phone or some other recording equipment, right?

4   A.  Yes.

5   Q.  And yet after the meeting when you immediately told him

6   send me -- did you get the recording, he said that it was

7   impossible?

8   A.  Yes.

9   Q.  Because of a restaurant, right?

10  A.  Yes.

11  Q.  And still to this day you haven't seen -- let me just

12  backup.  At that time -- just focusing on the time the photo

13  that you saw, that's not a photo inside of a restaurant, right?

14  A.  No.  It's not inside of a restaurant.

15  Q.  By the way, you joked with Sentado about the text savviness

16  of him, right?

17          MR. BOVE:  Objection.  Scope.

18          THE COURT:  Overruled.

19          THE WITNESS:  I believe so.

20  Q.  Right.  It was a little bit of a joke where he was like --

21  you know, the defendants think that I'm not text savvy, right?

22  A.  I don't know if he said he didn't think or that he wasn't

23  text savvy.

24  Q.  It was a joke though because he was a little bit tech

25  savvy, right?

1    A.  I don't think so.

2    Q.  Now, one of the things that you pointed out to us, Agent

3    Gonzalez, is there was a statement in your notes where

4    Mr. Campo Flores said that if his family found out, his family

5    would kill him, something like that?

6    A.  Yes, sir.

7    Q.  And you included in some of your other reporting that this

8    was clearly not meant literally; that he just meant that he

9    would be -- his family would be very upset?

10    A.  Yes.

11    Q.  And, by the way, I think when the prosecutor was asking you

12    about the -- was asking you about whether or not at the time of

13    this interview you had revealed the essential nature of the

14    investigation, what you said was that you guess you had by

15    virtue of the fact that he now saw the undercover recording,

16    right?

17    A.  Yes, sir.

18    Q.  And from that vantage point it's pretty obvious that

19    someone was wearing an undercover recording device in that

20    meeting, right?

21    A.  You could assume that, yes.

22    Q.  And so at this point it was at least clear to anyone that

23    that whole thing was a setup, right?

24    A.  Not necessarily.

25    Q.  But possibly, right?

GB99FLO2                          Gonzalez - recross

1    A.  Depends on your point of view.

2    Q.  I see.  One thing that you had not revealed to him at that

3    point is that Sentado was also working as a confidential

4    informant, right?

5    A.  No.  I did not reveal that.

6    Q.  So when he told you that friends in the drug business told

7    him that he should make up a story he could have very well been

8    referring to Sentado, right?

9    A.  I don't think so.

10   Q.  Well that's not my question.  He could have very well been

11   referring to Sentado, correct?

12   A.  It's possible.

13   Q.  Right.  Now, also -- by the way, you showed us this photo.

14   This is a photo of like Hugo Chávez, right?

15   A.  Yes, sir.

16   Q.  This has no relevance in the investigation, right?

17   A.  That was the screen shot that was on Mr. Campo's phone.

18   Q.  I see.  This is not like a realtime photo of Hugo Chávez?

19   This is like an internet capture, right?

20   A.  I don't know where he got it from.

21   Q.  Hugo Chavez doesn't figure into this investigation in any

22   way, does he?

23   A.  Other than Mr. Campo used that picture for his phone.

24   Q.  And what Sentado did not send you a picture of was any

25   drugs whatsoever, right?

GB99FLO2                    Gonzalez - recross

1    A.  No, he did not.

2    Q.  And to be clear one of the things that you said during your

3    redirect a moment ago is that no one can put together 800 kilos

4    as an amateur, right?

5    A.  I believe I said --

6    Q.  That's what you said, right?

7    A.  I believe I said that that's not something an amateur could

8    do.

9    Q.  Right.  You're exact words were no one can put together

10   800 kilos as an amateur, right?

11   A.  Okay.

12   Q.  And in this case the defendants never actually possessed

13   any 800 kilos that you ever saw, right?

14   A.  I never saw them.

15   Q.  Right.  No one in this investigation ever saw the

16   defendants with 800 kilos, right?

17   A.  I did not see it, no.

18   Q.  And the DEA never took possession of the supposed 800 kilos

19   that they were going to deliver in this case, right?

20   A.  Correct.

21   Q.  Agent Gonzalez, I know you've been on the stand a long

22   time.  I want to wrap up.  I just have a couple more quick

23   questions for you.

24           One of the other things that you said is that you saw

25   aspects on the phone that show sophistication in that they were

1    careful on phones, that show sophistication in terms of drug

2    trafficking?

3    A.  Yes, sir.

4    Q.  Is it your experience that it's only drug traffickers that

5    ever exhibit being careful on phones?

6    A.  In drug investigations.

7    Q.  No.  That's not my question.  Is it your experience that

8    it's only drug traffickers that are ever careful on phones?

9    A.  Yes.  That's my experience.

10   Q.  Sir, you were careful on the phone in this investigation,

11   weren't you?

12   A.  What do you mean by "careful"?

13   Q.  I mean weren't there a number of situations where you were

14   talking to the confidential informants and you were

15   communicating with them about something and you started to say,

16   you know what, call me?

17   A.  That wasn't because I was being careful.  It was because I

18   couldn't type at the time.

19   Q.  I see.  But that's something that you said, right?

20   A.  To call me?

21   Q.  Yeah.

22   A.  Yes, sir.

23   Q.  That's something that came up at a couple of different

24   points in your conversations with them when they were

25   discussing sensitive matters, right?

GB99FLO2                          Gonzalez – recross

1    A.  It wasn't necessarily they were discussing sensitive

2    matters.

3    Q.  Not necessarily?

4    A.  No, sir.

5            MR. JACKSON:  Your Honor, may I speak to the

6    prosecutor briefly?

7            THE COURT:  Yes.

8            MR. JACKSON:  Your Honor, I'm going to reserve for a

9    later point, but I'm going to offer DX333 and we can discuss it

10   at a break, Judge.

11           MR. BOVE:  Registering our objection.

12   Q.  Let me just ask you just to close up.  We took a look at

13   all your very neatly typed report a moment ago, Agent Gonzalez.

14   A.  Yes.

15           THE COURT:  You don't have to say it's neatly typed.

16           MR. JACKSON:  It's his report.  It was well done.

17   BY MR. JACKSON:

18   Q.  That's not a report that you created at the time that you

19   were listening to the actual conversation you supposedly had

20   with my client, was it?

21   A.  No.  I did not create that.

22   Q.  And there is, to be clear -- there is no transcript of that

23   conversation anywhere, right?

24   A.  I have my notes.

25   Q.  Right.  There is no transcript of that conversation

GB99FLO2                        Gonzalez – recross

1    anywhere?

2    A.  No, sir.

3    Q.  All we have is your hand-scrawled notes that you took while

4    you were afraid of whatever imaginary security situation caused

5    you to not be able to record the actual meeting, right?

6            THE COURT:  Sustained.

7            MR. JACKSON:  I have no further questions.

8            THE COURT:  Mr. Rody.

9            MR. RODY:  Yes, sir.

10           May I have one moment to confer with counsel?

11           THE COURT:  All right Mr. Rody.

12   RECROSS EXAMINATION

13   BY MR. RODY:

14   Q.  Agent Gonzalez, did you communicate with anyone last night

15   about your testimony?

16   A.  No, sir.

17   Q.  Did you prepare with anyone for your testimony today?

18   A.  No, sir.

19   Q.  Did you suddenly feel like you were able to recall things

20   better during redirect examination this morning?

21           MR. BOVE:  Objection.

22           THE COURT:  Sustained.

23   Q.  I want to make clear one thing.  You said that -- I believe

24   your testimony was that you received draft summaries of the

25   recordings in late October 2015; is that right?

GB99FLO2                        Gonzalez - recross

1   A.  I believe so.

2   Q.  Were those draft summaries based on the recordings?

3   A.  We had translators that we provide our recordings to and

4   they do summary translations.

5   Q.  Right.  But you said you didn't receive the recordings

6   until November 2, 2015, correct?

7   A.  I believe so.

8   Q.  So you could not have received draft summaries in late

9   October 2015, correct?

10  A.  I'm not sure of the exact date of the draft summaries that

11  I received.

12  Q.  You couldn't have had them before you got the devices,

13  right?

14  A.  Correct.

15  Q.  And you didn't get the devices until November 2, right?

16  A.  I believe so.

17          MR. RODY:  No further questions.

18          THE COURT:  Anything else, Mr. Bove?

19          MR. BOVE:  No, your Honor.

20          THE COURT:  You're excused.

21          (Witness excused)

22          THE COURT:  Well take our morning recess.  We'll

23  resume in fifteen minutes.

24          (Jury excused)

25          (Continued on next page)

1          (In open court)

2          THE COURT:  Do you want to go first, Mr. Jackson?

3          MR. JACKSON:  Your Honor, I have discussed it with

4   Mr. Bove and we don't -- I don't have any application at this

5   time.

6          THE COURT:  Mr. Rody.

7          MR. RODY:  Nothing from me, Judge.

8          MR. MANN:  One thing.

9          THE COURT:  Mr. Mann.

10         MR. MANN:  This is in regards to GX6 and GX12.  Those

11  are the tarmac photos that were shown to the witness.  The

12  witness's testimony yesterday is that there were multiple

13  photos taken on the tarmac.  We've only received one of those

14  photo -- I'm sorry one photo in Haiti and one photo in White

15  Plains.

16         THE COURT:  Yes.

17         MR. MANN:  We now know that there are multiple photos

18  that exist on the tarmac and those have never been produced

19  particularly in connection with the prior proceeding in this

20  case, at the suppression hearing.  We've since asked the

21  government to produce the additional photographs and they've

22  told us that they have no reason to produce those to us.  We

23  think that, as the government said in its November 5 letter,

24  that Exhibits 6 and 12 are relevant and admissible.  So we

25  would take the position, your Honor, that the other photographs

GB99FLO2                        Gonzalez - recross

1    are also relevant and admissible.  We, again, oppose the

2    introduction of those two exhibits.

3              THE COURT:  Do you have the pictures, Mr. Bove?

4              MR. BOVE:  I do have them, Judge.

5              THE COURT:  Produce them.

6              MR. MANN:  Thank you, your Honor.

7              MR. JACKSON:  Your Honor, just to update the Court I

8    just want to let you know the parties conferred yesterday about

9    the payments that we questioned Special Agent Gonzalez about

10   and we were able to reach --

11             THE COURT:  The payments to the CSs?

12             MR. JACKSON:  Yes, your Honor.  So we were able to

13   reach a stipulation that we will offer in evidence at the

14   appropriate time that refers to the payments that were actually

15   paid.

16             THE COURT:  What's the total of the payments?

17             MR. JACKSON:  Between CS-1, 2, and 3 it gets -- I

18   think a little over $2 million.

19             THE COURT:  Over what period of time?

20             MR. JACKSON:  Some years, a few years.

21             MR. RODY:  Varies, your Honor.

22             THE COURT:  All right.

23             MR. JACKSON:  Thank you, your Honor.

24             THE COURT:  Do we have witnesses?  We're all set for

25   the rest of the day?

GB99FLO2                           Gonzalez - recross

 1              MR. BOVE:  Yes, Judge.

 2              THE COURT:  Who are we going to hear.

 3              MR. BOVE:  First, we'll hear from Ms. Alvarado, one of

 4     the translator witnesses.  And then a seconded translator

 5     witness.  Followed by someone who prepared audio exhibits and

 6     video exhibits.  And Special Agent Mahoney who will provide

 7     expert testimony about the drug trade.

 8              THE COURT:  Do we anticipate a lot of cross?

 9              MR. JACKSON:  These are going to be relatively limited

10     crosses, your Honor.  As we said before, there are only a few

11     witnesses that we think we will have extensive cross with.

12              THE COURT:  We'll see you at 25 after.

13              (Recess)

14              THE COURT:  Is the witness in the room?

15              MR. QUIGLEY:  Yes, your Honor.  She's in the back.

16              THE COURT:  Let's bring her in.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1            (Jury present )

2            THE COURT:  Mr. Quigley, would you call your next

3    witness.

4            MR. QUIGLEY:  Yes, your Honor.  The government called

5    Maria Elena Alvarado.

6      MARIA ELENA ALVARADO,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9            THE COURT:  Go ahead, Mr. Quigley.

10           MR. QUIGLEY:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MR. QUIGLEY:

13   Q.  Ms. Alvarado, what do you do for a living?

14   A.  I'm a translator and interpreter.

15   Q.  In what language?

16   A.  Spanish and English.

17   Q.  And what's the difference between an interpreter and a

18   translator?

19   A.  Usually we say interpreter to refer to someone who is

20   translating oral, spoken language.  And a translator is someone

21   who is changing written text from one language to the other.

22   Q.  And did you speak Spanish growing up?

23   A.  Yes, I did.

24   Q.  And have you lived in Spanish-speaking areas?

25   A.  Yes.

GB99FLO2                         Alvarado - direct

1   Q.  Where?

2   A.  I lived in Puerto Rico until I was 17.  And I also lived

3   for several years in Spain.

4   Q.  Can you describe your educational background?

5   A.  I went to high school in Puerto Rico and then I obtained my

6   bachelor's degree from Harvard University.

7   Q.  What was that in?

8   A.  It was Romance languages and literatures.

9   Q.  And what, if any, certifications do you have as an

10  interpreter?

11  A.  I'm certified by the federal court system.

12  Q.  How have you been certified?

13  A.  I was certified in the year 2000.

14  Q.  How does someone become certified?

15  A.  First you take a written exam and then the people who pass

16  the written exam go on to take an oral exam in front of a panel

17  of judges.

18  Q.  Did you work as an interpreter or translator before you

19  became certified in federal court in 2000?

20  A.  I've been a translator since 1996.

21  Q.  And where do you currently work generally?

22  A.  It's a several different things, but I do, especially in

23  the legal area, I work here in the courthouse in cases to help

24  the defendants understand proceedings that are going on.  I

25  also work for the U.S. Attorney's Office here and also in

1    Brooklyn.  I also work for private law firms that handle

2    immigration cases.  And also for individual defense lawyers,

3    usually who are defending their clients under the Criminal

4    Justice Act.

5    Q.  So you've done work for both the prosecution and defense in

6    criminal cases?

7    A.  Yes.  That's correct.

8    Q.  Are you an employee of the U.S. Attorney's Office?

9    A.  No.

10   Q.  Are you familiar with the terms transcribe and translate?

11   A.  Yes.

12   Q.  What does it mean to transcribe?

13   A.  To transcribe is to listen to a recording of some sort and

14   to write down exactly what is said in that recording word for

15   word.

16   Q.  And what does it mean to translate?

17   A.  To translate is to take text that is in one language and

18   render it into a different language with the same content but

19   appropriately in that new language.

20   Q.  What is a transcript?

21   A.  A transcript would be a document where you can see the --

22   what has been spoken in a recording but written, in written

23   form in a document.

24   Q.  Ms. Alvarado, can you briefly describe the process about

25   how you go from creating English language transcripts from

1    Spanish language recordings?

2    A.  Yes.  It's a process that has a few steps.  Because the

3    first step is always to listen to the Spanish, to make sure

4    that you can write down verbatim everything that is said in the

5    Spanish recording.  Sometimes that entails listening to it many

6    times, slowing it down, and some -- you know some parts might

7    be -- you know, you might not have to listen to some of the

8    parts many times but others you might listen to more.

9            And then once I am satisfied that the Spanish matches

10   the recording initially, then I will work on the English

11   translation of that, which is writing an English text that

12   shows the content of what it says in the Spanish.

13           After that there's other steps like just checking the

14   English and then always going back again to the Spanish,

15   listening to it again just to make sure that nothing was missed

16   and that it matches the recording.

17   Q.  When you transcribe Spanish from a recording you try to

18   capture exactly what you hear or do you make modifications?

19   A.  No.  No modifications are made.  The Spanish version is

20   exactly what I hear on the tape or recording.

21   Q.  And what about with respect to translation?

22   A.  Well, a translation, it changes the language so you have to

23   convey it in English.  But the content has to be the same.

24   That's my job to make sure that everything that it says in

25   Spanish is accurately reflected in the English.

GB99FLO2                         Alvarado - direct

1   Q.  Is that your own practice or is that something that's

2   generally accepted among interpreters and translators?

3   A.  It's widely accepted practice.

4   Q.  Since 2000 approximately how many Spanish language

5   recordings have you transcribed and translated?

6   A.  Hundreds.

7        MR. QUIGLEY:  Your Honor, the government offers Maria

8   Elena Alvarado as an expert in the field of Spanish

9   transcription and Spanish to English translation.

10       THE COURT:  Any objection?

11       MR. JACKSON:  No objection, your Honor.

12       MS. ESPINOSA:  No objection.

13       THE COURT:  Ms. Alvarado is recognized as an expert in

14  Spanish to English translation.

15  Q.  Ms. Alvarado, were you involved in translating and

16  transcribing Spanish recordings in this case?

17  A.  Yes.

18  Q.  What were your rates in this case?

19  A.  It's a standard rate.  It's $67 an hour through an agency.

20  Q.  I've handed you what's been marked for identification as

21  Government Exhibits 201T through 203T, 205T through 208T, 210T

22  through 213T, 215T through 216T, 220T through 225T, and 230 to

23  231T.

24       Do you recognize those documents?

25  A.  I do.

GB99FLO2                         Alvarado - direct

1   Q.  How do you recognize them?

2   A.  Because these are the transcripts that I prepared and I

3   recognize them because I initialed them on the first page of

4   each one.

5   Q.  Do 201T through 203T, 205T through 208T, 210T through 213T,

6   215T through 216T, 220T through 225T, and 230 and 231T reflect

7   fair and accurate transcriptions and translations of the

8   Spanish portions of the recordings that you were asked to

9   translate in this case?

10  A.  Yes.

11          MR. QUIGLEY:  Your Honor the government offers 201T

12  through 203T, 2015T through 208T, 210T through 213T, 215T

13  through 216T, 220T through 225T and 230T and 231T.

14          THE COURT:  Any objection?  Received in evidence.

15          MR. JACKSON:  No objection.

16          MS. ESPINOSA:  No objection.

17          THE COURT:  Received in evidence.

18          (Government's Exhibits 201T through 203T, 2015T

19  through 208T, 210T through 213T, 215T through 216T, 220T

20  through 225T and 230T and 231T received in evidence)

21          MR. QUIGLEY:  Mr. Calabrese, can we publish the first

22  page of 201T.

23  Q.  Ms. Alvarado, in creating these transcripts did you follow

24  the practices you outlined before?

25  A.  Yes, I did.

GB99FLO2                          Alvarado - direct

1   Q.  Just taking a look at the first page of 201T.  Do you see

2   all the information on the top of the page like the date,

3   location, recording, and participants?

4   A.  Yes.

5   Q.  Where did the date, location, and participants information

6   come from?

7   A.  That information was provided to me.

8   Q.  And what does the recording category reflect?

9   A.  That indicates the name of the file -- the recording file

10  that it matches.

11  Q.  So for example 201T would correspond to 201, and 202T to

12  202, and so on?

13  A.  That's right.

14  Q.  Do all the translations you did in this case have a cover

15  page similar to this?

16  A.  Yes, they do.

17  Q.  And can you discuss what the abbreviations on the bottom of

18  page one mean?

19  A.  Yes.  UI means unintelligible, which is used when there's a

20  word or a phrase or more that I can't understand what it's

21  saying because it's garbled or just hard to hear.  So when I'm

22  not certain of what it says in the recording, I use the

23  abbreviation UI.

24          PH is phonetic spelling.  That is when I can hear

25  clearly what the word is but it might be a word that I don't

GB99FLO2                        Alvarado - direct

1   recognize as a word.  That is recognized in Spanish.  It could

2   be a name.  And so I put PH there to say that it's just from

3   the way it sounds.

4           And then the two slashes are used to indicate when

5   voices overlap because people are speaking at the same time.

6   So they are divided up in rows but they could be spoken at the

7   same time.

8           MR. QUIGLEY:  Mr. Calabrese, can we turn to the second

9   page of Government Exhibit 201T.

10          THE WITNESS:  Yes.

11  Q.  Looking at that, Ms. Alvarado, do you see there are

12  essentially three columns on the page?

13  A.  Yes.

14  Q.  Who provided the information in the first column which

15  identifies the speakers?

16  A.  That was provided to me by the agency.  I didn't work on

17  that column.

18  Q.  Who provided the information in the second column, the

19  English language column?

20  A.  That is my translation.  In this particular case I was

21  provided with a draft translation and transcription to start

22  working from.  But the final content of this column is my final

23  translation of what the Spanish said.

24  Q.  And who provided the information in the third column?

25  A.  The same way it was -- I was also provided a draft

GB99FLO2                    Alvarado – cross

1    transcription but it -- what is in there now is my final

2    product of what I heard on the recording.

3    Q.  And does this format appear on the -- each of the

4    transcriptions and translations that you did in this case?

5    A.  Yes, it does.

6    Q.  Did you have any other involvement in this case?

7    A.  No.

8              MR. QUIGLEY:  One moment, your Honor.

9              No further questions.

10             THE COURT:  Ms. Espinosa.

11             MS. ESPINOSA:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MS. ESPINOSA:

14   Q.  Good morning, Ms. Alvarado.

15   A.  Good morning.

16   Q.  I just have a few questions for you about these

17   transcripts.

18   A.  Okay.

19   Q.  Now these transcripts, it's fair -- or these recordings --

20   I apologize, these recordings, it's fair to say that they are

21   fairly difficult to understand in large part, correct?

22   A.  I wouldn't say in large part.  Some were and others were

23   much clearer.

24   Q.  And you explained when you were looking at the front page

25   of Exhibit 201 that it was -- that certain abbreviations

GB99FLO2                    Alvarado - cross

1  indicate where something is unintelligible or overlapping?

2  A.  Yes.

3  Q.  So can we go to the next page, please.

4       So every time, just so that I'm clear, where the two

5  lines appear there's multiple voices talking at once and you

6  couldn't understand what was being said?

7  A.  No.  That's not quite right.  It indicates that there were

8  several voices speaking at the same time but they could be

9  heard.  If I couldn't hear them, then the abbreviation UI would

10  appear there.

11  Q.  Let's take a step back and talk a little bit about your

12  process.

13       So approximately how many hours would you say you

14  spent reviewing these recordings to prepare the transcripts and

15  translations?

16  A.  I spent more than a hundred hours.

17  Q.  And during that time you played the recordings repeatedly,

18  correct?

19  A.  Yes.

20  Q.  And is it fair to say that you played those recordings many

21  times?

22  A.  Yes.  Some parts more than others.

23  Q.  Now when you're reviewing recordings to transcribe them you

24  use headphones, correct?

25  A.  I do.

GB99FLO2                        Alvarado - cross

1   Q.  Do you use noise-canceling headphones?

2   A.  Yes.

3   Q.  And you run the file back -- the recording back and forth

4   and back and forth until you can understand what's said?

5   A.  Sometimes.  Sometimes it can be just a word that I want to

6   make sure it's what I heard or there's -- you hear noise that

7   you want to figure out if it's a word or not.

8   Q.  Now, in these particular transcripts there are quite a few

9   reasons why they were difficult to understand in some places,

10  correct?

11  A.  I'm not sure what you mean.

12  Q.  So in many parts of these recordings there were people

13  talking over each other, correct?

14  A.  In some parts.

15  Q.  And they're talking very quickly in some parts?

16  A.  In some parts they are but I also am able to slow down the

17  speed of the recording.  So if someone is speaking too fast

18  then I can listen to it more slowly.

19  Q.  And some of these participants in -- some of the speakers

20  on these recordings interrupt each other, correct?

21  A.  Sometimes.

22  Q.  And sometimes on these recordings there's background noise?

23  A.  In some of them.

24  Q.  Or interference?

25  A.  In -- what do you mean by interference?

GB99FLO2                          Alvarado - cross

1  Q.  Some sort of noise that prevents you from hearing what's

2  happening?

3  A.  Sometimes.

4  Q.  Now, for -- we can take that exhibit down.  Thank you.

5        Now, you didn't do the original attributions for the

6  voices on these recordings, did you?

7  A.  At no time did I do any attributions.  Not the original

8  ones.  At no point was I involved in that.

9  Q.  As you were listening to these recordings did you ever

10 disagree with any of the attributions?

11        MR. QUIGLEY:  Objection.

12        THE COURT:  Overruled.

13        THE WITNESS:  That's not -- it's not part of my job to

14 say who is speaking.

15 Q.  Now, Ms. Alvarado, while you were going through these

16 recordings to transcribe them did you consult with anyone else

17 about the Spanish transcription?

18 A.  No.  I did use, as is common practice, dictionaries and

19 online sources to -- sometimes to doublecheck on the meaning of

20 certain terms and phrases or, you know, to make sure that that

21 was the -- yeah, that I was translating them correctly.

22 Q.  Did you ever ask anyone else to listen to it and see what

23 they could hear?

24 A.  No.  I'm not allowed to do that.

25 Q.  And do you ever discuss the substance of these recordings

GB99FLO2                          Alvarado - cross

1    with anyone else?

2    A.   No.

3    Q.   Now, as we discussed a bit earlier, in many places these

4    recordings are just inaudible and you can't hear what's being

5    said, right?

6    A.   In some places.

7    Q.   And you said that you received a draft translation and

8    draft transcription from an agency?

9    A.   Yes.

10   Q.   Now in some places there may have been an entry from the

11   agency but when you listened to the Spanish you couldn't hear

12   it, right?

13   A.   Yes.  So I couldn't be a hundred percent certain and in

14   order to certify it I have to be certain.

15   Q.   And when you weren't certain you deleted that portion of

16   the draft transcript?

17   A.   Yes -- or not deleted it.  I used the abbreviation UI.

18   Q.   Just to backup for a second.  You mentioned that you used

19   online sources when you are transcribing and translating?

20   A.   I would say more when translating, yes, more when

21   translating.

22   Q.   Could you tell me what online sources you typically rely

23   on?

24   A.   There is a website called WordReference that is an

25   aggregate of several of the major dictionaries and it includes

GB99FLO2                          Alvarado - cross

1    translations to a lot of different languages.  So I used that

2    as a source.  I also -- there's a website called Linguee that

3    compares text as it appears on the web in Spanish and English

4    to show how some things are translated because sometimes even

5    if I know what something means I'm looking for the ideal way of

6    translating it in the most accurate way.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB95flo3                    Alvarado - cross

1    BY MS. ESPINOSA:

2    Q.  Now, do either of those sources or any other online sources

3    that you consult include definitions or explanations of slang

4    or colloquialism?

5    A.  Sometimes, yes.

6    Q.  Now, the Spanish language contains a large amount of slang

7    and colloquialisms, doesn't it?

8    A.  Yes; like any language.

9    Q.  And the language and the colloquialisms can vary between

10   different Spanish speaking countries?

11   A.  Yes.

12   Q.  And they can very differently?

13   A.  That's correct.

14   Q.  So sometimes a word in one country will mean something

15   entirely different in another country, right?

16   A.  That happens at times.

17   Q.  Now, when you are translating something that has been

18   transcribed from Spanish and contains slang and colloquialism,

19   do you endeavor to determine the country of origin of the

20   speakers?

21   A.  Sometimes I do.  I don't try to find out the speakers but

22   the accent gives me a clue.

23        I am very familiar with a lot of different, the

24   accents and the way of speaking from many different countries

25   so I can detect, a lot of times, where they're from and that

GB95flo3                        Alvarado - cross

1  helps me determine, at times, the most appropriate translation

2  for something.

3  Q.  And knowing someone's country of origin is as important

4  context when you are translating Spanish, correct?

5  A.  Not necessarily knowing their country of origin.  It is

6  just from the way that they speak I am able to tell.  In many

7  cases, not all.  In many cases I am able to tell where they

8  learned Spanish or where they have been living.  It doesn't

9  mean it is their country of origin.

10  Q.  Excuse me, Ms. Alvarado.  Would you mind pulling the

11  microphone down closer to you?

12  A.  Sorry.

13  Q.  Thank you.

14       Now, it is important for to you know the country of

15  origin of the speaker so you know what they mean by a certain

16  word used in the conversation, right?

17           MR. QUIGLEY:  Objection.

18           THE COURT:  Overruled.

19  A.  Not to know the country of origin, no, I don't agree with

20  that.

21  Q.  But, given that Spanish slang can vary dramatically between

22  different countries, isn't it important for you to know where

23  that person is from so that you know what they mean by that

24  word?

25  A.  It's a factor that is included but I don't need to know

1  their country of origin in order to know what the language of

2  others speaking from what country it is.

3  Q.  So, if you come across a Spanish language word that can

4  mean multiple different things, can you tell me how you

5  determine what the appropriate translation is in that context?

6  A.  It would be very specific to the word.  There is some slang

7  words that do mean different things in different places and

8  there is many others that are only used in one place or that

9  they're used the same way, so I would have to look at the

10  specific case.  It has a lot do with context and with the kind

11  of language that they are using.

12  Q.  Now, I think you said a bit on your direct examination that

13  when you are translating you have to make sure that the Spanish

14  is appropriately conveyed in the English, correct?

15  A.  Yes.

16  Q.  So you are not translating literally word-for-word the

17  Spanish to English, correct?

18  A.  The entire content is rendered into English but English has

19  a different sentence structure and so it has to be correct

20  usage and correct grammar in the English.  So, you have to

21  adapt to English but the content has to remain the same and be

22  reflected in English.  That's standard practice for a good

23  translation.

24  Q.  And sometimes in order to make sure that the content is

25  accurately reflected in English you need to use words in

GB95flo3                    Alvarado - cross

1    English that are not the literal translation of the word in

2    Spanish, right?

3    A.  I guess it depends on what you mean.  I'm not sure that I

4    understand what you mean.

5    Q.  So, let me give you an example.  In English it is a

6    colloquialism to say pulling someone's leg, right?

7    A.  Uh-huh.

8    Q.  If you were to translate that literally into Spanish using

9    the exact words in Spanish, that wouldn't really make sense,

10   would it?

11          MR. QUIGLEY:  Objection, your Honor.  She is talking

12   about Spanish-to-English and Ms. Espinosa is talking to

13   English-to-Spanish.

14          THE COURT:  Overruled.

15   A.  If it is an expression like the one you mentioned, yes,

16   when it wouldn't make sense in the other language then we use

17   something that means the same thing to convey that.

18   Q.  Does it use an equivalent phrase or something to that

19   effect?

20   A.  A phrase that means the same thing or express that meaning

21   in the way that you find most appropriate for that text.

22   Q.  Now, can I direct you to a specific example of a Spanish

23   slang term in these transcription and translation.

24          Mr. Calabrese, can we pull up Government Exhibit 201T

25   at page 7?

GB95flo3                     Alvarado - cross

1          Now, if you would look at you line 7 of this page you

2    will see the word *güeros* appears there?

3    A.  Yes.

4    Q.  Now, you translated that word as "Americans," correct?

5    A.  Yes.

6    Q.  But *güeros* doesn't literally mean Americans, does it?

7    A.  That's correct.

8    Q.  It is a Spanish colloquialism that is often used to refer

9    to people with light skin and light hair, right?

10   A.  Yes.

11   Q.  And not necessarily American people, right?

12   A.  That's correct.  In this particular case the context also

13   led me to that translation.

14   Q.  So, in this case it is because of the context, not because

15   of the literal meaning of the word?

16   A.  It is both.

17   Q.  Now, the word *güeros* is a common colloquialism in Mexico,

18   right?

19   A.  Yes.

20   Q.  Do you know if it is used in other areas of Latin America

21   as well to mean the same thing?

22   A.  I know it is used in others areas but with not the exact

23   same meaning.

24   Q.  So it has a number of meanings across Latin America?

25   A.  Yes.

1  Q.   Now, I would like to direct you to another example --

2  excuse me one moment.

3         MS. ESPINOSA:  One moment, your Honor?  I apologize.

4         (pause)

5  Q.   Page 4.

6         THE COURT:  201T page 4?

7         MS. ESPINOSA:  Yes.

8  Q.   If you look at line 9?

9  A.   Yes.

10  Q.   Now, in that line you translate the Spanish words:  *Hemos*

11  *trabajado... un con... un charma* as:  We've worked a con.

12         Is that right?

13  A.   Oh, yes.  I see that.

14  Q.   Now, the word *con* in Spanish doesn't mean a con in English,

15  does it?

16  A.   No.  This is the -- you are correct that in this particular

17  case there was an additional word that I left there, *con*.  It

18  is an error to have the word *con* there.

19  Q.   Okay.  One moment.

20  A.   It is the Spanish word that I made the mistake of not

21  deleting it from the English.

22         MS. ESPINOSA:  Thank you.

23         I have no further questions at this time.

24         THE COURT:  Mr. Jackson, anybody on your team?

25         MR. JACKSON:  Very briefly, your Honor.

GB95flo3                          Alvarado - cross

1                  THE COURT:  Sure.  Go ahead.

2                  Thank you, Ms. Espinosa.

3    CROSS EXAMINATION

4    BY MR. JACKSON:

5    Q.  Good morning, Ms. Alvarado.

6    A.  Good morning.

7    Q.  Now, Ms. Alvarado, one of the things that you described

8    about your process is you showed us the transcripts and the

9    translations that we looked at?

10   A.  Yes.

11   Q.  And on the left column you had the English translations,

12   right?

13   A.  Yes.

14   Q.  And then on the right column you have the transcription in

15   Spanish?

16   A.  Yes.

17   Q.  I'm curious as to why you felt it necessary to first

18   transcribe these conversations in Spanish?

19   A.  That's a very important part of the process because first

20   you have to be very sure of what the Spanish says before you

21   would even start translating them into English.

22   Q.  Well, I mean, you are an extremely sophisticated

23   translator, am I correct?

24   A.  Yes.

25   Q.  You have a lot of experience with translation?

GB95flo3                          Alvarado - cross

1    A.   Yes.

2    Q.   Even for you, as we learned, you sometimes make mistakes

3    but you try to get it very right, right?

4    A.   Yes.

5    Q.   And you -- I'm just asking why wouldn't you, with that

6    level of experience, just translate in real-time and write it

7    out in English?

8    A.   That's not recommended procedure in the interpreting

9    business.  That's -- if you read anything about this process

10   it's the one thing that is not recommended at all because they

11   are two very different and very complex tasks --

12   Q.   What do you mean by that?

13   A.   -- and they need to be done separately.

14   Q.   Can you explain why?

15   A.   Yes.

16        Because when you are listening to a recording you are

17   concentrating all of your energy and your mental capacity on

18   what you are hearing and writing it down and capturing that.

19   Translating is a completely different kind of task that

20   involves other processes.  So, you are not even -- when I am

21   translating into English I am not even listening to anything, I

22   am just going by what I wrote in the Spanish that then I do

23   check several times over and match up the English to.

24   Q.   Perhaps a translator who is more sophisticated than you

25   could translate, in real-time, and actually just write out

1   accurately, in English, what was being said in Spanish?

2   A.  It is not recommended.  I would be capable of doing it if I

3   wanted to, but it is not recommended because it can cause more

4   problems and it can cause more mistakes and it is just not

5   recommended, that that is a very widely accepted practice in

6   terms of transcribing and translating.  You shouldn't be doing

7   both things at the same time because it is not going to be as

8   good a quality.

9   Q.  I see.

10          And it's the case, isn't it, that when you are talking

11  about yourself, you are using sophisticated equipment that

12  allows you to slow down and stop and start, right?

13  A.  I don't know if I would call it sophisticated.

14  Q.  Sure.

15  A.  It is a little program that helps slow down the --

16  Q.  Is it a program, ma'am, that's called Start-Stop?

17  A.  It is called Express Scribe.

18  Q.  Express Scribe.

19          And so -- yes, but this is a program that allows you

20  to pause when you want to, right?

21  A.  Yes.

22  Q.  And you would pause and then you will transcribe some

23  things, right?

24  A.  Uh-huh.

25  Q.  And then you will -- is that a yes?  I'm sorry.

1    A.  Yes.

2    Q.  And then you will continue and do some more, right?

3    A.  Yes.

4    Q.  This is a task that would be a lot more complicated if you

5    didn't have the ability to stop and start using the program,

6    right?

7    A.  Well, you can't transcribe something if you are not able to

8    stop it whether it is with the program or not.

9    Q.  Well, you can't transcribe something accurately if you are

10   not able to stop the recording?

11   A.  Not me, because I'm not a trained stenographer.

12   Q.  I see.

13          So perhaps a trained stenographer could?

14   A.  Yeah.  I don't know how that process works.

15   Q.  I see.

16          MR. JACKSON:  Just one moment, your Honor?

17          (pause)

18   Q.  Now, one of the other things that you talked about,

19   Ms. Alvarado, is some of the things that you had to interpret

20   were based on your understanding of the context, right?

21   A.  That I had to translate, yes.

22   Q.  Right.

23          Just to be clear, no one briefed you on the overall

24   investigation in this case, right?

25   A.  No.  I mean the context of the tapes, there was a lot of

GB95flo3                    Alvarado - cross

1    hours of tapes.

2    Q.  Right, right, right.  But my only question is no one gave

3    you a briefing on the nature of the investigation, right?

4    A.  No.

5    Q.  And no one introduced you to any of the participants in

6    this, that were on the recordings?

7    A.  No.  I never met any of them.

8    Q.  In some situations when you are conducting a translation

9    and the transcription, you will actually meet with some of the

10   participants, right?

11   A.  Not in my experience.

12   Q.  That never occurs?

13   A.  I don't -- it hasn't occurred to me.

14   Q.  I see.  Okay.

15           So, but the point is, I guess, when you were talking

16   about context, you will acknowledge your understanding of the

17   context was limited to what you were able to glean just from

18   listening to the recordings, right?

19   A.  Yes, exactly; to the content of hours and hours of

20   recordings helped me understand what was being spoken about

21   besides hearing it, it confirmed.

22   Q.  Right, but that was the extent of your understanding of the

23   content?

24   A.  Yes, that's correct.

25   Q.  So it is possible, right, that there are additional things

GB95flo3                          Alvarado - cross

1    about the contacts that weren't shared with you that could have

2    impacted the way you may have translated certain things, right?

3    A.   That's possible.

4    Q.   Okay.

5         MR. JACKSON:  One more moment, your Honor?  One more

6    question.

7              (Counsel conferring)

8         MR. JACKSON:  I don't have any additional questions.

9    Thank you very much, Ms. Alvarado.

10             THE COURT:  Mr. Bove?

11             MR. BOVE:  No redirect, your Honor.  Thank you.

12             THE COURT:  Ms. Alvarado, thank you very much.

13             THE WITNESS:  Thank you.

14             MR. BOVE:  The government calls Henry Rugeles.

15             THE DEPUTY CLERK:  Sir, can you please state your full

16   name and spell your name for the record.

17             THE WITNESS:  Yes.  My name is Henry Rugeles.

18   R-U-G-E-L-E-S.

19             THE DEPUTY CLERK:  Raise your right hand, sir.

20    HENRY RUGELES,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23             THE COURT:  Please sit down, sir.  Come on up and make

24   yourself comfortable.

25             THE WITNESS:  Thank you, your Honor.  Good morning.

GB95flo3                    Rugeles – direct

1              THE COURT:  Good morning.  All set?

2              THE WITNESS:  Yes, sir.  Yes, your Honor.

3              THE COURT:  Mr. Bove, go ahead.

4              MR. BOVE:  Thank you, Judge.

5     DIRECT EXAMINATION

6     BY MR. BOVE:

7     Q.  What do you do for a living, sir?

8     A.  I'm a professional translator and interpreter.

9     Q.  Do you focus in your work on any particular languages?

10    A.  Yes, I do, sir.

11    Q.  Which languages?

12    A.  Spanish and English.

13    Q.  I would like to focus on your work as a translator.  When

14    did you start doing that?

15    A.  A little bit over 10 years ago.

16    Q.  And what types of things do you do as a translator?

17    A.  I translate many different kinds of documents from informal

18    slang field documents to books and contracts, any type of legal

19    documents.

20    Q.  Have you ever worked for defendants in criminal cases?

21    A.  Yes, I have.

22    Q.  What types of work did you do?

23    A.  Mainly attorney-client meetings.

24    Q.  And what did you do in those meetings?

25    A.  Interpret and translate between the attorney and the

GB95flo3                          Rugeles - direct

1    clients.

2    Q.   About how many times did you perform that type of service?

3    A.   Too many to remember.  I could say hundreds, maybe

4    thousands.

5    Q.   Have you taught any courses about translation?

6    A.   Yes, I have.

7    Q.   Where are some of the places that you taught?

8    A.   NYU, Rutgers, University, Brookdale College and University

9    of California at San Diego.

10   Q.   What types of classes did you teach at those institutions?

11   A.   Translation, introduction to translation, advanced

12   translation.

13   Q.   Where were you born, sir?

14   A.   I was born in Caracas, Venezuela.

15   Q.   How long did you live in Venezuela?

16   A.   22 years.

17   Q.   What was your primary language growing up?

18   A.   Spanish.

19   Q.   Did you go to school in Venezuela?

20   A.   Yes, I did.

21   Q.   How far in school did you go while you lived in Venezuela?

22   A.   I finished all my primary and secondary education and I had

23   two years of college.

24   Q.   And what language was spoken during those educational

25   experiences?

1    A.  Spanish.

2    Q.  Do you have any other education that is relevant to your

3    work as a translator?

4    A.  Yes, I do.

5    Q.  Please describe it.

6    A.  One of my bachelors is in Spanish, and I have a masters

7    degree in translation and interpretation of Spanish from

8    Rutgers University.

9    Q.  Are you familiar with the term "written source text" in

10   your field?

11   A.  Yes, I am.

12   Q.  What is a written source text?

13   A.  A written source text is the, we call it the departing

14   point of a translation.  It is pretty much the text that is

15   given to you in the original language or the source language

16   that is to be translated into the target language.

17   Q.  Is that a generally accepted practice among translators?

18   A.  Yes, it is.

19   Q.  Now, in your translation work, how do you go about

20   translating from the Spanish source text to the target

21   language?

22   A.  First, one has to read the source text fully in order to

23   understand the general idea used in the scope of the text and

24   then understand the main ideas and the subordinate ideas.  In

25   other words, you have to understand the text fully before you

GB95flo3                         Rugeles - direct

1    proceed to start transferring those ideas into the target

2    language which, in this case, would be English.

3    Q.  Now, in your translation work, do you ever come across

4    words in Spanish that you don't recognize?

5    A.  Yes.

6    Q.  And what are some of the things that you do when you

7    encounter a situation like that?

8    A.  I have to do research -- yes, research is basically what I

9    have to do.

10   Q.  What kind of research?

11   A.  Reference, books, dictionaries, the Internet are very

12   useful.  Sometimes colleagues, depending on the kind of word,

13   and sometimes native speakers of certain, specific areas where

14   they might use that word on a daily basis.

15   Q.  Is consulting those types of other sources a generally

16   accepted practice in your field?

17   A.  Yes, it is.

18   Q.  And since approximately 2007, about how many times have you

19   performed translations of Spanish language source text into

20   English?

21   A.  Too many to remember.  Probably hundreds, maybe thousands.

22          MR. BOVE:  Your Honor, the government offers

23   Mr. Rugeles as an expert in the field of Spanish-to-English

24   translation.

25          MS. ESPINOSA:  No objection.

GB95flo3                        Rugeles – direct

1              MR. JACKSON:  No objection.

2              THE COURT:  He is recognized as an expert.

3    BY MR. BOVE:

4    Q.  Now, in this case have you been involved in translating

5    Spanish-based source text into English?

6    A.  Yes, I have.

7    Q.  Do you expect to be paid for that work?

8    A.  Yes.  Yes, I do.

9    Q.  Approximately how much?

10   A.  Around $20,000.

11             MR. BOVE:  May I approach, your Honor?

12             THE COURT:  Yes, you may.

13   Q.  I am showing you what's been marked for identification as

14   Government's Exhibits 300T through 310T, 403T through 409T,

15   416T, 417T, 502T through 518T, and 3508-38-T.

16             Could you please take a look at those?

17   A.  Yes.

18   Q.  Do you recognize those documents?

19   A.  Yes, I do.

20   Q.  What are they?

21   A.  These are transcriptions and some of them contain

22   photographs.

23   Q.  So they're transcriptions of Spanish source texts?

24   A.  Yes; and translation of those.

25   Q.  Who prepared the translations?

GB95flo3                          Rugeles - direct

1    A.  I did.

2    Q.  How do you recognize them?

3    A.  I have, besides the fact that I worked on them, I checked

4    them and I put my initials on them.

5    Q.  Now, in creating the translations that are set forth in

6    those documents, did you deviate at all from the general

7    practices that you described earlier?

8    A.  No.  Not at all.

9    Q.  And, to the extent that there are translations set forth in

10   those documents, are they fair and accurate translations of the

11   Spanish language source text that you were provided?

12   A.  Yes, they are, to the best of my ability and knowledge.

13            MR. BOVE:  Your Honor, the government offers the

14   exhibits that I described when I brought them up to the witness

15   stand.

16            MR. JACKSON:  No objection.

17            MS. ESPINOSA:  No objection.

18            THE COURT:  Okay.  They're received in evidence.

19            (Government's Exhibits 300T through 310T, 403T through

20   409T, 416T, 417T, 502T through 518T, and 3508-38-T received in

21   evidence)

22   BY MR. BOVE:

23   Q.  Mr. Calabrese, can we take a look at 300-T, please?

24            Mr. Rugeles, is this one of the documents that

25   contains a translation that you prepared?

GB95flo3                        Rugeles - cross

1    A.  Yes, it is.

2    Q.  Did you provide any of the information that is listed on

3    page 1?

4    A.  Yes, I did.

5    Q.  Is that just your initials?

6    A.  Yes, they are.

7    Q.  Let's take a look at the next page.  Where in this document

8    is the Spanish language source text?

9    A.  It is located in the column on the far right.

10   Q.  And then what is the column to the left of that?

11   A.  It's the English translation.

12   Q.  And so, to the extent that there is English in that field

13   in the documents that you testified about, that's English that

14   you prepared?

15   A.  Yes, it is.

16             MR. BOVE:  Nothing further, your Honor.

17             MS. ESPINOSA:  Your Honor, may I inquire?

18             THE COURT:  Yes, you may, Ms. Espinosa.

19   CROSS EXAMINATION

20   BY MS. ESPINOSA:

21   Q.  Good morning, Mr. Rugeles.

22   A.  Good morning, counsel.

23   Q.  Now, you -- your contribution to this -- sorry.  Withdrawn.

24             Your work on this case was limited to the translation

25   of these text messages; is that correct?

GB95flo3                         Rugeles - cross

1  A.  Yes, it is.  It was, yes.  It has been.

2  Q.  Now, did you do original translation of these text messages

3  or were you provided with draft translation?

4  A.  I was provided with a draft.

5  Q.  So, you reviewed that draft and made changes as you saw

6  fit?

7  A.  Yes.  Anything, though that I didn't agree with would be --

8  I would totally erase it and rewrite it.

9  Q.  And approximately how many hours would you say you spent

10 working on these text messages?

11 A.  A lot of hours.  I -- it is hard to tell.  A hundred, maybe

12 200 hours.

13 Q.  Now, in Spanish the same word can mean different things in

14 different countries, correct?

15 A.  Yes.  In Spanish and in any other language.

16 Q.  And so, an example in Spanish is the word *ahora* can mean

17 "now" in Mexico but "later" in the Dominican Republic, for

18 example?

19 A.  Yes.  That is correct.

20 Q.  So when you are translating from Spanish-to-English and

21 also when you translating from Spanish-to-English, you can't

22 necessarily literally translate word to word, right?

23 A.  Exactly.  That can't -- and not only from Spanish into

24 English but into -- you cannot do that from one language to the

25 next.  You can put it any language and that can't be done.

1    Q.  Because it wouldn't necessarily make any sense if you

2    translated it literally word for word, right?

3    A.  Because languages handle ideas in different ways and they

4    use different words and they use different, depending on the

5    context.  So, word for word is -- it depends.  Sometimes you

6    might run into a situation like when you say *buenos dias* in

7    Spanish, in English you can say "good morning" but you would

8    have to say literally in English "goods days" because that's

9    the way Spanish would put it.  Even a phrase like that would

10   need a little change.

11   Q.  Okay.

12            Now chats and text messages, in particular, are often

13   full of colloquialisms, slang, abbreviations, inside jokes,

14   typos and things of that nature, right?

15   A.  Yes, they are.

16   Q.  And all of those things can make it difficult to understand

17   what the person who sent the message was trying to say, right?

18   A.  Sometimes.

19   Q.  In those cases you need to review it multiple times to try

20   to figure out what they were saying?

21   A.  Yes.

22   Q.  Now, were you aware that many of the people who were

23   communicating in the text messages that you translated were

24   Venezuelan?

25   A.  Yes.

GB95flo3                              Rugeles - cross

1    Q.  How did you learn that?

2    A.  I -- two things.  Number one, because I knew about the case

3    from the media but, number two, because the speech patterns

4    were very similar to what I am used to, the way I used to talk

5    when I was in Venezuela and when I talk to Venezuelans.

6    Q.  So, it is fair to say you are very familiar with Venezuelan

7    slang and colloquialism and speech pattern?

8    A.  Yes, I am.  My native language, my native country.

9    Q.  You said that you knew about this case from the media.

10   Were you given any other information about this case from the

11   prosecutors or anyone else?

12   A.  None at all.

13   Q.  They didn't give you any context about it at all?

14   A.  Not at all.

15   Q.  Did you meet with any of the participants in any of these

16   chat conversations to discuss them?

17   A.  Not at all.

18   Q.  Did you consult with anyone about the translations of the

19   text messages?

20   A.  Not at all.

21   Q.  Now, are you aware that at least one of the participants in

22   these chat translations was of Mexican origin?

23   A.  Yes.  I had a suspicion that one of them was Mexican for

24   two reasons:  The words they used were pretty much curse words

25   in Mexico that are unique to that country, and also because

GB95flo3                         Rugeles - cross

1    they did mention welcome to Mexico, you can come to Mexico.  So

2    I got that information strictly from the texts.

3    Q.  Now, when you are translating from Spanish-to-English it is

4    your goal to make sure that the English translation accurately

5    reflects the intent of the speaker, right?

6    A.  Yes.  Of course.

7    Q.  So, you use your judgment to determine what the speaker

8    intended to convey in Spanish, right?

9    A.  Judgment and expertise.

10   Q.  Now, I want to direct you to an example in Exhibit 403-T at

11   page 3, if you don't mind, Mr. Calabrese.

12         Now, if you look at the second line of this chat

13   conversation it says, *que hom mi ray*, right?

14   A.  Yes.

15   Q.  In Spanish?

16   A.  Yes.

17   Q.  And you translated that as:  What's going on my man; right?

18   A.  Yes.

19   Q.  Now,the words *mi rey* don't literally mean "my man," right?

20   A.  No, they mean "my king".

21   Q.  But you want to translate them literally into English

22   because that wouldn't make sense in English?

23   A.  It wouldn't make sense and it would sound really awkward.

24   Q.  Right.

25         And could I direct you to another example in Exhibit

GB95flo3                         Rugeles – cross

1    408-T, please, Mr. Calabrese, at page 4?

2           Now, in the final line of this one it says, in

3    Spanish: *Mijo ya ando pendiente de todo eso*, and you

4    translated *mijo* as buddy, right?

5    A.  Yes.

6    Q.  *Mijo* is a contraction of the words *mi hijo*, right?

7    A.  Yes; my son.

8    Q.  And that's another example of where you wouldn't translate

9    it literally because it wouldn't make sense in English, right?

10   A.  Correct.  And sometimes like in Venezuela we say *mijo* the

11   same way somebody would say dude.

12   Q.  Right.

13          Now, I want to direct you to a third example in

14   Exhibit 405T at page 7, please, Mr. Calabrese.

15          Now, here you translate the word *marico* as an

16   offensive slur for gay people, right?

17   A.  Yes.

18   Q.  In about two thirds of the way down the page?

19   A.  Yeah, I am looking for it.

20   Q.  Right above one of the emoticons?

21   A.  Oh.  Yeah.

22   Q.  Now, that word is used colloquially in Venezuela to mean

23   dude between friends, right?

24   A.  Nope.

25   Q.  No?

GB95flo3                    Rugeles - cross

1    A.  I mean it could be used colloquially but it means -- it is

2    the offensive word in Spanish.

3    Q.  Right, but I am not referring to its literal translation, I

4    am referring to its colloquial usage.  Are you familiar with

5    the fact that this word is used colloquially in Venezuela to

6    mean dude?

7    A.  Yes, but it is still a bad word that means, it is an

8    expletive to homosexuals so it is both.  It is -- it is

9    equivalent to somebody speaking English and calling a --

10   Q.  We understand that it is a slur.

11              MR. BOVE:  I ask that he be allowed to finish the

12   answer.

13              THE COURT:  Do you have something else to say?

14              MS. ESPINOSA:  I apologize.

15              THE WITNESS:  Yes, your Honor, I do.

16              It is like -- I will given an example.  Like when guys

17   talk to each other and say Mo Fo, you know the whole

18   expression.  Even though it is a term of endearment in that

19   sense, it still means Mo Fo.  It doesn't change the offensive

20   term.  And, in Spanish, when you use the word *marico*, that's a

21   word you use for somebody, for a gay person and, but you use it

22   like that either to offend, to insult somebody, or you use it

23   between friends.

24              MS. ESPINOSA:  One moment, your Honor?

25              (pause)

GB95flo3                          Rugeles - cross

1   Q.  Now, in a couple of places you didn't translate some of the

2   words that appeared in Spanish into English, right?

3           Oh, sorry.  Mr. Calabrese, you can take this one down?

4   Thank you.

5           THE COURT:  What are you referring to, Ms. Espinosa?

6           MS. ESPINOSA:  Sorry.

7   Q.  In certain portions of the transcripts there are words that

8   appear in the Spanish text that you left in Spanish in the

9   English translation, right?

10  A.  Yes.

11  Q.  Can I direct you to an example in Exhibit 504-T at page 2,

12  please?  Now here, in the second line, you didn't translate the

13  word *primo*, you left it primo in the English?

14  A.  Yes.

15          THE COURT:  Excuse me, Ms. Espinosa.  What page?

16          MS. ESPINOSA:  Page 2, your Honor.

17          THE COURT:  Thank you.

18  Q.  *Primo* means cousin in Spanish, right?

19  A.  Yes, it does.

20  Q.  And is there a reason you decided to leave that one in

21  English here or -- sorry, I apologize -- in Spanish here in the

22  English translation?

23  A.  Yes.  Sometimes he gave me the impression -- I have to make

24  a decision how I was going to handle that word.  Sometimes it

25  seemed that they were talking about a person that they were

GB95flo3                          Rugeles - cross

referred to as primo the same way they refer to other persons,

they talk about other people with other nicknames and I would

transfer the nickname into English without -- I mean, I would

transfer it into the English portion and leave it in the

Spanish.  So, sometimes the context seemed to talk about a

cousin in general and sometimes the contacts seemed to talk

about somebody whose nickname was Primo or they're referred to

as Primo.  So, I chose the second part.

Q.  So you're assuming, based on the context, that it was a

nickname?

A.  It is not an assumption, it's an educated decision.

Sometimes the translator has to make those decisions.  The

other way I could do it is put a slash and Primo or cousin and

that's not -- that's not appropriate in this context.

Q.  But you don't know for sure that it was a nickname and not

referring to a cousin, right?

A.  Exactly.

Q.  Okay.  You can take this one down.

        I just want to return to a minute for the translation

of the word *marico*?

A.  Yes.

Q.  Now in the draft translations that you received it wasn't

translated as a slur, was it?

A.  A what?

        THE COURT:  It wasn't translated as a slur.

GB95flo3                        Rugeles – cross

1    A.  No.

2    Q.  And you changed the translation to a slur, right?

3    A.  Yes.

4    Q.  And you did that despite the context of the messages and

5    the colloquial use of the word?

6    A.  Yes, because that's what the word means and that's how they

7    were using it.

8    Q.  Okay.

9            MS. ESPINOSA:  I have no further questions right now.

10           THE COURT:  Anything further, Mr. Jackson?

11           MR. JACKSON:  Just really brief.

12   CROSS EXAMINATION

13   BY MR. JACKSON:

14   Q.  Hello, sir.  How are you?

15   A.  How are you, sir.

16   Q.  I just wanted to ask you, throughout the course of

17   reviewing these messages, is this the only -- these are the

18   only messages that you were asked -- text messages that you

19   were asked to translate by the government?

20   A.  When you say these, you are referring about the ones you

21   showed me?

22   Q.  The ones admitted in evidence.

23   A.  If I remember correctly, I interpreted a lot of material

24   and -- I translated, correct -- I translated a lot of material

25   and then probably some of that material was narrowed down to

GB95flo3                        Rugeles - cross

1    some specific documents.  But, everything was my work and I

2    revised the specific documents and I put my initials on those

3    just to make sure.

4    Q.  The only question I am asking you is besides these --

5    A.  Sorry.

6    Q.  -- specific conversations, were there any other text

7    messages that you were asked to translate?

8    A.  Yes.

9    Q.  So there were some others?

10   A.  Yeah.

11        MR. JACKSON:  Okay.  I don't have any further

12   questions.  Thank you, your Honor.

13        THE COURT:  Mr. Quigley or Mr. Bove?

14        MR. BOVE:  Nothing further, your Honor.  Thank you.

15        THE COURT:  Thank you.

16        You may step down.

17        MR. QUIGLEY:  Your Honor, the government calls Daniel

18   Mahoney.  May we use the easel with this witness?

19        THE COURT:  Yes.

20        THE DEPUTY CLERK:  Sir, can you please state your full

21   name and spell your full name for the record?

22        THE WITNESS:  Daniel Mahoney.  Last name

23   M-A-H-O-N-E-Y.

24    DANIEL MAHONEY,

25        called as a witness by the Government,

GB95flo3                              D. Mahoney – direct

1              having been duly sworn, testified as follows:

2                   THE COURT:  Mr. Mahoney, come on up and sit down.

3                   All set to go, Mr. Quigley.

4                   MR. QUIGLEY:  Yes, your Honor.

5                   THE COURT:  All right.  Go ahead.

6    DIRECT EXAMINATION

7    BY MR. QUIGLEY:

8    Q.   Good afternoon, sir.  Where do you work?

9    A.   I work for the United States Drug Enforcement

10   Administration.

11   Q.   What is your title with DEA?

12   A.   Special agent.

13   Q.   And other than testifying today and preparing for your

14   testimony, have you had any involvement in this investigation?

15   A.   I have not.

16   Q.   How long have you been with the DEA?

17   A.   Just over 24 years.

18   Q.   And where were you first assigned after you completed the

19   DEA academy?

20   A.   I was assigned to the Miami field division in Miami,

21   Florida.

22   Q.   How long did you spend in Miami?

23   A.   Over seven and a half years.

24   Q.   What kinds of cases did you investigate when you were in

25   Miami?

GB95flo3                              D. Mahoney – direct

1   A.  I was investigating complex international investigations as

2   well as lower level, local impact cases.

3   Q.  And what were some of the investigative techniques you used

4   in those cases, all the cases that you did in Miami?

5   A.  We used undercover officers and agents.  We used

6   confidential informants, confidential sources, cooperating

7   defendants, and we also used surveillance, both physical

8   surveillance following people, and electronic surveillance

9   where we would tap people's communications, telephones and

10  such, with the Court's permission.

11  Q.  And, approximately how many investigations were you

12  involved in during your time in Miami?

13  A.  That would be in excess of a thousand investigations for

14  sure.

15  Q.  What was the primary drug that was being investigated in

16  these cases?

17  A.  As this was the mid–1990s it was cocaine that was entering

18  through South Florida.

19          MR. QUIGLEY:  Your Honor, if we could publish a blowup

20  of Government Exhibit 21 on the easel?

21          THE COURT:  Yes.

22  Q.  Agent Mahoney, in the '90s in Miami, how was this cocaine

23  getting to South Florida?

24  A.  The cocaine was originating from Colombia, which is just at

25  the tip of South America there, where it joins Central America,

GB95flo3                          D. Mahoney - direct

1   and it was flying up through the Caribbean through the islands

2   of the Dominican Republic, Haiti, getting to the Bahamas, where

3   it would them try to make its last entrance into the United

4   States into South Florida.

5   Q.  Can you use the laser pointer to point out where Colombia

6   is on the map?

7   A.  Sure.  Right there.

8   Q.  Can you indicate where Miami is on the map?

9           When did you leave Miami?

10  A.  I left Miami in 2002.

11  Q.  And after you left Miami, where were you assigned?

12  A.  I was assigned to the U.S. Embassy in San Jose, Costa Rica.

13  Q.  Can you indicate on the map roughly where Costa Rica is?

14  A.  So, above Colombia you have got the next country -- the

15  first country in Central America is Panama and just above

16  Panama is Costa Rica.

17  Q.  How long were you assigned -- strike that.  One second.

18          What, if any language training, did you receive before

19  you went to Costa Rica?

20  A.  Prior to going to Costa Rica I was sent to a six-month

21  one-on-one language training program in Washington, D.C.

22  Q.  And what language was that in?

23  A.  Spanish.

24  Q.  And how long were you assigned to Costa Rica?

25  A.  Six and a half years.

GB95flo3                          D. Mahoney - direct

1   Q.  As a DEA agent assigned to a foreign country like Costa

2   Rica, how did your duties compare to a domestic assignment like

3   Miami?

4   A.  As a special agent assigned overseas we do not have law

5   enforcement authority in the foreign country, so our position

6   is more of a liaison function; we exchange information with the

7   host nation -- in this case Costa Rica -- with their law

8   enforcement personnel, exchanging information that we have

9   about narcotics trafficking, and then also sharing information

10  that they received about narcotics trafficking and sending it

11  back to the United States.

12  Q.  Were you able to meet with or debrief informants during

13  your time at Costa Rica?

14  A.  Yes.

15  Q.  And what, if any authorization, did you need to conduct

16  other activities in Costa Rica, like surveillance?

17  A.  With the ambassador's permission we are allowed to

18  accompany our host nation law enforcement authorities -- their

19  version of DEA and FBI -- in conducting surveillance, assisting

20  them with wiretap investigations, and being present when

21  narcotics were seized.

22  Q.  And approximately how many investigations were you involved

23  in during your six years in Costa Rica or during the time you

24  were in Costa Rica?

25  A.  Would be thousands of investigations.

GB95flo3                         D. Mahoney - direct

1   Q.  Is your goal as a DEA agent to seize narcotics?

2   A.  It is one of the things we try to do but, most importantly,

3   we just try to disrupt and dismantle drug trafficking

4   organizations.

5   Q.  And how do you do that?

6   A.  We do that through our investigations, and ultimately

7   seizing drugs or conducting arrests.

8   Q.  Would you consider an investigation a failure because no

9   drugs were seized?

10          MR. JACKSON:  Your Honor, objection.  This is outside

11  the scope.

12          THE COURT:  It is getting pretty far away from where

13  we want to be, Mr. Quigley.  Objection sustained.

14  BY MR. QUIGLEY:

15  Q.  What type of drug was most commonly at issue in the

16  investigations you were involved in in Costa Rica?

17  A.  Cocaine.

18  Q.  How did the quantity of cocaine involved in those

19  investigations compare to the drug quantities you saw while in

20  Miami?

21  A.  During the Miami years we would often see dozens of

22  kilos -- kilograms of cocaine, up to hundreds, and up to a

23  thousand.  However, in Costa Rica we were assisting in the

24  seizure of 15,000 to 30,000 kilograms of cocaine every year.

25  Q.  When did you leave Costa Rica?

GB95flo3                          D. Mahoney - direct

1    A.  I left in 2008.

2    Q.  Where did you go after that?

3    A.  I went to our special operations division in Washington,

4    D.C.

5    Q.  And how long were you there?

6    A.  For two years.

7    Q.  Where did you go next?

8    A.  I was promoted to a supervisory special agent position and

9    reassigned to Panama City, Panama.

10   Q.  Can you indicate where Panama City is on the map?

11   A.  Panama is just above Colombia, right there.  It is the

12   sideways country.

13   Q.  How long were you in Panama for?

14   A.  Four years.

15   Q.  What was your role there?

16   A.  My role was the country attache so in addition to

17   supervising approximately 19 DEA personnel on a daily basis on

18   our operations, I was also the ambassador's advisor on all

19   narcotics and narcotics-related money laundering issues.

20   Q.  What were some of the investigative techniques that were

21   used in the cases you supervised in Panama?

22   A.  Very similar.  There were undercover operations, there were

23   wire intercept investigations, and then also the use of

24   cooperating defendants, confidential informants, confidential

25   sources.

GB95flo3                          D. Mahoney - direct

1   Q.  What was the drug most commonly -- the most common drug you

2   saw in these investigations in Panama?

3   A.  Again, cocaine.

4   Q.  How did the quantities at issue in Panama compare to the

5   quantities you saw in your prior investigations?

6           MR. JACKSON:  Your Honor, we stipulate to this

7   witness' qualification.

8           THE COURT:  You can answer the question.

9   BY MR. QUIGLEY:

10  Q.  How did the quantities compare to the quantities at issue

11  in -- how did the quantities of cocaine at issue in the

12  investigations you were involved in in Panama compare to those

13  in Costa Rica and Miami?

14  A.  As we were closer to the country of Colombia, which was the

15  origin of the cocaine, the amounts were even more staggering.

16  They ranged from 30,000 to 50,000, 60,000 kilograms of cocaine

17  were seized every year in Panama.

18          MR. QUIGLEY:  Your Honor, just one more question in

19  light of the stipulations.

20  Q.  Sir, since Panama, have you spent additional time in Latin

21  America?

22  A.  Yes.  I was recently reassigned to our office in Bogota,

23  Colombia.

24          MR. QUIGLEY:  Your Honor, I would move to qualify

25  Agent Mahoney on drug trafficking routes, particularly the

GB95flo3                          D. Mahoney - direct

1    routes used to move cocaine from South and Latin America, the

2    ways, manor, means and method of trafficking along those routes

3    and the prices of cocaine along those routes.

4              THE COURT:  Any objection?

5              MR. JACKSON:  We have no objection, your Honor.

6              MR. RODY:  No, your Honor.

7              THE COURT:  Agent Mahoney is recognized as an expert.

8    BY MR. QUIGLEY:

9    Q.  Agent Mahoney, where is cocaine produced?

10   A.  In Colombia, and also in Peru and Bolivia.

11   Q.  And, roughly, how much cocaine is produced in Colombia

12   annually?

13   A.  It is an unknown definitive number because it is an illegal

14   product.  It is not a widget that can be quantified in

15   production in a factory, but it is estimated between 500 and

16   700 tons of cocaine every year.

17   Q.  What country in the world consumes the most cocaine?

18   A.  Unfortunately, it is the United States.

19   Q.  And is cocaine typically sent directly from Colombia to the

20   United States?

21   A.  No.

22   Q.  Why not?

23   A.  That's because of the -- it is well known in the law

24   enforcement community that cocaine originates from Colombia, so

25   any cargo or aircraft that is arriving from Colombia gets a

GB95flo3                              D. Mahoney - direct

1   higher level of scrutiny by customs and border patrol.

2   Q.  Going back to the '90s, what was the primary area that

3   cocaine was getting from Colombia to the U.S.?

4   A.  It was traveling by air and sea up through the Caribbean

5   routes into South Florida.

6   Q.  And did there come a time when there was a shift in the

7   primary way that cocaine was getting to the U.S.?

8   A.  Yes.

9   Q.  And roughly how did -- sorry.  How did that change?

10  A.  It was the late 1990s, early 2000s that cocaine started

11  shifting to using a Central American corridor to reach the

12  United States.

13  Q.  Can you just, roughly, point out on Government Exhibit 21

14  what you mean by the Central American corridor?

15  A.  Okay.  Basically traveling through Central America and

16  along its shores up into Mexico into the United States.

17  Q.  And what were some of the reasons for the shift in the

18  route?

19  A.  In the late 1990s, 1997, the government of Colombia decided

20  to allow extradition of its own citizens to the United States

21  for prosecution.  That's not very normal that countries will

22  give up their own citizens for prosecution.  So, Colombian drug

23  trafficking organizations were trying to recede from their role

24  in getting the cocaine to the United States.  At the same time,

25  in or around 1994, the North American Free Trade Agreement was

GB95flo3                          D. Mahoney - direct

1    signed which opened up our southern borders to facilitate the

2    flow of commerce, trucks and such received less scrutiny at

3    that time.  And along that time Mexican drug traffickers and

4    criminals decided they would like the opportunity to make

5    profit on the movement of cocaine into the United States.

6    Q.  Now, has that Central American route continued to be used

7    up until the present time?

8    A.  Yes.

9    Q.  Does it remain the primary way that cocaine gets to the

10   United States?

11   A.  Yes.

12   Q.  Based on your experience, is the fact that cocaine along

13   this route is headed to the United States something that is

14   generally known among traffickers in the region?

15   A.  Yes.

16   Q.  And, based on your experience, would cocaine typically be

17   taken to Europe, Australia or Asia via the Central American

18   route?

19   A.  No.  It would be very unusual.

20   Q.  During your years in Panama and Costa Rica, how many times

21   did you come across cocaine that was headed to Europe?

22   A.  Of the thousands of cases there was one occasion.

23   Q.  And, generally, how was cocaine taken from South America to

24   Europe?

25   A.  It generally goes by cargo.  It is a lot longer distance

1   and harder to get there so it is mainly moved by cargo or

2   commercial aircraft.

3   Q.   Which direction would that be on the map?

4   A.   That would be an easterly route through the Caribbean

5   heading towards Europe.

6   Q.   So, basically to the right of the map -- to the right on

7   the map?

8   A.   That's correct.

9   Q.   Now, focusing on the Central American route, roughly how

10  much of the cocaine sent along that route is destined for the

11  United States?

12  A.   Approximately 90 percent.

13  Q.   Why is it not sold in other countries along the route?

14  A.   Because of the price of cocaine those are poorer nations,

15  there is less disposable income, if you will, and the local

16  population can't afford to purchase the cocaine at those

17  prices, and those that are trafficking the cocaine will realize

18  a much higher profit if the cocaine reaches the United States.

19  Q.   How is the cocaine generally packaged as it travels along

20  this route?

21  A.   They're packaged in kilogram-sized packages which is

22  basically a flat brick, if you will.

23  Q.   What happens to the price -- you alluded to this earlier.

24  What happens to the price of cocaine if it moves further north

25  along the route?

GB95flo3                         D. Mahoney – direct

1   A.   It increases.

2   Q.   So, how much would cocaine sell for in Honduras or

3   Guatemala?

4   A.   Approximately $10,000 to $12,000 per kilogram of cocaine.

5   Q.   What about, say, in the United States?

6          MR. RODY:  Your Honor, can we get a time period for

7   these estimates?

8          MR. QUIGLEY:  I can fix that, your Honor.

9   Q.   Throughout your experience in Latin America, have these

10  prices remained relatively steady?

11  A.   Yes.

12  Q.   How much would a kilogram of cocaine sell for in the United

13  States?

14  A.   That varies based on different factors, but approximately

15  $25,000 per kilogram.  It could be $20,000, it could be $30,000

16  depending on factors.

17         THE COURT:  So, a kilo in Honduras would be 10 to 12

18  and the price in the United States would be 25 to 30?

19         THE WITNESS:  Yes, your Honor.

20  Q.   Focusing on the area around Costa Rica and Panama, is it

21  rare to come across an 800 to 1,000 kilogram load in that part

22  of the world?

23  A.   No.  It is quite common.

24  Q.   What are some of the different ways that cocaine is moved

25  along this route?

GB95flo3                           D. Mahoney - direct

A.  The principal route, approximately 80 percent of the

cocaine moves through maritime routes; that can be commercial

fishing vessels and quite commonly what we refer to as go-fast

vessels that are small water craft about 35 feet in length with

multiple engines on the back.

Q.  What are some of the other techniques that are used?

A.  It can also move through cargo, through containers, or

through air using light aircraft.

Q.  You mentioned maritime routes.  What are some of the

relative advantages and disadvantages using a maritime route to

move cocaine north?

A.  Maritime routes, an advantage for the traffickers as you

can see, it is a very big ocean out there and it is very

difficult to detect these boats as they move along and even

more difficult when you consider we have very few law

enforcement or naval assets to interdict go-fast vessels or any

vessel on the sea.  A disadvantage is that generally these

go-fast vessels will travel in the nighttime hours and when

they're traveling at a high rate of speed, they create a wake

behind them and there are maritime patrol aircraft, both the

United States and the countries in the area, that fly in these

areas trying to see, looking for those wakes.  And if they

detect the wake they can then vector in on the surface which

would be ships, navy ships to interdict them.

Q.  What would be some of the advantages or disadvantages of

GB95flo3                           D. Mahoney – direct

1    moving cocaine along via aircraft?

2    A.  Via aircraft?  It -- is a disadvantage for traffickers

3    would be that all these countries have radar so aircraft are

4    detected by radar, so therefore they're being seen.  Now, if

5    they are conducting a drug movement and going, you would say,

6    covert, where they turn off their transponder or they're not

7    flying on a flight plan, that attracts the attention of law

8    enforcement and civil aviation authorities.

9            An advantage would be the speed and ease of movement

10   and the difficulty for law enforcement to interdict aircraft.

11           THE COURT:  Mr. Quigley, would this be a convenient

12   place?

13           MR. QUIGLEY:  Yes, your Honor.

14           THE COURT:  We will take our lunch break now.  We will

15   resume at 2:00.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

GB95flo3                              D. Mahoney - direct

1                    (Jury not present)

2                    THE COURT:  Thanks, Agent.

3                    THE WITNESS:  Thank you.

4                    THE COURT:  See you at 2:00.

5                    Anything to take up?  See you at 2:00.

6                    (Luncheon recess)

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB99FLO4

                        AFFERNOON SESSION

1                        AFTERNOON SESSION

2                          2:02 p.m.

3         (Trial resumed; jury not present)

4         THE COURT:  Mr. Rody, you want to put something on the

5  record?

6         MR. RODY:  I would, Judge.

7         THE COURT:  Do you want to do it here, in open court?

8         MR. RODY:  I want to do it at the sidebar, Judge.

9         THE COURT:  Okay.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB99FLO4

1              (At the sidebar)

2              MR. RODY:  I don't think this is a big deal at all.  I

3    just wanted to advise you that over the lunch break I ran into,

4    I believe it's juror number two.

5              THE COURT:  Mr. Rojas.

6              MR. RODY:  I think so.  In the bathroom on the 15th

7    floor.  I didn't realize it was him.  I don't think he realized

8    it was me.  I was washing my hands next to him.  We both looked

9    at each other and then sort of looked away.

10             THE COURT:  You didn't talk to him?

11             MR. RODY:  I did not talk to him.

12             He said sorry to me because he was trying to throw out

13   his paper towel and I was in the way of the trash can or

14   something.  He went out.  And I waited.  And he went away.  And

15   I went down.  That's it.

16             THE COURT:  Should I say anything to Mr. Rojas?

17             MR. RODY:  I don't think so.  I told the government.

18   I want to put it on the record.

19             MR. QUIGLEY:  That's fine with us, your Honor.

20             THE COURT:  Thank you very much.  I appreciate it.

21             (Continued on next page)

22

23

24

25

1              (In open court)

2              (Jury present)

3        DANIEL MAHONEY, resumed.

4              THE COURT:  All right, Mr. Quigley.

5              MR. QUIGLEY:  Thank you, your Honor.

6    DIRECT EXAMINATION CONTINUED

7    BY MR. QUIGLEY:

8    Q.  Agent Mahoney, before lunch we were talking about some of

9    the advantages disadvantages of getting cocaine out of South

10   America via aircraft.  Do you recall that?

11   A.  Yes, sir.

12   Q.  What were some of the relative advantages and

13   disadvantages?

14   A.  The advantages being the speed that cocaine could be

15   transported from down south up north.  And disadvantages are

16   the ability to be detected by radar anywhere that you're flying

17   when you're flying through radar-covered areas such as southern

18   countries.

19   Q.  How have you, in your experience with drug traffickers,

20   dealt with the challenges inherent in radar detection in this

21   part of the world?

22   A.  They seek to avoid the radar coverage.

23   Q.  How so?

24   A.  For example, with Colombia they have a robust radar program

25   throughout their country and that extends to a territory that

belongs to Colombia.  It's up off the Nicaragua coast.  It's an

island called San Andrés.  That creates their air -- their air

space, if you will.

Q.  Where do those planes generally leave from to avoid that

air space?

A.  If they were coming from the Colombia area, they tend to

depart from the Apuerre area of Venezuela and fly north and

around the Colombian radar coverage into Central America;

mainly Honduras or Guatemala.

Q.  Can you indicate on the map where the Apuerre area of

Venezuela is.

A.  Sure.  It's mainly that flat area along the border of

Colombia and Venezuela, goes side to side.

Q.  Where is Honduras on the map?

A.  It's a country in Central America that kind of forms a

little shelf right up there.

Q.  What are some of the advantages of flying cocaine into

Honduras?

A.  The areas that they use, Gracias a Dios area, is less

populated, it's more farm or jungle area that has less of a

government control and presence.

Q.  What about the geographic location of Honduras in relation

to countries further south?

A.  By transporting cocaine to this area you are foregoing all

the lower countries in the Central America isthmus.  By doing

GB99FLO4                      Mahoney – direct

so you're avoiding many border checkpoints that are show points

that the traffickers would have to cross with their illegal

drugs.  When they get to Honduras or Guatemala there is a vast

road network with hundreds of border crossings.  And to go

through a checkpoint is largely voluntarily.  So they could

easily avoid it.

Q.  One last question on Colombia.  Are you familiar with an

organization called the FARC?

A.  I am.

Q.  What is the FARC?

A.  It's the Fuerzas Armadas Revolucionarias de Colombia.  It's

the revolutionary armed forces of Colombia.

Q.  Is that a paramilitary organization?

A.  Yes, a gorilla organization that is in conflict with the

government of Colombia for over 50 years now.

Q.  You mentioned flight paths as one way to avoid detection by

radar.  What are some of the other ways that aircraft flying

drugs along this route have sought to avoid detection?

A.  Oftentimes they will modify their aircraft install extra

fuel bladders so they can go longer distances.  They will also

modify an aircraft to turn off the transponders that all

aircraft have so that they are not transmitting a signal to

civil aviation authorities to let them know where they are.

Q.  Do these planes typically file flight plans?

A.  Not usually.  They fly dark, if you will.  Covertly.  Or

1    they may file a flight plan just -- and continue on that flight

2    plan until they know they're outside of radar coverage and then

3    deviate to where they want to go.

4    Q.  What would be some of the advantages if an aircraft were to

5    obtain a legitimate flight plan?

6    A.  If they obtained a legitimate flight plan then they would

7    appear as a legitimate flight.  They'd be complying with the

8    civil aviation standards and attract less attention from air

9    traffic controllers and law enforcement.

10   Q.  And what types of airfields have these planes typically

11   departed from in Venezuela and elsewhere and typically arrived

12   in Honduras and elsewhere?

13   A.  They're not typical airports that we would be used to in

14   the United States.  We refer to them as clandestine airstrips

15   which are often just fields or roads that have been leveled out

16   to try to insure the aircraft isn't damaged in takeoff or

17   landing.

18   Q.  And if a drug trafficker were able to obtain access to a

19   legitimate air field would that be advantageous?

20   A.  It would be.  It would cause less damage to the aircraft.

21   But it would require better coordination.

22   Q.  What do you mean by that?

23   A.  That would require it having be -- if you're crossing over

24   international borders to have the customs authorities at the

25   airport paid off to either look the other way or not search the

GB99FLO4                          Mahoney - direct

1    aircraft.

2    Q.  And what types of planes are generally used to transport

3    drugs along this route?

4    A.  Generally they are single or dual propeller aircraft.  So

5    that would be the equivalent of like a small Cessna or

6    Beechcraft airplane.

7    Q.  Have you heard of jets being used along this route?

8    A.  I have to a lesser extent.

9    Q.  What would be some of the advantages to using a jet as

10   opposed to a propeller plane?

11   A.  A jet would be able to cover the same distance in a shorter

12   amount of time.  And it would also give a sense of legitimacy

13   because a small jet is not normally used to transport drugs.

14   It's usually used by more wealthy individuals.

15            Another advantage would be when a jet lands at an

16   airport in a rural area it would likely intimidate the

17   authorities at the airport knowing that they're dealing with a

18   wealthy client, maybe draw less scrutiny.

19   Q.  What happens to the cocaine -- or how does the cocaine move

20   once it's delivered to Honduras or elsewhere in Central

21   America?

22   A.  Quite often it's moved to a storage location.  The timing

23   of these events is not always certain.  When trying evade law

24   enforcement they may have to adjust their time schedules.  So

25   generally the large shipment of cocaine would be stored in a

1  location until it was ready to be moved onward using vehicles

2  on the road networks.

3        Also, the loads would be broken down so, for example,

4  if you had one thousand kilograms of cocaine, it may be broken

5  down into ten one-hundred kilogram quantities of cocaine, which

6  would be more difficult for law enforcement to interdict and,

7  therefore, lower your exposure in case there was a seizure, you

8  wouldn't lose your entire load.

9  Q.  How is the cocaine typically brought into the United States

10 along this route?

11 A.  Mainly by vehicles.  That could be 18-wheelers.

12       The transporters are only limited by their creativity.

13 They will use natural voids in vehicles to conceal the cocaine

14 in what we call traps.  Those could be false bottoms, false

15 walls, false roofs, inside sleeper cabins, places constructed

16 to conceal the cocaine.

17       It would also move into smaller vehicles.  Any of your

18 common vehicles that you drive today have natural voids in them

19 that could be taken advantage of, or false compartments can be

20 installed in those vehicles as well.

21 Q.  So what are the main border crossing points for cocaine

22 into the United States?

23 A.  The main areas are the southeastern Texas border, which

24 would be Arroyo and McAllen area.  And then also Southern

25 California:  San Diego, San Ysidro area.

1    Q.  Could you just indicate on the map the southeastern Texas

2    area.

3    A.  Sure.  Right there along the Gulf Coast.

4    Q.  And then the San Diego, San Ysidro area.

5    A.  Over there on the Pacific Coast.  California.

6    Q.  Far left side of the map?

7    A.  Correct.

8    Q.  Once the cocaine is sold in the United States what happens

9    to the proceeds?

10   A.  The proceeds make their way back down south to the owners

11   of the cocaine shipment and then also the proceeds are paid to

12   the transporters or anyone that incurred expenses to get the

13   cocaine to the United States.

14   Q.  What currency is typically used and generated by drug sales

15   in the United States?

16   A.  United States dollars.

17   Q.  And what, if anything, does the fact that U.S. dollars are

18   used in a drug -- used in a drug transaction indicate to you

19   about where those drugs are ultimately being sold?

20   A.  It indicates that the drugs are sold in the United States.

21            MR. QUIGLEY:  One moment, your Honor.

22            THE COURT:  Yes.

23            MR. QUIGLEY:  Nothing further, your Honor.

24            THE COURT:  Mr. Jackson.

25            MR. JACKSON:  Thank you very much, your Honor.

GB99FLO4                         Mahoney – cross

1    CROSS-EXAMINATION

2    BY MR. JACKSON:

3    Q.  Good afternoon, sir.  How are you?

4    A.  Good afternoon, counsel.  Fine.  Thank you.

5    Q.  Just out of curiosity.  Did you train up here from

6    somewhere else, from another place?

7    A.  I'm sorry?

8    Q.  Did you travel up to New York for this testimony?

9    A.  I did, sir.

10   Q.  Tell me again where are you stationed now?

11   A.  Bogotá Colombia at the United States Embassy.

12   Q.  One of the things that you -- just as a little bit more

13   background, this is only your second time testifying as an

14   expert, correct?

15   A.  That's correct.

16   Q.  The first time that you testified as an expert was a little

17   bit earlier this year?

18   A.  That's correct.

19   Q.  Now, you are not, just to be clear, a professor anywhere or

20   anything like that?

21   A.  No, I'm not, sir.

22   Q.  You're a special agent?

23           MR. QUIGLEY:  Objection your Honor.  It's stipulated.

24           THE COURT:  Overruled.  This is all background.

25           You're a career DEA employee?

GB99FLO4                        Mahoney – cross

1           THE WITNESS:  That's correct, your Honor.

2   Q.  And it's been your mission throughout the time that you've

3   been a DEA agent to work on the type of cases the DEA

4   prosecutes, right?

5   A.  That's correct.

6   Q.  That's what you still do?

7   A.  That's correct.

8   Q.  Primarily?

9   A.  Yes, sir.

10  Q.  Now, one of the things that you were telling us about

11  during your direct testimony was the amount of cocaine that

12  comes out of Colombia on an annual basis, correct?

13  A.  That's correct.

14  Q.  And can you tell me again how much cocaine comes out of

15  Colombia on an annual basis?

16  A.  It's estimated between five hundred and seven hundred tons.

17  Q.  And your testimony as to what percentage of that goes to

18  the U.S. was what?

19  A.  Approximately 40 percent.

20  Q.  So the majority of the cocaine that comes from Colombia,

21  which is the biggest producer of cocaine, doesn't ultimately

22  end up in the United States?

23  A.  The largest percentage does.

24  Q.  Right.  That's not my question though.  My question is the

25  majority of the cocaine that comes out of Colombia does not go

GB99FLO4                    Mahoney - cross

1    to the United States, correct?

2    A.  Correct.

3    Q.  And it's also true that the majority of cocaine that leaves

4    Venezuela does not go to the United States, correct?

5    A.  Correct.  Again it would be the largest percentage.

6    Q.  Sir -- and I completely understand that and I respect your

7    expertise but I'm just asking very specific questions.

8            THE COURT:  Well 40 percent comes to the United

9    States.  60 percent goes some place else.  Is that what you're

10   saying?

11           MR. JACKSON:  Absolutely, Judge.

12           THE COURT:  The same is true with Venezuela, correct?

13           THE WITNESS:  Correct, your Honor.

14   BY MR. JACKSON:

15   Q.  Just out of curiosity what is the percentage of cocaine

16   that leaves Venezuela that ultimately ends up in the United

17   States?

18   A.  Approximately 80 percent is what I understand.

19   Q.  80 percent of the cocaine that leaves Venezuela ends up in

20   the United States?

21   A.  That is, to clarify that, traveling along the Central

22   American corridor.

23   Q.  So you're only talking about the cocaine that travels along

24   the Central American corridor?

25   A.  That's correct.

GB99FLO4                        Mahoney - cross

1    Q.  Just focusing on the cocaine that leaves Venezuela in

2    general, what percentage of that ends up in the United States?

3    A.  That would be -- I would approximate it at 40 percent as

4    well.

5    Q.  Isn't it true, sir, that -- isn't true, sir, that it has

6    been estimated by international law enforcement that 70 percent

7    of the cocaine that leaves Venezuela ultimately ends up in

8    Europe?

9    A.  There are many studies and, again, as I mentioned

10   previously it's an unknown.  But that sounds like it would be

11   acceptable.

12   Q.  That's one of the numbers that you've heard that's one of

13   the potential calculations, right?

14   A.  Correct.

15   Q.  And it's a fact that as you were saying this is one of

16   these things, it's not a precise science; it's difficult to

17   estimate, right?

18   A.  That's correct.

19   Q.  No one has a grasp on the total amount of cocaine that is

20   leaving any particular location and ending up in other

21   locations, right?

22   A.  That is correct.

23   Q.  And one of the reasons for that is that these estimates are

24   based primarily on seizures, right?

25   A.  There are many factors that go into those calculations,

GB99FLO4                    Mahoney - cross

1    seizures being one of them.

2    Q.   Seizures are the most important one, right?

3    A.   It's one of the factors.  I can't say whether it's the most

4    important one.

5    Q.   What would you say is potentially more important than

6    seizures?

7    A.   Estimates on the acreage being used to grow coca, the

8    production.

9    Q.   Right.  But the acreage that's being used to grow coca

10   doesn't really tell us anything about where it ultimately ends

11   up, right?

12   A.   No.  It speaks more to the yield, the crop potential.

13   Q.   Right.  It tells us how much coca is being grown, correct?

14   A.   Correct.

15   Q.   And that's one of the things that the U.S. Government

16   monitors, right?

17   A.   That's correct.

18   Q.   The department -- the various departments of the U.S.

19   Government do, you know, aerial surveys to estimate how much

20   coca is being grown, right?

21   A.   That's correct.

22   Q.   When a coca plant is growing you can't determine at that

23   point if it's going to end up in the United States or if it's

24   going to end up in Europe?

25   A.   That's correct.

GB99FLO4                     Mahoney - cross

Q.  So seizures, you agree with me, are ultimately the most

important part of the information that's used to determine

where cocaine ultimately ends up, right?

A.  Yes.  It's an indicator of the routes being used for sure.

Q.  Right.  It's the most important part of the information,

right?

A.  Yes.  I would say it's important.

Q.  You would say it's the most information that you rely on,

right?

        THE COURT:  You're debating over whether it's

important or most important?

        MR. JACKSON:  I'm debating whether it's the most

important.

        THE COURT:  Is it the most important or just

important?

        THE WITNESS:  I would say it's important.

Q.  What's more important?

A.  The --

        THE COURT:  You've got to go on.  This is really.

        MR. JACKSON:  Yes, your Honor.  And I'll go just a

little bit further.  But I'd like to know what is more

important than seizures.

        THE COURT:  I sustain the objection to the question.

Go on to something else, will you.

        MR. JACKSON:  Thanks, Judge.

GB99FLO4                        Mahoney – cross

1    Q.  Now it's a fact, isn't it, Special Agent Mahoney, that the

2    United States spends more money than any other country on

3    seizures in terms of interdicting seizures?

4              MR. QUIGLEY:  Objection to relevance.

5              THE COURT:  Overruled.

6              THE WITNESS:  I would say yes.

7    Q.  And so the information that we have about seizures in the

8    United States is much more complete than the information that

9    law enforcement has in many other countries with less

10   resources, right?

11   A.  Yes.

12   Q.  It's possible, right, that the estimates that we have even

13   currently in terms of how much -- in terms of how much of the

14   total cocaine yield ends up in particular countries

15   underestimate the amount that ends up in other countries

16   because of the reduced law enforcement resources in those other

17   country, right?

18             THE COURT:  If you can figure out that question you

19   can answer it.

20             MR. JACKSON:  He's a good agent, your Honor.

21             MR. QUIGLEY:  Objection.

22             THE COURT:  Go ahead.  Answer it if you can.

23             THE WITNESS:  Could you just restate the question for

24   me, counsel.

25             MR. JACKSON:  Sure.  Let me try to break it down a

GB99FLO4                          Mahoney – cross

1   little bit.

2          THE COURT:  I think that's a good idea.

3   Q.  We agree the U.S. has the most resources in terms of

4   determining -- in terms of interdicting seizures, right?

5   A.  Correct.

6   Q.  And there are some countries like -- there are some

7   countries like Haiti, for example, and some places even in

8   Europe that have a lot less law enforcement resources directed

9   towards drug trafficking, right?

10  A.  That's correct.

11  Q.  So the seizure information that we rely on to determine

12  what percentage of the total cocaine produced in South America

13  ends up in the different countries, it's possible that our

14  information overestimates the amount that's going to the United

15  States, correct?

16  A.  I cannot say whether it overestimates or not.

17  Q.  I know that you can't say whether it does.  What I'm asking

18  you is it's possible that it overestimates it, right?

19  A.  Is it possible?  Yes.

20  Q.  Now, by the way, even within North America, the United

21  States is not the only end point destination for cocaine,

22  correct?

23  A.  That's correct.

24  Q.  A significant amount of cocaine is actually consumed

25  ultimately in Canada, right?

GB99FLO4                    Mahoney - cross

1    A.  I think it's far, far less.

2    Q.  Right.  But it's certainly an amount that you would

3    consider significant, right?

4    A.  In comparison to the United States, no.

5    Q.  Well how much cocaine in tonnage is consumed in Canada on

6    an annual basis?

7    A.  I do not know that answer.

8    Q.  I just want to ask what are you basing your comparison on

9    if you don't know the answer?

10   A.  Based on the amount of users per population.  There is a

11   higher percentage of users in the United States and a much

12   larger population.

13   Q.  What is the percentage of users in Canada?

14   A.  It is far less than the United States.  I do not have the

15   answer.

16   Q.  Do you have a rough estimate of what the number is?

17   A.  No.

18   Q.  You're not really -- you don't really know the answer in

19   terms of Canada, right?

20   A.  No.  I just know through my experience that it's far less

21   of a social problem up in Canada.

22   Q.  That's not a -- but you don't have any data on the

23   percentage of users in Canada versus the United States?

24   A.  I do not.

25   Q.  So it's possible that the numbers are actually similar,

1    right?

2    A.   No.   I am familiar with, through briefings and

3    investigations, that it is significantly smaller than the

4    United States.

5    Q.   Well what is the rough percentage of usage in the United

6    States?

7    A.   That is -- I believe there were estimated in the '90s at

8    about ten million users and it's down to about five million

9    users.

10   Q.   In the United States?

11   A.   Correct.

12   Q.   What percentage of the population is that?

13   A.   I do not know that answer.

14   Q.   Whatever the case may be you agree with me that tons of

15   cocaine are sent to Canada every year, right?

16            MR. QUIGLEY:  Objection.

17            THE COURT:  You can answer it if you can.

18            THE WITNESS:  I believe that's fair.

19   Q.   Now, it's also the case -- you talked a little bit on your

20   direct testimony, Special Agent Mahoney, about drug pricing?

21   A.   Yes.

22   Q.   And it's also the case that the pricings that you talked

23   about for cocaine being sold in the United States, those prices

24   are much higher in Europe, correct?

25   A.   That is correct.

GB99FLO4                         Mahoney - cross

1    Q.  In fact, in some situations people are able to get twice

2    the price for a kilogram of cocaine in Europe than they are for

3    a kilogram of cocaine in the United States?

4    A.  That's correct.

5    Q.  It's also the case the prices are higher in Canada

6    typically per kilogram than they are in the United States on

7    average, correct?

8    A.  Correct.

9    Q.  And one of the things that you talked a little bit about

10   during your direct testimony was about drug trafficking routes

11   into the United States, correct?

12   A.  Correct.

13   Q.  And you talked a little bit about the fact that one of the

14   ways that drugs end up in the United States is through tunnels?

15   A.  I didn't mention tunnels but they do exist.

16   Q.  Oh, okay.  I thought there was a mention of tunnels.  There

17   are tunnels, though, right?

18   A.  There are.

19   Q.  Some of the drug trafficking organizations in Mexico use

20   tunnels that actually are dug into the ground and they end up

21   in a location perhaps in Arizona?

22   A.  Yes.

23   Q.  Some of these tunnels are extraordinarily sophisticated,

24   right?

25   A.  Yes.

GB99FLO4                     Mahoney - cross

1   Q.  And the location of the tunnels is something that is pretty

2   widely known within each one of the organizations, right?

3   A.  I'm not sure.  I'm sure they protect that information

4   within their own organizations.  But, yes, people know about

5   them.

6   Q.  What do you mean protect that information?

7   A.  In order to protect that route into the United States from

8   being discovered I'm sure they compartmentalize within the

9   organization who knows where those tunnels are.

10  Q.  Why would they compartmentalize it?

11  A.  To reduce the risk of discovery.  Less people that know

12  about it the less possibility that that information can be

13  learned.

14  Q.  So it's your claim that even within a drug trafficking

15  organization they would limit the amount of information that

16  was disseminated about what the locations were of some of their

17  drug trafficking routes?

18  A.  Yes.

19  Q.  Well, I assume you agree with me that at least in terms of

20  drug dealers who are dealing with people who are not in the

21  organizations, they're more likely to freely share information

22  about their routes, right?

23  A.  To freely share information?

24  Q.  About the routes that they would use?

25  A.  With people outside their organization?

GB99FLO4                         Mahoney - cross

1    Q.   Yeah.

2    A.   I don't think they would freely share that information.

3    Q.   Why?  Why do you say that?

4    A.   To protect their routes and methods that they're using.

5    Q.   So it's your testimony that it's unlikely that a person in

6    a drug organization would freely share information with someone

7    outside of that organization about where their drugs -- their

8    drug trafficking routes were?

9    A.   If they are not involved, doubtful.

10   Q.   Now, one of the other things that you told us is that it's

11   not rare -- I think the exact question that was asked of you

12   was:  Is it rare to come across an 800-kilogram load in South

13   America.  Do you remember being asked that question?

14   A.   Yes, sir.

15   Q.   And I think your answer was:  No, it's quite common?

16   A.   Correct.

17   Q.   What do you mean "come across"?

18   A.   When the cocaine is being shipped out of Colombia it's sent

19   out in large scale amounts, usually multiple tons of cocaine

20   down to multi hundred kilogram amounts of cocaine.

21   Q.   I guess what I was a little bit confused by with that

22   question is certainly you're not saying that the average person

23   who is walking around in Bogotá might just chance upon

24   800 kilograms of cocaine?

25   A.   No, sir.  I'm referring to the transportation out of

GB99FLO4                    Mahoney – cross

1    Colombia.

2    Q.  Right.  And certainly you're not saying that an

3    800-kilogram shipment of cocaine would be a shipment of cocaine

4    that had no meaning for drug traffickers in South America,

5    right?

6    A.  No.  That has value.

7    Q.  That would be a very significant shipment, right?

8    A.  Certainly.

9    Q.  And it is the case that that would amount to -- in your

10   work as a DEA agent you're actually working out of the

11   Colombia, Bogotá country office, right?

12   A.  That's correct.

13   Q.  Sometimes the DEA in Bogotá actually assist with seizure

14   operations with the Colombian government?  Is that ever the

15   case?

16   A.  Yes.  We share information.

17   Q.  And for your group an 800-kilogram seizure would represent

18   in any year one of the bigger seizures that you personally see

19   at any one time?

20   A.  No.  There -- the larger seizures are multiton seizures but

21   it is a significant amount if that's what you're asking.

22   Q.  It would be a huge seizure, right?

23   A.  It would be a significant seizure, yes.

24   Q.  Let me just ask you in this year what is the biggest

25   seizure just in terms of quantities that your group has

1   actually participated in?

2   A.   The country office has documented seizures of three tons,

3   six tons.  Those are some of the larger ones.

4   Q.   And those were very big seizures, right?

5   A.   Yes.

6   Q.   And when your -- what are the smaller seizures that your

7   group has dealt with in this year?

8   A.   The country has dealt with even small mail parcels down to

9   ounces.  Sometimes body carriers, mules in that -- we refer to

10  them as mules, people that ingest the cocaine in balloons that

11  could be a kilogram of cocaine.  So those are the smaller

12  amounts.

13  Q.   Okay.  That's great.

14         Now, one of the things, Special Agent Mahoney, that

15  you talked about a little bit was some of the structure I

16  think, a little bit of how drug trafficking organizations are

17  dealing with this type of movement of drugs.

18  A.   The structure?

19  Q.   Well let me ask a different question.

20         Part of your expertise in terms of understanding the

21  movement of drugs comes from your work in investigations that

22  deal with the actual exchange of money for narcotics, right?

23  A.   That's one part of the investigation for sure.

24  Q.   And one of the things that is a fact, right, is that it is

25  not -- there are certain situations in terms of drug

GB99FLO4                     Mahoney – cross

1    trafficking where people will provide narcotics without

2    payment, right?

3    A.   Yes.  That's referred to as fronting the narcotics.

4    Q.   Fronting.  And, by the way, this is the subject matter that

5    you've testified before about before as an expert, right?

6    A.   That's correct.

7    Q.   And fronting, it means providing the drugs and no payment

8    has been received yet, right?

9    A.   Yes.  It can also work the other way as in fronting the

10   money before the narcotics are received.

11   Q.   Right.  And that's called buying on credit, right?

12   A.   Yes.  Fronting the money is similar to being given credit.

13   Q.   And you would agree with me that fronting the drugs is much

14   more common in the narcotics trafficking world than fronting

15   the money?

16   A.   That is correct.

17   Q.   And in your time as special agent you have never worked on

18   a case where someone fronted, that you learned about, where

19   someone fronted $20 million before receiving any drugs, have

20   you?

21   A.   That amount?  No.

22   Q.   It's also true, isn't it, Special Agent Mahoney, that in

23   terms of this fronting it's your opinion, isn't it, that

24   organizations will not do this for people that they don't

25   already intimately know?

1    A.  Yes.  There are exceptions to that.

2    Q.  Right.  But just to be clear your testimony in the past has

3    been, correct, that organizations will not do this for each

4    other if they don't know -- if the person is not known to them,

5    just as you wouldn't just turn over money to someone you didn't

6    know, correct?

7    A.  Right.  With the exception of collateral, if you will,

8    being provided.

9    Q.  So let's get to the collateral in a moment.  But putting

10   aside the collateral situation, it's your testimony that --

11   it's your opinion that as a general matter organizations are

12   not going to be willing to front cocaine or money with someone

13   that they don't already have an intimate relationship with in

14   the business sense, right?

15   A.  Correct.

16   Q.  And one of the reasons for that is because, as you've -- in

17   your opinion the person who is providing the cocaine without

18   payment or the cash without cocaine is at risk, right?

19   A.  That's correct.

20   Q.  And the risk that they're at is that someone will just keep

21   the money, right?

22   A.  Yes.  They would be ripped off, if you will.

23   Q.  It's also the case that when you talk about collateral -- I

24   just want to unpack that collateral.  The types of collateral

25   that are used for these types of transactions, the significance

GB99FLO4                        Mahoney – cross

1   of the amount of money or the significance of the amount of

2   cocaine is directly proportional to the significance of the

3   collateral that would have to be put up in a fronting

4   situation, right?

5   A.  I would say that depends on each organization what level of

6   collateral they would require.

7   Q.  Well as a general matter though -- I don't mean to be

8   confusing when I said directly proportional but what I mean is

9   as the size of the amount of money goes up, more money, more

10  collateral, right?

11  A.  Generally, yes.

12  Q.  More cocaine, more collateral, right?

13  A.  I would agree with that.

14  Q.  Now, Special Agent Mahoney, you don't have any personal

15  involvement in this investigation, right?

16  A.  No, sir.

17  Q.  And so you have no -- have you been briefed on this

18  investigation?

19  A.  No.  I was specifically not briefed on this investigation.

20  Q.  You were walled off, right?

21  A.  Correct.

22  Q.  That's really the best procedure in terms of dealing with

23  an expert witness like yourself, to separate you from specific

24  knowledge about it, right?

25  A.  Correct.

GB99FLO4                        Mahoney - cross

1            MR. QUIGLEY:  Objection.

2            THE COURT:  Overruled.

3   Q.  And so with regard to this case you have no idea, right,

4   whether or not -- whether or not any of the types of

5   transportation that you talked about here or the routes that

6   you talked about were actually utilized, right?

7   A.  That's correct.  I do not know.

8   Q.  It's also the case that you have no idea what the level of

9   sophistication was of the individuals who are involved in this

10  particular case, right?

11  A.  That's correct.  I don't know the facts of this

12  investigation.

13  Q.  You'd agree with me though that it is not the case that

14  every single person whoever had a connection to any drugs in

15  South America is as familiar with the complex information about

16  drug trafficking routes that you're talking about here, right?

17  A.  Could you restate that question for me, please.

18  Q.  Sure.

19            THE COURT:  There's several elements in there.

20            MR. JACKSON:  Absolutely, your Honor.  Let me break

21  that down.

22  Q.  You're talking about, when you talk about the locations,

23  right, that drugs end up and the routes that are traveled,

24  that's not common, everyday information that everyone in South

25  America has?

GB99FLO4                     Mahoney – cross

A.   Everyone in South America would not know that information.

Q.   Right.  That's information that is in the possession of
sophisticated traffickers, right?

A.   Yes.  Traffickers in general.  They wouldn't have to be
sophisticated.

Q.   Right.  They would have to have some experience though in
terms of drug trafficking to have that information, right?

A.   Well the routes that we spoke about here today are common
knowledge.

Q.   Amongst people who actually traffic drugs, right?

A.   Yes.  And I would say even a fair amount of the population.

Q.   Right.  But in terms of the specific information that you
were talking about, about what percentage of cocaine ends up in
the United States, that's information that you have based on
your years as a DEA agent and your access to relatively
sophisticated information that's maintained by the United
States government, correct?

A.   Yes.  But I also --

Q.   Sir --

          MR. QUIGLEY:  I'd ask what the witness be allowed to
answer.

          THE COURT:  Let him finish the answer.

          Yes, but?

          THE WITNESS:  But I also believe that the general
public is aware that cocaine is entering the United States

GB99FLO4                          Mahoney - cross

1   through Mexico and Central America.

2   Q.  Right.  You don't think, though, that the general public in

3   South America knows the specific percentage of cocaine that

4   goes to the United States as opposed to the percentage of

5   cocaine that goes to Europe, do you?

6   A.  I don't believe they know specific percentages.

7   Q.  But you're aware that people in the general public know

8   that cocaine goes to the United States and goes to Europe,

9   right?

10  A.  Yes.

11  Q.  People know that cocaine ends up in Canada?

12  A.  Yes.

13          MR. JACKSON:  May I have just one moment, your Honor?

14          THE COURT:  Yes.

15          MR. JACKSON:  I have no further questions.  Thank you

16  very much, Special Agent Mahoney.

17          THE WITNESS:  Thank you, counselor.

18          THE COURT:  Mr. Rody.

19          MR. RODY:  Can I confer with counsel for one moment?

20          THE COURT:  Yes.  Sure.

21  CROSS-EXAMINATION

22  BY MR. RODY:

23  Q.  Agent Mahoney, you mentioned I believe that your office

24  earlier this year seized -- had a three-ton seizure or

25  something like that?

GB99FLO4                          Mahoney - cross

1    A.  Correct.

2    Q.  Can you tell us was that via containership or something?

3    What was the method of that -- of the transportation of that

4    particular load?

5    A.  That was using a semisubmersible -- it's like a low profile

6    boat that's got a top on it.  We call them semisubmersibles.

7    They are very low profile boats.

8    Q.  That kind of boat, the cocaine, is it packed in bulk or how

9    do they pack it in there?

10   A.  They are generally in 25-kilogram or 30-kilogram bundles.

11   They place them in like rice sacks, canvas sacks and are bound

12   with twine.  And that way they can easily account for how much

13   they have and move the drugs in bulk.

14   Q.  So the 25-kilo bundle was a standard -- would be a standard

15   amount so they would know they could count bundles and they

16   would know how many they had?

17   A.  Correct.

18   Q.  And the -- would that be the same like for the go-fast

19   boats?

20   A.  Yes.  It's very common.

21   Q.  Do you ever see cocaine like in a pallet essentially shrink

22   wrapped in a pallet or something?

23   A.  Not normally.

24   Q.  Can you -- let me take a step back.  How big is a kilo

25   approximately?

GB99FLO4                         Mahoney – cross

1    A.  It's approximately 2.2 pounds in weight.

2    Q.  Sure.  I meant physically.  Like is it a foot long by three

3    or four inches wide, something like that?

4    A.  It's a couple inches tall.  It's like a wide brick, if you

5    will.

6    Q.  Wider than a standard red brick you'd see in a house?

7    A.  It's about the same thickness but wider in depth.

8    Q.  And if you -- so my math is terrible.  So if you had these

9    25-kilo bundles, just for example.

10           MR. RODY:  With the Court's permission could I have

11   the agent stand up or step off the stand for one moment, Judge?

12           THE COURT:  You can stand up.  Get some exercise.

13   Q.  Can you show us how big one of those bundles would be with

14   just maybe putting your arms out or use the measure from the

15   height of the witness stand to show us how high it would stand

16   off of there?

17   A.  It's about this high, this wide.

18   Q.  And you're indicating one 25-kilo bundle, correct?

19   A.  Correct.

20   Q.  Sorry.  And if you could just do it again because I just

21   want to put on the record:  The agent is holding his -- he's

22   standing up outside the witness stand and holding his hand

23   maybe six inches or so higher than the witness stand itself

24   which is --

25           THE COURT:  About three feet off the ground.

1          THE WITNESS:  Yes, your Honor.

2          MR. RODY:  I didn't hear what you said, Judge.

3          THE COURT:  I said three feet off the ground.

4          MR. RODY:  It looks a little bit higher than that to

5    me.  Three, three-and-a-half?  Is that fair?

6          And how wide?  Maybe two feet wide or something?

7          THE WITNESS:  Approximately, yes.

8    Q.  And you'd need 16 of those to make eight hundred kilos?

9    A.  (No response).

10   Q.  Did I get that wrong?  Thirty-two?

11   A.  How many kilos are you asking about?

12   Q.  If you had 800 kilos.  800 kilos.

13         THE COURT:  Thirty-two.

14         MR. RODY:  Thirty-two.  Thank you, Judge.

15         THE COURT:  You're welcome.

16   Q.  Thirty-two of the bundles that you just described would,

17   what, take from where I'm standing, twelve feet away from you

18   to you, something like that?

19   A.  No.  Well 32 bundles, yeah, about that.

20         MR. RODY:  Fifteen feet, Judge?  Twelve-and-a-half

21   feet?

22         THE COURT:  Ten, fifteen feet, yes.

23         You can sit down, Mr. Mahoney.

24         MR. RODY:  No further questions.  Thanks very much,

25   Agent.

GB99FLO4                        Mahoney - recross

          MR. QUIGLEY:  One or two quick questions, your Honor.

          THE COURT:  Yes, sure.

REDIRECT EXAMINATION

BY MR. QUIGLEY:

Q.  Agent Mahoney, Mr. Jackson asked you some questions about

drugs going into Canada.  Do you recall that?

A.  Yes.

Q.  In your experience with respect to drugs traveling along

the Central American route, how are those drugs transported to

Canada?

A.  They would go over land through checkpoints on our northern

border up into Canada.

Q.  So they would go from Mexico, through the United States,

and up to Canada?

A.  Yes.

Q.  Over land?

A.  Correct.

          MR. QUIGLEY:  No further questions, your Honor.

          THE COURT:  You're excused, Agent Mahoney.

          MR. JACKSON:  Your Honor, may I ask one question?

          THE COURT:  One question.

RECROSS EXAMINATION

BY MR. JACKSON:

Q.  They wouldn't necessarily go overland, right?

A.  That's the most common.

GB99FLO4                    Piazza - direct

1    Q.  My question is they would not necessarily --

2              THE COURT:  One question.  You're excused.

3              THE WITNESS:  Thank you, your Honor.

4              (Witness excused)

5              THE COURT:  Next witness.

6              MR. QUIGLEY:  Your Honor, the government calls Frank

7    Piazza.

8       FRANK PIAZZA,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11             THE COURT:  Go ahead, Mr. Quigley.

12   DIRECT EXAMINATION

13   BY MR. QUIGLEY:

14   Q.  Good afternoon, sir.  Where do you work?

15   A.  I work for Legal Audio Video.

16   Q.  What's your title there?

17   A.  I am the president and owner.

18   Q.  How long have you been the president and owner of Legal

19   Audio Video?

20   A.  Since the year 2000.

21   Q.  Were you the founder of the company also?

22   A.  Yes.

23   Q.  What is Legal Audio Video?

24   A.  It's a company that was created to assist the legal

25   community with their audio and video evidence.

GB99FLO4                          Piazza - direct

1    Q.  And what types of services does Legal Audio Video provide?

2    A.  There are numerous services we provide that would include

3    enhancement of audio and video, authentication of audio and

4    video files, voice comparison techniques, testimony, and any

5    consulting or helping to create trial exhibits for trials.

6    Q.  Would that include also creating subtitles of recordings?

7    A.  Yes.

8    Q.  What did you do before you founded Legal Audio Video?

9    A.  Before Legal Audio Video my background is I'm an owner and

10   founder of Audio Paint Recording Studios in New York City.

11   Q.  Is that company still in existence also?

12   A.  Yes, it is.

13   Q.  Have you testified before?

14   A.  Yes, I have.

15   Q.  Have you testified in the Southern District of New York

16   before?

17   A.  Yes.

18   Q.  And have you testified in both audio enhancement and

19   subtitles?

20   A.  Yes, I have.

21   Q.  In your experience testifying, as a general matter, not

22   just here, who have you testified on behalf of?

23   A.  I have testified on behalf of the prosecution, the federal

24   government, and defense teams as well in both civil and

25   criminal cases.

GB99FLO4                        Piazza - direct

1    Q.   What is audio enhancement?

2    A.   Audio enhancement is the process of improving an audio

3    recording, the goal to create better clarity and better

4    playback.

5    Q.   What are some of the steps you might take to enhance an

6    audio recording?

7    A.   There are many numerous steps that might be employed.

8    Specifically each audio file has to be reviewed.  But typical

9    areas might include noise reduction, adjusting the volume, or

10   gain changes, applying equalization in order to be able to hear

11   things a certain way.

12   Q.   And how long have you been doing audio enhancement?

13   A.   I've been doing audio enhancement for the legal community

14   since 2000.

15   Q.   And how did you learn to do audio enhancement?

16   A.   As just part of my workload, my background experience,

17   working with many numerous cases since that year, having been

18   exposed to thousands of hours of audio at this stage.

19   Q.   And over the last 15, 16 years how many recordings have you

20   enhanced?

21   A.   I would say easily more than 750 recordings.

22   Q.   And what, if anything, do you do to stay current on audio

23   enhancement techniques?

24   A.   The day-to-day workload plays a huge role in staying

25   current.  I belong to a couple of professional organizations.

GB99FLO4                        Piazza - direct

1    I read articles.  I discuss with other professionals more of a

2    general just staying alert when there are changes or any

3    additions to the techniques.

4              MR. QUIGLEY:  Your Honor, may I approach?

5              THE COURT:  Yes, you may.

6    Q.  I'm handing you what's been marked for identification as

7    Government Exhibit as 203E.  I'm just also placing some other

8    exhibits that we'll get to in a second over here.

9              Take a look at 203E and tell me whether you recognize

10   that.

11   A.  I do.

12   Q.  How do you recognize it?

13   A.  This is a disk that I reviewed and I also initialed it as

14   well.

15   Q.  Is that a subset of a recording in this case?

16   A.  Yes.  This is an audio recording.

17   Q.  And is that a recording you enhanced in this case?

18   A.  Yes.  This is an enhanced version of a recording that I

19   worked on.

20   Q.  With respect to this recording can you describe the process

21   by which you enhanced it?

22   A.  Sure.  This particular recording, when I initially

23   evaluated it and listened to it, it sounded very dull or muddy

24   or as if someone had placed a banket over your ears, and my

25   goal was to give it better clarity.

GB99FLO4                          Piazza - direct

1          So some of the steps I took were adding equalization,

2     the ability to add -- to simplify treble or remove the bass

3     sounds in order to make it brighter or crisper.

4          Additionally in this recording there are numerous

5     speakers and they are not all close to the microphone.  And I

6     took steps to increase the volume of each voice individually

7     and bring them more forward in the recording so you could hear

8     them -- hear their speaking.

9          Additionally when you apply these techniques you also

10    bring up the environmental noise or any noises that might be

11    present in the recording.  And those have to be reduced as a

12    result of those being brought forward.

13    Q.  Did you change or alter the content of the recordings in

14    any way?

15    A.  No, I did not.

16          MR. QUIGLEY:  Your Honor, the government offers

17    Government Exhibit 203E which is a subportion of Government

18    Exhibit 203.

19          MR. JACKSON:  No objection, your Honor.

20          THE COURT:  203E is received in evidence.

21          (Government's Exhibit 203E received in evidence)

22    Q.  Sir, were you asked to perform any other work in this case?

23    A.  Yes.

24    Q.  What was that?

25    A.  Creating subtitles.

GB99FLO4                          Piazza - direct

1    Q.  What do you mean by that?

2    A.  Taking an already recorded video file and syncing it with a

3    transcript, enabling you to watch the video and read the

4    subtitles below.

5    Q.  And you have up there Government Exhibits 201S, 202S, 203S,

6    205S, 206S, 207S, 208S, 210S, 211S, 212S, 213S, 215S and 216S,

7    220S through 225S and 230 and 231S.  Do you see those?

8    A.  Yes.

9    Q.  And do you recognize those?

10   A.  I do.

11   Q.  How do you recognize them?

12   A.  Each one of these disks I had an opportunity to review and

13   I initialed each disk.

14   Q.  And what are they?

15   A.  These are video files of subtitles.

16   Q.  That you created in this case?

17   A.  Yes.

18   Q.  And do the subtitle exhibit numbers correspond to the

19   similarly numbered transcripts and recordings?  So, for

20   example, Government Exhibit 201S corresponds to Government

21   Exhibit 201 and 201T?

22   A.  That's correct.

23          MR. QUIGLEY:  Your Honor, the government offers the

24   subtitle exhibits that I just went through.

25          THE COURT:  The subtitle exhibits 201 through 231

GB99FLO4                         Piazza - cross

1    received in evidence.

2              (Government's Exhibits 201S, 202S, 203S, 205S, 206S,

3    207S, 208S, 210S, 211S, 212S, 213S, 215S and 216S, 220S through

4    225S and 230 and 231S received in evidence)

5              MR. QUIGLEY:  One moment, your Honor.  Nothing

6    further, Your Honor.

7              THE COURT:  Mr. Mann.

8              MR. MANN:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. MANN:

11   Q.  Good afternoon, Mr. Piazza.

12   A.  Good afternoon.

13   Q.  I just want to clarify a few points.  It's fair to say that

14   you don't get retained for every case where the government has

15   video or audiotape, right?

16             MR. QUIGLEY:  Objection.

17             THE COURT:  Overruled.

18             THE WITNESS:  That's correct.

19   Q.  You're only retained when the audio or video is difficult

20   to hear?

21             MR. QUIGLEY:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  That's not exactly the reasons I would

24   be retained but that would include some of it, yes.

25   Q.  In this case that was why you were retained, correct?

GB99FLO4                         Piazza - cross

1          MR. QUIGLEY:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4    Q.  And you were retained by the prosecutors, right?

5    A.  That's correct.

6    Q.  Not the DEA?

7    A.  That's correct.

8    Q.  And you were retained recently in September of 2016?

9    A.  Yes.

10   Q.  And you understood that your engagement was limited to

11   preparing for this trial, correct?

12   A.  Yes.

13   Q.  And you had no prior role at all in the actual

14   investigation of the defendants?

15   A.  No.

16   Q.  And as far as you're aware the recordings that you enhanced

17   had not been enhanced previously?

18   A.  Yes.  That's correct.

19   Q.  Is it fair to say that the audio and video that you

20   enhanced was difficult to follow?

21          MR. QUIGLEY:  Objection, your Honor.  He said he

22   didn't enhance any video.

23          MR. MANN:  I'll rephrase, your Honor.

24   Q.  Is it fair to say that the audio that you enhanced was

25   difficult to follow?

GB99FLO4                        Piazza – cross

1    A.  At times, yes.

2    Q.  And that it was relatively poor quality?

3    A.  Yes.  At times.

4    Q.  And you said that numerous people were speaking at times,

5    correct?

6    A.  Yes.

7    Q.  And there was lots of dialogue over one another?

8    A.  Do you mean dialogue colliding with each other or do you

9    mean just lots of dialogue?

10   Q.  Dialogue colliding with one another.

11   A.  Yes.  That occurred.

12          THE COURT:  Does that mean two people talking at the

13   same time?

14          THE WITNESS:  Yes.

15          MR. MANN:  Correct, your Honor.

16   Q.  So I think you've used the term rapid-fire talking?

17   A.  I used the term rapid-fire talking?

18   Q.  Yes.  Is that a term that you use, sir?

19          THE COURT:  I didn't hear him say that.

20          THE WITNESS:  I don't believe I said that today.

21   Q.  Not today.  Have you ever said that?

22   A.  Oh, rapid-fire talking?

23   Q.  Yes.

24   A.  I probably have.

25   Q.  And when you -- the term rapid-fire talking, it means that

GB99FLO4                         Piazza - cross

1   they're talking very fast on the tape, correct?

2   A.  I would -- yeah, I would assume that, sure.

3   Q.  And that makes it difficult to understand for listeners,

4   correct?

5   A.  That's possible.

6   Q.  And it could be difficult to understand for even

7   participants in the conversation, correct?

8   A.  Ask that question again, please.

9   Q.  If people are talking very fast on the tape it could also

10  be difficult for a listener who was participating in the actual

11  conversation to understand it, correct?

12          MR. QUIGLEY:  Objection.

13          THE COURT:  Sustained.

14  Q.  Now, some of these audiotapes took place in restaurants,

15  right?

16          MR. QUIGLEY:  Objection.

17          THE COURT:  Sustained.

18  Q.  Sir, are you aware that some of the audio files are

19  conversations that took place in restaurants?

20          MR. QUIGLEY:  Objection.

21          THE COURT:  Are you aware of that, Mr. Piazza?

22          THE WITNESS:  Yes.

23  Q.  And that's not a good environment to make a recording,

24  correct?

25  A.  That's really per recording.  A quiet restaurant is no much

GB99FLO4                           Piazza - cross

1    more of a challenge than a quiet room.

2    Q.  But a noisy restaurant would not be an ideal environment to

3    make a recording, correct?

4    A.  It presents challenges.

5    Q.  One of the things, sir, that you identified while you were

6    performing services for the government is that there appeared

7    to be some distance between the microphone and the speakers.

8    When I say "speakers," I mean the individuals speaking.

9            Is that right?

10   A.  Yes.

11   Q.  Any other challenges that you identified in your work?

12   A.  In this particular file?

13   Q.  Right.

14   A.  The overall sound quality sounded very muffled or dull

15   sounding.

16   Q.  Are there things that had you been consulted at the time

17   the recordings were being made that you could give guidance to

18   avoid some of these challenges?

19           MR. QUIGLEY:  Objection.

20           THE COURT:  Sustained.

21   Q.  Now you testified, sir, that you also created subtitles on

22   the videos, correct?

23   A.  Yes.

24   Q.  And that work was a challenge too, right?

25   A.  Yes.

GB99FLO4                        Piazza - cross

1   Q.  And it took you a long time to perform this work?  Correct?

2   A.  Yes.

3   Q.  Is it fair to say it took you about an hour for every five

4   minutes of recording?

5   A.  Yes.

6   Q.  And it took over 70 hours to complete the project in total?

7   A.  Yes.

8   Q.  And, again, that was because people were talking fast and

9   it made it hard to follow, correct?

10  A.  A centum of some of these recordings, that is very true.

11  Identifying numerous voices takes more time.

12  Q.  Were there other challenges that required this to take over

13  70 hours?

14  A.  We went back and forth to correct typos, things of that

15  nature.

16  Q.  And how much were you paid in connection with your

17  engagement to do the subtitles and the enhancements of the

18  audio file?

19  A.  At this stage we will probably be invoicing in the area of

20  fifteen to twenty thousand for the entire work.

21  Q.  And in your direct examination you mentioned that you

22  provide services for voice identification and audio file and

23  video identification; is that correct?

24  A.  Yes.

25  Q.  You were not in this case asked to assist the prosecutors

GB99FLO4                    Piazza- cross

1    in identifying any voices, were you?

2    A.  No.

3    Q.  And you were not asked to assist the prosecutors in

4    authenticating either video or audio files, correct?

5    A.  No, I was not.

6    Q.  Sir, do you speak Spanish?

7    A.  I do not speak Spanish conversationally.

8            MR. MANN:  No further questions, your Honor.

9            THE COURT:  Mr. Quigley.

10           Or Mr. Jackson.

11           MR. JACKSON:  Very briefly, Judge.

12   CROSS-EXAMINATION

13   BY MR. JACKSON:

14   Q.  Good afternoon, sir?

15   A.  Hi.

16   Q.  Sir, in matching the audio to the subtitles that you talked

17   about on the video, did you actually look at all the videos?

18   A.  At times, yes.

19   Q.  You watched a number of these videos as you were putting

20   subtitles on them?

21   A.  Sometimes, yes.

22   Q.  At any point in your review of the video and applying

23   subtitles did you have to apply subtitles to any video of eight

24   hundred kilograms of cocaine arriving in the United States?

25           MR. QUIGLEY:  Objection.

1           THE COURT:  Sustained.

2  Q.  At any point in any video did you observe eight hundred

3  kilograms of cocaine?

4           MR. QUIGLEY:  Objection.

5           THE COURT:  Sustained.

6           MR. JACKSON:  I have no further questions, your Honor.

7           THE COURT:  Mr. Quigley.

8           MR. QUIGLEY:  No redirect, your Honor.

9           THE COURT:  You're excused, Mr. Piazza.

10          (Witness excused)

11          THE COURT:  We're going to take our afternoon break

12  now.  We'll resume in fifteen minutes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Anything to take up?

3           MR. QUIGLEY:  Not from the government, Judge.

4           MR. JACKSON:  No.  Thank you, Judge.

5           (Recess)

6           THE COURT:  Your next witness, Mr. Quigley.

7           MR. QUIGLEY:  Your Honor, we need a jury.

8           Just for the record, we've distributed transcript

9    binders to the jurors.

10          THE COURT:  You distributed them already?

11          MR. QUIGLEY:  Yes, your Honor.

12          THE COURT:  I'm going to tell them at the end of the

13   day to leave them there.

14          MR. RODY:  Could you also tell them not to look ahead

15   in the binder, to only look at whatever it is --

16          THE COURT:  Correct.

17          MR. JACKSON:  Just curious.  The transcript binders

18   are the same as the subtitles?

19          MR. QUIGLEY:  Well the transcript binders are in

20   English and in Spanish.

21          MR. ZACH:  Your Honor, can I say one more quick

22   suggestion?  It came up that one of the witnesses read about

23   the case in the media.  It may be worth reminding them not to

24   look in the papers.

25          THE COURT:  I remind them that everyday.  I reminded

GB99FLO4                         Piazza- cross

1    them Monday.  I reminded them yesterday.  I'll remind them

2    today.

3            MR. ZACH:  Thank you, your Honor.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please, be be seated.

3           Each of you has a little binder on your chair.  Put it

4   along side your chair and we will tell you when it is

5   appropriate to open it up and read along.  Don't read ahead,

6   just read the pages that the lawyers are referring to at the

7   time they're referred to.

8           Do you want to call your witness?

9           MR. QUIGLEY:  Your Honor, the government calls Jose

10  Santos Peña.

11   JOSE SANTOS PEÑA,

12       called as a witness by the Government,

13       having been duly sworn, testified through an interpreter,

14       as follows:

15          THE COURT:  All right, Mr. Quigley.

16  DIRECT EXAMINATION

17  BY MR. QUIGLEY:

18  Q.  Sir, have you ever worked for the United States government?

19  A.  Yes, sir.

20  Q.  In what capacity?

21  A.  As an informant.

22  Q.  For what agency?

23  A.  For the DEA.  And also for state agencies.

24  Q.  How long were you a DEA employee?

25  A.  From 2003 to 2016.

GB95flo5                        Santos Peña - direct

1    Q.  Are you still a DEA informant?

2    A.  No, sir.

3    Q.  So, where do you live now?

4    A.  In a jail.

5    Q.  Why are you in jail now?

6    A.  For having committed a crime.

7    Q.  What was that crime?

8    A.  To help people bring drugs into the United States, to help

9    people traffic drugs in the United States, and for having lied

10   to the DEA.

11   Q.  Let's back up to October 2015.  Sir, were you in jail at

12   that time?

13   A.  No, sir.

14   Q.  Sir, what state were you living in at that time?

15   A.  In California, in the United States.

16   Q.  In October 2015 did you travel to Venezuela?

17   A.  Yes, sir.

18   Q.  Why did you go to Venezuela?

19   A.  I went there.  I was sent by the DEA.

20   Q.  And were you instructed by the DEA to meet with anyone from

21   Venezuela?

22   A.  Yes, sir.

23   Q.  Did you in fact participate in meetings in Venezuela?

24   A.  Yes, sir.

25   Q.  In the course of your meetings, did you learn the names of

GB95flo5                    Santos Peña - direct

1    the people you were meeting with?

2              INTERPRETER:  I'm sorry, the course of the meetings?

3    Q.  Did you learn the names of the people you were meeting

4    with?

5    A.  Only Mr. Francisco and Mr. Campo Flores.  That's all.

6    Q.  Do you think you could identify those people if you saw

7    them in the courtroom today?

8    A.  Yes, sir.

9    Q.  Can you identify Mr. Campo Flores by an item of clothing

10   that he is wearing?

11   A.  Can I stand up?

12   Q.  Yes.

13   A.  He is wearing something gray, gray clothes.

14             MR. QUIGLEY:  Can I ask the record reflect the

15   identification of defendant Campo Flores?

16             THE COURT:  Yes.

17   Q.  Can you identify the person you knew as Francisco?

18   A.  Yes, sir.

19   Q.  What is he wearing?

20   A.  Something blue.  That's it.

21             MR. QUIGLEY:  Your Honor, I ask the record to

22   reflected identification of Defendant Flores.

23             THE COURT:  Yes.

24   BY MR. QUIGLEY:

25   Q.  So before you went to Venezuela what, if any equipment, did

GB95flo5                    Santos Peña – direct

1    you get from the DEA?

2    A.  Yes, sir.  Two recording devices.

3    Q.  We will refer to those devices as device 1 and device 2,

4    okay?

5    A.  Yes, sir.

6    Q.  What does device 1 record?

7    A.  Audio and video.

8    Q.  And what does device 2 record?

9    A.  Only audio.

10   Q.  Who else went with you to Venezuela?

11   A.  My son and a friend of my son, whose name is Paul.

12   Q.  Was your son also a DEA confidential source?

13   A.  Yes, sir.

14   Q.  Did the DEA know he was going to Venezuela with you?

15   A.  Yes, sir.

16   Q.  Did the DEA know that Paul was going to Venezuela with you?

17   A.  No, sir.

18   Q.  When did you tell the government that Paul had gone to

19   Venezuela with you?

20   A.  After I was arrested some days later, after being arrested.

21   Q.  How many times did you meet with the defendants in

22   Venezuela?

23   A.  Four times.

24   Q.  How many of those meetings did you record?

25   A.  Three, sir.

GB95flo5                         Santos Peña – direct

1    Q.   Why didn't you record one of the meetings?

2    A.   Because Mr. Campo and Mr. Francisco invited me to go to a

3    disco and they asked me not to make any comments regarding drug

4    trafficking in that location because there were going to be

5    other people there, friends of theirs, and they were going with

6    their body guards.  Since I had been told it was a disco I also

7    felt it wasn't really prudent for me to do so because I had to

8    conserve the battery life of the equipment and in that location

9    you couldn't -- you were not going to be able to hear whether

10   it was recording by audio or by video.

11   Q.   Now, during the three meetings that you did record, did you

12   use either of the two recording devices that you had gotten

13   from the DEA?

14   A.   Yes, sir.

15   Q.   Which one?

16   A.   Device no. 2.

17   Q.   And who, if anyone, used device 1 in those meetings?

18   A.   It was used, and it was used by my son.

19   Q.   I want to focus on the first meeting you had with the

20   defendants in Venezuela.

21   A.   Yes, sir.

22   Q.   How long had you been in Venezuela before that meeting

23   happened?

24   A.   Approximately four days.

25   Q.   Did there come a point when one of the defendants contacted

GB95flo5                        Santos Peña – direct

1    you?

2    A.  Yes, sir.

3    Q.  Who contacted you?

4    A.  Mr. Campo.

5    Q.  How did he do that?

6    A.  Through a Blackberry, like messages.

7    Q.  How did you get to the meeting with him?

8    A.  Mr. Campo sent some of his security agents to pick me up at

9    the hotel.

10   Q.  And who else went with you?

11   A.  My son and Paul.

12   Q.  What did you do with device 1 before you left the hotel?

13   A.  I gave it to my son.

14   Q.  What did you do with device 2 before you left the hotel?

15   A.  I kept it with my personal belongings, on my body.

16   Q.  You said some people picked you up at the he hotel; is that

17   correct?

18   A.  Yes, sir.

19   Q.  Showing you what's been marked for identification

20   Government Exhibit 68.  Do you recognize that?

21   A.  Yes, sir.

22   Q.  Does that fairly and accurately depict one of the people

23   who picked you up at the hotel that day?

24   A.  Yes, sir.

25            MR. QUIGLEY:  Your Honor, the government offers

1    Government Exhibit 68.

2              MR. RODY:  No objection.

3              THE COURT:  68 is in evidence.

4              (Government's Exhibit 68 received in evidence)

5    BY MR. QUIGLEY:

6    Q.  Can we publish that please, Mr. Calabrese?

7              How long did it take you to get from the hotel to the

8    place where the meeting happened?

9    A.  Approximately 20, 25 –– approximately 20 minutes, more or

10   less.

11   Q.  Where did the meeting take place?

12   A.  In the building which Mr. Campo said was his property.

13   Q.  What did you do when you got there?

14   A.  I asked one of the security guards who were on the property

15   for the bathroom to do my physiological needs, but my intention

16   was to activate device no. 2.

17   Q.  Did you do that?

18   A.  Yes, sir.

19   Q.  Where inside the building did the meeting take place?

20   A.  In a room which was functioning as an office.

21   Q.  And who else was in the room?

22   A.  My son, Paul, Mr. Campo, and Mr. Francisco.

23   Q.  And can you describe how everyone was seated in the room?

24   A.  Yes.

25              Mr. Campo was in front or across from me, my son was

GB95flo5                          Santos Peña – direct

1   to my right side, Paul was in the rear behind myself, and my

2   son and Mr. Francisco was to the left of Mr. Campo.

3   Q.  Sir, I would like to direct your attention and the jury's

4   attention to what's in the binders as Government Exhibit 203-T?

5             THE COURT:  What was that, Mr. Quigley?

6             MR. QUIGLEY:  203-T your Honor.

7             THE COURT:  Please go to 203-T, ladies and gentlemen.

8   Q.  The first page reflects this is recording of October 23rd

9   2015 meeting in Caracas, Venezuela.

10  A.  Yes, sir.

11  Q.  Can we go to page 4, line 2?  I would ask -- and we will

12  read to page 6, line 7.  I will read the part of Defendant

13  Campo, I ask Mr. Calabrese to read the part of Mr. Santos Peña

14  who is on here as CS-1, and Agent Gonzalez to read the line of

15  Defendant Flores at page 6.

16            "CAMPO:  Because we went to the give them a little --

17  we went over to see your friend at the H.  How long ago?

18            "FLORES:  A little over a month ago.

19            "CAMPO:  About -- a month and a week ago.  So, look.

20  I don't know, the person all, to do a no, no.  Well, let's meet

21  already because you left me with an idea here to do something

22  as possible

23            "CS-1:  Okay.

24            "CAMPO:  So we just went and got going, having -- too

25  much time goes by so then imagine things over there.

1              "CS-1:  Really?

2              "CAMPO:  That is -- this is why do you reiterate the

3      test.  Visibility?

4              "CS-1:  Later.

5              "CAMPO:  All of this I --

6              "CS-1:  Uh-huh.

7              "CAMPO:   So you are doing one?

8              "CS-1:  Of course."

9              MR. RODY:  Your Honor, I object.  We have videos of

10     this, we understand, with subtitles.

11             MR. QUIGLEY:  Your Honor, it is a document in

12     evidence.  We can read from it.

13             THE COURT:  The document is in evidence, overruled.

14             MR. QUIGLEY:  Page 5, line 4.

15             "CS-1:  Of course.

16             "CAMPO:   Why?  Because it doesn't actually seem to me

17     that things are very good over there, as the guy said there,

18     because he disappeared on me a lot.  Do you understand?

19             "CS-1:  Uh-huh.

20             "CAMPO:   I think that you can't disappear so long in

21     this business

22             "CS-1:  No.

23             "CAMPO:   Besides, I have a person there.  It is the

24     person I have there, he could get it for me.  So then he shows

25     up and it is like, look, we'll meet here.  Great.  I need this,

for this to get going.  So then, another step backward.  And he

disappears on me again for another week and a half

        "CS-1:  But.

        "CAMPO:  And we talked, so really --

        "CS-1:  What -- what is happening.  And I understand

you, I understand you perfectly and you are entirely right.

The problem with the situation over there, I'm the person who

buys everything from him and I'm the person who is responsible

for taking everything to the United States.  I'm the one who

works on -- the problem that they have there right now in -- in

that town you went to in Honduras, is that they have -- son of

a bitch.  There are very good -- understand -- but if -- uh --

uh -- uh -- the -- I scold him sometimes because he is one of

these people who sometimes -- because he is extremely cautious

and it is good that he is --

        "CAMPO:  No.

        "CS-1:  That sometimes he disappears on me for two or

three days.

        "CAMPO:   Of course."

BY MR. QUIGLEY:

Q.  Okay.  So, sir, directing your attention back to page 4,

row 2.  Do you see where Defendant Campo said:

        "We went over to see your friend at the H?"

A.  Yes, sir.

Q.  Who did you understand defendant Campo to be referring to

GB95flo5                          Santos Peña – direct

1    when he said "your friend"?

2    A.   Mr. El Sentado.

3              (Continued next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB99FLO6                         Santos Peña – direct

1    Q.  Now, is Sentado actually your friend?

2    A.  No, sir.

3    Q.  Did you ever meet him in person?

4    A.  No, sir.

5    Q.  And where did you understand -- what did you understand

6    defendant Campo to be referring to when he said "the H"?

7    A.  Honduras.

8    Q.  I want to direct your attention to the last line or the

9    last two lines, page 4, row 12.

10            THE INTERPRETER:  Where?

11   Q.  Page 4, row 12.

12   A.  Yes, sir.

13   Q.  Where defendant Campo says "to do something as soon as

14   possible."

15   A.  Yes, sir.

16   Q.  What did you understand him to want to do as soon as

17   possible?

18   A.  To send a delivery of cocaine to Honduras.

19   Q.  Page 5, row 6.

20   A.  Yes, sir.

21   Q.  Do you see where defendant Campo says "he disappeared on me

22   a lot?"

23   A.  Yes, sir.

24   Q.  Who did you understand defendant Campo to be referring to

25   there?

1    A.  Sentado.

2    Q.  Do you see where on page 5, row 10, defendant Campo says,

3    "you can't disappear so long in this business?"

4    A.  Yes, sir.

5    Q.  What business did you understand him to be referring to?

6    A.  Drug trafficking.

7    Q.  I want to focus your attention on page 6, row 1, about five

8    lines down.

9    A.  Yes, sir.

10   Q.  Do you see where you said, "I'm the person who buys

11   everything from him?"

12   A.  Yes, sir.

13   Q.  What were you referring to there?

14   A.  All of the drugs that Mr. Sentado had.

15   Q.  Then do you see where you say, "I am the person who is

16   responsible for taking everything to the United States?"

17   A.  Yes, sir.

18   Q.  What did you mean by that?

19   A.  I was in charging taking all of the drugs to the United

20   States to sell it.

21   Q.  Let's move ahead to page 10, row 11.

22   A.  Yes, sir.

23   Q.  And again I'd like to read from page 10, row 11, to page

24   11, row 11.  And I would ask Mr. Calabrese to read the part of

25   the witness and I'll read the part of Mr. Campo.

1          "CAMPO:  We don't really have a problem with that.

2    What I was really worried about that I believed them because I

3    wanted fully, I mean, that is, based on the fact that the

4    person wouldn't show up.

5          "CS-1:  Mm-hmm.

6          "CAMPO:  Wouldn't arrive meeting over there, I started

7    to look around elsewhere.  Why?

8          "CS-1:  Mm-hmm.

9          "CAMPO:  Because we were having an election, do you

10   understand?  My mom, my mom is running for the election and I

11   need -- I need 20 million dollars.

12         "CS-1:  I, I, you.

13         "CAMPO:  In other words, the issue of the money we

14   need it by December.

15         "CS-1:  I have, I have some money right now to put up

16   and hand to you.  We can send it to you."

17   BY MR. QUIGLEY:

18   Q.  So let's back up to page 10, row 16.

19         MR. RODY:  Your Honor, could I just note for the

20   record that there are numerous locations here where there is an

21   indication that's something is unintelligible that's not being

22   registered in this dialogue.

23         THE COURT:  Yes.  If the jury is following along,

24   you'll note that, that there is a number of UIs.

25         MR. RODY:  Thank you, Judge.

GB99FLO6                         Santos Peña – direct

1          THE COURT:  UI standing for unintelligible.

2          Go ahead, Mr. Quigley.

3   Q.  Sir, if you could backup for a second.  Do you see on page

4   10, row 16 defendant Campo says, "I started to look around

5   elsewhere?"

6   A.  Yes, sir.

7   Q.  What did you understand him to mean by that?

8   A.  That he was doing other drug deals with other people.

9   Q.  Other than who?

10  A.  Other than Mr. Sentado and me.

11  Q.  Let's move ahead to page 20, row 32.

12          THE COURT:  What page?

13          MR. QUIGLEY:  Page 20, row 32.

14          THE WITNESS:  Yes, sir.

15          MR. QUIGLEY:  And we'll read again from page 20, row

16  32 to page 21, row 9.

17          I'll read the part of defendant Campo.  And I would

18  ask Mr. Calabrese to read the part of the witness.

19          "CS-1:  With you, from here on I'm you are going to

20  have to talk directly to me.

21          "CAMPO:  Great.

22          "CS-1:  So you wouldn't have any, any problem.

23          "CAMPO:  That's why.

24          "CS-1:  That way I can avoid because over there, over

25  there I have a bunch of workers of mine.  Do you understand?

GB99FLO6                      Santos Peña – direct

1    And he -- because I put him in charge, I'm saying now.

2              "CAMPO:  Exactly.  This is my cousin, this is my

3    brother and my partner.

4              "CS-1:  Everything.

5              "CAMPO:  I bring him to the meeting.

6              "CS-1:  Of course.

7              "CAMPO:  Because on the day that I am not around,

8    that's why."

9    BY MR. QUIGLEY:

10   Q.  All right.  So, sir, focusing your attention on page 20,

11   row 32.  What did you mean when you said "with you, you're

12   going to have to talk directly with me?"

13   A.  I was referring to the fact that Mr. Campo was now going to

14   deal directly with me and no longer with Mr. Sentado.

15   Q.  And moving ahead to page 21, row 3?

16   A.  Yes, sir.

17   Q.  Who do you understand defendant Campo to be referring to

18   when he said this is my cousin, this is my brother, and my

19   partner?

20   A.  Mr. Francisco.

21   Q.  And was defendant Flores in the room in this meeting?

22   A.  Yes, sir.

23   Q.  Move ahead to page 24, line 23.

24             MR. QUIGLEY:  We'll read to page 27, row 26.

25             Again, I'll read the part of Mr. Campo and I'd ask

1   Mr. Calabrese to read the part of the witness.

2        "CAMPO:  Like over here?  Over there.  Um.

3        "CS-1:  Mm-hm.

4        "CAMPO:  The.

5        "CS-1:  Do you want me to send a car for you?  Or will

6   you send the car?

7        "CAMPO:  I said that to him.

8        "CS-1:  However you want to do it, but I.

9        "CAMPO:  I told him I may have the possibility of

10  providing the car.  But what happens?  If I provide the car,

11  the person works from here and I have to manage him.  Why?

12  Because I had some cars and was working with some people from

13  over there where you guys are from.

14       "CS-1:  Mm-hm.

15       "CAMPO:  And the people didn't come through for us,

16  and they came by to pay us and the cars were under the name of

17  people with cars who have been working and that's it.

18       "CS-1:  Of course.  Right.  What happens is.

19       "CAMPO:  You understand?

20       "CS-1:  Mm-hm.

21       "CAMPO:  But they are looking for problems.  Are the

22  cars being used or not?  Pay some money and done.

23       "CS-1:  Mm-hm.

24       "CAMPO:  So, right now we have no availability of

25  cars, and I even told him.

GB99FLO6                          Santos Peña – direct

1               "CS-1:  Mm-hm.

2               "CAMPO:  I said, Well, I could get um, the car, as you

3       prefer.  He told me, No, look, I will.

4               "CS-1:  Mm-hm.

5               "CAMPO:  And that they have several cars to work with.

6       I said there is a, a detail.

7               "CS-1:  What kind of cars do you have?

8               "CAMPO:  Um, at least I work with GIIs.

9               "CS-1:  Mm-hm.  It's very good.

10              "CAMPO:  Yes, yes.  It's just that.

11              "CS-1:  I have them right outside.

12              "CAMPO:  There is a problem, I mean, with the cars.

13      It's" over money.  Sorry.  "It's money, Venezuelan money over

14      here.

15              "CS-1:  Mm-hm.

16              "CAMPO:  Twice over you can send me the money there.

17              "CS-1:  Know what?

18              "CAMPO:  Uh, like the office they set up.

19              "CS-1:  Mm-hm.

20              Get rid of the Colombians.

21              "CAMPO:  To the prosecutor's office.

22              "CS-1:  Yes, sir.

23              "CAMPO:  That's crazy.

24              "CS-1:  Mm-hm, mm-hm.

25              "CAMPO:  He said there were some limitations, but

1  regarding quantities, um, we don't have too much of a problem

2  with that anymore give you a sample with such a large quantity

3  he has to be running with me already because they.

4           "CS-1:  Look, let's –- look, look, let's do something.

5  Let's do something."

6  BY MR. QUIGLEY:

7  Q.  Okay.  So I want to backup to page 25, row 5.

8  A.  Yes, sir.

9  Q.  Sir, do you see where you say, "Do you want to send me a

10  car for you or will you send a car?"

11  A.  Yes, sir.

12  Q.  What do you mean by "a car" there?

13  A.  An airplane.

14  Q.  To do what?

15  A.  To send the drugs from Venezuela to Honduras.

16  Q.  And do you see on page 25, row 11 where defendant Campo

17  says, "I told him I may have the possibility of providing the

18  car?"

19  A.  Yes, sir.

20  Q.  Who do you understand defendant Campo to be referring to

21  when he used the word "him" here?

22  A.  Mr. Sentado.

23  Q.  Do you see later in that same row where defendant Campo

24  said, "I had some cars and I was working with some people over

25  there from where you guys are from?"

GB99FLO6                          Santos Peña - direct

1   A.  Yes, sir.

2   Q.  What did you understand defendant Campo to mean when he

3   said he had been working with some people over there from where

4   you guys are from?

5   A.  He was referring to some Mexicans.

6   Q.  And what kind of work did you understand did he say he was

7   doing with them?

8   A.  Drug trafficking.

9              MR. JACKSON:  Excuse me, your Honor.  I object to

10  phrasing interpretation.

11             THE COURT:  Overruled.

12  Q.  I want to focus your attention on page 26, row 11.

13             Do you see where you ask defendant Campo, "What kind

14  of cars do you have?"

15  A.  Yes, sir.

16  Q.  And do you see where it says -- where he says a GII or he

17  refers to GIIs in the next row?

18  A.  Yes, sir.

19  Q.  What do you understand a GII to be?

20  A.  An airplane.

21  Q.  One more selection from this page -- sorry, from this

22  exhibit.  If you could go to page 28, row 23.

23             Do you see where defendant Campo says, "I have to meet

24  with, with, with, with the person about the car?"

25             THE INTERPRETER:  I'm sorry.  What row was it?

1           MR. QUIGLEY:  23.

2           THE WITNESS:  Yes, sir.

3    BY MR. QUIGLEY:

4    Q.  We can shift to Government Exhibit 201-T.

5           MR. QUIGLEY:  Mr. Calabrese, can call up 201-S which

6    is the subtitle version.  If you could play --

7           THE COURT:  Yes, Mr. Quigley.

8           MR. QUIGLEY:  Sorry, your Honor.  If we could play

9    from the beginning to 57 seconds which corresponds to roughly

10   page 2, row 1 on the transcript and page 3, row 3.

11          THE COURT:  201-T?

12          MR. QUIGLEY:  Yes, your Honor.  201-S is up on the

13   screen right now.

14          (Recording played)

15   Q.  Sir, what are we listening to a recording of here?

16   A.  The first meeting with Mr. Campo and Mr. Francisco.

17   Q.  And this is a continuation of the transcript we were

18   reading earlier?

19   A.  Yes, sir.

20   Q.  Sir, do you see on page 3, row 29?

21   A.  Yes, sir.

22   Q.  Where you refer to "little white cars?"

23   A.  Yes, sir.

24   Q.  What do you mean by that?

25   A.  Planes with flight plans.

GB99FLO6                          Santos Peña – direct

1   Q.   When you say, "The first one in Honduras, the second one

2   for Mexico," what are you referring to there?

3   A.   That the first drug shipment would be to Honduras and the

4   second one to Mexico.

5   Q.   And from where?

6   A.   Departing from the airport in Caracas, Venezuela.

7          MR. QUIGLEY:  Mr. Calabrese, can we continue playing

8   to 1 minute and 19 seconds, which is about page 4, row 9.

9          (recording played)

10  Q.   Sir, on page 4, row 5.

11  A.   Yes, sir.

12  Q.   Do you see where defendant Campo refers to the topic of the

13  little animals?

14  A.   Yes, sir.

15  Q.   What did you understand him to mean by "little animals?"

16  A.   Kilos of cocaine.

17         MR. QUIGLEY:  Mr. Calabrese, if you can continue

18  playing to 2 minutes and 2 seconds which is to about page 6,

19  row 34.

20         (recording played)

21         MR. QUIGLEY:  Backup to page 4, row 23.

22         THE WITNESS:  Yes, sir.

23  Q.   Do you see where defendant Campo says, "they told me that

24  it was one thing and something different arrived?"

25  A.   Yes, sir.

GB99FLO6                       Santos Peña - direct

1  Q.  And do you see in row 29 where he says, "I didn't even

2  check it?"

3  A.  Yes, sir.

4  Q.  And do you see on page 5, row 19 where he says I -- where

5  defendant Campo says, "I lost money?"

6  A.  Yes, sir.

7  Q.  What did you understand defendant Campo to be discussing

8  here?

9  A.  About a drug shipment that he had done in the past of

10  cocaine to Mexico with other people but it was a bad quality so

11  the deal didn't work out.

12  Q.  Focusing your attention on page 5, row 31.

13  A.  Yes, sir.

14  Q.  Who is the individual referenced as CS-2 here?

15  A.  Me.

16  Q.  Are you CS-1 or CS-2?

17  A.  I'm sorry.  CS-2 is my son.

18  Q.  And do you see on page 5, row 31 and 35 where your son

19  says, "You know that we send a lot of that to -- to New York,

20  all that?"

21  A.  Yes, sir.

22  Q.  And I want to skip ahead to page 7, line 7.

23           THE INTERPRETER:  Line?

24           MR. QUIGLEY:  Row 7.  Page 7, row 7.

25           THE WITNESS:  Yes, sir.

GB99FLO6                          Santos Peña – direct

1   Q.  Do you see where he said there, sir, "The only way to do

2   well with the Americans is time-wise?"

3   A.  Yes, sir.

4   Q.  And in row 11 do you see where you say, "And you have to do

5   well I arrive there with the work because paper is there?"

6           "I have to do well with them through the time factor?"

7   A.  Yes, sir.

8   Q.  When you said, "I arrived with the work because the paper

9   is there," what did you mean by "paper?"

10  A.  The money.

11  Q.  What were you referring to when you said "there?"

12  A.  What line?

13  Q.  Page 7, line 11.  You said "because the paper is there."

14          THE INTERPRETER:  Interpreters comment.  It doesn't

15  say in Spanish there.

16          MR. QUIGLEY:  Okay.  We'll move beyond that.

17          THE WITNESS:  Yes, sir.

18          MR. JACKSON:  Excuse me, your Honor.  Could we have

19  clarity on that point.

20          THE COURT:  Apparently he's looking at the Spanish

21  language and it doesn't note the word "there" in the Spanish

22  language.

23          THE INTERPRETER:  That is correct, your Honor.

24          MR. JACKSON:  Thank you, your Honor.

25          MR. QUIGLEY:  If we could move ahead, Mr. Calabrese,

GB99FLO6                         Santos Peña – direct

1    and play from 8:28 to 9:58.  Sorry.  Page 22, row 1.

2              THE COURT:  I thought you said page 8.  Now you're up

3    to page 22.

4              MR. QUIGLEY:  I was referring to the timing.  From

5    8:28 on the tape.  And we'll start at page 22, row 1.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Tell me again where you are.

8              MR. QUIGLEY:  Page 22, row 1 in the transcript, your

9    Honor.

10             THE COURT:  All right.

11             (recording played)

12             MR. QUIGLEY:  Stop it right there.  Thank you, sir.

13             THE WITNESS:  Yes, sir.

14   BY MR. QUIGLEY:

15   Q.  Sir, I want to direct your attention back to page 24, row

16   31.

17   A.  Yes, sir.

18   Q.  Do you see where defendant Campo says, "But we need the

19   money.  Why?  Because the Americans are hitting us hard with

20   money.  Do you understand?  The opposition is getting an

21   infusion of a lot of money."

22   A.  Yes, sir.

23   Q.  And then on page 25, row 4 where he says, "And so it's also

24   us.  That's why we are at war with them?"

25   A.  Yes, sir.

GB99FLO6                         Santos Peña – direct

1    Q.  All right.  If we could move ahead in the transcripts to

2    page 31, row 1.  Which is at 12:01 on the tape.

3    A.  Yes, sir.

4           MR. QUIGLEY:  And we'll play to, Mr. Calabrese, to

5    12:40.

6           (recording played)

7    Q.  Sir, do you see on page 32, row 1.

8    A.  Yes, sir.

9    Q.  Where defendant Campo says, refers to a meeting for about

10   two hours with him.

11   A.  Yes, sir.

12   Q.  What meeting did you understand him to be referring to

13   there?

14   A.  To a meeting that he had with Mr. Sentado in Honduras.

15   Q.  If we could move ahead to page 38, row 18.

16   A.  Yes, sir.

17          MR. QUIGLEY:  Mr. Calabrese, that's at 15:06 on the

18   tape.  And we'll play until 15:32 which will take us to page

19   39, row 11.

20          (recording played)

21   Q.  Sir, I want to focus your attention on page 39, rows 3 to

22   9.

23   A.  Yes, sir.

24   Q.  Do you see where defendant Campo says, "Leaves here, from

25   here, from over here, it won't be followed because it departs

1  from here as if someone from our family were on the plane?"

2  A.  Yes, sir.

3  Q.  What did you understand defendant Campo to be referring to

4  when he said "it leaves here?"

5  A.  That he left from Venezuela.

6  Q.  What did you take him to mean when he said, "it departs

7  from here as if someone from our family were on the plane?"

8  A.  That the drug shipment that he was going to send from

9  Venezuela to Honduras was going to be a hundred percent safe as

10  if he had sent it on a white flight.

11          MR. QUIGLEY:  Mr. Calabrese, if we could move ahead to

12  16:54 which for the jury and the court is at page 42, line 17.

13          THE WITNESS:  Yes, sir.

14          (recording played)

15          MR. RODY:  Your Honor, I apologize.  We've lost video

16  on this monitor, so.

17          THE COURT:  What do you want to do about that?

18          You'll have to follow along in the transcripts.  Okay

19  what's your question?

20  BY MR. QUIGLEY:

21  Q.  Sir on row 17 on page 42?

22  A.  Yes, sir.

23  Q.  Do you see where defendant Flores says, "all of us, we'll

24  take care of sending it personally?"

25  A.  Yes, sir.

GB99FLO6                        Santos Peña – direct

1    Q.  And then further down on the same page from row 37 to 41

2    where defendant Campo says, "that leaves no, when the little

3    animals leave on the way there, we will be there?"

4    A.  Yes, sir.

5    Q.  What did you understand defendant Campo to mean by "little

6    animals?"

7    A.  Kilos of cocaine.

8    Q.  So let's continue playing from page 43, row 3 on the

9    transcript which is at 17:08 on the tape and we'll play to

10   roughly 17:40.

11           (recording played)

12   Q.  Sir, I want to focus your attention on page 43, line 39.

13   A.  Yes, sir.

14   Q.  Do you see where defendant Campo says, "my guys can

15   withstand anything.  But if all of a sudden a bigger goat

16   arrives, let's say a colonel, a general?"

17   A.  Yes, sir.

18   Q.  Then defendant Campo says on the next page.  And he says,

19   "open that for me, because I'm going to lack at it?"

20   A.  Yes, sir.

21   Q.  And then on -- further down on the page, row 15 defendant

22   Campo says, "but me being there?"

23   A.  Yes, sir.

24   Q.  And row 19, "Are you crazy?"

25           And then in row 23, "I mean, what, what are you

GB99FLO6                        Santos Peña - direct

1    opening that for, what?  Who do you work for?"

2    A.  Yes, sir.

3    Q.  What do you understand defendant Campo to be referring to

4    here?

5              MR. JACKSON:  Your Honor, objection.  There were

6    several different phrases.

7              THE COURT:  Overruled.

8              MR. QUIGLEY:  I could break it down, your Honor.

9    That's fine.

10             THE COURT:  You don't have to.  If you want to, go

11   ahead.

12   Q.  Sir, at page 43.

13   A.  Yes, sir.

14   Q.  Rows 43 -- sorry.  Row 39.

15   A.  Yes, sir.

16   Q.  What do you understand defendant Campo to be referring to

17   when he says, "If all of a sudden a bigger goat I arrives,

18   let's say a colonel or a general?"

19   A.  At the moment of doing the drug shipment, referring to the

20   plane to Honduras, an actual colonel or a general arrived to

21   inspect the plane he would be there making sure that that

22   didn't happen.

23   Q.  And is that -- okay.

24             If we can move ahead to 18:05 on the tape, page 46,

25   row 35 in the transcripts.

GB99FLO6                        Santos Peña - direct

1              If you could play from 18:05, Mr. Calabrese, to 19:06

2     which will take us to page 49, row 6.

3              (recording played)

4     Q.  Sir, I want to direct your attention back to page 48, row

5     11.

6     A.  Yes, sir.

7     Q.  Do you see where defendant Flores said, "the DEA is not

8     here?"

9     A.  Yes, sir.

10    Q.  What did you understand him to mean when he said that?

11    A.  That the DEA was not in Venezuela.

12    Q.  And I want to direct your attention to page 31 on the same

13    page.

14              THE INTERPRETER:  Page 31?

15    Q.  Sorry.  Row 31 on the same page.

16    A.  Yes, sir.

17    Q.  Do you see where defendant Campo said, "Americans don't

18    come in?"

19    A.  Yes, sir.

20              "CAMPO:  If we could move on the Government Exhibits

21    202-T which is also -- (recording played) and 202-S.

22              If we could begin at page 6, row 10.  And we'll just

23    play that row.

24              (recording played)

25    Q.  Sir, what are we listening to a recording of here?

1    A.  When he was referring to the cocaine purchase.  That he had

2    had a bad experience in the past.

3    Q.  Is this a continuation of the first meeting?

4    A.  Yes, sir.

5    Q.  And do you see where in page 6, row 10 defendant Campo

6    said, "it's been a long time since I've purchased directly?"

7    A.  Yes, sir.

8    Q.  What did you understand defendant Campo to be referring to

9    purchasing here?

10   A.  That he didn't buy kilos of cocaine.

11   Q.  So what was he referring to purchasing?

12          MR. JACKSON:  Objection, your Honor.  Asked and

13   answered.

14          THE COURT:  Overruled.

15          THE WITNESS:  Kilos of cocaine.

16          MR. QUIGLEY:  Move ahead to page 8, row 25.  And I'd

17   ask Mr. Calabrese to read the witness's part.  I'll read

18   defendant Campos part.  And we'll read to page 9, row 10.

19          "CAMPO:  No that's why.  Let's -- oh, tomorrow, I'm

20   going to meet with the people.  But I'm telling you again it's

21   about a while since I last looked for merchandise myself

22   because of that I issue.

23          "CS-1:  Mm-hm.

24          "CAMPO:  Of the fact that it happened to us already.

25   At one time, I said, I'll never again will I look.

GB99FLO6                          Santos Peña – direct

1          "CS-1:  Now.

2          "CAMPO:  For the merchandise.

3          "CS-1:  That's the.

4          "CAMPO:  Myself.

5          "CS-1:  That the what I'm proposing for better."

6          MR. QUIGLEY:  If we could move ahead, page 10, row 5.

7    And play to roughly page 11, row 10.

8          (recording played)

9    Q.  Sir, do you see on page 10, row 9?

10   A.  Yes, sir.

11   Q.  Where defendant Campo said, "Look, I need for you to give

12   me some material so I can see what it's like, if I like it,

13   good."

14   A.  Yes, sir.

15   Q.  What did you understand defendant Campo to mean by

16   "material?"

17   A.  Cocaine.

18   Q.  And who was he going to ask to get him cocaine?

19   A.  He's a drug supplier, cocaine supplier.

20   Q.  And at page 10, row 23.  Do you see where defendant Campo

21   said, "we're going to work?"

22   A.  Yes, sir.

23   Q.  And at row 25 where defendant Flores said, "and if it's

24   ready, then right away?"

25   A.  Yes, sir.

GB99FLO6                        Santos Peña – direct

1    Q.  Let's move ahead to page 28, row 42.

2    A.  Yes, sir.

3           MR. QUIGLEY:  Mr. Calabrese, if we could play from

4    9:55 to 10:23.

5           (recording played)

6    Q.  Sir, who is that individual we see on the screen right

7    there?

8    A.  Mr. Campo.

9    Q.  If you could continue playing from where we left off, which

10   is roughly page 30, line 41 to page 33, line 6.

11          (recording played)

12   Q.  Sir, do you see on page 33, row 6 where defendant Campo

13   says --

14   A.  Yes, sir.

15   Q.  "No at the H.  It arrives in Roatan over there?"

16   A.  Yes, sir.

17   Q.  Where is Roatan?

18   A.  In Honduras.

19   Q.  And what did you understand defendant Campo to mean when he

20   said, "it arrives to Roatan?"

21   A.  The drug shipment he was going to do from Venezuela to

22   Honduras.

23   Q.  Sir, what did you do at the end of this first meeting?

24          THE INTERPRETER:  I'm sorry, counsel.  Can you repeat.

25   Q.  What did you do at the end of this first meeting?

1  A.  When I got out I turned off the recording device before

2  exiting the building.  And Mr. Campo Flores, they sent me to

3  the hotel with the security agents.

4  Q.  What did you do with Device-1 and Device-2 when you got

5  back to the hotel?

6  A.  I asked my son for Device No. 1.  And I put it away

7  together with the Device No. 2 in the safe deposit box in the

8  room of the hotel.

9            THE COURT:  Is this a convenient place to break?

10            MR. QUIGLEY:  It is your Honor.

11            THE COURT:  Ladies and gentlemen of the jury, please

12  leave those transcript books right alongside the chair.  Don't

13  bring them into the jury room.

14            Remember what my instructions are.  Don't do any

15  investigation.  Don't talk about the case.  Keep open minds.

16  And we'll resume tomorrow morning at 9:30.  Thanks very much.

17  Safe home tonight.

18            (Continued on next page)

19

20

21

22

23

24

25

GB99FLO6                          Santos Peña – direct

1            (Jury not present)

2            (Witness excused)

3            THE COURT:  Anything to take up?

4            MR. JACKSON:  Your Honor, very briefly.

5            THE COURT:  Yes, Mr. Jackson.

6            Please be seated.

7            MR. JACKSON:  Thank you, Judge.

8            I understand the Court's ruling with regard to

9    interpretations.  I just wanted to say I am trying not to

10   interrupt the direct with objections.  I have a very different

11   view I think from the government in terms of what is an

12   appropriate interpretation.  I think that the prosecutors are

13   appropriately asking for words to be interpreted.  I think when

14   they ask for entire phrases and they -- it crosses a line that

15   ties into a previous objection.  All I'm asking, your Honor, is

16   if we can note for the record that I have a standing objection

17   to all of that, that type of questioning so I don't have to

18   interrupt them every time they make --

19           THE COURT:  That's fine with me, Mr. Jackson.

20           MR. JACKSON:  Thank you very much, Judge.

21           THE COURT:  Mr. Rody, do you have anything?

22           MR. RODY:  I have a similar objection, Judge, that I

23   did not want to interrupt on, and it's related to the earlier

24   testimony today about the transcript.  In the transcript it

25   says Americans when it says gueros, the Spanish word gueros

1    which is spelled --

2            THE COURT:  There's another one that you missed.  It

3    referred to Americans as gringos.

4            MR. RODY:  Correct.  No.  That was said by Mr. Campo.

5    When it's said by the Mexican -- by the person who is referring

6    to himself as the Mexican, he says gueros.  And it's written in

7    the transcript and in English as American.

8            THE COURT:  Yes.  And you pointed that out on

9    cross-examination.

10           MR. RODY:  We have an objection to that.

11           THE COURT:  Okay.  Fine.  Objection noted.

12           MR. JACKSON:  That's it from us.  Thank you very much,

13   your Honor.

14           THE COURT:  See you at 9:30 tomorrow morning.

15           MR. JACKSON:  Judge, I'm sorry.  It's my understanding

16   we're not sitting on Friday or is that undetermined at this

17   point?

18           THE COURT:  I think -- I'm told it creates an

19   administrative havoc with the Bureau of Prisons, and moving the

20   prisoners from where they're stationed into the courthouse.

21   It's a holiday for the interpreters.  It's a holiday for the

22   court reporters.  I had in the back of my mind that we'd ask

23   the jurors but the administrative hassle is so great I'm not

24   going to ask.  So the short answer to your question is we're

25   not going to sit on Friday.

GB99FLO6                          Santos Peña – direct

1           MR. JACKSON:  Thank you very much, Judge.

2           (Adjourned to November 10, 2016 at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                               Page

 3    SANDALIO GONZALEZ

 4    Cross By Mr. Rody . . . . . . . . . . . . . 438

 5    Redirect By Mr. Bove . . . . . . . . . . . 457

 6    Recross By Mr. Jackson . . . . . . . . . . 482

 7    Recross By Mr. Rody  . . . . . . . . . . . 490

 8     MARIA ELENA ALVARADO

 9    Direct By Mr. Quigley  . . . . . . . . . . 495

10    Cross By Ms. Espinosa  . . . . . . . . . . 503

11    Cross By Mr. Jackson . . . . . . . . . . . 515

12    HENRY RUGELES

13    Direct By Mr. Bove . . . . . . . . . . . . 521

14    Cross By Ms. Espinosa  . . . . . . . . . . 527

15    Cross By Mr. Jackson . . . . . . . . . . . 536

16    DANIEL MAHONEY

17    Direct By Mr. Quigley  . . . . . . . . . . 538

18    Cross By Mr. Jackson . . . . . . . . . . . 562

19    Cross By Mr. Rody  . . . . . . . . . . . . 582

20    Redirect By Mr. Quigley  . . . . . . . . . 586

21    Recross By Mr. Jackson . . . . . . . . . . 586

22     FRANK PIAZZA

23    Direct By Mr. Quigley  . . . . . . . . . . 587

24    Cross By Mr. Mann  . . . . . . . . . . . . 593

25    Cross By Mr. Jackson . . . . . . . . . . . 599
```

```
1    JOSE SANTOS PEÑA
2    Direct By Mr. Quigley . . . . . . . . . . . 603
3                    GOVERNMENT EXHIBITS
4    Exhibit No.                              Received
5    3508-38  . . . . . . . . . . . . . . . . 475
6    201T through 203T, 2015T through 208T,  . . . 500
7            210T through 213T, 215T
8            through 216T, 220T through
9            225T and 230T and 231T
10   300T through 310T, 403T through 409T, . . . . 526
11           416T, 417T, 502T through 518T,
12           and 3508-38-T
13   203E  . . . . . . . . . . . . . . . . . . 591
14   201S, 202S, 203S, 205S, 206S, 207S, . . . . . 593
15           208S, 210S, 211S, 212S, 213S,
16           215S and 216S, 220S through
17           225S and 230 and 231S
18   68   . . . . . . . . . . . . . . . . . . 609
```