GBA8FLO1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                        15 Cr. 765 (PAC)
4
    EFRAIN ANTONIO CAMPO FLORES and
5   FRANQUI FRANCISCO FLORES DE FREITAS,
6                Defendants.
    ------------------------------x
7
                                          New York, N.Y.
8                                         November 10, 2016
                                          9:30 a.m.
9   Before:
10                        HON. PAUL A. CROTTY,
11                                          District Judge
12                              APPEARANCES
13  PREET BHARARA
         United States Attorney for the
14       Southern District of New York
    EMIL J. BOVE III
15  BRENDAN F. QUIGLEY
         Assistant United States Attorneys
16
    BOIES, SCHILLER & FLEXNER LLP
17       Attorneys for Defendant Campo Flores
    RANDALL W. JACKSON
18  JOHN T. ZACH
    JOANNA CHRISTINE WRIGHT
19
    SIDLEY AUSTIN LLP
20       Attorneys for Defendant Flores de Freitas
    DAVID M. RODY
21  ELIZABETH A. ESPINOSA
    MICHAEL D. MANN
22
    ALSO PRESENT:
23
    HUMBERTO GARCIA
24  ANNA MARIA RISO
    ERIKA DE LOS RIOS
25  VIVIAN GOA
    Spanish Interpreters

1              (Trial resumed; jury not present)

2              THE COURT:  The jury is not here yet.  Do you want to

3      take something up?

4              MR. QUIGLEY:  Yes.  Very briefly, your Honor.  Your

5      Honor, during the testimony yesterday of Mr. Santos Peña the

6      interpreter asked for a clarification.  I asked a question to

7      Mr. Santos Peña about what do you mean by there and she asked

8      for a clarification saying that the word "there" did not appear

9      on the page.  I don't think we're asking for an instruction at

10     this time.  We'd just like the record to reflect two things.

11     Number one, that that's not evidence.  She's not testifying.

12     Number two, after speaking with her, her view is that the

13     interpretation is actually correct.  She said the object

14     "there" is added in the English to have the sentence make sense

15     in English.

16             THE COURT:  I thought the witness testified that

17     "there" wasn't there.

18             MR. QUIGLEY:  No.  I think the interpreter did, your

19     Honor.

20             MR. JACKSON:  Your Honor if the government is not

21     asking for an instruction we think the record is sufficiently

22     clear.  We don't intend to do anything with this.

23             THE COURT:  I don't think I'm going to do anything

24     with it.

25             What would the instruction say again Mr. Quigley?

1          MR. QUIGLEY:  Just that -- we're not asking for an

2     instruction at this time, your Honor.

3          THE COURT:  How are we doing in terms of witnesses?

4     One of the things I'd like to say -- I thought that was one of

5     the jurors who just walked in --

6          MR. JACKSON:  I was just going to say we did -- I'll

7     defer to the government, your Honor.

8          THE COURT:  What I'd like to say to the jury at the

9     close of business today is we're on track, we're not on track,

10    is the government going to be finished as of a certain date.

11         MR. QUIGLEY:  Your Honor, this is the witness we

12    anticipated having on direct yesterday and today.  So I think

13    from our perspective we are on track.  It's difficult to say.

14    Obviously, ultimately that will be affected also by the length

15    of cross-examination.

16         THE COURT:  All right.

17         Mr. Jackson.

18         MR. JACKSON:  Your Honor, from the defense's

19    perspective we are on track and I don't anticipate, as Mr. Rody

20    said, that the cross-examinations with most of the remaining

21    government witnesses will be long.  The cross-examination of

22    this witness I think, obviously, is going to be somewhat

23    substantial.

24         THE COURT:  I understand that.

25         MR. JACKSON:  But I think we'll be moving pretty

GBA8FLO1                    Trial

1    quickly.  We notified the government this morning that we were

2    withdrawing one of our subpoenas related to a government

3    witness and I think hopefully we'll be able to get some more

4    clarity at the end of the week in terms of what witnesses are

5    expected next week.  But I think we may be moving even faster.

6            THE COURT:  Do you anticipate your examination to be

7    finished today, Mr. Quigley?

8            MR. QUIGLEY:  I think it will take most of the day,

9    your Honor.  We may get through it by sometime in the

10   afternoon.

11           THE COURT:  So I'll tell the jury we're on track.

12           MR. QUIGLEY:  I think that's fair, your Honor.

13           THE COURT:  Anything else?  They're here?

14           THE DEPUTY CLERK:  Yes.

15           MR. QUIGLEY:  Grab the witness first, your Honor?

16           THE COURT:  Oh, yes, please.

17     JOSE SANTOS PEÑA, resumed

18           (Continued on next page)

19

20

21

22

23

24

25

GBA8FLO1                        Santos Peña – direct

 1              (Jury present)

 2              THE COURT:  Good morning.

 3              Pick up your notebooks.

 4              Let me remind the witness that he's still under oath.

 5              THE WITNESS:  Yes, sir.

 6              THE COURT:  All right, Mr. Quigley.

 7     DIRECT EXAMINATION CONTINUED

 8     BY MR. QUIGLEY:

 9     Q.  Good morning.

10     A.  Good morning.

11     Q.  So yesterday we were talking about the first meeting you

12     had with the defendants in Venezuela.  Do you recall that?

13     A.  Yes, sir.

14     Q.  I'd like to turn to Government Exhibit 202-T.  We'll go to

15     page 21, line 20.

16     A.  Yes, sir.

17              MR. QUIGLEY:  We could read from page 21, 20 to page

18     22, line 10.  I'll read the part of defendant Campo and I'd ask

19     Mr. Calabrese to read the part of the witness.

20              "CAMPO:  I said to him since when, how much time does

21     the person have uh, merchandise?  And he said to me, Yes as

22     much as we want.  I said to him, Perfect.  I need the contact

23     for the merchandise.

24              "CS-1:  Mm-hm.

25              "CAMPO:  They haven't given it to me.

GBA8FLO1                          Santos Peña – direct

1          "CS-1:  Mm-hm.

2          "CAMPO:  I went over there a month ago, and since then

3    I've been -- the contact, the contact?  He said to me with the

4    person.

5          "CS-1:  What.

6          "CAMPO:  With Rayo.

7          "CS-1:  Is happening that.

8          "CAMPO:  He will, he will bring you the merchandise.

9          "CS-1:  Yes.  What's going on is that Rayo, Rayo is,

10   he was going to be in charge of that.  And, and since I came

11   here and I was going to see you I said to him those two men."

12   BY MR. QUIGLEY:

13   Q.  Sir, who was Rayo an associate of?

14   A.  Nobody.  He is a worker for Sentado.

15   Q.  Did he ever arrive in Venezuela from Honduras?

16   A.  No, sir.

17   Q.  If you could go to what's in evidence as Government Exhibit

18   300-T which is a BlackBerry chat from October 2000 between the

19   witness and Rayo.

20   A.  Yes, sir.

21        MR. QUIGLEY:  And we'll read from page 2, row 2.

22   Mr. Calabrese, if you would read the part of the witness and I

23   will read the part of Rayo.

24        "CS-1:  Good afternoon.

25        "CAMPO:  How are you sir.  Hello sir.

1           "CS-1:  Good evening sir.  How are you?

2           "CAMPO:  I was here running an errand.

3           "CS-1:  So what's new?  Are you already here?

4           "CAMPO:  Well, no, sir because I had trouble getting a

5     visa.

6           "CS-1:  Okay.  So you won't be able to come?

7           "CAMPO:  Look, sir, I think the man is going to send

8     someone else because things got complicated for me because of

9     some papers.

10          "CS-1:  All right sir.  No worries these things

11    happen.

12          "CAMPO:  What do you think about these people, sir?

13          "CS-1:  Excellent.  Very reliable.  Well, look, I'll

14    talk to Sentado and work that out."

15          MR. QUIGLEY:  Now if we could go to what's in evidence

16    as Government Exhibits 504-T which is a BlackBerry chat between

17    defendant Flores and Rayo.  And if you could go to segment B on

18    pages three and four.  And Mr. Calabrese if you could read the

19    part of Rayo and I'll read the part of defendant Flores.

20          "FLORES:  What's up brother how are you?  What

21    happened to the man he hasn't been in touch with el primo for a

22    while and we're ready.  He's only been in touch with Flaco.

23          "RAYO:  Okay brother I will get you in touch no.  In

24    touch.

25          "FLORES:  Perfect.  We are ready.

1          "RAYO:  We're at one hundred percent.

2          "FLORES:  Here too. We already have the fbo.

3          "RAYO:  Okay perfect.

4          "FLORES:  He never said anything about the visas for

5     the drivers from America.

6          "RAYO:  Okay I'm going to where he is now and I'll

7     tell him.  How is everything brother.

8          "FLORES:  Everything is good brother just waiting to

9     receive your visit over here.

10         "RAYO:  Yes brother we're working on it so we can

11    travel.

12         "FLORES:  Excellent.

13         "RAYO:  That's right brother."

14         MR. QUIGLEY:  If you could go ahead to segment E on

15    page 8.

16         THE WITNESS:  Yes, sir.

17         MR. QUIGLEY:  Again, I'll read the part of the

18    defendant Flores and Mr. Calabrese if you could read the part

19    of Rayo.

20         "FLORES:  What was up brother we are waiting for you

21    to confirm that you're coming.

22         "RAYO:  Yes, sir.  I was just going to write to you

23    now because we need visas to go where you guys are.

24         "FLORES:  Okay, okay.

25         "RAYO:  I don't know how you can help them getting the

1    visas.

2              "FLORES:  We don't have a contact in your area.  We

3    have that in the USA.

4              "RAYO:  Okay let me see now what we can do for the man

5    brother.

6              "FLORES:  Okay.  Okay.

7              "RAYO:  Good day, brother."

8              MR. QUIGLEY:  You can put the transcripts away for a

9    few minutes.

10   BY MR. QUIGLEY:

11   Q.  Sir, after you first met with the defendants to discuss the

12   deal, where was the next place that you saw them?

13   A.  I'm sorry.  I didn't understand the question.

14   Q.  After the first business meeting with the defendants, where

15   was the next time you saw them?

16   A.  The same day at night, that night, at a disco-tech.

17   Q.  How did you end up at a disco with them?

18   A.  After I finished the first work meeting, Mr. Campo and

19   Mr. Flores, they invited me to a disco.

20   Q.  And was that the meeting that you said you didn't record?

21   A.  Yes, sir.

22   Q.  How did you get to the disco?

23   A.  First they took me to the hotel and then they came by to

24   pick me up at the hotel.

25   Q.  What, if any, illegal activity did you engage in while at

GBA8FLO1                          Santos Peña – direct

1    the disco?

2    A.  Yes, sir.  I consumed drugs.

3    Q.  What drug?

4    A.  Cocaine.

5    Q.  And were you authorized by the DEA to be doing that?

6    A.  No, sir.

7    Q.  After you got back to the United States did you tell the

8    DEA that you had used cocaine while in Venezuela?

9    A.  No, sir.

10   Q.  Did you use cocaine multiple times while in Venezuela?

11   A.  Yes, sir.

12   Q.  Did you use a prostitute that night as well?

13   A.  Yes, sir.

14   Q.  Who paid for the prostitute that night?

15   A.  Mr. Campo.

16   Q.  And did you use prostitutes more than once while in

17   Venezuela?

18   A.  Yes, sir.

19   Q.  After you got back to the United States did you tell the

20   DEA that you had used prostitutes while in Venezuela?

21   A.  No, sir.

22   Q.  Were you authorized to be doing that?

23   A.  No, sir.

24   Q.  After the meeting at the disco, did you meet with the

25   defendants again to discuss the drug?

GBA8FLO1                       Santos Peña – direct

1   A.  Yes, sir.

2   Q.  Where did that meeting happen?

3   A.  At the same place where I had met with them the first time.

4   Q.  And how did you get to that meeting?

5   A.  Mr. Campo and Francisco sent for me at the hotel.

6   Q.  And what did you do with Device-1 before you left the

7   hotel?

8   A.  I gave it to my son.

9   Q.  What did you do with Device-2?

10  A.  I kept it on my body.

11  Q.  What did you do with Device-2 when you got to the meeting?

12  A.  I asked for a bathroom inside the building where the

13  meeting was going to be held and there I activated it.

14  Q.  Who was present in the room where the meeting took place?

15  A.  Mr. Campo, Mr. Francisco, my son, Paul, and myself.

16  Q.  And how was everybody seated in the room?

17  A.  Mr. Campo was across from me.  My son was to my right.

18  Paul was in the back behind me and my son.  And Francisco was

19  to the left of Mr. Campo.

20          MR. QUIGLEY:  If we could go back to the binders and

21  pull up what's in evidence as Government Exhibit 205-T.

22          THE WITNESS:  Yes, sir.

23          MR. QUIGLEY:  If we could play from the beginning

24  which is at page 2, row 4 to page 4, row 3 which is about 1:20.

25          THE COURT:  What page are you starting on?

1          MR. QUIGLEY:  Right at the beginning, your Honor, page

2    2, row 4.

3          (Recording played)

4    Q.  Sir, what are you discussing here?

5    A.  There needed to be a guarantee.  There was a difference

6    between a white flight and a black flight.

7    Q.  What do you mean by a white flight?

8    A.  This is an aircraft that has a flight plan and has

9    permission to fly.

10   Q.  And an aircraft used to carry what?

11   A.  Cocaine.  Drugs.

12         MR. QUIGLEY:  If we could continue playing from where

13   we left off on page 4 to page 5, row 3.

14         (Recording played)

15   Q.  What were you just mentioning about the DEA there?

16   A.  They flew inside the planes that did the aerial intercept.

17   Q.  In Mexico and other countries?

18   A.  Yes, sir.

19         MR. QUIGLEY:  If we could move ahead to page 14, row

20   29.  And play to page 17, row 11.

21         (Recording played)

22   Q.  Backing up to page 15, row 21.

23   A.  Yes, sir.

24   Q.  Do you see where you say, "a thousand or two thousand?"

25   A.  Yes, sir.

1    Q.  What do you mean by a thousand or two thousand?

2    A.  One thousand or two thousand kilos of cocaine.

3              MR. QUIGLEY:  If we could move ahead to page 16, row

4    20.

5    Q.  Do you see in that row where Mr. Campo says, "I have two

6    GIIs"?

7    A.  Yes, sir.

8    Q.  What do you understand him to mean by GIIs?

9    A.  Two GII airplanes.

10   Q.  If we could go further down on that page to row 34.  Do you

11   see where defendant Campo says, "Since I'm putting in the load

12   and I'm providing the plane, they're only providing the

13   landing, I'm going for sixty percent"?

14   A.  Yes, sir.

15   Q.  What did you understand defendant Campo to mean when he

16   said, "I'm putting in the load"?

17   A.  That he was putting up the drugs, the cocaine.

18   Q.  And going from where to where?

19   A.  From Venezuela to Honduras.

20   Q.  And what did you understand him to be saying about who was

21   providing the landing?

22   A.  Receiving the airplane in Honduras.

23   Q.  And who was going to be doing that?

24   A.  Mr. Sentado.

25             MR. QUIGLEY:  Play from page 17, row 11 to page --

GBA8FLO1                    Santos Peña – direct

1    roughly page 20, row 20.

2            (Recording played)

3    Q.  Do you see on page 20, row 2?

4    A.  Yes, sir.

5    Q.  Where defendant Campo says, "Could go to Miami"?

6    A.  Yes, sir.

7    Q.  And then further down on the page your son says, "All of

8    our business there" in row 20?

9    A.  Yes, sir.

10   Q.  And then in the next row you say, "All of the business"?

11   A.  Yes, sir.

12           MR. QUIGLEY:  Let's continue playing from page 20, row

13   20 to page 25, row 11.

14           (Recording played)

15           MR. QUIGLEY:  Stop one second.

16           Continue.  Thank you.

17           (Recording played)

18   Q.  If you could back up to page 22, row 20.

19   A.  Yes, sir.

20   Q.  Do you see when in page 22, row 20 you ask defendant Campo

21   when you went to Honduras whether he went with his real name?

22   A.  Yes, sir.

23   Q.  What was the trip to Honduras you were asking defendant

24   Campo about here?

25   A.  A trip that defendant Campo and Francisco had made to

1    Honduras with Sentado.

2    Q.  And do you see on page 22, row 20 where defendant Campo

3    said, "I went with my real name"?

4           Sorry, page 22, row 28.

5    A.  Yes, sir.

6    Q.  And moving ahead to page 23 -- sorry, page 24, row 4?

7    A.  Yes, sir.

8    Q.  Do you see where defendant Campo said, "The extraditables

9    and so I needed to meet with a professor from there"?

10   A.  Yes, sir.

11   Q.  What did you understand him to be referring to here?

12   A.  He was using that phrase to justify his arrival in

13   Honduras.

14   Q.  For the meeting with Sentado?

15          MR. JACKSON:  Objection to the leading.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Overruled.

18   Q.  What do you understand the extraditables to be a reference

19   to?

20   A.  The extraditables are people who commit crimes in any

21   country against the United States.

22          MR. QUIGLEY:  If you could move ahead to page 29, row

23   33.

24          THE WITNESS:  Yes, sir.

25          MR. QUIGLEY:  And play from there to page 30, row 17.

GBA8FLO1                        Santos Peña – direct

1              (Recording played)

2   Q.  So do you see on page 30, row 6 where defended Campo said

3   "800"?

4   A.  Yes, sir.

5   Q.  What do you understand him to mean by "800" here?

6   A.  Eight hundred kilos of cocaine.

7   Q.  And then in row 11 where he says, "In the meantime, well we

8   can work with that and then for the second one we'll"?

9   A.  Yes, sir.

10  Q.  What did you understand him to mean by "the second one"?

11  A.  The second shipment of drugs.  In the future.

12  Q.  In addition to the 800?

13  A.  Yes, sir.

14          MR. QUIGLEY:  We could continue playing from page 30,

15  row 17 to page 31, row 17.

16              (Recording played)

17  Q.  In page 31, row 17, what were you referring to when you

18  said a GII?

19  A.  An airplane.

20          MR. QUIGLEY:  I'd now like to read from page 31, row

21  25 to page 32, row 26.  And I'd ask Mr. Calabrese to read the

22  part of the witness and I'll read the part about defendant

23  Campo.

24          "CAMPO:  No because we can.

25          "CS-1:  But what.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              "CAMPO:  Purchase it.

2              "CS-1:  Don't want.

3              "CAMPO:  We can purchase it.

4              "CS-1:  Is.  Bring it to me.  For it to look like a

5      tail.  I prefer that not even the" explicative "damn traveler.

6              "CAMPO:  No.

7              "CS-1:  Knows anyone.

8              "CAMPO:  Because we can purchase it.  You know what?

9      We can purchase a GII.

10             "CS-1:  Right.

11             "CAMPO:  From the United States."

12             THE WITNESS:  Yes, sir.

13     Q.  Let's move ahead to page 38, row 21?

14     A.  Yes, sir.

15     Q.  Do you see where defendant Campo says, "If not we'll

16     purchase a Falcon"?

17     A.  Yes, sir.

18     Q.  What did you understand him to mean by "a Falcon"?

19     A.  An airplane.

20             MR. QUIGLEY:  If we could play on the tape from page

21     38, row 21 to page 39, row 21.

22             (Recording played)

23     Q.  Do you see on page 39, row 21 where defendant Campo says,

24     "Here we are all set with the topic of the car"?

25     A.  Yes, sir.

GBA8FLO1                        Santos Peña – direct

1          MR. QUIGLEY:  We could move ahead to Government

2  Exhibit 206-T.

3          THE WITNESS:  Yes, sir.

4          MR. QUIGLEY:  Mr. Calabrese, could you pull up 206-S.

5          If we could play from the beginning of the recording

6  on page 2 to roughly page 3, row 5.

7          THE WITNESS:  Yes, sir.

8          (Recording played)

9  Q.  What did we just listen to, sir?

10 A.  The continuation from the prior conversation.

11 Q.  The prior recording?

12 A.  Yes, sir.

13 Q.  And you see on page 3, row 5 where defendant Campo said,

14 "the car, well we wrapped it up.  The test, mm-hm, the price

15 for landing and unloading over there"?

16 A.  Yes, sir.

17 Q.  What did you understand defendant Campo to be referring to

18 when he said "the price for landing and unloading over there"?

19 A.  Did you mention the car?

20 Q.  No.  I asked you what do you mean -- what did you

21 understand defendant Campo to be referring to when he said "the

22 price for landing and unloading over there"?

23 A.  Yes, sir.

24          That was the price for receiving the plane that he was

25 going to send from Venezuela to Honduras.

GBA8FLO1                        Santos Peña – direct

1    Q.  And in what country would that price need to be paid?

2    A.  The cost of receiving it in Honduras.

3              MR. QUIGLEY:  If we could play from page 3, row 5 to

4    page 4, row 21.

5              (Recording played)

6    Q.  Do you see where on page 4, row 21?

7    A.  Yes, sir.

8    Q.  Defendant Campo said, "He did tell me the landing and the

9    unloading have to be paid and the landing and unloading is nine

10   hundred thousand"?

11   A.  And what is the question?

12   Q.  Do you see that?

13   A.  Yes, sir.

14   Q.  Now, further up in the row do you see where defendant Campo

15   says, "He said on the low, low end twelve"?

16   A.  Yes, sir.

17   Q.  What do you understand "twelve" to be a reference to here?

18   A.  Twelve thousand dollars was the price of the cocaine that

19   Sentado had to pay for it going to Honduras.

20   Q.  And who would be paid the twelve thousand dollars per kilo?

21   A.  Sentado.

22   Q.  Who would he be paying that to?

23   A.  Mr. Campo.

24             MR. QUIGLEY:  Let's continue to play from page 4, row

25   21 to page 5, row 5?

1    A.  Yes, sir.

2              (Recording played)

3    Q.  At page 5, row 5?

4    A.  Yes, sir.

5    Q.  Do you see where defendant Campo says, "Yes and he said,

6    depending on how much you send, the landing and unloading will

7    be more economical"?

8    A.  Yes, sir.

9    Q.  What do you understand the defendant to be saying here?

10   A.  Mr. Sentado was telling him that the highest amount of the

11   drugs, the more the profits.  Because he would pay a minimum

12   amount to receive the plane.  Regardless of the amount that

13   arrived.

14   Q.  So he's saying that the landing fee was the same regardless

15   of the amount?

16              MR. JACKSON:  Objection.  Leading.

17              THE COURT:  Overruled.

18              THE WITNESS:  Yes, sir.

19              MR. QUIGLEY:  Let's continue playing from page 5, row

20   5 to page 7, row 8.

21              (Recording played)

22   Q.  At page 7, row 6 do you see where defendant Flores said

23   "That's also the main airport in the country"?

24   A.  Yes, sir.

25   Q.  And then at page 7, row 8 where defendant Campo said "We're

1    taking that out from the main airport in the country"?

2    A.  Yes, sir.

3    Q.  What did you understand defendant Campo to mean by the

4    main -- "taking that out from the main airport in the country"?

5    A.  That the cocaine was going to be taken out from the main

6    airport in Caracas, Venezuela.

7           MR. QUIGLEY:  Continue playing from page 7, row 8 to

8    page 8, row 9.

9              (Recording played)

10   Q.  So backing up to page 7.

11   A.  Yes, sir.

12   Q.  Row 34.  Do you see where defendant Campo says "I told him,

13   well, that works for me, because the maximum, maximum"?

14   A.  Yes, sir.

15   Q.  Who is defendant Campo referring to when he said, "I told

16   him"?

17   A.  To Mr. Sentado.

18   Q.  And do you see on page 7, row 34, carrying over to page 8,

19   row 5, "And he told me" explicative "going out to Europe.  If

20   we were going to Europe, then they would raise the cost.  But

21   for this area, at least Central America, all of those

22   countries, it's one million two hundred tops"?

23   A.  Yes, sir.

24          MR. QUIGLEY:  If we could play from page 8, row 9 to

25   page 21, row 33.

 1              (Recording played)

 2              MR. QUIGLEY:  If we could read now from page 21, row

 3     33 to page 22, row 5.  And I'll read the part of defendant

 4     Campo and I would ask Mr. Calabrese to read the part of the

 5     witness.

 6              "CAMPO:  The price of uh, uh is that one, because I

 7     was discussing it with him, and he told me, Yeah, sometimes it

 8     goes up a little bit, sometimes it goes down another, but

 9     that's standard right now, he told me.

10              "CS-1:  That's correct.

11              "CAMPO:  Because of the demand at the present time,

12     perhaps in two months, one could go up a little more.

13              "CS-1:  Mm-hm.

14              "CAMPO:  But he told me it's very rare for it to go

15     under twelve, man, that is I mean it's rare.  He told me

16     however, this is how much we pay for the landing and unloading.

17     I see, all right, all set.  I told him, Perfect, that's fine,

18     because let's suppose that it's the, the same nine hundred.

19              "CS-1:  Mm-hm.

20              "CAMPO:  They're charging a thousand for each, for

21     each one."

22     Q.  Who did you understand defendant Campo to be talking about

23     the conversation with here?

24     A.  With myself.

25     Q.  And with defendant Campo is talking about the price,

GBA8FLO1                    Santos Peña – direct

1    directing your attention to page 22, row 1, where defendant

2    Campo says "He told me it's very rare for it to under twelve."

3    A.  Yes, sir.

4    Q.  What did you understand "twelve" to mean there?

5    A.  Twelve thousand dollars per kilo.

6    Q.  Of what?

7    A.  Of cocaine that Mr. Sentado would pay Mr. Campo.

8         MR. QUIGLEY:  Let's continue playing from where we

9    left off, page 21, row 33 to page 22, row 17.

10        (Recording played)

11        MR. QUIGLEY:  If we could look at page 22, row 14.

12        THE WITNESS:  Yes, sir.

13   Q.  Do you see towards the bottom of the row where you say,

14   "I'll keep putting money into it until it gets to Mexico, and I

15   keep putting money into it to get it over there, and I keep

16   putting money into it to get it into the Americans, to cross it

17   over, and I'm taking all the risks, but this is the deal, when

18   I do sell, I sell at a high price"?

19   A.  Yes, sir.

20   Q.  What did you mean when you said you keep putting money into

21   it to get it into the Americans?

22   A.  That I keep investing money to each kilo of cocaine in

23   order to cover more land and get to the U.S.

24   Q.  And what were some of the expenses that you would need --

25   you were referring to here?

GBA8FLO1                    Santos Peña – direct

1   A.  Transportation and safety.

2   Q.  And at the bottom -- towards the bottom of that row right

3   after the word "Americans" do you see where it says "to cross

4   it over"?

5   A.  Yes, sir.

6   Q.  What do you mean by, "cross it over"?

7   A.  To cross the U.S. border.

8        MR. QUIGLEY:  If you could continue playing from where

9   we left off which is at page 22, row 14 to page 24, row 24.

10        (Recording played)

11  Q.  Sir, do you see, backing up to page 24, row 14?

12  A.  Yes, sir.

13  Q.  Where defendant Campo refers to negotiations with some

14  French people?

15  A.  Yes, sir.

16  Q.  And on page 24, row 18 where defendant Flores says, "for us

17  to pay them"?

18  A.  Yes, sir.

19  Q.  What type of negotiations did you understand the defendants

20  to be referring to here?

21  A.  A different negotiation they had, different than the one

22  that they had with me.  It was a different one.

23  Q.  About what type of product?

24  A.  Cocaine.

25        MR. QUIGLEY:  Now, if we could continue playing from

1  page 24, row 24 to page 25, row 27.

2            (Recording played)

3            MR. QUIGLEY:  Go ahead to page 28, row 21.  And if

4  Mr. Calabrese could read the part of the witness and I'll read

5  the part of defendant Campo and we'll read to the bottom of the

6  page.

7            "CS-1:  Here, here no, here, what I'm going to do here

8  is that the thousand kilos, or two thousand, or three thousand,

9  or five thousand, whatever you'll be sending me, we'll start

10  with those thousand or eight hundred whatever you can.

11            "CAMPO:  Yes.  Let's get started right away."

12            MR. QUIGLEY:  If we could play from page 28, row 25 to

13  page 33, row 4.

14            (Recording played)

15  Q.  Sir, what did you understand defendant Campo to be saying

16  here about why it was important for him to get money from this

17  drug deal?

18  A.  To bribe regarding his mom's political campaign.

19            MR. QUIGLEY:  If we could read from page 33, row 4.

20            THE WITNESS:  Yes, sir.

21            MR. QUIGLEY:  To page 33, row 28.  I'll read the part

22  of defendant Campo and I'd ask Mr. Calabrese to read the part

23  of the witness.

24            "CAMPO:  Do you understand?  So that's why I need to

25  wait for the election to take place, and then have them pay.

1              "CS-1:  Right.  Okay.  I, uh, uh, we understood that

2      clearly and the intention is clear, and where we're going to

3      focus.  The only thing I wanted to say, so you can also make

4      your own plans, is this:  My commitment as a man is that I'll

5      work with you starting today up until.

6              "CAMPO:  Until no but I'm saying.

7              "CS-1:  The day.

8              "CAMPO:  Up until the 8th, until the 8th.

9              "CS-1:  Up until the 8th, 12th of December tops.

10             "CAMPO:  And then we around the 15th of January.

11             "CS-1:  And I will, and I will, and I will explain

12     why, um, I stopped during that time.  Because starting

13     December 8th or 12th I'll stop putting anything into the

14     United States.  Why?  Because the border gets very harsh

15     surveillance then and I'm not going to risk having problems and

16     having taken away from me."

17     BY MR. QUIGLEY:

18     Q.  Do you see on page 33, row 24 where you say "Because

19     starting December 8th or 12th I'll stop putting anything

20     into the United States"?

21     A.  Yes, sir.

22     Q.  What did you mean by that?

23     A.  That I would stop introducing drugs, specifically cocaine,

24     to the United States.

25     Q.  On or about what date?

GBA8FLO1                        Santos Peña – direct

1    A.   In December from 8 to 12 tops.

2              MR. QUIGLEY:  Let's play the tape from where we are to

3    the end.  So we'll go from page 33, row 24 to the end.

4              (Recording played)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBA5flo2                        Santos–Peña – direct

1    BY MR. QUIGLEY:  (continuing)

2    Q.  If we could move on to Government Exhibit 207-T?

3    A.  Yes, sir.

4    Q.  We will play from the beginning on page 2 through page 3,

5    row 4.

6    A.  Yes, sir.

7            (Audiofile played)

8    Q.  Sir, what is this a recording of?

9    A.  The continuation of the one we were seeing before.

10   Q.  And, directing your attention to page 3, row 2 --

11   A.  Yes, sir.

12   Q.  -- do you see where defendant Campo says:  I see.  See, I

13   told you that I would put up the sweets for you and I don't

14   have a problem with that.

15   A.  Yes, sir.

16   Q.  What did you understand him to be referring to by sweets

17   here?

18   A.  Cocaine.

19   Q.  Just continuing playing to 107 which will take us down to

20   the middle of page 3.

21           (Audiofile played)

22   Q.  Sir, directing your attention to page 3, row 10.

23   A.  Yes, sir.

24   Q.  Do you see where defendant Campo said:  So, I -- but I

25   called him again.  Look, buddy, I need this.  He said, but, if

1    you want to, we can fix.

2              Who do you understand defendant Campo to be referring

3    to here?

4    A.   A person whom he had spoken to in the past?

5    Q.   About what?

6    A.   The delivery of the cocaine.

7    Q.   And what had this person done in the past with respect to

8    Defendant Campo?

9    A.   The Defendant Campo had bought cocaine from him but he had

10   sent not such good quality.

11   Q.   Okay.  Let's continue playing then to where we left off to

12   page 4, row 9.

13              (Audiofile played)

14   Q.   Now I would like to read from page 4, row 13, to page 5,

15   row 1.  I will read the part of Defendant Campo and I would ask

16   Mr. Calabrese to read the part of the witness.

17   A.   Yes, sir.

18              MR. QUIGLEY:

19              "CAMPO:  What worries me a bit, since I pay for all of

20   this at once is the topic of the payment.  I was thinking the

21   following:  Let's so something for -- for both of our sakes.

22   You mentioned that at the latest it would take five days to,

23   for you to pay, at least for the first two or three times.

24              "CS-1:  Okay.

25              "CAMPO:  Well, let's do something.  You pay me 50

1   percent up front and 50 percent five days later.  At least the

2   first.

3               "CS-1:  50 percent on arrival?

4               "CAMPO:  No.  You give me 50 percent over here,

5   through somebody here.  If you want, when you guys leave from

6   the, from the *trompa*, and it gets there all right, I am with

7   the person here, I get paid my part, I will go, pay things off,

8   and then we will talk about mine in five days.  We won't talk

9   about this in five days."

10              Sir, directing your attention to page 4, row 17?

11  A.  Yes, sir.

12  Q.  What do you understand Defendant Campo to mean when he said

13  he wanted payment up front?

14  A.  He wanted the 50 percent payment for what he was going to

15  send from Venezuela to Honduras.

16  Q.  At what point?

17  A.  Up front.  First he wanted the money to be in Venezuela,

18  then send the airplane, and when the airplane was received,

19  having money at that moment.

20  Q.  Sir, directing your attention to page 5, row 1, do you see

21  where Defendant Campo said:  You give me 50 percent over here,

22  through somebody here?

23  A.  Yes, sir.

24  Q.  And then going down to page 5, row 3, do you see where you

25  said:  The issue of the assurance that I need to have regarding

1    the plane flying white?

2    A.   Yes, sir.

3    Q.   What did you mean by the plane flying white?

4    A.   That the airplane would depart with a flight plan.

5    Q.   Which plane?

6    A.   The plane that was taking the drugs from the airport in

7    Caracas, Venezuela, to Honduras.

8    Q.   Let's play page 4, row 9, to page 6, row 14.

9            (Audiofile played)

10   Q.   Did you see a few seconds ago where Defendant Campo

11   referred to somebody called Jose Bolanos?

12   A.   Yes, sir.

13   Q.   Who did Defendant Campo refer to as Jose Bolanos?

14   A.   This was a nickname that he gave me in order not to say my

15   name or the Mexican so that we could identify each other in our

16   communications.

17           (counsel conferring)

18   Q.   If you could go back to page 6, row 12?

19   A.   Yes, sir.

20   Q.   Do you see where Defendant Campo says:  I'm 30 years old.

21   30 years old.  I have been doing this work since I was 18.

22   A.   Yes, sir.

23   Q.   What type of work did you understand Defendant Campo to be

24   referring to here?

25   A.   Drug trafficking.

GBA5flo2                           Santos-Peña – direct

1   Q.  Let's play it from -- let's move ahead to page 14, row 28?

2   A.  Yes, sir.

3   Q.  And we will play to page 17, row 21.

4            (Audiofile played)

5   Q.  Do you see on page 17, row 21 --

6   A.  Yes, sir.

7   Q.   -- where Defendant Campo refers to little animals?

8   A.  Yes, sir.

9   Q.  What did you understand him to mean by little animals?

10  A.  The kilos of cocaine that he would send from Caracas,

11  Venezuela, to Honduras.

12  Q.  Let's play from where we left off, page 17, row 21, to page

13  20, row 19.

14           (Audiofile played)

15  Q.  Sir, directing your attention back to page 18, row 9 --

16  A.  Yes, sir.

17  Q.   -- do you see where at line 9 you say to Defendant Campo:

18  If you want to send someone over there?

19  A.  Yes, sir.

20  Q.  And then on page 18, row 11 Defendant Campo says:  I have a

21  guy there.

22  A.  Yes, sir.

23  Q.  And then on row 15 where Defendant Campo says:  He is

24  really super loyal.

25  A.  Yes, sir.

1    Q.  And then, at row 21, where Defendant Campo says:  He's a

2    very responsible person.  As a matter of fact, he is very good

3    friends with Sentado, a very good friend.

4    A.  Yes, sir.

5    Q.  Sir, I want to focus your attention on page 19, row 1.  Do

6    you see where you said:  Sentado's people are all my people

7    including Sentado, too.

8    A.  Yes, sir.

9    Q.  If we could move on to Government's Exhibit 208-T?

10            THE COURT:  Why don't we take our morning recess.

11            (Jury not present)

12            THE COURT:  See you in 15 minutes.

13            (Recess)

14            (Jury present)

15            THE COURT:  Mr. Quigley?

16   BY MR. QUIGLEY:

17   Q.  Sir, when we left off we were talking about the second

18   meeting you had with the defendants in Venezuela regarding this

19   drug transaction.  Do you recall that?

20   A.  Yes, sir.

21   Q.  If we can go to Government Exhibit 208-T?

22   A.  Yes, sir.

23   Q.  And I would ask everyone to turn to page 13, row 6.

24   A.  Yes, sir.

25   Q.  Sir, do you see where it says, in that row:  Right now for

1   that amount, the five million.  I'll just ask some guys who I

2   know here that move paper for me?

3   A.  Yes, sir.

4   Q.  What were you referring to when you said "five million"?

5   A.  That was what Mr. Campo was asking for, for what he was

6   going to send from Venezuela to Honduras.

7   Q.  What portion of the total cost was that going to be?

8   A.  50 percent.

9   Q.  If we could play from 435 on the tape, which will take us

10  from page 13, row 6 to page 15, row 13.

11          (Audiofile played)

12  Q.  Thank you.

13          Sir, do you see at page 15, row 9?

14  A.  Yes, sir.

15  Q.  Where Defendant Campo says:  Well, the truth is that for me

16  to open up to -- look.  Here you could say, this guy is doing

17  this, but nobody has any real proof of what I might or might

18  not be doing.

19  A.  Yes, sir.

20  Q.  Do you see on page 15, row 13 where Defendant Campo says:

21  Nobody, I mean nobody can say -- look.  How come this guy

22  drives those trucks over here?

23          And then further down in the row he says:  But nobody

24  around here knows what we might or might not end up doing.

25  A.  Yes, sir.

GBA5flo2                          Santos-Peña – direct

1  Q.  What did you understand Defendant Campo to be referring to

2  here?

3  A.  Nobody had evidence to say that he was dedicated to drug

4  trafficking.

5  Q.  If we could move on to page 18, row 24?

6  A.  Yes, sir.

7  Q.  And play from there to page 20, row 22?

8          (Audiofile played)

9  Q.  Sir, do you see on page 20, row 22 --

10 A.  Yes, sir.

11 Q.  -- where Defendant Campo says:  We are going to do the

12 first one on Tuesday?

13 A.  Yes.

14 Q.  And then:  He moves the M here on Tuesday?

15 A.  Yes, sir.

16 Q.  You finish paying me, be off on Sunday?

17 A.  Yes, sir.

18 Q.  Look, next Wednesday, I'm going to be sending you the other

19 one.

20 A.  Yes, sir.

21 Q.  What did you understand Defendant Campo to mean what he

22 said:  The first one.

23 A.  The first of the delivery of drugs that he was going to

24 make from Caracas, Venezuela to Honduras.

25 Q.  And in that same row, what did you understand Defendant

GBA5flo2                        Santos-Peña - direct

1    Campo to mean when he said:  The other one.

2    A.  Another drug shipment that would be made, but in the

3    future.

4    Q.  Let's play from 758, Mr. Calabrese, so from page 20, row

5    22, to page 21, row 20.

6            (Audiofile played)

7    Q.  So, sir, focusing your attention back on page 21, row 16 --

8    A.  Yes, sir.

9    Q.  Do you see where Defendant Campo said:  I'm need 20 million

10   by December 10, at the latest?

11   A.  Yes, sir.

12   Q.  What did you understand him to mean by 20 million?

13   A.  That he needed 20 million doing drug shipments and that he

14   would use those 20 million for his mother's campaigns.

15   Q.  20 million what?

16   A.  Dollars.

17   Q.  If we could play Mr. Calabrese page 21, row 16 to page 22,

18   row 5?

19            (Audiofile played)

20   Q.  Do you see on page 22, row 5 --

21   A.  Yes, sir.

22   Q.   -- where Defendant Campo refers to the car make, the

23   sweets, and all of that?

24   A.  Yes, sir.

25   Q.  What did you understand him to mean by the car?

GBA5flo2                          Santos-Peña - direct

1    A.  An airplane.

2    Q.  And the sweets?

3    A.  Cocaine.

4    Q.  If we could continue playing to page 24, row 1?

5            (Audiofile played)

6    Q.  If we could back up for a second to page 23, row 20?

7    A.  Yes, sir.

8    Q.  Do you see in that row where Defendant Campo says:  The

9    truth is that I really didn't have any problem working directly

10   with you?

11   A.  Yes, sir.

12   Q.  And then on -- I want to direct your attention to page 29,

13   row 1?

14   A.  Yes, sir.

15   Q.  Sorry, row 2.  Do you see where Defendant Campo says:

16   Besides it is -- we knew that the H was complicate, but we

17   arrived and then -- there was -- we traveled over there, very

18   white.

19   A.  Yes, sir.

20   Q.  What did you understand Defendant Campo to be referring to

21   when he said:  The H?

22   A.  Honduras.

23   Q.  And what was your understanding of why he had traveled to

24   Honduras?

25   A.  To talk to Mr. Sentado.

GBA5flo2                          Santos-Peña - direct

1    Q.  If we could play from page 29, row 2, to page 31, row 29?

2              (Audiofile played)

3    Q.  What did you understand Defendant Campo to be talking about

4    here?

5    A.  That he had gone to Honduras and he hadn't had a good

6    welcoming at the time of arriving.

7    Q.  And let's continue playing from where we left off to page

8    35, row 1.

9              (Audiofile played)

10   Q.  So, if we can move back to page 33, row 32?

11   A.  Yes, sir.

12   Q.  Do you see where you said:  He is afraid and I understand

13   him, it is good for him to take care of himself?

14   A.  Yes, sir.

15   Q.  Who were you talking about here?

16   A.  Sentado.

17   Q.  I want to move ahead to page 34, row 9.

18   A.  Yes, sir.

19   Q.  Actually, let's back up to 34, row 5?

20   A.  Yes, sir.

21   Q.  Do you see where Defendant Campo says:  Imagine I -- I

22   delayed things with you over here because I wasn't ready for

23   you last week because I had already pulled the plug on all of

24   this?

25   A.  Yes.

1   Q.  And then, in row 9 where defendant Campo says:  As I

2   explained it to you, I was talking to other people?

3   A.  Yes, sir.

4   Q.  What did you understand Defendant Campo to mean when he

5   said:  Talking to other people.

6   A.  A different drug cartel.

7   Q.  Other than who?

8   A.  Another purchaser replacing me or Sentado.

9   Q.  If we could move ahead to -- let's play from 1602, which is

10  at page 35, row 1, and play to page 37, row 1.

11            (Audiofile played)

12  Q.  Sir, what do you understand Defendant Campo and Defendant

13  Flores to be discussing here?

14  A.  The impression they had of Sentado the day that they went

15  to talk to him about the drug shipment that they were going to

16  do.

17  Q.  What did they say happened when they got to see Sentado?

18  A.  That Sentado didn't receive them at the time when they

19  arrived at the airport because Mr. Sentado was watching a

20  soccer game.

21  Q.  Directing your attention to page 36, row 7?

22  A.  Yes, sir.

23  Q.  Do you see where Defendant Campo says:  Now, I am telling

24  you, I'm a fan of Barcelona.  I love Barcelona.  I like the

25  Magallanes.  I like the Boston Red Sox.  I love sports.  But,

GBA5flo2                          Santos–Peña – direct

1   brother, this is something so much more important.

2   A.  Yes, sir.

3   Q.  What did you understand Defendant Campo to be saying that

4   he thought was much more important than sports?

5   A.  That the drug deal he had gone to talk to Sentado about was

6   much more important than any soccer game.

7   Q.  If you can jump ahead to page 37, row 2?

8   A.  Yes, sir.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Do you see where defendant Campo says, "In fact, over there

2  people -- in fact my people over there told me, look, that man

3  is in a very good position over here, the thing is that it has

4  been really hot ground here so we had to disappear.  I mean the

5  truth is he's a person who is in a very good position and they

6  told me you only, you only have to talk to him"?

7  A.  Yes, sir.

8        MR. QUIGLEY:  We can play from 17:52 which is right at

9  page 37, row 2 to the end.

10        (Recording played)

11        MR. QUIGLEY:  All right.  Sir.

12  Q.  What did you do at the end of this meeting?

13  A.  I went to the bathroom to turn off Device No. 2 and then

14  the security agents of Mr. Campo took me to the hotel.

15  Q.  What, if anything, did you do with Device-1 when you got

16  back to the hotel?

17  A.  I asked it from my son.  And I put it away in the safe

18  deposit box together with Device No. 2.

19  Q.  Did you meet with the defendants again in Venezuela, sir?

20  A.  Yes, sir.

21  Q.  What was the reason for that meeting?

22  A.  The third meeting?

23  Q.  Yes.

24  A.  Mr. Campo was going to have for me a sample of cocaine.

25  Which would be the sample that we would test for me in order to

GBA9FLO3                       Santos Peña – direct

1    see the quality.

2    Q.  We'll get to that in a second.

3            MR. QUIGLEY:  You can put the binders down for a few

4    minutes.

5    A.  Yes, sir.

6    Q.  Let's take a step back.  Have you been involved in drug

7    trafficking outside your work as a DEA informant?

8    A.  Yes, sir.

9    Q.  When did you first get involved in drug trafficking?

10   A.  In the past?

11   Q.  Yes.

12   A.  From the year 1991 to the year 2000 I was involved in

13   receiving cocaine from Colombia to Mexico.

14   Q.  Where were you living at that time?

15   A.  In Mexico, Sinaloa.

16   Q.  Is that where you're from originally?

17   A.  Yes, sir.

18   Q.  You said you were receiving cocaine.  What were you doing

19   with that cocaine?

20   A.  I introduced it in the United States.

21   Q.  How did you go about doing that?

22   A.  With the support of the Mexican government.  And with other

23   people of the Sinaloa cartel.

24   Q.  You said with the support of the Mexican government.  What

25   did you mean by that?

GBA9FLO3                        Santos Peña – direct

1    A.  They would provide security to me at the moment of

2    receiving them and transporting them in entire Mexican

3    territory.

4    Q.  What, if anything, did you and your associates give to

5    Mexican officials to obtain that security?

6    A.  Money.

7    Q.  So you bribed them?

8    A.  Yes, sir.

9    Q.  And what happened to you in 2000?

10   A.  I was arrested in Mexico City by the Mexican government.

11   Q.  For what crime?

12   A.  Kidnapping.

13   Q.  And how had you gotten involved in a kidnapping?

14   A.  321 kilos of cocaine had gone missing.

15   Q.  And what did you and your associates try to do with respect

16   to that cocaine?

17   A.  It was necessary to kidnap several people so they could

18   provide information about where the cocaine was.

19   Q.  Were any of the people you and your associates kidnapped

20   killed?

21   A.  Yes, sir.

22   Q.  How many?

23   A.  One.

24   Q.  What did you do after you got arrested in Mexico?

25   A.  I joined witness protection program.

GBA9FLO3                          Santos Peña - direct

1    Q.  With what government?

2    A.  Mexican from the PGR.

3    Q.  Is that the Mexican prosecutor's office?

4    A.  Yes, sir.

5    Q.  Were you and your family placed in protective custody?

6    A.  Yes, sir.

7    Q.  And how long did you spend in protective custody in Mexico?

8    A.  From July 21 of 2000 to October 30 of 2003.

9    Q.  Where did you and your family go in 2003?

10   A.  To the U.S.

11   Q.  How did you end up in the U.S.?

12   A.  By the -- through the DEA.

13   Q.  And have you been working with the DEA since that time?

14   A.  Yes, sir.

15   Q.  And since 2003 about how much money have you received from

16   the DEA?

17   A.  Approximately $750,000.

18   Q.  Has most of that money been paid to you in the last several

19   years?

20   A.  Yes, sir.

21   Q.  Since 2003 have you worked for any other U.S. law

22   enforcement agencies as an informant?

23   A.  Yes, sir.

24   Q.  And how much money have you made from them, approximately?

25   A.  Around $300,000.

GBA9FLO3                        Santos Peña – direct

1   Q.  Have you paid all the taxes you were supposed to on the

2   income you received from the DEA and these other law

3   enforcement agencies?

4   A.  No, sir.

5   Q.  Do you expect to receive any additional payments from the

6   DEA or the U.S. Government?

7   A.  No, sir.

8   Q.  What, if any, immigration benefits did you and your family

9   receive?

10  A.  Permission to reside in the U.S. and work permit.

11  Q.  And why are you in jail now?

12  A.  For having committed a crime.

13  Q.  And what crimes were those?

14  A.  Help people to introduce drugs to the U.S., help people to

15  sell drugs inside the United States, and having lied to the

16  DEA.

17  Q.  And what did you lie to the DEA about?

18  A.  Of not letting them know about those illegal deals that I

19  was doing.

20  Q.  Did some of the deals you were involved in involve cocaine?

21  A.  Yes, sir.

22  Q.  What's the current status of the case against you?

23  A.  I pled guilty of those charges.

24  Q.  Sir, is this the first trial you testified in, in the

25  United States?

GBA9FLO3                          Santos Peña – direct

1    A.  No, sir.

2    Q.  Where else in the United States have you testified at

3    trial?

4    A.  In Richmond, Virginia.

5    Q.  Was that during the period when you were engaged in

6    unauthorized drug dealing?

7    A.  No, sir.  That was jointly with the DEA.

8    Q.  Were you selling drugs on the side illegally during that

9    time?

10   A.  Yes, sir.

11   Q.  Did you tell the judge or the jury about that in the other

12   trial you testified in?

13   A.  No, sir.

14   Q.  Before your current case have you previously been arrested

15   in the United States?

16   A.  Yes, sir.

17   Q.  For what?

18   A.  For theft.

19   Q.  What did you steal?

20   A.  Clothing.

21   Q.  From where?

22   A.  From a Macy's store.

23   Q.  You testified before that you used cocaine while in

24   Venezuela.  When was the first time you used illegal drugs?

25   A.  In 1985.

GBA9FLO3                    Santos Peña - direct

1    Q.  When was the last time you used illegal drugs?

2    A.  One day before I was arrested.

3    Q.  When was that?

4    A.  The last time was August 13 of 2016.

5           THE INTERPRETER:  Sorry.  August 3.  Correction.

6    Q.  Sir, did you seek reimbursement from the DEA for expenses

7    in connection with your trip to Venezuela, like food and hotel

8    rooms?

9    A.  Yes, sir.

10   Q.  Earlier you mentioned that you and your son had brought

11   someone named Paul along on that trip without telling the DEA.

12   Do you remember that?

13   A.  No, sir.

14   Q.  You don't remember saying you brought Paul along on the

15   trip with you?

16   A.  I'm sorry.  I didn't understand.

17   Q.  Do you remember saying earlier that you had brought

18   somebody named Paul on the trip to Venezuela with you without

19   telling the DEA?

20   A.  That's correct.

21   Q.  And was some of the money you sought reimbursement for

22   actual money that had been spent on Paul or by Paul?

23   A.  Yes, sir.

24   Q.  Sir, I want to focus back on the meetings you had with the

25   defendants in Venezuela in this case; specifically, the third

GBA9FLO3                          Santos Peña – direct

1  meeting you had at defendant Campo's building.

2  A.  Yes, sir.

3  Q.  How did you get to that meeting?

4  A.  Mr. Campo and Mr. Francisco sent for me at the hotel.

5  Q.  And who else went to the meeting with you?

6  A.  My son and Paul.

7       I'm sorry.

8       I'm sorry.  It wasn't at the hotel that they picked me

9  up on the third meeting.  They picked me up at a restaurant.

10 Q.  And who was present at the third meeting?

11 A.  My son, Paul, Mr. Campo, Mr. Francisco, and myself.

12 Q.  If you could turn to Government Exhibit 210-T.  If you

13 could go to page 15, row 8.

14 A.  Yes, sir.

15      MR. QUIGLEY:  If we could play from there to page 15,

16 row 32.

17      (Recording played)

18 Q.  Sir, did you see -- first of all, what is this a video of?

19 A.  The day that Mr. Campo was going to show me the sample of

20 cocaine.

21 Q.  Directing your attention back to page 15, row 20?

22 A.  Yes, sir.

23 Q.  Do you see where defendant Campo said he had a little

24 animal?

25 A.  Yes, sir.

GBA9FLO3                    Santos Peña – direct

1    Q.  And what did you understand him to be referring to by a

2    little animal?

3    A.  He had a sample of cocaine.

4    Q.  What did he do as he said this to you?

5    A.  I'm sorry.  I don't understand.

6    Q.  After he said he had a little animal what did he do next?

7            THE INTERPRETER:  What did he do next?

8    Q.  What did defendant Campo do next?

9    A.  After he showed me the sample which was a kilo of cocaine,

10   I asked for a blade to open up the packaging to see if it was

11   really cocaine.

12           MR. QUIGLEY:  Okay.  Let's continue playing.

13           (Recording played)

14   Q.  Whose hands do we see on the screen just now?

15   A.  Mine.

16   Q.  What are you doing?

17   A.  I'm trying to open up the packaging of the kilo of cocaine,

18   the sample that Mr. Campo had brought.

19           MR. QUIGLEY:  Let's continue playing to 9:35 on the

20   tape.

21           (Recording played)

22   Q.  Who do we see on the screen there?

23   A.  Mr. Campo.

24   Q.  And what is he doing?

25   A.  He's putting on latex gloves.

GBA9FLO3                        Santos Peña – direct

1    Q.  What's your understanding of why he's putting on latex

2    gloves?

3    A.  So as not to leave his fingerprints on the kilo of cocaine.

4    Q.  Let's continue playing to 10:07.

5              (Recording played)

6    Q.  So do you see back on page 18, row 16?

7    A.  Yes, sir.

8    Q.  Where you said "because I don't, I don't think I can open

9    it with this"?

10   A.  Yes, sir.

11   Q.  What did you mean by that?

12   A.  The issue is that they had some scissors but the scissors

13   were not sharp enough so I couldn't open it.

14   Q.  Do you see a few seconds ago on the screen defendant Campo

15   looks like he's talking on a radio?

16   A.  Yes, sir.

17   Q.  What was your understanding of who he was talking to?

18   A.  With one of his bodyguards he was asking for a switch blade

19   to be able to open up the kilo of cocaine.

20             MR. QUIGLEY:  Let's continue playing to 11:09.

21             (Recording played)

22   Q.  Do you see where defendant Campo said, "No, it's to

23   differentiate them, they are known"?

24   A.  Yes, sir.

25   Q.  And then you said, "Yes, to differentiate them"?

GBA9FLO3                          Santos Peña - direct

1   A.   Yes, sir.

2   Q.   What were you and defendant Campo referring to there?

3   A.   I asked him what stamp or seal was on the kilo of cocaine

4   that he was showing me.  And if he knew what the samples were

5   in order to be able to differentiate.  I was referring to

6   differentiate one kilo from another kilo of cocaine.

7              MR. QUIGLEY:  If you could continue playing.

8              THE WITNESS:  Yes, sir.

9              (Recording played)

10  Q.   Sir, a few seconds ago you referenced someone named Amado

11  Carrillo Fuentes?

12  A.   Yes, sir.

13  Q.   Who were you referring to?

14  A.   A Mexican drug trafficker.

15  Q.   From what time period?

16  A.   From the '90s.

17  Q.   And also just now we heard what sounded like a voice on the

18  radio?

19  A.   Yes, sir.

20  Q.   Who did you understand that to be?

21  A.   One of his bodyguards who was answering, telling him that

22  he already had the pocketknife with him, and that would be used

23  to open up the kilo of cocaine.

24  Q.   Whose bodyguard?

25  A.   Defendant Campo.

1          MR. QUIGLEY:  If you could continue playing to 15:51.

2          (Recording played)

3   Q.  Sir, I want to backup for a second and go to page 23, row

4   29.

5   A.  Yes, sir.

6   Q.  Do you see where defendant Campo says "No, no, sure, but

7   just the same the gloves help to, to"?

8   A.  Yes, sir.

9   Q.  Then in the next row you say, "There is no problem.  Most

10  of all because here we know that they are with your people and

11  that they will bring it to your people, but one day in the

12  future, in three months, six months"?

13  A.  Yes, sir.

14  Q.  And when it goes, "or one day it goes off with other

15  merchandise, one day it arrives on the other side, and one

16  day"?

17  A.  Yes, sir.

18  Q.  What did you mean by "the other side"?

19  A.  The United States.

20  Q.  And what were you referring to arriving on the other side?

21  A.  That kilo of cocaine that we were opening could go over to

22  the United States and that they might be full of our

23  fingerprints, mine and Mr. Campo's, and that kilo could be

24  arrest -- or we could be arrested because of that kilo by an

25  agency such as the DEA.

GBA9FLO3                          Santos Peña – direct

1   Q.  Do you see where page 23, row 34 Mr. Campo says "ta, ta,

2   ta, ta"?

3   A.  Yes, sir.

4        MR. QUIGLEY:  We can move ahead to Government Exhibit

5   211.

6        THE WITNESS:  Yes, sir.

7        MR. QUIGLEY:  We'll just play the whole thing.

8        (Recording played)

9   Q.  What's that a recording of?

10  A.  The continuation of the video that we were watching of the

11  third meeting.

12       MR. QUIGLEY:  If we could move ahead to Government

13  Exhibit 212.

14       THE WITNESS:  Yes, sir.

15       MR. QUIGLEY:  And just play the whole thing.

16       (Recording played)

17  Q.  Sir, what were you doing with the kilo of cocaine there?

18  A.  I was checking it out to evaluate the quality and to make

19  sure that it was cocaine.

20  Q.  How were you doing that?

21  A.  I took a little bit with my hands.  I smelled it to see if

22  it smelled of cocaine.  I looked at the color to see what kind

23  of color it had.  I rubbed it a little on my hand so that it

24  would release the oils on my hand and see how much oil it would

25  release.

GBA9FLO3                          Santos Peña – direct

1    Q.  Where did you learn that test?

2    A.  In the building that he had told me belonged to him.

3    Q.  Where did you learn to do that test?

4    A.  In Mexico when I worked for the Sinaloa cartel.

5    Q.  When was that?

6    A.  In the '90s and 2000.

7            MR. QUIGLEY:  If you could move ahead to Government

8    Exhibit 213-T?

9            THE WITNESS:  Yes, sir.

10           MR. QUIGLEY:  We'll continue playing -- we'll start

11   playing from the beginning to 41 seconds.

12   Q.  Sir, what are you doing there?

13   A.  I took a little piece, a sample of the cocaine in my hand.

14   Q.  To do what?

15   A.  To test it and evaluate the quality.

16   Q.  How so?

17   A.  Smelling it, looking at it, and rubbing it on my hand.

18   Q.  And based on that what conclusion did you come to?

19   A.  That it was cocaine and it was good quality.

20           MR. QUIGLEY:  We can continue playing to 2:03.

21           (Recording played)

22   Q.  Sir what did you mean when you said 95 to 97?

23   A.  To the purity of the cocaine that that one kilo had.

24           MR. QUIGLEY:  Let's continue playing to 3:20, page 5.

25           (Recording played)

GBA9FLO3                      Santos Peña – direct

1    Q.   Sir, what do you see the defendant Campo doing here?

2    A.   He's helping me to cut a piece of tape in order to seal the

3    kilo.

4    Q.   Why are you sealing the kilo?

5    A.   Because we had opened it to check the quality of the

6    cocaine.

7    Q.   What were you going to do with it now?

8    A.   I was going to give it to Mr. Campo and Mr. Campo was going

9    to put it away.

10            MR. QUIGLEY:  If you could continue playing to 4:01.

11            (Recording played)

12   Q.   Sir, what did you understand defendant Campo to be

13   referring to when he said tusi a few seconds ago?

14   A.   It's a drug that he was asking me about whether I could

15   send to the U.S.

16   Q.   Do you see on, drawing your attention back to page 6, row

17   34?

18   A.   Yes, sir.

19   Q.   Do you see where defendant Campo says, "Listen, don't you

20   guys sell tusi over there"?

21   A.   Yes, sir.

22   Q.   What do you understand him to be referring to by "over

23   there"?

24   A.   The U.S.

25   Q.   By the way, where is defendant Flores at this point?

1   A.  He's next to Mr. Francisco, to the left of Mr. Francisco.

2           MR. QUIGLEY:  You can keep playing to 5:24.

3           (Recording played)

4   Q.  Do you see where object page 10, row 6, it's also on the

5   screen defendant Flores said, "They're also in the United

6   States"?

7   A.  Yes, sir.

8   Q.  And defendant Campo said, in the next row, page 10, row 8,

9   "Yes, but in the United States it costs two hundred thousand

10  dollars per kilo"?

11  A.  Yes, sir.

12  Q.  What did you understand the defendants to be referring to

13  there?

14  A.  To a kilo of tusi.

15  Q.  Where?

16  A.  In the United States.  The cost, the value.

17          MR. QUIGLEY:  Let's continue playing to 7:10.

18          (Recording played)

19  Q.  Sir, did you hear what sounded like some tape in the

20  background there?

21  A.  Yes, sir.

22  Q.  What was that?

23  A.  Between Mr. Campo and myself we were wrapping the kilo with

24  a gray color wrapping tape.

25  Q.  Directing your attention to page 12, row 27.

1   A.  Yes, sir.

2   Q.  Do you see where your son references China White?

3   A.  Yes, sir.

4   Q.  What do you understand China White to be a reference to?

5   A.  Heroin.

6   Q.  And do you see on page 12, row 31 where your son says, "In

7   New York it's an eighty"?

8   A.  Yes, sir.

9   Q.  What do you understand him to mean by that?

10  A.  The cost of the one kilo of heroin.

11          MR. QUIGLEY:  Keep playing to 8:36.

12          (Recording played)

13          MR. QUIGLEY:  All right.  Just go ahead and keep

14  playing to 9:45.

15          (Recording played)

16          MR. QUIGLEY:  Stop right there, please.

17  Q.  Sir, who did we see in the red shirt a few seconds ago?

18  A.  Mr. Francisco.

19  Q.  Defendant Flores?

20  A.  Yes, sir.

21          MR. QUIGLEY:  Let's keep playing, Mr. Calabrese, to

22  9:45.  Thank you.

23          (Recording played)

24  Q.  What did we just see defendant Campo do there, sir?

25  A.  To put away the kilo of cocaine in a suitcase.

GBA9FLO3                          Santos Peña – direct

1   Q.  Do you know what happened to the cocaine after that?

2   A.  No, sir.

3   Q.  What did you do with the gloves that you wore earlier in

4   the meeting?

5   A.  We put them in the trash, in a trash bin that Mr. Campo

6   gave me.

7           MR. QUIGLEY:  If we could just play to the end.

8           (Recording played)

9   Q.  Did you have anymore meetings with the defendants in

10  Venezuela after this?

11  A.  No, sir.

12          MR. QUIGLEY:  Your Honor, I'm about to move on to a

13  different topic.

14          THE COURT:  Let's take our luncheon recess.

15          We'll resume at 2 o'clock.

16          (Jury not present)

17          (Witness excused)

18          THE COURT:  Okay.  See you at two o'clock.

19          (Luncheon recess)

20

21

22

23

24

25

GBA5flo4                         Santos Peña - direct

```
 1                    A F T E R N O O N   S E S S I O N

 2                              2:10 p.m.

 3              (Jury present)

 4              THE COURT:  All right, Mr. Quigley.

 5              MR. QUIGLEY:  Thank you, your Honor.

 6              THE COURT:  You're welcome.

 7    BY MR. QUIGLEY:

 8    Q.  Sir, after you left Venezuela, did you eventually return to

 9    the United States?

10    A.  Yes, sir.

11    Q.  What did you do with device 1 and device 2 when you got

12    back to the U.S.?

13    A.  I gave them to Special Agent Gonzalez.

14    Q.  And where did you do that?

15    A.  In the state of Washington, Virginia.  In Virginia.  In

16    Virginia.

17    Q.  When was that, approximately?

18    A.  Around the beginning days of November.

19    Q.  Did there come a time when you met with the defendants in

20    this case again?

21    A.  Yes, sir.

22    Q.  Where was that?

23    A.  In Port-Au-Prince, Haiti.

24    Q.  And between the time you left Venezuela and the time you

25    wept back to Haiti, did you continue to communicate with either
```

GBA5flo4                          Santos Peña - direct

1  of the defendants?

2  A.  Yes, sir.

3  Q.  With who?

4  A.  With Mr. Campo.

5  Q.  How?

6  A.  Through Blackberry PIN message.

7  Q.  What did you do with the Blackberry PIN messages?

8  A.  I sent them to Special Agent Gonzalez.

9  Q.  And what Blackberry screen name did you use?

10 A.  Mine was negro, N-E-G-R-O, and Mr. Campo was the four

11 letters, the first letter was H, then there was a C.  I don't

12 remember.

13 Q.  Sir, if you can take a look at Government Exhibit 301-T in

14 the binder?

15 A.  Yes, sir.

16 Q.  And specifically on the first page.  Tell me if that

17 refreshes your recollection about the Blackberry screen name

18 that defendant Campo used.

19 A.  Yes, sir.

20 Q.  What was it?

21 A.  HRCF.

22 Q.  If we could keep looking on 301-T and go to page 8, row 13?

23        INTERPRETER:  Page 8?

24 Q.  Yes; row 13.

25 A.  Yes.

1   Q.  If you can, read page 8, row 6.  I would ask Mr. Calabrese

2   to read the part of the witness and I will read the part of the

3   Defendant Campo:

4               "CS-1:  Already in Mexico, sir.  The flight departed

5   way behind schedule but already here.  Thank God, doing fine.

6   Really thankful for your hospitality and as we talked about.

7   Brother.  I will sleep over in the DF.  Frankly, I am tired and

8   tomorrow I will get on my properties which are also yours, sir,

9   and start working on it to take care of that detail as soon as

10  possible.  If -- I will reach out to you if I think of

11  something more practical.  We will make arrangements without

12  leaving those five Mexican girls who are going to be really

13  hot.  You will see them.  I am going to be on the lookout, sir.

14              "CAMPO:  Forgive me, sir.  I haven't answered you.

15  How are you?  That's good that you got that already.  That's

16  all.  I will be waiting for you.  Let me know right around when

17  to send you the drivers as we discussed so they can check how

18  everything is there.  I thought they could go with the tall one

19  around December 2nd or 3rd.  What do you think?  To see if we

20  can put together the little party with the group of tall ones,

21  the 6th or 7th of December.  Keep in mind that it is urgent for

22  me to" --

23              Skip to the next line.

24              "CAMPO:  Sir, how are you?

25              "CS-1:  Very well, sir.  Thank God.  Here, early

GBA5flo4                          Santos Peña – direct

1    morning in my land.

2             "CAMPO:  That's good.  That's good.  Let's not fall

3    asleep.

4             "CS-1:  Give me a few minutes, sir, and I will call

5    you right back.

6             "CAMPO:  All right.  Let me know.

7             "CS-1:  Yes, sir.

8             "CAMPO:  Where are you.  I can't see you, sir.  Tell

9    me, sir.

10            "CS-1:  Sir, I was on the road but I am working on

11   your stuff to welcome your drivers to make sure they get here

12   safe as it should be.  As it should be.

13            "CAMPO:  I need you to do me a favor over there at the

14   H, sir.

15            "CS-1:  At your service.

16            "CAMPO:  Because I have one person by himself is there

17   and I need to –- I need $10,000 delivered to him there and that

18   is hard to deliver that to him because the guy is sick over

19   there.

20            "CS-1:  Immediately.

21            "CAMPO:  Wondering if you can help me with that over

22   there.

23            "CS-1:  And who would we have to deliver that to?

24            "CAMPO:  One more thing.  When can you meet my driver

25   over there?  I need for us to get going with the event, sir, to

GBA5flo4                          Santos Peña – direct

1    the same guy I told you to keep an eye one for me there.

2              "CS-1:  I am waiting for Sentado to come out of his

3    therapy and I will let you know immediately, sir.  Okay.

4    Perfect.  Let me call the chair guy if he is ready to give him

5    that for me there to your guy, sir.

6              "CAMPO:  But first meet my drivers over there to check

7    all the logistics?

8              "CS-1:  Yes, sir.  Of course that.  Your drivers come

9    first.  Show them around the city where they would be living.

10             "CAMPO:  Exactly.

11             "CS-1:  Show them around.  Very well.

12             "CAMPO:  Only waiting for you.  I am waiting there.

13   Remember, it is a bit urgent for me, sir.

14             "CS-1:  Yes, sir.  Based on that, I will not bring you

15   the five Mexican hookers that I told you were really hot.  I

16   will bring you 11 when I am ready for you and your guys."

17   Q.  If we can back up to page 8, row 19?

18   A.  Yes, sir.

19   Q.  Do you see where you reference five Mexican girls in that

20   row?

21   A.  Yes, sir.

22   Q.  What were you referring to there?

23   A.  The $5 million.

24   Q.  What was that payment for?

25   A.  50 percent payment for the drug shipment that Defendant

GBA5flo4                        Santos Peña – direct

1    Campo was going to send from Caracas, Venezuela, to Honduras.

2    Q.  Do you see on page 9, row 2 where Defendant Campo said:

3    Let me know right around when to send you the drivers as we

4    discussed so they can check how is everything there?

5    A.  Yes, sir.

6    Q.  What did you understand Defendant Campo to mean by drivers?

7    A.  Pilots of the plane.

8    Q.  Where were they going to be going?

9    A.  Honduras.

10   Q.  To do what?

11   A.  To check the logistics where he would send the plane with

12   the cocaine.

13   Q.  And do you see where it says:  I thought they could go with

14   the tall one around December 2nd or 3rd.  What do you think?

15   A.  Yes, sir.

16   Q.  What did you understand Defendant Campo to mean by that?

17   A.  He wanted to say either the 2nd or 3rd of November.

18   Q.  Even though he said December?

19   A.  Yes, sir.

20   Q.  What makes you say that?

21   A.  That because we had agreed that it wasn't only the real

22   day.  I mean, if he said the 2nd or the 3rd, that would be the

23   real day, but then if he said December or January, that

24   wouldn't matter.

25   Q.  Do you see in the end of that row where Defendant Campo

GBA5flo4                          Santos Peña – direct

1    says:  Keep in mind, I said that this is urgent for me?

2    A.  Yes.

3    Q.  What did you understand Defendant Campo to mean by that?

4    A.  That he was in need of money.

5    Q.  And moving ahead to page 11, row 4?

6    A.  Yes.

7    Q.  Do you see where Defendant Campo said:  Remember, it is a

8    bit urgent for me, sir?

9    A.  Yes, sir.

10   Q.  And do you see in the next row where you said, based on

11   that I will not bring you the five?

12   A.  Yes, sir.

13   Q.  Instead, you said, I'll bring you 11?

14   A.  Yes, sir.

15   Q.  What did you mean by that?

16   A.  First of all, that he really needed the money.  And when I

17   replied that I wouldn't bring the five Mexicans, rather the 11,

18   I was saying I wasn't going to bring him $5 million, rather I

19   would bring him $11 million.

20   Q.  Let's move ahead to page 12, row 13.

21   A.  Yes, sir.

22   Q.  We will read to page 12, row 27, and I would ask

23   Mr. Calabrese to read the part of the witness and I will read

24   the part of Defendant Campo:

25              "CAMPO:  I will get you the other car in January.

GBA5flo4                    Santos Peña – direct

1           "CS-1:  And what for?  Oh, okay.  In the meantime.  In

2     H then.  And in January we'll do it over here after Christmas

3     and New Year's holidays.

4           "CAMPO:  At the moment I have only that one and no

5     problem.  I will send you 800 head of cattle weekly.  That is

6     all that I can fit in those trucks.

7           "CS-1:  I think it is excellent.

8           "CAMPO:  Yes, exactly, but it is very urgent for me

9     that you welcome my drivers over there right now."

10    Q.  Sir, what did you understand Defendant Campo to mean on

11    page 12, row 21 where he referred to 800 head of cattle weekly?

12    A.  800 kilos of cocaine.

13    Q.  Let's move on to Government Exhibit 306.

14    A.  Yes, sir.

15    Q.  This is another Blackberry chat?

16    A.  Yes, sir.

17    Q.  Can you go to page 6, row 5?

18    A.  Yes, sir.

19    Q.  Do you see where Defendant Campo says:  If it is too much

20    trouble I will arrange for another car and I will personally go

21    as a passenger or the cousin himself will go so there are no

22    more issues.

23    A.  Yes, sir.

24    Q.  Who did you understand Defendant Campo to mean when he said

25    "the cousin"?

1   A.  Mr. Flores, Francisco.

2   Q.  And where are they going to go?

3   A.  Honduras.

4   Q.  And if we can read from page 7, row 26 to page -- sorry,

5   page 9, row 37, I would ask Mr. Calabrese to read the part of

6   the witness and I will read the part of the defendant:

7              "CAMPO:  I'll send the cousin, if it is possible

8   tomorrow, with other pilots, because no one is answering over

9   there.  I found out that they are going to Aruba again.

10             "CS-1:  The cousin instead of the drivers?

11             "CAMPO:  I'm going to place an alert on that car,

12  here.  As soon as they get here they should be brought to me.

13             "CS-1:  To talk?

14             "CAMPO:  The cousin with the other drivers.

15             "CS-1:  So everyone is going back without talking.

16             "CAMPO:  And another car?"

17             MR. QUIGLEY:  We will skip the next row 11.

18             "CAMPO:  And I'm so sorry.  I personally owe you an

19  apology for this mess.  Truly, I am really sorry.  Damn it.

20             "CS-1:  No, don't worry.

21             "CAMPO:  Give me a few days and I will send you a

22  picture of those people.  You will see.

23             "CS-1:  I'll say that everyone is going back.

24             "CAMPO:  So you will not be suspicious of me.

25             "CS-1:  And tomorrow you let me know who you will be

GBA5flo4                          Santos Peña – direct

1    sending to me.

2             "CAMPO:  The cousin is going in person.

3             "CS-1:  Okay you.  As you say, sir, they are gone.

4    Everybody.

5             "CAMPO:  Don't worry, they're going through Aruba and

6    tomorrow back here.  I already verified.  I will be waiting

7    here.

8             "CS-1:  Okay.

9             "CAMPO:  And I'm making arrangements to send your

10   cousin with other drivers as soon as possible, if it can be

11   tomorrow.

12            "CS-1:  Okay, sir.  You let me know.

13            "CAMPO:  I will let you know.

14            "CS-1:  Okay, sir.

15            "CAMPO:  I'll send you the information for the other

16   car.

17            "CS-1:  Okay.  You handle that and let me know.  I'll

18   change the location anyway to meet in honda but at different

19   airport would be better.  I think we can't trust those --

20   expletive -- drivers anymore.  What do you think, sir?

21            "CAMPO:  Don't worry about the drivers, that in a

22   couple of days I will send you a picture of those idiots.

23   Don't worry about it.

24            "CS-1:  Okay.

25            "CAMPO:  Don't worry about that.  And tomorrow at noon

GBA5flo4                         Santos Peña – direct

1    I'll tell you when the cousin will be there.  He will

2    personally go on the plane.

3          "CS-1:  Okay."

4    Q.  Sir, where do you understand, based on this conversation,

5    that Defendant Flores was going to go?

6    A.  Honduras.

7    Q.  And when Defendant Campo was referring to drivers, what did

8    you understand him to be referring to?

9    A.  Pilots of a plane.

10   Q.  If you go to page 11?

11   A.  Yes, sir.

12   Q.  And we will read page 11, row 5 to page 12, row 19?  Again,

13   I would ask Mr. Calabrese to read the part of the witness and I

14   will read the part of Defendant Campo.

15         "CAMPO:  No, sir.  Two things.  First, the cousin will

16   go along so you guys may how serious we are here.  Second,

17   leave the pilots to me because I'll take care of that.  Don't

18   worry.

19         "CS-1:  Okay.  Say no more.  I will be waiting, sir.

20         "CAMPO:  All right, sir.  Once again, I'm sorry about

21   today and tomorrow.  I will let you know when we will be

22   sending the other one as soon as possible.  If I can, it will

23   be tomorrow.

24         "CS-1:  One of the guys from the tower is staying.

25   The other one has to go to work.  But, one is saying to wait

GBA5flo4                    Santos Peña – direct

1    for the one you sent tomorrow.  God willing.  And don't feel

2    bad, sir, it is not you.  Unfortunately, they make you look bad

3    but you have the prescription for that.  Permanent vacations

4    for those -- expletives.  They earned it.  Better laugh,

5    brother.

6         "CAMPO:  I just can't laugh right now.  But soon we

7    will laugh.

8         "CS-1:  Okay, sir.  I have to go.  I'll be waiting, as

9    usual.

10        "CAMPO:  And then I will go over there where you live

11   to apologize in person because I know this shouldn't have

12   happened.  Big hug.  We will get in touch tomorrow.

13        "CS-1:  God willing, sir.  Amen.

14        "CAMPO:  Sir, tomorrow at 12 our time I will meet with

15   a person who has a Falcon 200 so we can work with that one as

16   soon as the meetings ends.  I will let you know when it is

17   ready and the time I will send the cousin.  Just so you know,

18   sir, one more day of delay and I almost want to do the work

19   alone.  I have all the bouquets here.  We have the ladder

20   ready."

21   Q.  Sir, row 19, what did you understand Defendant Campo to be

22   referring to when he said bouquets?

23   A.  The kilos of cocaine.

24   Q.  And moving ahead to page 9, row 13?

25        INTERPRETER:  Page 9?

GBA5flo4                          Santos Peña – direct

1   Q.  Yes.  Sorry, correction, page 13, row 9.

2   A.  Yes, sir.

3   Q.  Sir, do you see where Defendant Campo said:  Well, as I was

4   telling you, we have the chairs and the tables here already

5   packed for 800 people.  The ladder is all set and you guys are

6   ready to roll there.

7   A.  Yes, sir.

8   Q.  What do you understand the reference to 800 to mean there?

9   A.  800 kilos of cocaine.

10  Q.  I would like to move ahead to page 15, row 19.

11  A.  Yes, sir.

12  Q.  Do you see where you reference the 9 or the 10 in Haiti?

13  A.  Yes, sir.

14  Q.  And then, later on in row 29 where Defendant Campo says:

15  The 9 or 10 and done?

16  A.  Yes, sir.

17  Q.  What were you discussing there about the 9th or the 10th?

18  A.  The day that we would meet in Port-Au-Prince in Haiti.

19  Q.  Who had directed you -- who, if anybody, directed you to

20  arrange a meeting on the 9th or the 10th in Haiti?

21  A.  Special Agent Gonzalez.

22  Q.  If we could go to page 17?

23  A.  Yes, sir.

24  Q.  Row 1.  And we will read to row 9.  Again, I will read the

25  part of Defendant Campo, and ask Mr. Calabrese to read the part

1    of the witness.

2              "CAMPO:  Now, I can tell you the same way that you

3    told me just the day before we met -- hehehe -- I'm in your

4    hands and in God's.  It will be complicated for me on Wednesday

5    because we almost want to work on the campaign on Thursday,

6    Friday, and Saturday.

7              "CS-1:  In God's hands first and then mine like a

8    gentleman, sir, just like you did, sir.  Okay, then.  We are

9    all in for Tuesday but send me the cousin tomorrow or whoever

10   else so you can have that information, sir."

11   Q.  Again, sir, at the page 17, row 9, when you say send me the

12   cousin tomorrow, where were you referring to that the cousin

13   go?

14   A.  Honduras.

15   Q.  If we can go to Government Exhibit 307-T?

16   A.  Yes, sir.

17   Q.  Do you see where you say, in row 1:  Sir, I'm sorry, but

18   the guy from the tower is asking for the registration number?

19   A.  Yes, sir.

20   Q.  What did you mean by that?

21   A.  The airplane's tail number, the one that Mr. Francisco was

22   coming to in Honduras.

23   Q.  Was the tower really asking for that?

24   A.  No, sir.

25   Q.  So, why did you ask Mr. Campo to provide the tail number?

GBA5flo4                        Santos Peña - direct

1    A.   Special Agent Gonzalez asked me to ask Defendant Campo for

2    it.

3    Q.   Did you see down in row 22 where he said:  YV570T?

4    A.   Yes, sir.

5    Q.   What do you understand that to reflect, sir?

6    A.   The plane's tail number, the one that Mr. Francisco was

7    going to fly into Honduras.

8    Q.   Now, if we could go ahead to -- actually, we can put down

9    the transcript for a second.

10          Sir, did you in fact travel to Haiti to meet with the

11   defendants?

12   A.   Yes, sir.

13   Q.   When was that, approximately?

14   A.   It was on the 9th or the 10th, I don't remember exactly.

15   But, it was either the 9th or the 10th of November, 2015.

16   Q.   And when you got to Haiti, before you met with the

17   defendants, did you meet with anyone from the DEA?

18   A.   Yes, sir.

19   Q.   And what, if any equipment, did they give you?

20   A.   Two recording devices; one for audio and the other one for

21   audio with video.

22   Q.   Was the audio only device, device 2, and the audio-video

23   device, device 1?

24   A.   Yes, sir.

25   Q.   If we can go to Government's Exhibits 308-T?  Do you see on

GBA5flo4                        Santos Peña – direct

1    page 2, row 4, Defendant Campo sent you a message with

2    "YV2030"?

3    A.  Yes, sir.

4    Q.  What did you understand that to mean?

5    A.  The tailgate number of the airplane that they were coming

6    to -- that they were coming in to Port-Au-Prince Haiti.

7    Q.  Sir, if you could go to, directing your attention to row 16

8    and 18?

9    A.  Yes, sir.

10   Q.  Do you see where Defendant Campo says:  I'm going with the

11   cousin and my two shadows?

12   A.  Yes, sir.

13   Q.  What did you understand the cousin and the two shadows to

14   mean?

15   A.  That he was going with Defendant Francisco Flores and two

16   bodyguards -- two of Mr. Campo's bodyguards.

17   Q.  If we can move ahead to Government Exhibit 310.  Do you see

18   where on page 2, row 6?

19   A.  Yes, sir.

20   Q.  Defendant Campo says:  I have arrived.  I'm going through

21   immigration.

22   A.  Yes, sir.

23   Q.  So, when did you first meet the defendants that day in

24   Port-Au-Prince, Haiti?

25   A.  At the airport of Port-Au-Prince, Haiti.

1  Q.  Can you describe what happened when you first got to the

2  airport?

3  A.  Yes, sir.

4  Q.  What happened?

5  A.  I was with an undercover agent from the Haitian police and

6  when Special Agent Gonzalez informed me that they had already

7  landed, I went from the regular airport to the private airport,

8  myself with the undercover agent from the Haitian police.  The

9  two airports are next to each other, there is a distance of 20

10  to 30 meters between them.

11  Q.  Where did you first see the defendants?  At which airport?

12  A.  In the private airport.

13  Q.  And, did there come a point when you left the airport?

14  A.  Yes, sir.

15  Q.  And where did you go?

16  A.  To a hotel.

17  Q.  How did you get there?

18  A.  We went in the pickup with the undercover agent; Mr. Campo,

19  Mr. Francisco Flores, and myself.

20  Q.  What did you do when you got to the hotel?

21  A.  We got to the restaurant area.

22  Q.  Where did you go?

23  A.  We stayed at the hotel restaurant where we held a meeting.

24  Q.  What did you do before you went into the restaurant?

25  A.  When we got to the restaurant they were ordering something

GBA5flo4                          Santos Peña – direct

1   to eat and something to drink and I went to the bathroom to

2   activate device 1 and device 2.

3   Q.  If we can go to Government's Exhibits 231-T?

4   A.  Yes, sir.

5   Q.  If you could play from page 19, row 10 to page 20, row 3?

6           (Audiofile played)

7   Q.  We are having a technical issue with the screens in the

8   jury box.

9           Sir --

10          THE COURT:  Do you have a question, Mr. Quigley?

11          MR. QUIGLEY:  Yes, sir.

12  Q.  Sir, do you see where on page 19, row 30 where Defendant

13  Campo says:  They told us on Sunday the 15th, this Sunday.

14  Here, Sunday, the 15th?

15  A.  Yes, sir.

16  Q.  And then further up on the page where Defendant Flores

17  says:  We have it set up for he 15th?

18  A.  Yes, sir.

19  Q.  What do you understand the defendants to be referring to

20  when they said "the 15th"?

21  A.  That was the day that they would send the drugs, the

22  cocaine from Caracas, Venezuela, to Haiti.

23  Q.  Let's continue playing to 1426, which would take us to page

24  20, row 27.

25          (Audiofile played)

GBA5flo4                          Santos Peña – direct

1    Q.  Sir, do you see on page 20, row 21 where Defendant Campo

2    said:  And it's all in place?

3    A.  Yes, sir.

4    Q.  And what did you understand him to be referring to there?

5    A.  That the cocaine was already packaged in the equipment.  It

6    was already packaged.

7    Q.  Can you keep playing to page 22, row 45?

8            (Audiofile played)

9    Q.  Sir, on page 22, row 5 --

10   A.  Yes, sir.

11   Q.  -- what did you understand Defendant Flores to be referring

12   to when he said:  In Roatan.  Roatan.

13   A.  The place where the airplane would arrive with the cocaine.

14   Q.  What country is that in?

15   A.  Honduras.

16   Q.  Sir, if we can move ahead to page 27, row 15?

17   A.  Yes, sir.

18   Q.  Do you see where you say:  The business that I -- it is up

19   there in the United States?

20   A.  Yes, sir.

21   Q.  If we could move ahead to Government Exhibit 230, please?

22   A.  Yes, sir.

23   Q.  If we could play from the beginning to 49 seconds, please,

24   Mr. Calabrese?

25           MR. RODY:  230?

GBA5flo4                          Santos Peña – direct

1            MR. QUIGLEY:  230.

2            (Audiofile played)

3  Q.  Sir, what is this a recording of?

4  A.  This is the continuation of the meeting in Haiti.

5  Q.  And do you see where on page 3, row 7 --

6  A.  Yes.

7  Q.  -- Defendant Campo says:  And he is the one who -- a

8  commander for the FARC?

9  A.  Yes, sir.

10 Q.  Can we continue to playing to 153 which would take us to

11 page 5, row 1?

12           (Audiofile played).

13 Q.  Sir, do you see on page 5, row 1 --

14 A.  Yes.

15 Q.  -- where you said:  I sell almost everything in the United

16 States, the east coast, New York, see.  All of Chicago?

17 A.  Yes, sir.

18 Q.  What are you talking about selling there?

19 A.  Cocaine.

20 Q.  If we could keep playing to 441, page 8, row 30?

21           (Audiofile played).

22 Q.  Sir, directing your attention back to page 8, row 10?

23 A.  Yes, sir.

24 Q.  Do you see where you say:  My business is right there

25 inside the United States --

GBA5flo4                        Santos Peña – direct

1    A.  Yes, sir.

2    Q.  -- which is your business as well because you are the owner

3    of that work.

4    A.  Yes, sir.

5    Q.  Sir, did there come a time when you got up from the table

6    in this meeting?

7    A.  Yes, sir.

8    Q.  And what did you tell the defendants about why you were

9    getting up from the table?

10   A.  That I was going to go up to one of the rooms to come down

11   with the $11 million that I was going to give them.

12                  (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

GBA9FLO5                        Santos Peña - direct

1  Q.  Why did you actually get up from the table?

2  A.  Because Agent Gonzalez told me that I should leave the

3  table because they were going to do the operation.

4  Q.  And after you got up from the table what did you do with

5  Device 1 and Device 2?

6  A.  I gave them to Special Agent Gonzalez.

7  Q.  Sir, you said you pled guilty to the charges against you.

8  Do you recall testifying about that?

9  A.  Yes, sir.

10 Q.  When did you plead guilty?

11 A.  In the month of September 2016.

12 Q.  What, if any, agreement did you have with the government

13 when you pled guilty?

14 A.  I'm sorry.  I plead guilty of what agreement?

15 Q.  Do you have an agreement -- did you -- when you pled guilty

16 did you have an agreement with the government?

17 A.  Yes, sir.

18 Q.  I'm handing you what's been marked --

19       MR. JACKSON:  May I confer, your Honor, just a moment?

20       THE COURT:  Yes.

21 Q.  Sir, who is your agreement between?

22 A.  The prosecutor's office.

23 Q.  And what do you have to do in your cooperation agreement?

24 A.  First of all, tell the truth, tell them the entire truth

25 about my crimes, go to court whenever it's necessary, and to

GBA9FLO5                          Santos Peña – direct

1  file my tax returns before I get sentenced.

2  Q.  If you do those things what is your understanding of what

3  the government will do for you?

4  A.  They will give the 5K letter.

5  Q.  And what does it talk about in the 5K letter?

6  A.  It talks about all of the good things and the bad things

7  about me.

8  Q.  So does it talk about all of the crimes you committed

9  whether you pled guilty to them or not?

10 A.  Yes, sir.

11 Q.  And if you don't get that letter, what's the lowest

12 sentence you can get?

13 A.  Ten years.

14 Q.  If you get the letter, what's the lowest sentence you can

15 get?

16 A.  From zero to life.

17 Q.  If you get -- if you don't get the letter what's the

18 highest sentence you can get?

19 A.  Life.

20 Q.  What's your understanding of what will happen if you lie in

21 court?

22 A.  I will not get the 5K letter.

23 Q.  Does whether or not you get the 5K letter depend on whether

24 the defendants at this trial are convicted?

25 A.  No, sir.

GBA9FLO5                        Santos Peña – direct

1    Q.  If you don't get the 5K letter, can you take back your

2    guilty plea?

3    A.  No, sir.

4    Q.  Has anyone, including the government, promised you any

5    particular sentence?

6    A.  No, sir.

7    Q.  Has anyone told you what sentence you're going to get?

8    A.  Well, no.  Well, just what I pled guilty for which is from

9    ten to life.

10   Q.  And, sir, as part of your cooperation agreement what

11   happens to any money or property you got as a result of your

12   illegal activities?

13   A.  They will be seized.

14   Q.  By the government?

15   A.  Yes, sir.

16   Q.  Sir, do you understand you could be deported back to Mexico

17   after you complete your sentence in this case?

18   A.  Yes, sir.

19   Q.  And what, if anything, will the government do with respect

20   to immigration if you comply with the cooperation agreement?

21   A.  Just inform them about my situation.

22   Q.  And what's your understanding of who ultimately decides

23   whether you stay in the country?

24   A.  Immigration.

25   Q.  Sir, I'm going to ask you a few final questions about your

GBA9FLO5                          Santos Peña – direct

1    work as a DEA informant.

2    A.  Yes, sir.

3    Q.  In your work as a DEA informant did you ever meet with

4    someone named Julian Pacheco Tinoco?

5    A.  Yes, sir.

6    Q.  What country did you meet Mr. Pacheco Tinoco in?

7    A.  In Honduras.

8    Q.  And were you aware whether -- of whether he had a position

9    in the Honduran government?

10   A.  Yes, sir.

11   Q.  What was that position?

12   A.  Minister of Defense of Honduras.

13   Q.  And how did you meet him?

14          MR. JACKSON:  Your Honor, I would just object on the

15   relevance ground.

16          THE COURT:  Overruled.

17   Q.  How did you meet him?

18   A.  I met him through the son of the ex president of Honduras

19   Fabio Lobo.

20   Q.  Were you meeting with Mr. Lobo as part of your work as a

21   DEA informant?

22   A.  Yes, sir.

23          MR. QUIGLEY:  One moment, your Honor.

24   Q.  What did the meeting with Mr. Pacheco relate to?

25   A.  It was for him to give me support to receive shipments from

GBA9FLO5                           Santos Peña – direct

1    Colombia to Honduras.  He was in charge of the security part in

2    Honduras.

3    Q.  And what kind of shipments?

4    A.  Cocaine.

5           MR. QUIGLEY:  Your Honor, I have no further questions.

6           THE COURT:  Ladies and gentlemen, we'll take our

7    afternoon break.

8           (Jury excused)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBA9FLO5                      Santos Peña – direct

1           (In open court)

2           THE COURT:  See you in fifteen.  Who is going first,

3    you, Mr. Jackson?

4           MR. JACKSON:  That would be Mr. Rody, your Honor.

5           THE COURT:  Mr. Rody.

6           MR. JACKSON:  Thank you.

7           (Recess).

8           JOSE SANTOS PEÑA, resumed.

9           THE COURT:  Are you all set now, Mr. Rody.

10          MR. RODY:  Yes.  Thank you, Judge, very much.

11          THE COURT:  Marlon.

12          THE DEPUTY CLERK:  Yes, sir.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  All right, Mr. Rody.

3          MR. RODY:  Thanks, Judge.

4          THE COURT:  You're welcome.

5     CROSS-EXAMINATION

6     BY MR. RODY:

7     Q.  Mr. Santos Peña, right before we broke do you recall being

8     asked questions by the prosecutor about your plea agreement?

9     A.  Plea agreement?  What plea?

10    Q.  Just before we broke you were answering questions from the

11    prosecutor about your plea agreement, right?

12    A.  Yes, sir.

13    Q.  And I believe you said that you pled guilty to your plea

14    agreement in September of this year, correct?

15    A.  Yes, sir.

16    Q.  Now, you said in your prior testimony today that you

17    understood that you had to do certain things under your

18    agreement, correct?

19    A.  Yes, sir.

20    Q.  You said that you had to tell the entire truth about your

21    crimes, right?

22    A.  Yes, sir.

23    Q.  You said you had to go to court when it was necessary,

24    right?

25    A.  Yes, sir.

GBA9FLO5                      Santos Peña – cross

1   Q.  And you said you had to file your tax returns before you

2   got sentenced?

3   A.  Yes.  My taxes.

4   Q.  Now, before you pleaded guilty you had a number of meetings

5   with the government, correct?

6   A.  Yes, sir.

7   Q.  Do you recall that you were arrested sometime in early

8   August of this year?

9   A.  Yes, sir.

10  Q.  And between early August and September you had a number of

11  meetings with the government, right?

12  A.  Yes, sir.

13  Q.  And at those meetings you were represented by a lawyer,

14  correct?

15  A.  Yes, sir.

16  Q.  And there were prosecutors there and agents there, correct?

17  A.  Which agents?

18  Q.  DEA agents.

19  A.  Yes, sir.

20  Q.  And the government asked you a lot of questions about your

21  prior criminal conduct, right?

22  A.  Yes, sir.

23  Q.  And they told you you had to tell the full truth about all

24  your prior crimes, right?

25  A.  Yes, sir.

GBA9FLO5                        Santos Peña - cross

1  Q.  And they emphasized again and again that you had to tell

2  the truth, correct?

3  A.  Yes, sir.

4  Q.  Did they start every meeting by telling you that the most

5  important thing is to tell the truth?

6  A.  Yes, sir.

7  Q.  And you understood that once you pled guilty pursuant to

8  your agreement if you lied your agreement would get ripped up,

9  right?

10  A.  Yes, sir.

11  Q.  And you understand that omitting information is the same

12  thing as a lie, right?

13  A.  Yes, sir.

14  Q.  So if you failed to tell the government some important fact

15  about your criminal conduct that would be a lie, right?

16  A.  Yes, sir.

17  Q.  Now, is it true that you pled guilty pursuant to your

18  agreement on September 1, 2016?

19  A.  I don't remember the exact date but I do remember it was

20  the month of September.

21          MR. RODY:  May I approach, your Honor?

22          THE COURT:  Yes, you may.

23  Q.  Showing you what's marked for identification as 3504-18.  I

24  just want you to take a look at this document.  Let me know if

25  this refreshes your recollection that you pleaded guilty on

GBA9FLO5                        Santos Peña – cross

September 1, 2016.

A.  Yes, sir.

Q.  And you did plead guilty on September 1, right?

A.  Yes, sir.

Q.  Now, do you recall that eight days later you testified in a prior proceeding in this matter?

A.  I don't understand the question.

Q.  Eight days after you pled guilty was September 9, correct?

A.  Yes, sir.

Q.  And do you recall that you testified that day in a prior proceeding in this case?

A.  Specific about the same case?

Q.  Sir, you were in this courtroom eight days after you pleaded guilty, correct?

A.  Yes, sir.

Q.  You sat up right where you're sitting today, right?

A.  Yes, sir.

Q.  And you were testifying under oath just like you are today, right?

A.  Yes, sir.

Q.  Now do you recall that day that you testified in the afternoon?

A.  Yes, sir.

Q.  You testified after lunch, right?

A.  I don't remember exactly the time but I do remember that I

1   testified.

2   Q.  Do you recall that your son also testified in that

3   proceeding?

4   A.  Yes, sir.

5   Q.  He testified in the morning, correct?

6   A.  Yes, sir.

7   Q.  And you testified in the afternoon, right?

8   A.  Yes, sir.

9   Q.  And isn't it true that the prosecutors and agents met with

10  you over lunch before you testified that day?

11  A.  Yes, sir.

12  Q.  And they met with you over lunch because they wanted to ask

13  you questions about your upcoming testimony, right?

14  A.  Yes, sir.

15  Q.  And what they asked you about was your meetings down in

16  Caracas in October 2015, correct?

17  A.  To be honest about that.

18  Q.  Right.  But they asked you questions about something you

19  had not told them previously about your meetings in Venezuela,

20  correct?

21  A.  Correct.

22  Q.  They asked you questions about your son's friend Paul,

23  right?

24  A.  Yes, sir.

25  Q.  And they asked you what Paul had done down in Venezuela,

GBA9FLO5                         Santos Peña - cross

1    correct?

2    A.  Yes, sir.

3    Q.  And during that lunch hour was the first time you ever told

4    the government that Paul had attended the meetings with the

5    defendants, right?

6    A.  Yes, sir.

7    Q.  So you had lied about it to them, right?

8    A.  At that moment, yes.

9    Q.  Now, this was a week after you had pleaded guilty pursuant

10   to your plea agreement, right?

11   A.  Yes, sir.

12   Q.  The plea agreement that requires you to tell the truth,

13   right?

14   A.  Yes, sir.

15   Q.  So you lied to the government by failing to reveal that

16   information before you pled, right?

17   A.  At that moment, yes.

18   Q.  Has the government ripped up your cooperation agreement?

19   A.  No, sir.

20   Q.  Have they told you that they're going to rip it up?

21   A.  If they investigate, if I lie, the cooperation agreement

22   will be torn.

23   Q.  Right.  But you already lied to them before that prior

24   proceeding, right?

25   A.  I was afraid.

GBA9FLO5                    Santos Peña – cross

1    Q.  Well, sir, you told them about all kinds of criminal

2    activity you had been involved in with all kinds of drug

3    dealers, right?

4    A.  Yes, sir.

5    Q.  You told them about your involvement with senior members of

6    the Sinaloa drug cartel, correct?

7    A.  Yes, sir.

8    Q.  And your testimony is that you were afraid to tell them

9    that Paul had participated in your meetings with the defendants

10   in Venezuela?

11   A.  Yes, sir.

12   Q.  Paul's a drug dealer, right?

13   A.  No, sir.

14   Q.  Well he is certainly someone that you have engaged in drug

15   deals with back in California, correct?

16   A.  Yes, sir.

17   Q.  He's helped you pick up kilograms of drugs around L.A.,

18   right?

19   A.  Yes, sir.

20   Q.  And you guys brought him along to Venezuela to make you

21   seem more like real drug dealers, right?

22   A.  Yes, sir.

23   Q.  And he sat in your meetings with the defendants, right?

24   A.  Yes, sir.

25   Q.  And he participated in those meetings, correct?

GBA9FLO5                        Santos Peña – cross

1    A.  Just by his presence.  Not intervening.

2    Q.  Well he spoke at some of the meetings, right?

3    A.  No, sir.

4    Q.  His voice is on some of the recordings we heard this

5    morning, right?

6    A.  Probably he laughed or he made a comment that was of no

7    relevance.  I don't remember him talking.

8    Q.  So when you were talking about how you shipped China White

9    heroin up to the United States that was something of no

10   relevance?

11   A.  I'm sorry.  I don't understand.

12   Q.  You talked on the recordings we listened to today about

13   shipping China White heroin to the United States, right?

14   A.  Yes, sir.

15   Q.  And Paul participated in those conversations, right?

16   A.  No, sir.

17   Q.  Okay.  We'll come back to that.

18   A.  Yes, sir.

19   Q.  So, you acknowledge that you lied to the government

20   after -- well withdrawn.

21       You acknowledge that you lied to the government before

22   you pled guilty to your agreement, right?

23   A.  I'm sorry.  I didn't understand.

24   Q.  I'll ask it again.

25   A.  Yes, sir.

GBA9FLO5                          Santos Peña – cross

1    Q.  You lied to the government about Paul before you pled

2    guilty, correct?

3    A.  Yes, sir.

4    Q.  And you only told the truth about that right before you

5    testified in a prior proceeding, right?

6    A.  Yes, sir.

7    Q.  So, is it your understanding that you are going to get life

8    in prison now?

9    A.  That's not up to me.

10   Q.  But you expect your agreement to get ripped up?

11   A.  If I lie it will be torn up.  I haven't lied.  In the past

12   I have.  I'm not lying now.  I'm just telling the truth.

13   Q.  But they caught you in a lie after you already pled, right?

14   A.  I was ashamed.

15   Q.  You've already violated the agreement, right?

16   A.  At that moment, yes.

17   Q.  Mr. Santos Peña, you said you started in the drug business

18   in the 1990s; is that right?

19   A.  Yes, sir.

20   Q.  And you were a member of the Sinaloa drug cartel?

21   A.  Yes, sir.

22   Q.  And one of the things that you did in the 1990s was receive

23   very large loads of cocaine via plane, right?

24   A.  Yes, sir.

25   Q.  These were loads of 700 to 800 kilograms of cocaine,

GBA9FLO5                        Santos Peña – cross

1    correct?

2    A.  Yes, sir.

3    Q.  And in the 1990s for a time these loads were coming from

4    Pablo Escobar in Colombia, right?

5    A.  Yes, sir.

6    Q.  Now, at some point you started to get even larger loads of

7    cocaine, right?

8    A.  Yes, sir.

9    Q.  Loads that contained many thousands of kilograms, right?

10   A.  Yes, sir.

11   Q.  And these were also coming from Pablo Escobar?

12   A.  Some of them.

13   Q.  And can you calculate how many total kilograms you got from

14   Pablo Escobar?  Can you estimate it?

15   A.  I don't have an exact amount.

16   Q.  It was many thousands, right?

17   A.  Yes, sir.

18   Q.  Now at some point you started helping to deliver drugs for

19   another narcotics trafficker named Arturo; is that right?

20   A.  Yes, sir.

21   Q.  And in order to do that this had to be blessed by El Chapo

22   Guzman, right?

23   A.  Yes, sir.

24   Q.  And did he give you his blessing to conduct those

25   negotiations with Arturo?

GBA9FLO5                         Santos Peña – cross

1    A.  What do you mean by blessing?

2    Q.  Well he had to approve it; is that right?

3    A.  Yes, sir.

4    Q.  And did he approve it?

5    A.  Yes, sir.

6    Q.  And El Chapo Guzman is this fellow who escaped from jail in

7    Mexico?

8    A.  Yes, sir.

9    Q.  So in the 1990s you were working at the highest levels of

10   the cocaine profession, correct?

11   A.  Yes, sir.

12       MR. RODY:  One moment, your Honor.

13   Q.  Now you said you got arrested in 2000; is that right?

14   A.  Yes, sir.

15   Q.  And originally you were arrested by Mexican authorities; is

16   that correct?

17   A.  Yes, sir.

18   Q.  After you got arrested by Mexican authorities you

19   immediately went into witness protection in Mexico?

20   A.  Yes, sir.

21   Q.  During that period of time were you assisting United States

22   authorities or just Mexican authorities?

23   A.  The Mexican authorities but I was in contact with the U.S.

24   authorities?

25   Q.  When you say you were in contact with the U.S. authorities

GBA9FLO5                         Santos Peña – cross

1    was that in the United States or in Mexico?

2    A.  In Mexico.

3    Q.  Did you serve any time in jail in Mexico after getting

4    arrested in 2000?

5    A.  Yes, sir.

6    Q.  How long?

7    A.  Three years.

8    Q.  So when you were in protective custody that was jail?

9    A.  It was home.  It was like home arrest.

10   Q.  So you weren't in a jail, right?

11   A.  No, sir.

12   Q.  Now in 2003 you came into the United States?

13   A.  Yes, sir.

14   Q.  And at that time did you go into protective custody in the

15   United States?

16   A.  No, sir.

17   Q.  So when is the first time you've ever been to jail in your

18   life?

19   A.  I'm sorry?

20   Q.  When was the first time you ever went to jail in your life?

21   A.  The first time it was in Mexico in 1985 only for a few

22   hours.

23   Q.  But the first time you ever spent any long period of time

24   in jail is this period right now, correct?

25   A.  Yes, sir.

GBA9FLO5                        Santos Peña – cross

1  Q.  After you came to the United States did you begin working

2  with the authorities to assist them on drug cases?

3  A.  With information.

4  Q.  Well, you testified many times in trials, correct?

5  A.  On some occasions.

6  Q.  And that was in the United States or in Mexico?

7  A.  Both places.

8  Q.  And did you testify in federal court?

9  A.  In what country?

10  Q.  In the United States.

11  A.  Yes, sir.

12  Q.  Did you also testify in state court?

13  A.  No.

14         For what case?

15  Q.  Any case.

16  A.  On one when I committed a theft then I went to court.

17  Q.  Well that's separate.  Let's talk about that.

18  A.  Okay.

19  Q.  You say that you got -- one moment, Judge.

20         MR. RODY:  Thanks, Judge.

21  Q.  You got arrested in 2007 in California, right?

22  A.  Yes, sir.

23  Q.  And that was a situation where your son was working at a

24  Macy's, right?

25  A.  Yes, sir.

GBA9FLO5                         Santos Peña – cross

1    Q.   And your son was essentially allowing you and other family
2    members to rip off the Macy's, right?
3    A.   Yes, sir.
4                (Continued on next page)

```
1   BY MR. RODY:  (continuing)
2   Q.  You were taking lots and lots of merchandise but only
3   paying a little bit, right?
4   A.  Yes, sir.
5   Q.  That's fraud, right?
6   A.  It's theft.
7   Q.  It's fraud too, right?
8          MR. QUIGLEY:  Objection.
9          THE COURT:  You have him on theft.  That's good enough
10  for your purposes.
11  Q.  Mr. Santos Peña, I want to go back to your arrest in Mexico
12  in 2000.  This was a situation where I believe you said 321
13  kilograms of cocaine had gone missing?  Is that right?
14  A.  Yes, sir.
15  Q.  And you and some other members of the Sinaloa cartel went
16  to find out who was responsible, right?
17  A.  Yes, sir.
18  Q.  And you were going to go find out what happened violently,
19  right?
20  A.  First we were investigating.
21  Q.  It was just an investigation, right?
22  A.  Yes, sir.
23  Q.  You had guns, right?
24  A.  I didn't.
25  Q.  The folks you were with had guns, right?
```

1    A.  Yes, sir.

2    Q.  You were too senior to have a gun, right?

3    A.  I didn't carry a weapon because I had the Mexican

4    government with me who gave me protection.

5    Q.  And was the Mexican government helping you investigate who

6    stole the 321 kilos?

7    A.  Yes; with bribery.

8    Q.  But eventually you found some people who you thought had

9    stolen the kilograms, right?

10    A.  Yes, sir.

11    Q.  And you kidnapped them, right?

12    A.  Yes, sir.

13    Q.  How many people got kidnapped?

14    A.  I think it was around four or five.  I don't remember

15    exactly.

16    Q.  And how many members of the Sinaloa cartel carried out that

17    kidnapping?

18    A.  Four people, including me.

19    Q.  So, four people kidnapped four or five other people?

20    A.  Four from the Sinaloa cartel, the others belonged to the

21    Mexican police, the Mexican government.

22    Q.  So you had a bunch of Mexican police officers there with

23    you, right?

24    A.  Yes, sir.

25    Q.  And these people were taken somewhere, the people who were

GBA5flo6                          Santos Peña – cross

1   kidnapped?

2   A.  Yes, sir.

3   Q.  And you tried to find out if they had taken the kilograms

4   and where the drugs were, right?

5   A.  Yes, sir.

6   Q.  You tortured them to get the information, correct?

7   A.  Yes, sir.

8   Q.  You beat them?

9   A.  Yes, sir.

10  Q.  Did you burn them with irons?

11  A.  No, sir.

12  Q.  How did you torture them?

13  A.  They were tied up with their hands and their feet and their

14  eyes and there was a person who was beating them up just with

15  his fist.  The torture was verbal.

16  Q.  The torture was verbal.

17          Did people get hit with guns, with pistols?

18  A.  No, sir.

19  Q.  And eventually one of the people you kidnapped was killed,

20  right?

21  A.  Yes, sir.

22  Q.  So, was it only one or was it more than one?

23  A.  One.

24  Q.  Now, your testimony is that this was the only time you

25  participated in a kidnapping as a member of the Sinaloa cartel?

GBA5flo6                     Santos Peña – cross

1            MR. QUIGLEY:  Objection.  Mischaracterizes his

2      testimony.

3            THE COURT:  Overruled.

4      A.  Yes, sir.

5      Q.  That's not true, is it?

6      A.  As far as I know it is the only time I have kidnapped

7      somebody.

8      Q.  Well, you know that members of the Sinaloa cartel kidnapped

9      many suspected drug traffickers, correct?

10            MR. QUIGLEY:  Objection.  Relevance.

11            THE COURT:  Overruled.

12     A.  In which situation?  What affair?

13     Q.  In the 1990s, in Mexico?

14     A.  Oh yes.

15     Q.  Oh yes.  They kidnapped many people who they thought had

16     stolen from them, right?

17     A.  Yes, sir.

18     Q.  They killed many people, correct?

19     A.  Yes.

20     Q.  They killed people who they thought were going to the

21     authorities and telling on them, right?

22     A.  I'm sorry.  I didn't understand that question.

23     Q.  They killed people who they thought had told on them to the

24     authorities?

25     A.  You mean accusing them of something?

GBA5flo6                          Santos Peña - cross

1   Q.  Yes; accusing them to the authorities, snitching on them.

2   A.  Yes.

3   Q.  And they also killed people who they thought had stolen

4   drugs and money from them, correct?

5        INTERPRETER:  Did you say kill or kidnap?

6   Q.  Kill.

7   A.  That happens.  In drug trafficking it happens.

8   Q.  And you were a member of that organization for 10 years?

9   A.  Yes, sir.

10  Q.  Now, you still keep in contact with members of the Sinaloa

11  cartel, correct?

12  A.  Yes, sir.

13  Q.  And even though you're a cooperating witness for the

14  government, you still keep in contact with members of the

15  Sinaloa cartel?

16  A.  Yes, sir.

17  Q.  Have you told that to the government?

18  A.  Yes, sir.

19  Q.  And what do you -- withdrawn.

20        Is it true, sir, that you are continuing your illegal

21  drug business even though you are a cooperating witness?

22  A.  I didn't understand the question.

23  Q.  Is it true, sir, that you are continuing your illegal drug

24  business even though you are a cooperating witness?

25  A.  Right now?  At this moment?

GBA5flo6                          Santos Peña – cross

 1  Q.  Yes.

 2  A.  No.

 3  Q.  How about since you have been in federal custody?

 4  A.  No.

 5  Q.  You're sure?

 6  A.  100 percent.

 7  Q.  Just going back to what you told the government about the

 8  kidnapping related to the 321 kilograms.

 9  A.  Yes, sir.

10  Q.  You said that members of your cartel kidnapped people many

11  times, right?

12  A.  That happens in drug trafficking but not that I

13  participated in or anything that had anything to do personally

14  with me.  This is a very dangerous business the drug business.

15  Q.  Right.  Exactly.

16          So, that's my question, why did you only go the one

17  time?

18  A.  Only one time what?

19  Q.  You only went and participated in the kidnapping one time

20  according to what you told the government, right?

21  A.  Yes, sir.

22  Q.  They just need you all the other times?

23  A.  Not me.

24  Q.  Why didn't they need you on these other kidnappings, sir?

25  A.  I don't know.

GBA5flo6                        Santos Peña - cross

1    Q.  You had bosses in the organization?

2    A.  Yes, sir.

3    Q.  But you are high level yourself, correct?

4    A.  I was a worker.

5    Q.  You were just a worker in the Sinaloa cartel?

6    A.  Yes, sir.

7    Q.  And as a worker, you only went and participated in one

8    kidnapping?

9    A.  Yes, sir.

10   Q.  Did you kill the man who got killed in that kidnapping?

11   A.  No, sir.

12   Q.  Who did?

13   A.  Sergio Fierro Chavez and Abel Soriana.

14   Q.  And you know that because you saw them do it?

15   A.  I didn't see when they did it but they took him away from

16   where he was.  I just heard the shot.  And they said that they

17   had killed him.  The following day it was published in the

18   newspaper.

19   Q.  So you were with them right up until before the man was

20   killed, right?

21   A.  Not there, but they took him away and I heard the shot at

22   40 or 50 meters away.

23   Q.  You were the one who told them to kill the man, right?

24   A.  No, sir.

25   Q.  They just did it because they felt like doing it?

GBA5flo6                        Santos Peña – cross

1    A.   The owner of the cocaine was the one who ordered having him

2    killed.   Sergio Fierro Chavez.

3    Q.   And you just happened to leave right before it happened.

4    That's your testimony?

5    A.   I don't understand your question.

6    Q.   You happened to leave right before they killed the man,

7    right?

8    A.   I went where?  I'm sorry.  I don't understand.

9    Q.   I thought you said you left and you were 40 or 50 meters

10   away and then they killed the man.

11            MR. QUIGLEY:  Objection.  Mischaracterizes his

12   testimony.

13            THE COURT:  Sustained.

14   Q.   You weren't there when they killed him, right?

15   A.   No, sir.

16   Q.   But you could hear the shots, right?

17   A.   Yes, sir.

18   Q.   How long after you left the victim did you hear the shots?

19            MR. QUIGLEY:  Objection.

20            THE COURT:  Overruled.

21   A.   Can you please repeat the question?

22   Q.   How long after you left the victim did you hear the gun

23   shots?

24   A.   15 minutes.

25   Q.   And your testimony is that the one and only time that you

GBA5flo6                    Santos Peña – cross

1   went on a kidnapping/murder you happened to get caught?

2   A.  Some days later I was arrested for kidnapping by the

3   Mexican government.

4           MR. RODY:  One moment, Judge?

5           (counsel conferring)

6   Q.  Mr. Santos Peña, I want to direct your attention to October

7   2015.  Do you have that period of time in mind?

8   A.  My arrest in 2015?

9           THE COURT:  No.  He just wants to focus your attention

10  on the events that occurred in October 2015.

11          THE WITNESS:  Yes, sir.

12  Q.  Okay.

13          You went down to Venezuela, correct?

14  A.  Yes, sir.

15  Q.  You went down at the direction of the DEA, correct?

16  A.  Yes, sir.

17  Q.  Specifically Agent Gonzalez, right?

18  A.  Under his instructions.

19  Q.  Before you went down, did you speak to him over the phone?

20  A.  Yes, sir.

21  Q.  You were also in contact with him by Blackberry text

22  messages, right?

23  A.  Yes, sir.

24  Q.  Before you went to Venezuela he gave you a number of

25  instructions, right?

GBA5flo6                          Santos Peña – cross

1    A.  Yes, sir.

2    Q.  One of the things he told you was to record your meetings

3    with the defendants, right?

4    A.  Yes, sir.

5    Q.  He told you to record all of the meetings, right?

6    A.  All of the ones -- all of the necessary ones that had to do

7    with drug trafficking.

8    Q.  So, Agent Gonzalez told you to only record the necessary

9    meetings?

10   A.  Everything related to drugs, drug trafficking, or weapons.

11   Q.  Did he tell that you if you met with the defendants at

12   other times it was okay not to record?

13   A.  He didn't tell me that.

14   Q.  He told you to record your meetings with the defendants,

15   right?

16   A.  Yes, sir.

17   Q.  Now, you did not record all of your meetings with the

18   defendants, right?

19   A.  No, sir.  No, sir.  In other words, I didn't record one of

20   them.

21   Q.  Well, you didn't record an entire night when you went out

22   to a club with them, correct?

23   A.  Yes, sir.

24   Q.  But there were other times when you met with them and you

25   did not record it, correct?

1    A.   I'm sorry?

2    Q.   There were other times when you met with them when you did

3    not record it in Venezuela, correct?

4    A.   No, sir.  Not at any other time that I was with them did I

5    not record, just the night at the discotheque.

6    Q.   You didn't see them at your hotel or in restaurants?

7    A.   No, sir.

8    Q.   Your testimony is there were no other meetings you held

9    with the defendants that you failed to record?

10   A.   I'm sorry.  I didn't understand.

11   Q.   You are saying that there were no other meetings you had

12   with the defendants that you failed to record?

13   A.   Only the one at the discotheque.

14   Q.   Now, for the meetings that you did record, you did not

15   record all of those meetings, correct?

16   A.   When I was with them I recorded everything.

17   Q.   Well, sir, you said that at the meetings you would go into

18   a bathroom to activate your recording device, right?

19   A.   Yes, sir.

20   Q.   But before you went into the bathroom you weren't

21   recording, right?

22   A.   Before going to the bathroom?  No.

23   Q.   Okay.  So, you determined when to turn on the recorder and

24   when to turn it off, correct?

25   A.   Yes, sir.

GBA5flo6                        Santos Peña – cross

1   Q.  There was no agent there that you met with before you went

2   into these meetings, correct?

3   A.  I didn't understand the question.

4   Q.  There was no DEA agent in Venezuela with you helping you to

5   turn on and off the recording, correct?

6   A.  Correct.  Nobody was there.

7   Q.  You're the one who did it, right?

8   A.  Yes, sir.

9   Q.  And you made the decision when to turn it on and when to

10  turn it off, right?

11  A.  Yes, sir.

12  Q.  And there were conversations that you had with the

13  defendants that you did not record, correct?

14  A.  Only the one at the disco.

15  Q.  I'm not talking about that night.

16  A.  That was the only time.

17  Q.  But, at your meetings before you went into the bathrooms

18  you had conversations with the defendants, correct?

19  A.  No, sir.

20  Q.  Your testimony is that, every meeting, you went into the

21  bathroom immediately as soon as you got there?

22  A.  You mean when I got there to be with them?

23  Q.  Right.

24  A.  Yes, sir.

25  Q.  You just ran right into the bathroom as soon as you got to

GBA5flo6                          Santos Peña – cross

1    the building?

2                    MR. QUIGLEY:  Objection.

3                    THE COURT:  Sustained.

4    Q.  Did you say hi to anyone before you went into the bathroom?

5    A.  The security agents who would come to get me.

6    Q.  Right; and then you would come to the building, right?

7    A.  Yes.

8    Q.  And you would go immediately into the bathroom?

9    A.  By the first door there was a bathroom to the left and

10   that's the one I went into.  They didn't receive me upon coming

11   in, they were at the other end of the building in a room which

12   was adapted to be an office.

13   Q.  Now, the night when you went to the disco you had lots of

14   conversations with the defendants, right?

15   A.  At the disco?  Or before?

16   Q.  At the disco.

17   A.  Yes, sir.

18   Q.  And your testimony --

19   A.  Only for moments because they were with women.

20   Q.  So, you didn't talk to them much at the disco?

21   A.  Yes, sir.

22   Q.  You talked to them about your negotiations, didn't you?

23   A.  No, sir.

24   Q.  Not one word about that?

25   A.  They just bragged to their friends that I was a member of

GBA5flo6                          Santos Peña – cross

1    the Sinaloa cartel and that I was Mexican.

2    Q.  And your testimony is you didn't discuss drug deals at that

3    disco; is that right?

4    A.  I don't remember.

5    Q.  So, you might have discussed drug deals with them and you

6    just don't remember, right?

7    A.  I'm also certain -- I'm almost certain that I didn't but I

8    don't remember having spoken about drugs.  They were mentioned.

9    They mentioned that I was a member of the Sinaloa cartel.  If

10   that's what you're talking about, that's related to drug

11   trafficking, but nothing specific.  Nothing specific related to

12   the shipment of drugs that they were intending to send to

13   Honduras.

14   Q.  Nothing about Sentado?

15   A.  No, sir.

16   Q.  Now, while you were in Venezuela you were communicating

17   with your son by text message also, correct?

18   A.  My son and I have always communicated through text

19   messages.

20   Q.  Sure.

21           And you continued to do that when you were in

22   Venezuela in October 2015, correct?

23   A.  Yes, sir.

24   Q.  Were you also texting with Paul while you were in Caracas?

25   A.  Not me.

GBA5flo6                          Santos Peña – cross

1   Q.  Your son was though, correct?

2   A.  Could be.  I don't know.

3   Q.  Now, when you weren't with the defendants, you and your son

4   were with Paul, correct?

5   A.  Yes, sir.

6   Q.  And did you engage in other drug negotiations with your son

7   and Paul in Caracas?

8   A.  No, sir.

9   Q.  Isn't it true that one of the reasons that Paul accompanied

10  you to Caracas was so that you could investigate the

11  possibility of doing other drug deals?

12  A.  No, sir.

13  Q.  It was just like a day trip for him?

14          MR. QUIGLEY:  Objection.

15          THE COURT:  Sustained.

16  Q.  Your son went to the trouble of specifically purchasing

17  tickets for Paul, right?

18  A.  Yes, sir.

19  Q.  Was Paul living, at that time, in California or Mexico?

20  A.  Mexico.

21  Q.  And you all traveled -- withdrawn.

22          You and your son traveled specifically from California

23  to Mexico in order to fly to Venezuela, correct?

24  A.  I flew separate from my son.

25  Q.  You did not fly with your son?

GBA5flo6                          Santos Peña – cross

1    A.  To the City of Mexico I flew separately.  He flew from

2    Sinaloa to the Mexican capital, and the three of us met there

3    and the three of us traveled together to Caracas, Venezuela.

4    Q.  So, to be clear, you, your son, and Paul, met in Mexico

5    City and flew to Caracas, right?

6    A.  Yes, sir.

7    Q.  And you purchased Paul's tickets with money that you had

8    received from the DEA, correct?

9    A.  My son did, I didn't.

10   Q.  You don't know that your son bought the tickets with money

11   that you received from the DEA?

12   A.  I don't know.  We had just received a large payment from

13   the DEA.

14   Q.  That was for some different case?

15   A.  I don't understand.

16   Q.  The money you had just received, you said the large amount

17   of money you had just received, that was from some different

18   case?

19   A.  A case that had already been closed, that we had already

20   done it.

21   Q.  By the way, Paul is from Los Mochis, right?

22   A.  Yes, sir.

23   Q.  And is that where you and your son are originally from?

24   A.  Yes, sir.

25   Q.  So, your son traveled first from California to Los Mochis

GBA5flo6                          Santos Peña – cross

1   to meet up with Paul, correct?

2   A.  Yes, sir.

3   Q.  And then they traveled from Los Mochis to Mexico City,

4   correct?

5   A.  Yes, sir.

6   Q.  Meanwhile, you traveled from California; did you go

7   directly to Mexico City?

8   A.  I don't know whether I traveled from California to Mexico

9   City or from Tijuana to Mexico city.

10  Q.  In any event, you all met up in Mexico City to fly to

11  Caracas, right?

12  A.  Yes, sir.

13  Q.  So you had planned this out, right?

14  A.  What do you mean?  What do you mean by planning?

15  Q.  Well, you planned to go and meet in Mexico City to fly to

16  Venezuela, correct?

17  A.  My son and myself.

18  Q.  Right.

19          But your son planned to go to Los Mochis, right?

20  A.  Yes, sir.

21  Q.  And he planned to pick up Paul and travel with Paul to

22  Mexico City, right?

23  A.  No, sir.  That was not the initial plan.

24  Q.  So, Paul going along to Venezuela was totally random?

25          MR. QUIGLEY:  Objection.

GBA5flo6                        Santos Peña – cross

1         THE COURT:  Sustained.

2    Q.  You are saying that you did not plan to take Paul to

3    Venezuela?

4         THE COURT:  He said it was not the original plan.  He

5    said it was not the original plan.

6    Q.  But then it became the plan, right?

7    A.  Yes, sir.

8    Q.  And your testimony is that you did not take Paul with you

9    to Caracas in order to investigate other drug deals?

10   A.  That's correct.

11   Q.  By the way, at the time you were engaged in illegal,

12   unauthorized drug deals in California, right?

13   A.  In what time?

14   Q.  In October 2015.

15   A.  October of 2015?

16   Q.  Yes.

17   A.  I don't remember the exact month but it was in 2015, yes.

18   Q.  But you were engaged in illegal drug trafficking throughout

19   2015, correct?

20   A.  Yes, sir.

21   Q.  And the year before that, right?

22   A.  Yes, sir.

23   Q.  And the year before that, right?

24   A.  Yes, sir.

25   Q.  And for many years going back you were involved in illegal,

GBA5flo6                          Santos Peña – cross

1  unauthorized drug deals, correct?

2  A.  Only from 2012 to 2016.

3  Q.  So, your testimony is that prior to 2012 you were not

4  engaged in any unauthorized drug deals?

5  A.  Yes, sir.

6  Q.  Now, your son was involved in illegal drug deals all the

7  way back to 2010, right?

8  A.  I don't know.

9  Q.  You were not involved in his illegal activities between

10 2010 and 2012?

11 A.  No, sir.

12 Q.  Going back to when you were in Caracas, before you left

13 Caracas you deleted your text messages with your son, right?

14 A.  Yes, sir.

15         MR. RODY:  One moment, Judge?

16         (counsel conferring)

17 Q.  Did Agent Gonzalez tell you to provide him with those texts

18 before you deleted them?

19 A.  What are you referring to?

20 Q.  Your texts with your son that you deleted in Caracas.

21 A.  I deleted the text messages, mine and my son's, in Mexico

22 City before leaving for Caracas for my own security and for my

23 son's security.  Not only my son's, all of the ones that were

24 on my phone; my wife's, my daughter's.  Any messages that

25 existed.

GBA5flo6                          Santos Peña – cross

1    Q.  Right.  But then, when you were in Caracas, you were

2    texting with your son, correct?

3    A.  Yes.  I don't remember, but I must have.

4    Q.  You must have texted with your son while you were in

5    Caracas, right?

6    A.  I suppose so.

7    Q.  And any texts between you and your son while you were in

8    Caracas might reflect what you and your son were doing in

9    Caracas, right?

10   A.  There were personal things, nothing that had to do with the

11   deal that I was doing with Mr. Campo and Francisco.

12   Q.  I'm not talking about them.  I'm talking about what you

13   were doing with your son.

14   A.  When you say doing, what are you referring to?

15   Q.  Well, you met with the defendants on four occasions, is

16   that right?

17   A.  Yes, sir.

18   Q.  You were in Caracas from October 19th to the 29th; is that

19   right?

20   A.  Yes, sir.  Approximately.

21   Q.  10 days, right?

22   A.  Approximately.

23   Q.  And you met with the defendants four times, right?

24   A.  Yes, sir.

25   Q.  And the night at the disco, that was a few hours, right?

GBA5flo6                    Santos Peña - cross

1    A.  It was several hours.

2    Q.  And each of the prior, the other three meetings that you

3    had with them, each of those was between one and two hours?

4    A.  One hour for sure, approximately.  And they lasted for

5    minutes, 40 minutes, I cannot be precise, 30 minutes to an

6    hour.

7    Q.  So, for the three meetings that you recorded, the total

8    amount of time that you were with the defendants was, what,

9    three or four hours?

10   A.  I cannot be exact with that.

11   Q.  Let's say it was between two and six hours.

12          MR. QUIGLEY:  Objection.  That's not a question.

13          THE COURT:  Overruled.

14   Q.  Is that fair to say, between two hours on the low end and

15   six hours on the high end of an estimate?

16   A.  That wouldn't be correct because I wouldn't be telling the

17   truth.

18   Q.  Right.  I'm not asking for an exact amount of time.

19          You met with the defendants for a few hours, right?

20   A.  Yes.  One hour, couple of hours, could be.

21   Q.  What did you and your son and Paul do the rest of the time

22   you were in Caracas for those 10 days?

23   A.  We were on one or two occasions at a table dance -- on one

24   occasion my son, Paul, and I went, and on another occasion my

25   son, Paul, and I went, and Mr. Campo and Mr. Francisco's

GBA5flo6                         Santos Peña - cross

1   bodyguards.  On that occasion -- it was only one or two hours,

2   I'm not sure.

3   Q.  You are talking about going to strip clubs, right?

4   A.  Yes, sir.

5   Q.  And did you use prostitutes at those locations?

6   A.  No, sir.  No, not on those occasions, no.

7   Q.  But you did use a prostitute a couple of times when you

8   were down in Caracas, right?

9   A.  Yes, sir.

10  Q.  Now, was that at night?

11  A.  Yes, sir.

12  Q.  What did you do during the day, when you were in Caracas,

13  with your son and Paul?

14  A.  Almost always we were at the restaurant.  We'd only go eat

15  at a shellfish restaurant.  We would go to a restaurant that

16  was across the street, a shellfish or meat restaurant.  I don't

17  remember.  And on one day we went to, like, a small shopping

18  mall.

19  Q.  And your testimony is that in all that time you didn't meet

20  with any other drug dealers?

21  A.  That's correct.  I didn't meet with anybody else.

22          THE COURT:  Mr. Rody, is this a convenient place to

23  break?

24          MR. RODY:  A convenient place, Judge.  Thanks.

25          THE COURT:  Now, ladies and gentlemen of the jury,

GBA5flo6                          Santos Peña – cross

1    tomorrow is Veterans Day.  It used to be called Armistice Day

2    because on the 11th day -- or the 11th hour of the 11th day of

3    the 11th month we declared the Armistice that ended World War

4    I.  We now call it Veterans Day where we honor the veterans who

5    have served and kept our freedoms here in the United States.

6    It is a federal holiday, we are going to observe the federal

7    holiday.  We will resume with this case on Monday morning.  In

8    the meantime, remember my instructions.  Please don't talk to

9    anybody about the case, don't do any investigations on your

10   own.  Keep open minds.  Have a safe weekend and we will see you

11   Monday morning at 9:30.

12            Thank you very much.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Anything to take up?

3           MR. JACKSON:  No, your Honor.

4           MR. QUIGLEY:  No, your Honor.

5           THE COURT:  See you Monday.  Thank you.

6           (Adjourned to November 14, 2016 at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JOSE SANTOS PEÑA

Direct By Mr. Quigley  . . . . . . . . . . . . 644

Cross By Mr. Rody  . . . . . . . . . . . . . . 725