GBG9FLO1                         Trial

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA,
 3
                  v.                        15 Cr. 765 (PAC)
 4
      EFRAIN ANTONIO CAMPO FLORES and
 5    FRANQUI FRANCISCO FLORES DE FREITAS,
 6                  Defendants.
      ------------------------------x
 7
                                        New York, N.Y.
 8                                      November 16, 2016
                                        9:36 a.m.
 9    Before:

10                     HON. PAUL A. CROTTY,

11                                         District Judge

12                          APPEARANCES

13    PREET BHARARA
           United States Attorney for the
14         Southern District of New York
      EMIL J. BOVE III
15    BRENDAN F. QUIGLEY
           Assistant United States Attorneys
16
      BOIES, SCHILLER & FLEXNER LLP
17         Attorneys for Defendant Campo Flores
      RANDALL W. JACKSON
18    JOHN T. ZACH
      JOANNA CHRISTINE WRIGHT
19
      SIDLEY AUSTIN LLP
20         Attorneys for Defendant Flores de Freitas
      DAVID M. RODY
21    ELIZABETH A. ESPINOSA
      MICHAEL D. MANN
22
      ALSO PRESENT:
23
      HUMBERTO GARCIA
24    MIRTA HESS
      ANNA MARIA RISO
25    VIVIAN GOA
      Spanish Interpreters

GBG9FLO1                          Trial

 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning.  Please be seated.

 3              Mr. Bove, do you want to take up something?

 4              MR. BOVE:  Yes, your Honor.  Just in response or I

 5    guess following up on the Court's discussion with us last night

 6    about the drug quantity issues in the charge and the verdict

 7    sheet.

 8              THE COURT:  Yes.

 9              MR. BOVE:  We reviewed the proposed charge last night.

10    We're comfortable proceeding based on the way the Court has

11    proposed without putting the quantity question to the jury and

12    using the language as it's framed.  I think we may have some

13    proposals this evening at the charge conference.

14              THE COURT:  Fine.

15              MR. BOVE:  But we're generally okay with that.

16              MR. JACKSON:  Yes, your Honor.  We appreciate the

17    government looking back into it.  I think we're agreeing as

18    well.

19              THE COURT:  You thought so yesterday, too,

20    Mr. Jackson.  Just because hope springs eternal.

21              MR. JACKSON:  Exactly, your Honor.

22              As Mr. Bove was saying, there may be a word or two

23    that we'd like to discuss with the Court but I think we're in

24    substantial agreement.

25              THE COURT:  Do you have other matters, Mr. Bove?

1          MR. BOVE:  I don't, your Honor, other than to say that

2     yesterday when I estimated the rest of the government's case I

3     misspoke when I said there were three witnesses.  There are

4     four.

5          THE COURT:  All right.

6          MR. BOVE:  It's another DEA agent.  The two DEA agents

7     will be Kevin Corcoran and Leith Habayeb.  We expect the direct

8     exams of those witnesses to both certainly be less than half an

9     hour and probably less than that.

10          THE COURT:  Anything else?

11          Marlon, is the jury here?

12          THE DEPUTY CLERK:  Not yet.

13          THE COURT:  Mr. Jackson, do you want to take something

14     up?

15          MR. JACKSON:  I was just curious.  I apologize if I

16     missed this.  Has the Court determined what time tonight we're

17     going to do the charge conference?

18          THE COURT:  It really all depends on -- I thought

19     there were three witnesses.  I had hoped we'd get finished

20     today.

21          I don't know.  Do you want to suggest a time?  4:30,

22     5 o'clock at the end of the day?

23          MR. JACKSON:  Any time that works for the Court is

24     fine for us.

25          THE COURT:  Why don't we say tentatively 4:30.

GBG9FLO1                      Trial

1           MR. RODY:  Yes.  The earlier the better I think.

2           THE COURT:  Well if we end sooner we'll start sooner.

3           MR. RODY:  Great.  Thanks.

4           THE COURT:  We won't end later than 4:30 because I'm

5    going to excuse the jury at 4:30.  So the latest we'll start is

6    4:30.  If we get finished sooner, we'll start sooner.

7           MR. RODY:  Judge, if the witnesses kick over to

8    tomorrow, and I'm not saying that they are but if they do,

9    would we go straight into summations immediately or take a

10   break or --

11          THE COURT:  Well, again, it depends.  I understand how

12   important the summations are and you want some time to get

13   ready.

14          MR. RODY:  That would be nice.

15          THE COURT:  But I mean if the jury -- if we go over to

16   tomorrow and there's a half an hour I would take a short break

17   and then ask you to do your summations.

18          MR. RODY:  Great.  Thanks.

19          THE COURT:  But I'm willing to take guidance on it.  I

20   want to accommodate all the parties so that they have the time

21   they need to make the summations they want to make.  Okay.

22          We'll start as soon as the jury gets here.

23          Mr. Ovalles reminds me we have an arraignment we have

24   to do this afternoon.  But we'll fit that in.

25          Marshal, do you want to bring out the witness.  Thank

GBG9FLO1                    Trial

1    you.

2      CARLOS GONZALEZ, resumed.

3            THE COURT:  The jury has arrived.  If there's nothing

4    to take up, we'll resume the examination.  Are you all set,

5    Mr. Zach?

6            MR. ZACH:  I am, your Honor.  Thank you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBG9FLO1                          C. Gonzalez - cross

1              (Jury present)

2              THE COURT:  Good morning.  Please be seated.

3              Are you ready, Mr. Zach?

4              MR. ZACH:  I am.  Thank you, your Honor.

5              THE COURT:  Mr. Gonzalez.  Let me remind you:  You're

6    still under oath.

7              THE WITNESS:  Okay.

8              THE COURT:  Thank you.

9              All right, Mr. Zach.

10   CROSS-EXAMINATION

11   BY MR. ZACH:

12   Q.  Good morning, Mr. Gonzalez.

13   A.  Good morning.

14   Q.  I want to take a -- with that meeting that we were talking

15   about yesterday, the meeting you had with the DEA on June 21,

16   2016.  Do you recall that meeting?

17   A.  Yes, sir.

18   Q.  And you recall that it happened on June 21, 2016?

19   A.  I don't remember the exact date, sir.  But it was in June.

20   Q.  You signed a piece of paper when you met with the DEA at

21   that first meeting, right?

22   A.  Yes, sir.

23             MR. ZACH:  Your Honor, may I approach briefly?

24             THE COURT:  Yes.

25   Q.  My question to you, Mr. Gonzalez, is does this refresh your

1    recollection that the meeting was on June 21, 2016?

2    A.  Yes, sir.

3    Q.  Thank you.  Now, we talked yesterday about while you were

4    at that meeting you did not tell the agents about the

5    October 2015 meeting that you testified about on your direct

6    here yesterday.  Do you recall that?

7    A.  Yes, sir.  I do remember.

8    Q.  Now, after that meeting in Honduras at some point you

9    traveled to the United States, right?

10   A.  Yes, sir.

11   Q.  And when you came to the United States you sat down with

12   the agents and the prosecutors in this case, right?

13   A.  Yes, sir.

14   Q.  And prior to sitting down at that meeting you actually got

15   a lawyer, right?

16   A.  Yes.  The government assigned one to me.

17   Q.  And I don't want to get into any of the substance of what

18   you said with your lawyer but I just want to ask you, yes or

19   no, you had the opportunity to meet and discuss the case with

20   your lawyer before you met with the government here, right?

21   A.  Yes, sir.

22   Q.  And you ended up meeting with the government in this case

23   on August 11, 2016.  Do you recall that?

24   A.  Yes, sir.

25   Q.  And you understood going into that meeting that it was

GBG9FLO1                         C. Gonzalez – cross

1   important for you to be truthful with the government, right?

2   A.  Yes, sir.

3   Q.  And you understood that it was important to tell them

4   everything you knew about El Sentado and your activities in

5   Honduras, right?

6   A.  Yes, sir.

7   Q.  And in that meeting with the government you were, in fact,

8   asked a whole bunch of questions about El Sentado, right?

9   A.  Yes.  There were several questions.

10  Q.  And in this meeting you had as much time as you needed to

11  tell your story, right?

12  A.  Yes, sir.

13  Q.  And in this meeting with the government, sir, on August 11,

14  2016 you didn't say one word about the October 2015 meeting you

15  testified about on direct, did you?

16  A.  I don't remember whether it was in this one or in the

17  second meeting but I did mention it.

18  Q.  I'm asking you about the first time you sat down with these

19  prosecutors on August 11, 2016.  Do you understand that?

20  A.  Yes, sir.

21  Q.  And you understand that -- you just testified you had as

22  much time as you needed to tell them about everything you knew

23  about Sentado, right?

24  A.  Yes, sir.

25  Q.  Isn't it a fact, sir, that you did not tell them one word

GBG9FLO1                              C. Gonzalez – cross

1    about the August 2015 meeting you just testified about, right?

2              MR. ZACH:  Let me rephrase that.

3              THE COURT:  I think you said August and you meant to

4    say October.

5              MR. ZACH:  I apologize.

6              THE COURT:  So we're going to strike the question and

7    you're going to start all over again.

8              MR. ZACH:  Thank you, your Honor.

9    Q.  Isn't a factor, sir, that in that August 11, 2016 meeting

10   with the government you did not say a single word about the

11   October 2015 meeting with El Sentado that you testified about

12   in your direct yesterday?

13   A.  Yes, sir.

14   Q.  Now, to be clear, sir, even in the testimony you gave about

15   that October 2015 meeting on direct, it was your testimony that

16   El Sentado and El Sentado's associates summoned you to meet

17   with him, right?

18   A.  They called Mr. Soto who called me to attend the meeting.

19   Q.  But the "they" in your answer, sir, was El Sentado and his

20   associates, right?

21   A.  Sentado and the worker who called Soto.

22   Q.  And after you received -- I want to move forward now to the

23   November meeting, okay.

24   A.  Yes.

25   Q.  And that meeting is the one that we spent all the time

GBG9FLO1                        C. Gonzalez - cross

1    watching the videotape on, right?

2    A.  Yes, sir.

3    Q.  The reason that you even attended that meeting, sir, was

4    because El Sentado or his associates asked you and Mr. Soto to

5    come and see them, right?

6    A.  Yes, sir.

7    Q.  And you jumped to it?  You went to see them the very next

8    day, right?

9    A.  Yes, sir.

10   Q.  El Sentado is a very important person in your area of

11   Honduras, isn't he?

12   A.  In the drug trafficking business.  I'm not sure about any

13   other area.

14   Q.  That's what I mean, sir.

15           Now, you testified -- to be clear about something

16   else, you testified on direct that in order to carry out a

17   number of the activities at the airport, the Honduran national

18   police were involved, right?

19   A.  Yes, sir.

20   Q.  And you weren't bribing the Honduran national police, were

21   you?

22   A.  It was being paid for the work, yes.

23   Q.  And it was El Sentado and his associates that were bribing

24   the Honduran national police, right?

25   A.  The island police was being paid by us, sir.

GBG9FLO1                          C. Gonzalez – cross

1    Q.  And El Sentado and his associates also had contacts with

2    the Honduran Air Force, didn't they?

3    A.  I don't know, sir.

4    Q.  You never had a discussion with anyone about that?

5    A.  With him, no, sir.

6    Q.  Now, in that meeting that we watched for 45 minutes that

7    was you and Mr. Soto, right?

8    A.  Yes, sir.

9    Q.  And the other -- there was also a Colombian there, right?

10   A.  Yes, sir.

11   Q.  And that was an individual that was named Juan Gomez,

12   right?

13   A.  I don't remember his name but in the testimony it says that

14   the last name is Gomez.

15   Q.  You understand who we're referring to when we're talking

16   about Mr. Gomez, right?

17   A.  Yes, sir.

18   Q.  And you understand that he was -- you understand now today

19   that he was a confidential informant, right?

20   A.  Yes, sir.

21   Q.  And you understand now today that El Sentado was

22   cooperating with the DEA, right?

23   A.  Yes, sir.

24   Q.  And so that meeting involved you, Mr. Soto, and two

25   cooperators, right?

GBG9FLO1                          C. Gonzalez – cross

1    A.  Yes, sir.

2    Q.  Now, I want to ask you a few other questions.  To be clear

3    in your work at the airport you never actually loaded,

4    personally loaded cocaine onto a fast boat, did you?

5    A.  No, sir.

6    Q.  And you never unloaded cocaine from the fast boat on the

7    coast of Honduras, the continental coast of Honduras, right?

8    A.  No, sir.

9    Q.  And you never helped truck cocaine from the shore of

10   Honduras into the interior of the country, did you?

11   A.  No, sir.

12   Q.  And you never flew on any of these planes that took off

13   from the airport to deliver the cocaine somewhere, did you?

14   A.  No, sir.

15   Q.  And to be clear, you were an air traffic controller; you

16   never personally worked in any drug cartel or drug

17   organization, did you?

18   A.  I did work, yes.

19   Q.  You worked -- for what drug organization did you work?

20   A.  It wasn't an organization.  I organized the airports for

21   the cartels, sir.

22   Q.  That's what I said.  You worked at the airport, right?

23   A.  Yes, sir.

24   Q.  But that was the extent of your role in the drug

25   trafficking operation that you were participating in, right?

GBG9FLO1                          C. Gonzalez - cross

1    A.  Could you repeat the question.  I don't understand.

2    Q.  Well your role in the drug trafficking organization was

3    limited to your work as an air traffic controller, right?

4    A.  To organize the airport to receive and dispatch planes

5    associated with drug trafficking business.

6    Q.  Just at that airport, right?

7    A.  Yes.  At the Roatan Airport, sir.

8    Q.  So you, sir, have no firsthand knowledge of where the

9    cocaine actually went after it left your airport, do you?

10   A.  I did have knowledge.  I did have knowledge ever since I

11   started being involved in the drug trafficking of where the

12   drugs ended up that went through Honduras.

13   Q.  Sir, you know, don't you, that much of the cocaine that

14   goes through Honduras actually goes to Europe, don't you?

15            MR. BOVE:  Objection.

16            THE COURT:  Overruled.

17   A.  No, sir.

18   Q.  Now, sir, you testified about your belief about where

19   narcotics go from Honduras on direct, didn't you?

20   A.  Yes, sir.

21   Q.  And to be clear you never shared your belief with the

22   defendants in this case, did you?

23   A.  I don't know the defendants, sir.

24   Q.  You've never spoken to them, right?

25   A.  No, sir.

1    Q.  And you've never even seen them before you entered the

2    courtroom today, right?

3    A.  Yes, sir.

4            MR. ZACH:  No further questions.

5            THE COURT:  Mr. Rody.

6            MR. RODY:  Thanks, Judge.

7    CROSS-EXAMINATION

8    BY MR. RODY:

9    Q.  Sir, the video that we saw yesterday was of a meeting you

10   attended in November of 2015; is that right?

11   A.  Yes, sir.

12   Q.  Just to be clear.  He was not at that meeting, right?

13   A.  No, sir.

14           MR. RODY:  That's Mr. Campo Flores for the record.

15   Q.  And he wasn't at the meeting either, right?

16   A.  No, sir.

17           MR. RODY:  And that was Mr. Flores de Freitas.

18   Q.  Sir, you testified about your understanding of the word

19   gueros.  Do you recall that from yesterday?

20   A.  Yes, sir.  I do remember.

21   Q.  And you know that the same word in Spanish can have

22   different meanings in different Spanish-speaking countries,

23   right?

24   A.  No, sir.

25   Q.  You don't know that?

GBG9FLO1                          C. Gonzalez – cross

1    A.  I only know it just to acknowledge a person who is from the
2    United States.
3    Q.  And you were born and raised in Honduras?
4    A.  Yes, sir.
5    Q.  Have you ever lived in Venezuela?
6    A.  No, sir.
7    Q.  Now, you signed a cooperation agreement with the
8    government, right?
9    A.  Yes, sir.
10   Q.  And you're hoping to get a 5K letter from the government,
11   right?
12   A.  Yes, sir.
13   Q.  Because you understand that if you get the 5K letter you
14   can get a reduced sentence, right?
15   A.  Yes, sir.
16   Q.  Now, in order to get the 5K letter from the government you
17   have to do certain things, right?
18   A.  Yes, sir.
19   Q.  And one of the things you have to do is provide substantial
20   assistance to the government, right?
21   A.  To tell the truth, not to commit anymore crimes, and
22   testify when it's requested of me.
23   Q.  Right.  That's what you're required to do.  That's part of
24   what you're required to do, right?
25   A.  Yes, sir.

GBG9FLO1                          C. Gonzalez – cross

1    Q.  But you understand that you can't get a 5K letter unless

2    you provide substantial assistance to the government, right?

3    A.  I don't understand.

4            MR. RODY:  May I approach, your Honor?

5            THE COURT:  Yes, you may.

6            MR. RODY:  This is 3513-07-R, your Honor.

7    Q.  I'm going to point to a line on page three and ask the

8    translator to translate this line starting with that word?

9            THE INTERPRETER:  Up to where?

10           MR. RODY:  Right there.  It's really just one

11   sentence.  Starting there.

12   Q.  Mr. Gonzalez, does that refresh your recollection that one

13   of the requirements of your cooperation agreement is that in

14   order to get a 5K letter you have to provide substantial

15   assistance to the government?

16   A.  Yes, sir.

17           MR. RODY:  Your Honor, the government offers at this

18   time -- sorry, the defense -- old habits, Judge -- 3513-07-R.

19           THE COURT:  Objection?

20           MR. BOVE:  No objection, your Honor.

21           THE COURT:  3513-07-R is received in evidence.

22           (Defendants' Exhibit 3513-07-R received in evidence)

23   Q.  So, Mr. Gonzalez you understand that in order to get the 5K

24   letter you have to help the government, right?

25   A.  Yes, sir.

GBG9FLO1                              C. Gonzalez - cross

1    Q.  And you have to help the government in a big way, right?

2    A.  Yes, sir.

3    Q.  And you understand that helping the government convict

4    these men would constitute substantial assistance, right?

5              MR. BOVE:  Objection.

6              THE COURT:  Sustained.

7    Q.  Your understanding, sir, is it not, is that helping the

8    government to convict these men would constitute substantial

9    assistance for you, right?

10             MR. BOVE:  Objection.

11             THE COURT:  Sustained.

12             MR. RODY:  I'm inquiring about his understanding, your

13   Honor.

14             THE COURT:  I understand what you're asking.  The

15   objection is made and it's been sustained.

16   Q.  You believe that it will help you if you testify in this

17   trial, right?

18   A.  I'm complying with one of the obligations that I signed in

19   the agreement.

20   Q.  Right.  And that obligation we're talking about now is to

21   provide substantial assistance, right?

22             MR. BOVE:  Objection.

23             THE COURT:  The agreement is to provide substantial

24   assistance.  The objection is sustained.  It's been asked and

25   answered.

GBG9FLO1                          C. Gonzalez – cross

1   Q.  And you believe that it will help you get a 5K letter if

2   the defendants get convicted, right?

3              MR. BOVE:  Objection.

4              THE COURT:  Sustained.  There's nothing in that

5   agreement about conviction.

6              MR. RODY:  I'm just inquiring about his understanding,

7   Judge.

8              THE COURT:  Okay.  The objection is sustained.

9   Q.  Now, Mr. Gonzalez, is it correct that you traveled to the

10  United States voluntarily?

11  A.  Yes, sir.

12  Q.  After you met with the DEA in Honduras, right?

13  A.  Yes, sir.

14  Q.  And the DEA agents told you about the charges you faced if

15  you came here, right?

16  A.  Yes, sir.

17  Q.  And, in fact, the charge you pled guilty to carries a

18  maximum sentence of life in prison, correct?

19  A.  Yes, sir.

20  Q.  And it carries a mandatory minimum sentence of ten years,

21  correct?

22  A.  Yes, sir.

23  Q.  And that is for a charge of conspiring to import drugs into

24  the United States, correct?

25  A.  Yes, sir.

GBG9FLO1                          C. Gonzalez - cross

1    Q.   And for conspiring to manufacture and distribute drugs
2    intending that they would be imported into the United States,
3    right?
4    A.   I don't know.  It was just to send 5 kilos or more of drugs
5    to the United States -- conspiring to send 5 kilos or more to
6    the United States.
7    Q.   And you understand that you cannot get less than ten years
8    unless you get a 5K letter from the government, right?
9    A.   Not even if I got the 5K1 because that's up to the judge.
10   Q.   Right.  It's up to the judge what your ultimate sentence
11   will be, correct?
12   A.   Yes, sir.
13   Q.   But you don't even have the possibility of getting a
14   reduced sentence if you don't get the 5K letter first from the
15   prosecutors, right?
16   A.   Yes, sir.
17   Q.   Now, you understand the difference between the statute you
18   were charged under and the sentencing guidelines, right?
19   A.   Yes, sir.
20   Q.   And you understand that under the statute you would face a
21   ten-year mandatory minimum, right?
22   A.   Yes, sir.
23   Q.   But when you pled guilty you had admitted to conspiring to
24   import lots and lots of cocaine, right?
25              MR. BOVE:  Judge, I object to the questions that

GBG9FLO1                              C. Gonzalez – cross

1    relate to the sentencing guidelines because of the way that --

2    the issues it will raise.

3              THE COURT:  Let it go for a while longer.  The

4    objection is overruled.

5    A.  It's conspiracy to send 5 kilos or more to the United

6    States.

7    Q.  Right.  That's what triggers the ten-year mandatory

8    minimum, right?

9    A.  Yes, sir.

10   Q.  But you admitted to trafficking hundreds of kilograms of

11   cocaine, right?

12             MR. BOVE:  Objection.

13             THE COURT:  Sustained.

14   Q.  Regardless of the statute, sir, you understand that the

15   guideline range that you face is life in prison, right?

16             MR. BOVE:  Objection.

17             THE COURT:  Sustained.

18   Q.  So, you met with the DEA in Honduras and they talked to you

19   about the charges you would face; is that right?

20   A.  To the problems that I had in the U.S.  Yes, sir.

21   Q.  But they talked about the charges you would face, right?

22   A.  Yes, sir.

23   Q.  And did they talk to you about the penalties you would face

24   in the United States?

25   A.  About penalties, I don't remember that, sir.

1    Q.  Well, they must have told you that you were going to get an

2    opportunity --

3              MR. BOVE:  Objection.

4    Q.  -- to cooperate, correct?

5              THE COURT:  Sustained.

6              MR. RODY:  I'm sorry.  To this question?

7              THE COURT:  He objected.  I sustained the objection.

8              MR. RODY:  He objected before I asked the question.

9    I'm sorry, Judge.

10             THE COURT:  He knew what you were asking.

11             Do you object to the question?

12             MR. BOVE:  I do, Judge.  I had a sense of where he was

13   going.

14             THE COURT:  Sustained.

15   Q.  Did you understand before you came to the United States

16   that you would have an opportunity to cooperate?

17   A.  Yes, sir.

18   Q.  Did the DEA agents promise you that you would be allowed to

19   cooperate?

20   A.  No, sir.

21   Q.  But you came here voluntarily to face these charges?

22   That's your testimony?

23   A.  Yes, sir.

24   Q.  You didn't actually think you were going to face a long

25   time in prison, did you?

1              MR. BOVE:  Objection.

2              THE COURT:  Overruled.

3    A.  I didn't know how long I was going to be in jail.  And even

4    to this day I still don't.

5    Q.  Sure.  Now, today, you don't know, right?

6    A.  I don't know, sir.

7    Q.  Your testimony is that you voluntarily came to the United

8    States to face ten years in prison?

9    A.  I came to face the charges against me.  I didn't know how

10   long I was going to remain in jail.

11   Q.  Now, you talked about attending the meeting in November of

12   2015 in Honduras with Mr. Soto?

13   A.  Yes, sir.

14   Q.  And is it true that he was someone you had worked with in

15   the drug business before?

16   A.  Yes, sir.

17   Q.  And you arranged drug deals with him for years?

18   A.  Yes, sir.

19   Q.  And he never once mentioned these two defendants to you,

20   right?

21   A.  No, sir.

22   Q.  In all the years of your dealings with him, right?

23   A.  No, sir.  No.

24   Q.  Did you mention yesterday that you were investigated for

25   human trafficking at one point?

GBG9FLO1                          C. Gonzalez – cross

1   A.  I wasn't investigated.  I told the prosecutors.

2   Q.  So -- but what prompted you to tell the prosecutors?

3   A.  I've been telling the truth, sir, since I came to the

4   United States.

5   Q.  No.  No.  No.  I'm sorry.  This was in Honduras, right?

6   A.  What was in Honduras?

7   Q.  I thought you testified yesterday that in Honduras there

8   was some issue about human trafficking; is that right?

9   A.  I was asked if I had been involved in some kind of job with

10  trafficking people.

11  Q.  You were asked in Honduras or asked by the prosecutors here

12  in the U.S.?

13  A.  Here in the United States, sir.

14  Q.  So you never talked to the authorities in Honduras about

15  this?

16  A.  I was never investigated by the Honduran authorities

17  regarding this, sir.

18  Q.  And you said that the -- whatever the issue was with human

19  trafficking it was just conversations?

20  A.  Yes, sir.

21  Q.  And you said nothing actually happened?

22  A.  Yes, sir.

23  Q.  And so because of that the prosecutors did not require you

24  to plead guilty to any charge relating to human trafficking,

25  right?

GBG9FLO1                        C. Gonzalez - redirect

1              MR. BOVE:  Objection.

2              THE COURT:  Sustained.

3    Q.  Well you don't face any charge because of that, right?

4              MR. BOVE:  Objection.

5              THE COURT:  Sustained.

6              MR. RODY:  No further questions.

7              THE COURT:  Mr. Bove.

8              MR. BOVE:  Thank you, your Honor.

9              May I have access total to the ELMO, please, Mr.

10   Calabrese.

11   REDIRECT EXAMINATION

12   BY MR. BOVE:

13   Q.  Sir, you were asked some questions during cross-examination

14   about your cooperation agreement?

15   A.  Yes, sir.

16   Q.  You were also asked some questions about the amount of

17   money that you made during your drug trafficking crime.

18   A.  Yes, sir.

19             MR. BOVE:  Your Honor, I'm going to publish 3513-07-R

20   at page two with the Court's permission.

21             THE COURT:  Yes.

22             MR. BOVE:  Thank you, your Honor.

23             THE COURT:  This is in evidence?

24             MR. BOVE:  Yes, your Honor.

25   Q.  Sir, I'd like to direct your attention to the paragraph at

GBG9FLO1                        C. Gonzalez – redirect

 1   the top of the page.
 2          MR. BOVE:  Sorry, your Honor.  We've got a technical
 3   glitch here.
 4   Q.  You're familiar with the agreement, right?
 5   A.  Yes, sir.
 6   Q.  And have you agreed to forfeit all of the money that you
 7   made in connection with this crime when you're sentenced?
 8   A.  Yes, sir.
 9   Q.  And you were also asked some questions about the airport in
10   Honduras.
11   A.  Yes, sir.
12   Q.  Are you familiar with the term FBO?
13   A.  Yes, sir.
14   Q.  What's an FBO?
15          MR. ZACH:  Objection.  Outside the scope.
16          THE COURT:  Overruled.  What's an FBO?
17          THE WITNESS:  The FBO is the ramp of an airport.
18   Q.  And you were asked some questions about the first meeting
19   that you had with the DEA in Honduras.  Do you recall those
20   questions?
21   A.  Yes, sir.
22   Q.  Approximately how long did that meeting take?
23   A.  It was not longer than three hours.
24   Q.  And was that enough time to tell the DEA all of your crimes
25   between 2008 and 2016?

1    A.  No, sir.

2    Q.  You were asked some questions about your decision to

3    surrender in the United States.

4    A.  Yes, sir.

5    Q.  Why did you do that?

6    A.  Surrender voluntarily?

7    Q.  Yes.  Why did you make the decision to do that?

8    A.  Because I had to take responsibility that the problems that

9    I had gotten myself involved in.

10   Q.  Why did you decide to take responsibility?

11   A.  It was my responsibility.  They were my problems and I got

12   involved in them.

13   Q.  You were asked some questions about your testimony relating

14   to that meeting in mid-October of 2015 with the three Mexicans

15   that you described.

16   A.  Yes, sir.

17   Q.  And I believe you testified on direct that one of the

18   Mexicans made reference to someone with access to the

19   presidential hangar in Venezuela?

20   A.  Yes, sir.

21   Q.  Do you know whether either of these men have that kind of

22   access?

23   A.  I don't know, sir.

24   Q.  Because you don't know anything about them, right?

25   A.  I know nothing, sir.

GBG9FLO1                        C. Gonzalez - redirect

1   Q.  Let's take -- now you were asked some questions about any

2   other statements that were made in that meeting relating to

3   Venezuelans.  Do you recall those questions?

4   A.  Can you repeat the question, please.

5   Q.  You were asked some questions about any statements relating

6   to Venezuelans at the meeting that took place in mid-October of

7   2015?

8           MR. ZACH:  Objection.

9           THE WITNESS:  Yes, sir.

10          MR. BOVE:  May I proceed?  I'm sorry.  I thought there

11  was a pending objection.

12          THE COURT:  He had answered.  The objection is

13  overruled.

14          MR. BOVE:  Thank you, Judge.

15          I'll ask the jurors to take a look in their binders

16  Government Exhibit 403-T.

17          Mr. Calabrese, if we could take a look at the first

18  page.

19          MR. ZACH:  Your Honor.

20          THE COURT:  Yes.

21          MR. ZACH:  We'll lodge an objection.  I don't think

22  they're about to ask him a question.  I think what they're

23  going to do is just read from a document that this witness is

24  not on.  I don't think that's appropriate.

25          MR. BOVE:  It's a document in evidence, your Honor.

GBG9FLO1                          C. Gonzalez - redirect

1            THE COURT:  Let him ask the question and then object,

2     Mr. Zach.

3            MR. BOVE:  Before I ask the question I'm going to ask

4     Mr. Calabrese to help me read portions of this exhibit back to

5     frame a question.

6            MR. ZACH:  Objection, your Honor.

7            THE COURT:  Overruled.  Go ahead.  You're going to

8     read 403-T?

9            MR. BOVE:  Yes, your Honor.  And I'll ask that the

10    jurors turn to page four.  I'll ask Mr. Calabrese to read the

11    part of A.m.  It's a BlackBerry messenger communication between

12    Campo and someone using the screen name A.m.

13            "A.m:  Buddy, they're asking me about the transport's

14    model, that what model is it.

15            "CAMPO:  What do you mean?  I don't, I don't

16    understand you.

17            "A.m:  The plane's model.

18            "CAMPO:  Buddy, I'm sorry I hadn't responded.  Listen

19    we don't have the bird.  We only got the tickets you understand

20    me.  This is a home run for us.  No one can get tickets right

21    now to travel and we have the connections ready.  We're doing

22    good.  Let's do it.

23            "A.m:  Let's meet up tomorrow.  Can you?

24            "CAMPO:  On the other hand, it's all BS and I'm

25    already tired of this.  So I'm traveling by myself to take care

GBG9FLO1                          C. Gonzalez - redirect

1    of everything on my own because this sucks.

2              "A.m:  I got almost everything but those little

3    questions need to be clarified.  We'll clarify them tomorrow

4    right away.  And we'll decide what to do.  I'll even jump in

5    myself.

6              "CAMPO:  What are you doing later?  Where are you

7    right now?  What are you doing?  I'm looking everywhere for

8    her.  We have gold in our hands and we're throwing it away.

9    Where are you right now?

10             "A.m:  Right now I'm getting some cash.  I should be

11   home around nine.  If you want we can meet now or tomorrow

12   morning.  Whatever you want.

13             "CAMPO:  All right.  I'll do everything I can.  I have

14   another meet that I had set up earlier and I can't leave them

15   hanging.

16             "A.m:  Yes.  A home run.

17             "CAMPO:  But nobody has it.  What we have.  Nobody.

18   Look there are no tickets to go anywhere and we are all able to

19   move around.

20             "A.m:  Cool.  Let me know as soon as you are finished

21   then.

22             "CAMPO:  And we'll be looking up.

23             "A.m:  Okay.  Cool.  We'll talk about that and I'll

24   set it up.

25             "CAMPO:  Cool.  See you in a few.

GBG9FLO1                          C. Gonzalez - redirect

1              "A.m:  Okay."

2              MR. RODY:  Your Honor, objection.  Improper redirect.

3              THE COURT:  Overruled.

4              MR. BOVE:  We're now on page seven.

5              "CAMPO:  Talk to me buddy.  I'm on trip related to

6     that precisely.  That's why I haven't let you know so when we

7     meet up both have everything okay.  When I get there I'll

8     holler and we'll meet up.

9              "A.m:  Oh, all right.  All good, buddy.  All right.

10    I'll see you when you come back.  Hope everything goes well.

11             "CAMPO:  Talk to me, buddy, how are you?

12             "A.m:  What happened, stranger?  What's up?  We

13    haven't talked.

14             "CAMPO:  What's up, buddy.  I'm working on the deal

15    like crazy, my beautiful buddy.  All good.  And you."

16             MR. BOVE:  Stop there, Mr. Calabrese.

17    Q.  Do you see where we are on the transcript at page eight?

18    A.  Yes, sir.

19             MR. ZACH:  Objection, your Honor.  He's not on this --

20    this is not his chat.

21             MR. BOVE:  I have one question, your Honor.

22             THE COURT:  I understand.

23    Q.  What's the date of that chat?

24             MR. ZACH:  Objection, your Honor.

25             THE COURT:  Overruled.

GBG9FLO1                           C. Gonzalez - recross

1   Q.   The one that we just read on page eight.

2   A.   October 15, 2015.

3          MR. BOVE:  Nothing further, your Honor.

4          MR. RODY:  May I, your Honor?

5          THE COURT:  Yes, you may.

6   RECROSS EXAMINATION

7   BY MR. RODY:

8   Q.   Do you see a reference to the presidential hangar in that

9   chat?

10  A.   No, sir.

11  Q.   And have you actually forfeited any money?

12  A.   I signed an agreement and that's included in the agreement.

13  Q.   Right.  Have you actually forfeited any money to the United

14  States government?

15  A.   No, sir.

16  Q.   Where is your money now?

17  A.   I have no money, sir.

18  Q.   So, having it in your agreement isn't any penalty to you,

19  right?

20         MR. BOVE:  Objection.

21         THE COURT:  Overruled.

22         THE WITNESS:  It does because if they give me one I'd

23  have to pay for it.

24  Q.   Give you one what?

25  A.   Fulfill whatever the government says or the judge.

GBG9FLO1                         C. Gonzalez - recross

1    Q.  You signed a cooperation agreement that has a forfeiture

2    provision in it, right?

3    A.  Yes, sir.

4    Q.  It says you have to forfeit all the money you made from

5    your drug dealing days, right?

6    A.  Yes, sir.

7    Q.  How much did you make?

8    A.  I don't know, sir.

9    Q.  Hundreds of thousands of dollars?

10   A.  I don't know, sir.

11   Q.  Fifty something planes at ten thousand dollars a plane,

12   right?

13   A.  Most of them, sir.

14   Q.  And where is all that money today that you made?

15   A.  It's spent, sir.

16   Q.  So you're not going to have to forfeit any of the money you

17   made selling drugs, right?

18            MR. BOVE:  Objection.

19            THE COURT:  Overruled.

20            THE WITNESS:  I don't know, sir.

21            THE COURT:  You don't have any money to pay the

22   forfeiture, do you?

23            THE WITNESS:  No, sir.

24   Q.  So it's a meaningless provision, right?

25   A.  I don't know, sir.

GBG9FLO1                         Habayeb – direct

1    Q.  It doesn't impose any material penalty on you, right?

2    A.  I don't know, sir.

3              MR. RODY:  Thank you, Judge.  No further questions.

4              MR. BOVE:  Briefly, Judge, on the forfeiture.

5              THE COURT:  One or two questions.

6              MR. BOVE:  Thank you.

7    REDIRECT EXAMINATION

8    BY MR. BOVE:

9    Q.  Sir, if at the time of the your sentencing you are ordered

10   to pay forfeiture and if in the future you make money, what

11   will be your plan?

12   A.  Pay for it, sir.

13             MR. BOVE:  Thank you.

14             THE COURT:  You're excused.  Thank you very much.

15             (Witness excused)

16             THE COURT:  Do you have another witness?

17             MR. QUIGLEY:  Yes, your Honor.  The government calls

18   Leith Habayeb.

19     LEITH HABAYEB,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. QUIGLEY:

24   Q.  Good morning, sir.  Where do you work?

25   A.  I work for the Special Operations Division of the Drug

GBG9FLO1                          Habayeb - direct

1   Enforcement Administration.

2   Q.  How long have you been with the DEA?

3   A.  For eleven years.

4   Q.  Do you have any collateral duties as a DEA agent?

5   A.  Yes, I do, as an emergency medical technician.

6   Q.  In your work as a DEA agent have you become familiar with

7   two recording devices which I'll refer to as Device 1 and 2?

8   A.  Yes, I have.

9   Q.  And Device-1 is an audio-video recorder?

10  A.  Yes.

11  Q.  Device-2 is an audio only recorder?

12  A.  Yes.

13  Q.  As to Device-1 can the operator start and stop the

14  recording?

15  A.  Yes.

16  Q.  What happens when the operator initiates or reinitiates a

17  recording?

18  A.  When the operator initiates a recording in Device-1 it

19  creates a file, an audio-video file that is stored on the hard

20  drive.  And then once the device is stopped that file is

21  closed.

22  Q.  What's your understanding of how files are saved onto

23  Device-1?

24  A.  Well since Device-1 is an audio-video recorder, the files

25  take up a lot of memory.  So as a file is being created or as a

GBG9FLO1                    Habayeb - direct

1   recording is being created the files are segmented into smaller
2   sections so that they can be stored on the hard drive and more
3   easily downloaded.
4   Q.  So one recording gets broken up into multiple files?
5   A.  Yes.
6   Q.  How do you retrieve files from Device-1?
7   A.  Device-1 is plugged into a computer using a USB drive and
8   then the files are transferred from the device to the computer
9   and then opened there.  They have to be decrypted and then
10  opened.
11  Q.  Can files be opened or altered without following that
12  procedure?
13  A.  No.
14  Q.  Are DEA confidential sources trained in that decryption
15  procedure from Device-1?
16  A.  No.
17  Q.  Let's focus on Device-2, the audio only recorder.  Can the
18  operator of Device-2 start and stop recording?
19  A.  Yes.
20  Q.  And can the operator manipulate or control the device in
21  any way other than turning it on and off?
22  A.  No.
23  Q.  What happens when the operator initiates or reinitiates a
24  recording?
25  A.  When the device is turned on a file is created on the

GBG9FLO1                    Habayeb - direct

1    memory, a hard drive.  And then when it is turned off that file

2    is closed so that one file is created once it is started and

3    stopped.

4    Q.  Can you generally describe how files are downloaded or

5    retrieved from Device-2?

6    A.  Device-2 needs proprietary hardware and software to be

7    downloaded so the device has to be plugged into a piece of

8    hardware that is connected to the computer and then software on

9    the computer is used to download the audio file.

10   Q.  And are confidential sources provided with that software or

11   hardware?

12   A.  No.

13   Q.  I'm going to shift topics and focus your attention on

14   November 10, 2015.  Where were you that day?

15   A.  I was in Haiti.

16   Q.  Why were you in Haiti?

17   A.  I was there to conduct an operation with other DEA agents.

18   Q.  Did you have any involvement in the case before you went to

19   Haiti?

20   A.  No.

21   Q.  What equipment did you bring with you to Haiti?

22   A.  I brought an emergency medical technician bag.

23   Q.  And what, if anything, were you given to keep a record of

24   what, if anything, going on that day?

25   A.  I was taking notes as the events were going on throughout

GBG9FLO1                    Habayeb - direct

1    the day.

2    Q.  Did there come a time when the defendants in this case were

3    arrested that day?

4    A.  Yes.

5    Q.  Were you personally involved in the arrest?

6    A.  No, I was not.

7    Q.  Did you note the time of the arrest?

8    A.  Yes, I did.

9    Q.  Do you know what time it happened?

10   A.  Not off the top of my head.  I'd have to refer to my notes.

11   Q.  Handing you what's been marked for identification as

12   3509-01.  Sir, does that refresh your recollection about what

13   time the defendants were arrested?

14   A.  Yes, it does.

15   Q.  What time was that?

16   A.  11:16 a.m.

17   Q.  And when was the first time you had any interaction with

18   the defendants?

19   A.  The first time I had any interaction was when they were

20   transferred from Haitian police custody to DEA custody at the

21   airfield.

22   Q.  And about what time was that?

23   A.  May I refer to my notes again?

24          THE COURT:  Yes.

25          THE WITNESS:  Thank you.  That was 4 p.m.

GBG5flo2                        Habayeb - direct

1    BY MR. QUIGLEY:

2    Q.  And what time did the DEA flight leave Haiti?

3    A.  4:30 p.m.

4    Q.  What, if anything, were the defendants given to eat and

5    drink while on the flight?

6    A.  They were given bottles of water and hard candy on the

7    flight.

8    Q.  Were you involved in any debriefing of the defendants on

9    the flight?

10   A.  No, I was not.

11   Q.  What, if any -- what time did the plane arrive in New York?

12   A.  8:10 p.m.

13   Q.  And what, if any contact, did you have with the defendants

14   after the plane got to New York?

15   A.  I had no contact with them.

16   Q.  While you were on the plane, did you hear anyone yelling?

17   A.  I did not.

18   Q.  Did you see anyone physically threaten the defendants?

19   A.  No.

20   Q.  Did you hear -- did you see either of the defendants

21   trembling or shaking?

22   A.  I did not.

23              MR. QUIGLEY:  No further questions, your Honor.

24              THE COURT:  Mr. Jackson.

25              MR. JACKSON:  Thank you, your Honor.

GBG5flo2                        Habayeb – cross

1    CROSS EXAMINATION

2    BY MR. JACKSON:

3    Q.  Good morning, Special Agent Habayeb.

4    A.  Good morning.

5    Q.  How are you today?

6    A.  Well, thank you.

7    Q.  Sir, there was zero discussion on the defendant's

8    extradition flight about any security concerns that indicated

9    that nothing could be recorded on the flight, correct?

10   A.  Repeat that again, please?

11   Q.  Absolutely.

12       There was no discussion on the extradition flight

13   about security concerns that indicated that the interviews on

14   the flight could not be recorded, correct?

15   A.  I did not have discussion.

16   Q.  Right.

17       You didn't participate in any discussion like that

18   with Agent Gonzalez?

19   A.  No.

20   Q.  You didn't participate in any discussion like that with any

21   of the agents, correct?

22   A.  No.

23   Q.  And at no point, on the extradition flight, did anything

24   happen that caused you to personally fear for your safety,

25   correct?

GBG5flo2                        Habayeb - cross

1   A.  Well, we were transporting prisoners so the entire time we

2   need to be cautious.

3   Q.  Let me repeat my question, Special Agent.

4   A.  Okay.

5   Q.  At no time on the flight did anything happen that caused

6   you to personally fear for your safety, correct?

7   A.  By the end of the flight, correct.

8   Q.  At no time?

9   A.  At no time.

10  Q.  Now, Special Agent Habayeb, you are aware that the

11  individual known as CS-1 was a highly trusted, long-term

12  confidential source for the DEA, correct?

13  A.  I'm sorry, I don't.

14  Q.  You have been one of the agents involved in the

15  investigation, correct?

16  A.  That is not correct.

17  Q.  You were involved in the extradition flight, correct?

18  A.  Yes.

19  Q.  You were briefed on the basic nature of the investigation,

20  correct?

21  A.  I was not.

22  Q.  Okay.

23          At no point did anyone brief you?

24  A.  Not on the investigation.

25  Q.  All right.

GBG5flo2                          Habayeb – cross

1              You have had no discussion with anyone about CS-1?

2    A.   No.

3    Q.   None?

4    A.   At the time of the investigation, no.

5    Q.   I'm talking about through today; have you had any

6    discussion with anyone about CS-1?

7    A.   I do not know who CS-1 is right now that you are referring

8    to.

9    Q.   Okay.

10             I'm referring to an individual who is known as Jose

11   Pena Santana.

12             (counsel conferring)

13   Q.   I'm referring to an individual known as Jose Santos Peña.

14   Do you know who I'm talking about?

15   A.   I do not.

16   Q.   Let me move on.

17             To be very clear, you were talking on direct

18   examination about this device 1 and device 2?

19   A.   Yes.

20   Q.   And I'm not asking to you describe the devices but these

21   are small devices, right?

22   A.   Generally speaking they are small, yes.

23   Q.   They're small enough that they could easily fit in the

24   average pocket, right?

25   A.   In a clothing pocket?  Yes.

GBG5flo2                    Habayeb - cross

1    Q.  Right; any kind of clothing pocket, right?

2    A.  Yes.  Correct.

3    Q.  And they're also small enough that if you wanted to send

4    several of them in a standard size FedEx box you could do that,

5    right?

6    A.  Yes.

7    Q.  Now, you don't personally know anything about the

8    technological capabilities of the confidential sources who were

9    utilized in this investigation, do you?

10   A.  No.

11   Q.  And you can't testify, sitting here today, that no DEA

12   agent trained them on how to access the devices that we are

13   talking about, can you?

14   A.  Not for certain but it is --

15   Q.  Sir?

16   A.  Yes.

17   Q.  You can't testify to that, can you?

18   A.  Correct.

19        MR. JACKSON:  May I have one moment, your Honor?

20        THE COURT:  Yes, you may.

21        (Counsel conferring)

22        MR. JACKSON:  Special Agent Habayeb, thank you very

23   much.  I don't have any further questions for you.

24        THE COURT:  Mr. Rody?

25        MR. RODY:  No questions, Judge.

GBG5flo2                          Habayeb – cross

1                THE COURT:  Mr. Quigley?

2                MR. QUIGLEY:  Nothing further, your Honor.  Thanks.

3                THE COURT:  Agent, thank you very much.

4                THE WITNESS:  Thank you, your Honor.

5                (Witness excused)

6                THE COURT:  Why don't we take our morning recess now

7     and resume in 10 minutes.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBG5flo2                         Habayeb - cross

1              (Jury not present)

2              THE COURT:  See you in 10 minutes.

3              (recess)

4              MR. JACKSON:  Your Honor, I'm sorry.  May I raise just

5    a 20-second issue?

6              THE COURT:  Yes.

7              MR. JACKSON:  I am really sorry.

8              THE COURT:  Yes.

9              MR. JACKSON:  Your Honor, I just want to note, and we

10   understand the prosecutors are entitled to put in their case,

11   we do just have an objection to the extent that there is going

12   to be lengthy reading from transcripts that don't relate to the

13   witness.  We think that's pre-summation and they have an

14   opportunity to give a summation tomorrow.  So, we would just

15   ask, your Honor, that the Court police, to some degree, that it

16   not just be hours of them going through highlights of their

17   favorite points in the documents.

18             THE COURT:  It is in evidence.  You can see that they

19   can read documents that are in evidence.  I'm not going to --

20             MR. JACKSON:  I agree, your Honor.  I'm only asking

21   that we stay aware, your Honor; that this doesn't go so far

22   that we are hearing a summation.

23             THE COURT:  All right.

24             Don't go too far.

25             MR. JACKSON:  Thank you, Judge.
               (Continued on next page)

GBG5flo2                           Gomez – direct

 1              (Jury present)

 2              THE COURT:  Mr. Bove, do you want to call your next

 3   witness?

 4              MR. BOVE:  Thank you, your Honor.  The government

 5   calls Juan Gomez.

 6              THE DEPUTY CLERK:  Sir, can you please rise and raise

 7   your right hand?

 8    JUAN GOMEZ,

 9        called as a witness by the Government,

10        having been duly sworn, testified through an interpreter,

11        as follows:

12              THE DEPUTY CLERK:  He has been sworn.

13              THE COURT:  Please sit down, Mr. Gomez.

14              All right, Mr. Bove.

15              MR. BOVE:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. BOVE:

18   Q.  How old are you, sir?

19   A.  48 years old.

20   Q.  In what country were you born?

21   A.  In Colombia.

22   Q.  What is your native language?

23   A.  Spanish.

24   Q.  Do you speak any other languages?

25   A.  Yes; a little English.

GBG5flo2                          Gomez – direct

1    Q.  What do you do for work, sir?

2    A.  I work as an informant for the DEA.

3    Q.  Is that sometimes called being a confidential source?

4    A.  Yes.

5    Q.  When, approximately, did you start working as the

6    confidential source for the DEA?

7    A.  Approximately in 2009.

8    Q.  Now, I would like to direct your attention to early

9    November of 2015.  Did you do anything to assist the DEA in

10   that time frame?

11   A.  Yes.

12   Q.  What did you do first as it relates to this case?

13               INTERPRETER:  What did you what?

14               THE COURT:  What did you do first as relates to this

15   case.

16               MR. BOVE:  Do first.

17   A.  First I traveled to Washington.  I had some meeting with

18   DEA agents and with two informants.

19   Q.  Now, you said Washington.  Do you mean Washington, D.C.?

20   A.  Yes.

21   Q.  And who were some of the DEA agents at the meeting that you

22   went to in early November?

23   A.  Agent Gonzalez was there, Agent Corcoran, Agent Peterson,

24   the Boss Zach, and two Mexicans.

25   Q.  Were the two Mexicans informants, as far as you knew?

GBG5flo2                    Gomez – direct

1   A.  Yes.

2   Q.  Did you know either of their names?

3   A.  No.

4   Q.  Were you given any instructions at this meeting?

5   A.  Yes.

6   Q.  What were some of the things that you were instructed to

7   do?

8   A.  Travel to San Pedro Sula to make myself appear as a

9   representative for one of the Mexicans, to cover a drug

10  shipment that was coming from Venezuela.

11  Q.  Were you instructed to contact anyone when you arrived in

12  Honduras?

13  A.  Yes.

14  Q.  What were you instructed to do?

15  A.  They gave me a phone number to call a man whom they called

16  "El Sentado."

17  Q.  At that time, did you know if Sentado had any formal

18  relationship with the DEA?

19  A.  He was assisting the DEA.

20  Q.  Did you bring anything with you to Honduras?

21  A.  Yes, sir.

22  Q.  What were some of the things that you brought?

23  A.  Some devices.  One was to record audio and the other one

24  was to record audio and video.

25  Q.  Let's refer to the audio-only recording device as device 2,

GBG5flo2                           Gomez – direct

1    okay?  Okay?

2    A.  Yes.

3    Q.  Let's refer to the audio-video recording device as device

4    3, okay?

5    A.  Yes.

6    Q.  Where did you get device 2 and device 3?

7    A.  The DEA agents gave them to me.

8    Q.  And were you provided any instructions for using those

9    devices?

10   A.  Yes.

11   Q.  What were some of the things that you were instructed to

12   do?

13   A.  Be present at the meeting, cover the meeting, and record.

14   Q.  Did you ever receive any training from the DEA about how to

15   download recordings from the devices?

16   A.  No.

17   Q.  Around the time that you traveled to Honduras, had you

18   recently used device 2 to make recordings in another

19   investigation?

20   A.  In another investigation, yes.

21   Q.  Before traveling to Honduras, were you provided with any

22   other equipment relating to device 2 or device 3?

23            INTERPRETER:  I'm sorry.  Can you repeat the question?

24   Q.  Before traveling to Honduras, were you provided with any

25   other equipment relating to device 2 and device 3?

1    A.  No.

2    Q.  Where, in Honduras, did you go in early November of 2015?

3    A.  To San Pedro Sula.

4    Q.  What did you do when you got to San Pedro Sula?

5    A.  I went straight to the hotel and registered there.  After a

6    few hours, I called Mr. Sentado to let him know that I had

7    arrived.

8    Q.  What happened after that call?

9    A.  Mr. Sentado let me know that some of his employees were

10   going to come and pick me up to take me to a meeting, for a

11   meeting in the afternoon.

12   Q.  What happened next?

13   A.  At approximately 6:00 to 6:30 he called me to let me know

14   that the drivers had gone to pick me up at the hotel.

15   Q.  Did you meet up with the drivers?

16   A.  Yes, sir.

17   Q.  Where did they take you?

18   A.  They took me to a restaurant.

19   Q.  What happened when you got to the restaurant?

20   A.  Mr. Sentado was there waiting for me and there were a

21   couple of people who were there who belonged to the airport in

22   Roatan.

23   Q.  Was there a discussion at the restaurant that night about

24   drug trafficking?

25   A.  Yes.

GBG5flo2                          Gomez - direct

```
 1   Q.   Was Sentado also there?

 2   A.   Yes.

 3   Q.   Did you take any steps to record that meeting?

 4   A.   Yes.

 5   Q.   Please describe what you did.

 6   A.   I was sitting at the table, I turned on one of the devices

 7   and then I excused myself to go to the bathroom, and then in

 8   the bathroom I turned on the second one.  And then I came back

 9   to the table.

10   Q.   Now, the device that you turned on in the bathroom, was

11   that device 2, the audio-only recorder?

12   A.   Yes, sir.

13   Q.   Mr. Calabrese, can we take a look at Government Exhibit 65,

14   please?

15        Do you see that photo, sir?

16   A.   Yes.

17   Q.   Do you recognize this man?

18   A.   Yes.

19   Q.   Was he at the first meeting that you just described?

20   A.   Yes, sir.

21   Q.   Did you get his name?

22   A.   No.

23   Q.   Had you met this man before the meeting?

24   A.   No.

25   Q.   Now, were there other people expected to come to this
```

GBG5flo2                          Gomez – direct

1    meeting?

2    A.   Yes.

3    Q.   And what was your understanding of who else was supposed to

4    come?

5    A.   Some people who were coming from Venezuela.

6    Q.   Did anybody from Venezuela come to this first meeting?

7    A.   No.

8    Q.   Can you describe generally, please, what was discussed?

9    A.   Yes.

10          We spoke about the way the airplane with drugs would

11   come to Honduras; specifically to Roatan.  And they were giving

12   me details about the arrival time and the way they could

13   receive the drugs at the airport.

14   Q.   What happened after the meeting that night?

15   A.   After being there, they told us that the people from

16   Venezuela were not able to come because of a problem at the

17   airport and that they were going to try to come the following

18   day.

19   Q.   What happened next that night?

20          INTERPRETER:   That night?

21   A.   After the meeting ended, the person whom we see here left

22   with somebody else.  And then I turned off the devices and went

23   back to the hotel.

24   Q.   What happened the next day?

25   A.   Approximately in the morning I called Mr. Sentado,

GBG5flo2                           Gomez – direct

1    approximately at 10:00 a.m. to know, inquire if the people from

2    Venezuela had arrived.  He told me that he had gotten

3    confirmation that they would arrive that afternoon and that in

4    the afternoon he would send for me to go and meet with them.

5    Q.  Did Sentado send drivers to pick you up again?

6    A.  He sent one person.

7    Q.  And where did that person take you?

8    A.  He picked me up at the hotel and took me to the restaurant,

9    same restaurant.

10   Q.  Can we take a look at Government Exhibit 66, please?

11           Do you generally recognize these photographs?

12   A.  Yes.

13   Q.  Do you know the name of the man on the left?

14   A.  No.

15   Q.  What about the man in the middle?

16   A.  No.

17   Q.  And do you know the name of the man on the right?

18   A.  No.

19   Q.  Is that the same man that you met with the night before on

20   November 5th?

21   A.  The one on the right, yes.

22   Q.  What happened when you got to the restaurant on November

23   6th?

24   A.  Mr. Sentado was waiting at a table.  I sat there with him.

25   A few minutes after that, some people arrived; three people.

GBG5flo2                          Gomez – direct

1    Q.  Do you see any of the people that arrived in Government

2    Exhibit 66?

3    A.  Yes; the person on the left and the person in the middle.

4    Q.  Now, the person on the left, did you speak with him that

5    evening?

6    A.  Briefly, yes.

7    Q.  Based on that conversation, where do you think he is from?

8    A.  Based on the accent, Colombia.

9    Q.  Did you speak to the man in the middle of Government

10   Exhibit 66 during the meeting?

11   A.  Yes.

12   Q.  Based on that conversation, where do you think the man in

13   the middle is from?

14   A.  Venezuela.

15   Q.  Now, you said that a third man came in this group?

16   A.  Yes, sir.

17   Q.  Where did that third man sit during the meeting?

18   A.  He sat at a table behind the man that appears in the

19   picture, the man who is sitting in the middle.

20   Q.  Mr. Calabrese, if we can keep 66 on the left and take a

21   look at Government Exhibit 68?

22          Do you recognize the man on the right side of the

23   screen?

24   A.  Yes.

25   Q.  Is that the man that you saw on November 6, 2015, at the

GBG5flo2                           Gomez - direct

1    restaurant?

2    A.  Yes.

3    Q.  Mr. Calabrese, if we can take a look in the main window at

4    Government Exhibit 105?  This is the passport belonging to

5    Mr. Flores.  If you can please go to page 6, and if you could

6    rotate this with the other page and zoom in on the bottom left

7    stamp, the exit stamp from Venezuela on the 6th?  Now, if we

8    can zoom back out and looking at page 11 of the passport, if

9    you could, please?  If we can rotate that and zoom in on the

10   top right entry; that's an entrance stamp into Honduras -- San

11   Pedro, Honduras on November 6.

12           Have you reviewed the recordings that you made in

13   Honduras during these meetings?

14   A.  Yes.

15   Q.  I'm going to show you some documents marked for

16   identification as Government's Exhibits 215-T, 216-T, 220-T,

17   221-T, 222-T, 223-T, 224-T, and 225-T.  Do you recognize these?

18   A.  Yes.

19   Q.  What are these?

20   A.  These are transcripts of recordings that I made there.

21   Q.  And what, if any role, did you play in the preparation of

22   the documents that I just put on the witness stand?

23   A.  To I.D. the people that are in the videos and the

24   recordings.

25   Q.  Now, you said that you didn't know some of the men's names,

GBG5flo2                        Gomez - direct

 1    correct?

 2    A.  Yes, that's correct.

 3    Q.  So, how did you identify speakers?

 4    A.  Based on how they were sitting, each of them, a number was

 5    assigned to each of them and that's how I was able to identify

 6    each of them, by the number.

 7    Q.  Now, were there situations where you listened or watched

 8    one of the recordings and you couldn't tell who was speaking?

 9    A.  Yes, that is correct.

10    Q.  What did you do in that circumstance?

11    A.  Sometimes I left it blank and others I put unidentified.

12    Q.  Are the attributions in the documents on the witness stand

13    accurate, to the best of your ability?

14    A.  Yes.

15    Q.  I will ask the jurors now to take out their binders.

16           And, Mr. Calabrese, if we can take a look at 221-T,

17    please?

18           INTERPRETER:  Counsel, can we get a binder for us?

19           THE COURT:  221-T?

20           MR. BOVE:  Yes, your Honor.  Thank you.

21    Q.  So, this is a transcript of one of the recordings from

22    Honduras dated November 6, 2013; page 1 lists the participants

23    in the meetings.  If we can turn to page 7 of this Exhibit?

24           Mr. Calabrese, if you can start playing around 4:05 of

25    221, please?

GBG5flo2                        Gomez - direct

1    A.  Page 7, yes?

2    Q.  Yes.

3            THE COURT:  What line?

4            MR. BOVE:  Your Honor, we should be starting around

5    line 33.

6            THE COURT:  Thank you.

7            (Audiofile played)

8    Q.  Mr. Calabrese, if you can restart that, please, now that

9    the technical issue is addressed?

10           (Audiofile played)

11   Q.  Now, on page 7 -- excuse me page 8, line 3, Flores says:

12   From the M.

13           Do you see that?

14   A.  Yes.

15   Q.  What did you understand him to mean when he said that?

16   A.  Whether I was coming from the Mexican drug dealer -- drug

17   trafficker and from Mexico.

18   Q.  Now, if we can skip ahead to Government Exhibit 222-T?  So

19   this is a transcript of recording from that same meeting, if

20   the jurors can turn to page 5, please?

21           Mr. Calabrese, if you can start 222-S around 1:36?

22           (Audiofile played)

23   Q.  Now, at this point in the meeting, who was at the table?

24   A.  You mean all the people?

25   Q.  Yes.

GBG5flo2                        Gomez – direct

1   A.  To my side the man of the airport was sitting next to me,

2   the one that was the night before, the meeting of the night

3   before; and to my right, Mr. Sentado was there; across from me

4   there was the man from Venezuela; and to the left there was the

5   Colombian.

6   Q.  Would you take a look at page 5, row 15, please?  Sentado

7   says:  Let's get started with the matter at hand.

8           Do you see that?

9   A.  Yes.

10  Q.  What did you understand him to be referring to when he said

11  that?

12  A.  He was trying to say that we should start talking about the

13  drug business because the guys looked tired.

14  Q.  Now, if you can look at page 6, row 1, Sentado says:  So

15  that you guys can understand each other.

16          Do you see that?

17  A.  Yes.

18  Q.  When Sentado referred to "you guys," who did you understand

19  him to be referring to?

20  A.  He was referring to the men from Venezuela and the man of

21  the airport that was sitting next to me.

22  Q.  Then in the next row, row 3, Flores says:  Perfect.  This

23  is the time.

24          Do you see that?

25  A.  Yes.

GBG5flo2                         Gomez - direct

1   Q.  What did you understand him to mean?

2   A.  That he understood and that was the time to talk about the

3   subject.

4   Q.  Now I'm going to pick back up with the recording and it

5   should start around page 6, line 7 of the transcripts.

6           Mr. Calabrese, if we can skip ahead to 2:30, please?

7           (Audiofile played)

8   Q.  If we can look at the transcript page 8, row 16, Soto says:

9   The thing is that we will spend 20 minutes to be able to send

10  it off again.

11          Do you see that?

12  A.  Yes.

13  Q.  What did you understand Soto to mean when he said that?

14  A.  They needed approximately 20 minutes to unload the drugs,

15  load it, and dispatch it back again.

16  Q.  If you can take a look at row 20 on page 8, Soto says:  If

17  you guys plan it well, this animal will be coming in at 4:00,

18  4:40.

19          Do you see that?

20  A.  Yes.

21  Q.  And then at row 22 Flores says:  All right.

22  A.  Yes.

23  Q.  What did you understand Soto to be referring to when he

24  said "this animal?"

25  A.  The plane with drugs.

GBG5flo2                        Gomez - direct

1   Q.  And what did you understand him to mean by this comment

2   with the time references?

3   A.  The plane had to arrive approximately between 4:00 and 4:30

4   p.m. so they could unload it without any problems.

5   Q.  We are going to start playing again for the jurors, they

6   should pick up around page 8, row 28.

7            Mr. Calabrese, if you want to hit play?

8            (Audiofile played)

9   Q.  If we can take a look at page 9, row 23, please, Flores

10  says:  You guys receiving it for me.

11           Do you see that?

12  A.  Yes.

13  Q.  What did you understand Flores to mean when he said that?

14  A.  The people at the airport will receive the plane with the

15  drugs.

16  Q.  Then at row 27 Flores says:  You unload the merchandise for

17  me immediately.

18           Do you see that?

19  A.  Yes.

20  Q.  What did you understand Flores to mean by that?

21  A.  That once the plane landed they could unload the drugs

22  immediately.

23  Q.  Now we are going to start the recording again, it should

24  pick up around page 9, row 27.

25           (Audiofile played)

GBG5flo2                        Gomez - direct

1   Q.  If we can take a look at page 10, row 1?  Soto said:  All

2   the Hondurans are all set; and then he says:  Except for the

3   Americans.

4           Do you see that?

5   A.  Yes.

6   Q.  What did you understand Soto to mean by that?

7   A.  That he had bribed all of the Honduran authorities and the

8   biggest concern was for the Americans.

9   Q.  And then in that same row Soto says:  If there is an alarm

10  they will -- they will tell the authorities that we already

11  have with us, that we send it here.

12          Do you see that?

13  A.  Yes.

14  Q.  What did you understand Soto to mean by that?

15  A.  If there ever was an alert, an alarm from some authorities,

16  the alarm or the alert would get to the people, the workers of

17  Soto's at the airport.

18  Q.  So we are going to continue now, in the transcript we are

19  at page 10, row 1.

20          Mr. Calabrese, if you can hit play?

21          (Audiofile played)

22  Q.  Page 11, row 1 Soto refers to a double.  Do you see that?

23  A.  Yes, sir.

24  Q.  And then at row 3 Flores says:  Exactly.

25  A.  Yes.

GBG5flo2                          Gomez - direct

1    Q.   What did you understand Soto to mean when he said "a

2    double"?

3    A.   That they could do one flight with drugs and then another

4    one, meaning they could do two flights with drugs that same

5    week.

6              MR. BOVE:   Hit play again?

7              (Audiofile played)

8              MR. BOVE:   We can keep going, Mr. Calabrese, to 8:25,

9    please.

10             (Audiofile played)

11   Q.   Can we take a look in the transcripts at page 13, row 22?

12   You ask:   But are you thinking of leaving from the same runway

13   from which you came from now?

14             Do you see that?

15   A.   Yes.

16   Q.   And Flores responds:   Of course.

17   A.   Yes.

18   Q.   And then at row 28 he says:   Even though we have full

19   command there.

20             Do you see that?

21   A.   Yes.

22   Q.   What did you understand Flores to mean by "full command

23   there"?

24   A.   Basically, they control the airport there in Venezuela.

25   Q.   And then, at page 13, line 34 Flores says:   I have control.

GBG5flo2                        Gomez – direct

1          Do you see that?

2    A.  Yes.

3    Q.  Coming over to 14, row 4, Flores says:  To leave at

4    whatever time we want.

5          Do you see that?

6    A.  Yes.

7    Q.  What did you understand Flores to mean?

8    A.  That they can leave and come in at any time they wish.

9    Q.  So, we are going to hit play again on the tape and we are

10   going to begin at page 14, row 6 of the transcript.

11          (Audiofile played)

12   Q.  If we can take a look in the transcripts at page 15, row 12

13   Soto says:  Because we really need 10 minutes to remove the

14   sweets on the other plane.

15          Do you see that?

16   A.  Yes.

17   Q.  What did you understand Soto to mean when he said "sweets?"

18   A.  Cocaine.

19   Q.  Now we are going to pick back up with the recording and

20   this should pick up on the transcripts on page 15, row 18.

21          (Audiofile played)

22   Q.  If we can take a look at page 16, row 4?  Soto refers to a

23   second option.  Do you see that?

24   A.  Yes.

25   Q.  What did you understand him to mean when he said "second

GBG5flo2                              Gomez - direct

1    option?"

2    A.  He had said that there was another landing strip to land

3    the plane on if he had problems with the first one.

4    Q.  And at row 8 on this page Soto says:  And the alternate

5    landing strip, we can't be responsible for the plane.

6              Do you see that?

7    A.  Yes.

8    Q.  What did you understand Soto to mean when he said that?

9    A.  That they could just take responsibility for the drugs but

10   not for the airplane.

11   Q.  Down on row 30 of page 6 Flores says:  We don't like that,

12   not even a little bit.

13             Do you see that?

14   A.  Yes.

15   Q.  What did you understand Flores to mean by that?

16   A.  That he didn't agree with the idea.  He wasn't in

17   agreement.  He did not like the idea.

18   Q.  The idea of what?

19   A.  That the airplane would be lost.

20   Q.  We are going to pick back up in the recording at 1027 and

21   this should start in the transcripts around page 3 of line 17.

22             (Audiofile played)

23             (Continued next page)

24

25

GBG9FLO3                        Gomez - direct

1   Q.  We're at page 17, row 13.  And Soto says, "The gringos

2   could come up."  Do you see that?

3   A.  Yes.

4   Q.  What did you understand Soto to mean by that?

5   A.  That he was very afraid that the DEA could land there.

6   Q.  And also on this row Soto says, "All the flights that,

7   unintelligible, to this side have arrived fine."  Do you see

8   that?

9   A.  Yes.

10  Q.  What did you understand Soto to mean by that?

11  A.  That all of the jobs, all of the flights that he had done

12  with drugs, they had all turned out fine.

13            MR. BOVE:  We're going to resume with the recording.

14  This should pick up at page 17, row 15 in the transcripts.

15            (Recording played)

16  Q.  So at page 18, row 1 of the transcript Flores says,

17  "Besides that it's depart from the, the president's hangar, I

18  mean, that's another story."  Do you see that?

19  A.  Yes.

20  Q.  What did you understand Flores to be referring to there?

21  A.  He's talking about the president's hangar in Venezuela.

22  Q.  What would be departing from there?

23  A.  The Venezuelan's president's hangar.

24  Q.  What would be departing from there?

25            THE INTERPRETER:  I didn't hear the question, please.

GBG9FLO3                          Gomez – direct

1    Q.  Flores used the term "departing" at page 18, row 1.  What

2    did you understand him to mean by departing?

3    A.  He was referring to the airplane with drugs would be

4    departing from that president's hangar.

5            MR. BOVE:  So, Mr. Calabrese, if we could jump ahead

6    to 11:47, please.  I think we should be in the transcripts

7    around page 18, row 1.

8            (Recording played)

9    Q.  If we could take a look at page 22, row 11.  Flores says,

10   "We have that point straight, after that Sunday, what other day

11   can we work?"  Do you see that?

12   A.  Yes.

13   Q.  What did you understand Flores to mean by that question?

14   A.  After receiving the first airplane on Sunday the 15th

15   what other day could he send an airplane with drugs, another

16   airplane with drugs.

17           MR. BOVE:  Mr. Calabrese, if we could continue with

18   the recording, please.

19           (Recording played)

20           MR. BOVE:  You can just continue through the end,

21   Mr. Calabrese.

22           (Recording played)

23           MR. BOVE:  Now if we could turn ahead in the binders

24   to 223-T.  This is another recording from November 6.  We will

25   pick up at the beginning here on page 2.

1            Mr. Calabrese if you could play from the beginning of

2    223-S.

3            (Recording played)

4    Q.  If we could take a look at page 3, row 13, please.  Flores

5    says, "Then with the schedule you are telling me, that's

6    perfect."  Do you see that?

7    A.  Yes.

8    Q.  What did you understand Flores to mean by that?

9    A.  That it would be good if they had everything ready with the

10   scheduling or timing that they had spoken of.  And that would

11   be perfect for him.

12   Q.  Take a look at row 23 on page 3.  Flores says, "Great.

13   That time is good for us."  Do you see that?

14   A.  Yes.

15   Q.  What did you understand him to mean?

16   A.  That that was the perfect time to go, for the plane to

17   land.

18   Q.  Let's take a look at page 4, row 17.  Flores says, "You

19   give him the code so that the guys don't feel nervous."  Do you

20   see that?

21   A.  Yes, sir.

22   Q.  Then at row 23 Flores says, "They unload it all and they

23   get on board, ready to go."  Do you see that?

24   A.  Yes.

25   Q.  What did you understand Flores to mean in these comments?

GBG9FLO3                        Gomez – direct

1   A.  Which ones?

2   Q.  Rows 17 and 23.

3   A.  Here he says that they should be given a code for the

4   pilots so that they shouldn't feel nervous when they unload the

5   drugs.

6   Q.  Then at page 5, row 7.  Flores says, "Listen, we will send

7   that pretty nicely in new suitcases, new suitcases, perfectly."

8    Do you see that?

9   A.  Yes.

10  Q.  What did you understand Flores to mean there?

11  A.  That they were going to pack the drugs inside new suitcases

12  and that would be perfect.

13          MR. BOVE:  If we could continue playing the recording.

14          (Recording played)

15  Q.  If we could take a look at page 6, row 8.  Flores says,

16  "And now it's clear to us that we have a precise time."  Do you

17  see that?

18  A.  Yes.

19  Q.  What did you understand Flores to mean by that?

20  A.  Now that they had explained the timing to him he knew what

21  time he had to send the airplane with drugs.

22          MR. BOVE:  Now, Mr. Calabrese, if we could continue

23  with the recording through 3:24, please.

24          THE INTERPRETER:  I'm sorry.  Where are you starting

25  because we're a little lost.

1          MR. BOVE:  We are at page 6, right around row 10.

2          (Recording played)

3     Q.  If we could take a look at page 6, row 18.  Flores says,

4     "That plane is coming totally clean just as I said.  It's

5     coming totally clean."  Do you see that?

6     A.  Yes.

7     Q.  What did you understand Flores to mean when he said that?

8     A.  That the plane was coming from Venezuela without any

9     problem with the flight plan and everything was arranged in

10    Venezuela for it to depart.

11    Q.  If you could take a look at row 24 Flores says, "Guys

12    receive it and that's it.  And if you have everything exactly

13    as you're telling me, great."  Do you see that?

14    A.  Yes.

15    Q.  What did you understand him to mean by that?

16    A.  That the people at the airport would receive the airplane

17    with drugs.  And that if it was the way they told him it would

18    be perfect.

19         MR. BOVE:  We're going to pick back up with the

20    recording.  At the transcript we're at page 6 around line 28.

21         (Recording played)

22    Q.  Let's take a look at page 7, row 8, please.  Flores asks,

23    "Imagine they are unloading that and something comes up.  How

24    do you guys fix that?"  Do you see that?

25    A.  Yes.

GBG9FLO3                        Gomez - direct

1    Q.  What did you understand Flores to be asking there?

2    A.  Asking if when the airplane would land with the drugs if

3    there was any problem on the runway how would they fix it or

4    solve it.

5    Q.  Then at rows 18 and 20 Soto says, "You are the chief of

6    police, you will be told but you can, 'Sir, nothing is going on

7    here.'"  And Flores responds, "Great" at row 20.  Do you see

8    that?

9    A.  Yes.

10   Q.  What did you understand Soto to be saying?

11   A.  He's telling him that if an alert or an alarm would come

12   in, the authorities that he had arranged things with would

13   come.  If the alarm would come, the authorities or the police

14   that he had arranged things with would come.

15            MR. BOVE:  Now if we could continue with the

16   recording, should be picking up right around page 7, row 22.

17            (Recording played)

18   Q.  If we could take a look at page 8, row 16, please.  Flores

19   says, "So having cleared up this issue, on Sunday the 15th,

20   from 4:30 to 5 in the afternoon they must be landing."  Do you

21   see that?

22   A.  Yes.

23   Q.  What did you understand Flores to mean by that?

24   A.  He had understood that the plane should arrive on Sunday,

25   the 15th.  Approximately at 4:30 to 5 in the afternoon.

GBG9FLO3                          Gomez - direct

1    Q.  And then at row 32 on page 8 you said, "What you have to be

2    is very punctual on your departure."  Do you see that?

3    A.  Yes.

4    Q.  At rows 34 and 38 Flores says, "Yes, yes, yes.  No.  We

5    will work on it so that -- to land perfectly."  Do you see

6    that?

7    A.  Yes.

8    Q.  What did you understand Flores to mean there?

9    A.  I was asking him or telling him that he had to be precise

10   about the departure of the plan that was coming from Venezuela

11   with the drugs.  And he answered yes, that they were going to

12   work on that so that the plane would come in perfectly.

13           MR. BOVE:  Now we're going to pick up at page 9,

14   around row 2.

15           Mr. Calabrese if you could play ahead in the

16   recording.

17           (Recording played)

18   Q.  Take a look at page 9, row 8.  Flores says, "Flight plan 30

19   minutes prior, and as soon as we arrive we load and immediately

20   depart."  Do you see that?

21   A.  Yes.

22   Q.  What did you understand Flores to mean by that?

23   A.  He was going to prepare the flight plan from Venezuela to

24   Honduras 30 minutes before.  And then they load the drugs and

25   they immediately depart.

GBG9FLO3                        Gomez – direct

1    Q.  Now go to 26 on page 9.  Soto says, "Do you understand?

2    When he arrives, whistles, like this because we saw them,

3    that's the one that goes, we will be at the tip."  Do you see

4    that?

5    A.  Yes.

6    Q.  What did you understand Soto to mean when he said, "We will

7    be at the tip"?

8    A.  That Soto and his people would be waiting on the landing,

9    on the runway, at the end of the runway.  At the tip of the

10   runway.

11            MR. BOVE:  Mr. Calabrese, could we take a look at

12   Government Exhibit 30, please.

13            In the transcripts take a look at page 10, row 5.

14            You can take that down.

15   Q.  Soto says, "We are the ones who will unload the sweets."

16   Do you see that?

17   A.  Yes.

18   Q.  And Flores responds, "Great."  Do you see that?

19   A.  Yes.

20   Q.  What did you understand Soto to mean when he said "sweets"?

21   A.  He's talking about the drugs.

22            MR. BOVE:  Now if we could pick back up with the

23   recording around 5:40 and this should be in the transcripts at

24   10, around row 9.

25            (Recording played)

GBG9FLO3                         Gomez - direct

1   Q.  Now if we could flip ahead in the binders to page 19 of the

2   transcripts, page 19 of 223-T.

3            MR. BOVE:  And, Mr. Calabrese, if you could start at

4   around 10:20.

5            (Recording played)

6   Q.  Take a look at page 19, row 17.  Flores says, "After that

7   day it takes seven, eight days."  Do you see that?

8            THE INTERPRETER:  I think we're on the wrong -- 222-T?

9            MR. BOVE:  223-T.

10           THE INTERPRETER:  Line 17?

11           MR. BOVE:  Yes.

12  A.  Yes.

13  Q.  What did you understand Flores to mean by that?

14  A.  After having the first plane landing -- after the first

15  plane landed, then he had another seven or eight days to send

16  another plane with drugs.

17  Q.  If you could turn ahead in this transcript to page 24.

18  Take a look at row 7.  Flores says, "We are very twisted."  Do

19  you see that?

20  A.  Yes.

21  Q.  What did you understand him to meaning when he said that?

22  A.  Basically that they're crooks.

23  Q.  Take a look at Government Exhibit 224-T now, the next

24  transcript.

25           MR. BOVE:  Mr. Calabrese, if you could play starting

GBG9FLO3                    Gomez - direct

1  at the beginning.

2              (Recording played)

3  Q.  If we could take a look at the transcripts at page 7, row

4  16.  Flores says, "He's got problems, he's got problems in the

5  United States and he was accused of drug trafficking."  Do you

6  see that?

7  A.  Yes.

8  Q.  What did you understand Flores to mean by that?

9  A.  He's talking about Gustavo Cabello.

10  Q.  What did you understand him to mean by "problems"?

11  A.  The word, the Spanish word P-E-O-S peos means problems.

12  With the U.S.

13  Q.  If we could turn ahead to page 17 of the transcripts.  Take

14  a look at row 1.  Flores says, "Look, I wanted to apologize one

15  more time for what happened with these guys."  Do you see that?

16  A.  Yes.

17  Q.  What did you understand Flores to mean there?

18  A.  He was apologizing for the fact that the pilots couldn't

19  come and attend the meeting.

20  Q.  That meeting that had happened the day before?

21  A.  Yes, sir.

22  Q.  Now if we could take a look at page 18 starting on row 12.

23  From row 12 to 18 Flores says, "We're going to do everything

24  ideal to get this moving."  Do you see that?

25  A.  Yes.

GBG9FLO3                        Gomez - direct

1    Q.  What did you understand him to mean by that?

2    A.  That they were going to do anything -- everything they

3    could to send the plane with drugs as soon as possible.

4    Q.  Now how did this meeting end?

5    A.  Well, we all reached an agreement with the men of the

6    airport, with the men from Venezuela.  Then everybody got up

7    but I stayed sitting with Mr. Sentado.

8    Q.  What, if anything, did you do with the recording devices?

9    A.  Yes.

10   Q.  What did you do with the recording devices?

11   A.  First, I turn off one and then I turn off the other one

12   right there at the table.

13   Q.  So you shut Device-2 and Device-3 off at the table?

14   A.  Yes.

15   Q.  Where did you go that night after the meeting?

16   A.  A few minutes after they left I was taken to the hotel and

17   I stayed there.

18   Q.  What happened the next day?

19   A.  So I got up at approximately 9 a.m. and I received a call

20   from Mr. Sentado.  He was going -- I called Mr. Sentado in

21   order to have somebody pick me up for me to travel.

22   Q.  Had there been a discussion the night before of an

23   additional meeting?

24   A.  Of a meeting?  No.  Just a breakfast.

25   Q.  Did you take any steps to try and record any conversations

GBG9FLO3                      Gomez – direct

1    at that breakfast?

2    A.  No.

3    Q.  Why not?

4    A.  There was no need for it.  The night before everything had

5    been clear.

6    Q.  You said that you spoke with Sentado on the morning of

7    November 7, 2015?

8    A.  Yes.

9    Q.  What happened after you spoke with him?

10   A.  I talked to him to let him know that I was going to travel

11   and he sent two drivers to take me.

12   Q.  Where did the drivers take you?

13   A.  They took me by road on the border with Honduras and

14   Guatemala.

15            MR. BOVE:  Your Honor, this might be a good stopping

16   point.

17            THE COURT:  All right.  Take a break now for lunch.

18   We'll resume at 2 o'clock.

19            (Jury not present)

20            THE COURT:  Okay, Mr. Gomez.  Enjoy your lunch.

21            (Witness excused)

22            THE COURT:  See you at two o'clock.

23            (Luncheon recess)

24

25

GBG5flo4                        Gomez – direct

1                    A F T E R N O O N    S E S S I O N

2                              2:10 p.m.

3            MR. JACKSON:  Excuse me, your Honor.  We don't have

4    anything we need to discuss now.  We just want to flag with the

5    Court that at the afternoon break before the final witness

6    testifies, we would like to take an issue up with the Court.

7            THE COURT:  All right.

8            MR. JACKSON:  Thank you.

9            THE COURT:  Can we bring the witness in, Marshal?

10           THE MARSHAL:  The witness is not in custody.

11           THE COURT:  Where is the witness?  Oh.  Come on up.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

GBG5flo4                          Gomez – direct

1              (Jury present)

2              THE COURT:  Good afternoon.  Please, be seated.

3              All right, Mr. Bove.

4              MR. BOVE:  Thank you.

5    BY MR. BOVE:

6    Q.  Sir, before the lunch break we were talking about the

7    morning of November 7th, 2015.  Do you recall those questions?

8    A.  Yes.

9    Q.  And do you recall explaining that there was a breakfast, or

10   you understood there to be a breakfast meeting that morning?

11   A.  Yes.

12   Q.  Did you go to that meeting?

13   A.  No.

14   Q.  Why not?

15   A.  Because the night before, during the meeting with all the

16   conversations, it was very clear what needed to be done.  There

17   was no need to go to the breakfast.

18   Q.  Now, you said that you left Honduras that morning?

19   A.  Yes.

20   Q.  Mr. Calabrese, can we take a look at Government Exhibit

21   105, please, Mr. Flores' passport, and take a look at page 11

22   of the passport?

23              MR. RODY:  Objection.

24              THE COURT:  Overruled.

25   Q.  If we can zoom in on the top left entry, please?  This is a

GBG5flo4                          Gomez – direct

1   departure stamp leaving Honduras on November 7, 2015, at 11:03

2   in the morning.  Do you see that?

3               MR. RODY:  Objection.

4               THE COURT:  Overruled.

5               THE WITNESS:  Yes, sir.

6   Q.  Mr. Calabrese, can we take a look at page 348 of Government

7   Exhibit 500?  And if we can zoom in on entry 3121?  This entry

8   relates to a video from one of the phones that's in evidence.

9   Mr. Calabrese, can we play about the first 20 seconds of

10  Government Exhibit 531-A in evidence?

11              MR. RODY:  Same objection, Judge.

12              THE COURT:  Okay.  Overruled.

13              (Audiofile played)

14              MR. BOVE:  Thank you.  You can take that down.

15  BY MR. BOVE:

16  Q.  Now, when you left Honduras on November 7th, did you forget

17  anything?

18  A.  Yes.

19  Q.  What did you forget?

20  A.  I left behind some things at the hotel.

21  Q.  What were some of the things that you left?

22  A.  One of the devices and my personal phone.

23  Q.  Was that device 3 that you left at the hotel in Honduras?

24  A.  Yes.  That is correct.

25  Q.  What did you do when you realized that you had left device

GBG5flo4                          Gomez - direct

1    3 at the hotel?

2    A.  I called the hotel to let them know that I have left

3    something in my room.

4    Q.  What did you do next?

5    A.  Approximately 10 minutes after that I called back to find

6    out whether they had found --

7    Q.  Found what?

8    A.  I'm sorry, the objects that I had left.

9    Q.  What did you learn?

10   A.  That they had found them; and I instructed them to left

11   them at the reception.

12   Q.  Did you speak with anyone at DEA about having left device 3

13   at the hotel?

14   A.  That is correct, yes.

15   Q.  And did you receive any instructions from the DEA about

16   that issue?

17   A.  Yes.

18   Q.  What were you instructed to do?

19   A.  To let Mr. Sentado know so that he would go to the hotel to

20   pick them up, and that somebody at the DEA office there in

21   Honduras were going to get them.

22   Q.  Did you contact Sentado?

23   A.  Yes.

24   Q.  And did you ask him to do that?

25   A.  Yes.

GBG5flo4                       Gomez – direct

1   Q.  Let's focus on device 2, the audio-only recorder.  Did you

2   bring that when you left Honduras?

3   A.  Yes, sir.

4   Q.  Once you arrived at your destination, what did you do with

5   device 2?

6   A.  I get it to a DEA agent.

7   Q.  Sir, have you ever used drugs?

8   A.  Yes.

9   Q.  Which drugs?

10  A.  Marijuana.

11  Q.  About how many times?

12  A.  Three to four times my whole life.

13  Q.  And when was the last time that you used marijuana?

14  A.  A little bit over two years ago.

15  Q.  Have you ever been charged with a crime?

16  A.  Yes.

17  Q.  Where?

18  A.  In Panama.

19  Q.  When, approximately, did that happen?

20  A.  Approximately in 2001.

21  Q.  What were you charged with?

22  A.  Possession of fake credit cards.

23  Q.  Were you arrested based on that charge?

24  A.  Yes.

25  Q.  Were you later released on bail?

GBG5flo4                        Gomez – direct

1   A.  Yes; 15 days after that.

2   Q.  Did you comply with your bail conditions?

3   A.  No, sir.

4   Q.  What did you do?

5   A.  I left Panama.

6   Q.  What's the status of that case?

7   A.  Still, to this day, I have a lawyer working on that.

8   Q.  And what is your understanding of what the current status

9   is?

10  A.  About a year and a half ago or a little over year and a

11  half ago, or two years, they told me that I had to pay like a

12  penalty, a fine.

13  Q.  Do you have a written agreement with the DEA?

14  A.  Yes.

15  Q.  What are some of the things that you are required to do

16  under that agreement?

17  A.  Follow orders, tell the truth.  Things of that nature.

18  Q.  What is your understanding of what will happen if you

19  violate the agreement?

20  A.  They could fire me or I could end up in jail.

21  Q.  Have you been paid for your work by the DEA?

22  A.  No.

23  Q.  For your work as an informant?

24  A.  Oh, I'm sorry.  Yes.

25  Q.  Approximately how much have you been paid?

GBG5flo4                          Gomez - cross

1    A.  Around $400,000, more or less.

2    Q.  And over what time period were you paid that money by the

3    DEA?

4    A.  Approximately since 2009.

5    Q.  Have you been paid or compensated for your work on this

6    case?

7    A.  No.

8    Q.  Have you received money for expenses that you incurred in

9    connection with this case?

10   A.  Yes, for travel expenses.

11   Q.  Have you been promised any additional payments?

12   A.  No.

13   Q.  Do you see hope to be paid for your work?

14   A.  Yes.  Of course.

15   Q.  Have you received any immigration benefits from the U.S.

16   government?

17   A.  Yes; years ago, for a visa.

18           MR. BOVE:  Nothing further, your Honor.

19           THE COURT:  Mr. Mann?

20           MR. MANN:  Thank you, your Honor.

21   CROSS EXAMINATION

22   BY MR. MANN:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  Sir, I want to focus you first on the meeting held on

GBG5flo4                              Gomez – cross

1    November 6 in Honduras.

2    A.   Okay.

3    Q.   That was the second meeting that you attended in Honduras,

4    correct?

5    A.   What's the date are you talking about?

6    Q.   November 6th, 2015.

7    A.   Correct.

8    Q.   Sir, that was the only time that you met Defendant Franqui

9    Flores, correct?

10   A.   Yes, sir.  That is correct.

11   Q.   And that was the only time you ever even communicated with

12   him, correct?

13   A.   Yes.

14   Q.   You never spoke to him on the phone, right?

15   A.   No.

16   Q.   And you never texted with him, correct?

17   A.   Yes.  That is correct.

18   Q.   And you never met or communicated with defendant Efrain

19   Campo, have you?

20   A.   No.

21   Q.   Now, on direct examination we reviewed a transcript of that

22   November 6th meeting.  Do you remember that?

23   A.   Yes.

24   Q.   And you helped the prosecutors prepare that transcript for

25   this trial, correct?

GBG5flo4                          Gomez – cross

1  A.  I didn't understand the question very well.  What is

2  transcripts?

3  Q.  The document that we were reviewing on direct examination

4  that reflects what occurred at the meeting.

5  A.  Yes.

6  Q.  Sir, it is true, isn't it, that at that meeting there was

7  no discussion about importing drugs into the United States of

8  America?

9  A.  Could you repeat the question, please.

10  Q.  Of course.

11          It is true, sir, isn't it, that at that meeting there

12  was no discussion about importing drugs into the United States

13  of America?

14  A.  Not directly.

15  Q.  Again, and that was the only meeting you ever had with

16  Mr. Flores, correct?

17  A.  That is correct.

18  Q.  And, in fact, the sole reference to Americans in those

19  transcripts relate to whether the DEA was monitoring the

20  airport in Honduras, correct?

21  A.  Please, could he repeat the question again?

22  Q.  Of course.

23          The sole reference to Americans in the transcript

24  relate to whether the DEA was monitoring the airport in

25  Honduras, correct?

GBG5flo4                          Gomez - cross

1    A.  Yes.

2    Q.  And those references had nothing to do with importing drugs

3    into the United States, correct?

4    A.  At that moment?  No.

5    Q.  Now, Mr. Calabrese, can we pull up GX- 222-T, page 17?  I'm

6    sorry, let's do GX- 224, page 7 -- GX- 224-T, page 7.  I want

7    to direct your attention, sir, to line 16.

8          Do you have that in front of you, sir?

9    A.  Yes.

10   Q.  Now, on direct examination you were asked some questions

11   about the statement in line 16.  Do you remember that?

12   A.  Yes.

13   Q.  You were asked about an individual named Diosdado.  Do you

14   remember that?

15   A.  Yes.

16   Q.  And whether he had problems in the United States?

17   A.  Yes.

18   Q.  If you keep reading, I would like you to read, in

19   particular, from line 16 to line 20.

20   A.  Would you like me to reeled the whole thing?

21   Q.  Just line 16 to line 20.  You can read it to yourself, you

22   don't have to read it out loud.  I'm sorry.

23          THE COURT:  Do you have a copy of the transcript here

24   so he doesn't have to read it off the screen?  It would be

25   faster.

GBG5flo4                        Gomez - cross

1               MR. BOVE:  I believe it is on the witness stand, your

2       Honor.

3               THE COURT:  Pardon me?

4               INTERPRETER:  We have the folder.

5               THE COURT:  Mr. Gomez, why don't you look at it in the

6       book, it would be simpler.

7               THE WITNESS:  Okay.

8       BY MR. MANN:

9       Q.  In line 20, sir, it says here, they say he is the boss,

10      just rumors.  No, I really don't, don't know that, but the dude

11      tells me that he'd be good for president.

12      A.  All right.

13      Q.  Diosdado is a well-known political figure in Venezuela,

14      correct?

15      A.  Yes.

16      Q.  And at the time of this conversation it was widely

17      publicized that he had potential issues in the United States

18      with drug trafficking, correct?

19      A.  I don't know.  That's what Mr. Flores said.

20      Q.  Mr. Flores isn't providing you any information here that

21      isn't in the public domain, is he?

22      A.  It is possible.  I don't know.

23      Q.  Let's go, sir -- Mr. Calabrese, can we get up 223-T, page

24      24, please?

25              THE COURT:  Page 24, Mr. Mann?

GBG5flo4                        Gomez - cross

1              MR. MANN:  Yes, sir; page 24, line 7, in particular.

2    Q.  Do you see that, sir?

3    A.  Yes, sir.

4    Q.  Do you remember on direct examination that you were asked

5    what line 7 meant?  And I will read line 7 for you now, it

6    says:  We are very twisted.

7              Do you remember being asked about that line?

8    A.  Yes.

9    Q.  And you answered that question on direct examination that

10   it meant that Mr. Flores was saying that he is a crook,

11   correct?

12   A.  Yes.

13   Q.  Sir, if you could turn to page 23, please -- and in

14   fairness to you it is very hard to be asked questions about

15   single lines and not have the full context -- but, if you begin

16   on page 23, line 11, and read to page 24?  And then I will ask

17   you a question.

18   A.  Okay.

19   Q.  Sir, that's a conversation about politics in Venezuela, is

20   it not?

21   A.  Yes.

22   Q.  So, having read that, is it fair to say that the statement:

23   We are very twisted; is a reference to the political situation

24   in Venezuela?

25             INTERPRETER:  Is a reference to?

GBG5flo4                         Gomez – cross

1    Q.  The political situation in Venezuela.

2    A.  I wasn't there to talk about Venezuelan politics, I was

3    there for a drug case.

4    Q.  I understand that, sir.

5         I was asking, you asked a question about what "we are

6    very twisted" means, correct?

7    A.  Correct.

8    Q.  And your testimony was that you understood "we are very

9    twisted" to mean that Defendant Flores was communicating that

10   he is a crook, correct?

11   A.  That's correct.

12   Q.  And, having read that, having read this transcript more

13   fully, you now know that the comment was about Venezuela's

14   politics, correct?

15   A.  Could be.

16   Q.  Well, sir, you just testified that you weren't there to

17   talk politics, right?

18   A.  That's right.

19   Q.  But you brought up politics, correct?

20   A.  I didn't initiate the conversation, it was somebody else.

21   Q.  Okay.  Let's go to page 23, line 11.  This is what I just

22   asked you to read, is it not, sir?

23   A.  Yes.

24   Q.  Do you see CS-3 on the left column of line 11?

25   A.  Yes.

GBG5flo4                           Gomez - cross

1    Q.   Who is CS-3?

2    A.   It would be me.

3    Q.   Sir, you say, *How are things going for the elections?*

4    *House is it looking?*

5         Correct?

6    A.   Yes.

7    Q.   So you raised politics in Venezuela, did you not?

8    A.   Yes, but when you do that in my line of work you do it to

9    break the ice, talk about other things.

10   Q.   Understood, sir.

11        My point is merely, on page 24, line 7, when

12   Mr. Flores says "we are very twisted" he is talking about we,

13   Venezuela?

14   A.   My understanding is that he is talking about himself

15   personally.

16   Q.   Okay.

17        Sir, you never ever saw any drugs from the defendants,

18   did you?

19   A.   No, sir.

20   Q.   And the plane of drugs that were discussed on November 6th

21   with Mr. Flores never arrived in Honduras, did it?

22   A.   No.

23   Q.   And that meeting on November 6th was set up by El Sentado,

24   correct?

25   A.   That's correct.

GBG5flo4                          Gomez – cross

1  Q.  El Sentado was a real drug trafficker, correct?

2  A.  I didn't know.  I wouldn't know what to tell you.  I just

3  knew that he assisted the DEA.

4  Q.  Okay.

5         But it was clear before your November 6th meeting that

6  Mr. Flores did not have a lot of experience in the drug trade,

7  correct?

8  A.  No.  On the contrary.

9  Q.  Sir, he didn't have a lot of experience using airplanes to

10  transport drugs, right?

11  A.  From what I understand the person who has control over an

12  airport and has airplanes, that's a person with experience.

13  Q.  Sir, in the transcripts of the November 6th meeting

14  Sentado's workers had to educate Mr. Flores, correct?

15  A.  Explain.

16  Q.  Well, that's a yes or no question?

17         THE COURT:  I don't think it is.  Ask another

18  question.

19  Q.  The next question I have is, sir, who set the date that the

20  drugs were supposed to arrive in Honduras?

21  A.  The man at the airport.  He works at the airport.

22  Q.  Sir, didn't you set the date that the drugs were supposed

23  to arrive in Honduras?

24  A.  No, sir.

25  Q.  Sir, can we turn to GX- 222-T, page 7, lines 1 through 7?

GBG5flo4                          Gomez - cross

1   If you could look at, in particular, line 3?

2              THE COURT:  What page, Mr. Mann?

3              MR. MANN:  Page 7, your Honor.

4              THE COURT:  Thank you very much.

5              THE WITNESS:  Only line 3?  Or all of it?

6   BY MR. MANN:

7   Q.  All of line 3.  It is the line:  As I said, it must be

8   exactly on the 15th.

9   A.  Yes.  That's what it says.

10  Q.  Sir, it wasn't Mr. Flores that said the drugs had to arrive

11  on November 15th, was it?

12  A.  That's the date that the man who works at the control tower

13  at the airport set.

14  Q.  And that is someone who worked for Sentado, correct?

15  A.  No, sir; he works for the airport in Roatan.

16  Q.  Understood, but Sentado brought him to the meeting on

17  November 6th, correct?

18  A.  Yes, but it doesn't mean that he works for Sentado.

19  Q.  Okay.

20             That individual from the airport, though, he told

21  Mr. Flores the time the plane needed to arrive, correct?

22  A.  That's correct.

23  Q.  He gave him a plan A, correct?

24  A.  Yes.

25  Q.  He gave him a plan B, correct?

GBG5flo4                          Gomez – cross

1    A.  Yes.

2    Q.  He told Flores that he needed passengers to be on the

3    plane, correct?

4    A.  What he told him precisely that that was an option.

5    Q.  Okay.

6         Well, he told Mr. Flores that those passengers had to

7    stay for a few days in Honduras, correct?

8    A.  I repeat it again, that was an option.

9    Q.  Well, that individual from the airport told Mr. Flores how

10   the shifts worked at the airport, correct?

11   A.  Yes.

12   Q.  Now, we were just looking at GX- 222-T, page 7, line 1,

13   sir.

14   A.  Yes.

15   Q.  Do you have that in front of you?

16   A.  Page 7, line 1, right?

17   Q.  Correct.

18   A.  Yes.

19   Q.  You see it says the participant CW-1, that's Sentado,

20   correct?

21   A.  Yes.

22   Q.  And he says:  I suggest that he explain it to you slowly

23   and thoroughly so that you understand and they understand, and

24   that there won't be any misinformation because we won't discuss

25   this again.

GBG5flo4                          Gomez - cross

1              Do you see that?

2    A.  Yes.

3    Q.  And it is your testimony, sir, that Mr. Flores had a lot of

4    experience moving drugs by airplane?

5    A.  Yes.

6    Q.  Now, Sentado's workers gave a lot of other instructions to

7    Mr. Flores in the transcripts, correct?

8    A.  I don't understand -- I don't understand.  Who are

9    Sentado's workers?

10   Q.  The gentleman who works at the airport, he gave other

11   instructions, correct?

12             MR. BOVE:  Objection.

13             THE COURT:  Sustained.  I don't think that's his

14   testimony.

15   Q.  Now, during the meeting on November 6th, was Mr. Flores

16   taking notes?

17   A.  No, sir.

18   Q.  But at some point Mr. Flores was supposed to communicate

19   all of the information that he learned at that meeting to

20   pilots of an aircraft, correct?

21   A.  Yes.

22   Q.  And this was about one week before the drug transaction

23   that you allege is being discussed was supposed to occur,

24   correct?

25   A.  Yes.

GBG5flo4                        Gomez - cross

1    Q.  And at that point you had never met any pilots, correct?

2    A.  No.

3    Q.  You don't know if Mr. Flores had pilots, do you?

4    A.  He mentioned it.

5    Q.  But you don't know whether Mr. Flores actually had pilots,

6    do you?

7    A.  No.  As I said, he repeated it a couple of times.

8    Q.  Now, you testified on direct that the way that you helped

9    the government prepare the transcripts of the meeting that took

10   place on November 6th was that you looked at the faces of the

11   speakers on the video; is that correct?

12        MR. BOVE:  Objection.  Mischaracterizes the testimony.

13        THE COURT:  Sustained.

14   Q.  Sir, was it your testimony on direct examination that you

15   identified speakers based on where they were sitting at the

16   table?

17   A.  Where they were seated and by the voices.

18   Q.  And you did that by watching the video of the meeting,

19   correct?

20   A.  Not necessarily; because before that they had asked me

21   where each of them were sitting.

22   Q.  I want to move on to another topic, sir.

23        You were sent down to Honduras because the DEA told

24   you that Sentado was an unreliable source, correct?

25        MR. BOVE:  Objection.

GBG5flo4                        Gomez - cross

1               THE COURT:  Overruled.

2               THE WITNESS:  Can you repeat the question, please?

3               MR. MANN:  Sure.

4               THE COURT:  You were told by the DEA that Sentado was

5    unreliable.

6               THE WITNESS:  No, they never told me that.

7    BY MR. MANN:

8    Q.  Well, did the DEA tell you that Sentado could not follow

9    instructions?

10   A.  No.

11   Q.  The DEA flew you from Mexico to Washington, D.C., correct?

12   A.  That's correct.

13   Q.  And then from Washington to Honduras?

14   A.  Yes.

15   Q.  And it did that, it did that because it told you that

16   Sentado was unreliable, no?

17              MR. BOVE:  Objection.

18              THE COURT:  Sustained.  Excuse me.  Overruled.

19              THE WITNESS:  Can you ask the question again?

20              MR. MANN:  Sure.

21              THE COURT:  Did the DEA tell you that Sentado was

22   unreliable?

23              THE WITNESS:  No, they never told me that.

24   BY MR. MANN:

25   Q.  When you arrived in Honduras, Sentado sent one of his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GBG5flo4                              Gomez - cross

1    workers to pick you up at the airport, correct?

2    A.  No.

3    Q.  You took a taxi to the hotel?

4            INTERPRETER:  I'm sorry.

5    Q.  You took a taxi to the hotel?

6    A.  That's correct.

7    Q.  And to arrive at the restaurant where the meeting was to

8    take place, Sentado sent one of his workers, correct?

9    A.  Two.

10   Q.  He sent two workers.

11   A.  Yes.

12   Q.  And outside the restaurant, when you arrived, you saw

13   additional people who were working for Sentado, correct?

14   A.  There were people there but honestly I didn't notice.  I

15   just went into the restaurant.

16   Q.  Sir, you were sent to Honduras for one reason:  To document

17   conversations about a potential drug transaction with the

18   defendants, correct?

19           MR. BOVE:  Objection.

20           THE COURT:  Sustained.

21   Q.  Sir, you were sent to Honduras to document conversations

22   about a potential drug transaction with the defendants?

23           MR. BOVE:  Objection.

24           THE COURT:  Sustained.

25   Q.  Sir, you texted back and forth with Sentado on your phone,

GBG5flo4                          Gomez – cross

```
 1    correct?

 2    A.  Yes.

 3    Q.  And you communicated with Sentado about the defendants,

 4    correct?

 5    A.  No.

 6    Q.  You didn't communicate with Sentado about the defendants

 7    before you attended the meeting on November 5th or November

 8    6th?

 9              MR. BOVE:  Objection.

10              THE COURT:  Overruled.

11    A.  If I communicated or did not communicate?

12    Q.  Did you communicate with Sentado.

13    A.  Only over the phone, to tell him that I had arrived in

14    Honduras.

15    Q.  I want to focus you again, sir, on the November 6 meeting,

16    and that's the second of the two meetings that you attended.

17    A.  Correct.

18    Q.  And you testified that there was a discussion about a

19    breakfast that was to take place the following morning with

20    Mr. Flores?

21    A.  Yes.

22    Q.  And that would have been the morning of November 7th,

23    right?

24    A.  I think so.

25    Q.  And you testified on direct examination that you didn't
```

GBG5flo4                         Gomez - cross

1    attend this meeting because you had found out all the

2    information you needed the day before, correct?

3    A.  Yes.

4    Q.  Sir, wasn't the purpose of the breakfast to continue the

5    discussion from November 6th?

6    A.  No, sir.

7    Q.  Can we turn to GX- 225-T, page 5, line 6?  Could you just

8    read line 6?

9    A.  Okay.

10   Q.  And, sir, do you see where it says:  So we can finish

11   talking and so they can rest up a bit there?

12   A.  I see it.

13   Q.  And, sir, it is your testimony that there was no

14   discussions at that November 7th breakfast that was relevant to

15   the conversations from the night before?

16            MR. BOVE:  Objection.

17            THE COURT:  He didn't attend.

18            (Counsel conferring)

19   Q.  The purpose of the breakfast was to continue the discussion

20   from the night before, correct?

21   A.  No, sir.  It was a breakfast.

22   Q.  Sir, there was a discussion at that meeting on November

23   7th -- I'm sorry, on November 6th where Sentado said he would

24   provide Mr. Flores with a cell phone.

25            Do you remember that?

GBG5flo4                          Gomez – cross

1   A.  Yes.

2   Q.  And that was a continuation of the meeting on November 6th,

3   was it not?

4   A.  I repeat:  No, sir.

5   Q.  So, it is your testimony that this cell phone did not

6   relate to the meeting on November 6th?

7           MR. BOVE:  Objection.

8           THE COURT:  Sustained.

9   Q.  Sir, have you ever seen a recording of the breakfast that

10  occurred on November 7th?

11  A.  No.

12  Q.  Are you aware of whether a recording was ever made of that

13  breakfast meeting?

14  A.  No.

15  Q.  Did you ever tell the DEA that that breakfast was occurring

16  between Sentado and Mr. Flores?

17  A.  That I told them?

18  Q.  Yes.

19  A.  No.

20          MR. MANN:  No further questions, your Honor.

21          THE COURT:  Mr. Zach, do you have anything for

22  Mr. Gomez?

23          MR. ZACH:  Very briefly, your Honor.

24          THE COURT:  Okay.

25  CROSS EXAMINATION

GBG5FLO4                              Gomez - cross

1  BY MR. ZACH:

2  Q.  Mr. Gomez, you have never seen my client outside this

3  courtroom, have you?  You have never spoken to him before,

4  right?

5  A.  I didn't hear.

6  Q.  Sir, you have never seen my client anywhere outside of this

7  courtroom before, have you?

8  A.  Who is your client?

9  Q.  This man right here, Mr. Campo Flores.

10  A.  No, I haven't seen him.

11  Q.  Never spoken to him before, right?

12  A.  No, sir.

13              (Continued next page)

14

15

16

17

18

19

20

21

22

23

24

25

GBG9FLO5                          Gomez - cross

1   Q.  I want to briefly go back to something Mr. Mann was asking

2   you about.  Could you please turn in your binder that's up

3   there to GX224-T and could we please turn to page 7.  And I

4   want to look again at line 16.  This is, again, the discussion

5   you were having about Diosdado Cabello.  Do you remember him?

6   A.  Yes.

7   Q.  And Mr. Mann asked you whether or not it was well known

8   that he had been accused by the United States of drug

9   trafficking.  Do you recall that question?

10  A.  Repeat again what he said, please.

11  Q.  Sure.  Mr. Mann had asked you whether or not it was

12  publicly known that Mr. Cabello had been accused by the United

13  States of drug trafficking.

14  A.  Yes.

15  Q.  You know, sir -- and this meeting took place in November of

16  2015, right?

17  A.  Yes.

18  Q.  You know, sir, that on May 18 of 2015 the Wall Street

19  Journal published an article about Mr. Cabello being a drug

20  trafficker suspected by the United States, right?

21          MR. BOVE:  Objection.

22          THE COURT:  Did you read the Wall Street Journal in

23  May?

24          THE WITNESS:  No.

25  Q.  Did you read the Washington Post?

GBG9FLO5                        Gomez - cross

1    A.   No.

2    Q.   How about the New York Times?

3    A.   (No response).

4    Q.   Okay.  Because there were articles in all of those papers.

5    You know that?

6              THE COURT:  You're testifying now.  Sustained.

7              MR. BOVE:  Objection.

8              THE COURT:  Strike that out.

9    Q.   Now, sir, I want to switch gears a little bit and just ask

10   a little bit about your background.  So, you first became an

11   informant for the DEA in what year?

12   A.   Approximately in 2009.

13   Q.   And before that, yes or no, had you been involved in

14   narcotics trafficking?

15   A.   No.

16   Q.   So before that the only connection to narcotics that you

17   testified on direct was that you had used marijuana a handful

18   of times, right?

19   A.   Not necessarily.  I knew many drug traffickers where I

20   lived.  But I never was involved in drug deals.  I never did

21   that for a living.

22   Q.   And at some point in -- around the time that you became an

23   informant you were detained in Guatemala, right?

24   A.   No, sir.

25   Q.   You remember being detained for questioning in Guatemala?

GBG9FLO5                        Gomez - cross

1    A.  No, sir.

2    Q.  Let me -- just one second -- I'm sorry.  In Belize.

3    A.  Dates, please.

4    Q.  Around the time that you became an informant for the DEA.

5    A.  So what is the question?

6    Q.  Around the time that you became an informant for the DEA

7    were you detained for questioning in Belize?

8    A.  Yes.  But by which authorities?

9    Q.  According -- in an interview, sir, with the agents and the

10   government did you say to them that you were detained for

11   questioning in Belize around the time that you became a CS?

12   A.  Yes.  That is correct.

13   Q.  And you were concerned about harassment at that time,

14   right?

15   A.  Yes.  I had a problem with a police officer of that

16   country.

17   Q.  And then you contacted the United States, right?

18   A.  That is correct.

19   Q.  You contacted a government official in the United States,

20   right?

21   A.  That is correct.

22   Q.  Was it a DEA agent?

23   A.  Yes.

24   Q.  And what was it, sir, that you did before you became an

25   informant that made you know so much -- know so many different

GBG9FLO5                         Gomez – cross

1    drug dealers?

2    A.  Because of my, how do you say that, my past, where I lived.

3    In the place where I was living at that time, there was a lot

4    of drug business on the border.  And I met many people that did

5    that for a living.

6    Q.  What were you doing for a living?

7    A.  I had a business of wholesale clothing.

8    Q.  Now I want to ask you about one last area which is before

9    you went to Honduras you had a meeting with the DEA and the

10   other informants in this case, right?

11   A.  Yes.

12   Q.  And that included Special Agent Gonzalez who is sitting

13   right there?

14   A.  Yes.

15   Q.  And did it also include a father and son informant team

16   that we'll call CS-1 and CS-2?

17   A.  Yes.

18   Q.  And at that meeting CS-1 and CS-2 explained to you what had

19   been going on in connection with this DEA operation, right?

20   A.  Vaguely, yes.

21   Q.  They provided the information, the background about what

22   was going on, right?

23   A.  Yes.

24   Q.  And they were also providing that information to the DEA,

25   right?

GBG9FLO5                          Gomez - redirect

1   A.  Yes.

2   Q.  And that's the information you used to play the role that

3   you did when you went down to Honduras, right?

4   A.  Not exactly.  I was explained the role that I had to play

5   and that's what I did.

6   Q.  Yeah.  They told you what role you're going to play, right?

7   A.  Yes.

8           MR. ZACH:  Thank you, your Honor.

9           THE COURT:  Mr. Bove.

10          MR. BOVE:  Thank you, Judge.

11  REDIRECT EXAMINATION

12  BY MR. BOVE:

13  Q.  Sir, you were asked some questions by Mr. Mann about who

14  brought up the topic of politics at the meeting on November 6.

15  Do you recall those questions?

16  A.  Yes.

17  Q.  Could the jurors please take a look in their binders at

18  Government Exhibit 223-T.

19          MR. BOVE:  Mr. Calabrese if we could zoom in -- look

20  at the whole page 22.

21          THE COURT:  Page 22, Mr. Bove?

22          MR. BOVE:  22, your Honor.  Thank you.

23  Q.  Do you see at the bottom where Mr. Flores brings up the

24  issue of the campaign?

25  A.  Yes.

GBG9FLO5                          Gomez - redirect

1    Q.  Now if you could take a look at page 24, row 7 again.  This

2    is that comment by Mr. Flores, "We are very twisted."  Do you

3    see that?

4    A.  Yes.

5    Q.  If you could turn ahead to the next transcript, 224-T,

6    please.  Take a look at row 4.  And Mr. Flores continues there,

7    "We cheat, do stuff and everything.  We don't walk straight."

8    Do you see that?

9    A.  Yes.

10   Q.  You were asked some questions about who introduced the

11   specific date when the cocaine was to be shipped.  Do you

12   recall those questions?

13   A.  Yes.

14   Q.  Mr. Mann asked you questions about the transcripts relating

15   to the November 6 meeting.  Do you remember that?

16   A.  Yes.

17   Q.  But he didn't ask you any questions about who brought up

18   November 15 at the November 5 meeting, did he?

19   A.  No.

20   Q.  Take a look at Government Exhibit 215-T, please.

21            MR. BOVE:  Start on page 1, Mr. Calabrese.

22   Q.  So this is a transcript relating to a meeting on

23   November 5, 2015.  Do you see that?

24   A.  Yes.

25   Q.  And there's somebody on the front of this document with the

GBG9FLO5                        Gomez - redirect

1   name Carlos Gonzalez.  Do you see that?

2   A.  Yes.

3   Q.  And he's referred to in the transcript as CW-2, right?

4   A.  Yes.

5   Q.  Take a look at page 6, row 11, please.

6   A.  Yes.

7   Q.  Do you see where CW- 2 says "On Sunday afternoon of next

8   week"?

9   A.  Yes, I do see it.

10  Q.  And at that point on November 5, Sunday afternoon of next

11  week was November 15, correct?

12  A.  Fifteen.  Yes.

13  Q.  Now, Mr. Mann also asked you some questions about whether

14  you understood Mr. Flores to have access to pilots.  Do you

15  remember those questions?

16  A.  Yes.

17          MR. BOVE:  I'll ask the jurors to take a look in their

18  binders at Government Exhibit 306-T.

19  Q.  These are BlackBerry communications involving defendant

20  Campo.

21          Let's take a look, if you could, at page 5, row 17.

22          MR. ZACH:  Objection.

23          MR. RODY:  Objection, your Honor.

24          MR. BOVE:  Page 5, row 17.

25  Q.  Do you see where Mr. Campo says "Wait they say that the

GBG9FLO5                    Gomez - redirect

1    pilots should be sent back and the airport authorities are not

2    letting the guys go out because there's a flight plan already.

3    What a mess.  Look, sir, I swear by God that I will kill those

4    pilots.  I will kill them."  Do you see that?

5                MR. RODY:  Objection.

6                THE COURT:  Overruled.

7                THE WITNESS:  Yes.  I see it.

8    Q.  Can you see what the date is on the front of Government

9    Exhibit 306-T?

10               MR. RODY:  Same objection, Judge.

11               THE COURT:  Okay.  Same ruling.

12               THE WITNESS:  Yes.  It says November 6, 2015.

13   Q.  Now if we could take a look at page 7 of Government Exhibit

14   306-T, beginning at row 22.  Campo says, "If you can help me

15   where will arrive, if you could help me out, as soon as they

16   get off the plane I'll kill them.  What's wrong with those as

17   you say.  I'll send the cousin if it's possible tomorrow with

18   other pilots because no one is answering over there.  I found

19   out they're going to Aruba again."

20               Do you see that?

21               MR. RODY:  Same objection, Judge.

22               THE COURT:  Overruled.

23   A.  Yes.  I do.

24   Q.  Now if you could take a look at page 11, row 5.  Do you see

25   where Mr. Campo says, "No, sir, two things.  First the cousin

GBG9FLO5                        Gomez - recross

1    will go along so you guys may see how serious we are here;

2    second, leave the pilots to me because I'll take care of that.

3    Don't worry."

4              Do you see that?

5    A.  Yes I do.

6              MR. BOVE:  Nothing further, your Honor.

7              MR. MANN:  A few questions.

8              THE COURT:  Yes, Mr. Mann.

9              MR. MANN:  Mr. Calabrese, if you could pull that up

10   real quick, what you just had up.

11   RECROSS EXAMINATION

12   BY MR. MANN:

13   Q.  This is 306-2 page 11.  This is what we were just reading,

14   sir.

15   A.  Okay.

16   Q.  You are not a party to that communication, correct?

17   A.  No, sir.

18             MR. MANN:  Okay.  You can take that down

19   Mr. Calabrese.

20   Q.  Now with regard to the date of the transaction that you

21   were asked about on redirect, the prosecutor asked you who

22   selected the date, right?

23   A.  Yes.

24   Q.  And he directed you to a transcript of a meeting that

25   occurred on November 5, correct?

GBG9FLO5                    Gomez - recross

1    A.  Yes.

2    Q.  And Mr. Flores was not present at that meeting, correct?

3    A.  Yes.  That is correct.

4    Q.  So you brought up that date to Mr. Flores at the November 6

5    meeting, correct?

6    A.  No.  It was the men of the airport.

7    Q.  Okay.  One more question.  You were shown GX224-T a moment

8    ago.  And page 2 in particular and line no. 4?

9            THE INTERPRETER:  One second, please.  Page?

10           MR. MANN:  Page 2, line no. 4.

11           THE WITNESS:  Yes.

12   Q.  And this is a communication -- I'm sorry.  This is a

13   transcript of what was said after the prior recording where

14   Mr. Flores says, "We are very twisted," correct?

15   A.  Yes.

16   Q.  And line 4 on page 2 of GX224-T it says, "We cheat, do

17   stuff and everything.  We don't walk straight."  There's a

18   laugh, an unintelligible.  "Is the administrator of the

19   National Assembly, the administrator around there."  Correct?

20   A.  Yes.

21   Q.  Sir, again, Mr. Flores is talking about the politics of

22   Venezuela, correct?

23   A.  Well, I understand Spanish perfectly well.  He's talking

24   about himself.

25   Q.  Is he the administrator of the National Assembly in

GBG9FLO5                          Gomez - recross

1    Venezuela?

2    A.   No.

3              MR. MANN:  No further questions.

4              THE COURT:  Mr. Gomez, you're excused.  Thank you.

5              (Witness excused)

6              THE COURT:  Why don't we take our afternoon break.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBG9FLO5                      Gomez - recross

1              (Jury not present)

2              THE COURT:  Mr. Jackson, do you want to take something

3      up?

4              MR. JACKSON:  Yes, your Honor.

5              THE COURT:  Okay.  The door is closed.

6              MR. JACKSON:  Yes, your Honor.  And I'm going to defer

7      largely to my colleague here.  But I just -- we wanted to raise

8      that there are a number of different charts which I understand

9      are going to be introduced by Mr. -- summary charts that are

10     going to be introduced by Mr. Calabrese who is the excellent

11     paralegal specialist for the U.S. Attorney's Office here.

12     Many -- the summary charts are in a lot of different fashion.

13     There are a lot of them.  I think there are 20-some-odd summary

14     charts.  And we don't have any issue with any of those charts

15     being displayed to the jury during summations.

16             The problem is I think, your Honor, if we look at

17     these summary charts they are actually really argumentative.

18     They're not what the summary rule is designed for which is to

19     provide a summary of voluminous evidence for the jury.

20     Instead, they are just marshaling things and there's a lot of

21     confusion.  There's a lot of stuff that's left out.  And we

22     would submit, your Honor, these are just summation slides and

23     not actually summary charts.  And I think Ms. Espinosa can put

24     a little bit more color on that.  But that's --

25             THE COURT:  Ms. Espinosa.

GBG9FLO5                          Gomez - recross

          MS. ESPINOSA:  Thank you, your Honor.  Yes.  In

particular if you look at the chart that they -- or there's a

chart listing a number of text messages involving the

defendants in this case.  It's currently I believe GX715.  And

for example, your Honor, many of those text message

conversations are not for -- the basis for including them as

related to certain meetings that took place in November or

October of 2015 is unclear on the face of those messages.  And,

in fact, there is no evidence in the record at this time that

the government even knows who some of the participants in those

chat conversations are.

          THE COURT:  Anybody have a copy of the exhibit?

          MR. BOVE:  I can hand one up, Judge.

          THE COURT:  Okay.  Ms. Espinosa, go ahead.

          MS. ESPINOSA:  So if your Honor you see on page two

and three of this document they've organized these chat

conversations as they are apparent -- or saying that they are

related to certain meetings.

          THE COURT:  Yes.

          MS. ESPINOSA:  And it's unclear to us, your Honor, the

basis for deciding that certain of those messages are actually

related to those meetings.

          THE COURT:  Yes.

          MS. ESPINOSA:  They're not -- on the surface they

don't appear to have any reference to those meetings or to the

GBG9FLO5                        Gomez - recross

1    participants at those meetings.  And it's -- there is no

2    evidence in the record that we're aware of, your Honor, that

3    the government even knows who some of these individuals are.

4    For example, the individual -- the individual in line 46 who is

5    known as A.m.  So it's unclear to us, your Honor, the basis

6    that the government has for determining that these messages are

7    related to those meetings and, therefore, it seems that these

8    are more appropriately used at summation.

9                THE COURT:  Yes.

10               MR. BOVE:  Your Honor, as you can see this is a chart

11   that simply lists in chronological fashion chats that are in

12   evidence.  The chats, as your Honor is familiar with from the

13   binder, are, in fact, voluminous.  There's not an assertion

14   anywhere on this document that any particular chat is related

15   to any particular meeting.  They are simply listed

16   chronologically.  I think that's a fair summary.  Mr. Calabrese

17   can be cross-examined about what went into the decisions for

18   what was included.

19               There's a voluminous record right now.  It is the

20   exhibits in the 500 and 400 series.  We're permitted to offer a

21   summary chart pursuant to 1006 relating to those records.

22               I don't think there's any requirement that we know

23   specifically who some of the declarants are on these chats,

24   certainly not under Rule 1006.  So from our perspective,

25   especially this chart is not particularly argumentative at all.

1          THE COURT:  I'm reading Rule 1006.  Summaries to

2     provide content.  And if the proponent has made originals or

3     duplicates available -- which he has, which the government

4     has -- the proponent can use the summary chart or calculations

5     to prove the contents of voluminous writings.

6          MR. JACKSON:  Your Honor --

7          THE COURT:  If your objection is that these -- that

8     these various dates and materials are as described to meeting

9     in Honduras, meeting in Venezuela, meeting in Venezuela,

10     meeting in Venezuela, you can certainly question Mr. -- who is

11     going to do this, Mr. Calabrese?  And maybe you could even

12     suggest limiting language about the headings.  Headings are not

13     evidence.  The government's attempt at summarizing materials.

14          So if that's the objection, Mr. Jackson and

15     Ms. Espinosa, it's overruled.

16          Anything else?

17          MR. JACKSON:  No, your Honor.

18          THE COURT:  This is fairly typical of what the

19     government does at the end of a case, providing summaries.  And

20     in my experience it's always been admissible.  If you want to

21     take a whack at the headings, I'll consider limiting

22     instructions in the final instructions to the jury.

23          MR. JACKSON:  We appreciate that, your Honor.  We'll

24     take a whack at the headings.

25          Just to point, just to clarify in terms of what we

GBG9FLO5                    Gomez - recross

1    view.  We certainly are fine with summary charts.  We think

2    they can be helpful and obviously we've introduced them.

3            THE COURT:  Do you have any of your own?

4            MR. JACKSON:  I don't think that we have any in this

5    case.  But we've used summary charts before.

6            The distinction here, I think, is we think 1006 is and

7    what has always been our practice is, it's for -- it says the

8    content of voluminous writings, recordings or photographs that

9    cannot be conveniently examined in court.  And I think that

10   there is -- there's a subtle distinction between taking

11   voluminous writings and reducing them to a chart that makes it

12   easy to understand, for example a huge body of information, and

13   simply marshaling your evidence.  What they've done is they've

14   created categories that they identify as relevant and picked

15   out the things that they think relate to that.  And so that's

16   where we will come back to your Honor with the request I think

17   in terms of some of the headings.

18           THE COURT:  I think you've got a point there about

19   1006.  It's supposed to be complicated accounting and

20   scientific data that's summarized in a chart.  On the other

21   hand, this is fairly common and it's been done in a number of

22   cases that I've presided at and the rule doesn't exclude it.

23   So I'm going to allow it.

24           MR. JACKSON:  That's fine.  Thank you, your Honor.

25           MR. RODY:  Judge, if I may.  It's just that they're

GBG9FLO5                         Gomez - recross

1   not including all communications that occurred between that

2   period.  It's just the ones that they're selecting which that's

3   a summation argument.

4          THE COURT:  I understand your point.  You can

5   certainly go after Mr. Calabrese on that point.

6          MR. RODY:  We will.

7          THE COURT:  Okay.  Be careful, Mr. Calabrese.

8          MR. JACKSON:  Thank you, Judge.

9          THE COURT:  Thank you.  How many more witnesses -- are

10  we going to finish today?

11         MR. QUIGLEY:  I think we will, your Honor.  We have

12  two more.  The next one is a very brief witness.  And then

13  Mr. Calabrese.

14         THE COURT:  Then we're going to talk about the

15  schedule tomorrow.  If everybody is going to take an

16  hour-and-a-half we're going to have problems getting all the

17  summations in tomorrow.

18         MR. JACKSON:  Thank you, Judge.

19         THE COURT:  We'll resume in ten minutes.

20         (Recess)

21         THE COURT:  Call in the jury.

22         (Continued on next page)

23

24

25

GBG9FLO5                    Corcoran - direct

 1          (Jury present)

 2          THE COURT:  Mr. Quigley, would you call your next

 3  witness.

 4          MR. QUIGLEY:  Yes, your Honor.  The government calls

 5  Kevin Corcoran.

 6    KEVIN JAMES CORCORAN,

 7       called as a witness by the Government,

 8       having been duly sworn, testified as follows:

 9          THE COURT:  Please sit down, Mr. Corcoran.  Make

10  yourself comfortable.

11          All right, Mr. Quigley.

12          MR. QUIGLEY:  Thank you, your Honor.

13  DIRECT EXAMINATION

14  BY MR. QUIGLEY:

15  Q.  Sir, where do you work?

16  A.  Drug Enforcement Administration.

17  Q.  How long have you been with the DEA?

18  A.  Since November 2003.

19  Q.  Focusing your attention back on the fall 2015.  Where were

20  you assigned with the DEA  at that time?

21  A.  I was assigned to the bilateral investigations unit.

22  That's special operations.

23  Q.  Focusing specifically on early November 2015, did you meet

24  with any confidential sources in connection with this

25  investigation?

GBG9FLO5                          Corcoran - direct

1    A.  Yes, I did.

2    Q.  Where was that meeting?

3    A.  It took place in Northern Virginia.

4    Q.  What was the purpose of the meeting?

5    A.  It was to introduce a third CS into the investigation and

6    introduce that third CS to the first two CSs.

7    Q.  And the third individual was an individual named Juan

8    Gomez?

9    A.  Yes, it was.

10   Q.  Where did Gomez go after this meeting in Virginia?

11   A.  Honduras.

12   Q.  And what, if any, recording equipment was Gomez sent to

13   Honduras with?

14   A.  He was sent with two recording devices.

15   Q.  We'll call this Device-2 and Device-3.  Device-2 is an

16   audio only device?

17   A.  Yes, it is.

18   Q.  And Device-3 is an audio-video device?

19   A.  Yes, it is.

20   Q.  What are some of the basic capabilities of Device-3?

21   A.  Device-3 is a video recording device.  Has an on and off

22   switch.

23   Q.  What was the purpose of providing the source with two

24   devices?

25   A.  Backup plan.  In case one of devices fails.

1    Q.   Did there come a point when Gomez left Honduras?

2    A.   Yes, he did.

3    Q.   Do you know what happened with Device-3 when Gomez left

4    Honduras?

5    A.   He accidentally left it in the hotel room.

6    Q.   Did there come a time when you received it?

7    A.   Yes, it was.

8    Q.   How did you get it back?

9    A.   I received it via FedEx from Special Agent Passmore from

10   Honduras.

11   Q.   Where was Special Agent Passmore assigned?

12   A.   Honduras.

13   Q.   What did you do with the Device-3 when it arrived at your

14   office?

15   A.   Downloaded the content onto a DVD.

16   Q.   What did you do with that DVD?

17   A.   I placed it into evidence.

18   Q.   Are you familiar with some of the basic features of

19   Device-3?

20   A.   I am.

21   Q.   Can the operator stop and start recording?

22   A.   Yes, he can.

23   Q.   What happens if the operator of the device initiates

24   another recording?

25   A.   It starts another file.

GBG9FLO5                        Corcoran - direct

1    Q.   Is it possible to delete files on Device-3 before they're

2    downloaded?

3    A.   No, sir.

4    Q.   Is it possible to modify files on Device-3 before they are

5    downloaded?

6    A.   No, sir.

7    Q.   Can you describe the steps for downloading files on

8    Device-3.

9    A.   Sure.  Device-3 is a plug-and-play device.  That means you

10   plug it in the computer.  Then you enter in a numeric password

11   which opens up the media files so you can access them.

12   Q.   Was Gomez provided with the password associated with

13   Device-3 to download file?

14   A.   No, sir.

15   Q.   Did you also recover recordings from Gomez from Device-2

16   that had been made by Gomez?

17   A.   Yes, I did.

18   Q.   How did you get those?

19   A.   Via FedEx from the Mérida Mexico country office.

20   Q.   What happened when the FedEx with those recordings arrived?

21   A.   They came on a disk.  And then we reviewed the disk and

22   removed the audios pertinent to this investigation.

23   Q.   And what did you do with those audios?

24   A.   Placed them into evidence.

25          MR. QUIGLEY:  One moment, your Honor.

GBG9FLO5                        Corcoran - cross

1    Q.  On Device-2 how did you figure out which audios were

2    pertinent to this investigation?

3    A.  I reviewed them with Special Agent Leith Habayeb.  It was

4    his recording device.  And the additional recordings were from

5    a previous investigation he was conducting.

6            MR. QUIGLEY:  Nothing further, your Honor.

7            THE COURT:  Mr. Jackson.

8            MR. JACKSON:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. JACKSON:

11   Q.  Good afternoon, sir.

12   A.  Good afternoon, sir.

13   Q.  Sir, there's nothing about these devices that can be used

14   to monitor confidential sources' activities at all times,

15   right?

16   A.  Are you referring to like a GPS tracking device?

17   Q.  Right.

18   A.  No, sir.

19   Q.  Nothing like that?

20   A.  No, sir.

21   Q.  And it's not the case that what the DEA does is have a

22   confidential source record the entire amount of time that they

23   are in possession of a device, right?

24   A.  Correct.

25   Q.  What happens is you train them to activate it when they're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GBG9FLO5                         Corcoran - cross

1     supposed to be meeting with targets of an investigation, right?

2     A.   Correct.

3     Q.   You're one of the people that actually does the training,

4     right?

5     A.   Not specifically, no.

6     Q.   But you've trained CSs on these devices before?

7     A.   I have trained CSs that I have controlled, yes.

8     Q.   About how long did that training take?

9     A.   It varies from informant to informant.  Some people pick it

10    up quicker than others.  So a few minutes each time.  Could be

11    longer.

12    Q.   This isn't like a day-long training?  This is like a few

13    minutes sometimes?

14    A.   No.  They're not very sophisticated devices.

15    Q.   You kind of press a button to turn it on and to turn it

16    off, right?

17    A.   Yes, sir.

18    Q.   And before you give a CS one of these devices you don't

19    gather intel on what the technological sophistication is of

20    that particular CS, do you?

21    A.   No, sir.

22    Q.   By the way, you didn't have any substantive involvement in

23    this investigation, right?

24    A.   Not really, sir, no.

25    Q.   So you at no point, just to be clear, saw any cocaine,

GBG9FLO5                      Calabrese – direct

1    right?

2    A.  Me personally, no.

3    Q.  And you're not aware of any seizure of any cocaine in

4    connection with this investigation?

5    A.  I am not aware of any.

6           MR. JACKSON:  No further questions, your Honor.

7           MR. RODY:  One moment, Judge.

8           No questions, Judge.  Thanks.

9           THE COURT:  Mr. Quigley.

10          MR. QUIGLEY:  No redirect, your Honor.  Thanks.

11          THE COURT:  You're excused, Mr. Corcoran.

12          (Witness excused)

13          Next witness.

14          MR. BOVE:  Your Honor, the government calls Peter

15   Calabrese.

16    PETER CALABRESE,

17       called as a witness by the Government,

18       having been duly sworn, testified as follows:

19          THE COURT:  Please sit down, Mr. Calabrese.

20          All right.  Mr. Bove.

21          MR. BOVE:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MR. BOVE:

24   Q.  Mr. Calabrese, where do you work?

25   A.  The United States Attorney's Office.

1    Q.  And when did you start at the office?

2    A.  In July of 2015.

3    Q.  When approximately did you start working on this case?

4    A.  Around June 2016.

5    Q.  Now are you generally familiar with the translations of

6    electronic communications that are in evidence at the trial?

7    A.  Yes.

8    Q.  And have you reviewed the reports prepared by Mr. Ogden

9    which are marked as Government Exhibits 400 and 500?

10   A.  Yes, sir.

11   Q.  Are you generally familiar with the business records that

12   are in evidence as Government Exhibits 600 through 610?

13   A.  Yes.

14   Q.  What about the documents relating to the defendants'

15   postarrest statements that are marked as Government Exhibits

16   2000 through 2003?

17   A.  Yes.

18   Q.  What's your best estimate of the number of pages of

19   exhibits that you have reviewed in preparation for your

20   testimony?

21   A.  Around 1,500.

22   Q.  And were you asked to prepare summaries relating to these

23   records?

24   A.  Yes.

25   Q.  Did you do that?

GBG9FLO5                    Calabrese – direct

1    A.   Yes.

2    Q.   What types of summaries did you prepare?

3    A.   There are two types.  The first was chronological charts

4    which I made two of.  And the other was thirteen

5    person-specific summary charts.

6    Q.   Let's talk about one of the chronologies first.  I'm going

7    to hand you what's been marked for identification as Government

8    Exhibit 701.  Do you recognize that?

9    A.   Yes.

10   Q.   What is it?

11   A.   This is a -- one of the chronological charts that I made

12   relating to toll data.

13   Q.   How was this document prepared?

14   A.   I used Government Exhibit 400 and Government Exhibit 500 as

15   data points in which I reviewed the call log entries in each

16   report and compiled that information into this chart.

17   Q.   Did anyone else participate in the preparation of this

18   document?

19   A.   Yes.

20   Q.   Describe how that worked.

21   A.   So there were a few people who assisted in compiling the

22   information.  But in the end I was the one who reviewed

23   everything that was input into the chart and gave the final

24   check.

25   Q.   And is Government Exhibit 701 a fair and accurate summary

1   of the call log data in Government Exhibits 400 and 500?  Those

2   are the reports of Mr. Ogden.

3   A.  Yes.

4           MR. BOVE:  Your Honor, the government offers 701

5   pursuant to Rule 1006.

6           THE COURT:  Any objection?

7           MR. JACKSON:  No new objection, your Honor.

8           MR. RODY:  Same, Judge.  No new objection.

9           THE COURT:  All right.  701 is received in evidence.

10          (Government's Exhibit 701 received in evidence)

11          MR. BOVE:  Please publish 701.

12          Zoom in on the top half of this.

13  Q.  Mr. Calabrese, could you please give the jury a sense of

14  what these columns mean, starting with the left.

15  A.  So the first column that has the number signs and title is

16  just the row number for this chart.

17          The second column, which is date, is the date in which

18  the call for the chart was made.

19          The third column says time in the title.  That is the

20  time in which the call was made, which has been converted from

21  UTC time to Venezuela time.

22          The fourth column says caller, is the name of who made

23  the call.

24          And caller number is the phone number associated with

25  the caller column.

1           Recipient is the name of the person who received the
2   call.
3           Recipient number is the number associated with the
4   recipient column.
5           Duration is the length of the call.
6           GX is the exhibit number from which the row came from.
7           And entry number is the specific entry number from
8   that exhibit.
9   Q.  Thank you.
10          MR. BOVE:  You can take that down.
11  Q.  I'm now going to show you documents marked for
12  identification as Government Exhibits 702 through 714.  What
13  are these?
14  A.  These are the person-specific summary charts that I made.
15  Q.  How were these prepared?
16  A.  So I reviewed the exhibits that were in evidence and
17  compiled that information into these charts.
18  Q.  What types of exhibits did you summarize in preparing these
19  charts?
20  A.  I looked over business records, phone reports, photos,
21  transcripts, electronic communications.
22  Q.  Did anyone else participate in the preparation of these
23  documents, Government Exhibits 702 through 714?
24  A.  Yes.  I was similarly assisted in -- with getting the
25  information into the charts.  But like the toll data chart, I

1    gave the final review.

2    Q.  And do these documents accurately summarize the phone

3    reports that we just talked about, the translations that are in

4    evidence, business records, and the DEA documents that are in

5    evidence and that you've reviewed?

6    A.  Yes.

7              MR. BOVE:  Your Honor, the government offers 702

8    through 714.

9              THE COURT:  Objections anyone?

10             MR. JACKSON:  No objection.

11             THE COURT:  Mr. Rody, the same?

12             MR. RODY:  Yes, Judge.  Thanks.

13             THE COURT:  Government Exhibits 702 through 714 are in

14   evidence.

15             (Government's Exhibits 702 through 714 received in

16   evidence)

17             MR. BOVE:  With the Court's permission, may I hand out

18   Government Exhibits 702 through 714 to the jury.

19             THE COURT:  Yes, you may.

20   Q.  Can we take a look at 702, please.

21             Would you please tell the jury how these summary

22   charts were formatted?

23   A.  At the top of the page would be the name or alias

24   associated with the person that the chart is related to.

25             Below that are photos in evidence that are either of

GBG9FLO5                          Calabrese - direct

1    the person the chart is about or relating to the person the

2    chart is about.  And below that is a table -- like a summary

3    chart.

4    Q.  You said that some of the photos are related to the person

5    referenced on the top of the chart.  Let's talk about this one.

6    That photo in the center is just a contact information photo

7    from one of the phones, right?

8    A.  Yes.

9    Q.  Now there's a table towards the bottom half of the chart.

10   Do you see that?

11   A.  Yes.

12   Q.  Could you please describe to the jury how you prepared the

13   table?

14   A.  So I reviewed the various exhibits in evidence that I

15   mentioned before and compiled them into this chart.

16          The column on the left is the accounts column and that

17   lists any accounts relating to the person the chart is about.

18          The source column details the specific locations where

19   the account was identified.

20          And the communications column shows the government

21   exhibits where the account was in use.

22   Q.  So let's take for an -- as an example the top row, the

23   phone number ending in 3803.  Do you see that?

24   A.  Yes.

25   Q.  So in the source column there are a few numbers there.

GBG9FLO5                         Calabrese – direct

1    Could you please describe what the numbers are?

2    A.   So the numbers that aren't in brackets are the exhibit

3    number that the account came from.  And the numbers that are in

4    brackets are the specific entry number within the government

5    exhibit where the account came from.

6    Q.   So the bracketed numbers are the entries from those big

7    phone reports?

8    A.   Yes.

9    Q.   And then what are the parenthetical references?

10   A.   Those are the user names of those accounts within the

11   government exhibit.

12   Q.   So those are the ways that the phone numbers are saved in

13   the phones?

14   A.   Yes.

15   Q.   And now if you could take a look at the communications

16   column for this entry.  Do you see that?

17   A.   Yes.

18   Q.   What's listed here for the phone ending 3803?

19   A.   Government Exhibit 701.

20   Q.   So, that's the summary chart that you just described with

21   the phone chronology?

22   A.   Yes.

23   Q.   What about the next entry down, the WhatsApp account?

24   A.   The communications are Government Exhibits 405–T to

25   Government Exhibits 409–T.

GBG9FLO5                          Calabrese - direct

1   Q.  So those are translations in evidence of the user of that

2   account making communications?

3   A.  Yes.

4   Q.  Please take a look at 703 now, the next page.

5         Now is this chart, Government Exhibit 703, formatted

6   in the same way?

7   A.  Yes.

8   Q.  And so taking the top entry in the table, the number ending

9   in 5405.  What does it a mean in one of these charts if you see

10  both the 400 exhibit and the 500 exhibit cited?

11  A.  So that means that this account, the phone number ending in

12  5405 was located in both phones, in Government Exhibit 400 and

13  Government Exhibit 500.

14        MR. BOVE:  Let's take a look at 704, please.

15  Q.  Let's take -- is this chart formatted a little bit

16  differently?

17  A.  Yes.

18  Q.  There is a table at the very bottom listing references.  Do

19  you see that?

20  A.  Yes.

21  Q.  What information is included in that references table?

22  A.  Those are the areas within the government exhibits.  So

23  there's specific pinpoints where this person was referenced.

24  Q.  So, for example, the top row.  What does that mean?

25  A.  So in Government Exhibit 405-T at page 5 they were

GBG9FLO5                      Calabrese – direct

1    referenced as Pepero.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBG5flo6                        Calabrese - direct

1   BY MR. BOVE:

2   Q.   Thank you.

3        Let's take a look at -- one moment.  Before we go past

4   704, why did you include Jose as an alias on the top of this

5   chart?

6   A.   There were two reasons.  The first, in the Government

7   Exhibit 500 there is a SnapChat account by the name Jose A.

8   Pepero and the second is we learned in Special Agent Gonzalez'

9   testimony that Jose -- Pepe was short for Jose.

10  Q.   Let's take a look at 705, please.  Now let's skip ahead to

11  708.  This is someone using an alias "Rayo."  Do you see that?

12  A.   Yes.

13  Q.   If we can publish on the screens Government Exhibit 231-T

14  at page 1?  So, this is a transcript from the November 10th

15  2015 meeting in Haiti, and if we can take a look at page 17 and

16  focus on, highlight rows 26 and 28?

17       There are references there to Rayo; do you see that?

18  A.   Yes.

19  Q.   And if you look at Government Exhibit 708 in the handout,

20  the second row of your references table lists this as well?

21  A.   Yes.

22  Q.   Now, in the table above that, in the communications column

23  there are two listed; do you see that?

24  A.   Yes.

25  Q.   Let's take a look at 504-T.  You can put that on the main.

GBG5flo6                          Calabrese - direct

1                So, these are Blackberry messenger communications

2        between Flores and Rayo.  Do you see that?

3        A.   Yes.

4        Q.   Let's take a look at page 3.  In the second row here there

5        is a reference to a Flaco; do you see that?

6        A.   Yes.

7        Q.   Now, if you can take a look at the handout marked 706.

8        What is this one?

9        A.   This is one of the specific charts I made related to

10       someone named Cesar Orlando Daza Cardona.

11       Q.   I see there is an alias here, "Flaco?"

12       A.   Yes.

13       Q.   Now, the phone number listed in the accounts column has a

14       504 beginning.  Do you see that?

15       A.   Yes.

16       Q.   What is the 504?

17       A.   That is the Honduras country code.

18       Q.   And there is an exhibit listed in the communications column

19       in the second roam 409-T; do you see that?

20       A.   Yes.

21       Q.   If we can publish, in the main window, 409-T, please?

22                So, these are WhatsApp messenger communications

23       between Campo and somebody using the screen name Negrito Nico;

24       do you see that?

25       A.   My screen isn't working.

GBG5flo6                       Calabrese - direct

1   Q.  I'm sorry.  Let me get you a binder.  We are on 409-T,

2   please?

3   A.  Okay.

4   Q.  These are WhatsApp messenger communications between Campo

5   and someone using the name Negrito Nico; do you see that?

6   A.  Yes.

7   Q.  Is that one of the aliases you included on Government

8   Exhibit 706?

9   A.  Yes, it is.

10  Q.  If we can take a look at page 2, so these are

11  communications between Campo and Negrito Nico on October 2nd?

12  A.  Yes.

13  Q.  And let's take a look at page 3.

14          Do you see that top entry there, there is -- Negrito

15  makes a comment I will be wearing a dark khaki shirt and white

16  pants?

17  A.  Yes.

18  Q.  Can you please put on the right side of the screen

19  Government Exhibit 110?

20          Do you see the man to the right of the man in the

21  wheelchair?

22  A.  Yes.

23  Q.  What does it look like he is wearing?

24  A.  It appears to be a khaki shirt and white pants.

25  Q.  If we can take a look at Government Exhibit 2000 at page 3

GBG5flo6                          Calabrese – direct

1    and zoom in on the bottom right entry?  Now let's take a look

2    at 602.  You can put 602 in the main window and zoom in on the

3    top, please?

4              MR. RODY:  Judge, I object.  That has nothing to do

5    with the witness' summary charts that he has put in.

6              THE COURT:  Overruled, Mr. Rody.

7    Q.  Do you see an iCloud recovery e-mail in this document?

8    A.  Yes, I do.

9    Q.  And what's that?

10   A.  It is ramses66_@hotmail.com.

11   Q.  Do you know if there was a account associated with that

12   user name?

13   A.  Yes, there was.

14   Q.  Let's take a look at 607, please.  What is this?

15   A.  This is subscriber information relating to the ramses

16   iCloud account.

17   Q.  What was the subscriber name provided for this account?

18   A.  Efrain Campo.

19   Q.  And if we can take a look at 608, please, and zoom in on

20   the text?  Thank you.

21              What do we see here?

22   A.  This is a notes file related to the ramses iCloud account.

23   Q.  Is it dated?

24   A.  Yes.

25   Q.  What is the date?

GBG5flo6                         Calabrese – direct

1    A.  September 30th of 2015.

2    Q.  What does the entry on the bottom read?

3    A.  Orlando Daza, alias El Flaco.

4    Q.  If we can keep 608 and bring up 609 on the right?  And zoom

5    in on the text, please, of 609?

6            What is 609?

7    A.  It is another notes file related to the ramses iCloud

8    account.

9    Q.  What is this one dated?

10   A.  October 3rd, 2015.

11   Q.  How does the Daza-related information in 609 compare to the

12   information in 608?

13   A.  There seems to be additional information, specifically a

14   number and his full name.

15   Q.  Is that the full name that you included in your chart that

16   is marked as 706?

17   A.  Yes.  It is.

18   Q.  Thank you.

19           We can zoom back out now and compare 609 to 610.

20   Thank you.

21           So, what is the date on 609?

22   A.  It is October 3rd, 2015.

23   Q.  What is the date on 610?

24   A.  October 27, 2015.

25   Q.  And focusing on Mr. Daza, are there any differences between

GBG5flo6                         Calabrese – direct

1    the document that is marked 609 and the document that is marked

2    610?

3    A.  Yes, there is this one; 610 involves a phone number.

4    Q.  Does it look like that phone number also has the 504

5    Honduras country code?

6    A.  Yes, it does.

7    Q.  Let's take a look at 707, please, in the handout.  Were you

8    able to find any phone numbers or accounts used by Gocho in the

9    evidence?

10   A.  No, I did not.

11   Q.  But there is a photograph hears that the chart indicates

12   appears in 408-T and 518-T?

13   A.  Yes.

14   Q.  What is that?

15   A.  That is a photo that was sent in one of the electronic

16   communications; two of them in Government Exhibit 408-T and

17   518-T.

18   Q.  If we can take a look at Government Exhibit 711 in the

19   handout?  If we can publish Government Exhibit 503-T, these are

20   Blackberry messenger communications between Flores and Campo.

21   Let's take a look at page 2.  Do you see the references here to

22   Tortuga?

23   A.  Yes.

24   Q.  And then the bottom row, that's his full name, correct?

25   A.  Yes.

GBG5flo6                              Calabrese – direct

1    Q.  And so is this document, this exhibit that is on the

2    screen, referenced in your chart?

3    A.  Yes, it is.

4    Q.  Where is that?

5    A.  In the references column, that's below the main table.

6    Q.  Now, for the entry time stamped 3:20:58, do you see the

7    name Samia?

8    A.  Yes.

9    Q.  Let's look at the handout 712.  And then last if you look

10   at the 32001 entry do you see reference to Neike?

11   A.  Yes.

12   Q.  If you can look at 713, please?  Thank you, that is all for

13   that one.

14           Showing you document marked for identification as

15   Government Exhibit 700A, what is 700A?

16   A.  This is a revised version of another summary chart of

17   recording exhibits.

18   Q.  You said that it was revised?

19   A.  Yes.

20   Q.  What was the original version?

21   A.  There was a different device number in the November 10,

22   2015 meeting in Haiti chart.

23   Q.  That chart was originally 700?

24   A.  Yes.

25   Q.  And so what is the correction?

GBG5flo6                         Calabrese – direct

1   A.  I changed, in the November 10th, 2015 meeting, the Haiti

2   chart, I changed it from device 3 to device 1.

3           MR. BOVE:  Your Honor, the government offers 700A and

4   moves to withdraw 700.

5           MR. JACKSON:  No objection.

6           THE COURT:  Your prior objections are noted.  700A is

7   received in evidence, 700 is withdrawn.

8           (Government's Exhibit 700A received in evidence)

9   BY MR. BOVE:

10  Q.  Lastly, I am going to show you a document marked for

11  identification as Government Exhibit 715.  What's this one?

12  A.  This is the second chronological chart that I made of

13  selected electronic communications.

14  Q.  How was this chart prepared?

15  A.  I reviewed all of the transcripts that are in evidence and

16  put them in chronological order.

17  Q.  Did anyone else participate in the preparation of this

18  chart?

19  A.  Yes; similar to the other charts, I had additional help in

20  compiling the information, but in the end it was my review.

21  Q.  And is 715 is a fair and accurate summary of the electronic

22  communications that are in evidence?

23  A.  Yes.

24          MR. BOVE:  Your Honor, the government offers 715.

25          MR. RODY:  No objection.

GBG5flo6                        Calabrese – direct

1           THE COURT:  715 is in evidence.

2           (Government's Exhibit 715 received in evidence)

3  BY MR. BOVE:

4  Q.  If we can publish that on the screen, please?

5           Could you please describe the columns that are in this

6  chart?

7  A.  So, the first column is just the row number for the chart.

8  The second one is the date relating to the specific sources.

9  The event has to do with who is speaking to who and what

10  application is being used, and the source is the government

11  exhibit and page number.

12  Q.  Is the information in the event field information taken

13  from the covers of the transcripts?

14  A.  Yes.

15  Q.  If we can take a look at page 2, please?  There are some

16  meetings referenced in gray rows in this chart.

17           Do you see that?

18  A.  Yes.

19  Q.  What is the basis for including those?

20  A.  I was tasked with making a chronological chart and they --

21  that's the date in which they fit in this chart.

22           MR. BOVE:  Nothing further, your Honor.

23           THE COURT:  Ms. Espinosa?

24           MS. ESPINOSA:  Thank you, your Honor.

25  CROSS EXAMINATION

1    BY MS. ESPINOSA:

2    Q.  Hello, Mr. Calabrese.

3    A.  Hello.

4    Q.  Just a few questions to make sure we are all on the same

5    page with your charts.

6            I would like to start with 715.

7    A.  Okay.

8    Q.  Now, you said that the headings on page 2 and page 3 of

9    this chart giving the dates of certain meetings, those were

10   included because they fall at that point in the chronology?

11   A.  Yes.

12   Q.  So, just to be clear, you're not saying that all of the

13   text messages for those headings are related to those meetings,

14   correct?

15   A.  Correct.

16   Q.  Now, these are selected communications from the telephones,

17   correct?

18   A.  Correct.

19   Q.  And you selected these particular communications at the

20   direction of the prosecutors?

21   A.  Yes.

22   Q.  Now, you have no personal knowledge of these text

23   conversations, do you?

24   A.  Besides my involvement with this case.

25   Q.  Right; but you have no personal knowledge of what was

1    intended to be communicated through these conversations,

2    correct?

3    A.   Correct.

4    Q.   And just to be clear, you have no knowledge that these text

5    messages were related to these particular meetings?

6    A.   Correct.

7    Q.   Now, if I could go back to 701 -- direct you to 701; now,

8    the data in this chart is selected call data again, correct?

9    A.   Correct.

10   Q.   And this was also selected at the direction of the

11   prosecutors?

12   A.   Yes.

13   Q.   And this is not all of the call data from the phones,

14   right?

15   A.   No, it is not.

16   Q.   So, you selected certain calls to include here and you left

17   other calls out of this chart?

18   A.   Correct.

19   Q.   And you have no knowledge of the substance of these calls,

20   correct?

21   A.   Correct.

22   Q.   You don't have any recordings of these calls?

23   A.   No, I do not.

24   Q.   So, you don't have any personal knowledge of whether or not

25   these calls had anything to do with this case, correct?

GBG5flo6                        Calabrese - cross

1    A.  Correct.

2    Q.  Now, regarding the exhibits marked 702 to 714, those are

3    summaries of a number of the accounts in the phones, correct?

4    A.  Correct.

5    Q.  There were other contacts in the phones?

6    A.  Correct.

7    Q.  And you did not include those -- you didn't summarize

8    those, correct?

9    A.  Yes.

10   Q.  So, you selected these contacts at the direction of the

11   prosecutors?

12   A.  Yes.

13           MS. ESPINOSA:  I have no further questions.

14           THE COURT:  Mr. Jackson?

15           MR. JACKSON:  Thank you.  Thank you, your Honor.

16   CROSS EXAMINATION

17   BY MR. JACKSON:

18   Q.  Good afternoon, Mr. Calabrese.

19   A.  Good afternoon.

20   Q.  Mr. Calabrese, when did you come out of school?

21   A.  It was a year and four or five months ago.

22   Q.  Where did you graduate from?

23   A.  Northeastern University.

24   Q.  Congratulations.

25   A.  Thank you.

GBG5flo6                       Calabrese – cross

1    Q.  Now, Mr. Calabrese, you have been involved since –– you

2    have been involved as the person who is sort of the custodian

3    of all of the documents and the evidence on the prosecution

4    team here?

5    A.  Yes.

6    Q.  And one of the things that you have been involved in is

7    just a discussion about the best way to present some of the

8    evidence, right?

9    A.  Right.

10   Q.  And that's part of the discussion that related to the

11   creation of some of the charts that we saw today, right?

12   A.  Yes.

13   Q.  Can we just look very briefly at, I think it was Government

14   Exhibit 702?  This is one of the charts that the prosecutors

15   had you put together, right, Mr. Calabrese?

16   A.  Yes.

17   Q.  Now, there are a number of different images of

18   Mr. Campo Flores that exist in this case, right?

19   A.  Yes.

20   Q.  There are some videos of him?

21   A.  In this exhibit?

22   Q.  In the case in general that you have seen.

23   A.  Oh, yes.  Yes.

24   Q.  You have seen all of the evidence, right?

25   A.  Yes.

GBG5flo6                         Calabrese - cross

1  Q.  There is probably not a piece of evidence that you haven't

2  had to personally deal with, right?

3  A.  I have reviewed all of the evidence.

4  Q.  Right.

5          And there was some discussion about the fact that the

6  inclusion of the sunglasses picture on this would be the best

7  one because it's the one where Mr. Campo Flores looks the most

8  nefarious, right?

9  A.  No.

10 Q.  There was no discussion about the fact that this is the one

11 where he looks kind of the scariest?

12 A.  No, there was not.

13 Q.  No discussion at all.

14 A.  No.

15 Q.  Okay.

16         By the way, just to be clear, we do know that the

17 person in the middle, I think you identified it as something

18 related to an avatar but that's not Mr. Campo Flores, right?

19 A.  Correct.

20 Q.  Do you know who that is?

21 A.  Hugo Chavez.

22 Q.  Right.

23         You haven't seen any evidence, any connection between

24 Mr. Campo Flores and Hugo Chavez, right?

25 A.  No.

GBG5flo6                         Calabrese - cross

1   Q.  Can we take that down?

2            One of the things that you did in terms of reviewing

3   the evidence, there was an exhibit that came in earlier which

4   was a photograph of the moment before the defendants were

5   extradited -- or I'm sorry -- expelled to the United States?

6   Do you remember that?

7   A.  Yes.

8   Q.  I just want to show you a document that has -- that the

9   parties have, I believe, agreed is admissible, which is marked

10  as DX- 341.

11           MR. JACKSON:  May I approach, your Honor?

12           THE COURT:  Yes, you may.

13           (counsel conferring)

14           THE COURT:  Can I see it, Mr. Calabrese?

15           THE WITNESS:  Yes.

16  BY MR. JACKSON:

17  Q.  Mr. Ovalles, would it be possible to activate the ELMO,

18  briefly?

19           What are we looking at in DX- 341, Mr. Calabrese?

20  A.  It is an image of the defendants in front of a plane.

21  Q.  Okay.

22           And this is a different image from the one that came

23  in earlier in the case but it's at the same time, right?

24  A.  I believe so.

25  Q.  Okay.

GBG5flo6                          Calabrese – cross

1              MR. JACKSON:  Your Honor, the defendants offer

2     DX- 341.

3              MR. BOVE:  No objection.

4              THE COURT:  341 is in evidence.

5              (Defendant's Exhibit 341 received in evidence)

6              MR. JACKSON:  Thank you, your Honor.  May I publish

7     it?

8              THE COURT:  Yes.

9     BY MR. JACKSON:

10    Q.  Now, in this photo which you can see, Mr. Calabrese, is

11    this is a photo of the moment before the defendants were taken

12    onto the airplane, right?

13    A.  Okay.  I --

14    Q.  That's what your understanding is, right?

15    A.  I personally didn't work with this photograph.

16    Q.  That's fine.  I have more questions closer to your

17    expertise.

18    A.  Okay.

19    Q.  Can you inform our jurors, who may not be familiar, what is

20    a selfie?

21    A.  It is a picture of yourself that you take of yourself.

22    Q.  And in this picture we can see, right, that one of the

23    people who is putting the defendants under arrest here is

24    taking a selfie, right?

25    A.  I have no idea what he is doing with his phone.

GBG5flo6                        Calabrese – cross

1    Q.  Okay.  He is holding the phone in his hand though, right?

2    A.  It looks like a phone.

3    Q.  Now, one of the other things you did, Mr. Calabrese, during

4    the course of this, is you identified photographs and matched

5    them up to names of some of the people in the investigation,

6    right?

7    A.  Right.

8    Q.  And I think you showed us some of those during your direct,

9    correct?

10   A.  Correct.

11   Q.  One of the ones that you showed us was a photo of Hamudi?

12   A.  Yes.

13   Q.  And you were able to match that name up based on looking at

14   the photos, looking at the other information you had?

15   A.  Correct.

16   Q.  And you also, during the course of this, during the course

17   of preparing exhibits, you saw a photo of Gilson, the person

18   identified as Gilson, and at one point you prepared a faceplate

19   for Gilson, right?

20   A.  Yes.

21   Q.  You know what he looks like, right?

22   A.  Yes.

23   Q.  Now I want to show you a photograph that's been marked as

24   DX- 326.

25   A.  Thank you.

GBG5flo6                          Calabrese – cross

1    Q.  You can see this is a team of people with paintball gear on

2    and the Venezuelan flag, right?

3    A.  I'm not familiar with paintball so I'm not sure what gear

4    is involved.

5    Q.  You can see there is sort of protective gear, right?

6    A.  I see a few, maybe, helmets but I'm not sure what

7    protective gear for paintball is like.

8    Q.  Okay, sure.

9           But you see that Gilson is in this photograph, right?

10   A.  I need to see the faceplate that I made also.

11   Q.  Right, looking at that you -- you saw Gilson before,

12   correct?

13   A.  I have seen a picture a long time ago.

14   Q.  And you matched it up to the name?

15   A.  Yes.

16   Q.  And the person to the left of this appears to be him,

17   correct?

18   A.  I would need to refresh my memory.

19   Q.  Okay.

20          I want to show you something that's marked as DX- 10B

21   and I just want to ask you if that refreshes your recollection.

22   A.  Thank you.  It could be the same person.

23   Q.  It appears to be, correct?

24   A.  I am not a hundred percent sure.

25   Q.  But it appears to be, correct?

GBG5flo6                        Calabrese - cross

1           MR. BOVE:  Objection.

2           THE COURT:  Sustained.

3           MR. JACKSON:  Your Honor, we offer DX- 326.

4           THE COURT:  Any objection?

5           MR. BOVE:  We don't think there is a foundation, your

6    Honor.

7           THE COURT:  326 is in evidence.

8           (Defendant's Exhibit 326 received in evidence)

9           MR. JACKSON:  Thank you.  May I display it, your

10   Honor?

11          THE COURT:  Yes, you may.

12   BY MR. JACKSON:

13   Q.  And that's a Venezuelan flag, right?

14   A.  I believe so.

15   Q.  Now, I want to ask you, just very briefly -- I just have a

16   couple more questions for you, Mr. Calabrese.

17          The records that you reviewed in this case were quite

18   voluminous, right?

19   A.  Yes.

20   Q.  Are there any types of charts that you discussed with the

21   prosecutors making, that you -- I'm not asking you what they

22   were -- but whether, yes or no, there were types of charts that

23   you discussed making with the prosecutors that you ultimately

24   decided that you didn't want to make?

25   A.  No.

GBG5flo6

1    Q.  So all the charts that you discussed you actually made?

2    A.  Yes.

3    Q.  And you have been through all the evidence?

4    A.  Yes.

5    Q.  In any of the information that you looked at, did you come

6    across any information, anything that actually showed 800

7    kilograms of cocaine?

8            MR. BOVE:  Objection.

9            THE COURT:  Sustained.

10   Q.  Did you come across anything that actually showed any

11   cocaine coming to the United States?

12           MR. BOVE:  Objection.

13           THE COURT:  Sustained.

14           MR. JACKSON:  Mr. Calabrese, I want to thank you.

15   Thank you for your help throughout the trial.

16           THE WITNESS:  Thank you.

17           THE COURT:  Mr. Bove?

18           MR. BOVE:  Nothing further.

19           THE COURT:  Mr. Calabrese, you have to go back to

20   work.

21           (Witness excused)

22           THE COURT:  Any more witnesses?

23           MR. BOVE:  No, your Honor.  The government rests.

24           THE COURT:  Anything for the defense?

25           MR. RODY:  Can we have a moment, Judge?

GBG5flo6                        Rosen - direct

1            THE COURT:  Yes, you may.

2            (counsel conferring)

3            MR. JACKSON:  Your Honor, at this time we would like

4    to reserve on an application for the Court for later, if that's

5    acceptable.

6            THE COURT:  Yes, it is.

7            MR. JACKSON:  Thank you, your Honor.  And we have a

8    witness that I think will take approximately one minute to call

9    that's just -- that we would like to call, if that's possible.

10            THE COURT:  I will ask the jury for a little bit of

11    indulgence.  It is 4:30 but Mr. Jackson says it is very short.

12            MR. JACKSON:  Thank you.  Thank you, your Honor.  At

13    this time the defense calls Emma Rosen.

14            THE DEPUTY CLERK:  Ms. Rosen, can you please state

15    your full for the record and spell your last name?

16            THE WITNESS:  Emma Rosen.  R-O-S-E-N.

17     EMMA ROSEN,

18        called as a witness by the Defendant Campo Flores,

19        having been duly sworn, testified as follows:

20            THE DEPUTY CLERK:  She's been sworn.

21            THE COURT:  Please sit down, Ms. Rosen.

22    DIRECT EXAMINATION

23    BY MR. JACKSON:

24    Q.  Good afternoon, Ms. Rosen.

25    A.  Good afternoon.

GBG5flo6                          Rosen - direct

1   Q.  Ms. Rosen, you are a paralegal specialist?

2   A.  Yes.

3   Q.  I want to hand you some documents that are marked as

4   DX- 334, 335, 336, 337, 338, and 339.  Ms. Rosen, can you tell

5   us what those documents are?

6   A.  These are various images of Airsoft guns and their

7   advertisements that were pulled off of Airsoft online

8   retailers.

9   Q.  Okay.

10          MR. JACKSON:  Your Honor, the government offers the

11  enumerated -- the defendants.  Sorry, the defense offers --

12          THE COURT:  You need to have a different uniform on.

13          MR. JACKSON:  Thanks, Judge.

14          THE COURT:  You are offering 334 through 339?

15          MR. JACKSON:  Yes.

16          MR. QUIGLEY:  No objection.

17          THE COURT:  Received in evidence.

18          MR. JACKSON:  Thank you, your Honor.  May I retrieve

19  these?

20          THE COURT:  Yes.

21          (Defendant's Exhibits 334 through 339 received in

22  evidence)

23  BY MR. JACKSON:

24  Q.  And, Ms. Rosen, I just want to display, really quickly,

25  showing DX- 334; is this one of the Airsoft advertisements that

GBG5flo6                         Rosen - direct

1    you were talking about?

2    A.  Yes, it is.

3    Q.  These are essentially hyper-realistic BB guns, correct?

4    A.  Yes.

5    Q.  In looking at this, did you see any that had clips that

6    looked like real clips for real guns?

7    A.  Yes.  There was a few.

8    Q.  I want to show you one that's marked as DX- 335.  And this

9    is another Airsoft advertisement?

10   A.  Yes, it is.

11   Q.  I'm showing you DX- 336; is that an advertisement for an

12   Airsoft clip that has realistic looking bullets in it?

13   A.  Yes, it is.

14   Q.  I'm showing you DX- 338 -- I'm sorry, I'm going to show you

15   DX- 339; is that an advertisement for an Airsoft Krissvector

16   SMG that actually has a safety on it and a long clip?

17   A.  Yes.

18   Q.  By the way, Ms. Rosen, during the course of looking at

19   this, did you look at any press related to Krissvector?

20   A.  I did.

21   Q.  Did you review a press release in which a company talked

22   about hyper-realistic imitations being made of their guns?

23            MR. BOVE:  Objection.

24            THE COURT:  Sustained.

25            MR. JACKSON:  Your Honor, this is the final thing.  I

GBG5flo6                          Rosen - cross

1   am handing Ms. Rosen DX- 329.

2              THE COURT:  339 is it?

3              MR. JACKSON:  I believe this is 329, your Honor.

4              THE COURT:  329.  I'm sorry.

5              MR. JACKSON:  Thank you.

6   BY MR. JACKSON:

7   Q.  Ms. Rosen, what is DX- 329?

8   A.  It is the press release from Kriss U.S.A. that --

9              MR. QUIGLEY:  Objection, your Honor.  He didn't even

10  show it to us.

11             MR. JACKSON:  Oh.  I'm sorry.

12             MR. QUIGLEY:  We still object.

13             MR. JACKSON:  Your Honor, not for the truth, we would

14  invite any limiting instruction, but we offer DX- 329.

15             MR. QUIGLEY:  Your Honor, it is a press release that

16  is coming in for the truth of the matter asserted.

17             THE COURT:  Objection sustained.

18             MR. JACKSON:  Thank you, your Honor.  We have no

19  further questions.

20             MR. BOVE:  Briefly, your Honor?

21             THE COURT:  Yes, very briefly.

22  CROSS EXAMINATION

23  BY MR. BOVE:

24  Q.  Would you please bring up 407-T at page 9?

25             Ms. Rosen, you just testified about some exhibits that

GBG5flo6

1    were basically replicas –– that related to replicas of

2    firearms?

3    A.   Correct.

4    Q.   And those replicas are legal to possess, correct?

5    A.   I believe so.

6              MR. JACKSON:  Objection.

7              THE COURT:  Overruled.

8    Q.   And if they're legal to possess there would be no reason to

9    try and keep your fingerprints offer them, right?

10             MR. JACKSON:  Objection.

11             THE COURT:  Sustained.

12   Q.   There would be no reason to try to smuggle them over a

13   border, right?

14             MR. JACKSON:  Objection.

15             THE COURT:  Sustained.

16             MR. BOVE:  Nothing further, your Honor.

17             THE COURT:  Ms. Rosen, you are excused.

18             (Witness excused)

19             THE COURT:  Anything else, Mr. Jackson?

20             MR. JACKSON:  No, your Honor.  The defense rests.

21             THE COURT:  Mr. Rody?

22             MR. JACKSON:  I'm sorry.  I'm sorry, your Honor.

23   There is one stipulation that we are going to offer that the

24   parties agreed upon.  Subject to an agreement between the

25   parties, we are going to offer a stipulation in the morning

GBG5flo6

1    after we finalize it.

2              THE COURT:  All right.

3              MR. JACKSON:  Thanks.

4              MR. RODY:  Mr. Flores de Freitas rests.

5              THE COURT:  Mr. Campo rests?

6              MR. JACKSON:  Yes, your Honor.

7              THE COURT:  Ladies and gentlemen, that finishes the

8    evidentiary presentation.  We will have summations tomorrow by

9    the lawyers.  So, if you can get in a little bit earlier, we

10   can start.  As soon as the summations are finished I will

11   charge the jury and then you can begin your deliberations.

12             Remember:  Keep open minds, don't do any

13   investigation, don't talk about the case until you begin your

14   deliberations which will be very shortly.  Thanks very much.

15             Try to get in a little bit early tomorrow.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

GBG5flo6

```
 1              (Jury not present)
 2              THE COURT:  Please, be seated.
 3              How long will your summation be?
 4              MR. QUIGLEY:  Your Honor, I estimate about an hour and
 5     45 minutes.
 6              THE COURT:  An hour and 45 minutes?
 7              MR. QUIGLEY:  Hour and a half.
 8              THE COURT:  I don't want to limit you.
 9              MR. QUIGLEY:  I think somewhere in the neighborhood of
10     an hour and 45 minutes.
11              THE COURT:  Mr. Jackson?
12              MR. JACKSON:  Your Honor, Mr. Rody is going to go
13     first.
14              THE COURT:  Okay.  Mr. Rody, I will ask you first
15     then.
16              MR. RODY:  It's very tough to say, Judge.  I would
17     estimate somewhere about the same, between an hour and a half,
18     two hours.  It is very difficult to say.
19              THE COURT:  You are probably about the same.
20              MR. JACKSON:  Probably, your Honor, but I'm going to
21     try to be shorter than Mr. Rody.
22              THE COURT:  Well, I mean, if each of you takes two
23     hours that's going to consume the whole day and I don't want to
24     limit you.  This has been a complicated matter, it was well
25     tried.  I know you have lots to say and want to give all the
```

GBG5flo6

1     time that you need, but it doesn't seem to me that we are going

2     to be able to get the summations done with rebuttal and charge

3     to the jury by the time we meet tomorrow.

4            MR. JACKSON:  Your Honor, I agree.  I don't think

5     there is any way, certainly with the charge.  The one thing

6     that we would ask, your Honor, is I think that we think it

7     would be -- it would be -- from the defense perspective, and I

8     know this is an application made often, but it would be very

9     problematic, from our perspective, if only the rebuttal is on

10    the day of the charge, so.

11           THE COURT:  Well, I mean, I am going to do the best I

12    can.

13           MR. JACKSON:  I understand, your Honor.

14           THE COURT:  And you will do the best you can and we

15    will have to cross this bridge when we come to it.

16           MR. JACKSON:  Absolutely, your Honor.

17           THE COURT:  The only way you can get the rebuttal in

18    tomorrow is everybody giving up some of their time which is up

19    to you but I understand if you want to have both.

20           MR. JACKSON:  I definitely understand.

21           I guess what I would ask, your Honor, is just I guess

22    with an understanding that if we can finish by a specific -- if

23    we can finish by a reasonable time, that we can expect to have

24    the rebuttal go at that time.

25           THE COURT:  Well, I have an appointment over in the

GBG5flo6

1    Second Circuit at 4:00 tomorrow, that's why I asked them to

2    come in a little bit early.

3              MR. JACKSON:  Yes.

4              THE COURT:  So, we go until -- I have to be over there

5    at 4:00 so I have to leave here at 10 of 4:00.

6              MR. RODY:  Judge, can you give us one minute?

7              THE COURT:  Yes, Mr. Rody.

8              (counsel conferring)

9              MR. JACKSON:  And, your Honor, understanding that we

10   are going to have to wait and see how things play out, we may

11   make an application to the Court, if we get far enough in the

12   day, to push off the second defense summation to the day of the

13   rebuttal.

14             THE COURT:  Fine.

15             MR. JACKSON:  Thank you, Judge.

16             THE COURT:  We have a short criminal matter that I

17   would like to take up.

18             MR. RODY:  Okay.

19             THE COURT:  It does not involve this case.  Then we

20   will go to the jury charge.

21             MR. JACKSON:  That's good, your Honor.

22             Before we go on the jury charge, we did want put on

23   the record but we do have application under Rule 29.

24             THE COURT:  Yes.

25             MR. JACKSON:  Your Honor, we are going to pass up a

GBG5flo6

1    written submission that we would like the Court to have, but

2    our basic application, your Honor, we do not believe that the

3    government has met its burden of proving beyond a reasonable

4    doubt that these defendants are guilty of the charged crime.

5                THE COURT:  All right.

6                MR. JACKSON:  Your Honor, is it all right if I pass

7    this to Mr. Ovalles?

8                THE COURT:  Yes.

9                That's on behalf of both defendants?

10               MR. JACKSON:  Yes, your Honor.

11               MR. RODY:  It is a joint submission, your Honor.

12               THE COURT:  Joint submission?  I will reserve.

13               MR. JACKSON:  Thank you, your Honor.

14               (recess)

15               MR. RODY:  Judge, if I may?  Counsel for both

16   defendants, with defendants here, they waive their appearance

17   at the charge conference.

18               THE COURT:  All right.

19               Any lawyers who wants to leave, leave somebody behind

20   who is capable of handling the charge; the lawyers can go, too.

21               MR. QUIGLEY:  Thank you, your Honor.

22               MR. JACKSON:  Thank you, Judge.

23               (Recess)

24               THE COURT:  Is everybody all ready now?

25               MR. JACKSON:  Yes, your Honor.

GBG5flo6

1          THE COURT:  We sent out the jury charge last night

2     around 7:30, so we will be working off that document.  What I

3     normally do is go through this page by page.  A lot of it is

4     pretty common material so at what page do you have your first

5     objection?

6              Mr. Bove?

7              MR. JACKSON:  Your Honor, can either party go?

8              THE COURT:  Either party can go, yes.

9              MR. JACKSON:  Thank you, Judge.  I think our first

10    note is on page 11, unless --

11             THE COURT:  Does anybody have anything before 11?

12             MR. BOVE:  No, your Honor.

13             MR. RODY:  One moment, Judge.

14             THE COURT:  Okay.

15             (Continued next page)

16

17

18

19

20

21

22

23

24

25

GBG9FLO7

1          MR. RODY:  No, Judge, not to 11.

2          MR. JACKSON:  So, your Honor, at page 11 there are

3    just two things.  One, I think where the Court adds "add any

4    others," I think we do need to add the final cooperating

5    witness.

6          THE COURT:  With expert witnesses, we'll just add

7    others.  At page 10 we have to add a few others.  We don't have

8    to add any others.

9          MR. JACKSON:  No.  I think for expert witnesses we're

10   good, your Honor.  I think that's all.

11         THE COURT:  Okay.  We'll strike those.

12         Now at page 11, Mr. Jackson.

13         MR. JACKSON:  Yes, your Honor.  So at page 11 under

14   cooperating witnesses.  I think we have Jose Santos Peña.  I

15   think we can scratch off Jose Santos Hernandez because he

16   didn't testify.  We have Carlos Gonzalez and I believe there is

17   one additional which is Mr. Gomez.

18         THE COURT:  Juan Gomez.

19         MR. JACKSON:  Juan Gomez.

20         MR. BOVE:  Your Honor, Mr. Gomez testified that he was

21   a confidential source.  I don't think he belongs in this

22   category.

23         THE COURT:  What's the difference?

24         MR. BOVE:  He has not pleaded guilty to criminal

25   conduct.  He just has an agreement with the DEA, providing

GBG9FLO7

1    services in exchange for funds.

2              MR. JACKSON:  That's a fair point, your Honor.  I

3    guess Mr. Gomez is -- he's being paid a substantial reward and

4    so I mean from our standpoint he sort of fits in a similar

5    category but we would defer to the Court, whatever the Court

6    thinks is appropriate.

7              THE COURT:  I think I have to add another sentence

8    because after we talk about Santos Peña and Carlos Gonzalez,

9    they pled guilty to a variety of criminal conduct and so I

10   don't want to say that Juan Gomez has pled guilty if he hasn't.

11             I'll willing to say that he's a cooperator with the

12   DEA and he's receiving compensation.

13             MR. BOVE:  Judge, I think it might be more fair to

14   include him in the section on law enforcement witnesses rather

15   than to lump him in with the witnesses who have actually

16   disclosed criminal conduct and pleaded guilty to criminal

17   conduct.

18             MR. JACKSON:  Your Honor, we're fine with that if the

19   sentence, with regard to him, there can be a brief notation

20   that Mr. Gomez also is receiving.

21             THE COURT:  Compensation.

22             MR. JACKSON:  Compensation.

23             THE COURT:  Yes.

24             MR. JACKSON:  And rewards.

25             THE COURT:  Yes.  We'll put that in under law

GBG9FLO7

```
 1   enforcement witnesses?

 2             MR. RODY:  That's fine.

 3             MR. JACKSON:  That's fine for us, your Honor.

 4             MR. RODY:  Judge, also on page 11.

 5             THE COURT:  Yes, Mr. Rody.

 6             MR. RODY:  Just above the cooperating witnesses at the

 7   very end of the expert witness section, the final clause of the

 8   final sentence says "would be justified in placing great

 9   reliance on the expert's testimony."

10             THE COURT:  Yes.

11             MR. RODY:  I don't believe that Sand uses that word.

12   Our review is that "great" is unnecessary there and may

13   influence the jurors to place undue weight on the expert's

14   testimony.

15             THE COURT:  So what language do you suggest, Mr. Rody?

16             MR. RODY:  I think just reliance is fine.

17             THE COURT:  Why don't we say you can rely on the

18   expert testimony.

19             MR. RODY:  That's fine.

20             MR. JACKSON:  So, your Honor --

21             THE COURT:  So the last sentence, the last line, "You

22   can rely on that expert's testimony."

23             MR. RODY:  If you just said, "You would be justified

24   in relying on the expert's testimony."

25             THE COURT:  Okay.
```

GBG9FLO7

1          MR. JACKSON:  Your Honor, also on page 11.  The last

2     sentence, the last full sentence on that page as it's currently

3     written is, "The government must take its witnesses as it finds

4     them and frequently must use such testimony in a criminal

5     prosecution."  We would respectfully request that that be

6     edited for this particular case just to say, "The government

7     frequently must use such testimony in a criminal prosecution."

8          The problem with, "The government must take its

9     witnesses as it finds them" is that typically with cooperating

10    witnesses it's a person who is arrested and is an accomplice of

11    the defendant.  Here, the cooperating witnesses are all people

12    who were injected into the situation with the defendants.  And,

13    in fact, some of them weren't even cooperating at the time.

14    They were paid DEA informants.

15          THE COURT:  So what language do you want, Mr. Jackson?

16          MR. JACKSON:  I think it should just say, "The

17    government frequently must use such testimony in a criminal

18    prosecution," and just excise the words "must take its

19    witnesses as it finds them."

20          MR. BOVE:  Judge, I object to that proposal.  I think

21    the sentence is pretty standard.  Mr. Santos Peña, I recognize,

22    presents a special unique case.  I think there's language in

23    your Honor's charge to which the government has no objection

24    relating to Mr. Santos Peña.

25          I think this sentence here is accurate as to both

GBG9FLO7

 1   cooperating witnesses, including Carlos Gonzalez, and that to

 2   the extent there are additional distinctions that need to be

 3   drawn out, the defense is obviously welcome to do that, but I

 4   don't think it needs to be baked into the charge.

 5          THE COURT:  Give me your language again, Mr. Jackson.

 6          MR. JACKSON:  I think it should just be the sentence,

 7   "The government frequently must use such testimony in a

 8   criminal prosecution."  I think that acknowledges that that's

 9   something the government has to do sometimes in a criminal

10   prosecution without, I think, misleading the jury about the

11   fact that these are witnesses who are essentially selected by

12   the government to be --

13          THE COURT:  "The government frequently must use such

14   testimony in a criminal prosecution."  All right.  That takes

15   care of page 11?

16          MR. JACKSON:  Yes, your Honor.

17          THE COURT:  Page 12.

18          MR. JACKSON:  We have nothing on 12, your Honor.

19          THE COURT:  13.

20          Going to go with the first part of subpart G. at the

21   bottom of page 13.

22          MR. JACKSON:  Yes, your Honor.  That's perfect for us.

23          THE COURT:  14.

24          MR. JACKSON:  Apart from the additional stuff that is

25   a carryover, we have nothing, your Honor.

GBG9FLO7

1          THE COURT:  The additional stuff -- I missed that,

2     Mr. Jackson.

3          MR. JACKSON:  I'm sorry.  The top of 14, your Honor,

4     carries over from 13.  But apart from that we don't have

5     anything additional.

6          THE COURT:  Mr. Rody.

7          MR. RODY:  We had an objection during the trial,

8     Judge, and this is related to section H., the second full

9     paragraph, the last sentence says "I instruct you that no one's

10    rights were violated."

11         THE COURT:  Yes.

12         MR. RODY:  We asked a number of questions of witnesses

13    relating to their consular notification rights.  We do think

14    those rights were violated.

15         That would be the kind of thing where I would say, "I

16    instruct you that the government's use of this evidence is

17    entirely lawful."  And strike the part that says, "That no

18    one's rights were violated."

19         THE COURT:  Well I don't think their consular rights

20    were violated either.  Eventually they were told.  The consular

21    officials were notified.

22         MR. RODY:  The consular notification -- their consuls

23    were notified after they were arrested.  They were not advised

24    before making statements that they had a right to speak to

25    their consul before.  And in DOJ policy that is required and

GBG9FLO7

1    they weren't advised of that.

2         MR. BOVE:  Judge, I don't think there's a foundation

3    in the record to be arguing this point or striking this

4    sentence which is accurate.

5         THE COURT:  I'm going to leave it the way it is.  You

6    have your objection.

7         Page 15.  16.

8         MR. RODY:  One small thing, Judge.

9         THE COURT:  Yes.

10        MR. RODY:  In Section L. Evidentiary Sources.

11        THE COURT:  Yes, sir.

12        MR. RODY:  There is a sentence two-thirds of the way

13   down, that paragraphs that starts with "Regardless of your

14   person until opinions."  It says, "You must give this evidence

15   full consideration."  We would prefer the word "may."  As with

16   all the other evidence, they may consider it.

17        THE COURT:  Okay.  I'll make that change.  17.

18        MR. BOVE:  Your Honor, I think in 17 this language

19   might be modified slightly to incorporate both the meetings as

20   well as the electronic communications.  So maybe just in the

21   first sentence, "Recordings of various Spanish conversations as

22   well as electronic communications have been admitted into

23   evidence."

24        THE COURT:  All right.

25        MR. BOVE:  Then I would propose that in the carryover

GBG9FLO7

1    paragraph beginning, "If you wish to hear," that that same

2    addition be made, "Spanish language recordings or

3    communications."

4                THE COURT:  Okay.  Inferences.  Stipulations.

5                MR. RODY:  Sorry.  I must have missed.  I'm on page

6    17, Judge.

7                THE COURT:  Yes, Mr. Rody.

8                MR. RODY:  In the top paragraph, again, two-thirds of

9    the way down.  It's same situation with the last category.

10   It's a must/may thing.

11               THE COURT:  I'll say "may."

12               MR. RODY:  Thanks.

13               THE COURT:  Does that take care of 17?

14               MR. JACKSON:  Yes, your Honor.

15               THE COURT:  On page 18, I think we're about there.

16   I'm going to add a charge on charts and summaries.  I can read

17   it to you.  I have one copy here.  I could read it to you or I

18   can give it to you and you can -- Laena, do you want to --

19               THE COURT:  Again, I think this is a pretty standard

20   charge.

21               MR. JACKSON:  That's fine for us, your Honor.  Thank

22   you.

23               THE COURT:  Show it to Mr. Rody.

24               MR. RODY:  I'm fine, Judge.  Thanks.

25               THE COURT:  We'll put this in after redaction of

GBG9FLO7

1    evidence.  O. will be charts and summaries.  Inferences will be

2    made under P.

3            What page are we up to now?

4            MR. JACKSON:  I believe page 19, your Honor.

5            THE COURT:  Are we okay on stipulations?

6            MR. BOVE:  Yes, Judge.

7            THE COURT:  All right.  Summary of indictment?

8            MR. JACKSON:  That's fine for us, your Honor.

9            MR. BOVE:  Judge, on page 20, the first full paragraph

10   summarizing Count One of the indictment.  We would ask that the

11   references as to five kilograms or more in describing both

12   objects be stricken in light of the parties' agreement and

13   consistent with the proposed verdict form.

14           MR. JACKSON:  Your Honor, I think that the discussion

15   that we had was about the instruction with regard to the

16   quantity determination.  The indictment is going back to the

17   jury anyway.  They always should see what the indictment

18   actually charges.

19           THE COURT:  I'm reading now what's in the indictment.

20           The indictment -- where in the indictment does it say

21   five kilos, Mr. Jackson?

22           MR. BOVE:  Your Honor, I believe the way the

23   indictment is structured is there is a paragraph describing --

24   there are paragraphs describing the two objects of the

25   conspiracy in a way that's consistent with the verdict form.

GBG9FLO7

And then there's a following paragraph that says in substance
the offense is alleged to have involved five or more kilos.  We
could, and I believe should, redact that part of the indictment
if we're going to have an agreement that the quantity at issue
is not going to the jury and that the defendants admit that
that paragraph is accurate.  If that's not the case, then maybe
Mr. Jackson and I need to discuss further whether we have an
agreement.

          MR. JACKSON:  I respectfully believe that that's just
not accurate, Judge.  The instructions as your Honor has them
written now appropriately instruct the jury that they -- that
the defendants have admitted that if there was a conspiracy,
that it involved five kilograms or more.  And so there is no
real question on quantity.

          This is the part that is in literally every single
charge, including every charge in a drug case, where the Court
just recites what's actually in the indictment.  And I think
it's your Honor's practice to actually send the indictment
back.

          THE COURT:  I think that's what I'm going to do,
Mr. Bove.  I mean literally it's accurate.  That's what the
indictment says.  They're going to have the indictment.

          MR. BOVE:  Judge, I respectfully disagree.  The
indictment does not refer to five kilos in the paragraphs
charging the objects, I don't believe.  I don't have it in

GBG9FLO7

```
 1     front of me.
 2                 THE COURT:  I'll consider it overnight.  I think
 3     Mr. Jackson has the better of the argument.
 4                 But what do you want done, Mr. Bove?
 5                 MR. BOVE:  I believe that the references to five
 6     kilograms or more in the description of both objects should be
 7     stricken consistent with the parties' agreement if quantity is
 8     actually not an issue in this case.
 9                 And then the government would then submit a proposed
10     redacted indictment that redacts out the paragraph.
11                 THE COURT:  I think you better talk to Mr. Jackson
12     some more.  I'll reserve on this.
13                 We're up to page 20 now.
14                 MR. JACKSON:  Yes, your Honor.
15                 THE COURT:  Any problems with 20?
16                 MR. JACKSON:  We have nothing on 20, your Honor.
17                 THE COURT:  21.
18                 MR. JACKSON:  Nothing on 21.
19                 THE COURT:  22?  23?
20                 MR. JACKSON:  Nothing on 23, your Honor.
21                 THE COURT:  24?
22                 MR. BOVE:  I have something for 24, Judge.
23                 THE COURT:  Yes.
24                 MR. BOVE:  In the first full paragraph, the sentence
25     beginning, "If the government fails to prove beyond a
```

GBG9FLO7

1    reasonable doubt."  Consistent with the next paragraph, which

2    begins "with respect to the second object," we would ask that

3    that sentence be clarified that it's referring to the first

4    object.  So the language we would propose is to add "as to the

5    first object,".

6            MR. JACKSON:  I'm sorry.  I didn't follow that.  May I

7    I ask your Honor if Mr. Bove could repeat what he just said.

8            MR. BOVE:  In the sentence -- in the paragraph that

9    begins, "If the government fails to prove that either of the

10    charged objects," the second sentence we're proposing the

11    phrase, "as to the first object," and then leave the rest of

12    the sentence intact in order to be consistent with the

13    structure of the following paragraph which describes the second

14    object.

15            MR. RODY:  You're saying at the beginning of the

16    sentence?

17            THE COURT:  The beginning of the second sentence?

18            MR. RODY:  Could you read the way it would read?

19            THE COURT:  I guess it would read, "If the government

20    fails to prove that either of the charged objects of the

21    conspiracy was -- that either of the charged objects of the

22    conspiracy was an object of the conspiracy in which the

23    defendant participated, then you must find the defendant not

24    guilty -- that defendant as to first object, if the government

25    fails to prove beyond a reasonable doubt."  Right?

GBG9FLO7

| | |
|---|---|
| 1 | MR. BOVE:  Yes, Judge.  Thank you. |
| 2 | THE COURT:  What else do you have there, Mr. Bove? |
| 3 | MR. BOVE:  Nothing else on 24, your Honor. |
| 4 | THE COURT:  Mr. Jackson and Mr. Rody. |
| 5 | MR. JACKSON:  No, your Honor. |
| 6 | THE COURT:  25. |
| 7 | MR. JACKSON:  Nothing on 25. |
| 8 | MR. BOVE:  Your Honor, I think -- |
| 9 | THE COURT:  On 26. |
| 10 | MR. BOVE:  On 25, your Honor.  I'm sorry.  There's a |
| 11 | sentence that begins "But as I will instruct you, should you |
| 12 | find either defendant or both defendants guilty" and it refers |
| 13 | to a finding regarding a quantity of drugs involved in the |
| 14 | conspiracy.  I would propose that we just flag that for now |
| 15 | pending my further discussion with Mr. Jackson. |
| 16 | THE COURT:  Okay.  That's the last sentence in the |
| 17 | carryover paragraph, the top of page 25. |
| 18 | Now can we go back to page -- because I didn't make a |
| 19 | note of this.  We're going to include Mr. Gomez in paragraph D. |
| 20 | together with law enforcement witnesses?  Is that the |
| 21 | agreement? |
| 22 | MR. ZACH:  What page, Judge. |
| 23 | THE COURT:  Law enforcement witnesses are at page 10. |
| 24 | MR. RODY:  He may need his own sentence, Judge.  He's |
| 25 | kind of a category unto himself.  He's not exactly a law |

GBG9FLO7

1    enforcement witness.  He's someone who is an agent of the

2    government, certainly.

3            MR. BOVE:  Judge, if I could.

4            THE COURT:  He's not a cooperating witness either

5    though.

6            MR. RODY:  Correct.

7            THE COURT:  So where do you propose we put him?

8            MR. RODY:  I think he's fine to go --

9            THE COURT:  I'm happy to put him anywhere --

10           MR. RODY:  I'll resist.

11           THE COURT:  I mean in the charge.

12           MR. JACKSON:  This is fine, your Honor.  Law

13   enforcement witnesses.  I think --

14           THE COURT:  As long as you make reference to the fact

15   that he's being paid.

16           MR. JACKSON:  Exactly.  And that he received rewards

17   in connection with this.

18           THE COURT:  All right.  We're up to page 26.

19           MR. BOVE:  I have something, the second full

20   paragraph.

21           THE COURT:  Yes.  Go ahead.

22           MR. BOVE:  In describing the second object in

23   romanette two, the language reads "intending and knowing."  I

24   think consistent with the statute it should be "intending or

25   knowing."

GBG9FLO7

1        THE COURT:  What page are you on, Mr. Bove?

2        MR. BOVE:  26, second full paragraph.

3        THE COURT:  And what do you want -- what language do

4   you want?

5        MR. BOVE:  Strike the "and" between intending and

6   knowing and replace it with an "or."

7        THE COURT:  Where is that?

8        MR. BOVE:  Romanette two.

9        THE COURT:  What word do you want?

10        MR. BOVE:  "Or."

11        THE COURT:  Okay.  What changes do we have to make in

12   informants are not coconspirators?

13        MR. JACKSON:  Your Honor, I think we need to add

14   Mr. Gonzalez to the list.

15        THE COURT:  We have to strike --

16        MR. RODY:  I think you should leave CS-2 because he's

17   been discussed and he's on the videos.  He's in the meetings.

18        MR. JACKSON:  So I think all that really needs to

19   happen, your Honor, is that we add -- we strike the "and"

20   before Juan Gomez and add Mr. Gonzalez, Juan Gonzalez.

21        MR. BOVE:  Judge, I'm not sure that's right.  I'm

22   confused.  Mr. Gonzalez was not cooperating at the time of the

23   events that he testified about.  So he can be considered a

24   coconspirator.

25        MR. JACKSON:  Okay.  That's fine.  In that case we're

GBG9FLO7

1    fine with that.

2              THE COURT:  So I'm striking Juan Gonzalez.  I added

3    him in.  I'll take him out.  And I'll strike "add any others."

4              MR. BOVE:  The next sentence now being, "Since they

5    are agents of the government."  We think there's some ambiguity

6    around the role played by Sentado in the record right now,

7    including there have been arguments made about whether he was

8    following instructions and acting at the direction of the DEA

9    or outside of that authority.  So we would simply request here

10   that that language be changed to read, "Insofar as they were

11   acting as agents of the government."

12             MR. JACKSON:  Your Honor, there's is no --

13             THE COURT:  You think that makes a difference to the

14   jury?  "Insofar as" is different than "since"?

15             MR. BOVE:  I do, Judge, because it leaves them with

16   some discretion to look at that question.

17             MR. JACKSON:  I also don't think that as a legal

18   matter it matters.  It should be "since" because there

19   shouldn't be any ambiguity.  The defendants can't legally be

20   responsible for conspiring with CW-1 no matter what he was

21   doing.

22             THE COURT:  I'm going to leave it the way it is.

23             Okay.  We're onto page 27.

24             MR. RODY:  We have something at the top, the first

25   full paragraph starting with "The government must prove."  We

GBG9FLO7

would respectfully request that where it says, "and knowingly

entered into the conspiracy with a purpose to violate the law,"

that we add "of the United States."

        And then it says "and agreed to take part in the

conspiracy to further and promote and cooperate in its unlawful

objectives."  Can possibly change the "its" to "these" but I

think "its" is probably fine.

        THE COURT:  So after law I'll insert "of the United

States."

        MR. RODY:  Thanks.

        THE COURT:  You're welcome.

        Anything else on 27?

        MR. BOVE:  No, your Honor.

        THE COURT:  28?  29?

        MR. RODY:  One moment, Judge.

        MR. JACKSON:  On 29, yes, your Honor.  In the second

full paragraph.

        THE COURT:  Yes.

        MR. JACKSON:  There is a sentence which says, "It is

also irrelevant whether individuals acting at the direction of

the government introduced the concept of the drugs going to the

United States, as long as the defendant you are considering

then took a voluntary action in connection with the

conspiracy."  We have two requests related to that.  For one,

we understand the Court's ruling with regard to this particular

GBG9FLO7

```
 1    issue.  But we would submit that it's not irrelevant in that it
 2    shouldn't be a part of the analysis at all in terms of the
 3    court but, rather, I think it should say it is also:  It is not
 4    dispositive if individuals acting at the direction of the
 5    government introduced the concept of the drugs going to the
 6    United States as long as the defendant you are considering then
 7    took a voluntary action.
 8             So we would just ask that "irrelevant" be changed to
 9    "is not dispositive."
10             THE COURT:  Mr. Bove.
11             MR. BOVE:  Judge, I think that's fair to account for
12    the entrapment defense.
13             THE COURT:  Mr. Jackson's comment is fair?
14             MR. BOVE:  Yes, your Honor.
15             MR. RODY:  Judge, the language -- I'll wait until
16    you're done.
17             MR. JACKSON:  I just have one other thing.
18             And, your Honor, we would also respectfully request at
19    the end of that paragraph just one sentence that says:
20    However, you may consider a defendant's claim that he lacked
21    the ability to achieve the goals of the conspiracy in
22    determining whether he had the necessary intent.
23             THE COURT:  I'm not going to do that.
24             MR. JACKSON:  Thank you, your Honor.
25             THE COURT:  I don't think that's right as a matter of
```

GBG9FLO7

1   law.

2              MR. RODY:  Judge, in the same sentence.

3              THE COURT:  Yes.

4              MR. RODY:  In the first part -- the first clause where

5    it says "At the direction of the government introduced the

6    concept of the drugs going into the United States."  Instead of

7    going -- sorry, of drugs going to.  The language of the

8    indictment that we've been discussing all trial is importation.

9    So if we could say:  the concept of the drugs, I guess, being

10   imported into.

11             THE COURT:  Okay.  I'll make that change.

12             MR. RODY:  Thanks.

13             THE COURT:  Page 30.

14             MR. JACKSON:  So, your Honor, this is the big issue

15   for us.  And you know I just want to say it is very obvious to

16   us how much work the court put into getting an accurate charge,

17   and we are appreciative of that.  The conscious avoidance

18   issue, obviously we put in another submission on this issue.

19   We really do believe, your Honor, that this is a situation

20   where it is -- it is cuts right to the core of what the

21   government's burden is to introduce a conscious avoidance

22   charge.  And we pointed out in the United States v. Umeh, Judge

23   Rakoff did not issue a conscious avoidance charge.  The

24   government did not press that.  Because when you take a look --

25   with full respect to everyone else, I've studied the statute a

lot.  This is the fourth importation trial I've worked on, and

I've really thought hard about this issue.  You can't -- the

law is so clear that you cannot consciously avoid the elements.

You can't consciously avoid the elements.  And there is no

logical way for us to separate out the fact that importation

into the United States and/or knowing that -- knowing and

intending that the drugs are going to the United States is part

of the conspiracy.  So when you add a conscious avoidance

charge you have antagonistic instructions that we're giving to

the jury.

            THE COURT:  Mr. Bove.

            MR. BOVE:  Judge, I think the Second Circuit is clear

on this; that we're permitted the instruction and the Court is

right to include it.  For example:  The government "need not

choose between an actual knowledge and a conscious avoidance

theory."  U.S. v. Ferguson, 676 F.3d at 278.  There's

additional authorities specifically in the context of 963

cases.  We think the Court's charge is appropriate.

            THE COURT:  I'll read the cases again, Mr. Jackson.

But I think this is an accurate statement of the law.

            MR. RODY:  Judge.

            THE COURT:  Yes, Mr. Rody.

            MR. RODY:  Let me go -- Mr. Jackson is going to talk

about the law which he's much more expert on.  My concern is of

juror confusion.  Because these are very difficult issues for a

GBG9FLO7

1    a very experienced district judge and experienced counsel to

2    parse out what you can consciously avoid and what you have to

3    intend.  And I am very afraid that the jury is not going to get

4    it and they're going to think that if they sort of knew it

5    might be going to the U.S. but they didn't confirm it, then

6    that's where conscious avoidance fits in and they're going to

7    get convicted unlawfully.

8        And as Mr. Jackson just said, there do appear to be

9    antagonistic instructions.  In your Honor's own instructions

10   you say in the first paragraph:  One may not willfully --

11   sorry.  I'm in the wrong place.  One second.

12       It's in the second paragraph.  "It is logically

13   impossible for a defendant to join a conspiracy unless he knows

14   that a conspiracy exists."

15       And you say above that, that conscious avoidance, "it

16   does not apply when determining whether a defendant knowingly

17   participated in the conspiracy."  This is the heart of the

18   issue that Mr. Jackson is saying.  This conspiracy is an

19   into-the-U.S. conspiracy.  So they can't join it unless they

20   know and agree and intend that the drugs are going into the

21   U.S.  It can't be separated out into a second question.  And so

22   our -- my fear is that -- we're having difficulty figuring this

23   out.  The jury is never going to be able to do it.  They can't

24   join the conspiracy unless they intend to import into the

25   United States.  And this is inviting an improper verdict, I

GBG9FLO7

1    would suggest.

2            MR. JACKSON:  Your Honor -- I'm sorry.  I don't mean

3    to interrupt.

4            The sentence that we have the greatest problem with is

5    the third sentence in the second paragraph where it says "Thus,

6    for example, if you find that the defendants were aware of a

7    high probability that the conspiracy at issue in Count One was

8    to import cocaine into the United States, and the defendants

9    consciously avoided confirming that fact, you may infer that

10   they implicitly had that knowledge."  Now, we believe -- and we

11   really do believe, your Honor, that the conscious avoidance

12   charge shouldn't be given.  That sentence, your Honor, takes

13   this from problematic, very problematic to extraordinarily

14   problematic.  If there's anything that the Court would consider

15   excising, this is the thing that we would ask your Honor to

16   think very hard about removing because it's saying that if the

17   defendants were aware of a high probability that the conspiracy

18   was to import cocaine, then they are guilty.  Well it can't be

19   that they were -- that a high probability is enough because the

20   government has the burden of proving beyond a reasonable doubt

21   that they knew or intended that the drugs were coming to the

22   United States pursuant to the elements --

23           THE COURT:  Well, it's not just a high probability,

24   Mr. Jackson.  It's the defendants consciously avoided

25   confirming the fact.  And so we're not shifting from beyond a

GBG9FLO7

1    reasonable doubt to a high probability.

2            The defendants here, there's lots of evidence that

3    suggests that the drugs that were moving from Colombia via

4    Honduras through Mexico were destined for only one place and

5    that's the United States.  And so I think if the two defendants

6    knew that or believed it but then shut their eyes to it, I

7    think this is an appropriate charge and I think there's cases

8    in the Second Circuit that support that position.

9            So I will read again your papers.  And I will consider

10   it again.  Because you've told me how important it is.  So I

11   know that.  I know it's important.  I'll consider it.

12           Mr. Bove.

13           MR. JACKSON:  We appreciate that, Judge.

14           MR. BOVE:  Judge, I think you have these cases in

15   mind, but another Second Circuit case on the 963 issue that we

16   draw the Court's attention to is at 563 F. App'x 808.  I think

17   it's pretty squarely considering this issue and approving it.

18           THE COURT:  What year was that?

19           MR. BOVE:  2014.

20           MR. RODY:  Just to finish the record.  The sentence

21   that Mr. Jackson is reading, I completely agree is the terribly

22   problematic sentence.  And to us, speaking about how the

23   constructions are antagonistic, that sentence undoes all of the

24   good of the second clause of the first sentence of that

25   paragraph where it says, "It does not apply when determining

GBG9FLO7

1    whether a defendant knowingly participated in the conspiracy."

2    The "thus, for example" sentence undoes that.  I think it's

3    terribly confusing and, again, would invite --

4              THE COURT:  Mr. Rody, I don't mind your argument but

5    this is not made-up language.  This comes from a case in the

6    Second Circuit.  So I think it's the right charge.  Again, I

7    will read your submissions and carefully consider them.

8              MR. RODY:  Thank you, Judge.

9              THE COURT:  I guess you have a good objection to this

10   because you've certainly made the point.  But what's wrong with

11   this --

12             MR. RODY:  I just want to be sure you've got it,

13   Judge.

14             THE COURT:  I have it.  You've made it very clearly.

15             Okay.  We're still fighting over the special

16   interrogatory on drug type and quantity?

17             MR. JACKSON:  Your Honor, I respectfully don't think

18   we are.  I mean, again, we're now several hours away from

19   summation.  And at the end of the day no one has articulated

20   how there could be any possible prejudice to the government

21   while we've articulated enormous prejudice to us.  I think now

22   we have a concession that this is the right verdict form.  The

23   only question is what should appear here.  And so I think that

24   all -- everything on 31 through 33 until you get to venue comes

25   out.

GBG9FLO7

1          THE COURT:  I think -- I mean I really want to do what

2     you suggested, Mr. Jackson.  I think that makes sense.  And to

3     pick up on Mr. Rody's point about jury confusion.  I think that

4     the special verdict sheet where you get into drug type, drug

5     quantity, the weights and what happens of various different

6     weights is terribly confusing, and I very much prefer doing

7     what -- we have no special verdict sheet and the language that

8     is accompanying that.  You really should agree, Mr. Bove.

9          MR. BOVE:  Judge, I do.  Our concern the entire time

10    has been that there will then be arguments made to this jury

11    tomorrow relating to the one bag of cocaine on the 27th and

12    the suggestion that if you only find that that -- that it

13    involved that one kilo, then you can't find them guilty of this

14    conspiracy because the government has charged five.  If we're

15    not going to hear arguments tomorrow about five kilos and less

16    and those types of things, if we're not going to hear arguments

17    about drug quantity tomorrow, then I have no pause.  That is

18    the basis for the pause.

19          MR. JACKSON:  To be clear we're definitely not making

20    that argument.

21          Now, the second thing that he said about drug quantity

22    I don't know how broadly he's placing that, but as I think

23    should be clear, we are going to point out that there is no

24    800 kilograms ever discovered, but we're certainly not going to

25    say, you know, if you find that -- this kilo whatever.  The law

GBG9FLO7

 1   is instructed I think entirely accurately in your Honor's
 2   instructions that that's not the issue.
 3            MR. BOVE:  I don't think we have a problem, Judge.
 4            THE COURT:  Okay.  I'm going to go with the language
 5   at the bottom of page 30, carrying over to the top of page 31.
 6   The balance of 31 --
 7            MR. RODY:  Your Honor, I'm going to leave because
 8   Mr. Quigley has a head start on me and it's making me very
 9   anxious.
10            THE COURT:  All right.
11            MR. RODY:  Thanks very much.
12            THE COURT:  Thank you for your help, Mr. Rody.
13            MR. RODY:  Thanks, Judge.
14            THE COURT:  Before you leave I want to say how much I
15   appreciate the high quality of representation that you afforded
16   your clients.  I'm sorry that the public is not here to see me
17   recognize the quality of the advocacy here because it's been
18   very good and I appreciate it and I appreciate all the work
19   that you've done.  Now, go on and do some more work.
20            MR. RODY:  Thanks very much, Judge.
21            MR. JACKSON:  Judge, we appreciate that.  Also just
22   want to say we very much appreciate all the Court's patience
23   and consideration in this complicated case.
24            THE COURT:  You don't have to say that.
25            Okay we're up to venue?  Is there any problem with

GBG9FLO7

1    venue?

2            MR. BOVE:  No, your Honor.

3            THE COURT:  Entrapment?

4            MR. JACKSON:  No, your Honor.

5            MR. MANN:  Nothing from us, your Honor.

6            THE COURT:  I'm up to page 37, the concluding

7    instructions.

8            MR. JACKSON:  This is all fine for us, your Honor.

9            MR. MANN:  We're fine for 37, your Honor.

10           THE COURT:  If we could review scheduling for just a

11   second.  We'll start as soon as the jury arrives.  You know

12   this jury is from -- a lot of people from upstate and they have

13   trouble getting in in the morning.  So we haven't started at

14   9:30 yet.  I asked them to get in early.  You'll be an hour and

15   45 minutes, two hours?

16           MR. BOVE:  I expect that Mr. Quigley will be.

17           THE COURT:  Okay.  And then who is going next?

18   Mr. Rody or you Mr. Jackson?

19           MR. JACKSON:  Mr. Rody will go after Mr. Quigley.

20   And.

21           THE COURT:  See if it's two hours and a half-hour for

22   a break and another half-hour after -- you may not be finished

23   by tomorrow.

24           MR. JACKSON:  That's quite possible, your Honor.

25           THE COURT:  And that would be not something upsetting

```
 1   to you because then you'd still be speaking on Friday morning.
 2             MR. JACKSON:  That's true, your Honor.
 3             THE COURT:  This charge will take me about an
 4   hour-and-a-half to deliver.  So I won't be much -- so this will
 5   be in the hands of the jury by Friday afternoon.  Okay.
 6             MR. JACKSON:  Judge, can I ask what the plan is in
 7   terms of what you're going to serve the jurors lunch?  Is there
 8   a particular place that the Court usually orders from?
 9             THE DEPUTY CLERK:  It will be the cafeteria.
10             THE COURT:  The cafeteria.  The other alternative is
11   the Civic Deli?
12             THE DEPUTY CLERK:  No longer an option for us.  New
13   management.  New owner.  So the contract has to be reviewed.
14             THE COURT:  Do you miss working for the government,
15   Mr. Jackson?
16             MR. JACKSON:  You know some days, some days.  You
17   probably see me looking at Mr. Bove with a little bit of a
18   gleam in my eye.
19             THE COURT:  Okay we're reviewing the contract.  So
20   it's a downgrade in food supply.
21             MR. JACKSON:  Thank you, Judge.
22             THE COURT:  Thank you.  Anything else?
23             MR. BOVE:  No, your Honor.  Thank you.
24             THE COURT:  Thanks very much.
25             (Adjourned to November 17, 2016 at 9:30 a.m.)
```

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    CARLOS GONZALEZ

 4   Cross By Mr. Zach . . . . . . . . . . . . .1103

 5   Cross By Mr. Rody . . . . . . . . . . . . .1111

 6   Redirect By Mr. Bove . . . . . . . . . . .1121

 7   Recross By Mr. Rody . . . . . . . . . . . .1128

 8   Redirect By Mr. Bove . . . . . . . . . . .1130

 9    LEITH HABAYEB

10   Direct By Mr. Quigley . . . . . . . . . . .1130

11   Cross By Mr. Jackson . . . . . . . . . . .1136

12   JUAN GOMEZ

13   Direct By Mr. Bove . . . . . . . . . . . .1142

14   Cross By Mr. Mann . . . . . . . . . . . . .1179

15   Cross By Mr. Zach . . . . . . . . . . . . .1197

16   Redirect By Mr. Bove . . . . . . . . . . .1202

17   Recross By Mr. Mann . . . . . . . . . . . .1206

18    KEVIN JAMES CORCORAN

19   Direct By Mr. Quigley . . . . . . . . . . .1215

20   Cross By Mr. Jackson . . . . . . . . . . .1219

21    PETER CALABRESE

22   Direct By Mr. Bove . . . . . . . . . . . .1221

23   Cross By Ms. Espinosa . . . . . . . . . . .1240

24   Cross By Mr. Jackson . . . . . . . . . . .1242

25
```

```
 1                    INDEX OF EXAMINATION CONTINUED

 2   Examination of:                              Page

 3   EMMA ROSEN

 4   Direct By Mr. Jackson  . . . . . . . . . . .1251

 5   Cross By Mr. Bove  . . . . . . . . . . . . .1254

 6                       GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    701   . . . . . . . . . . . . . . . . . . .1224

 9    702 through 714   . . . . . . . . . . . . .1226

10    700A   . . . . . . . . . . . . . . . . . . .1238

11    715   . . . . . . . . . . . . . . . . . . .1239

12                       DEFENDANT EXHIBITS

13   Exhibit No.                              Received

14    3513-07-R   . . . . . . . . . . . . . . . .1113

15    341   . . . . . . . . . . . . . . . . . . .1246

16    326   . . . . . . . . . . . . . . . . . . .1249

17    334 through 339   . . . . . . . . . . . . .1252

18

19

20

21

22

23

24

25
```