

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
+1 212 839 5300
+1 212 839 5599 FAX

AMERICA • ASIA PACIFIC • EUROPE

December 1, 2017

**By ECF and Electronic Mail**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Chambers 1350
New York, NY 10007

     Re:   <u>United States v. Campo Flores & Flores de Freitas</u>, S5 15 Cr. 765 (PAC)

Dear Judge Crotty:

     We represent defendant Franqui Francisco Flores de Freitas ("Flores") in the above-captioned matter and respectfully submit this letter for the Court's consideration in connection with Mr. Flores's sentencing, currently scheduled for December 14, 2017. This letter is Mr. Flores's second submission in advance of sentencing, following his brief addressing various Sentencing Guidelines issues, filed jointly with Mr. Flores's co-defendant, Efrain Campo-Flores ("Campo"), on August 25, 2017. (Defs.' Joint Initial Sentencing Submission in Opp'n to the Guidelines Calculations in the Presentence Report, Dkt. No. 178). Mr. Flores respectfully submits that an analysis of the Section 3553(a) factors in his individual case compels the Court to impose a sentence no greater than the ten-year mandatory minimum term required under 21 U.S.C. § 841. Any additional amount of imprisonment would be "greater than necessary" to fulfill the purposes of sentencing in this case.

## I.    INTRODUCTION

     Mr. Flores was convicted after trial of conspiracy to import into the United States, or to manufacture and distribute, knowing and intending that it would be imported into the United States, five or more kilograms of cocaine. The nature and circumstances of the crime at issue—a "dry" sting operation where the Government recovered no drugs; where there is no allegation that the Defendants engaged in any violence in connection with the offense; and where the Government has no proof that the Defendants have ever successfully distributed a single gram of drugs to anyone anywhere, much less into the United States—warrant a sentence far lower than

Sidley Austin (NY) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 2

the Government's requested sentence of "not less than 30 years." (Gov't Sentencing Mem., Dkt. No. 180, at 6).

In addition, Mr. Flores's personal history and characteristics also justify a much shorter sentence, again, no greater than the mandatory minimum. Mr. Flores rose from tragic childhood circumstances to become a devoted, responsible, and caring father for his nine-year-old son. He has also made many positive contributions to his community, as evidenced by the letters of support attached hereto as exhibits. Further, Mr. Flores has been a model inmate at the Metropolitan Corrections Center ("MCC"), incurring no disciplinary infractions and earning the acknowledgment of his prison guards. Despite the daunting circumstances he has faced and continues to face, Mr. Flores has persevered, has learned from his prior actions, and is determined to make the best of a difficult situation. Accordingly, Mr. Flores's personal history and characteristics likewise make clear that the ten-year mandatory minimum term would be sufficient, and not greater than necessary, to accomplish the goals of sentencing.

## II. APPROPRIATE CONSIDERATION OF SECTION 3553(a) FACTORS

The Supreme Court has instructed that, after determining the applicable Guidelines range, a court should "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the [applicable guideline range] with reference to the latter." *Nelson* v. *United States,* 555 U.S. 350, 351 (2009). The "lodestar" of this analysis is "the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary to comply with' [those] factors." *United States* v. *Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (citation omitted). This clause mandates that a court consider "the nature and circumstances of the offense and the history and characteristics of the defendant" in imposing a sentence. 18 U.S.C. § 3553(a)(1).

Applying the statutory sentencing factors here, we respectfully submit that imposing either the Guidelines sentence of life imprisonment or the Government's requested sentence of 30 or more years would be grossly disproportionate to the crime, manifestly unjust in light of Mr. Flores's personal circumstances, and substantially in excess of what is required to accomplish the goals of sentencing. For all of these reasons, we respectfully submit that the appropriate sentence under the 3553(a) factors is the mandatory minimum term of ten years.

### A. The Nature and Circumstances of the Offense

At the October 3, 2017 sentencing hearing, this Court found by a preponderance of the evidence that the offense involved more than 450 kilograms of cocaine and applied a base offense level of 38. (Sentencing Hearing Transcript, Dkt. No. 184, at 7). The Court thereafter applied a two-level enhancement for possession of a weapon in connection with the conspiracy (*id.* at 16), a two-level enhancement for use of an aircraft in connection with the conspiracy (*id.*

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 3

at 24), and a two-level enhancement for Mr. Flores's role as a leader, organizer, manager, or supervisor of the conspiracy (*id.* at 52).  The Court rightfully rejected the Government's requests to apply two-level sentencing enhancements for use of violence or threatened use of violence in connection with the conspiracy (*id.* at 20), bribery (*id.* at 37-38), and obstruction of justice (*id.* at 56).  As a result of this Court's rulings, the total offense level is 44.  While we disagree with the application of the enhancements for possession of a weapon, use of an aircraft, and aggravated role, we accept—for purposes of this letter—that the resulting offense level is 44, which would call for an advisory sentence of life imprisonment.

While the Government recognizes that the Guidelines sentence of life in prison would be completely inappropriate in this case, the Government nonetheless still explicitly seeks a "substantial sentence of not less than 30 years."  (Gov't Sentencing Mem., Dkt. No. 180, at 6).  But such a sentence is almost equally inappropriate in these circumstances, and would amount to all but life for Mr. Flores—or at least the vast majority of his adult life—given that he is now 32.  This is especially so inasmuch as Mr. Flores will be serving his sentence likely a thousand or more miles away from his family and his now nine-year-old son, making anything approaching regular family visits impossible.

The excessively harsh and punitive nature of the Government's requested sentence is even more evident in light of the following particular facts established by the evidence in this case, each of which—we believe—is undisputed by the Government.  First, the Government recovered no drugs in this case; indeed, there is no proof that the Defendants ever actually possessed the 800 kilograms of cocaine that they were supposedly going to transport to Honduras.  Second, the Defendants engaged in no acts of violence in connection with the charged crime.  Third, the Government has no evidence that the Defendants have ever actually distributed a single gram of cocaine to anyone, anywhere, much less into the United States.

Each of these facts distinguishes this case from the typical drug case in this District, but none more so than the last.  Specifically, in most drug cases there is evidence—in the form of cooperator testimony, seizures, recordings, admissions, etc.—establishing that the defendants distributed drugs in the past.  Indeed, in most drug conspiracy cases there is proof of a continuing course of conduct, that is, of repeated actual narcotics trafficking over a period of time that often extends over many months if not years.  Even in other "sting" cases, there is typically proof that the targets had previously engaged in actual drug dealing.  Yet here, there is no such proof.  At best, the Government showed that the Defendants attempted to do a prior drug deal with some Mexicans in or about August or September 2015; but according to the Government's own evidence the supposed deal never went through.  (*See* Gov't Sentencing Mem., Dkt. No. 180, at 22-23) (referencing "*efforts* to send drugs to Mexico") (emphasis added)).  This fact alone renders the instant case an extreme outlier.  More importantly, this fact makes clear the truly extraordinary and inappropriate nature of the Government's sentencing request—30 or more

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 4

years for individuals against whom there is no evidence of actual drug dealing, ever. In such circumstances, acceding to the Government's request would affect an extreme injustice.

In addition, the fact that this case was a sting operation orchestrated by the Drug Enforcement Administration ("DEA") is highly relevant to the determination of the appropriate sentence for the Defendants. In this regard, Mr. Flores adopts and incorporates by reference the arguments of his co-defendant, Mr. Campo, regarding the sentencing implications of the findings by several courts that sting operations, by their very nature, may amount to Due Process violations.[1] (Sentencing Letter of Efrain Campo Flores, at 4-7). But beyond such Constitutional issues, it is relevant and appropriate for the Court to consider that the DEA informants in this case orchestrated a fake drug deal for 800 kilograms of cocaine, and now the Government seeks to impose an extremely high sentence against the Defendants that is driven overwhelmingly by the quantity set for that fake drug deal. While the Government appears to claim that it was the Defendants who determined the amount of the deal (Gov't Sentencing Mem., Dkt. No. 180, at 25-26), the Defendants strongly dispute any such characterization, especially given that Government informants made no recording of (nor collected any other evidence except a single still photograph from) the Defendants' initial meeting with El Sentado, where the deal was first discussed. In any event, there can be no question that the evidence fails to establish even by a preponderance that it was the Defendants, and not the informants, who set the amount of the supposed drug deal.

The unfairness of these circumstances is magnified by the fact that the informants who did the orchestrating in this case were two of the most corrupt such persons imaginable. It is relevant and appropriate for the Court to consider that, as of the time of the charged conspiracy, the informants who set up the Defendants here had been lying to the DEA and the U.S. Attorney's Office for years, had been engaging in actual drug deals while getting paid handsomely as DEA informants for years, and were far bigger drug dealers, by their own admission, than the Defendants ever dreamed to be. It is likewise relevant and appropriate for the Court to consider that the conduct of the Government's informants was so outrageous and improper in this case that the Government was constrained from even calling one of the informants ("CS-2") as a witness during the trial, and that the Government felt compelled to notify the other informant ("CS-1"), its star witness, in front of the jury that his cooperation agreement was being ripped up and that he would receive no 5K1.1 letter—an event so extraordinary that counsel for Mr. Flores has never heard of it occurring previously in 20 years of criminal practice in this courthouse.

Finally, in determining the appropriate sentence here, Mr. Flores respectfully submits that he should receive no penalty or increase for having exercised his Sixth Amendment right to trial,

---

[1] Mr. Flores adopts and incorporates by reference all of the arguments of his co-defendant, Mr. Campo, to the extent that they are not inconsistent with his own.

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 5

especially since the Government essentially gave him no choice.  Specifically, prior to trial, when the Defendants asked the Government for its best plea offer, the prosecutors responded with a *Pimentel* letter that calculated the Defendants' Guidelines offense level as 54, eleven levels above mandatory life imprisonment on the Guidelines sentencing grid.  Faced with such an outrageous Guidelines calculation by the Government, the Defendants had no realistic option but to go to trial.  Accordingly, in the Court's determination of sentence, Mr. Flores should suffer no penalty for the failure to accept responsibility by pleading guilty, pursuant to U.S.S.G. § 3E1.1.

      B.      Mr. Flores's History and Characteristics

Mr. Flores's personal history and characteristics, including a traumatic childhood and other difficult life experiences, also weigh significantly against an extended sentence.  Mr. Flores's mother died when he was eight years old and he thereafter suffered harsh physical and emotional abuse from his alcoholic father, who often threw Mr. Flores and his sister out of their home.  Despite these challenges, Mr. Flores persevered and worked to overcome this childhood trauma.  He obtained employment at a very young age to help support his family, stayed out of trouble with the exception of the last few months before his arrest in this case, and became the father that his father never was.  Even during his imprisonment here he has worked to learn and improve himself, and has been a model inmate.  He has not given up on leading a productive life, and he is still looking toward the future.

Mr. Flores was born in Caracas, Venezuela on August 14, 1985.  His mother died of breast cancer when Mr. Flores was only eight years old, depriving him of a warm and loving mother.  (PSR ¶ 143).  The loss of his mother affected Mr. Flores profoundly during his youth, has been the source of much anguish (and some therapy) throughout his life, and still affects him to this day.

Following his mother's death, Mr. Flores and his sister lacked a stable, loving home.  They lived intermittently with their father, their maternal grandmother, and their uncle.  (PSR ¶ 143).  The siblings' mental, physical, and economic well-being depended on the whims of their father, who subjected Mr. Flores and his sister to serious abuse.  (PSR ¶ 142-43).  Their father had a violent temper that flared even at the typical behavior of a child, such as eating too much food from the refrigerator, refusing to eat, or mildly misbehaving.  (PSR ¶ 142-43).  As punishment, he often kicked the two out of the house, leaving them at the mercy and kindness of their relatives, until he decided to bring them home again.  (PSR ¶ 142-43).  As a result, Mr. Flores and his sister had a very unstable childhood and lacked a safe and reliable home.  What is more, their father's alcoholism caused him to regularly beat and verbally abuse Mr. Flores and his sister.  (PSR ¶ 144).  The children usually turned to their maternal grandmother when their father threw them out.  It was not until age 12, when Mr. Flores temporarily lived with his uncle

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 6

for three months, that he first saw what it was like to be part of a loving nuclear family. (PSR ¶ 143).

In addition to the abuses Mr. Flores suffered while under his father's care, he faced significant financial hardship.[2] Mr. Flores's maternal grandmother was poor and struggled to make ends meet. (PSR ¶ 144). This meant that, sometimes, his grandmother could not afford food for Mr. Flores and his sister, and they went hungry. (PSR ¶ 144). During these difficult times, Mr. Flores's sister did her best to take care of him. She acted as Mr. Flores's surrogate mother by cooking for him and helping him with homework. (PSR ¶ 144). Eventually, however, Mr. Flores's sister moved away because she could no longer tolerate their father's abuse. (PSR ¶ 145). These conditions made it difficult for Mr. Flores to continue his education and he dropped out before finishing high school. (PSR ¶ 156).

Mr. Flores's father continued his abusive behavior well into Mr. Flores's young adulthood. When Mr. Flores was 18, his father beat him and kicked him out of the home for the last time after he bought a new car. (PSR ¶ 145). With nowhere else to go, Mr. Flores slept in the car until a friend gave him a temporary place to live. (PSR ¶ 145). When a family friend heard about what had happened, he offered to sell Mr. Flores a house, which Mr. Flores accepted. (PSR ¶ 145). Mr. Flores gave his car as the down payment for the home and he moved there with his then-girlfriend (who later became the mother of his child). (PSR ¶ 145).

Despite his painful and unstable childhood, Mr. Flores's kind and responsible nature shone brightly throughout his life. When Mr. Flores began working, and despite his financial hardships, he gave his earnings to his grandmother to help support the family. (PSR ¶144). In her letter to the Court, Mr. Flores's sister explains that he began working at age 12, serving as an assistant on a truck, in order to help their father cover their living expenses. (*See* Ex. C; PSR ¶ 158).[3] At age 17, he began working as a cell phone store messenger in Caracas. He held many other jobs along the way. (Ex. C). As one of the letters to the Court describes, Mr. Flores "set up a repair shop for cellular equipment, working seven days a week." (*See* Ex. F). In the cell phone store, he had three workers under his supervision and paid the store's rent and kept "customers satisfied with prompt and reputable service." From 2012 until the time of his arrest, Mr. Flores worked as a car salesperson and owned a food distribution company with his friend and roommate. (PSR ¶ 157). Mr. Flores's persistent hard work shows his resolve to provide for his family.

---

[2] To be clear, although Mr. Flores's aunt, Cilia Flores—his father's sister—was a civil rights lawyer and prominent politician in Venezuela even when Mr. Flores was young, Mr. Flores and his sister were not close with Cilia Flores and did not receive any financial assistance or benefits from her.

[3] As the original letters of support are in Spanish, quotes are from English translations of the letters.

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 7

Mr. Flores's girlfriend lived with him from 2003 until their relationship ended, amicably, in 2010. (PSR ¶ 146). In her letter to the Court, Mr. Flores's former girlfriend asserts that Mr. Flores was a loving and supportive partner, who helped her pay for her higher education. (Ex. A). She credits Mr. Flores with enabling her to become a Public Accountant. (Ex. A). As indicated, Mr. Flores and his former girlfriend have a child together who is now nine years old. (Ex. A).

By all accounts, Mr. Flores has been an exemplary father to his son. Before the arrest, he always provided for his son financially and was a warm and loving father. Even after they separated, Mr. Flores and his son's mother maintained a close friendship and worked together to parent their child. The boy's mother has only positive things to say about Mr. Flores, referring to him as "the greatest father in the world." (Ex. A). As the letter from his son's mother shows, Mr. Flores has exhibited the sort of ideal parental behavior that his own father lacked. Mr. Flores's "main goal in life is to form a large family, get married, and grow old surrounded by the people he loves the most." (Ex. A). In fact, right around the time that Mr. Flores's son was born, when Mr. Flores was approximately 23 years old, he took proactive steps to address the prior abuse he had experienced at the hands of his own father to avoid perpetuating any of those behaviors in his own family. He visited a psychologist to discuss the abuse he suffered and his corresponding feelings of resentment. (PSR ¶ 153). Through these sessions, Mr. Flores learned to cope better with his emotions toward his father.

When Mr. Flores and his former girlfriend separated amicably, Mr. Flores allowed her and their son to remain in their family home while Mr. Flores moved to live with his friend and business partner. (PSR ¶ 145). Mr. Flores lived with his friend in a rental apartment up until his arrest in this case. (PSR ¶ 145).

Prior to his arrest Mr. Flores maintained an active presence in his son's life and saw him every day. In August 2015, for example, Mr. Flores and his son traveled to the United States on a tourist visa and visited Universal Studios in Orlando. As his son's mother explains, "[Mr. Flores] has never been apart from his son, despite the fact that he and I split up as a couple. He has always been there for our son, providing him with all the support, love, affection, values, and upbringing that he could." (Ex. A). Mr. Flores's son himself expresses that his father has taught him the values of respect, patience, and responsibility. (*See* Ex. B). Mr. Flores shared weekends with his son, took his son to sporting events, picked his son up from school every afternoon, encouraged his son to face difficult situations, and provided his son with the attention and love that every child should receive from his parent. (Ex. B). They traveled together, and his son visited Mr. Flores's place of work whenever he could. (Ex. B). Mr. Flores's son explains that he misses his father a lot and that his "greatest desire is to have him back soon and catch up on all of the time that [they] have been separated." (Ex. B).

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 8

Mr. Flores also displays kindness to other relatives and members of his community. In a joint letter of support, Mr. Flores's relatives, including his maternal grandmother, refer to Mr. Flores as a man with a big heart who cares for his family and community with many small acts of kindness. (*See* Ex. D). They describe him as being well-liked by his bosses and coworkers and state that everyone holds Mr. Flores in high esteem. (Ex. D). The grandmother of his son writes that Mr. Flores helped her cover the cost of medicine for her mother, who suffers from arthritis, and her brother, who suffers from epileptic seizures. (*See* Ex. E). She also describes how Mr. Flores bought gifts for socioeconomically disadvantaged children during Christmas, a helping act emphasized in many of the letters in connection with this submission. (Ex. E).

With such a sad and difficult upbringing, it is remarkable that Mr. Flores has no history of violence nor any foreign or domestic record of arrest.[4] In this regard, we respectfully submit that Mr. Flores is a thoroughly atypical defendant in a narcotics conspiracy case in this District. It would be a manifest injustice for him to receive the same sentence as those who have a criminal history or who do not possess the same characteristics as Mr. Flores as a supportive, caring, respectful, and reflective young man.

Further, an unnecessarily long term of imprisonment would fracture Mr. Flores's relationship with his son. In particular, there is a great risk that Mr. Flores will be unable to see his son during his most formative years since Mr. Flores's son and his mother live in Venezuela, with limited financial resources to travel to the United States to visit him. (*See* Ex. A.). Mr. Flores will be prevented from having any sort of regular personal contact with his son during an important part of his son's childhood and development. In addition to the impact that this separation has and will continue to have on Mr. Flores, it is even harder for his young son.

Looking forward to life after his sentencing, Mr. Flores has committed to rehabilitating himself, becoming a productive member of society, and continuing to be a responsible, loving, and present father. Mr. Flores keeps in touch with his son as much as he can. He often draws elaborate (and quite good) pencil and ink drawings for his son as a measure of how much he loves and misses him. Mr. Flores attends church often and is currently studying English. He has also been a model inmate for the two years of his incarceration thus far. (*See* PSR ¶ 5 ("As verified through the BOP, SENTRY report, the defendant has no disciplinary data reported.")). His model service is all the more impressive given several challenges he has faced during his time in pretrial detention, including: (i) his confinement, without justification, in the Special Housing Unit ("SHU") several weeks before trial, during which he was denied access to basic

---

[4] The Sentencing Commission appears to have recognized that first time offenders should be even further distinguished from other defendants. The Commission has acknowledged that Criminal History Category I is insufficient to separate first-time offenders from other offenders in the same category. *See* Sentencing Guidelines for United States Courts, 82 Fed. Reg. 40651, at 40656 (Aug. 25, 2017). The proposed Chapter Four Guideline, §4C1.1, would provide first-time offenders with a one-level decrease if the offense level is 16 or greater. *Id.*

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 9

hygienic necessities like soap and toothpaste; and (ii) the fact that he was denied access to dental care, which caused a molar on the right side of his jaw to fall out. (*See* Transcript of Conference, Dkt. No. 95, at 8-12; *see also* PSR ¶ 152). When defense counsel have visited Mr. Flores at the MCC, the correctional officers have praised his behavior, and expressed surprise and confusion that Mr. Flores was in the SHU prior to trial. (Transcript of Conference, Dkt. No. 95, at 12) ("When he was put into the SHU, some of the correctional officers at the facility when we first went down there were amazed and were asking us, Why is he put in the SHU? They couldn't understand it because of the type of person that he is."). Looking at Mr. Flores's life as a whole, it is apparent that he is a good person who acted foolishly and that he greatly regrets his mistakes.

By age 18, Mr. Flores had suffered more trauma than many people experience in a lifetime. But throughout his life, Mr. Flores has been able to develop and maintain positive and nurturing relationships, including his close relationship with his son, his son's mother, and his other relatives. While Mr. Flores exercised bad judgment in this specific case, he has shown kindness and compassion that transcends his circumstances. This compassion, along with the continued support of his family, is what will enable Mr. Flores to endure the challenges ahead. Mr. Flores's history of kindness and compassion makes clear who he will be in the future, and this experience has made him a better decision-maker, able to exercise good judgment in times of need. There is a positive future ahead for Mr. Flores.

### C. The Need to Afford Adequate Deterrence to Criminal Conduct

Section 3553(a)(2)(A) of Title 18, United States Code, requires judges to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Gall v. United States*, 552 U.S. 38, 53 (2007). In accordance with this mandate, district courts consider general and specific deterrence when sentencing. In this regard, a ten-year sentence is more than sufficient to meet the purposes of general and specific deterrence, while a higher sentence would promote derision given Mr. Flores's history and characteristics, detailed above, and the need to avoid unwarranted sentencing disparities, discussed below.

Specific deterrence will be satisfied by a ten-year sentence. This is Mr. Flores's first offense and it did not involve violence or threats of violence.[5] Further, Mr. Flores has been a model inmate, which indicates that he understands the seriousness of his offense, is capable of conforming his conduct to the requirements of the law, and has already begun to rehabilitate himself. Most important of all, the letters attached hereto document how important and significant Mr. Flores's relationship with his son is for both of them. Being separated from his

---

[5] Data on recidivism indicates that "first offenders generally pose the lowest risk of recidivism." *See* U.S. Sentencing Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview, at 18 (2016).

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 10

son by thousands of miles for the last two years has been a terrible hardship and heartbreak for Mr. Flores.  The prospect of spending at least another eight years similarly apart from his son and other family members is devastating to him.  In short, a ten-year sentence is more than severe enough punishment to deter Mr. Flores from ever participating in a narcotics offense or any other crime again.

General deterrence will also be met through the Court's public announcement of a ten-year sentence and all that will entail—which in this case inevitably means a press release by the U.S. Attorney's Office and extensive media coverage.  This is especially true in light of the magnitude of the press interest in this case from its inception, including in particular the Latin American press.  From the outset of this case, the press has covered every conference, motion, hearing, or other event of interest.  Numerous articles have been written, videos have been posted, and the trial was covered extensively.  Given this intense press interest, there is no chance that the Defendants' sentencing will not receive similar coverage, again, particularly in Latin America.  All of this press coverage will be more than sufficient to demonstrate to any would-be narcotics traffickers in Latin America that there are very harsh penalties for drug trafficking activities that touch the United States.  In these circumstances, the possibility of spending ten years in a United States penitentiary will be more than sufficient to deter potential future bad actors.  No higher sentence is required.

### D. The Need to Avoid Unwarranted Sentencing Disparities

"Section 3553(a)(6) requires judges to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"  *Gall,*, 552 U.S. at 54.  Here, an assessment of the sentences imposed upon similarly situated defendants makes clear that a sentence anywhere close to 30 years would be so disproportionately severe as to undermine respect for the law and "promote derision," as the law would be "viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *Id.*

Indeed, our research into similar cases reflects that courts usually reserve sentences above the ten-year mandatory minimum for experienced narcotics traffickers who participated in a continuing course of actual drug dealing conduct, repeat offenders with prior narcotics arrests and convictions, and/or gang or cartel members typically engaged in extensive narcotics conspiracies that involved the use of firearms and violence.  (*See, e.g.* Judgment, *United States v. Cardona*, No. 1:11-CR-00349-01 (LAP) (S.D.N.Y. Feb. 23, 2016) (Dkt. No. 38) (imposing a 300-month sentence for defendant who was a member of La Oficina de Envigado, a Colombia-based narcotics trafficking organization, for 12 years prior to his arrest)).  By contrast, defendants involved in sting cases have often received sentences below the ten-year mandatory minimum, and those who had little criminal history and young children to support—like Mr. Flores—received substantial reductions below their Guidelines range.  In all events, the

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 11

comparator cases support Mr. Flores's argument that he should receive a sentence far below the Government's requested 30-year term, and that the mandatory minimum sentence would be sufficient to fulfill the purposes of sentencing in his case.

For example, in *United States v. Lobo*, the defendant was likewise convicted of conspiracy to import five or more kilograms of cocaine into the United States. (Sentencing Transcript of Fabio Porfirio Lobo, 15 Cr. 174 (LGS) (S.D.N.Y. Sept. 5, 2017), at 2). After applying a two-level weapons enhancement, a three-level managerial or supervisory role enhancement, a two-level enhancement for direct involvement in importation, and a three-level reduction for a guilty plea, the Court found that Lobo's total offense level was 42, based on the distribution of over 450 kilograms of cocaine to the United States. (*Id.* at 5, 21). At Criminal History Category I, this yielded a guideline range of 360 months to life. (*Id.* at 5-6). The facts regarding the charged narcotics trafficking activity, however, were starkly different from those in Mr. Flores's case. In particular, the amount of drugs that the Government alleged Lobo's organization had actually transported into the United States was 4.4 metric tons. (*Id.* at 8). Moreover, at the height of his involvement in the conspiracy, Lobo had personally escorted two loads of drugs with an aggregate quantity of 1.4 metric tons of cocaine via plane into Honduras. (*See* Press Release, U.S. Dep't of Justice, *Son Of The Former President Of Honduras Sentenced To 24 Years In Prison For Conspiring To Import Cocaine Into The United States* (Sept. 5, 2017)). The Court sentenced Mr. Lobo to 24 years, concluding that a sentence below the Guidelines was justified given that this was the defendant's first offense, that he had three young daughters, and that he was "very accomplished" as an attorney in the Honduras. (Sentencing Transcript of Fabio Porfirio Lobo, 15 Cr. 174 (LGS) (S.D.N.Y. Sept. 5, 2017), at 21).

The facts of Mr. Flores's case are far more sympathetic than those in Lobo's case. While Lobo's organization had actually transported some 4,400 kilograms of cocaine into the United States over a sustained period of time, there is no evidence that Mr. Flores and his co-defendant ever successfully distributed a single gram of cocaine anywhere, much less into the United States. Moreover, unlike Lobo, Mr. Flores never personally escorted a load of cocaine, much less 1.4 metric tons of it. Mr. Flores's characteristics and history however, are analogous to Lobo's. This is Mr. Flores's first offense (PSR ¶ 137), he has a young son aged 9 (PSR ¶ 146), and held stable employment prior to his arrest (PSR ¶ 157). Because Mr. Flores's involvement in actual drug trafficking was far less extensive than Mr. Lobo's, but his history shares many of the same mitigating factors, he should receive a sentence substantially lower than 24 years.

In *United States v. Cuero*, another case that was *not* a sting, the defendant pled guilty to manufacturing and distributing, and possessing with intent to manufacture and distribute, five kilograms or more of cocaine while abroad a vessel subject to the jurisdiction of the United States. (Judgment, 15 Cr.125 (PKC) (S.D.N.Y. Jan. 20, 2017) (Dkt. No. 33)). Specifically, Cuero was caught in a speedboat off of Colombia carrying 350 kilograms of cocaine that was

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 12

headed for the United States. (Sentencing Memorandum of the United States, 15 Cr. 125 (PKC), (S.D.N.Y. Jan. 17, 2017) (Dkt. No. 29), at 1). Critically, this was not Cuero's first drug-related offense. In September 2007, law enforcement arrested Cuero in connection with a seizure of 2.8 tons of cocaine, for which he served a 70-month federal sentence after admitting his involvement in "15 to 20" prior maritime drug-trafficking operations. (*Id.* at 2). The court sentenced Cuero to a below-Guidelines sentence of 144 months of imprisonment, despite Cuero's prior narcotics conviction and longstanding involvement in actual, high-level narcotics trafficking. (Sentencing Transcript of Gabriel Aguirre Cuero, 15 Cr. 125 (PKC) (S.D.N.Y. Jan. 20, 2017) (Dkt. No. 36), at 25-26). In imposing sentence, the court took into account Cuero's supportive family and the absence of violence in his offense. (*Id.* at 23-24). Mr. Flores's case includes those positive aspects (family and lack of violence), but Mr. Flores plainly warrants a lower sentence than Cuero because Mr. Flores has no prior convictions and there is no evidence that he has ever been involved in actual narcotics trafficking.

In *United States v. Djeme*, the defendant was found guilty of conspiracy to import "hundreds of kilograms" of cocaine into the United States following a sting operation similar to the one at issue here. (Sentencing Memorandum of the United States, 12 Cr. 972 (RMB) (Dkt. No. 35) (S.D.N.Y. Aug. 25, 2014), at 3). Djeme's total offense level of 37 and Criminal History Category of I resulted in a Guidelines range of 210 to 240 months. (Sentencing Transcript of Papis Djeme, 12 Cr. 972 (Dkt. No. 43) (S.D.N.Y. Sept. 3, 2014), at 44). Despite Djeme's key role in the conspiracy—his coconspirators relied upon his linguistic skills and naval experience in carrying out the conspiracy (*id.* at 9)—the court imposed a sentence considerably below the Guidelines range, sentencing Djeme to only 78 months of imprisonment. (*Id.* at 47). Djeme's co-defendant, Tchamy Yala, faced the same Guidelines range and likewise received a greatly reduced sentence, 60 months. (*See* Sentencing Transcript of Tchamy Yala, 12 Cr. 972 (RMB) (S.D.N.Y. Dec. 8, 2014) (Dkt. No. 50), at 24). This occurred despite the fact that Yala played an integral role in the conspiracy, attending the "overwhelming majority" of the planning meetings (at least ten) and performing "significant tasks essential to [the conspiracy's] successful culmination." (*Id.* at 7). Yala was also responsible for securing "huge quantities" of cocaine upon arrival in Guinea Bissau prior to it being exported to the United States (*id.*), coordinating vehicles to transport the cocaine, and purchasing two cisterns to store it (*id.* at 8). Further, Yala provided "physical security" to the conspiracy by bringing a weapon to the final meeting at which he was arrested. (*Id.*). In sentencing him to 60 months, the court emphasized Yala's family circumstances and the number of people that depended on him, notably his children. (*Id.* at 23). The parallels to the instant case are significant, given that both resulted from sting operations; that Mr. Flores, like Djeme and Yala, has no prior criminal history; and that Mr. Flores has a son and a strong family network that depend on him in Venezuela. Mr. Flores should receive a comparable sentence—or at least the lowest possible sentence given the mandatory minimum in his case.

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 13

In *United States* v. *Miller*, the defendant pled guilty to conspiring to distribute and possess with intent to distribute 1,000 kilograms and more of marijuana. (*See* Sentencing Transcript of Howell Miller, No. 12 Cr. 368 (PAC) (S.D.N.Y. June 26, 2014) (Dkt. No. 66), at 20). The PSR calculated an offense level of 34 and Criminal History Category III, which resulted in a Guidelines range of 188 to 235 months with a ten-year mandatory minimum term. (*Id.*). Miller's offense involved the distribution of between 10,000 and 30,000 kilograms of marijuana, which he evidently shipped by trailer from Arizona to Texas, all while on supervised release from prior cocaine and gun charges in the Eastern District of Virginia. (*Id.* at 6). The Court sentenced Miller to 144 months primarily due to his Criminal History Category, his possession of a firearm in relation to drug trafficking, and the fact that he committed the crimes at issue while under supervision. (*Id.* at 19). Unlike Miller, Mr. Flores has no criminal record (and therefore no supervision) and had no involvement in actual narcotics trafficking. Accordingly, the mandatory minimum term is more than sufficient in Mr. Flores's case.

In *United States v. Coke*, the defendant, the longtime leader of a Jamaica-based international drug and weapons trafficking organization, pled guilty to one count of racketeering conspiracy and one count of conspiracy to commit assault with a dangerous weapon in aid of racketeering. (*See* Press Release, U.S. Dep't of Justice, *Jamaican Drug Lord Christopher Michael Coke Sentenced in Manhattan Federal Court to 23 Years in Prison* (June 8, 2017)). For two decades, Coke served as the leader of the Shower Posse, which he "controlled through violence and intimidation" and "an army of 'soldiers'" he enlisted to do his bidding. (*Id.*). Under Coke's orders, members of the Shower Posse distributed cocaine, crack cocaine, and marijuana in New York, Miami, and Kingston Jamaica, sending him the proceeds as well as firearms obtained in the United States. (*Id.*). In return, Coke provided his soldiers with protection and assistance with their narcotics businesses. (*Id.*). The Shower Posse often engaged in violence. (*Id.*). In 2007, for example, Coke, agreed to assault a drug trafficker in the Bronx for failing to pay his drug debt to another member of the Shower Posse. (*Id.*). Coke's large-scale involvement in the drug trade resulted in his designation as a Consolidated Priority Organization Target ("CPOT") by the U.S. Department of Justice, a list that includes the world's most dangerous narcotics traffickers. (*Id.*). Despite his extensive involvement in narcotics trafficking, Coke was sentenced to 276 months of imprisonment. Mr. Flores, who has no such lengthy involvement in criminality, engaged in no actual drug dealing, used no violence in connection with his offense of conviction, and was not affiliated with—much less the leader of—a violent racketeering organization, should receive a sentence substantially lower than 276 months. (*Id.*). Indeed, whereas Coke is the archetype of a violent narcotics trafficking kingpin, Mr. Flores is the polar opposite—and his sentence should reflect the vast difference in culpability that separates them.

# SIDLEY

Hon. Paul A. Crotty
December 1, 2017
Page 14

### III.     CONCLUSION

For all of the reasons set forth above, Mr. Flores respectfully asks the Court to impose the mandatory minimum sentence of ten years, which appropriately reflects the actual facts and circumstances of the crime as well as Mr. Flores's personal history and characteristics. Any higher sentence would be greater than necessary to satisfy the purposes of sentencing.

Dated: December 1, 2017
New York, New York

                                                            Respectfully Submitted,

                                                            /s/ David M. Rody
                                        David M. Rody
                                        Michael D. Mann
                                        Elizabeth A. Espinosa

                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone:     (212) 839-5300
                                        Facsimile:       (212) 839-5599

                                        *Attorneys for Defendant Franqui Francisco*
                                        *Flores de Freitas*

cc:     All Counsel of Record