17-4039(L)
USA v. Campo Flores

1:15-cr-00765-PAC-1

1   UNITED STATES COURT OF APPEALS

2   FOR THE SECOND CIRCUIT

3   - - - - - -

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Apr 01 2020
```

4   August Term, 2018

5   (Argued:  January 24, 2019                    Decided:  December 20, 2019)

6   Docket Nos. 17-4039(L), 17-4141(Con)

7   _____

8   UNITED STATES OF AMERICA,

9                                           *Appellee*,

10                                          - v. -

11  EFRAIN ANTONIO CAMPO FLORES and FRANQUI FRANCISCO
12  FLORES DE FREITAS,

13                                    *Defendants-Appellants*.[*]
14  _____

15  Before:  KEARSE, JACOBS, and SACK, *Circuit Judges*.

16          Appeals  from  judgments  of  the  United  States  District  Court  for  the

---

[*]   The Clerk of Court is directed to amend the official caption to conform with the
above.

1    Southern District of New York, Paul A. Crotty, *Judge*, convicting defendants of

2    conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 963,

3    959(c), 960(b)(1)(B)(ii), and sentencing each principally to 216 months' imprisonment

4    plus a $50,000 fine.   On appeal, defendants principally contend (a) that the trial

5    evidence was insufficient to establish their knowledge that the cocaine was to be

6    imported into the United States, and that the court erred by instructing the jury that

7    that element could be satisfied on the basis of conscious avoidance; (b) that the

8    government failed to meet its burden with regard to their defense of entrapment; and

9    (c) that the court abused its discretion in various evidentiary rulings, including the

10   admission of lay opinion testimony identifying a substance as cocaine, the admission

11   of government agents' interpretations of certain statements made by defendants, and

12   the admission, on direct examination, of a government agent's written notes and

13   reports as his prior consistent statements as to defendants' postarrest statements.

14   Defendants also challenge their sentences, principally contending that enhancement

15   under Guidelines § 2D1.1(b)(3)(A), applicable when private aircraft "was used" to

16   import drugs, was error given that their conspiracy was thwarted prior to the

17   transport of any narcotics.   Finding no basis for reversal, we affirm the judgments.

18          Affirmed.

```
1              EMIL J. BOVE III, Assistant United States Attorney, New
2                      York, New York (Geoffrey S. Berman, United States
3                      Attorney for the Southern District of New York,
4                      Brendan F. Quigley, Won S. Shin, Assistant United
5                      States Attorneys, New York, New York, on the brief),
6                      for Appellee.

7              RANDALL W. JACKSON, New York, New York (John T.
8                      Zach, Boies Schiller Flexner, New York, New York,
9                      on the brief), for Defendant-Appellant Efrain Antonio
10                     Campo Flores.

11             MICHAEL A. LEVY, New York, New York (David M.
12                     Rody, Michael D. Mann, Elizabeth A. Espinosa,
13                     Melanie Berdecia, Sidley Austin, New York, New
14                     York, on the brief), for Defendant-Appellant Franqui
15                     Francisco Flores de Freitas.
```

16    KEARSE, *Circuit Judge*:

17              Defendants Efrain Antonio Campo Flores ("Campo") and Franqui

18    Francisco Flores de Freitas ("Flores") appeal from judgments entered in the United

19    States District Court for the Southern District of New York following a jury trial

20    before Paul A. Crotty, *Judge*, convicting them on one count of conspiracy to import

21    five or more kilograms of cocaine into the United States, *see* 21 U.S.C. §§ 963, 959(c),

22    960(b)(1)(B)(ii), and sentencing each principally to 216 months' imprisonment and a

23    $50,000 fine. On appeal, defendants contend principally (a) that the trial evidence

1     was insufficient to establish their knowledge that the cocaine in question was to be

2     imported into the United States, and that the court erred by instructing the jury that

3     that knowledge element could be satisfied on the basis of conscious avoidance; (b)

4     that, with regard to their defense of entrapment, the government failed to meet its

5     burden to prove disposition, and (c) that the court abused its discretion in various

6     evidentiary rulings, including the admission of a lay opinion identifying a substance

7     as cocaine, the admission of government agents' interpretations of certain statements

8     made by defendants, and the admission, during a witness's direct examination, of his

9     written notes and reports as prior consistent statements as to defendants' postarrest

10     statements.  Defendants also challenge their sentences, principally contending that

11     an enhancement under Sentencing Guidelines ("Guidelines") § 2D1.1(b)(3)(A),

12     applicable when a private aircraft "was used" to import narcotics, was error given that

13     their conspiracy was thwarted prior to the transport of any drugs.  For the reasons

14     that follow, we see no basis for reversal.

15     I.  BACKGROUND

16     According to the evidence at the nine-day trial in November 2016, taken

17     in the light most favorable to the government, the events at issue in this prosecution--

4

1    all of which took place in 2015--had their origin in the efforts of Campo and Flores,

2    nephews of Cilia Flores, the First Lady of Venezuela, to obtain large quantities of

3    cocaine from a Colombian supplier, and then to ship the cocaine from Venezuela to

4    drug traffickers in Honduras.  According to Campo, who from an early age was

5    raised by Cilia Flores and sometimes referred to her as his mother, defendants sought

6    to raise $20 million in drug proceeds in order to fund Cilia Flores's 2015 campaign for

7    a  position  in  the  Venezuelan  National  Assembly.    The  United  States  Drug

8    Enforcement Administration ("DEA") received word of their efforts and infiltrated

9    defendants' discussions.

10   A. *The Trial Evidence*

11           At trial, DEA Special Agent Daniel Mahoney gave general testimony as

12   an expert on "drug trafficking routes, particularly the routes used to move cocaine

13   from South and Latin America, the ways, manor [*sic*], means and method of

14   trafficking along those routes and the prices of cocaine along those routes."  (Trial

15   Transcript ("Tr.") at 542-43.)  He testified that approximately 90% of the cocaine sent

16   from South America into Central America is destined for the United States, and that

17   it is generally known among traffickers in the region that cocaine sent out of South

18   America and into Central America is headed to the United States.

5

1    The government's evidence with respect to Campo and Flores themselves

2    was presented principally through (A) the testimony of DEA Special Agent Sandalio

3    Gonzalez, together with his notes and reports as to defendants' statements following

4    their arrests; (B) the testimony of two witnesses--each a confidential source (or "CS")--

5    whose identities were protected by the use of the following pseudonyms: "Juan

6    Gomez" ("Gomez"), a DEA confidential source, and "Jose Santos-Pena"

7    ("Santos-Pena"), a former DEA informant; and (C) video and audio recordings of

8    meetings attended by Campo and/or Flores in Venezuela, Honduras, and Haiti,

9    electronic communications between Campo and Santos-Pena, and electronic

10    communications involving one or both of the defendants and other drug traffickers,

11    obtained from cellphones seized from defendants incident to their arrests.


12    1. *The DEA Learns of Campo and Flores, and Sends in the Spies*

13    Gonzalez, who coordinated much of the operation that led to defendants'

14    arrests, testified that the DEA's investigation of Campo and Flores began on October

15    3, 2015, when Gonzalez was contacted by Carlos Amilcar Leva Cabrera, a Honduras-

16    based drug trafficker known as El Sentado (or "Sentado"). Sentado was being

17    prosecuted on federal narcotics charges in the Southern District of New York and had

18    begun providing assistance to the DEA in an effort to obtain a cooperation agreement.

1    Prior to Sentado's contacting Gonzalez, the DEA had not been investigating Campo

2    or Flores and did not know who they were.  (*See* Tr. 172.)

3            Based on what Sentado told Gonzalez, Gonzalez instructed him to record

4    a meeting he was scheduled to have that day in Honduras with Campo and Flores--

5    using his cellphone, as the DEA would be unable to get unobtrusive recording

6    equipment to him in time.  Gonzalez also instructed Sentado to try to contact another

7    DEA cooperating person who was in Honduras, in order to provide a second witness

8    to the meeting with Campo and Flores; but Sentado was not able to get in touch with

9    that person.

10           Sentado attended the meeting but did not record it.  He later sent the

11   DEA a photograph of himself with, *inter alios*, Campo, Flores, and a Honduras-based

12   Colombian drug trafficker, Cesar Orlando Daza Cardona ("Daza"), also known as El

13   Flaco ("Flaco" (or "Flacco")), who had never provided assistance to the DEA.  Flaco

14   was the person who had introduced Campo and Flores to Sentado in their quest for

15   cocaine distributors.  (*See* Tr. 162-63.)

16           After hearing from Sentado, Gonzalez enlisted Santos-Pena, a former

17   member of the Sinaloa drug cartel and long-time DEA confidential source, to meet

18   with Campo and Flores in Venezuela posing as a Mexican drug trafficking associate

19   of Sentado.  Santos-Pena went to Venezuela in late October, accompanied by his son

1    (who was given the protective pseudonym "Jose Santos-Hernandez"

2    ("Santos-Hernandez")), a CS who also had previously worked with Gonzalez on

3    investigations.  Father and son had also jointly provided assistance to other DEA

4    offices, as well as to various local law enforcement departments.  For their trip to

5    Venezuela they were equipped with covert recording devices to document their

6    meetings with Campo and Flores.


7        2.     *Conversations Among Campo, Flores, and the DEA Confidential Sources*

8        a.     *Defendants' October 23, 26, and 27 Meetings With Santos-Pena*

9        Santos-Pena and Santos-Hernandez met with Campo and Flores on

10    October 23, 26, and 27 and made recordings of their three business meetings, which

11    were given to the DEA.  At trial, the government played portions of audio recordings

12    and of video recordings with synched English subtitles, and introduced translations

13    and transcriptions (with "..." denoting a pause, and the court explaining that "UI

14    stand[s] for unintelligible" (Tr. 614-15)).  The recordings and Santos-Pena's testimony

15    about these meetings included the following.

16        In the October 23 meeting, Campo said that defendants had gone to

17    Honduras to meet with Sentado some weeks earlier and had wanted "'to do

18    something as soon as possible'" (Tr. 612 (quoting (Government Exhibit ("GX") 203-T

1    at 4))--which Santos-Pena testified he understood to mean that Campo wanted to

2    "send a delivery of cocaine to Honduras" (Tr. 612)--but Campo complained about

3    difficulties in reaching Sentado because he occasionally "disappeared" (GX 203-T at 5);

4    Campo said "you can't disappear so long in this business" (*id*.).  Santos-Pena

5    explained to Campo and Flores that Sentado was "extremely cautious" and said "I'm

6    the person who buys everything from him... and I am the person who is responsible

7    for taking everything to the United States."  (GX 203-T at 6.)

8        Campo explained defendants' need for speed, stating that "my mom is

9    running for the election and I need . . . twenty million dollars," and "we need it by

10    December." (GX 203-T at 11.)  Santos-Pena responded that he had available "money

11    right now to put up and hand to you."  (*Id*.)  Campo said that because of Sentado's

12    failure to attend "meeting[s] over there, *I started to look around elsewhere*" (GX 203-T

13    at 10 (emphasis added)), which Santos-Pena testified he understood to mean that

14    Campo "was doing other drug deals with other people," *i.e.*, other than Sentado and

15    Santos-Pena (Tr. 615).

16        At that October 23 meeting, part of the discussion concerned how the

17    cocaine would be transported.  Santos-Pena explained that portion of the recording

18    as follows:

1          Q. Sir, do you see where you say, "Do you want [me to
2          send] a car for you or will you send a car?"

3          A. Yes, sir.

4          Q. What do you mean by "a car" there?

5          A. An airplane.

6          Q. To do what?

7          A. To send the drugs from Venezuela to Honduras.

8          Q. And do you see . . . where defendant Campo says, "I
9          told him I may have the possibility of providing the car?"

10         A. Yes, sir.

11         Q. Who do you understand defendant Campo to be
12         referring to when he uses the word "him" here?

13         A. Mr. Sentado.

14         Q. Do you see later in that same row where defendant
15         Campo said, "I had some cars and I was working with some
16         people over there from where you guys are from?"

17         A. Yes, sir.

18         Q. What did you understand defendant Campo to mean
19         when he said he had been working with some people over there
20         from where you guys are from?

21         A. He was referring to some Mexicans.

1         Q.  And what kind of work did you understand did he say

2         he was doing with them?

3         A.  Drug trafficking.

4  (Tr. 619-20 (quoting GX 203-T at 25).)  A defense objection to the last question and

5  answer was overruled.

6         As to the proposed airplane, Campo said "'it departs from here as if

7  someone from our family were on the plane.'"  (Tr. 626-27 (quoting GX 201-T at 39).)

8  Santos-Pena interpreted this as an assurance that the drug shipment would be one

9  "hundred percent safe," as it would depart on an airplane with an approved flight

10  plan and official permission to fly.  (Tr. 627.)

11         At that October 23 meeting, Campo also said he would ask his supplier

12  for a sample of the cocaine so that Santos-Pena could "'see what it's like.'"  (*Id*. at 632

13  (quoting GX 202-T at 10).)

14         At the meeting on October 26, the negotiations covered, *inter alia*, the

15  quantity of cocaine for defendants' first planned shipment, the possibility that

16  defendants would buy an airplane for future trafficking, the price to be charged by

17  Sentado for receiving and unloading the cocaine in Honduras, and how soon

18  defendants would be paid.  As to quantity, Santos-Pena stated: "[T]he thousand kilos,

1    or two thousand, or three thousand, or five thousand... whatever you'll be sending

2    me, we'll start with those thousand or eight hundred, whatever you can." (GX 206-T

3    at 28.)  Campo stated:  "Yes, let's get started right away . . . ."  (*Id.*)

4                On the tape Santos-Pena was heard to say "I'll keep putting money into

5    it until it gets to Mexico, and I keep putting money into it to get it over there, and I

6    keep putting money into it to get it in to the Americans, to cross it over, and I'm

7    taking all the risks, but this is the deal, when I do sell, I sell at a high price" (GX 206-T

8    at 22); he explained what certain phrases meant:

9            Q.  What did you mean when you said you keep putting
10               money into it to get it into the Americans?

11           A.  That I keep investing money to each kilo of cocaine in
12               order to cover more land and get to the U.S.

13           Q.  And what were some of the expenses that you would
14               need--you were referring to here?

15           A.  Transportation and safety.

16           Q.  And . . . right after the word "Americans" do you see
17               where it says "to cross it over"?

18           A.  Yes, sir.

19           Q.  What do you mean by, "cross it over"?

20           A.  To cross the U.S. border.

21   (Tr. 662-63 (quoting GX 206-T at 22).)

1       There was also discussion of a range of per-kilogram prices for cocaine

2   in Honduras.  (*See* Tr. 658, 661-62.)   Santos-Pena and defendants agreed that

3   Santos-Pena would pay them $10 million for the first planned shipment of 800

4   kilograms, with "50 percent," $5 million, to be paid in advance shortly before the

5   cocaine was to be flown by defendants to Honduras (Tr. 673; *see* GX 208-T at 14).

6       At the meeting on October 27, Santos-Pena was allowed to "test" a

7   sample of cocaine brought to the meeting by defendants "in order to see the quality."

8   (Tr. 680-81.) The government played portions of the video recording for the jury; and

9   over defendants' standing objection (*see* Part II.A.2. below), Santos-Pena narrated his

10  inspection of the "kilo of cocaine" brought to the meeting by defendants:

11          Q. Sir, what were you doing with the kilo of cocaine there?

12          A. I was checking it out to evaluate the quality and to make
13          sure that it was cocaine.

14          Q.  How were you doing that?

15          A.  I took a little bit with my hands.  I smelled it to see if it
16          smelled of cocaine.  I looked at the color to see what kind of color
17          it had.  I rubbed it a little on my hand so that it would release the
18          oils on my hand and see how much oil it would release.

19          . . . .

20          Q.  Where did you learn to do that test?

13

1     A.  In Mexico when I worked for the Sinaloa cartel.

2     . . . .

3     Q.  And based on that what conclusion did you come to?

4     A.  That it was cocaine and it was good quality.

5 (Tr. 692-93.)

6     The video also showed hands, identified by Santos-Pena as those of

7 Campo, "putting on latex gloves" before handling the sample, being careful "not to

8 leave his fingerprints on the kilo of cocaine" (Tr. 688-89), because "'one day it arrives

9 on the other side'" (Tr. 691 (quoting GX 210-T at 23)).  Santos-Pena testified that they

10 were discussing the scenario that "[t]hat kilo of cocaine that we were opening could

11 go over to the United States and that they might be full of our fingerprints, mine and

12 Mr. Campo's, and that . . . we could be arrested because of that kilo by an agency such

13 as the DEA."  (Tr. 691.)

14     Santos-Pena testified that after his inspection, the kilogram of cocaine

15 was then resealed, with his help, and secured by Campo.

16     b. *Campo's Ensuing Communications With Santos-Pena*

17     After Santos-Pena left Venezuela, he had further communications with

18 Campo via text messages.  On October 30, after receiving a text from Campo saying

1    he needed money urgently, Santos-Pena agreed to pay defendants in full in advance

2    of the actual cocaine shipment; and he agreed to pay them $11 million instead of

3    $10 million--the then-market value of the 800 kilograms in Honduras--with any

4    surplus applied to defendants' future shipments. (*See* Tr. 704-05 (discussing GX 301-T

5    at 11-12).) Santos-Pena and Campo also planned to have a test flight from Venezuela

6    to Honduras in early November so that defendants' pilots could "check the logistics."

7    (Tr. 703.)  In a text on November 5 or 6, Campo confirmed to Santos-Pena that the

8    plan to ship 800 kilograms of cocaine was on track:

9              Q.  Sir, do you see where Defendant Campo said:  Well, as
10             I was telling you, we have the chairs and the tables here already
11             packed for 800 people.  The ladder is all set and you guys are
12             ready to roll there.

13             A.  Yes, sir.

14             Q.  What do you understand the reference to 800 to mean
15             there?

16             A.  800 kilos of cocaine.

17   (Tr. 710 (discussing GX 306-T at 13).)


18             c.  *Flores's November 6 Meeting With Gomez*

19             In early November, Gonzalez had DEA confidential source Gomez travel

15

1   to San Pedro Sula, Honduras, posing as a representative of Santos-Pena.   On

2   November 6, Gomez and Sentado met with Flores (who was accompanied by his

3   bodyguard, Jesfran Josnel Moreno (*see*, *e.g.*, Tr. at 1148-49; GX 68; GX 106; GX 402-T

4   at 2)).   Gomez recorded the meeting, and the government introduced transcripts.

5   Gomez testified that, Flores, after hearing that Sundays are generally quieter at the

6   Honduras airport and thus preferable days for handling narcotics shipments, stated

7   that he expected the first shipment to be on Sunday November 15, and that

8   defendants would aim to have the plane land in the late afternoon.  (*See* Tr. 1161-64.)

9   Flores stated that the "'plane is coming totally clean'" (*id*. at 1163 (quoting GX 223-T

10  at 6)) from the "'president's hangar'" (Tr. 1159  (quoting GX 222-T at 18)), which

11  Gomez understood to mean that "the plane was coming from Venezuela without any

12  problem with the flight plan and everything was arranged in Venezuela" (Tr. 1163).

13              d. *Defendants' November 10 Meeting With Santos-Pena*

14              At the direction of Gonzalez, Santos-Pena arranged to meet Campo and

15  Flores in Port-au-Prince, Haiti on November 10--supposedly to hand them their up-

16  front $11 million, but actually to set up their arrests.  On November 10, Santos-Pena

17  met defendants at the airport in Haiti and drove with them to a restaurant at a hotel.

1    During the recorded discussion in the restaurant, defendants confirmed their plan to

2    send the first shipment of drugs from Venezuela to Honduras on November 15.

3    Santos-Pena testified that when he received a signal from Gonzalez that

4    the arrests were about to be made, he excused himself, telling defendants he was

5    "going to go up to one of the rooms to come down with the $11 million." (Tr. 718.)

6    Campo and Flores were then arrested by Haitian authorities coordinating with DEA

7    agents. Later that day, after a formal DEA request to Haiti for defendants' expulsion,

8    custody of Campo and Flores was transferred to Gonzalez and the DEA. Campo and

9    Flores were then flown to Westchester County in New York.

10       3. *Defendants' Postarrest In-Flight Statements to Gonzalez*

11   Gonzalez testified that Campo and Flores, after they had been provided

12   with advice-of-rights forms in Spanish and had acknowledged understanding their

13   rights, made various statements to him during the flight to New York. The interviews

14   had not been recorded electronically. In addition to Gonzalez's testimony as to

15   defendants' statements, the government introduced into evidence Gonzalez's notes

16   and reports of those statements, over defendants' objections (*see* Part II.A.1. below).

17   Gonzalez described the interviews, conducted with each defendant separately, as

18   follows.

1        Shortly after the plane took off, Campo, upon realizing that Gonzalez

2    spoke Spanish, inquired whether he could ask Gonzalez some questions.  Gonzalez

3    responded that they could talk after the plane leveled off and Campo had been made

4    aware of his rights; and they did.  Gonzalez took Campo to the front of the plane,

5    beyond hearing distance of Flores; Campo asked about the crime for which he had

6    been arrested.  Gonzalez testified that when he responded that Campo was charged

7    with conspiring to import narcotics,

8            [Campo] asked me what if someone went down the path to
9            commit a crime but then repented before committing the crime.

10            Q.  What did you understand Campo to mean when you
11          [*sic*] asked that question?

12            MR. JACKSON [Campo's attorney]:  Objection.

13            THE COURT:  Overruled.

14            THE WITNESS:  I understood him to be referring to the
15          specific cocaine transaction that he had been arrested to [*sic*] prior
16          to delivering cocaine.

17            . . . .

18            Q.  How did you respond to the question?

19            A.  I told Mr. Campo that . . . there were recordings of the
20          meetings; that he had traveled to Honduras, he had connected to
21          Venezuela, and he traveled to Haiti.

1   (Tr. 135.)   When Campo asked whether Gonzalez had actual recordings of the

2   meetings, Gonzalez responded by displaying on his cellphone an image taken from

3   an undercover video recording of the October 27 meeting in Venezuela attended by

4   Campo, Flores, Santos-Pena, and Santos-Hernandez, which showed Campo wearing

5   plastic gloves and holding a package of a white substance.

6   Gonzalez, when asked what, if anything, he had said to Campo about the

7   picture, testified as follows:

8   A.  I asked him who was the person in the picture.

9   Q.   How did Campo react when you asked him that
10  question?

11  A.  He hung his head and he said it is me.

12  Q.  Did you ask Campo anything else about the photo . . . ?

13  A.  Yes, I did.

14  Q.  What else did you ask him?

15  A.  I asked him what he was holding in the picture.

16  Q.  How did Campo respond?

17  A.  He said you know what that is.

18  Q.   What did you understand Campo to mean when you
19  said that?

19

1        MR. JACKSON:  Objection.

2        THE COURT:  Overruled.

3        . . . .

4        A.  I understood him to be referring to cocaine.

5    (Tr. 137.)

6        Gonzalez asked Campo where he had obtained the cocaine.  Campo

7    responded that an individual called "El Gocho" had provided him with the package

8    in the photograph.  Campo said he had been introduced to El Gocho by a man known

9    as "Hamudi."  Campo said that he did not know the actual names of either man but

10   he knew that Hamudi had recently been killed.

11       Campo said that it was El Gocho, with whom he had met about five

12   times, who was to have provided the 800 kilograms of cocaine for defendants' first

13   planned shipment to Sentado, and that El Gocho said the cocaine was "coming from

14   the FARC"--a reference to the Fuerzas Armadas Revolucionarias de Colombia, "a

15   Colombian paramilitary organization . . . known to be one of the largest producers of

16   cocaine in the world" (*id*. at 149).  When Gonzalez asked Campo how he was planning

17   to ship drugs out of Venezuela, Campo stated "he didn't need anybody's help to do

18   it, that he could do it because of who he was and the access that he had at the airport."

1     (*Id*. at 150.)  Gonzalez then asked Campo

2     why he got involved in this deal, in specific selling cocaine to a
3     Mexican who was going to be distributing the cocaine in the
4     United States.

5     Q.  How did Campo initially respond to that question?

6     A.  *Campo initially responded* that *he did not know* the drugs
7     were going *to the United States and that those words never came out*
8     *of his mouth.*

9     Q.  Did you reply to that?

10     A.  Yes, I did.

11     Q.  What did you say?

12     A.  I reminded him that there are recordings of his meetings
13     and that *he didn't necessarily have to say it himself but he knew* that
14     the Mexican individual had said that.

15     Q.  How did Campo respond after you told him that?

16     A.  He said, *yes, but . . . I didn't emphasize it.*

17     Q.  Now, a moment ago you referred to the Mexican.

18     A.  Yes.

19     Q.  That's somebody that Campo referenced during the
20     interview?

21     A.  Yes, sir.

1    Q. Who did you understand him to be talking about when
2    he said that?

3    A.   He was talking about the confidential source, Mr.
4    Santos Pena.

5   (*Id*. at 152-53 (emphases added).)

6   After this interview ended, Gonzalez took Campo to the back of the

7   plane and brought Flores to the front.   In the course of the ensuing interview,

8   Gonzalez

9    asked Flores how he had gotten in contact with the people in
10   Honduras, and he said that Hamudi introduced him to a man by
11   the name of El Flacco in Honduras.

12   Q. Did Flores provide any further identifying information
13   for the man he referred to as El Flacco?

14   A. Yes.

15   Q. What else did he say?

16   A. He said he was Colombian.

17   Q. Did Flores say anything else about Flacco's role?

18   A. Yes.

19   Q. What?

20   A. He stated that Flacco introduced him to El Sentado and
21   that El Sentado introduced him to the Mexican.

1  (Tr. 162-63.)

2         Flores stated he had gotten involved in the deal simply to make money;

3  that "the Mexican" would pay $12,000 per kilogram of cocaine; and that, on the

4  planned 800-kilogram shipment, Flores expected to earn $560,000 for himself.

5  Gonzalez testified:

6         Q.  And when Flores referred to the Mexican, who did you
7         understand him to be referring to?

8         A.  To our informant, Mr. Santos Pena.

9         Q.  Did you ask Flores about the intended destination for
10        the cocaine?

11        A.  Yes, I did.

12        Q.  What did you ask him?

13        A.  I asked Flores if he knew where the cocaine was going.

14        Q.  How did Flores respond?

15        A.  Mr. *Flores stated that the Mexican had told him the cocaine*
16        *was going to Mexico and then to the United States*, and *several cities*
17        *within the United States*.

18  (*Id*. at 161 (emphases added).)

19        Gonzalez also testified that each defendant stated that he was involved

20  in the cocaine enterprise for personal gain.  Campo said that friends had warned him

23

1    against being robbed, and that, as protection, he had fabricated the story about raising

2    money for the campaign of Cilia Flores.

3    　　　　4. *Other Evidence*

4    　　　　Among the other evidence presented by the government at trial were

5    numerous electronic messages between Campo and Flores or between one of them

6    and other persons, collected from the cellphones seized from defendants incident to

7    their arrests.  These included hundreds of messages in August and September of 2015,

8    *i.e.*, prior to any involvement by the DEA.  (*See* Part II.B.4. below.)

9    　　　　As to Santos-Pena, the government had brought out, during its direct

10   examinations of Gonzalez and Santos-Pena himself, that Santos-Pena was no longer

11   a DEA informant, having been prosecuted in 2016 for engaging in drug trafficking

12   while he was a DEA informant and for lying to the government.  As discussed in Part

13   II.B.1. below, defendants in cross-examination of Santos-Pena elicited that he had also

14   continued his illegal activities by communicating with drug trafficking contacts while

15   he was incarcerated and by lying about it when testifying in court.  In light of these

16   revelations, the government on Santos-Pena's redirect examination, in the presence

17   of the jury, terminated his cooperation agreement.

24

1        5. *The Defense Case*

2         Neither defendant testified at trial.  Their primary defense was to argue

3 that they lacked knowledge that the drugs at issue were destined for the United

4 States; that the only mentions of the United States came from government informants;

5 and that defendants were the victims of United States Government entrapment.  (*See*

6 Parts II.B.2.-II.B.4. below.)

7 B. *The Jury Instructions and the Verdict*

8         In instructing the jury, the district court, *inter alia*, set out the basic legal

9 elements of the charged conspiracy, explaining that the government was required to

10 establish beyond a reasonable doubt that there existed an agreement to import a

11 controlled substance into the United States, or to distribute a controlled substance

12 "intending and knowing that the controlled substance would be imported into the

13 United States," and that defendants knowingly and intentionally associated with and

14 joined in that charged conspiracy (Tr. 1492).  Over defendants' objections, the court

15 also instructed that the element of knowledge that the cocaine in question was to be

16 imported into the United States would be satisfied if the jury found that defendants

1    had consciously avoided knowing that it was to be sent to the United States (*see* Part

2    II.B.3. below).

3           The jury, after deliberating for less than a full day, found Campo and

4    Flores guilty.

5           Defendants moved for judgments of acquittal or, alternatively, for a new

6    trial.  The court denied those motions in an Opinion and Order dated March 24, 2017,

7    *see United States v. Flores*, S5 15 Cr. 765, 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017)

8    ("Posttrial Order").  Pursuant to the 2016 version of the Guidelines, the district court

9    sentenced each defendant principally to serve a 216-month term of imprisonment and

10   to pay a $50,000 fine.  (*See* Part II.C. below.)

11          These appeals followed.

12                              II.  DISCUSSION

13          On appeal, defendants--each adopting the arguments made in the other's

14   brief--contend  principally  (1)  that  the  district  court  erred  in  several  evidentiary

15   rulings; (2) that the evidence was insufficient to show (a) that they either knew the

16   drugs in question were to be imported into the United States or deliberately avoided

                                    26

1    gaining that knowledge, or (b) that their defense of entrapment was defeated by

2    predisposition; and (3) that the application of a sentencing enhancement for private

3    aircraft "used to" import drugs was inappropriate.  For the reasons that follow, we are

4    unpersuaded.

5

6    A.  *Evidentiary Challenges*

7              Defendants' principal evidentiary challenges are that the district court

8    erred in allowing Gonzalez's notes and reports as to defendants' postarrest statements

9    to be admitted during his direct examination, in allowing Santos-Pena to opine that

10   the sample substance proffered by Campo was cocaine, and in allowing Gonzalez and

11   Santos-Pena to testify as to how they had interpreted certain of defendants'

12   statements.  We review such rulings under an abuse-of-discretion standard.  *See, e.g.,*

13   *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997); *United States v. Caracappa*, 614

14   F.3d 30, 39 (2d Cir.), *cert. denied*, 562 U.S. 1075 (2010); *United States v. Kaplan*, 490 F.3d

15   110, 117-18 (2d Cir. 2007) ("*Kaplan*").  A district court abuses its discretion when "its

16   ruling is based on an erroneous view of the law or on a clearly erroneous assessment

17   of the evidence, or if its decision cannot be located within the range of permissible

18   decisions."  *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013) ("*Cuti*"), *cert. denied,*

1 135 S. Ct. 402 (2014).

2   An evidentiary ruling that is erroneous warrants a new trial only if it

3 affects a party's substantial rights. *See* Fed. R. Evid. 103(a) ("A party may claim error

4 in a ruling to admit or exclude evidence only if the error affects a substantial right of

5 the party . . . ."); *Kaplan*, 490 F.3d at 122. "A district court's erroneous admission of

6 evidence is harmless 'if the appellate court can conclude with fair assurance that the

7 evidence did not substantially influence the jury.'" *United States v. Al-Moayad*, 545

8 F.3d 139, 164 (2d Cir. 2008) (quoting *United States v. Garcia*, 291 F.3d 127, 143 (2d Cir.

9 2002)). "We reverse a district court's evidentiary rulings 'only if we find manifest

10 error,' that is not 'harmless.'" *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016)

11 ("*Lange*") (quoting *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010), *cert. denied*,

12 565 U.S. 933 (2011)), *cert. denied*, 137 S. Ct. 685 (2017).

13   1. *Gonzalez's Interview Notes and Reports*

14   Defendants' principal evidentiary challenge is to the admission, during

15 Gonzalez's direct examination, of his written notes and reports as prior consistent

16 statements. They argue both (1) that those documents were not proper rebuttal

17 because defendants did not mount an "*express* challenge" to Gonzalez's memory

1   (Flores brief on appeal at 42 (emphasis in original)) and did not claim a "*recent*

2   fabrication*" (*id*. at 37 (emphasis in original); *see also id*. at 28 (stating that defendants'

3   argument was instead that Gonzalez "*was motivated* by his desire for an eventual

4   conviction *to fabricate or embellish* the confessions *at the time of the interviews*"

5   (emphases added))); and (2) that the government should not have been allowed to

6   "introduce[] those hearsay documents on *direct* examination . . . before Agent

7   Gonzalez had been subjected to any cross-examination or impeachment" (*id*. at 29

8   (emphasis in original)).  Given the record in this case and the permissible uses of prior

9   consistent statements, we see no abuse of discretion in the court's ruling of

10  admissibility, either as to propriety or as to timing.

11         Preliminarily, we reject defendants' characterization of the notes and

12  reports as hearsay.  The Federal Rules of Evidence provide, in pertinent part, that "[a]

13  statement . . . *is not hearsay* [if] . . . [t]he declarant testifies and is subject to cross-

14  examination about a prior statement," and the statement

15         (B) is consistent with the declarant's testimony and is
16         offered:

17              (i) to rebut an express *or implied* charge that the
18         declarant *recently* fabricated it or acted from a *recent*
19         improper influence or motive in so testifying; *or*

29

1                        (ii) to rehabilitate the declarant's credibility as a

2                        witness when attacked *on another ground* . . . .

3  Fed. R. Evid. 801(d)(1)(B) (emphases added). Subpart (B)(ii) was added to Rule

4  801(d)(1) in 2014; it was accompanied by the observation that, while subpart (B)(i)

5  provided for the "substantive admissibility" of prior consistent statements "that were

6  offered to rebut charges of recent fabrication or improper motive or influence,"

7  subpart (B)(i) did not "cover consistent statements that would be probative to rebut

8  a charge of faulty memory." Fed. R. Evid. 801 Advisory Committee Note (2014). The

9  Note explained that

10                 [t]he intent of the amendment [adding subpart (B)(ii)] is to *extend*

11                 *substantive effect* to consistent statements that rebut other attacks

12                 on a witness--such as the charges of inconsistency *or faulty*

13                 *memory*.

14  *Id*. (emphases added). As "not hearsay," such statements are--subject to the usual

15  prerequisites such as relevance--admissible as proof of the substance of the statement.

16            The district court ruled that Gonzalez's notes and reports were

17  admissible under Rule 801(d)(1)(B) in light of defendants' opening arguments to the

18  jury. In those opening statements, defendants launched an attack on the

19  government's case based principally on the fact that their in-flight interviews were

20  not recorded, and they pointed out, *inter alia*, that the interviews had been lengthy

1    and had occurred more than a year prior to trial.  Thus, Flores's counsel stated "when

2    th[e] agent tells you *what he recalls of those hour-long statements a year later*, you will

3    have only his word for it without any way to verify what he is saying."  (Tr. 85

4    (emphasis added).)  Campo's opening likewise suggested that Gonzalez might not be

5    sure about "what was actually said" in the interviews.  (*Id*. at 60.)  Defendants also

6    suggested that Gonzalez had a motive to fabricate or embellish defendants'

7    statements because the DEA investigation had been "botched" (*id*. at 70) in various

8    ways, with the government learning "literally right before this trial began" that it had

9    to arrest and prosecute Santos-Pena and Santos-Hernandez (*id*. at 58; *see also id*. at 70).

10          In light of these statements, the government promptly moved under Rule

11   801(d)(1)(B)(ii) to be allowed--as rebuttal to defense counsel's argument "that . . . as

12   to what was said on the airplane" "Agent Gonzalez's recollection can no longer be

13   trusted" (Tr. 90)--to introduce Gonzalez's contemporaneous notes and DEA reports

14   during his direct testimony.  The court granted that motion, and we see no error.

15   Although defendants' opening statement challenges to Gonzalez's memory were brief

16   and were not their main challenges, they were in fact made.  Further, regardless of

17   defendants' suggestion that Gonzalez had a motive to fabricate or embellish his

18   descriptions of defendants' statements as of the time of their arrests, their arguments

31

1     that he also had such a motive based on facts related to Santos-Pena that were

2     discovered "literally right before this trial began" (Tr. 58) literally suggested a motive

3     that was recent. Given this record, we cannot conclude that the trial judge lacked

4     discretion to rule that the admission of Gonzalez's notes and reports would constitute

5     a proper response to defendants' attacks on Gonzalez's credibility and memory.

6     Finally, as to timing, we reject defendants' contention, as stated to the

7     district court in their motion seeking reconsideration of that ruling, that Rule

8     801(d)(1)(B)(ii) is applicable only if the declarant's credibility or memory is

9     "challenged *during cross-examination*" (Letter from defendants to Judge Crotty dated

10    November 8, 2016, at 2 (emphasis in original)). The Rule applies to a witness who "*is*

11    *subject to* cross-examination," Fed. R. Evid. 801(d)(1) (emphasis added), about the

12    prior statement; this language does not restrict admissibility to statements of one who

13    has already been cross-examined. *See, e.g., United States v. O'Connor*, 650 F.3d 839,

14    862-63 (2d Cir. 2011) ("*O'Connor*") (trial judge had discretion to allow introduction of

15    a prior consistent statement even before the declarant had given any testimony,

16    where the defendants "had begun their attacks on the credibility of [the declarant's]

17    expected testimony in their opening statements" and "it was clear" that the declarant

18    would be called to testify and "could be cross-examined by the defense about the

1     statement"), *cert. denied*, 565 U.S. 1148 (2012). Here, where the government sought

2     permission to introduce the notes and reports of Gonzalez during his direct

3     testimony, it was clear that he would be subject to cross-examination.

4            In sum, we find no abuse of discretion in the trial court's ruling as to the

5     propriety or the timing of the admission of Gonzalez's notes and reports as prior

6     consistent statements.

7            2.  *Admission of Santos-Pena's Testimony Identifying Cocaine*

8            Defendants also contend that the district court erred in allowing

9     Santos-Pena to testify that the substance that Campo brought as a sample to the

10    Venezuela meeting on October 27 was cocaine. The court allowed Santos-Pena to so

11    testify as a lay witness. Defendants contend that he so testified as an expert and that

12    the court erred in not holding a *Daubert* hearing, *see Daubert v. Merrell Dow*

13    *Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), as to the validity of his testing process.

14    We disagree.

15           The Federal Rules of Evidence authorize the court to permit a witness to

16    testify to admissible evidence in the form of an opinion, either pursuant to Rule 702

17    as an expert, *i.e.*, one who has "scientific, technical, or other specialized knowledge"

1    based on his "knowledge, skill, experience, training, or education," Fed. R. Evid.

2    702(a), or pursuant to Rule 701 as a lay witness.  Rule 701 provides that

3              [i]f a witness is not testifying as an expert, testimony in the
4              form of an opinion is limited to one that is:

5              (a) rationally based on the witness's perception;

6              (b) helpful to clearly understanding the witness's
7              testimony or to determining a fact in issue; and

8              (c) not based on scientific, technical, or other
9              specialized knowledge within the scope of Rule 702.

10   Fed. R. Evid. 701.  In this Rule, part (a)'s rational-basis requirement "'is the familiar

11   requirement of first-hand knowledge or observation,'" *Kaplan*, 490 F.3d at 118 (quoting

12   *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) ("*Rea*")); part (b)'s helpfulness

13   requirement is "principally 'designed to provide assurance[] against the admission of

14   opinions which would merely tell the jury what result to reach,'" *Kaplan*, 490 F.3d

15   at 118 (quoting *Rea*, 958 F.2d at 1215).

16              Part (c) of Rule 701 is intended "to prevent a party from conflating expert

17   and lay opinion testimony [and] thereby conferring an aura of expertise on a witness

18   without satisfying the reliability standard for expert testimony set forth in Rule 702

19   and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R.

1    Civ. P. 26." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("*Garcia*").  "Lay

2    opinion under Rule 701 must be limited to opinions that 'result[] from a process of

3    reasoning familiar in everyday life.'"  *Cuti*, 720 F.3d at 459 (quoting Fed. R. Evid. 701

4    Advisory Committee Note (2000)); *see also United States v. Yannotti*, 541 F.3d 112, 126

5    (2d Cir. 2008) ("*Yannotti*"), *cert. denied*, 556 U.S. 1130 (2009).

6           With respect to the type of evidence needed for the identification of

7    chemical substances,

8           courts have permitted lay witnesses to testify that a substance
9           *appeared* to be a narcotic, so long as a foundation of *familiarity with*
10          *the substance* is established. . . .  *Such testimony is not based on*
11          *specialized knowledge within the scope of Rule 702, but rather is based*
12          *upon a layperson's personal knowledge.*

13   Fed. R. Evid. 701 Advisory Committee Note (2000) (emphases added).  Thus,

14          neither actual drug exhibits nor reports of chemical analysis are
15          required to support a conviction for possession of a controlled
16          substance. . . .  As we noted in *Bryce*, "[l]ay testimony and
17          circumstantial evidence may be sufficient, without the
18          introduction of an expert chemical analysis, to establish the
19          identity of the substance involved in an alleged narcotics
20          transaction."

21   *United States v. Gaskin*, 364 F.3d 438, 460 (2d Cir. 2004) (quoting *United States v. Bryce*,

22   208 F.3d 346, 353 (2d Cir. 1999) (other internal quotation marks omitted)), *cert. denied*,

23   544 U.S. 990 (2005); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 n.14 (2009)

1    ("we disagree with the dissent's contention . . . that only an analyst's testimony

2    suffices to prove [the] fact that the substance is cocaine" (internal quotation marks

3    omitted)).

4           As set out in Part I.A.2.a. above, Santos-Pena testified that the sample

5    substance presented by defendants at the meeting in Venezuela on October 27 was

6    cocaine. Prior to trial, defendants had moved *in limine* to preclude any such expert

7    testimony by either Santos-Pena or Santos-Hernandez. The government argued that

8    it instead proposed to offer their testimony as lay opinions. The district court ruled

9    that Santos-Pena would be allowed to identify the substance as cocaine as his lay

10    opinion, given his "established" "familiarity with cocaine" and the fact that at that

11    meeting "he saw, touched, and smelled the substance." (Pretrial Hearing Transcript,

12    November 2, 2016, at 5 (internal quotation marks omitted).) The court stated that the

13    fact that Santos-Pena had not also ingested the substance did not suffice to preclude

14    him from giving his lay opinion that it was cocaine. However, the court excluded any

15    opinion testimony by Santos-Hernandez, in part because he had only viewed the

16    substance and had made no tactile, olfactory, or other examination. (*See id*. at 5-6.)

17           On appeal, defendants maintain that Santos-Pena testified as an expert

18    because his "testimony that he could determine the identity *and purity* of cocaine by

1    extracting an unknown grease from it was precisely the type of 'technical, or other

2    specialized' knowledge that is the province of Rule 702" (Campo brief on appeal at 45

3    (emphasis added)), and that because Santos-Pena was not qualified as an expert in

4    accordance with Rule 702, his testimony was improperly admitted.  Defendants also

5    argue that because the tests to which Santos-Pena subjected the substance proffered

6    by Campo did not include ingestion, they were insufficient to permit him to reach a

7    rational opinion that it was cocaine because "[w]hen *a drug user* gives *expert* opinion

8    testimony as to the identity of a substance *based on his experience ingesting* the

9    particular substance, the drug user infers the identity of the substance *based on the*

10   *effects of the substance when ingested*."  (Campo brief on appeal at 42 (internal quotation

11   marks omitted) (emphases ours).)  We reject both the contention that Santos-Pena

12   testified as an expert and the proposition that he could not properly give his lay

13   opinion that a substance contained cocaine without having ingested it.

14          Preliminarily, we note that defendants' assumption that Santos-Pena

15   must have testified as an expert because he opined on "purity" (Campo brief on

16   appeal at 45) exaggerates the record.  The only reference to a specific degree of purity

17   ("[n]inety-five to ninety-seven") was in Santos-Pena's recorded statement to

18   defendants at the October 27 meeting (GX 213-T at 3-4).  At trial, Santos-Pena did not

1 testify that the cocaine sample had any particular degree of purity, other than to say

2 that it was of "good quality" (Tr. 693). Nor was there any need for evidence as to the

3 sample's degree of purity, as it is unlawful to import or conspire to import a

4 substance containing any "detectable amount" of cocaine, 21 U.S.C. § 960(b)(1)(B); *see*

5 *id*. § 963.

6       Moreover, the court plainly and properly did not allow Santos-Pena to

7 testify as an expert, nor did he purport to do so. Santos-Pena was not a chemist. He

8 testified that his tests "didn't involve any special instruments" (Tr. 917); nor had he

9 had any training in scientific analysis of chemical substances (*see id*. at 923-24).

10 Indeed, Santos-Pena had no schooling past the fourth grade. (*See id*. at 186.) Rather,

11 he used quick and practical tests for assessing whether a substance contained cocaine.

12 Further, although Santos-Pena was a "drug user" (Campo brief on appeal at 42

13 (internal quotation marks omitted)), Santos-Pena did not purport to base his opinion

14 on his experience as, or its effect on, a user. Rather, the tests he used--which, though

15 not scientific, were plausible as a practical matter--made it possible for him to make

16 such a determination without any ingestion of the substance.

17       The other foundations of Santos-Pena's familiarity with cocaine, and of

18 his ability to determine its presence without testing by ingestion, were established by

1    his decade of dealing with cocaine while working for the Sinaloa drug trafficking

2    cartel from 1991 to 2000. (*See* Tr. 681.) Santos-Pena testified that in examining the

3    sample substance handed him by Campo, he conducted the tests he had been taught

4    to use "[i]n Mexico when [he] worked for the Sinaloa cartel." (*Id*. at 693.) They

5    entailed "[s]melling [the cocaine], looking at it, and rubbing it on [his] hand." (*Id*.)

6    Sinaloa cartel personnel used these tests "[b]ecause when we received drug shipments

7    from Colombia" to be sold to drug traffickers in the United States, "[we] had to

8    confirm that it was actually cocaine" (*id*. at 920, 921)--in order to avoid, as defense

9    counsel characterized it and Santos-Pena acknowledged, the "known risk within the

10    drug business" (*id*. at 921).

11          Santos-Pena testified that in dealing with those shipments from

12    Colombia, to be sure they actually contained cocaine, "what we did is we very quickly

13    opened up one kilo just randomly. We would open it to confirm that it was cocaine.

14    And that was the test, the smell, by sight, by color, and the quality." (*Id*. at 920.)

15    Thus, while there was no indication that Santos-Pena was an educated expert or had

16    had training in any technical aspect of substance identification, the provenance of the

17    tests he used--an established drug cartel's standard practice--provided a rational basis

18    for Santos-Pena's ability to evaluate the substance submitted for his personal

1    examination.  Given that there was no physical substance available for examination

2    by the jury--whose members, in any event, likely did not share Santos-Pena's testing

3    experience--it was well within the district court's discretion to allow Santos-Pena to

4    give his lay opinion that the sample substance proffered by defendants was cocaine,

5    as an opinion that would be helpful to the jury in determining defendants' knowledge

6    and intent to participate in a cocaine trafficking conspiracy.


7            3. *Testimony Interpreting Defendants' Statements*

8                    Defendants also contend that the district court abused its discretion in

9    allowing Gonzalez and Santos-Pena to provide their interpretations of certain

10   statements made by Campo.  Although defendants at trial objected to several requests

11   for such witness interpretations and were granted a standing objection, their appellate

12   briefs target just two Gonzalez interpretations of statements by Campo during his

13   postarrest interview and one Santos-Pena interpretation of a Campo statement in the

14   October 23 meeting.   Both Gonzalez and Santos-Pena were so testifying as

15   participants in the conversations and as to what they had understood defendants to

16   mean, *i.e.*, as lay witnesses rather than as experts, and we reject defendants'

17   challenges, given the Rule 701 principles discussed above.

                                          40

1          The Gonzalez responses challenged here are (1) after Gonzalez told

2   Campo he had been arrested for conspiracy to import narcotics into the United States,

3   and Gonzalez was asked what he understood Campo to mean in responding "what

4   if someone went down the path to commit a crime but then repented before

5   committing the crime," Gonzalez testified that he understood Campo to be referring

6   to the cocaine undertaking for which he had just been arrested without actually

7   delivering cocaine (Tr. 135); and (2) after Gonzalez asked Campo what the packaged

8   white substance was that he was holding in the picture of himself wearing gloves,

9   and was asked what he understood Campo to mean in responding "you know what

10  that is," Gonzalez testified that he understood Campo to mean cocaine (*id*. at 137).

11  The first of Campo's statements was somewhat opaque; and the second was one that

12  might have had different meanings, depending on the speaker's tone, facial

13  expression, or gestures.  But plainly, Gonzalez's interpretations were the product of

14  reasoning processes familiar to the average person, rather than being based on

15  scientific, technical, or other specialized knowledge.  And while it seems likely that

16  the jury would have reached the same understandings Gonzalez did as to the

17  meanings of those statements, his interpretations need not have been essential to

18  enable the jury to have a clear understanding so long as they were "helpful," Fed. R.

1    Evid. 701(b).  The Rule allows a lay opinion that "affords the jury an insight into an

2    event that was uniquely available to an eyewitness.  In this respect, the Rule

3    recognizes the common sense behind the saying that, sometimes, 'you had to be

4    there.'"  *Garcia*, 413 F.3d at 212.

5         The other interpretation to which defendants object here concerned

6    Campo's October 23 statement to Santos-Pena that "'I had some cars and I was

7    working with some people over there from where you guys are from'" (Tr. 619

8    (quoting GX 203-T at 25)).  As we have recognized, "individuals engaging in illicit

9    activities rarely describe their transactions in an open or transparent manner and the

10    government may call witnesses to provide insight into coded language through lay

11    opinion testimony," *Yannotti*, 541 F.3d at 126, and we see no error in allowing such

12    insight in this instance.

13         Santos-Pena had interpreted "cars" to mean airplanes (Tr. 619 (internal

14    quotation marks omitted)); with respect to the latter part of Campo's statement he

15    interpreted "people" to mean Mexicans; and, over a defense objection, he interpreted

16    "working" to mean drug trafficking (Tr. 620).  This was hardly the only instance in

17    which Campo used "work" to refer to drug trafficking.  Most obviously, two days

18    after the initial drug transaction negotiation with Sentado, Campo had texted Sentado

1    and said "[w]hat I want is to start work because the electoral campaign is almost here

2    and I always contribute . . . [w]ith money if you know what I mean that is why I want

3    to start work" (GX 3508-38-T at 2 (October 5, 2015 text from Campo to Sentado)).  It

4    is entirely possible that the jury would have inferred on its own that Campo's

5    reference to "working" in his conversation with Santos-Pena also meant drug

6    trafficking.  Nonetheless, Santos-Pena's understanding as to what Campo meant by

7    "working," *i.e.*, drug trafficking--in their conversation about drug trafficking--was

8    admissible as helpful to the jury in understanding defendants' coded language.

9    B. *Sufficiency of the Evidence*

10           Defendants challenge the sufficiency of the evidence at trial to support

11   their convictions, contending principally (1) that we should "disregard" as incredible

12   the testimony of Santos-Pena and just "test the sufficiency of whatever evidence might

13   be left" (Campo brief on appeal at 26); (2) that there was inadequate proof that

14   defendants had any knowledge that the destination of the drugs would be the United

15   States; (3) that there was no evidence that they deliberately avoided gaining such

16   knowledge; and (4) that the government failed to rebut their defense of entrapment.

17   We reject all of these challenges.

43

1        In mounting a challenge to the sufficiency of the evidence, "defendants

2   face a heavy burden, as the standard of review is exceedingly deferential" to the jury's

3   apparent determinations.  *United States v. Baker*, 899 F.3d 123, 129 (2d Cir.) (internal

4   quotation marks omitted), *cert. denied*, 139 S. Ct. 577 (2018).  It is well established that

5   "the government is entitled to prove its case solely through circumstantial evidence,"

6   *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004); and when the offense at

7   issue is conspiracy, "deference to the jury's findings is especially important . . .

8   because a conspiracy by its very nature is a secretive operation, and it is a rare case

9   where all aspects of a conspiracy can be laid bare in court," *United States v. Rojas*, 617

10  F.3d 669, 674 (2d Cir. 2010) (internal quotation marks omitted).  On appeal from a

11  judgment of conviction, we "view the evidence in the light most favorable to the

12  government, crediting every inference that could have been drawn in the

13  government's favor."  *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008).  A

14  sufficiency challenge must fail if "*any* rational trier of fact could have found the

15  essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443

16  U.S. 307, 319 (1979) (emphasis in original).

17       It is also well established that "[i]t is the province of the jury and not of

18  the court to determine whether a witness who may have been inaccurate,

44

1    contradictory and even untruthful in some respects was nonetheless entirely *credible*

2    *in the essentials* of his testimony." *O'Connor*, 650 F.3d at 855 (internal quotation marks

3    omitted) (emphasis ours).  A jury is entitled to believe part and disbelieve part of the

4    testimony of any given witness.  *See, e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d

5    Cir. 2012); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 325 (2d Cir. 1986), *cert. denied*, 480

6    U.S. 922 (1987); *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir.) ("when

7    testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to

8    weigh the evidence and decide the credibility issues for itself" (internal quotation

9    marks omitted)), *cert. denied*, 558 U.S. 965 (2009).

10              A defendant's challenge to witnesses' "credibility based on their plea

11   agreements with the government and their long histories of criminal and dishonest

12   behavior" is subject to these standards.  *United States v. Florez*, 447 F.3d 145, 156 (2d

13   Cir.) ("*Florez*"), *cert. denied*, 549 U.S. 1040 (2006); *see, e.g.*, *United States v. Riggi*, 541 F.3d

14   94, 108 (2d Cir. 2008) ("All issues of credibility, including the credibility of a

15   cooperating witness, must be resolved in favor of the jury's verdict.").  "We will not

16   attempt to second-guess a jury's credibility determination," and "we will assume that

17   the jury 'resolve[d] all issues of credibility in favor of the prosecution.'"  *Florez*, 447

18   F.3d at 156 (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

1      1. *The Testimony of Santos-Pena*

2           Given these principles, we reject the contention that the testimony of

3      Santos-Pena should be entirely disregarded. At trial Campo and Flores extensively

4      explored Santos-Pena's credibility on cross-examination by, *inter alia*, emphasizing

5      that for several years during the time he operated as a DEA confidential informant,

6      he engaged in extensive unauthorized drug trafficking activities; that the government

7      learned of those activities in 2016; and that in September 2016, just two months before

8      defendants' trial, Santos-Pena pleaded guilty to charges of importing drugs into the

9      United States, distributing drugs in the United States, and lying to the government.

10     (*See* Tr. 725-33, 756-57, 879-94; *see also id*. at 602, 684, 719.) Defendants also elicited

11     new evidence that following that guilty plea Santos-Pena had continued his illegal

12     activities by communicating with Santos-Hernandez and other drug traffickers from

13     prison, and had lied under oath about having done so when he testified in the present

14     case. (*See id*. at 951-80.)

15          However, these were factors for the jury to assess, and the jury was

16     properly instructed that it was "quite free to reject all or any part of [Santos-Pena's]

17     testimony" (Tr. 1482). As Santos-Pena's testimony with respect to his dealings with

18     defendants was not incredible as a matter of law--indeed, most of those dealings had

46

1    been captured in recordings--we decline defendants' request to disregard it in our

2    assessment of the sufficiency of the evidence.

3         2. *Knowledge or Belief as to Likely United States Importation*

4         Title 21 of the United States Code provides, *inter alia*, that it is unlawful

5    for any person (i) "knowingly or intentionally" to "import[] . . . a controlled substance"

6    into the United States, 21 U.S.C. §§ 960, 952 (2015); or (ii) "to manufacture or distribute

7    a controlled substance . . . intending . . . or . . . knowing that such substance . . . will

8    be unlawfully imported into the United States," *id*. § 959(a); or (iii) to "conspire to

9    commit" such offenses, *id*. § 963. "To prove intent, of course, the government must

10   show knowledge, for 'knowledge is the foundation of intent.'" *United States v. Torres*,

11   604 F.3d 58, 66 (2d Cir. 2010) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703,

12   711-12 (1943)).

13        "The crux of a conspiracy is an agreement between two or more persons

14   to join together to accomplish something illegal." *United States v. Lyle*, 919 F.3d 716,

15   737 (2d Cir. 2019). That agreement "may be tacit rather than explicit." *United States*

16   *v. Zhou*, 428 F.3d 361, 370 (2d Cir. 2005) (internal quotation marks omitted). To

17   establish a conspiracy-to-import offense, the government is required to prove, *inter*

47

1    *alia*, that the defendant knew or believed that the conspiracy involved narcotics

2    bound for the United States. *See*, *e.g.*, *United States v. Romero-Padilla*, 583 F.3d 126, 129

3    (2d Cir. 2009) ("*Romero-Padilla*"), *cert. denied*, 559 U.S. 930 (2010); *United States v.*

4    *Londono-Villa*, 930 F.2d 994, 998 (2d Cir. 1991) ("*Londono-Villa*"). And "[a]lthough

5    knowledge is, fundamentally, belief substantiated by veracity," "in the context of a

6    sting operation" "belief is tantamount to knowledge." *United States v. Nektalov*, 461

7    F.3d 309, 316 (2d Cir. 2006).

8        While it is seldom feasible to present direct evidence of a person's state

9    of mind, it is often possible to infer knowledge or belief from outward manifestations

10   such as a defendant's statements or conduct, or from the circumstances surrounding

11   or attendant upon facts he or she is alleged to have known. *See United States v.*

12   *O'Brien*, 926 F.3d 57, 79 (2d Cir. 2019); *United States v. Nersesian*, 824 F.2d 1294, 1314

13   (2d Cir.), *cert. denied*, 484 U.S. 958 (1987). For example, evidence that a defendant was

14   aware that "narcotics transported from Colombia to Mexico typically do not remain

15   in Mexico because their value is considerably higher in the United States" provides

16   some evidence that he knew the cocaine at issue was to be imported into the United

17   States. *Romero-Padilla*, 583 F.3d at 130.

18       To meet its burden to prove knowledge in this case, the government

48

1    sought to show that Campo and Flores either actually knew the cocaine was to be

2    imported into the United States, or (*see* Part II.B.3. below) believed it was and

3    consciously avoided gaining that knowledge.  Contrary to defendants' supposed

4    argument that there is "no evidence" that they "understood or agreed to any decision

5    to send narcotics to the United States" (Campo brief on appeal at 21), defendants also

6    state that their "supposed confessions" to Gonzalez in-flight "*were* the only *direct*

7    *evidence* that the defendants believed that the drugs at issue were bound for the

8    United States" (Flores brief on appeal at 28 (emphases added); *see also id*. at 2 n.1, and

9    Campo brief on appeal at 16 n.3 (each defendant adopting the other's arguments on

10   appeal)).  Our review of the record persuades us that that direct evidence of

11   defendants' statements and the additional circumstantial evidence of such knowledge

12   were ample to permit a rational juror to infer that defendants well knew or at least

13   actually believed and agreed that the cocaine they sought to sell to Sentado in

14   Honduras was to be sent on to the United States.

15        As a general matter, DEA Special Agent Mahoney testified that the

16   approximate price of a kilogram of cocaine was $10,000-$12,000 in Honduras or

17   Guatemala, but $25,000 in the United States.  (*See* Tr. 547.)  The mere fact that

18   defendants planned to have the cocaine flown to Honduras would not alone have

49

1    been sufficient to support a finding that these defendants knew the cocaine would be

2    sent to the United States.  For example, in *Londono-Villa*, the defendant's role was to

3    guide a pilot from Panama to a certain Colombian airstrip in a roundabout way that

4    the pilot would be unable to duplicate, and to verify that the cargo delivered to the

5    plane in Colombia was cocaine, after which the plane returned to Panama and the

6    defendant remained in Colombia.  *See* 930 F.2d at 995-96.  We concluded that evidence

7    that Panama is sometimes used as an interim stop for drugs ultimately intended for

8    importation into the United States was not sufficient to show that the defendant had

9    knowledge of the United States as a destination given that he "*was not involved in any*

10    *of the lengthy negotiations* for the sale of the cocaine," there was "*no evidence that [he] had*

11    *been told* that the United States was to be the ultimate destination of the cocaine," and

12    there was "*no evidence that the United States was ever mentioned in his presence*," *id.*

13    at 1001 (emphases added).  But in the present case, there was evidence of all these

14    indicia of knowledge that we found meaningfully absent in *Londono-Villa*, including

15    the following.

16          First, Campo and Flores were participants in all four of the meetings held

17    in October with Sentado or Santos-Pena; indeed, Campo and Flores were principals.

18    Second, although it is not clear whether importation into the United States was

50

1   discussed at the very first (October 3) meeting, the government introduced into

2   evidence recordings of the other three October meetings and of the November 10

3   meeting, in which Santos-Pena or Santos-Hernandez met with defendants and made

4   a total of more than a dozen references to the trafficking of drugs into the United

5   States, including the following:

6   ■ At the October 23, 2015 meeting with defendants in Venezuela,
7   Santos-Pena said explicitly that he was "the person who buys everything
8   from" Sentado, "*taking everything to the United States*" (GX 203-T at 6
9   (emphasis added));

10   ■ at the same meeting, after Campo had described agreeing with
11   Sentado to "do something," Santos-Hernandez (listed as CS-2) said:

12   CS-2: *You know that we send a lot of that to...*

13   Campo: Of course.

14   CS-2: *... to New York . . . .*

15   (GX 201-T at 5 (emphases added));

16   ■ at the October 26 meeting, Santos-Pena explained he would
17   "keep putting money into it until it gets to Mexico" and "keep putting
18   money into it *to get it in to the Americans*," and *Campo directly responded,*
19   *"Of course"* (GX 206-T at 22 (emphases added));

20   ■ during that October 26 meeting, Santos-Pena stated that
21   "starting December eighth or twelfth" when "the border gets very harsh
22   surveillance," he would stop shipping cocaine "*into the United States*"
23   (GX 206-T at 33 (emphasis added));

51

1          ■ in Haiti on November 10, after Campo asked Santos-Pena if he

2   did not like working in Europe, Santos-Pena said "*my business is* right

3   there *inside the United States, which is your business as well because you are*

4   *the owner of that work*"; and when Santos-Pena said "*in New York I sell it*

5   *for thirty-six,* thirty-nine for each one," *Campo responded simply, "Sure*"

6   (GX 230-T at 8, 6 (emphases added));

7          ■ and at that final meeting, when Santos-Pena (listed as CS-1) said

8   "once you have finished up with your mom's commitments, you tell me,

9   'You know what? There go one thousand, of the one thousand, only pay

10   me eight hundred,' as an example, 'pay me nine hundred, whatever you

11   want,'" here is how defendants responded:

12        Campo: Yes, well, we discussed that yesterday...

13        CS-1: "And one hundred or two hundred..."

14        Campo: *Put them in for me over there...*

15        CS-1: "... *sell them for me in New York.*"

16        Campo: *Yes* [U/I].

17        CS-1: *So that you can see what one hundred kilos implies in New York.*

18        Flores: *Sure,* [U/I].

19   (GX 230-T at 8 (emphases added).)

20        Finally, at Santos-Pena's meeting with Campo and Flores on October 26,

21  Santos-Pena stated, *inter alia,* that the per-kilogram price of cocaine in Honduras

22  fluctuated between $12,000 and $14,000 (*see* GX 206-T at 18), and "if I sell in New

1    York, I sell it for forty-seven thousand" (*id*. at 23).  Santos-Pena later agreed to buy

2    defendants' 800 kilograms of cocaine for $11 million; that would cost Santos-Pena

3    $13,750 per kilogram.  Even if Santos-Pena had not explicitly told Campo and Flores

4    on October 26, "I sell . . . high," no rational person could infer that Santos-Pena would

5    plan to sell those 800 kilograms in Honduras for a profit of less than 2%--or for a

6    loss--when he has told them he could sell it in the United States for more than three

7    times what he was to pay them for it.

8           All of this circumstantial evidence easily permitted the jury to find that

9    defendants had the requisite knowledge that the cocaine they planned to have flown

10   to Honduras would ultimately be bound for the United States.  Indeed, the recorded

11   statements directly support Gonzalez's testimony that, when he asked Flores whether

12   Flores knew the cocaine was to go to the United States, "Flores stated that the Mexican

13   had told him the cocaine was going to Mexico and then to the United States, and

14   several cities within the United States" (Tr. 161).


15        3. *Conscious Avoidance*

16          At the request of the government, and over defendants' objections, the

17   court gave an instruction that the jury could find that the disputed knowledge

53

1  element of the charged conspiracy was proven if it found that defendants consciously

2  avoided knowing that the cocaine they were to sell to Sentado and Santos-Pena was

3  to be imported into the United States:

> 4  In determining whether the defendants acted knowingly
> 5  and intentionally regarding the object or purpose of the
> 6  conspiracy, *you may consider whether the defendants deliberately closed*
> 7  *their eyes as to what otherwise would have been obvious.* . . . [O]ne may
> 8  not willfully and intentionally remain ignorant of a fact that is
> 9  material and important to one's conduct in order to escape the
> 10  consequences of the criminal law.

11  (Tr. 1504 (emphasis added); *see also id*. at 1505 ("if you find that the defendants were

12  aware of a high probability that the conspiracy at issue . . . was to import cocaine into

13  the United States, and the defendants consciously avoided confirming that fact, you

14  may infer that they implicitly had knowledge").)

15  On appeal, defendants do not challenge the content of the court's

16  conscious-avoidance instruction. (*See* Flores reply brief at 7 n.1.) Rather, they

17  contend (a) that giving any instruction as to that concept was improper because there

18  was no factual predicate for it, arguing that there was no evidence that they

19  "*deliberately avoided* learning--or forming a belief" that the cocaine would be bound for

20  the United States (Flores brief on appeal at 21 (emphasis in original)), and (b) that

21  giving such an instruction "improperly permitted the jury to substitute conscious

54

1    avoidance for *knowledge of the existence of the conspiracy*" (*id*. at 25-26 (emphasis

2    added)).  We reject both contentions.

3          The latter contention warrants little discussion, as it is squarely refuted

4    by the conscious avoidance instruction as given.  The court stated:

> 5         I want to be clear that this concept only applies when
> 6    determining whether a defendant knew the objects or purposes of
> 7    the conspiracy; it does not apply when determining whether a
> 8    defendant knowingly participated in the conspiracy. It is logically
> 9    impossible for a defendant to join a conspiracy unless he knows
> 10    that a conspiracy exists.  Thus, for example, if you find that the
> 11    defendants were aware of a high probability that the conspiracy
> 12    at issue in Count One was to import cocaine into the United
> 13    States, and the defendants consciously avoided confirming that
> 14    fact, you may infer that they implicitly had knowledge; *if, however,*
> 15    *the defendants actually believed that the conspiracy was not to import*
> 16    *cocaine into the United States, or if the defendants were merely negligent*
> 17    *or careless with regard to the knowledge they had, they lacked the*
> 18    *knowledge necessary to become a coconspirator.*

19    (Tr. 1504-05 (emphasis added).)

20          As to defendants' contention that there was insufficient evidence to

21    indicate that they deliberately avoided knowing that the cocaine was to be sold in the

22    United States, the district court expressly recognized the principle that a conscious

23    avoidance charge is not warranted in the absence of such evidence:

> 24    "[a] conscious avoidance instruction may only be given if (1) the
> 25    defendant asserts the lack of some specific aspect of knowledge

1    required for conviction, and (2) the appropriate factual predicate
2    for the charge exists . . . ." *United States v. Svoboda*, 347 F.3d 471,
3    480 (2d Cir. 2003) (internal quotation marks and alteration
4    omitted). The second prong of the test "has two components--
5    there must be evidence that the defendant (1) was aware of a high
6    probability of the disputed fact and (2) deliberately avoided
7    confirming that fact." *Id*. "A factual predicate may be established
8    where a defendant's involvement in the criminal offense may have
9    been so overwhelmingly suspicious that the defendant's failure to
10   question the suspicious circumstances establishes the defendant's
11   purposeful contrivance to avoid guilty knowledge." *United States*
12   *v. Lange*, 834 F.3d 58, 78 (2d Cir. 2016) (internal quotation marks
13   and alteration omitted).

14   Posttrial Order, 2017 WL 1133430, at *6.

15   As discussed above, although it is rare to have direct evidence of a

16   person's state of mind, it may be possible to infer a person's knowledge, belief, or

17   intent from, for example, his or her statements or conduct, or from the circumstances.

18   Here, the district court (referring to Campo as "Campo Flores") aptly pointed to all

19   of these sources in rejecting defendants' contention that there was no evidence that

20   they had deliberately avoided knowing or believing that their cocaine was bound for

21   the United States:

22   The government presented evidence that Defendants made
23   a tactical decision not to confirm that the cocaine was bound for
24   the United States. *There are at least 13 recorded instances where the*
25   *CSes made statements about taking drugs to the United States*. Yet in
26   all of those instances, Defendants never really respond to the

56

1    CSes' statements.  Campo Flores appears to have provided the
2    explanation for why.  In his confession, Campo Flores initially
3    took the position "that he did not know the drugs were going to
4    the United States and that those words never came out of his
5    mouth."  Tr. 152.  However, *after DEA Special Agent Sandalio*
6    *Gonzalez explained to Campo Flores that "there are recordings of his*
7    *meetings and that [Campo Flores] didn't necessarily have to say it*
8    *himself but knew that the Mexican individual had said that," Campo*
9    *Flores responded "yes, but I didn't emphasize it."*  Tr. 153.  This is
10   strong evidence that, in order to maintain deniability, Defendants
11   made a conscious attempt to avoid confirming that the target of
12   the conspiracy was the United States.

13   Posttrial Order, 2017 WL 1133430, at *7 (emphases ours).  The court added that

14   in fact, because Defendants did not respond to the CSes' repeated
15   references to the United States, the defense was able to use as a
16   theme throughout the trial that Defendants did not know the
17   target of the conspiracy was the United States.

18   *Id*.  For example, in summation defense counsel emphasized that defendants

19   themselves had made "[z]ero" "references to importation . . . into the United States"

20   and that they "basically never respond[ed]" to the dozens of such references made by

21   the CSes.  (Tr. 1360-62.)  As the district court observed, a "'purposeful contrivance to

22   avoid guilty knowledge'" may be inferred from the fact that defendants declined to

23   mention the ultimate destination for the cocaine "after the CSes' myriad references to

24   taking drugs to the United States," Posttrial Order, 2017 WL 1133430, at *7 (quoting

25   *Lange*, 834 F.3d at 78).

57

1    In addition, we note recorded conversations in which defendants,

2    discussing other drugs, explicitly showed keen interest in the fact that those drugs

3    fetched higher prices in the United States than elsewhere.  For example, on October

4    27, Campo referred to "tusi" (Tr. 694)--apparently another Colombian drug (*see*

5    GX 213-T at 9)--a kilogram of which Campo said "on the market costs" "Fifty thousand

6    dollars.  *Here*!" (GX 213-T at 7 (emphasis added)).  Campo asked, "don't you guys sell

7    *tusi* . . . over there?" (GX 213-T at 6 (italics in exhibit)); Santos-Pena testified that "over

8    there" referred to the United States (Tr. 694 (internal quotation marks omitted)), and

9    that "[Campo] was asking me about whether I could send [tusi] to the U.S." (*id*.):

10   Campo:  . . . one kilo of sweets costs fifty thousand dollars, one
11   kilo.

12   CS-1 [Santos-Pena]:  They are sending those to Europe more,
13   right?

14   Flores: Yes... they are also *in the United States*.

15   Campo:  Yes, but *in the United States* it costs two hundred
16   thousand dollars per kilo [U/I].

17   (GX 213-T at 10 (emphases added).)

18   From defendants' vague or inaudible responses--or nonresponses--when

19   Santos-Pena mentioned the United States in connection with defendants' cocaine,

1    contrasted with their patent enthusiasm for the much higher prices that other drugs

2    could be sold for "in the United States," a juror could rationally conclude that if in fact

3    defendants did not actually know their cocaine was to be sent to the United States,

4    they deliberately avoided knowing it.

5           In sum, given the record, the evidence at trial was ample to permit the

6    jury to find that defendants, if they lacked actual knowledge, deliberately avoided

7    learning--or forming a belief--that their cocaine was to be bound for the United States.

8    We conclude that defendants' challenges to the instruction on conscious avoidance

9    are without merit.


10          4.  *The Defense of Entrapment*

11          At trial, defendants argued that they were inexperienced and

12   unknowledgeable, were not the large-scale narcotics traffickers that the government

13   painted them to be, and had been entrapped by the government.  "It is well settled

14   that the fact that officers or employees of the Government *merely afford opportunities*

15   or facilities for the commission of the offense does not defeat the prosecution."

16   *Jacobson v. United States*, 503 U.S. 540, 548 (1992) (internal quotation marks omitted)

17   (emphasis ours).  Rather,

1    a valid entrapment defense has two related elements:
2    government inducement of the crime, and *a lack of predisposition* on
3    the part of the defendant to engage in the criminal conduct. . . .
4    *Predisposition, the principal element in the defense of entrapment*, . . .
5    *focuses upon whether the defendant was an unwary innocent or, instead,*
6    *an unwary criminal who readily availed himself of the opportunity to*
7    *perpetrate the crime.*

8    *Mathews v. United States*, 485 U.S. 58, 63 (1988) (internal quotation marks omitted)

9    (emphases ours).  When a defendant has presented credible evidence of inducement

10   by a government agent, the government has the burden of proving beyond a

11   reasonable doubt that the defendant was predisposed to commit the crime.  *See, e.g.*,

12   *Jacobson*, 503 U.S. at 548-49.

13          The government may prove predisposition in any of a number of ways,

14   including by presenting evidence of

15          (1) an existing course of criminal conduct similar to the crime for
16          which [the defendant] is charged, (2) an already formed design on
17          the part of the accused to commit the crime for which he is
18          charged, or (3) a willingness to commit the crime for which he is
19          charged as evidenced by the accused's ready response to the
20          inducement.

21   *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) ("*Salerno*") (internal quotation

22   marks omitted), *cert. denied*, 516 U.S. 1063 (1996); *see, e.g.*, *United States v. Valencia*, 645

23   F.2d 1158, 1167 (2d Cir. 1980) (evidence that the defendants had a "readily available

1    source of supply for cocaine" and "were somewhat experienced with cocaine

2    transactions" supported an inference that they had previously been engaged in a

3    similar course of criminal conduct, and thereby established predisposition); *United*

4    *States v. Cromitie*, 727 F.3d 194, 216 (2d Cir. 2013) (predisposition shown by

5    "willing[ness] to join in a terrorism plot without any hesitation or reservation"

6    (internal quotation marks omitted)).

7                    "The question of entrapment is generally one for the jury, rather than for

8    the court." *Mathews*, 485 U.S. at 63.  When a defendant contends on appeal "that he

9    was entrapped as a matter of law," he is mounting "in substance an attack on the

10   sufficiency of the government's evidence of predisposition."  *Salerno*, 66 F.3d at 547;

11   *see*, *e.g.*, *United States v. Harvey*, 991 F.2d 981, 992 (2d Cir. 1993).  And when we

12   consider such a contention on appeal--the jury having found beyond a reasonable

13   doubt that the government established predisposition--we view the evidence in the

14   light most favorable to the government, drawing all reasonable inferences in its favor.

15   *See*, *e.g.*, *Salerno*, 66 F.3d at 547.

16                   Here, defendants contend that the government failed as a matter of law

17   to establish their predisposition to commit the charged crime of importing cocaine

18   into the United States, arguing that no rational juror could have found either that

1    their responses at their October meeting with Sentado evinced their ready willingness

2    to commit that crime or that they were generally involved in international drug

3    trafficking prior to that meeting. (*See*, *e.g.*, Campo brief on appeal at 32-36.) Given the

4    record, we reject these contentions.

5          As to an existing course of similar conduct, there was ample evidence

6    that defendants had long been involved in drug trafficking, including internationally,

7    well before they had any contact with anyone connected with the United States

8    Government; at their various October meetings in Venezuela, they told the CSes

9    about some of their drug trafficking experiences.  For example, at their first meeting

10   with Santos-Pena and Santos-Hernandez on October 23, Campo said that defendants

11   had been doing drug trafficking business with Mexicans. (*See* Tr. 619-20; GX 203-T

12   at 25.)  Campo also described a bad incident in which he had accepted a shipment

13   from a recommended narcotics supplier "relying on the fact that it has a certain

14   purity"; "they told me that it was one thing and something different arrived," and "I

15   lost money." (GX 201-T at 4-5.)  However, Campo left no doubt that defendants'

16   overall history in the business had been extensive and profitable.  At defendants'

17   October 26 meeting with the CSes, Campo said "I'm thirty years old, [U/I] thirty years

18   old.  I've been doing this work since I was eighteen"; he said "we have made money.

1    And ever since we started making money, we've been flashy. . . . [W]e have Ferraris"

2    and a "level of comfort that . . . is not going to go away because of a measly ten

3    million dollar deal."  (GX 207-T at 6.)

4              Campo's boasts that defendants had a sizable ongoing drug trafficking

5    business prior to October 2015 were supported by the texts of August and September

6    2015 found on the phones seized from defendants when they were arrested.  They

7    encompassed hundreds of messages from, to, or between Campo and Flores and

8    other drug traffickers, revealing other discussions of "looking for work," "sell[ing

9    1000] chairs for the party" at "200 per unit," the availability of "pilot[s]," and hoping

10   "to purchase" a "big" airplane "as soon as we are able."  For example:

11            ■ On August 7, Flores wrote to Campo that he had run into an
12            individual called "Pepero" or "Pepe," and that Pepe was "[l]ooking for
13            work."  (GX 405-T at 5.)

14            ■ On August 18, Campo contacted Pepe, saying, "My cousin gave
15            me your number."  (GX 408-T at 2.)

16            ■ On August 25, Pepe sent Campo an exchange of messages with
17            a person named "Mayweather" and wrote that "he has two with a pilot
18            and co-pilot," and Campo responded "[h]ere we go this is going to work
19            out for us."  (GX 408-T at 4-5.)

20            ■ On August 31, when Flores asked Pepe "[w]here do we send the g5"
21            (apparently referring to a Gulfstream V jet (*see* Tr. 204)), Pepe responded:  "It's
22            going for *el sombrero*."  (GX 515-T at 3 (italics in original).)

1          ■  On September 7, Pepe informed Campo he was "talking with
2      the people they want us to sell them the chairs for the party then they
3      will give us the papers."  (GX 408-T at 16.)  Pepe told Campo "we can
4      charge them 200 per unit if it's 1000 we will be left with 200 thousand."
5      (*Id*.)

6          ■  On September 16, Pepe sent Flores an exchange of messages in
7      which Mayweather--apparently referring to models of Cessna piston
8      engine aircrafts--had asked Pepe if they could use either a "402" or "404"
9      because "[t]hose are the ones which are available" (GX 515-T at 7); Flores
10     responded that the planes "ha[d] to be bigger" (*id*. at 9).

11         ■  Pepe relayed that message to Mayweather, who responded on
12     September 17 that he was "on the move already" looking for "a big one"
13     "[w]ith turbines."  (GX 515-T at 10.)  Pepe sent this exchange to Flores,
14     who responded:  "Okay let's wait."  (*Id*.)

15         ■  On September 20, when Pepe informed Flores that "[t]he other
16     big lift is ready"; Flores responded "[a]wesome," told Pepe "[w]e are
17     waiting to purchase one as soon as we are able to," and sent a picture of
18     a Learjet plane for sale at $128,500.  (GX 515-T at 11-12.)

19         ■    However, on September 25, Pepe sent Flores a series of
20     messages with Mayweather in which Mayweather indicated that the
21     "captain" had been unable to obtain the necessary permit.  (GX 515-T
22     at 16-17.)  Campo promptly texted Pepe that he was frustrated at having
23     been "postponed twice already," which made him look bad (GX 408-T
24     at 18-19), and said he had found "someone else to do it with" (*id*. at 18).

25         ■  In texts on September 28, 2015, between Flores and Pepe, Pepe stated
26     that "*the taco people* will be arriving today."  (GX 515-T at 9 (emphasis added).)

27         ■  In the afternoon of October 1, Campo stated that he was "tired
28     of waiting" and told Pepe he was "making arrangements with other
29     people" (GX 408-T at 26)--presumably Flaco.

■ In a text conversation on the night of October 1, 2015, Campo and his associate "Gilson" discussed plans to charter a plane to fly between Venezuela and San Pedro Sula, Honduras, which would cost around $20,000, and the need to have copies of the passengers' passports (GX 407-T at 19-21).

Thus, the thrust of defendants' conversations prior to October 3, 2015, revealed their efforts to obtain money by, *inter alia*, flying cocaine from Venezuela to buyers in other countries:  expressly to Honduras, as texted on October 1, and implicitly--given the references to the sombreros and taco people, as the government argued without objection--to Mexico.  Campo's frustration over delays by other would-be drug trafficking partners was what led defendants to go to Honduras on October 3 to meet with Sentado as recommended by Flaco--a Honduras-based Colombian drug trafficker who had no connection with the United States government.  The jury could easily view defendants' prior attempts to fly cocaine to drug traffickers in other countries as similar to the conduct charged here.

Finally, as to proof of predisposition through a defendant's response of ready willingness to commit the crime charged, there was abundant evidence of enthusiasm on the part of Campo and Flores for this crime.  In challenging the sufficiency of the government's evidence of predisposition to have their cocaine introduced into the United States, defendants emphasize that there was no recording

1    of the October 3 meeting with Sentado --their first meeting with anyone working with

2    the DEA--and thus no direct evidence of what was said at that meeting. But this

3    argument is a non sequitur. If at the October 3 meeting there was no indication that

4    the cocaine offered by defendants would be destined for the United States, then there

5    was no inducement by the government at that time.

6           And if there was such discussion of the United States at that October 3

7    meeting, the evidence showed that defendants signed on with alacrity, as on October

8    4 they told their cohort Pepe that they had found another buyer; and on October 5

9    they were urging more speed by Sentado and his associates. As chronicled by the

10   district court (referring to Campo as "Campo Flores," and to Flores as "Flores de

11   Freitas"), defendants' immediate responses to whatever was discussed on October 3

12   included the following:

13             ■ . . . [O]n October 4, 2015, Flores de Freitas told Pepe that
14             Defendants "already did it [somewhere] else[]." GX 515-T at 26.

15             ■ On October 4, 2015, Defendants discussed "security
16             logistics" and purchasing several new BlackBerrys. GX 402-T
17             at 2-3; GX 510-T at 16.

18             ■ On October 5, 2015, Flores de Freitas reached out to one
19             of Sentado's associates, Rayo, to complain that "[t]he man has not
20             given the name of the contact to primo." *See* GX 504-T at 2.

> ■ On October 5, 2015, Campo Flores explained to Sentado that "[w]hat I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work." GX 3508-38-T; Tr. 475.
>
> ■ On October 12, 2015, Flores de Freitas asked Rayo "[w]hat happened to the man he hasn't been in touch with *el primo* for a while and we're ready;" then subsequently explained that "[e]verything is good brother just waiting to receive your visit over here." GX 504-T at 3.

Posttrial Order, 2017 WL 1133430, at *4. In sum, the record showed that "[i]mmediately after their October 3, 2015 meeting with Sentado in Honduras, Defendants were eager to proceed full steam ahead with the scheme." *Id.*

Finally, even if at the October 3 meeting with Sentado there was no mention of selling cocaine in the United States, it is indisputable that distribution in the United States was discussed at the next meetings of Campo and Flores with Sentado's supposed associate Santos-Pena. Defendants first met Santos-Pena on October 23 and met with him again on October 26 and 27. As discussed in Parts I.A.2.a. and II.B.1. above, the recordings of defendants' first meeting with Santos-Pena show that in that October 23 meeting, when Campo complained about being unable to reach Sentado, Santos-Pena said "I am the person who is responsible for taking everything to the United States" (GX 203-T at 6), and nothing indicated that

1    defendants evinced any hesitation or reservation about proceeding.  Far from it.  The

2    discussions promptly turned to money and methods.  Campo said he "need[ed]

3    twenty million dollars" "by December" because "my mom is running for the election"

4    (*id*. at 11); and they discussed the logistics of transporting the cocaine to Honduras

5    (*see id*. at 9-10, 13-14).  Campo volunteered that he might be able to provide an

6    airplane; and he indicated that he had done similar business with other Mexicans (*see*

7    *id*. at 25).

8              In sum, upon mention that the drugs would be sold in the United States,

9    there was no semblance of any reluctance or hesitation by these defendants, who had

10   spent the previous two months attempting to get partners for their plans to fly

11   cocaine to other countries.  Defendants' challenge to the sufficiency of the evidence

12   of predisposition is meritless.

13   C.  *Sentencing*

14             The presentence report ("PSR") prepared for each defendant calculated

15   a base offense level of 38 based on drug quantity, *see* Guidelines §§ 2D1.1(a)(5) and

16   2D1.1(c), and recommended several increases for various enhancements or

17   adjustments.  The district court, after hearing argument on defendants' objections,

1 ruled that three two-step increases should be applied, bringing each defendant's total

2 offense level to 44, which was reduced to the Guidelines maximum of 43.  For that

3 level, the Guidelines recommend life imprisonment.  The government sought a

4 below-Guidelines sentence of 360 months.

5   The district court concluded that either the Guidelines-recommended life

6 imprisonment or the government-requested 360 months' imprisonment would be "the

7 equivalent of a life sentence" and therefore "too harsh."  (Sentencing Transcript

8 ("S.Tr.") at 42-43.)  It stated,

9    I'm going to impose a sentence of 216 months which will
10   put this case at the offense level of 36, which I think is
11   appropriate, considering all the circumstances, the nature and the
12   circumstances of the offense and the history and characteristics of
13   Mr. Flores De Freitas and Mr. Campo Flores.

14 (*Id*. at 43.)  The court also ordered each defendant to pay a fine of $50,000, plus the

15 mandatory special assessment of $100.

16   On appeal, defendants challenge two of the offense level increases found

17 appropriate by the district court:  (1) a two-step adjustment for defendants' roles in

18 the conspiracy as supervisors or leaders of criminal activity, *see* Guidelines § 3B1.1(c);

19 and (2) a two-step enhancement for use of a private aircraft for importation, *see id*.

20 § 2D1.1(b)(3)(A).  We reject both challenges; only the second requires extended

1     discussion.

2          1.  *The Supervisory Role Adjustments*

3          The Guidelines recommend a two-step increase in offense level for a

4     defendant convicted of nonextensive criminal activity in which he was an organizer,

5     leader, manager, or supervisor of at least one other participant, but of fewer than four

6     other participants.  *See* Guidelines § 3B1.1(c); *id.* Application Note 2; *see, e.g., Garcia*,

7     413 F.3d at 223.  A "participant" for purposes of § 3B1.1 is "a person who is criminally

8     responsible for the commission of the offense, but [who] need not have been

9     convicted."  Guidelines § 3B1.1 Application Note 1; *see, e.g., United States v. Ware*, 577

10    F.3d 442, 453 (2d Cir. 2009).  In imposing such a role adjustment, the court is required

11    to make findings that are sufficiently specific to permit meaningful appellate review.

12    *See, e.g., United States v. Skys*, 637 F.3d 146, 156-57 (2d Cir. 2011) ("*Skys*").  When the

13    court meets this standard, its findings of fact will be overturned only if they are

14    clearly erroneous.  *See, e.g., United States v. Napoli*, 179 F.3d 1, 14-15 (2d Cir. 1999); *see*

15    *generally United States v. Persico*, 164 F.3d 796, 804 (2d Cir. 1999).

16          Defendants, principally citing *Skys*, contend that the district court erred

17    in applying role increases to them because it did not sufficiently identify any other

70

1 person who was criminally responsible for the conspiracy and who was supervised

2 or led by either defendant.  (*See* Flores brief on appeal at 54-58.)  We disagree.

3         *Skys* was a case in which the district court found the defendant to have

4 organized an "extensive" fraudulent operation in which the court found he "had" one

5 named individual about whose knowledge of the fraud there was little evidence, and

6 "had the *unwitting* participation of other people at . . . financial institutions."  637 F.3d

7 at 156 (emphasis added).  We concluded that these findings were insufficient to

8 permit meaningful appellate review and required a remand for clarification or further

9 proceedings.

10         In the present case, in contrast, the district court found, after considerable

11 discussion, that Campo and Flores "were organizers and leaders" of the conspiracy

12 and that "[t]he participants that they led and organized were Pepe, Gocho, Daza at

13 least, and [Carlos] Gonzalez, as well, plus the one bodyguard Modino [*sic*] Moreno

14 who was there with Mr. Flores De Freitas in [Honduras] on the 6th of November of

15 2015."  (Hearing Transcript, October 3, 2017, at 56-57; *see* Flores brief on appeal at 55

16 n.12 ("'*Modino* Moreno' is not an individual who appears anywhere in the record,

17 though the District Court was likely referring to Jesfran Josnel Moreno, one of Flores's

18 bodyguards" (emphasis ours)).)

1     The court's statement was sufficient, in light of the trial record, to name

2     at least one criminally culpable person directed by Flores and one by Campo, and to

3     permit meaningful appellate review. The court found that Flores brought Moreno to

4     the November 6 meeting, which is described in Part I.A.2.c. above. Moreno served

5     as Flores's bodyguard at that meeting, at which Flores was advised about the most

6     suitable days and times to have a drug shipment arrive at the Honduras airport, and

7     at which Flores told Gomez that defendants would have a plane arrive with their first

8     shipment of cocaine late in the afternoon on November 15. With respect to Campo,

9     although the district court's findings did not elaborate on the actions and functions

10    of Pepe, Gocho, Daza, or Carlos Gonzalez, the trial record contained ample evidence

11    of the participation of at least Pepe, Gocho, and Daza in the drug trafficking

12    conspiracy. As to Daza in particular (who, as noted in Part I.A.1. above, was called

13    "Flacco"), there was evidence that it was he who had introduced Campo and Flores,

14    in their quest for cocaine distributors, to Sentado (*see id*.); and at defendants' October

15    26 meeting with the CSes, Campo referred to Daza as "my guy" (GX 208-T at 29), as

16    his "very responsible" and "super loyal" guy in Honduras (GX 207-T at 18), who, for

17    his role, would be paid by Campo (*see* GX 205-T at 50-51).

18    In light of the record, we see no error in the district court's findings that

1    Flores and Campo each supervised or directed at least one other criminally culpable

2    person.


3        2.  *The Enhancement for Private Aircraft*

4            Guidelines § 2D1.1's subsection (b), "Specific Offense Characteristics"

5    ("SOCs"), provides that a defendant's offense level is to be increased by two steps

6        *[i]f the defendant unlawfully imported* or exported *a controlled*
7        *substance under circumstances in which **(A)** an aircraft other than a*
8        *regularly scheduled commercial air carrier **was used** to import* or
9        export *the controlled substance,* (B) a submersible vessel or semi-
10       submersible vessel as described in 18 U.S.C. § 2285 was used, or
11       (C) the defendant acted as a pilot, copilot, captain, navigator,
12       flight officer, or any other operation officer aboard any craft or
13       vessel carrying a controlled substance.

14   Guidelines § 2D1.1(b)(3) (emphases added). The district court applied part (A) of this

15   SOC to Campo and Flores based on their plan to have the 800 kilograms of cocaine

16   flown from Venezuela to Honduras on an airplane coming from the "'president's

17   hangar'" (Tr. 1159 (quoting GX 222-T at 18)).

18           Defendants contend that, given part (A)'s phrase "was used," employing

19   the past tense, and given that the present prosecution resulted from a sting operation,

20   and the conspiracy did not result in any actual importation of cocaine into the United

73

1     States or the actual use of an aircraft to carry cocaine, the district court's application

2     of § 2D1.1(b)(3)(A) to them was error. (*See* Flores brief on appeal at 52-54.) In support

3     of this contention, defendants rely on decisions of the Ninth and Eleventh Circuits in

4     *United States v. Joelson*, 7 F.3d 174, 180 (9th Cir.) ("*Joelson*"), *cert. denied*, 510 U.S. 1019

5     (1993), and *United States v. Chastain*, 198 F.3d 1338, 1353 (11th Cir. 1999) ("*Chastain*"),

6     *cert. denied*, 532 U.S. 996 (2001).

7           Reviewing the district court's interpretation of the Guidelines *de novo*, *see*,

8     *e.g.*, *United States v. Valente*, 915 F.3d 916, 921 (2d Cir. 2019), we are not persuaded to

9     follow the decisions of *Joelson* and *Chastain* for the reasons we explain below. We

10     begin with observations as to the penalties prescribed by 21 U.S.C. § 963 for drug

11     conspiracies and the evolution of Guidelines §§ 2D1.1 and 2D1.1(b)(3)(A).

12          a. *Statutory Penalties Prescribed for Conspiracy Offenses*

13           Most federal criminal statutes prohibit completed substantive offenses;

14     conspiracies to violate such sections are generally prohibited by the umbrella

15     provisions of 18 U.S.C. § 371 (imposing a penalty of, *inter alia*, up to five years'

16     imprisonment if "two or more persons conspire either to commit any [felony] offense

17     against the United States, or to defraud the United States, or any agency thereof in

74

1    any manner or for any purpose, and one or more of such persons do any act to effect

2    the object of the conspiracy").

3           A few criminal statutes, such as the Hobbs Act and certain provisions of

4    the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA") and the

5    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), prohibit

6    conspiracies in the same section that prohibits the substantive crimes that are the

7    objects of the conspiracy. *See, e.g.*, Hobbs Act, 18 U.S.C. § 1951 (authorizing a penalty

8    of, *inter alia*, up to 25 years' imprisonment for a person who "in any way or degree

9    obstructs, delays, or affects commerce . . . by robbery or extortion or attempts *or*

10    *conspires so to do*" (emphasis added)); VCCLEA, 18 U.S.C. § 2332a (authorizing, *inter*

11    *alia*, "imprison[ment] for any term of years or for life" for "[a] person who, without

12    lawful authority, *uses*, threatens, or attempts *or conspires to use*, a weapon of mass

13    destruction" against certain persons or facilities (emphases added)); AEDPA,

14    18 U.S.C. § 2339B (authorizing, *inter alia*, up to 20 years' imprisonment for a person

15    who "knowingly *provides material support or resources to a foreign terrorist organization*,

16    or attempts *or conspires to do so*" (emphases added)). For these types of offenses, the

17    penalties authorized for conspiracy to commit the substantive offense are not found

18    in § 371. Rather the section that expressly prohibits substantive offenses and

1  conspiracy to commit those offenses also specifies the applicable penalties--but

2  without an indication as to Congress's view of the two categories' comparative

3  seriousness.

4          The Controlled Substances Act--comprising a subchapter called "Control

5  and Enforcement," 21 U.S.C. §§ 801-904, and a subchapter called "Import and Export,"

6  *id*. at §§ 951-971--is different. It contains two provisions that deal solely with attempts

7  and conspiracies, *i.e.*, 21 U.S.C. §§ 846 and 963. In contrast to the above provisions of

8  Title 18, these two sections provide that

9          [a]ny person who attempts or *conspires* to commit any offense
10         defined in this subchapter *shall be subject to the same penalties as*
11         *those prescribed for the offense*, the commission of which was the
12         *object of the* attempt or *conspiracy*.

13  21 U.S.C. §§ 846, 963 (emphases added).

14     b. *Guidelines § 2D1.1 and Prior § 2D1.4*

15         When the Guidelines were first promulgated in 1987, § 2D1.1 was titled

16  "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession

17  with Intent to Commit These Offenses)." At that time (and until 1992), § 2D1.1 was

18  not expressly applicable to conspiracies. Instead, the Guidelines included a separate

76

1   section, § 2D1.4, captioned "Attempts and Conspiracies," which provided as follows:

2           Base Offense Level:  If a defendant is convicted of participating in
3           an incomplete conspiracy or an attempt to commit any offense
4           involving a controlled substance, *the offense level shall be the same*
5           *as if the object of the conspiracy* or attempt *had been completed*.

6   Guidelines § 2D1.4 (1987) (emphases added).  This initiated application of the

7   provisions of 21 U.S.C. §§ 846 and 963--that the penalties for drug conspiracy be the

8   same as for the drug offense that was the object of the conspiracy--by providing that

9   the defendant's base offense level would be the same for either.

10          Although no specific offense characteristics were specified in § 2D1.4, we

11  think the Guidelines implicitly intended that the SOCs to be used in calculating the

12  offense level of a person convicted of a given substantive drug trafficking offense

13  should also be applied to one convicted of conspiracy to commit that offense.  As the

14  Guidelines themselves note, among Congress's goals in enacting the Sentencing

15  Reform Act of 1984, *see* 28 U.S.C. §§ 991-998; 18 U.S.C. §§ 3551-3586--and calling for

16  the creation of guidelines--were the achievement of "proportionality in sentencing

17  through a system that imposes appropriately different sentences for criminal conduct

18  of different severity," as well as "uniformity" by reducing the "disparity in sentences

19  imposed" for similar defendants "*for similar criminal conduct*."  Guidelines Chapter 1,

1    Part A, at 1.2 (1987) (emphasis added).  Accordingly, given that Congress in §§ 846

2    and 963 expressly provided that a person convicted of conspiracy to commit a

3    substantive drug trafficking offense be subject to the same penalties as if he had

4    committed that substantive offense, we infer that the Guidelines, in providing offense

5    level enhancements for specific characteristics of drug offenses, were not intended to

6    assign the conspirator and the substantive offender offense levels that differed.

7            In sum, we infer that when the Guidelines included § 2D1.4, they

8    implicitly required that the offense level of a person convicted of conspiring to

9    commit a drug trafficking offense be calculated with reference to § 2D1.1(b) specific

10   offense characteristics that would have affected his offense level if he had been

11   convicted of that substantive offense.


12        c.  *Section 2D1.1 and "Specific Offense Characteristics"*

13           The specific offense characteristic set out in § 2D1.1(b)(3) has been so-

14   numbered since 2010.  *See* Guidelines Appendix C, Vol. III, Amendment 748, at 374

15   (eff. Nov. 1, 2010).  It has existed in its present form, with three subparts, since 2009.

16   *See* Guidelines Appendix C, Vol. III, Amendment 728, at 314 (eff. Nov. 1, 2009)

17   (inserting part (B) after part (A), and redesignating the previous part (B) as (C)).

1    Prior to 1989, § 2D1.1's subsection (b) set out only one specific offense

2    characteristic; it prescribed a two-step increase in offense level if a dangerous weapon

3    such as a firearm "was possessed," Guidelines § 2D1.1(b)(1) (1988).  In 1989, the

4    subsection was amended to add a second SOC, *see* Guidelines Appendix C, Vol. I,

5    Amendment 134, at 72 (eff. Nov. 1, 1989), the precursor of the current § 2D1.1(b)(3).

6    It provided for at least a two-step increase in offense level

7        [i]f the defendant is convicted of violating 21 U.S.C. § 960(a) under
8        circumstances in which (A) an aircraft other than a regularly
9        scheduled commercial air carrier was used to import the
10       controlled substance, or (B) the defendant acted as a pilot, copilot,
11       captain, navigator, flight officer, or any other operation officer
12       aboard any craft or vessel carrying a controlled substance.

13   Guidelines § 2D1.1(b)(2) (1989); *see also id.* (providing that if the result of this increase

14   brought the defendant's offense level to less than 26, his offense level should be raised

15   to 26).

16   In 1992, Guidelines Amendment No. 446 amended then- § 2D1.1(b)(2),

17   to the extent pertinent here, by adding a reference to exportation, and by deleting the

18   reference to a conviction under § 960(a) and referring instead to a defendant who

19   "unlawfully imported or exported a controlled substance."  Guidelines Appendix C,

20   Vol. I, Amendment 446, at 320 (eff. Nov. 1, 1992).  Thus, the then-§ 2D1.1(b)(2)

79

1    provided for the at-least-two-step increase

2          [i]f *the defendant unlawfully imported or exported* a controlled
3          substance under circumstances in which (A) an aircraft other than
4          a regularly scheduled commercial air carrier was used to import
5          or export the controlled substance, or (B) the defendant acted as
6          a pilot, copilot, captain, navigator, flight officer, or any other
7          operation officer aboard any craft or vessel carrying a controlled
8          substance.

9    Guidelines § 2D1.1(b)(2) (1992) (emphasis added).

10          At the same time, the Guidelines were amended to delete § 2D1.4 which

11   had expressly covered Attempts and Conspiracies, and to make § 2D1.1--and 17 other

12   individual drug offense guidelines--expressly applicable to attempts and conspiracies.

13   *See* Guidelines Appendix C, Vol. I, Amendment 447, at 322-24 (eff. Nov. 1, 1992)

14   ("Amendment 447").  To accomplish the latter, Amendment 447 listed each of the 18

15   guidelines and stated that all "are amended in their titles by inserting at the end

16   thereof in each instance '; Attempt or Conspiracy'." *Id.* at 322.  Accordingly, the title

17   of Guideline 2D1.1 was amended, effective November 1, 1992, to read "Unlawful

18   Manufacturing, Importing, Exporting, or Trafficking (Including Possession with

19   Intent to Commit These Offenses); Attempt or Conspiracy."  As an explanation,

20   Amendment 447 stated only as follows:

21          **Reason for Amendment:** *This amendment clarifies and simplifies the*

80

1           *guideline provisions dealing with attempts and conspiracies in drug*

2           *cases* and conforms the *structure* of these provisions to that of other

3           offense guidelines that specifically address attempts and

4           conspiracies (*i.e.*, offense guidelines referenced by §2X1.1(c)).

5     Amendment 447, at 324 (emphases added). This statement does not suggest that any

6     substantive change in Guidelines treatment of drug offenses was intended.

7           Section 2D1.1 thus became one of the guidelines that, following

8     Amendment 447, is listed in § 2X1.1 as an "Offense guideline[] that expressly cover[s]

9     conspiracies," Guidelines § 2X1.1 Application Note 1. Section 2X1.1 instructs that

10    "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense

11    guideline section, *apply that guideline section*." Guidelines § 2X1.1(c) (emphasis added).

12    As a fundamental matter of interpretation, the Guidelines instruct that when one

13    guideline gives "an instruction *to apply* another offense guideline[]," that instruction

14    "refers to the *entire* offense guideline (*i.e.*, the base offense level, *specific offense*

15    *characteristics*, cross references, and special instructions)." Guidelines § 1B1.5(a)

16    (emphases added).

17           Thus, Amendment 447 clarified and made explicit what we view as

18    having been previously implicit. The title of § 2D1.1 was amended to show that that

19    guideline expressly covers drug conspiracies; § 2X1.1 thus identifies § 2D1.1 as a

1    guideline that does so; § 2X1.1(c) therefore instructs courts "to apply" § 2D1.1 to a

2    defendant convicted of a drug conspiracy; and under § 1B1.5(a), that instruction

3    means that the court is to apply to convicted drug trafficking conspirators the entire

4    § 2D1.1 guideline, including its stated specific offense characteristics.  Accordingly,

5    we conclude that the district court properly applied the SOC enhancement in

6    § 2D1.1(b)(3)(A) to Campo and Flores.

7         d.  *The Decisions in* Joelson *and* Chastain

8         The decisions in *Joelson* and *Chastain* do not persuade us to reach a

9    contrary conclusion.  In *Joelson*, the defendant was convicted of having, *inter alia*,

10   conspired in 1990 to import approximately 770 kilograms of cocaine, and having

11   aided and abetted the importation of that cocaine, in violation of 21 U.S.C. §§ 963, 952,

12   and 960.

13        [T]he cocaine was delivered to a landing strip in Guatemala in an
14        Arrow Commander one thousand, which was not a "regularly
15        scheduled commercial air carrier."  The cocaine was unloaded,
16        and DEA agents took the cocaine, stored it, and ultimately flew it
17        into the United States on a commercial Pan Am flight.

18   *Joelson*, 7 F.3d at 179-80.  The district court's calculation of Joelson's sentence included

19   a two-step increase in offense level pursuant to the private aircraft enhancement in

82

1    then-§ 2D1.1(b)(2)(A).

2    Joelson argued that that increase was error based on the past-tense

3    meaning of "was used" in then-§ 2D1.1(b)(2)(A).  The Ninth Circuit agreed and

4    remanded for resentencing without the two-step increase:

5    Joelson argues, and we agree, that the *plain language* of
6    section 2D1.1(b)(2) should be given effect.  The cocaine was
7    imported from the landing strip in Guatemala to the United
8    States.  Although *a private plane flew the cocaine to Guatemala, a*
9    *commercial Pan Am air carrier "**was used** to import" the cocaine into*
10   *the United States*.  *See* U.S.S.G.  § 2D1.1(b)(2).  *Stretching the*
11   *definition of "used to import" to incorporate any use of a private*
12   *airplane, regardless of whether it was used during the actual importation*
13   *of the cocaine, flies in the face of the "plain language" of section*
14   *2D1.1(b)(2)*. . . .  Moreover, nothing in the commentary to section
15   2D1.1(b)(2) compels a contrary conclusion. . . .

16   The government also argues that a two-level increase in the
17   offense level under section 2D1.1(b)(2) was proper because the
18   coconspirators *intended* to use a private airplane to import the
19   cocaine.  We disagree.  Section 2D1.1(b)(2) provides for a two-
20   level increase only if an aircraft other than a regularly scheduled
21   commercial air carrier *was used* to import the cocaine.  It does not
22   provide for an increase when the parties merely intended to use
23   a private airplane.

24   *Joelson*, 7 F.3d at 180 (emphases ours).

25   We question this reliance on the SOC's use of the past tense.  The

26   defendant in *Joelson* was sentenced in 1991, at a time when, as indicated in Part

83

1    II.C.2.c. above, Guidelines § 2D1.1 applied to convictions for "Unlawful

2    Manufacturing, Importing, Exporting, or Trafficking (Including Possession with

3    Intent to Commit These Offenses)" but did not cover conspiracies expressly. Given

4    that until late 1992 § 2D1.1 was only expressly applicable to completed offenses, it is

5    not surprising that its SOCs were described in language that used the past tense. Our

6    analysis in Parts II.C.2.a.-c. above, leading to the conclusion that the guidelines

7    applicable to a conviction under § 963 previously implicitly required--and now

8    explicitly require--application of the § 2D1.1(b) private aircraft enhancement to drug

9    trafficking conspirators as well as to those convicted of the substantive drug offense

10   that was the object of the conspiracy, is not refuted by the simple fact that part of a

11   guideline which was promulgated when the guideline only expressly covered

12   completed offenses was phrased in the past tense.

13          In *Chastain*, the defendants had been involved in several months of

14   mishaps, discussions, and negotiations in 1996 with a view to obtaining an airplane

15   in order to bring a large quantity of marijuana from Jamaica to the United States. *See*

16   198 F.3d at 1344-47. They were arrested before any flight was made to Jamaica to pick

17   up the drugs and were convicted of attempting and conspiring to import marijuana

18   into the United States in violation of 21 U.S.C. §§ 963 and 952(a). The district court's

1    calculation of the appellants' sentences included a two-step increase in offense level

2    pursuant to then-§ 2D1.1(b)(2)(A) for use of a private aircraft. The appellants

3    contended that that increase was error, and the Eleventh Circuit--relying in part on

4    *Joelson*--agreed:

5            Appellants . . . challenge the district court's application of
6    a two-level upward adjustment for *their plan to use* a private plane
7    to import narcotics, pursuant to U.S.S.G. § 2D1.1(b)(2).
8    § 2D1.1(b)(2) states, *inter alia*, that "If the defendant unlawfully
9    imported or exported a controlled substance under circumstances
10    in which an aircraft other than a regularly scheduled commercial
11    air carrier *was used* to import or export the controlled substance,
12    ... increase by two levels."

13            Appellants argue that the enhancement was inappropriate
14    because no *actual* importation or "use" occurred on these facts. *The*
15    *district court below, in applying the enhancement, endorsed a broad*
16    *interpretation of the plain language of the guidelines, relying on the*
17    *terms "Attempt or Conspiracy" found in the title of § 2D1.1.*

18            The Ninth Circuit, previously confronted with interpreting
19    § 2D1.1(b)(2), held that the *intent to use a private plane was not*
20    *enough to warrant the two-level enhancement. See United States v.*
21    *Joelson*, 7 F.3d 174, 180 (9th Cir. 1993) (*cert. denied*, 510 U.S. 1019,
22    114 S.Ct. 620, 126 L.Ed.2d 584). In Appellants' case, there was
23    clearly an attempt and a conspiracy, on which the district court
24    relied in applying this enhancement. However, *the plain language*
25    *of the guideline that uses the past tense, viz "used to import," cannot be*
26    *ignored. When the language of the guideline is clear, it is not necessary*
27    *to look elsewhere for interpretation.* Here, the language of the
28    guideline clearly contemplates a completed event, an actual
29    importation. That did not occur in this case. *The Court will not look*

1          *to the title of a guideline to explain what is quite clear in its text*.

2          Thus, the district court's reliance on the terms in the title as
3          explanatory of the guideline is misplaced.  The two-level increase
4          as applied to these three Appellants, therefore, was an error of
5          law.

6     *Chastain*, 198 F.3d at 1353 (emphases ours).

7          The events at issue in *Chastain* occurred in 1996; by that time, § 2D1.1 of

8     the Guidelines had been made expressly applicable to attempts and conspiracies.

9     Thus, we disagree with the decision in *Chastain* for two reasons.  First, as discussed

10    above with respect to *Joelson*, the past-tense phrasing on which that decision and the

11    *Chastain* decision relied was adopted at a time when attempts and conspiracies were

12    not expressly covered by 2D1.1.  Use of the past tense with respect to completed

13    crimes strikes us not as prescriptive but descriptive.

14         Second, we think the *Chastain* Court, in finding that the district court

15    erred in relying on the fact that the title of § 2D1.1 by then included attempts and

16    conspiracies, gave insufficient deference to the manner in which the Guidelines

17    drafters chose to indicate in 1992 that § 2D1.1 was amended to cover attempts and

18    conspiracies expressly.  In dealing with statutes, and attempting to fathom what

19    Congress intended, we look to the "factors that typically help courts determine a

1   statute's objectives and thereby illuminate its text," to wit, "the statute's language,

2   structure, subject matter, context, *and history*," *Almendarez-Torres v. United States*, 523

3   U.S. 224, 228 (1998) (emphasis added); and "the title of a statute and the heading of

4   a section are tools available for the resolution of a doubt about the meaning of a

5   statute," *id*. at 234 (internal quotation marks omitted).  Though the Guidelines do not

6   have the force of law, the title of a specific guideline must be viewed as a tool for

7   interpreting the scope of that guideline, especially when, as in Amendment 447, the

8   Sentencing Commission has expressly chosen expansion of the title as the means of

9   "clarif[ying]" the guideline's express scope.

10          We note also that it is hardly clear that the Eleventh Circuit itself

11  continues to follow the holding or reasoning of *Chastain*, as that court has held

12  § 2D1.1(b)(2) applicable to a defendant convicted of conspiracy despite its use of the

13  past tense, either in part (B) or indeed in that SOC's introductory clause--"[i]f the

14  defendant unlawfully impor*ted*" (emphasis added)--which applies to all of its parts.

15  In *United States v. Rendon*, 354 F.3d 1320, 1329-30 (11th Cir. 2003) ("*Rendon*"), the court

16  upheld an offense level enhancement under then-part (B) for a defendant convicted

17  under § 963, who had "*acted* as a . . . captain, . . . aboard a[] craft or vessel *carrying*"

18  cocaine, Guidelines § 2D1.1(b)(2)(B) (2002) (emphases added), despite the fact that the

87

1    cocaine had been jettisoned en route and never reached the United States.  Rejecting

2    the defendant's argument that imposition of the increase was error because the

3    enhancement's all-encompassing "introductory phrase . . . 'if the defendant

4    unlawfully imported or exported a controlled substance,' . . . is in the past tense," 354

5    F.3d at 1330 (quoting then-§ 2D1.1(b)(2)), the *Rendon* court noted that "the general

6    heading of § 2D1.1 provides that the adjustments in § 2D1.1 apply to not only

7    substantive drug offenses, but also to attempt and conspiracy offenses"; the court

8    adopted the reasoning of the First Circuit that an argument based on the

9    enhancement's use of the past tense was "'frivolous,'" 354 F.3d at 1330 (*quoting United*

10   *States v. Rodriguez*, 215 F.3d 110, 124 (1st Cir. 2000) ("*Rodriguez*"), *cert. denied*, 532 U.S.

11   996 (2001)):

12           "*The adjustment in § 2D1.1(b)(2)(B) plainly is to be applied to*
13           *convictions for conspiracy and attempt, so long as the necessary factual*
14           *predicate for the enhancement exists. . . .* [The defendant's] argument
15           is simply that the substantive crime was not committed.  *It simply*
16           *does not matter whether he actually carried the controlled substance; his*
17           *conspiring and his attempt to do so warrant the application of the*
18           *enhancement.*"

19   *Rendon*, 354 F.3d at 1330 (quoting *Rodriguez*, 215 F.3d at 124 (emphases ours)).

20           In sum, 21 U.S.C. § 963 provides that a defendant who has conspired to

21   violate §§ 959 or 960 is to be subject to the same penalties as those prescribed for one

88

1    who has violated those sections.  We conclude for the reasons discussed above that

2    § 2D1.1 of the Guidelines expressly covers both substantive drug trafficking offenses

3    and drug trafficking conspiracies.  Guidelines § 2X1.1 thus instructs courts "to apply"

4    § 2D1.1 to drug conspiracy convictions; and that instruction means that the court is

5    to apply the "entire" § 2D1.1 guideline, "including" its "specific offense characteristics,"

6    Guidelines § 1B1.5(a).  Accordingly, the district court did not err in applying the SOC

7    enhancement in § 2D1.1(b)(3)(A) to calculate the offense levels of Campo and Flores.

8                                         CONCLUSION

9             We have considered all of defendants' arguments on these appeals and

10   have found in them no basis for reversal.  The judgments are affirmed.